**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION**

| | |
|---|---|
| BROOKE HENDERSON and JENNIFER LUMLEY, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Case No. _____ ) ) |
| SCHOOL DISTRICT OF SPRINGFIELD R-12 ("SPRINGFIELD PUBLIC SCHOOLS"), BOARD OF EDUCATION OF THE SCHOOL DISTRICT OF SPRINGFIELD R-12, GRENITA LATHAN in her official capacity as Superintendent of Springfield Public Schools, MARTHA DOENNING in her official capacity as Director of Learning Development for Springfield Public Schools, YVANIA GARCIA-PUSATERI in her official capacity as Chief Equity and Diversity Officer of Springfield Public Schools, and LAWRENCE ANDERSON in his official capacity as Coordinator of Equity and Diversity for Springfield Public Schools, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

---

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

---

**INTRODUCTION**

1.     Public schools are an arm of the government. The First Amendment makes clear that the government cannot discriminate based on viewpoint, cause individuals to self-censor, or force individuals to accept beliefs with which they do not agree.

2.      Unfortunately, that is what Springfield Public Schools ("SPS") is doing. The school district forces teachers and staff to affirm views they do not support, to disclose personal details that they wish to keep private, and to self-censor on matters of public interest.

3.      In its mandatory district-wide staff trainings, SPS demands that its staff "commit" to equity and become "anti-racist educators."

4.      Although "equity" seems like a relatively benign cause—sometimes euphemistically called "social justice," "diversity and inclusion," or "culturally responsive teaching"—it is actually code-speak for a much bigger and more dangerous picture: the practice of conditioning individuals to see each other's skin color first and foremost, then pitting different racial groups against each other.

5.      Equity is very different from equality. Equity is about so-called fairness. Equality is the principle proclaimed in the Declaration of Independence, defended in the Civil War, and codified into law with the Fourteenth and Fifteenth Amendments to Constitution, the Civil Rights Act of 1964, and the Voting Rights Act of 1965. Equality strives for equal opportunity and colorblind treatment under the law, while equity in practice is an official license to punish individuals based on skin color.

6.      SPS requires that as a condition of their employment, all staff attend and participate in "equity training" to "learn about oppression, white supremacy, and systemic racism . . . engage in identity development and understanding . . . [and] become Anti-Racist educators."

2

7.     The district's lessons on oppression, identity, and anti-racism can be summarized by the following image, which staff were required to reflect upon and discuss:



| TYPE OF OPPRESSION | PRIVILEGED SOCIAL GROUP | BORDER SOCIAL GROUPS | OPPRESSED SOCIAL GROUPS | SOCIAL IDENTITY CATEGORY |
|---|---|---|---|---|
| RACISM | White People | Biracial People | Asian, Black, Latina/o, Native People | Race |
| SEXISM | Male assigned at birth | Intersex People | Female assigned at birth | Sex |
| TRANSGENDER OPPRESSION | Gender conforming CIS- men and women | Gender ambiguous CIS- men and women | Transgender, Genderqueer, Intersex People | Gender |
| HETEROSEXISM | Heterosexuals | Bisexuals | Lesbians, Gay men | Sexual Orientation |
| CLASSISM | Rich, Upper Class People | Middle Class People | Working Class, Poor People | Class |
| ABLEISM | Able-bodied People | People with Temporary Disabilities | Disabled People | Ability/Disability |
| RELIGIOUS OPPRESSION | Protestants | Roman Catholic (historically) | Jews, Muslims, Hindus, Sikhs | Religion |
| AGEISM/ADULTISM | Adults | Young Adults | Elders, Young People | Age |

8.     SPS teaches staff that to be anti-racist, they must "advocat[e] for changes in political, economic, and social life." If they fail to do so, they are "racist."

9.     Slide after slide, image after image, SPS promotes and reinforces a view of race essentialism that divides Americans into oppressor and oppressed based solely on their skin color. SPS sets up a dichotomy between white and non-white races that depicts whiteness as inherently racist and a tool of oppression.

