IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION


BROOKE HENDERSON, et al.,           )
                                    )
            Plaintiffs,             )
                                    ) Case No.
            vs.                     ) 21-3219-CV-S-MDH
                                    )
                                    )
SCHOOL DISTRICT OF SPRINGFIELD R-12,)
et al.,                             )
                                    )
            Defendants.             )



            CASE MANAGEMENT CONFERENCE
        BEFORE THE HONORABLE M. DOUGLAS HARPOOL
        TUESDAY, NOVEMBER 16, 2021; 1:33 P.M.
                SPRINGFIELD, MISSOURI



APPEARANCES:

FOR THE PLAINTIFFS:         MR. BRADEN BOUCEK
                            SOUTHEASTERN LEGAL FOUNDATION
                            560 W. Crossville Rd., Ste. 104
                            Roswell, GA  30075

FOR THE DEFENDANTS:         MR. RANSOM ELLIS, III
                            MR. ERIC RYAN OLSON
                            ELLIS, ELLIS, HAMMONS & JOHNSON
                            2808 S. Ingram Mill, Ste. A104
                            Springfield, MO  65804

COURT REPORTER:             MS. JEANNINE RANKIN, RPR, CSR
                            UNITED STATES DISTRICT COURT
                            222 N. Hammons Parkway
                            Springfield, MO  65806



        Proceedings recorded by mechanical stenography;
transcript produced by computer.

```
 1  BROOKE HENDERSON, et al., v SCHOOL DISTRICT OF SPRINGFIELD
 2  R-12, et al.
 3                  CASE NO. 21-3219-CV-S-MDH
 4                  CASE MANAGEMENT CONFERENCE
 5                      November 16, 2021
 6                      *  *  *  *  *  *
 7           THE COURT:  We are here for a case management
 8  conference in Henderson, et al., versus the School District of
 9  Springfield R-12, et al.  Who will be appearing on behalf of
10  the plaintiffs?
11           MR. BOUCEK:  Braden Boucek for Southwestern Legal
12  Foundation here on behalf of plaintiffs.  With me today are
13  Ms. Lumley and Ms. Henderson.
14           THE COURT:  All right.
15           And on behalf of the defendant?
16           MR. ELLIS:  Ransom Ellis; Ellis, Ellis, Hammons and
17  Johnson in Springfield, and Ryan Olson from the same firm.
18           THE COURT:  All right.  Well, welcome.
19           MR. ELLIS:  Thank you.
20           THE COURT:  Back in -- couple years ago, maybe three
21  year ago now, the civil rules committee of the federal bar
22  changed the rules to try to encourage courts to have earlier
23  intervention into cases believing that we could better manage
24  the scope of discovery and make litigation less expensive if
25  the courts took an early interest in the cases.  Since then
```

2

1    our training has told us they encourage us to do that in

2    cases.  Most of us do it in some cases, not other cases.  I've

3    selected this as one because it's a little bit unusual in

4    terms of what we typically see by way of cases and I thought

5    it would be beneficial to get together.

6              I always start these pretty simply.  I give the

7    plaintiff, just in a minute tell me what you think your case

8    is about.

9              MR. BOUCEK:  Your Honor, may I speak from the

10   podium?

11             THE COURT:  You can speak from there, from the

12   podium, wherever you want to speak from.  Just speak loud

13   enough we can hear you.

14             MR. BOUCEK:  Absolutely.  I don't usually have that

15   problem.

16             Your Honor, this is a First Amendment case brought

17   on behalf of two educators at Springfield Public School

18   System.  They were -- underwent training as part of their

19   mandatory teacher evaluations and as part of that training

20   they feel like their free speech rights were violated by

21   forcing them to disclose details they did not wish to disclose

22   and affirm positions that they do not wish to affirm.

23             THE COURT:  All right.  And the remedy you want is

24   what?

25             MR. BOUCEK:  The remedies we've asked for include

3

1  nominal damages of one dollar, declaratory relief and

2  injunctive relief.

3          THE COURT:  All right.  Is the training ongoing or

4  is it over with?

5          MR. BOUCEK:  The training from 2020 is over with but

6  we expect that there may be further training and that's what

7  we hope to discover through the discovery process.

8          THE COURT:  All right.  So you've not -- I assume

9  there's no reason for a TRO or a preliminary injunction

10  because there's no training ongoing at this time, or there's

11  none that your clients feel is offensive?

12          MR. BOUCEK:  Correct, Your Honor.

13          THE COURT:  All right.  If the training that you're

14  complaining about is over with, why isn't the case moot?

15          MR. BOUCEK:  Well, we do ask for retroactive relief

16  in the form of nominal damages but we also believe that

17  there's prospective relief in order as well given that we

18  think the equity training is ongoing and the district has

19  expressed a commitment to keep this sort of training ongoing.

20          THE COURT:  All right.  I'm going to ask you some

21  more about your case, but let me hear from the defendant.

22          If you have an affirmative defense, I want you to

23  tell me about it.  If your defense is there's just no evidence

24  of it, you can tell me that, too.

25          MR. ELLIS:  Well, that would be the first defense.

4

1        But the second defense, there's a standing issue.

 2   There's also -- and if you would like, I'll go ahead and tell

 3   you that the district has no plans to do any further training,

 4   at least this school year.  You know, we think on a

 5   school-year-to-school-year basis usually but that's right now

 6   where it is.

 7        And I say no more training.  The training that I

 8   think is the subject of the complaint has -- was training to

 9   teachers and staff members, it was not students, and the

10   district is not going to do similar training.  It's difficult

11   because there's lots of areas in this, but they're not going

12   to do similar training this year.

13        THE COURT:  All right.

14        MR. ELLIS:  And I mean school year.

15        THE COURT:  And I kind of got you off of -- your

16   initial is that the training that did take place was

17   appropriate?

18        MR. ELLIS:  Okay.

19        THE COURT:  Is that your --

20        MR. ELLIS:  Yes, sir.

21        THE COURT:  -- initial defense?

22        MR. ELLIS:  Yes, sir.

23        THE COURT:  All right.  Let me -- I want to look at

24   the complaint and ask some questions.