10.     It is well settled that "our Constitution is color-blind, and neither knows nor tolerates classes among citizens." *Plessy v. Ferguson*, 163 U.S. 537, 559 (Harlan, J., dissenting). In fact, this principle became "the rallying cry" for the Civil Rights Movement. *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 772 (2007) (Thomas, J., concurring).

3

11. But through its equity training, SPS teaches staff that colorblindness is a form of white supremacy:



12. SPS teaches staff that "believing we are post-racial" or saying "we're just one human family" are forms of white supremacy.

13. SPS requires staff to discuss how oppression, systemic racism, and white supremacy are present in their community.

14. Staff are required to disclose information about their identity during these exercises, including their age, race, religion, gender, socioeconomic status, and sexual orientation.

15. When SPS facilitators read a statement aloud acknowledging SPS's commitment to so-called equity, staff are told to hold up signs saying "agree."

16. After viewing these images, acknowledging their oppression, discussing white supremacy, and sharing personal views and identifying information, staff are directed to conclude the training by participating in an "Anti-Racist Solo Write," wherein they are expected to disclose the steps they plan to take "to become an Anti-Racist" in conformance with the training's lessons.

4

17.    The district mandates these viewpoints as part of staff's job responsibilities. According to SPS, racial equity "is more than a value, but now part of our work and job responsibilities."

18.    By binding equity to job responsibilities, SPS forecloses any opposition to equity or anti-racism and chills the speech of staff who disagree with those concepts.

19.    Worse still, SPS warns its staff during programming that "white silence" is a form of white supremacy. At the same time, it requires staff to "be professional" and "stay engaged" during break-out discussions "or be asked to leave." SPS puts its staff in the no-win situation of wondering if they should say what they *really* think (at the risk of being asked to leave), repeat what they think the district wants to hear (in conflict with their own beliefs), or not speak at all (at the risk of being labeled a white supremacist).

20.    SPS makes this programming mandatory. If staff opt out, their pay is reduced.

21.    Staff are expected to pass what they learn in the mandatory programming down to their students.

22.    Plaintiffs are all public employees, but even public employees are entitled to First Amendment protection for speech on matters of public concern. *See Morgan v. Robinson*, 881 F.3d 646 (8th Cir. 2018). It is undisputed that "[s]peech about racial discrimination is a matter of public concern." *Katosang v. Wasson-Hunt*, U.S. Dist. LEXIS 122122, at *4 (W.D. Mo. Nov. 18, 2010) (unpublished op.) (quoting *Connick v. Myers*, 461 U.S. 138, 148 (1983)).

23.    Fostering racial identities, promoting the idea that they are in conflict, and perpetuating divisive stereotypes pits individuals against one another based on the color of their skin. SPS's practices take its employees and students further from the truth and reconciliation. Instead, the district's practices divide them into two worlds: the oppressors and the oppressed.

They teach them that their whole identity comes from the color of their skin. They teach them to discriminate against each other. They teach them not only *how* to be racist, but that they *should* be racist.

24.     SPS's policies and programming are unconstitutional. SPS singles out equity as a priority and silences opposing views about the dangers of equity. SPS forces its staff to affirm beliefs with which they simply do not agree, and it chills the speech of those who disagree.

25.     "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). As an arm of the government, SPS must be held accountable to that same standard.

## PARTIES

26.     Plaintiff Brooke Henderson is a 504 Process Coordinator at SPS. Through her role, Brooke advocates for students with disabilities to ensure they have equal access to educational opportunities. Brooke has been in this position for one year, but she has been employed at SPS for approximately twelve years. Prior to her current role, she served SPS in several departments, from coaching, to teaching, to building the curriculum for special education students.

27.     Plaintiff Jennifer Lumley is a Records Secretary for the SPS Special Services Department. In her position, Jennifer handles highly sensitive information regarding student records. She collaborates with internal and external parties to provide academic, medical, and disciplinary records to various sources while protecting students' privacy. Jennifer is entering her second year of employment at SPS.

28.	Defendant School District of Springfield R-12 ("Springfield Public Schools" or "SPS") is a Missouri school district created under the laws of the State of Missouri, with the capacity to sue and be sued in this Court. It is the largest school district in Missouri, serving over 23,500 students from pre-kindergarten to twelfth grade.