25        MR. ELLIS:  More importantly, it wasn't

                                5

```
 1   inappropriate.

 2           THE COURT:  Yeah, it was not inappropriate, I guess

 3   is -- all right.  Thank you.

 4           Why don't we -- you filed an answer already,

 5   correct?

 6           MR. ELLIS:  Yes, sir.

 7           THE COURT:  You didn't file motions, you just filed

 8   an answer directly?

 9           MR. ELLIS:  No.  And I will say to you, the

10   complaint in this case was quite long and I answered it within

11   30 days.  I'm going to have to go back and revisit my answer

12   and I'm probably going to do an amendment, but we have that

13   timeline set out in our scheduling order so that's not a

14   problem.

15           THE COURT:  Right.  And we'll get to the scheduling

16   order here in a second.

17           I'm going to ask the plaintiff, I had some concerns

18   about your complaint, Paragraphs 4 and 5.  Are those in front

19   of you or where you can get access to them?

20           MR. BOUCEK:  If the Court doesn't object, can I call

21   it up on my computer?

22           THE COURT:  You may.

23           MR. BOUCEK:  Just one minute, Your Honor.  Please

24   bear with me.

25           I'm looking at the complaint.
```

6

1          THE COURT: I guess my struggle with Paragraphs 4

2     and 5 is they seem to me to be political statements and not

3     allegations relevant to a complaint. Why are they in there?

4          MR. BOUCEK: Sure, Your Honor.

5          We think it's important to understand the relevant

6     backdrop here. I think the Court's point is actually well

7     taken but -- goes straight to the heart of the case, which is

8     that the teachers object to being forced to adopt a political

9     position with which they disagree and so framing we thought

10    was necessary to outline what those respective political

11    positions are.

12         THE COURT: If your clients believed that slavery

13    was appropriate and the school district's policy was against

14    slavery, would your clients be allowed to sue the school

15    district for requiring them to be anti-slavery?

16         MR. BOUCEK: No, I don't think so, Your Honor.

17         THE COURT: Why not?

18         MR. BOUCEK: I think the civil rights laws would

19    require to teach -- educational environment to affirm that

20    position.

21         THE COURT: All right. Well, at one time separate

22    versus equal was the law of the land. If a teacher during

23    that period of time had believed in equality rather than

24    separate versus equal, could they have sued their school

25    district for requiring them to teach separate but equal is the

                                 7

```
 1   law?

 2              MR. BOUCEK:  I'm somewhat -- I'm trying to get my

 3   head around the question, Your Honor.  I think that, yes, any

 4   teacher could have sued to enforce the constitutional

 5   guarantee of equality, if I understand the Court's question.

 6              THE COURT:  Well, what about evolution?  Some

 7   teachers do not believe in evolution, they believe in

 8   creationism.  Some believe in creationism and not evolution.

 9              MR. BOUCEK:  True.

10              THE COURT:  Can a teacher sue if their school

11   district instructs them to teach evolution if they're a

12   creationist or if their school district teaches them to

13   teach -- instructs them to teach creationism if they're an

14   evolutionist?

15              MR. BOUCEK:  No, Your Honor.  In fact, I think that

16   there's relevant case law on that very point.

17              THE COURT:  All right.  So I guess I'm trying to

18   figure out how this is different.

19              MR. BOUCEK:  Well, because this is a controversial

20   political topic --

21              THE COURT:  So is creationism and evolution.

22              MR. BOUCEK:  -- that is outside the scope of their

23   job responsibilities.  There's specific --

24              THE COURT:  You think a school district has no

25   obligation to teach proper race relations?
```

8

1            MR. BOUCEK:  Well, Your Honor, I think that before
2    they can make anything compulsory it needs to be within the
3    scope of their job responsibilities, and the teachers here are
4    advocating a principle of equality and color blindness, not
5    against it.

6            THE COURT:  I guess I'm -- I'm really struggling
7    here because there are political issues in which teachers in
8    every school district are going to disagree.  They're not
9    going to agree with each other.  Because they don't agree with
10   each other, one of them is not going to agree with the school
11   district policy.  But under the lawsuit you filed it would
12   seem that whichever district teacher is not in touch with what
13   the school district policy is, they would have a right to sue.

14           MR. BOUCEK:  Your Honor, it's very important to note
15   that -- and this goes to important government speech
16   doctrines.  Whether or not this is an on-the-job job
17   requirement or not is a critical part of the inquiry.  And we
18   have pled and we believe we'd be able to prove that this is an
19   unrelated matter of public concern that they have brought into
20   the governmental work space and then forced them to take a
21   particular side on a political topic.

22           THE COURT:  Have you got any case that indicates
23   that -- doesn't a school district in fact have an affirmative
24   duty to see that racial justice occurs within its school
25   district?

1      MR. BOUCEK:  A school has an affirmative duty to
2  comply with the civil rights laws which include Title VI
3  requiring an educational work place.  But what that requires
4  is equality and --
5      THE COURT:  Aren't elected school boards the ones
6  that get to decide how to implement that policy rather than
7  any individual teacher?
8      MR. BOUCEK:  In the first instance, yes; however,
9  pulling an unrelated political topic and making it part of
10  mandatory teacher training, that goes straight to the
11  governmental speech doctrine and we believe that we have a
12  meritorious case and we're allowed to make it.
13      THE COURT:  Has there ever been a case reported
14  that's lead down this theory --
15      MR. BOUCEK:  Yes, Your Honor.  We think that --
16      THE COURT:  -- in a school district context?
17      MR. BOUCEK:  We think that there's -- no, Your
18  Honor.  There's actually a great deal of litigation in this
19  topic area right now about --
20      THE COURT:  Right.  A bunch of the people who don't
21  like the modern trend of race relations are now filing a bunch
22  of lawsuits.
23      MR. BOUCEK:  Respectfully, Your Honor, I disagree
24  with that characterization.
25      THE COURT:  Well, you told me there's a bunch of

1   lawsuits.  Aren't they the ones that don't like the modern

2   trend of race relations and theory?