29.	Defendant Board of Education of the School District of Springfield R-12 is a body of seven locally elected officials created under the laws of the State of Missouri, with the capacity to sue and be sued in this Court.

30.	Defendant Grenita Lathan is an adult resident of Missouri. She serves as Superintendent of SPS. Defendant Lathan was hired by SPS in July 2021, and from that point forward, she was acting under color of law and within the scope of employment.

31.	Defendant Martha Doenning is an adult resident of Missouri. She serves as Director of Learning Development for SPS. Defendant Doenning is responsible for overseeing and implementing professional development programming for all SPS teachers and staff. At all times relevant to this complaint, Defendant Doenning acted under color of state law and within the scope of employment.

32.	Defendant Yvania Garcia-Pusateri is an adult resident of Missouri. She serves as Chief Equity and Diversity Officer for SPS. Defendant Garcia-Pusateri is responsible for overseeing and implementing equity-oriented professional learning. At all times relevant to this complaint, Defendant Garcia-Pusateri acted under color of state law and within the scope of employment.

33.	Defendant Lawrence Anderson is an adult resident of Missouri. He serves as Coordinator of Equity and Diversity for SPS. Defendant Anderson is responsible for overseeing

and implementing equity-oriented professional learning. At all times relevant to this complaint, Defendant Anderson acted under color of state law and within the scope of employment.

<u>**JURISDICTION AND VENUE**</u>

34.     This case arises directly under the First Amendment to the United States Constitution and 42 U.S.C. § 1983.

35.     The Court has jurisdiction over the complaint under 28 U.S.C. §§ 1331 and 1343.

36.     This Court has authority to issue a declaratory judgment, to order injunctive relief, attorneys' fees and other relief that is necessary and proper pursuant to 28 U.S.C. §§ 2201 and 2202 and 42 U.S.C. §§ 1983 and 1988.

37.     Venue is appropriate in this district under 28 U.S.C. § 1391(e)(1). A substantial part of the events giving rise to this claim occurred in this district, Plaintiffs reside in this district, Defendants maintain one or more offices and employees in this district, and a substantial part of the property subject to this action is situated in this district.

<u>**FACTS**</u>

**Background**

38.     SPS maintains a Strategic Plan that "represents a collective vision" through five focus areas.

39.     Focus Area 2 is called "Empowered and Effective Teachers, Leaders and Support Personnel."

40.     Its stated goal is to "[c]reate a culture that empowers employees and provides each student access to a qualified and effective teacher in every classroom, an effective principal in every school and an effective employee in every position."

8

41.     Strategies to reach that goal include the need to foster "an understanding of culture, climate and professional expectations supported through monitoring of professional growth and practice," "[r]ecruit, hire, develop, support and retain an effective, qualified and diverse workforce," and implement "appropriate job-embedded professional learning for all staff focused on creating and supporting relevant and engaging learning environments for every student[.]"

42.     Focus Area 5 says SPS is committed to "equity and diversity." Goal 1 of Focus Area 5 is to "[c]reate and sustain a learning environment that supports equity and diversity through the development of staff, expanding diverse workforce, enhancing academic supports and culturally relevant curriculum while promoting increased engagement and advocacy of underrepresented and under-resourced students."

43.     Expressed strategies include presenting learning opportunities that "foster exploration of identity and self," "expand[ing] the curriculum to reflect student identities, lived experiences, cultural history and significant contributions," and deploying "engagement and advocacy" policies that "foster greater community engagement."

44.     SPS implemented its equity and diversity initiative as part of the district's strategic plan with "measurable goals and outcomes to ensure we are creating an inclusive, equitable, accessible and affirming learning and working environment for all students and staff." SPS openly states that because equity is part of its Strategic Plan, it "is more than a value, but now part of our work and job responsibilities." In that vein, SPS demands that its staff be "accountable in this work" and tells staff they "must commit" to equity.

**Mandatory 2020 Fall District-Wide Equity Training**

45.     During the 2020-2021 school year, SPS conducted district-wide equity training in line with Focus Areas 2 and 5.

9

46.    All staff were required to participate in the training to meet their mandatory credit hours. SPS warned staff that if they did not participate, their pay would be reduced.