3         MR. BOUCEK:  I can't speak to that.  All I can speak

4   to you is what my clients' concerns are, which is their view

5   that equality under the law is the correct viewpoint and the

6   best way to approach this hot button racial topic, and if the

7   district is going to force them as part of their job

8   responsibilities to adopt a different responsibility, the

9   First Amendment is in play.

10         THE COURT:  They're not required to work at the

11   school district, right?

12         MR. BOUCEK:  Correct.

13         THE COURT:  Has anybody been fired by the school

14   district as a result of this policy?

15         MR. BOUCEK:  No, but the teachers --

16         THE COURT:  Has anybody been demoted?

17         MR. BOUCEK:  Not to my knowledge, Your Honor.

18         THE COURT:  Has anybody had their pay cut?

19         MR. BOUCEK:  Not to my knowledge, Your Honor.

20         THE COURT:  Has any adverse employment action been

21   taken by any employee as a result of this policy?

22         MR. BOUCEK:  Your Honor, if I may.  Both of the

23   teachers were told that they had to do this or would face

24   those consequences.  It's not necessary in the First Amendment

25   context for them to actually endure those sorts of things.

1          THE COURT:  They were -- I read what you said about

2     holding up an agree sign.

3          MR. BOUCEK:  Yes, sir.

4          THE COURT:  Did anybody not hold up the agree sign

5     in the training, from what you've -- and I know you haven't

6     done all your discovery, but --

7          MR. BOUCEK:  Yes.

8          THE COURT:  Are you aware of anybody that didn't

9     hold up the agree sign?

10          MR. BOUCEK:  I just don't know the answer to the

11     Court's question at this point in time.  I know that one of my

12     clients was told that she needed to do that and to not hold up

13     anything other than the agree.

14          THE COURT:  All right.  Well, what if a teacher

15     didn't believe in gay rights and there was a student who was

16     gay.  Would that teacher have a civil rights action if the

17     school district policy was that gay students are to be treated

18     equally with the non-gay students?

19          MR. BOUCEK:  No, I don't think they would, Your

20     Honor.

21          THE COURT:  Why not?  How's that different than this

22     case?

23          MR. BOUCEK:  Because that is part of the in-class

24     instructional material.  This is part of teacher training

25     outside of it.

```
 1            THE COURT:  Well, okay.  Let's put it in the context
 2  of the basketball team.  What if a coach says, I'm never
 3  putting anybody who's gay on my basketball team.  That's
 4  outside of the instructional world.  Is that legal?
 5            MR. BOUCEK:  That would violate the civil rights
 6  laws as they are currently interpreted, Your Honor.
 7            THE COURT:  Because the school district would not
 8  tolerate it, right?
 9            MR. BOUCEK:  Well, I think it just violates the
10  civil rights laws on its own and the district would therefore
11  be well within its rights to take policies to further that
12  end.
13            THE COURT:  Well, what if the -- I guess where I'm
14  struggling is I don't understand how you contend this to be
15  outside the classroom.  One of your clients is an instructor,
16  right?
17            MR. BOUCEK:  One of them's a 504 process coordinator
18  and the other is not.  Neither of them are teachers per se in
19  the classroom.  This all -- everything we've alleged takes
20  place as part of teacher training.  None of it is in the
21  classroom.
22            THE COURT:  And so they have a right not to hear
23  what they don't want to believe?
24            MR. BOUCEK:  It's not a right to not hear.  It's a
25  right to not speak.
```

1          THE COURT:  All right.  And have either been
2    required to speak?
3          MR. BOUCEK:  Yes.
4          THE COURT:  And to whom did they have to speak?
5          MR. BOUCEK:  As part of the equity training they
6    were required to speak, disclose details they did not wish to
7    disclose and affirm positions that they do not wish to affirm.
8          THE COURT:  You think that violates the constitution
9    in an employment context?
10          MR. BOUCEK:  Your Honor, the governmental speech
11    employment context turns very much on whether or not this is a
12    matter of public concern or a matter of private concern and
13    whether this takes place in the workplace or not.
14          THE COURT:  And you think in this America race
15    relations is not a public concern?
16          MR. BOUCEK:  It is a matter of public concern, yes.
17    That's why the First Amendment obtains.
18          THE COURT:  All right.  Let me -- I'm still confused
19    as to what you want, because there are -- I'm speculating
20    here, but I bet there are employees of the R-12 School
21    District who absolutely agree with the training they received.
22    So had the training been different and taught them that
23    equality as you describe it is what our policy is going to be,
24    would those other teachers have a right to sue because they're
25    being required to believe something they don't believe?

1          MR. BOUCEK:  If it's an apples-to-apples comparison
2    and they're taking the teachers outside of the classroom
3    setting and then making them take a side on a position that
4    they do not agree, then, yes, they would have a First
5    Amendment position.  But even the scenario you posited is
6    somewhat distinguishable because now you're talking about a
7    message that is in -- is consistent with Title VI of the Civil
8    Rights Act, whereas my clients' view is -- the position
9    they're making -- wishing them to adopt is in contrast to
10   equal protection in the Civil Rights Act and therefore the
11   school would have greater latitude to ensure compliance with
12   Title VI and the constitution.
13          THE COURT:  Your clients are saying that the
14   training is inconsistent with Title VI?
15          MR. BOUCEK:  We have not brought a Title VI lawsuit,
16   but as it bears on the hypothetical, that is one of the
17   distinctions that I would point out to the Court, yes, Your
18   Honor.  Equality under the law and color blindness are the law
19   of the land.
20          THE COURT:  All right.  Let me give you another
21   hypothetical.  When I was a kid, five hundred years ago,
22   smoking in the bathroom was the biggest issue -- disciplinary
23   issue; that and sneaking out to lunch.  Those were the two big
24   issues that -- disciplinary issues.  What if a teacher or a
25   employee didn't think there was anything wrong with a high

1  school student smoking and didn't want to enforce that law.