47.    The equity training was made available to staff at different times and in different formats. Some trainings were in-person, and some were conducted online through Zoom.

48.    Regardless of format, the materials used in the training were substantially the same throughout the district.

49.    Throughout the training, staff were periodically directed to break up into small groups and share thoughts, personal details, and reactions to topics raised by the facilitator, whether they wished to do so or not.

50.    Staff might find themselves in small group discussions with supervisors, including principals.

51.    After small group discussions, staff were directed to reconvene as a large group and share thoughts, personal details, and reactions to topics. These discussions also included supervisors.

52.    The expressed goal of the equity training was to create a shared understanding of "identity and self" and "complex issues of systemic racism and Xenophobia."

53.    The guiding principles directed staff to "Stay Engaged;" "Lean into your discomfort;" and "Acknowledge YOUR privileges."

54.    Staff were also directed to "Be Professional – Or be Asked to Leave with No Credit."

55.    As an overview, staff were told they would learn about topics like "Oppression, White Supremacy, and Systemic Racism," receive tools on "how to become Anti-Racist educators," and share and dialogue in small and large group format.

10

56.     The equity training included several interactive exercises.

57.     For example, the first activity during the presentation involved a reflection video about George Floyd.

58.      The video is eight minutes long and is silent.

59.     During the eight minutes, the final words of George Floyd are flashed onto the screen.

60.     Following the viewing, staff were put into small groups to share how they felt while watching the video. SPS required staff to disclose their reactions.

61.     Staff were expected to share their opinions on the video with the larger group. If they did not share, they could be called on.

62.     Also during the training, SPS displayed the "Oppression Matrix" depicted in paragraph 7 to staff.

63.     SPS required staff to identify where they fall on the oppression matrix.

64.     Staff were put into small groups to share their reactions to the matrix through discussions, regardless of whether they wished to do so.

65.     Then staff were expected to share their reactions with the larger group. If staff did not share, they could be called on.

66.     Next, SPS displayed the following definition for "white supremacy," calling it "the all-encompassing centrality and assumed superiority of people defined and perceived as white":



67.     On the next slide, SPS showed staff a video called "Understanding White Supremacy."

68.     Although SPS stated that white supremacy does not merely refer to extreme hate groups, the first image in the "Understanding White Supremacy" video was a cartoon of a man wearing a white robe and a white pointed hood.

69.     After showing the video, SPS displayed the Covert/Overt White Supremacy image displayed in paragraph 11 to staff.

70.     Again, staff were told to share their reactions to the image.

71.     Some staff were also shown the following White Supremacy Pyramid, which teaches that the political campaign slogan, "Make America Great Again," is a form of white supremacy:



72.     SPS then displayed a Social Identities circle and required staff to complete the chart. The chart lists various immutable traits and directs staff to rank their identities based on the five prompts depicted below:



13

73. The training concluded with an Anti-Racist Solo Write exercise. Staff were told to examine the following Anti-Racism Statement:

    a. "Anti-Racism is defined as the work of actively opposing racism by advocating for changes in political, economic, and social life. Anti-racism tends to be an individualized approach and set up in opposition to individual racist."

74. After reading the statement, SPS instructed staff to answer the following prompts:

    a. How does this statement impact your role at SPS?

    b. What steps will you take to become an Anti-Racist?

    c. What tools/support will you need to be Anti-Racist?

75. Plaintiff Brooke Henderson attended an equity training via Zoom on October 14, 2020. The training was facilitated by Defendants Garcia-Pusateri and Anderson.

76. In the training, staff were reminded, "If you do not participate completely you will get kicked out and will not get credit."

77. Staff were instructed to show they were participating by always keeping their cameras on.

78. Prior to the training, Brooke's department provided Brooke and her colleagues with four paper signs each. The paper signs read: "Strongly Agree"; "Agree"; "Disagree"; and "Strongly Disagree."

79. The department supervisor notified the staff that they would be asked to hold up the signs in response to prompts during the Zoom training.