2  Could they be forced to?

3          MR. BOUCEK:  Yes.

4          THE COURT:  What's the difference?

5          MR. BOUCEK:  You're talking about something that is

6  not a First Amendment protected activity in the first

7  instance.  You're also talking about in-class discipline

8  versus --

9          THE COURT:  Right to believe.

10          MR. BOUCEK:  But this is --

11          THE COURT:  You're infringing on their right to

12  believe if they inherently believed smoking wasn't bad.

13          MR. BOUCEK:  There would be -- it would be different

14  if they were forcing them to take a position outside of the

15  educational setting that they did not wish to believe on a

16  matter of public concern.

17          THE COURT:  And where did your training require them

18  to believe that outside of the educational setting, outside

19  the school system?  Was there anything in this training that

20  required your clients to believe that outside the school

21  system?

22          MR. BOUCEK:  We will -- we have pled and we believe

23  prove that this was not part of the classroom training, that

24  this was unnecessary, instructional, that they were folded

25  into the scope of their job responsibilities.

                                16

1          THE COURT:  How's that different than smoking in the
2   bathroom?  That's not part of the teacher's classroom
3   responsibility.
4          MR. BOUCEK:  Well, I think the courts have
5   recognized that disciplining students in classroom hours is
6   certainly within the scope of their job responsibilities.
7          Your Honor, respectfully --
8          THE COURT:  So is fighting racism.
9          MR. BOUCEK:  And, Your Honor, respectfully, a great
10  deal of this is going to be dependent on the facts that we
11  think we can bring to bear about where this training occurred
12  and whether it fell within the scope of their job
13  responsibilities.  That goes to a lot of the Court's
14  hypotheticals that the Court has posed.
15         THE COURT:  You agree that within a classroom a
16  school district has a right to control speech?
17         MR. BOUCEK:  Yes.  And we have not alleged that
18  within the --
19         THE COURT:  So teachers can be required to teach the
20  definition of racism and equality that you claim this training
21  was teaching inside the classroom?
22         MR. BOUCEK:  That would be a very distinguishable
23  case.  The First Amendment question would be very different
24  with the governmental interest weighing much more heavily in
25  that instance, Your Honor.

17

```
 1              THE COURT:  All right.

 2              Mr. Ransom, I read the complaint.  The one thing

 3    that struck out to me that did concern me was allegations that

 4    people were told how to vote and at least insinuation that

 5    employees who didn't vote a certain way would be disciplined

 6    or at least would have consequences.  That's part of the

 7    allegation.  Tell me what your district's reaction is to that.

 8              MR. ELLIS:  Now we're talking about in the course of

 9    the training?

10              THE COURT:  Yes.  Allegedly someone said that

11    everybody should vote for socialists and -- well, that was the

12    word I remember sticking out so --

13              MR. ELLIS:  The district didn't require anybody to

14    vote in any particular way, if I'm understanding your

15    question.

16              THE COURT:  If a trainer suggested that it was

17    district policy to require someone to vote a certain way,

18    would that trainer be acting in accordance with school

19    district policy?

20              MR. ELLIS:  No, if I'm understanding what you mean

21    exactly by --

22              THE COURT:  Well, I'm just picking up what the

23    allegation is so -- again, he's right, we don't know exactly

24    what the facts are yet but --

25              MR. ELLIS:  Well, I think I have probably a better
```

1    handle on some of the facts than anybody else here, but no one
2    was disciplined.  These were questions you asked earlier.
3            THE COURT:  Yeah.
4            MR. ELLIS:  No one was disciplined.  No one was
5    terminated.  Frankly, the people I've spoken with could really
6    care less what answer people gave on any of the -- there were
7    two sets of documents.  There were things in Canvas which were
8    a self-directed kind of go through the -- go through the
9    process and learn, and then there was actual in-person -- and
10   it was either virtual or non-virtual -- but in-person
11   training, all in 2020.  No one got disciplined for anything.
12   No one lost money, in other words.  Teachers, as you know, get
13   paid a certain salary --
14           THE COURT:  There's no adverse employment action, is
15   what you're saying?
16           MR. ELLIS:  Right.  And the training here was extra
17   training.  In other words, it was not a part of their salaried
18   time.  Because of --
19           THE COURT:  Was it mandatory?
20           MR. ELLIS:  It was mandatory.
21           THE COURT:  And they received extra compensation for
22   it?
23           MR. ELLIS:  They would receive extra compensation
24   for it if they came and completed it.  If they didn't or chose
25   not to -- I mean, there were people that didn't complete.

19

1   There were very few but there were people that didn't complete
2   and they weren't disciplined.
3            THE COURT:  Were the answers of the participants
4   recorded anywhere?
5            MR. ELLIS:  This was done in a lot of different
6   ways.  My answer to you is I don't think so.
7            THE COURT:  All right.  Now I'm going to try to get
8   down to the scope of the discovery now that I understand more
9   what's going on.
10           This training was instituted via policy adopted by
11  the school board?
12           MR. ELLIS:  Yes.
13           THE COURT:  Was there a written policy?
14           MR. ELLIS:  It was actually -- short answer, kind
15  of.  The district had a strategic plan.  It encompassed
16  various elements.  It had 1 through 4; Strategic Plan 1, 2, 3,
17  and 4 through 2019.  In 2020 they instituted and went through
18  a big process with lots of partners to come up with Focus Area
19  5 which had to do with training and diversity and equity.
20           THE COURT:  Did the policy adopted by the school
21  board touch upon specific materials or just concepts?
22           MR. ELLIS:  Concepts.
23           THE COURT:  And then they were implemented by
24  administrative personnel or by outside personnel?
25           MR. ELLIS:  The district hired a person who was the

                                    20

1    head of -- who was new to the district, Office of Diversity

2    and Equity.

3                THE COURT:  That is now a school employee?

4                MR. ELLIS:  Yes, and a defendant in this case.

5                THE COURT:  All right.

6                All right.  Let me ask him another question.  I'm

7    trying to fashion what my ruling would be in this case and

8    right now we have an elected school board who's subject to

9    reelection and defeat and all those things.  If I rule what

10   the school district has to do, I'm not subject to election; I

11   have a lifetime appointment.  So I guess I'm struggling as to

12   how society is better or the law is advanced by having federal

13   judges tell local school boards how they have to implement

14   racial sensitivity training.  Shouldn't that be decided by the

15   school board and if your clients are unhappy with them they

16   can campaign against them?