80. However, the supervisor told Brooke and her colleagues not to hold up the "Disagree" or "Strongly Disagree" signs.

14

81. The supervisor explained that disagreeing with the prompts would be considered disrespectful, and that in a prior Zoom training, a teacher was reprimanded for holding up a "Disagree" sign.

82. Brooke understood the supervisor's remarks to mean that if Brooke disagreed with a statement, she would be kicked out of the Zoom training and would not get credit.

83. During the equity training, SPS made the following statements:

    a. "Equity and Diversity within SPS is no longer just a value but part of the district strategic plan with measurable goals and outcomes to ensure we are creating an inclusive, equitable, accessible and affirming learning and working environment for all students and staff."

    b. "As we begin our training, we want to acknowledge and honor the Native and Indigenous Peoples whose land we currently gather on. Springfield Public Schools is built on ancestral territory of the Osage, Delaware and Kickapoo Nations and Peoples. In doing social justice work, it is important we acknowledge the dark history and violence against Native and Indigenous People across the world. In this work, we are committed to promoting, supporting and affirming all communities, especially those that are marginalized[.]"

84. Brooke did not agree with the statements. However, because her supervisor warned her not to disagree, Brooke held up "Agree" signs when each statement was made.

85. During the large group conversations throughout the training Brooke attended, Defendants Garcia-Pusateri and Anderson made the following statements:

    a. Parents are the oppressors of their children.

15

b.  Parents oppress their children when they raise their children to vote a
    certain way.

c.  Educators have a duty to vote for socialist politicians.

d.  Educators have a duty to make sure students understand socialism is a
    good thing.

e.  White people are oppressors.

f.  White people must accept their privilege and own their whiteness.

g.  By celebrating nationalism and showing pride in America's history,
    staff should think about who they are harming.

86.     SPS required Brooke to participate in the exercises described above, including
viewing the George Floyd video, identifying where she falls on the Oppression Matrix,
understanding Covert and Overt White Supremacy, filling out the Social Identities chart, and
engaging in small and large group discussions about the lessons.

87.     Brooke did not want to disclose personal information about her identity or
participate in discussions on viewpoints with which she did not agree, but she understood that the
training facilitators would not let staff obtain credits unless they participated. Therefore, Brooke
participated in the exercises.

88.     Plaintiff Jennifer Lumley attended the mandatory equity training in person on
October 6, 2020. The training was facilitated by Defendant Garcia-Pusateri, Defendant Anderson,
and then-Coordinator for Equity and Diversity Olujimi "Jimi" Sode.

89.     SPS required Jennifer to participate in the same exercises described above,
including viewing the George Floyd video, identifying where she falls on the Oppression Matrix,

16

understanding Covert and Overt White Supremacy, and engaging in small and large group discussions about the lessons.

90.     During the Covert and Overt White Supremacy exercise, Jennifer understood from the lesson that only white people could be racist.

91.     Jennifer expressed concerns about this lesson with the large group. She stated that she believed the lesson was too broad because not every white person is racist, and some non-white people are racist. Jennifer also stated that she does not believe she is "privileged" because she grew up in poverty and worked hard to accomplish her goals.

92.     Defendant Anderson, Defendant Garcia-Pusateri, and Mr. Sode told Jennifer that non-white individuals could be prejudiced, but they could not be racist. They also told Jennifer that because she is white, she is privileged, regardless of her socioeconomic status. Finally, they indicated that Jennifer needed to reflect on herself more.

93.     During this exchange, a colleague berated Jennifer for voicing her concerns with the lesson.

94.     Jennifer did not speak again during the training because she feared she would be verbally attacked, asked to leave, and would not receive credit for the training.

**Canvas Modules**

95.     In addition to the mandatory equity training, most SPS staff were required to participate in online training modules by Canvas.

96.     As a 504 Process Coordinator, Brooke was required to complete the Canvas modules.

97.     There were approximately 25 modules for each staff member to complete on their own time.

17

98. If staff did not complete the modules, they were told they would not receive credit and their pay would be docked.

99. Each module contained several questions. Some questions were multiple choice, and some were fill in the blank.

100. The multiple-choice questions—called "Quick Check Questions"—provided teachers with two answer options.

101. There was only one correct answer. Staff were required to select the correct answer before they could move forward with the module.