17               MR. BOUCEK:  May I approach, Your Honor?

18               THE COURT:  Yeah.  However you want to respond.

19               MR. BOUCEK:  Thank you, Your Honor.

20               I think that brings to light a very important

21   distinction.  We are not asking the Court to set policy.  We

22   are not asking the Court to override the district's views on

23   how particular political topics should be taught.  We are

24   bringing a straight up First Amendment claim and that is some

25   distinction.  All we are asking the Court to do is go down

                                  21

1    well trod First Amendment doctrine to say what they can and
2    can't tell, instruct a government employee to say in a
3    particular setting.  So this is a First Amendment question.
4    We are not --
5                   THE COURT:  So you want me to tell them what they
6    can and cannot say?
7                   MR. BOUCEK:  No, Your Honor.
8                   THE COURT:  You don't want that?
9                   MR. BOUCEK:  We want you to tell the school board
10   what they can and can't tell them to say.  It's a compelled
11   speech issue at its heart.
12                  THE COURT:  Even at the school?  I understand that
13   in their private lives they can believe whatever they want to
14   believe.
15                  MR. BOUCEK:  Sure.
16                  THE COURT:  But you're telling me that I can tell
17   the school districts they can't even tell them how they can
18   implement -- take advantage of their job or implement their
19   job?
20                  MR. BOUCEK:  Your Honor, I think the Court is again
21   getting at a very important legal question that we're going to
22   be heavily briefing to the Court about where this took place
23   and what the First Amendment rights are in that space.  But to
24   accept what the Court's saying -- and I do accept it --
25   teachers have very little First Amendment rights when they're

1   actually performing instruction in front of students.  That's
2   why we have not alleged that and my clients have not alleged
3   it.  But teachers have a very different First Amendment
4   interest when you're taking them to part of training that is
5   unrelated to their core job responsibilities and then making
6   them weigh in on political questions that are unrelated to
7   what actually their job responsibilities are.  We think with
8   briefing and discovery the Court will be in a better position
9   to judge that.
10              THE COURT:  All right.  I got one more --
11              MR. BOUCEK:  Absolutely, Your Honor.
12              THE COURT:  -- one more hypothetical that bounced
13  through my mind as I read through this.
14              In the last ten years one of the hot topics in both
15  society and the schools would be what I guess they call the Me
16  Too movement or sexual harassment.  I think the school
17  district has adopted kind of a no tolerance policy where -- I
18  mean, it doesn't take much to get reported and get in trouble.
19  If a teacher thinks that that policy is too restrictive, do
20  you think -- and they attend the seminar and it says this is
21  sexual harassment and the teacher doesn't think that's sexual
22  harassment, can they then sue the school districts for making
23  them interpret sexual harassment in a way different than what
24  they personally believe it is?
25              MR. BOUCEK:  Again, it's somewhat fact sensitive.

23

1   There are a couple of distinctions I'll point out there.  One
 2   is, are you actually asking them to implement this or to also
 3   say they agree with it.  Again, this is a First Amendment
 4   question and there is a distinction between speech and
 5   conduct.
 6           THE COURT:  So your clients can be required to
 7   implement the racial policy consistent with the training they
 8   received?
 9           MR. BOUCEK:  As long as it's consistent with the
10   Equal Protection Clause and Civil Rights Act.  And we have not
11   put that question before the Court.  We have not alleged it.
12   But, yes.
13           THE COURT:  So what is it that you think made your
14   clients agree other than what some employee said you need to
15   agree?  There's no district policy saying everybody has to say
16   I agree to these questions.
17           MR. BOUCEK:  Well, they were -- we believe the facts
18   will show, as we have pled, that they were told that there was
19   only one right answer to the questions, they needed to divulge
20   personal details about --
21           THE COURT:  Told by who?
22           MR. BOUCEK:  Told by their trainers in these
23   training sessions as part of the district-wide training.  And
24   it's gotten less attention both today and, you know, in the
25   interaction between the parties, but there's a second part of

1    this training called Canvas modules which was actually --

2              THE COURT:  Well, couldn't there just be one correct

3    answer if you're going to correctly implement the policy of

4    the district?

5              MR. BOUCEK:  Well, again, that's --

6              THE COURT:  For example, sexual harassment.  Some

7    student taps a -- someone else on the butt and that person

8    says, Oh, that's just a happy tap, that's not sexual

9    harassment.  If the school policy says that's sexual

10   harassment, then the only correct answer when asked that is

11   that sexual harassment in training is yes, that's sexual

12   harassment.

13             MR. BOUCEK:  Sure.  And that's certainly a different

14   scenario because now you're saying what is the district's

15   policy.

16             THE COURT:  Well, and here you're talking about what

17   is racism.

18             MR. BOUCEK:  We're not asking them to say what is

19   the district's policy on racism.  We're asking them to affirm

20   that they personally agree with this, not merely that this --

21   I mean, they had to stand up and actually say things about

22   what their identity consists of and who they are that were

23   deeply objectionable to their core beliefs and that in that

24   sense is different.

25             And the other thing I'll point out about the Me Too

                                    25

1    thing -- which I think is a perfectly valid governmental

2    interest -- is you're also talking about things that are

3    directly related to the workplace employment setting as well

4    and certainly it's within a district's responsibility to

5    require employees to understand how to interact with their

6    co-workers.

7            THE COURT:  Well, and that's something I noticed all

8    through.  You refer to your people as individuals but they're

9    actually -- the actions here are as employees.

10            MR. BOUCEK:  That's true.

11            THE COURT:  But you're arguing that it was outside

12    the scope of their duties.  Is the scope of their duties not

13    something that the school district determines?

14            MR. BOUCEK:  That's a legal question that ultimately

15    we will be putting before the Court.  Again, if this is within

16    the scope of their job responsibilities, the First Amendment

17    interest that they have is far diminished.