102. Staff were also required to respond to all fill in the blank questions.

103. One of the modules was called "Social Emotional Learning from an Equity Lens."

104. The module described SPS's goal of creating a so-called equitable learning environment for "underrepresented and under-resourced students" as part of Focus Area 5.

105. In its definition for "underrepresented and under-resourced students," SPS included students of color, students with disabilities, English language learners, LGBTQ+ students, and students of diverse religious backgrounds.

106. However, the module followed this definition with descriptions for white supremacy, anti-racism, justice, systems of oppression, racism, and systemic racism, suggesting that when SPS promotes a goal of "equity," it is really talking about race.

107. Following the district's description of Focus Area 5, the module asked staff, "How does the addition of Focus Area V impact how you serve the students and staff of SPS?"

108. Staff had two options: (1) "It provides suggested guidance regarding equity and diversity issues," or (2) "It cements equity and diversity as a district priority that must be followed by all staff."

18

109. To move on to the next question, complete the module, and earn credit, staff had to select option two: "It cements equity and diversity as a district priority that must be followed by all staff."

110. Brooke did not agree with either answer. However, Brooke selected the second answer so she could move on.

111. In the module titled "Social Emotional Learning as It Relates to COVID-19," SPS asked, "Acknowledging and addressing students' social emotional needs in relation to COVID-19 is whose responsibility?"

112. SPS provided two answer choices: (1) "All caregivers and stakeholders," or (2) "Guardians and counselors." Staff were required to select the first option—caregivers and stakeholders—before they could move on.

113. Brooke did not agree with either choice. However, Brooke selected the answer to continue with the training.

114. During the module called "Social Emotional Learning as It Relates to Racial Injustice," SPS asked, "When you witness racism and xenophobia in the classroom, how should you respond?"

115. Staff were given two options: (1) "Address the situation in private after it has passed," or (2) "Address the situation in the moment you realize it is happening."

116. Staff had to select the second option—address the perceived racism in the moment—before they could move on and receive their credit.

117. Brooke disagreed with the second option. However, to move on with the training, Brooke selected the second option.

118.    As part of the online Canvas module, staff were also required to take a survey to determine how racist or anti-racist they were.

119.    Following the survey, the Canvas module released each staff member's results.

120.    Staff were given a list of "vulnerabilities, strengths, and needs" to work on as part of their results.

121.    Staff were then required to place their vulnerabilities, strengths, and needs in a chart.

| VULNERABILITIES | STRENGTHS | NEEDS |
|---|---|---|
| EXAMPLE:<br>"My students are multiracial. Can I remain calm and measured?"<br><br>"I don't know enough about the issues described here. Am I 'allowed' to lead a discussion while I also learn?" | EXAMPLE:<br>"I have good rapport with my students."<br><br>"I use community resources to support learning." | EXAMPLE:<br>"I need clearer ground rules for class discussions."<br><br>"I need to learn more information about sex, gender and gender expression." |
|  |  |  |
|  |  |  |
|  |  |  |

122.    Brooke found the survey and results objectionable. She did not want to disclose her vulnerabilities with her employer, nor did she believe she needed to work on becoming "less racist."

123.    The modules also contained several videos. After each video, staff members were required to submit a response before they could move on.

124.    Staff were required to watch a video about the Black Lives Matter movement.

125.    The video described the achievements of the Civil Rights Movement in eradicating what the video calls "individual racism." However, it went on to describe "structural racism" and attributed structural racism as the cause of George Floyd's death.

126. The video described the racial protests in the wake of George Floyd's death as "overwhelmingly peaceful." But "if you've been watching the news, you might think it's all been riots."

127. The video also described recent calls to defund the police in cities across the nation.

128. The video stated, "It seems like overnight, the whole country has woken up and realized what a big problem racism is."

129. Staff were required to watch another video about the Black Lives Matter movement.

130. The video stated that Black Lives Matter began as a hashtag "after Trayvon Martin's murderer was acquitted. . . . He was shot by a white man."