18            THE COURT:  Everybody needs to understand that at

19    these things I probe questions to try to understand the scope

20    of the complaint and the scope of the arguments and to predict

21    what legal issues are going to come down the pike as the case

22    progresses.  That's why I ask these questions.

23            MR. BOUCEK:  Your Honor, in this case I think it's

24    been quite useful to illuminate where I think some of the

25    determining legal questions actually lie.

1        THE COURT:  You think -- you're not talking about

2   within a classroom in terms of curriculum?

3        MR. BOUCEK:  Correct.

4        THE COURT:  I guess in a school district what

5   context would these issues of race arise other than within a

6   classroom and watching students interact with each other?  I

7   guess that's -- I don't understand --

8        MR. BOUCEK:  Sure.  I think that's a -- salient to

9   the questions that I'm kind of alluding here today.  We think

10  they aren't related to that.  They're related to instructing

11  these teachers to have personal views that they hold outside

12  the workplace.

13       THE COURT:  Well, if a teacher observes one student

14  treat a student of a different race in a certain way, can't

15  the district determine whether or not that's an acceptable

16  conduct under the school district's policy?

17       MR. BOUCEK:  I think within the scope of the

18  constitution Civil Rights Act, yes, and they would have broad

19  authority to do so.

20       THE COURT:  Okay.  And I'm still puzzled.  You keep

21  saying -- how did we try to control -- how did the school

22  district try to control these employees' beliefs outside of

23  the school?

24       MR. BOUCEK:  Because much of the training is not

25  relevant, nor did it even purport to be relevant to their

27

interactions with students in the school.  It was just about
these larger political questions that are raging through the
country right now.

THE COURT:  Well, but don't you think the training
was only concerned about how those broader issues would be
implemented within the school district?

MR. BOUCEK:  I think that we need some fact
discovery on that very question, Your Honor.  Based on what
I've seen and the documents I've seen, I think it was far, far
outside that scope.

THE COURT:  All right.

Mr. Ransom, you want to respond to that issue?

MR. ELLIS:  Yes, sir.

I think one thing that might be missing here is that
the training was not limited to dealing between adults and
children.  It also involved dealing between adults.  It wasn't
limited by age.  But the training in 2020 was -- as you've
said, had to do with sensitivity and -- whether it was right
or wrong and the way it was delivered, it had to do with
sensitivity and racial issues primarily, but when you get
right down to it, equity and diversity also moves on to sexual
and gender issues as well, they just haven't done the training
on it.

Does that make sense?

THE COURT:  This training was for all employees or

```
 1   just employees in certain categories?
 2            MR. ELLIS:  All employees.  Bus drivers, I think
 3   they did cooks, although they don't have a whole lot --
 4            THE COURT:  Did the training purport to implement
 5   any specific written policy of the board?  In other words, the
 6   board -- I know they want -- it's generally racial, but is
 7   there a written policy that said this is to train our
 8   employees on this policy?
 9            MR. ELLIS:  Well, you had the strategic plan which
10   is the framework for what was happening.
11            THE COURT:  You said it was Section 5 was the one
12   that impacted this?
13            MR. ELLIS:  Yeah.  Focus Area 5, I think, is --
14            THE COURT:  Focus Area 5.
15            MR. ELLIS:  Yeah.  Certainly the district has a
16   non-discrimination language, general non-discrimination
17   language.  Every district has that because it's required and
18   the right thing to do.
19            THE COURT:  And this policy was from the school
20   district's perspective the way that it was implementing the
21   law on non-discrimination?
22            MR. ELLIS:  I won't say that.  I don't know.  I
23   think that was the intent.  The intent was to have people
24   treat each other appropriately in classrooms and in schools
25   and have a welcoming place for kids to come that's safe.
```

29

1     THE COURT:  All right.

2          Plaintiffs' counsel, you said there were other

3     lawsuits.  Have any advanced to a decision level or an

4     appellate level at this point?

5          MR. BOUCEK:  None quite like this, Your Honor.  And

6     bearing in mind that these are new issues.  You've seen

7     similar sort of lawsuits with things like pronouns for

8     transgender students.  But the question at its bottom, Your

9     Honor, is really just one of governmental speech in the

10    workplace and where the workplace starts and that's been a

11    question that's been around for many, many decades.

12         THE COURT:  I've dealt with that in terms of

13    sheriff's offices and deputies criticizing the sheriff usually

14    having to do with an election going on.  I've had several

15    cases over the years I've been involved with involving that

16    issue.  I don't think that law applies much here because that

17    has to do with statements that -- where people were actually

18    terminated because they claimed the statements made critical

19    of the sheriff actually caused disharmony within the office

20    and I don't think that body of law is quite -- it's kind of

21    different than what you've had here.

22         MR. BOUCEK:  There is some overlap, Your Honor, and

23    I'm familiar with those cases, all having to do with what's in

24    the workplace and what's not.

25         THE COURT:  What can be said in the workplace,

```
1    right.
2              You -- I think you said this earlier.  You agree
3    that within the school district in interpreting policy your
4    clients had a responsibility to follow the training but they
5    didn't have an obligation to necessarily agree with it?
6              MR. BOUCEK:  I think that if I'm understanding the
7    Court's question correctly, yes.  Conduct is very different
8    from speech.
9              THE COURT:  All right.  Other than having -- feeling
10   like they had to say I agree during the training, any other
11   consequence to your clients?
12             MR. BOUCEK:  Well, we have a chilling effect on
13   their speech as part of our First Amendment claim, if that's
14   within the Court's --
15             THE COURT:  Chilling during the training or during
16   the school?
17             MR. BOUCEK:  During the training, Your Honor, yes.
18             And then the third claim --
19             THE COURT:  I guess when I read your -- I'm sorry.
20   When I read your -- I got the idea that they had like groups
21   where you were asked your opinion and your clients didn't give
22   their true opinions?
23             MR. BOUCEK:  Right, they were -- I think the Court's
24   correct.  They were brought into these training sessions and
25   they would go into small groups within them but there was only
```

31

1   one correct position to hold in those things and if you had a

2   different perspective, then you were going to face

3   consequences within that group setting.