131. According to the video, the stated purpose and goals of the Black Lives Matter movement were to "propel the conversation around . . . state-sanctioned violence," "highlight[] the egregious ways in which Black women, specifically Black trans women, are violated," and "support the development of new Black leaders."

132. Staff were told to complete a reflection about how they could describe the Black Lives Matter movement to students.

133. Staff were also required to watch a video about systemic racism.

134. After instructing staff about the ways in which systemic racism may still be visible today, the video told staff what they could do about it. First, they must acknowledge implicit bias. Next, they must acknowledge that the consequences of slavery are still felt today. "As a result, we should support systemic changes" including "increasing public school funding and making it independent from property taxes" to allow "equal access to resources."

135. After watching the video, staff were required to share something they learned from the video.

21

136.    In another module, staff were required to watch a [video](#) called "Debunking the Most Common Myths White People Tell About Race."

137.    According to the video, "common myths" include "I don't see color"; "I have black friends"; "Race has nothing to do with it. It's about class"; and "Focusing on race is what divides us."

138.    After watching the video, staff were obligated to respond to the question, "How prepared do you feel to debunk these myths moving forward?"

139.    Staff were also required to watch a [video](#) called "Advice for White People from an Anti-Racism Trainer."

140.    In the video, the trainer stated that "anti-racism depends on white America asking itself the critical question of are you still willing to receive these privileges, most of which . . . are not scarce, that can be extended to all people without you losing those privileges," and that "in everything we do we have to think about is this increasing the burden that's on the black body . . . and try[] to find acts in your life that you can take to decrease that burden. Go grocery shopping for a black person this week."

141.    The module then instructed staff to share one or two things from the video that resonated with them.

142.    Although Brooke did not agree with most of the viewpoints related in the videos, she was required to answer questions about those viewpoints to receive credit.

143.    Staff were required to log in to the modules so that SPS could track participation and credit hours.

144.    By answering the required questions to move forward, staff were forced to register their endorsement of certain beliefs with the district—beliefs with which they do not agree.

**Brooke's Personal Assessment with Defendant Anderson**

145.     Brooke completed nearly all of the online Canvas modules. However, near the end of a session, the links in her module stopped working so that she could not submit her work.

146.     When Brooke notified SPS about this, Defendant Anderson requested to meet with her to review the Canvas modules and to ensure Brooke completed the lessons.

147.     Brooke reviewed each of the modules with Defendant Anderson over the phone. This included modules Brooke had already completed.

148.     Each time a module posed one of the questions described above, Brooke did not share her personal opinions. Instead, she provided Defendant Anderson with the answers she believed he wanted to hear.

149.     She provided such answers because Defendant Anderson works closely with district administrators to facilitate the district's diversity and equity initiatives. Brooke recalled that Defendant Anderson facilitated the equity training she attended, where staff members were warned that if they did not fully participate, they could be kicked out and would not receive credit for their time. Brooke also recalled that her supervisor warned her not to disagree with any of the statements during the equity training she attended.

150.     Therefore, Brooke feared that if she gave an "incorrect" answer, or otherwise voiced her disagreement with the module lessons to Defendant Anderson, she would not receive credit, would lose pay, or would otherwise be retaliated against.

**Injury to Plaintiffs**

151.     Through the mandatory equity program and Canvas modules, SPS forced Plaintiffs and all other similarly situated staff to engage in speech by participating in exercises, both orally and in writing.

23

152.    Through its policies and programming, SPS espouses a viewpoint about equity to which Plaintiffs and similarly situated staff do not subscribe.

153.    Plaintiffs and all other similarly situated staff risk employment penalties for exercising their right to avoid messages with which they disagree and express messages with which they do agree. Plaintiffs and similarly situated staff are threatened with docked pay and loss of credit hours if they do not affirm those beliefs and participate in those trainings, both in the past and going forward.

154.    Mandatory training that demands affirmation of the district's views of equity has chilled, and will chill, the speech of Plaintiffs and others similarly situated.

155.    SPS has committed itself to continuing these equity-focused professional development trainings until at least 2024.

156.    If SPS's equity training is allowed to continue, Plaintiffs and all other similarly situated staff will be forced to make statements and factual disclosures during mandatory programming as a condition of their employment.