4           THE COURT:  By that you mean the other people in the

5   group would criticize you, or do you mean the school district

6   would take some type of action against you?

7           MR. BOUCEK:  Well, there was only one correct answer

8   per the equity training and so it fostered an environment

9   where they were not free to --

10          THE COURT:  I guess what -- and I'm getting back to

11  this, but as to what the district policy is, there might only

12  be one correct answer?

13          MR. BOUCEK:  Sure.  And, again, I'll draw a

14  distinction between asking them to say what is the district's

15  policy and what is the truth on this political question.  And

16  I think that --

17          THE COURT:  Well, for purposes of the employee of

18  the school district, the truth is whatever the district policy

19  says, isn't it?

20          MR. BOUCEK:  Well, but there's a difference between

21  a question that is what is the district's policy regarding

22  question X and then what is the truth about race relations in

23  the United States.

24          THE COURT:  All right.  And your clients' position

25  is that there is no systematic racism in our institutions?

MR. BOUCEK:  That's not my clients' position, Your
Honor.  Respectfully, I think that's kind of outside the scope
of what we've pled in our complaint.

         THE COURT:  Well, you're saying that they were
forced to take positions they didn't believe in.  I guess I
felt like if I know what they believe in I can better know
whether or not they were forced to believe something they
didn't believe in.

         MR. BOUCEK:  Well, to try to address the Court's
question, terms like systemic racism are slippery terms.
Different people use different things when they use those
terms and depending on what that term means, I better be able
to say what my clients' views on that might be.

         THE COURT:  All right.  That's fair.

         That would also cut the other way; the other person
might mean something by systemic racism that is not offensive
to your client but there are some people who the way they use
the phrase would be offensive.

         MR. BOUCEK:  I think that's entirely fair, Your
Honor.

         THE COURT:  Toward that end, look at Paragraph 6 of
your complaint.  You got that up again?  I'm sorry to --

         MR. BOUCEK:  I'm looking at it, Your Honor, yes.

         THE COURT:  I guess, As a condition of employment,
all staff attend and participate in equity training to learn

1    about oppression, white supremacy, systemic racism, engage in

2    identity development and understanding, and become anti-racist

3    educators.

4             Is there anything in any of those goals that were

5    offensive or the way they were implemented?

6             MR. BOUCEK:  Yes.  As the term anti-racist is

7    used -- and, again, that's another slippery term that means

8    different things to different people, but as the term

9    anti-racist was defined by the district, I think my clients

10   would tell you that they find that term offensive because what

11   they consider to be anti-racist is a rejection of colorblind

12   principles which requires them to reject the very Equal

13   Protection Clause itself.

14            THE COURT:  That's a political statement that --

15            MR. BOUCEK:  Agreed.

16            THE COURT:  -- a whole lot of people don't agree

17   with.

18            MR. BOUCEK:  Agreed.

19            THE COURT:  So if the school district adopted that

20   policy, there would be school teachers suing the school

21   district saying that you made me believe that interpretation

22   of racism.

23            MR. BOUCEK:  Which is why controversial political

24   topics are best avoided whenever necessary as a condition of

25   employment.

1          THE COURT:  Well, first of all, it's not a condition
 2   of employment.  Nobody was fired, right?
 3          MR. BOUCEK:  It doesn't have to be -- you don't have
 4   to get fired to make it a condition of employment.
 5          THE COURT:  Well, according -- over here there were
 6   people who didn't have the training and they were still
 7   employed, so what makes you think it's a condition of
 8   employment?
 9          MR. BOUCEK:  Well, that's going to be a fact
10   question, but they were certainly told that it was a condition
11   of their employment and it was mandatory.
12          THE COURT:  Well, I have to be honest, I'm
13   struggling to see the theory here.  And not so much that I
14   care what the definition of racism is, I think -- my thought
15   is that's up to the local school district, but more in that
16   it's a controversial issue and yet the school district I don't
17   think has the opportunity to just ignore issues of racism.  I
18   think it has to have some policy on it.  And whatever policy
19   they pick, somebody's not going to like because it's such a
20   controversial topic.  I guess that's my frustration with where
21   you're coming from.  I'm certainly willing to hear your
22   briefing and your -- obviously discovery, as you say.
23          All right.  Let's talk about the specific scheduling
24   here.  Amended pleadings by December 3rd.  I think Mr. Ellis
25   has said that he plans to amend his answer.

```
 1              Is December 3rd still an acceptable date for that?

 2              MR. ELLIS:  Yes, sir.

 3              THE COURT:  All right.  And does 12/3 still work for

 4    you on amending your pleadings?

 5              MR. BOUCEK:  Yes, Your Honor.

 6              THE COURT:  All right.  Discovery, you all think you

 7    can be done by May, still good, May 31st?

 8              MR. ELLIS:  Yes, Your Honor.

 9              MR. BOUCEK:  I don't think there's any revision to

10    any of these dates.

11              MR. ELLIS:  We had quite a discussion on that.  I

12    think we both feel we can get it done.

13              THE COURT:  Let me talk a little bit.  I'm a big

14    believer in Rule 26 is share each other what you got.  I

15    assume that whatever training materials you know about you're

16    going to provide?

17              MR. ELLIS:  Yes, sir.  They're also online, sir.

18              THE COURT:  And whatever training materials your

19    client was subjected to you're going to provide so that we're

20    all talking about apples and apples here?

21              MR. BOUCEK:  We certainly want to.  I mean, our

22    ability to get those documents is somewhat limited, but yes.

23              THE COURT:  If you have them.  Obviously you can't

24    produce something you don't have.

25              MR. ELLIS:  My initial disclosures had the training
```

```
 1   materials from 2020.

 2           THE COURT:  And this Strategic Plan No. 5, that --

 3           MR. ELLIS:  It's online on the district website.

 4           THE COURT:  All right.  So now you know about that.

 5   I don't know if you need to see it but now you know about it.

 6           MR. BOUCEK:  And, Your Honor, the parties have been

 7   very cooperative throughout this litigation.  Mr. Ellis has

 8   been very accommodating.

 9           THE COURT:  Let's talk about depositions.

10           Whenever we have a public entity like this, we

11   always get into the issue of which school board members if any

12   are going to be deposed and obviously you're going to want the

13   diversity trainer, I suppose.  You're going to want to depose

14   the plaintiffs.  I assume you might want to depose people who

15   -- did the two participate in the same pod of training or were

16   they in separate --

17           MR. ELLIS:  No.

18           MR. BOUCEK:  They were separate, Your Honor.

19           THE COURT:  So you may have to get some other people

20   who participated in that same training to see if they

21   perceived things the same way as they did.

22           How many were in the training at a time?  Are we

23   talking dozens or five or six?

24           MR. ELLIS:  Dozens and dozens.  They had the

25   cafeteria at the high school full sometimes and --
```