## CLAIMS FOR RELIEF

### COUNT 1
### First Amendment - Compelled Speech

157.    Plaintiffs fully incorporate the allegations above as if fully set forth herein.

158.    "[T]he right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977).

24

159.   Plaintiffs and similarly situated staff were compelled to speak as private citizens on matters of public concern when SPS required them to affirm beliefs about so-called racial equity and to disclose personal details about their identities during mandatory trainings and modules.

160.   SPS has no compelling interest in demanding staff disclose their identities or affirm statements made by the district on matters of public concern.

161.   The mandated disclosures and affirmations are not narrowly tailored.

162.   SPS's equity trainings and modules violate the First Amendment.

**COUNT 2**
**First Amendment – Content and Viewpoint Discrimination**

163.   Plaintiffs fully incorporate the allegations above as if fully set forth herein.

164.   By singling out equity as a priority and forcing its staff to engage in conversations about that topic, SPS engages in content discrimination.

165.   By treating equity as a settled fact rather than opinion, and demanding its staff embrace that opinion, SPS engages in viewpoint discrimination.

166.   Through its equity programming, SPS has created and continues to create a chilling effect on the speech of SPS staff because the district adopts a viewpoint about equity and expects staff to share that view. By binding equity to staff's job responsibilities, the district implicitly threatens staff with punishment—up to and including dismissal—for failing to adhere to that view.

167.   SPS's equity-oriented policies and programming do not serve a compelling interest and are not narrowly tailored.

168.   SPS's policies and programming violate the First Amendment.

**COUNT 3**
**Unconstitutional Condition of Employment**

169.   Plaintiffs fully incorporate the allegations above as if fully set forth herein.

25

170. SPS maintains policies that demand staff understand and promote so-called racial equity as part of their job responsibilities.

171. The consequences for failing to participate in equity trainings and Canvas modules include reduced pay and loss of mandatory credit hours.

172. By also declaring that racial equity is part of SPS staff members' job responsibilities, the district implies that failure to participate in its equity programming may result in consequences up to and including dismissal.

173. Through its equity-focused policies and programming, SPS imposes conditions on employment that infringe on staff members' constitutionally protected freedom of speech.

## **RELIEF REQUESTED**

Plaintiffs respectfully request that this Court:

A. Enter a declaratory judgment that Defendants' professional development programming complained of herein violated Plaintiffs' rights as secured by the First Amendment;

B. Enter a declaratory judgment that Defendants' professional development programming complained of herein is an unconstitutional condition of employment;

C. Enter an order permanently enjoining Defendants to take all affirmative steps necessary to remedy the effects of the unconstitutional conduct described herein and to prevent similar occurrences in the future;

D. Retain jurisdiction over this action to assure full compliance with the orders of the Court and with applicable law and require Defendants to file such reports as the Court deems necessary to evaluate compliance;

E. Enter each plaintiff an award for nominal damages of $1.00 per day of mandatory equity training;

F.     Award attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable legal authority; and

G.     Grant Plaintiffs such other and further relief as the Court deems appropriate.

Dated: <u>August 18, 2021</u>.

<div style="margin-left: 50%;">

Respectfully submitted,

<u>/s/ Derek H. MacKay</u>
Derek H. MacKay    MO #59078
Knight Nicastro MacKay, LLC
304 W. 10th Street
Kansas City, MO  64105
Phone: (816) 708-0105
mackay@knightnicastro.com

<u>/s/ Kimberly S. Hermann</u>
KIMBERLY S. HERMANN*
GA Bar No. 646473

<u>/s/ B. H. Boucek</u>
BRADEN H. BOUCEK*
TN BPR No. 021399

<u>/s/ Celia H. O'Leary</u>
CELIA H. O'LEARY*
GA Bar No. 747472

Southeastern Legal Foundation
560 W. Crossville Road, Suite 104
Roswell, GA  30075
Telephone: (770) 977-2131
khermann@southeasternlegal.org
bboucek@southeasternlegal.org
coleary@southeasternlegal.org

*Pro Hac Vice forthcoming*

</div>

27