37

```
 1              MR. BOUCEK:  If it's some reassurance to the Court,
 2   based on my limited interaction with Mr. Ellis, I think it --
 3   there may be less factual disagreements than the Court might
 4   think.  Our limited discussions indicate that this is probably
 5   going to be more of a matter of law that most of the facts
 6   we'll be able to kick to the Court.
 7              THE COURT:  All right.  Experts.  You expect to have
 8   experts?
 9              MR. BOUCEK:  No, Your Honor.
10              MR. ELLIS:  No.
11              THE COURT:  I couldn't think of any that you'd have
12   but didn't want to prejudge something.
13              MR. ELLIS:  Somebody can tell us what it all means.
14              THE COURT:  Discovery motions is okay.
15              I notice you kicked your dispositive motions.  I
16   guess that's, what, a couple months after the close of
17   discovery?
18              MR. BOUCEK:  Yes, sir.
19              THE COURT:  I can live with that.
20              MR. BOUCEK:  Thank you.
21              THE COURT:  Especially in a case that you think is
22   going to be legal, law sensitive.
23              Here's where I'm going to disappoint you.  If you
24   don't file dispositive motions until July 22nd, then that
25   means the response isn't going to be filed until August 22nd,
```

1   and that means the reply won't be filed until September 15th

2   or so.  I'd like to have some time to actually read it and

3   discuss it and consider it, so I can't handle -- your initial

4   pretrial and your pretrial memorandum and your trial date are

5   probably going to be moved back.  You expect it to be a bench

6   trial because of the equitable relief.  Your trial won't be as

7   early as 10/24.  I'll have to move that back in order to give

8   me time to consider -- especially in a case where you think

9   dispositive motions are going to play a significant role.  So

10  I'll move that back.  But other than that, those other dates

11  you've given me are acceptable.

12          I've gone through the issues that I wanted to go

13  through but I want to give you all an opportunity.  Is there

14  anything else anybody wants to say to me, something that you

15  think I'm off base on or something that you didn't get a

16  chance to say you want to say or anything like that?

17          MR. BOUCEK:  No, Your Honor.

18          I want to compliment Mr. Ellis for being cooperative

19  in this.

20          MR. ELLIS:  I say the same thing.

21          THE COURT:  Well, good.  We appreciate that.  We

22  expect professionalism.  I didn't give that speech because it

23  does look like you're working together but I have a

24  professionalism speech all ready for you.

25          I will say this.  If you do get hung up on issues --

1  and I litigated for 30 years; sometimes you get hung up on

2  issues, especially representing public entities.  I didn't

3  represent any school districts but I represented some public

4  entities occasionally.  Don't let it set for a month while you

5  fight with each other, or two months.  Give me a call; give my

6  office a call.  We set up a telephone call and we'll try to

7  resolve the discovery dispute as soon as possible so that you

8  guys can go on about your work rather than getting all tied

9  up.

10         Now, this does not seem to be a case where we're

11  going to need a protective order other than if your clients

12  have some protective things they want to be protected from the

13  public.  But the school district, most of that's public record

14  anyway, right?

15         MR. ELLIS:  Most everything's public record, yes,

16  sir.

17         THE COURT:  If for some reason they get into issues

18  that are not, try to agree on a protective order.  I'm pretty

19  free to submit those and protect people's privacy.  If you

20  can't agree on them, each submit your own version of it.  If

21  you don't agree with it at all, just give me a telephone call

22  and we'll decide what's an appropriate one.

23         MR. BOUCEK:  We appreciate that, Your Honor.

24  Mr. Ellis has been really reasonable.  I think we can work it

25  all out.

```
 1              THE COURT:  Good.  Anything else we need to talk

 2   about?

 3              MR. ELLIS:  No, sir.

 4              THE COURT:  I'll get your scheduling order out

 5   pretty quick here.  I do need to check my schedule and see

 6   what my trial schedule is.  You think four days is enough?

 7              MR. ELLIS:  Yeah.

 8              MR. BOUCEK:  I think it's more than sufficient, Your

 9   Honor, yes.

10              THE COURT:  I do -- especially in judge-tried cases,

11   I keep it moving pretty quick.  When we have juries, it

12   takes -- the breaks take a long time.  When it's just me, we

13   try not to break too long.  We keep going.

14              All right.  Thank you all very much.

15              MR. BOUCEK:  We appreciate the Court's time.

16              MR. ELLIS:  Thank you, sir.

17              (Court stands in recess at 2:23 p.m.)

18

19

20

21

22

23

24

25
```

```
 1              CERTIFICATE OF OFFICIAL REPORTER
 2       I, Jeannine M. Rankin, Federal Official Court Reporter,
 3   in and for the United States District Court for the Western
 4   District of Missouri, Southern Division, do hereby certify
 5   that the foregoing is a true and correct transcript of the
 6   stenographically reported proceedings.
 7
 8
 9
10
11                        /s/ Jeannine M. Rankin
12   Date:      12/03/2021    Jeannine M. Rankin, CCR, CSR, RPR
13
14
15
16
17
18
19
20
21
22
23
24
25
```