**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **Brooke Henderson and Jennifer Lumley,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 6:21-CV-03219** |
| | ) | |
| **School District of Springfield, R-12; Board** | ) | |
| **of Education for the School District of** | ) | |
| **Springfield R-12; Dr. Grenita Lathan;** | ) | |
| **Dr. Yvania Garcia-Pusateri; and** | ) | |
| **and Lawrence Anderson,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## SUGGESTIONS IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants School District of Springfield, R-12; Board of Education for the School District of Springfield, R-12; Dr. Grenita Lathan; Dr. Yvania Garcia-Pusateri; and Lawrence Anderson, by and through counsel, offer the attached suggestions in support of their motion for summary judgment.

Respectfully submitted,

ELLIS, ELLIS, HAMMONS & JOHNSON, P.C.

By: ___/s/ Ransom A Ellis, III_____

Ransom A Ellis, III    MBN: 29129
rellis3@eehjfirm.com
Todd A. Johnson    MBN: 38363
tjohnson@eehjfirm.com
Tina G. Fowler    MBN: 48522
tfowler@eehjfirm.com
2808 S. Ingram Mill Road, Suite A104
Springfield, MO 65804
Phone: 417-866-5091
Fax: 417-866-1064
*Attorneys for Defendants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ... . . . . . . ii

I.  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ... . . . . . 1

II. DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS . . . . .........2

III. STANDARD OF REVIEW . . . . .................................................................39

IV. ARGUMENT . . . . ...................................................................................39

    A.    PLAINTIFFS HAVE NOT SUFFERED AN "INJURY IN
            FACT"; THEIR CLAIMS MUST BE DISMISSED FOR
            LACK OF STANDING . . . . .......................................................40

    B.    NONE OF PLAINTIFFS' SEPARATE CLAIMS HAVE
            MERIT; DEFENDANTS ARE ENTITLED TO JUDGMENT
            AS A MATTER OF LAW . . . . .........................................................44

          1.    Plaintiffs' Count I Claim, Compelled Speech in Violation
                  of the First Amendment, Fails as a Matter of Law . . . .....................44

          2.    Plaintiffs' Count II Claim, Content and Viewpoint
                  Discrimination in Violation of the First Amendment,
                  Fails as a Matter of Law . . . .....................................................50

          3.    Plaintiffs' Count III Claim, Unconstitutional Condition
                  of Employment in Violation of the First Amendment,
                  Fails as a Matter of Law . . . .....................................................55

    C.    PLAINTIFFS ALSO CANNOT SUCCEED ON THEIR
            REQUEST FOR INJUNCTIVE OR DECLARATORY RELIEF . . . ............57

    D.    DEFENDANTS ARE ENTITLED TO THEIR COSTS AND
            ATTORNEYS' FEES . . . .............................................................58

V. CONCLUSION . . . . ................................................................................58

Case 6:21-cv-03219-MDH   Document 75   Filed 07/22/22   Page 2 of 64

## <u>TABLE OF AUTHORITIES</u>

### <u>United States Supreme Court</u>

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505 (1986)……………….…………39

*Board of Directors of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537 (1987)………....………55

*Bob Jones Univ. v. U.S.*, 461 U.S. 574, 103 S.Ct. 2017 (1983)…………………………………48

*Bostock v. Clayton Cty., Ga.*, — U.S. —, 140 S. Ct. 1731 (2020)…………………………56

*Brown v. Socialist Workers '74 Campaign Comm.*, 459 U.S. 87, 103 S.Ct. 416 (1982)……………45

*Christian Legal Soc. Chap. of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*,
561 U.S. 661, 130 S.Ct. 2971 (2010)………………………………………………………54

*City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660 (1983)…………………………43

*Garcetti v. Ceballos*, 547 U.S. 410, 126 S.Ct. 1951 (2006)…………………………………...44

*Gonzaga Univ. v. Doe*, 536 U.S. 273, 122 S.Ct. 2268 (2002)…………………………………39

*Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 121 S.Ct. 2093 (2001)…………………54

*Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 108 S.Ct. 562 (1988)……………………...51, 54

*Heart of Atlanta Motel, Inc. v. U.S.*, 379 U.S. 241, 85 S.Ct. 348 (1964)……………………48

*Hein v. Freedom From Religion Found.*, 551 U.S. 587, 127 S.Ct. 2553 (2007)……………………40

*Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 119 S.Ct. 2118 (1999)………………………………56

*Laird v. Tatum*, 408 U.S. 1, 92 S.Ct. 2318 (1972)…………………………………………42

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130 (1992)…………………………40

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 S.Ct. 764 (2007)…………………………58

*Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831 (1974)…………………………44

*New York State Rifle & Pistol Ass'n, Inc. v. City of New York, N.Y.*,
— U.S. —, 140 S. Ct. 1525, 1526 (2020)………………………………………………………..43

*Pacific Gas v. Pub. Utilities Comm. of Ca.*, 475 U.S. 1, 106 S.Ct. 903 (1986)……………………44

*Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 92 S.Ct. 2694 (1972)…………………………55

*Pleasant Grove City v. Summum*, 555 U.S. 460, 129 S.Ct. 1125 (2009)…………………………50

*Pickering v. Bd. of Edu. of Twp. High Sch. Dist.*, 205, 391 U.S. 563, 88 S.Ct. 1731 (1968)…..44, 55

*Roberts v. U.S. Jaycees*, 468 U.S. 609, 104 S.Ct. 3244 (1984)…………………………………54

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 115 S.Ct. 2510 (1995)…………..50

ii

*Rust v. Sullivan*, 500 U.S. 173, 111 S.Ct. 1759 (1991)………………………………..………54

*Shelton v. Tucker*, 364 U.S. 479, 81 S.Ct. 247 (1960)………………………..……………………45

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 134 S.Ct. 2334 (2014)…………………………40

*Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 114 S.Ct. 2445 (1994)……………………44

*West Virginia State Bd. of Edu. v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178 (1943)…………………45

*Wilton v. Seven Falls Co*., 515 U.S. 277, 115 S.Ct. 2137 (1995)…………………….……………57

*Wooley v. Maynard*, 430 U.S. 705, 97 S.Ct. 1428 (1977)…………………………………………44

**United States Courts of Appeals**

*ACLU of Fla. V. Miami-Dade Cty. Sch. Bd*., 557 F.3d 1177 (11th Cir. 2009)………………….....51

*Altman v. Minn. Dpt. of Corr.*, 251 F.3d 1199 (8th Cir. 2001)……………………………….....45

*Axson-Flynn v. Johnson*, 356 F.3d 1277 (10th Cir. 2004)…………………………………………45

*Barrett v. Claycomb*, 705 F.3d 315 (8th Cir. 2013)………………………………………………...58

*Brown v. Hot, Sexy and Safer Prod., Inc*., 68 F.3d 525 (1st Cir. 1995)……………………………43

*C.N. v. Ridgewood Bd. of Edu*., 430 F.3d 159 (3rd Cir. 2005)…………………………………47, 48

*Dataphase Sys., Inc. v. C L Sys., Inc*., 640 F.2d 109 (8th Cir. 1981)…………………………...57, 58

*Dunn v. Nexgrill Industries, Inc*., 636 F.3d 1049 (8th Cir. 2011)………………………………..39

*Keefe v. Adams*, 840 F.3d 523 (8th Cir. 2016)……………………………………………48, 49

*Keeton v. Anderson-Wiley*, 664 F.3d 865 (11th Cir. 2011)………………………………48, 51, 53

*Kinney v. Weaver*, 367 F.3d 337 (5th Cir. 2004)…………………………..………………………55

*Krenik v. Cty. of LeSueur*, 47 F.3d 953 (8th Cir. 1995)…………………………………………..39

*L.L. Nelson Enterprises, Inc. v. County of St. Louis, Mo*., 673 F.3d 799 (8th Cir. 2012)……………39

*McAllum v. Cash*, 585 F.3d 214 (5th Cir. 2009)…………………………………………………..48

*McCarthy v. Ozark Sch. Dist*., 359 F.3d 1029 (8th Cir. 2004)…………………………………..43

*McInnis v. Fairfield Comm., Inc*., 458 F.3d 1129 (10th Cir. 2006)………………………………56

*Morrison v. Bd. of Educ. of Boyd County*, 521 F.3d 602 (6th Cir. 2008)…………………42, 43, 44

*Novus Franchising, Inc. v. Dawson*, 725 F.3d 885 (8th Cir. 2013)………………………………57

*Padilla v. South Harrison R-II Sch. Dist*., 181 F.3d 992 (8th Cir. 1999)…………………………49

*Parker v. Hurley*, 514 F.3d 87 (1st Cir. 2008)……………………………………………...48

*Phelan v. Laramie County Comm. Coll. Bd. of Trustees*, 235 F.3d 1243 (10th Cir. 2000).......45, 46

*Robertson v. Anderson Mill Elem. Sch.*, 989 F.3d 282 (4th Cir. 2021)…………..………………50

*Saxe v. State College Area Sch. Dist.*, 240 F.3d 200 (3rd Cir. 2001)………………………………53

*303 Creative, LLC v. Elenis*, 6 F.4th 1160 (10th Cir. 2021)…………………………………....48

*Utah Animal Rights Coal. v. Salt Lake City Corp.*, 371 F.3d 1248 (2004)…………………………43

*U.S. v. Sindel*, 53 F.3d 874 (8th Cir. 1995)……………………………………………………44

**United States Federal District Courts**

*Church of the Word v. Page*, 2020 WL 97230256 (E.D. Mo. 2020)…………………..……………40

*Duren v. Byrd*, 2021 WL 3848105 (M.D. Tenn. 2021)…………………………….………………..47

*Hanover Cty. Unit of the NAACP v. Hanover Cty*., 461 F.Supp.3d 280 (M.D. Tenn. 2021)…..45, 46

*Menders v. Loudoun Cty. Sch. Bd.*, 2022 WL 179597 (E.D. Va. 2022)…………..……………43, 50

*O'Rourke v. Duncan*, 2011 WL 1297546 (E.D. Mo 2011)…………………………………………39

*Preskar v. U.S.*, 248 F.R.D. 576 (E.D. Cal. 2008)……………………………………………41

**Federal and State Statutes and Regulations**

20 U.S.C. §1681 *et seq*. (Title IX)……………………………………………………………52

29 U.S.C. § 701 *et seq.* (Section 504)………………………………………………………1, 52

42 U.S.C. § 1983 (Section 1983)…………………………………………………………1, 39

42 U.S.C. § 1988(a)…………………………………………………………………………58

42 U.S.C. § 2000d *et seq*. (Title VI)……………………………………………………………..52

42 U.S.C. §§ 2000e *et seq*. (Title VII)…………………………………………………54, 56

42 U.S.C. §§ 12132 *et seq*. (Title II of the ADA)……………………………………....52

RSMo. § 162.461 *et seq*……………………………………………………………………3

RSMo. § 213.010 *et seq*………………………………………...…………………………...54, 56

**Rules**

Federal Rule of Civil Procedure 56……………………………………………………...39

**Other Resources**

U.S. Department of Justice's Civil Rights Division (CRD) and the U.S. Department
of Education's Office for Civil Rights (OCR) Fact Sheets…………………………………………53

Equal Employment Opportunity Commission Fact Sheet………………………………………56

# I. <u>INTRODUCTION</u>

This 42 U.S.C. § 1983 lawsuit is brought by two individuals, Brooke Henderson and Jennifer Lumley ("Plaintiffs"). It is not a class action. Plaintiffs allege that their rights under the First Amendment of the United States Constitution were violated when the School District of Springfield, R12 (the "District")[1] required Plaintiffs, as non-teacher employees, to attend mandatory equity training in the fall of 2020. Plaintiffs claim Defendants[2]: (a) compelled them to speak as private citizens on matters of public concern and to disclose personal details about their identities during this training and while completing online training modules (i.e. the "equity training") (Count I); (b) created a chilling effect on Plaintiffs' speech by adopting a viewpoint about equity and by expecting Plaintiffs to share that view or be punished, up to dismissal from employment, for failure to adhere to that view (Count II); and, (c) created an unconstitutional condition of employment by demanding that Plaintiffs understand and promote "so-called" racial equity as a part of their job, by making reduced pay or loss of credit hours the consequences for failure to participate in the equity training, and by implying that Plaintiffs' failure to participate may result in dismissal (Count III).

Plaintiffs request that the Court issue a declaratory judgment that the equity training violated Plaintiffs' First Amendment rights and constituted an unconstitutional condition of employment. Plaintiffs seek (1) a permanent injunction requiring Defendants to take all steps necessary to remedy the effects of the unconstitutional conduct and to prevent future occurrences, (2) an Order that the Court will retain jurisdiction to ensure Defendants' compliance, (3) an award of nominal damages

---

[1] The District is a political subdivision of the State of Missouri. *See* Statement of Undisputed Material Facts ¶¶ 7-9, *infra*. Hereinafter, all paragraph references will be to these facts.

[2] Plaintiffs also named the Board of Education and the following individuals in their official capacity: Dr. Grenita Lathan (Superintendent); Dr. Yvania Garcia-Pusateri (Chief Equity/Diversity Officer); and Lawrence Anderson (Coordinator, Office of Equity/Diversity). ¶¶ 10, 12-17. Dr. Martha Doennig (Director of the Department of Learning Development) has been dismissed. ¶ 11.

1

of $1.00 per day of mandatory training, and (4) their attorneys' fees and costs. As discussed, Defendants are entitled to judgment as a matter of law.

## II. STATEMENT OF UNDISPUTED MATERIAL FACTS

Defendants respectfully submit the following undisputed material facts:

### The Parties

1.    Plaintiff Brooke Henderson ("Plaintiff Henderson") has been employed by Defendant District since 2008. Since school year 2012-13, Plaintiff Henderson has been classified as a Special Education Process Coordinator and later as a 504 Process Coordinator in Defendant District's Special Services Department. *See* Brooke Henderson deposition attached and hereinafter referred to as Exhibit A, p. 4, l. 4-13; Affidavit of Dr. John Jungmann attached and hereinafter referred to as Exhibit C, ¶ 4; Affidavit of Penney Rector attached and hereinafter referred to as Exhibit D, ¶ 5; Affidavit of Tammi Harrington attached and hereinafter referred to as Exhibit E, ¶ 2, DEX 2.07; and Deposition of Dr. Tanya Rapert attached and hereinafter referred to as Exhibit F, p. 12, l. 1-16.

2.    The 504 Process Coordinator position is an exempt, certificated position, but is not a classroom teaching position. As a 504 Process Coordinator, Plaintiff Henderson is responsible for facilitating District educational processes to implement and maintain educational programs and services which provide accommodations for students who have met the eligibility requirements to be considered "students with disabilities" pursuant to Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et. seq.* ("Section 504"). *See* Exh. A, p. 5, l. 19-21; p. 7, l. 24 to p. 8, l. 24; p. 72, l. 17 to p. 73, l. 6; and Exh. C, ¶¶ 4, 5; and Exh. D, ¶¶ 5, 6; and Exh. E, ¶ 2, DEX 2.07.

3.    Plaintiff Henderson has not received discipline during her employment with Defendant District. *See* Exh. C, ¶ 4; and Exh. D, ¶¶ 5, 28; and Exh. F, p. 13, l. 23 to p. 14, l. 4.

2

4.    Plaintiff Jennifer Lumley ("Plaintiff Lumley") was hired by Defendant District on July 9, 2020 as a District Level Departmental Secretary in Defendant District's Special Services Department. During her employment with Defendant District, Plaintiff Lumley has always been a non-exempt, non-certificated employee. *See* Deposition of Jennifer Lumley attached and hereinafter referred to as Exhibit B, p. 3, l. 23 to p. 4, l. 4; *also see* Exh. C, ¶ 6; and Exh. D, ¶ 7; and Exh. E, ¶ 2, DEX 2.06, DEX 12.02.

5.    Effective on September 13, 2021, Plaintiff Lumley received a transfer to the position of full-time Secretary in Defendant District's Analytics, Accountability and Assessment Department. This transfer resulted in an approximate pay rate increase of two dollars fifty cents per hour for Plaintiff Lumley. *See* Exh. B, p. 4, l. 15-19; p. 5, l. 11-13; and Exh. D, ¶ 7; and Exh. E, ¶ 2, DEX 2.06, DEX 12.02.

6.    Plaintiff Lumley has not received discipline during her employment with Defendant District. *See* Exh. D, ¶¶ 7, 28; and Exh. F, p. 14, l. 9-18.

7.    Defendant District is an urban public school district and a political subdivision of the State of Missouri as provided in Sections 162.461 *et seq*. RSMo. Defendant District is also referred to as: "Springfield Public Schools" or "SPS." *See* Exh. C, ¶ 7; and Exh. D, ¶ 8; and DOC 1, ¶ 28.

8.    During school year 2020-21, Defendant District had in excess of 24,000 enrolled students, 2,200 certificated staff and another 1,300 non-certificated staff. During school year 2020-21, Defendant District operated fifty-two instructional buildings and was the largest school district in the State of Missouri. Defendant District maintains its principal offices in Kraft Administrative Center, 1359 E. Saint Louis Street, Springfield, Missouri, 65802. *See* Exh. C, ¶ 8; and Exh. D, ¶ 8; and DOC 1, ¶ 28.

9.    Defendant District is governed by a seven-member Board of Education ("Defendant Board") which currently consists of the following individuals: Dr. Denise Fredrick (President), Dr.

3

Maryam Mohammadkahni (Vice-President), Mr. Kelley Byrne, Mr. Scott Crise, Ms. Danielle Kincaid, Mr. Steve Makoski and Dr. Shurita Thomas-Tate. Plaintiffs have named Defendant Board in its official capacity but have not individually named any of the members of Defendant Board. *See* Exh. C, ¶ 9; and Exh. D, ¶ 9; and DOC 1, ¶ 29.

10. Defendant Dr. Grenita Lathan ("Defendant Lathan") is currently the Superintendent of Schools for Defendant District and has been in that position since July 1, 2021. Defendant Lathan is sued in her official capacity only. *See* Exh. C, ¶ 12; and Exh. D, ¶ 10; and DOC 1, ¶ 30.

11. Defendant Dr. Martha Doennig ("Defendant Doennig") is the Director of the Department of Learning Development for Defendant District. She was sued in her official capacity only but has been dismissed from the lawsuit. *See* Exh. C, ¶ 11; and Exh. D, ¶ 11; and Exh. E, ¶ 2, DEX 2.02; DOC 1, ¶ 31; and DOC 72 and 73.

12. Defendant Dr. Yvania Garcia-Pusateri ("Defendant Garcia-Pusateri") has been the Chief Equity and Diversity Officer for Defendant District since she was hired on September 9, 2019. Defendant Garcia-Pusateri is being sued in her official capacity only. *See* Deposition of Yvania Garcia-Pusateri attached and hereinafter referred to as Exhibit G, p. 15, l. 1-5; *also see* Exh. C, ¶ 12; and Exh. D, ¶ 12; and Exh. E, ¶ 2, DEX 2.03; and DOC 1, ¶ 32.

13. Defendant Garcia-Pusateri holds a bachelor's degree in communication studies with an emphasis in journalism, a master's degree in college counseling and student development from Azusa Pacific University and a Ph.D. in educational leadership from Miami University of Ohio. *See* Exh. G, p. 10, l. 22 to p. 11, l. 5.

14. As Chief Equity and Diversity Officer, Defendant Garcia-Pusateri is responsible for working with Defendant District's Executive Leadership Team "to oversee initiatives and programs focused on equity and diversity." *See* Exh. G, p. 15, l. 6-14; p. 25, l. 16-24.

4

15.     Defendant Lawrence Anderson ("Defendant Anderson") is a Coordinator in Defendant District's Department of Equity and Diversity. Defendant Anderson is being sued in his official capacity only. *See* Deposition of Lawrence Anderson attached and hereinafter referred to as Exhibit H, p. 12, l. 13-16; *also see* Exh. C, ¶ 13; and Exh. D, ¶ 13; and DOC 1, ¶ 33.

16.     Defendant Anderson was first employed by Defendant District in June, 2013. As a Coordinator in the Department of Equity and Diversity, Defendant Anderson provides professional learning for staff and works with under-represented and under-resourced students to help them connect with the staff in their buildings and the community. *See* Exh. H, p. 10, l. 2-4; p. 12, l. 17 to p. 13, l. 1.

17.     Defendant Anderson holds a bachelor's degree from Southwest Missouri State University (now Missouri State University) in recreation with a minor in political science and a master's degree in education from Drury University. *See* Exh. H, p. 7, l. 8-21.

**Defendant District's Strategic Plan**

18.     Prior to May 19, 2020, the District's Board of Education developed a Strategic Plan, which resulted from the work of study groups that engaged parents, educators and administrators in conversations about what the District's students both needed and wanted out of their school experience and asked those groups how they would define student and school system success and the measures they believed should be used to evaluate progress. *See* Exh. C, ¶14; and Exh. E, ¶ 2, DEX 3.06.

19.     Prior to school year 2018-19, Defendant District's Strategic Plan consisted of the following four (4) "Focus Areas:"

Focus Area 1 – Student Success and Learning Support
Focus Area 2 – Empowered and Effective Teachers, Leaders and Support Personnel
Focus Area 3 – Financial Sustainability and Operational Efficiency
Focus Area 4 – Communication and Engagement

5

*See* Exh. C, ¶ 15; and Exh. D, ¶ 15; and Exh. E, ¶ 2, DEX 3.06.

20.     Each Focus Area had multiple goal areas. The purpose of these Focus Areas and the strategic goals set forth therein, was to establish goals to meet the legal and educational responsibilities of the District as determined by federal and state law with the input of the District's educators, parents and community members. *See* Exh. C, ¶ 15; and Exh. D, ¶ 15; and Exh. E, ¶ 2, DEX 3.06.

### Defendant Board's Resolution to Affirm Commitment to Equity and Diversity
### May 21, 2019

21.     During school year 2018-19 Defendant District experienced a series of disturbing events that impacted the District's students, staff, parents and the school community. The acts targeted several District students, specifically students of color and LGBTQ+ students, and represented what the District's Board believed to be "opposition to basic human rights and to a learning environment defined by inclusivity and respect for every individual." *See* Exh. C, ¶ 16.

22.     In response to these events, Defendant Board issued a definitive statement opposing racism, bigotry and disrespect in any form and on May 21, 2019 passed a Resolution to Affirm Commitment to Equity and Inclusivity in all District operations during an open meeting of Defendant Board. *See* Exh. C, ¶ 17; and Exh. E, ¶ 2, DEX 26.02.

### The Equity and Diversity Advisory Council Meetings and Recommendations
### August 2019 through April 2020

23.     In August, 2019, a forty-six (46) person citizen's committee composed of residents of the District, present and former members of the District's Board of Education, educators and administrators was gathered by Defendant District to serve as the Equity and Diversity Advisory Council ("EDAC"). *See* Exh. C, ¶ 18; and Exh. D, ¶ 16.

24.     Dr. Nicole Holt, Director of Defendant District's Learning Development Department (at that time) was the facilitator and Stephen Hall, (Chief Communications Officer), Defendant

6

Garcia-Pusateri and Penney Rector (Chief Human Resources Officer) served as liaisons between the EDAC and the District's Administration. *See* Exh. C, ¶ 18; and Exh. D, ¶ 16.

25.     The EDAC had eight (8) meetings beginning in August, 2019 and ending in April, 2020 when it issued a Final Report. *See* Exh. C, ¶ 19; and Exh. E, ¶ 2, DEX 6.01-6.09.

26.     During these meetings, the EDAC members studied the "driving question" given to them by Defendant Board of Education and Dr. Jungmann, which was:

> "What actions should the district deploy to ensure that all students excel through purposeful engagement, rigorous instruction, cultural awareness and relevant education experiences with an intentional focus on historically under-represented and under-resourced groups?"

*See* Exh. C, ¶ 20; and Exh. E, ¶ 2, DEX 6.02.

27.     The EDAC Council Members were also asked by the Superintendent to "bring forth a specific list of recommendations and action steps the District should deploy to positively impact the following four strategies which are part of the District's strategic plan:

- The district will research, develop, and deploy strategies that improve engagement, safety, and attendance rates for under-resourced and under-represented student populations.
- The District will demonstrate annual growth in the core academic success (iReady, MAP, EOC, Common Assessments) of all students, with an intensive focus on closing performance gaps for under-resourced and under-represented students.
- The District will research, develop and deploy actions to increase the graduation rate of all student populations, with an intensive focus on under-resourced and under-represented students.
- Recruit, hire, develop, support and retain an effective, qualified and diverse workforce of teachers, staff and leaders to better meet the needs of students."

*See* Exh. C, ¶ 21; and Exh. E, ¶ 2, DEX 6.01-6.09.

28.     During the EDAC meetings held in August and September 2019, Mr. Wes Pratt, the Chief Equity Officer and Assistant to the President of Missouri State University presented "Mini-Diversity Workshop Sessions" which were designed to provide the EDAC Members with a

7

definitional understanding of the equity and diversity issues that can impact the classroom delivery of educational learning for under-represented and under-resourced student groups. *See* Exh. C, ¶ 22; and Exh. E, ¶ 2, DEX 6.01-6.03, 6.09.

29.     During the EDAC meeting on September 24, 2019, District Staff provided an overview of the staffing in the District which focused on the current staffing demographics in Defendant District's teachers and staff members in order to provide the Council Members with "hard data" showing the challenges to recruiting, hiring and retaining an effective, qualified and diverse workforce of teachers, staff and leaders to better meet the needs all District students. *See* Exh. C, ¶ 23; and Exh. E, ¶ 2, DEX 6.04.

30.     During the EDAC meeting on October 18, 2019, the Council focused on improving high school student engagement and attendance and were provided with research briefs for improving student engagement and attendance in high school and an analysis of chronic absence data. *See* Exh. C, ¶ 24; and Exh. E, ¶ 2, DEX 6.05.

31.     During the EDAC meeting on October 22, 2019, the Council focused on Instructional Strategies to reduce achievement gaps in all areas of the District. A large part of this discussion dealt with:  (a) the need to acknowledge students and their cultural heritage; (b) the need to connect the curriculum to what students already know, their heritage and communities, so they feel comfortable and included in the classroom; and, (c) the need to accommodate diverse learning styles. *See* Exh. C, ¶ 25; and Exh. E, ¶ 2, DEX 6.06.

32.     During the EDAC meeting on November 12, 2019, the Council prepared Initial Focus Area Strategies and Recommendations for Defendant District and Defendant Board.  Included in these Focus Area Strategies and Recommendations were the following: (a) the need for teacher cultural competence; (b) teacher training on culturally competent teaching strategies; and (c) teachers who show value and concern for students. *See* Exh. C, ¶ 26; and Exh. E, ¶ 2, DEX 6.07.

33.     In April, 2020, the EDAC issued its Final Report which included its final recommendations to Defendant Board and Defendant District. Included in the final recommendations were recommendations for: (a) ensuring that Defendant District was assessing the gaps in equity as it impacts each student's learning and experience; (b) development of affirming and supportive policies for all students, their identities and lived experiences; and (c) development of ongoing Identity and Equity training for Defendant District's students, staff, faculty and leaders. *See* Exh. C, ¶ 27; and Exh. E, ¶ 2, DEX 6.09.

## Fall (2019) Equity Training

34.     During the Fall of school year 2019-20 Defendant District provided Equity Training for its employees in order to further reaffirm its commitment to equity and inclusivity within the District and provide employee understanding concerning: (a) the "complex issues facing marginalized students in our system;" and (b) the "ethical responsibility" of Defendant District's employees to "positively influence the trajectory of all of our student's lives." *See* Exh. C, ¶ 28; and Exh. D, ¶ 17; and Exh. E, ¶ 2, DEX 25.03.

35.     In the Complaint, Plaintiffs have not alleged that Defendant District's Fall (2019) Equity Training violated any provision of Federal or State law. *See* Exh. D, ¶ 18; and DOC 1.

36.     No complaints were received by Defendant District concerning its "Equity Training Fall 2019." *See* Exh. C, ¶ 29; and Exh. D, ¶ 18; and Exh. E, ¶ 2, DEX 25.03.

## Hiring of the Chief Equity and Diversity Officer
## September 2019

37.     On September 9, 2019, Defendant Board hired Defendant Garcia-Pusateri as the Chief Equity and Diversity Officer for Defendant District. *See* Exh. C, ¶ 30; and Exh. D, ¶ 19; and DOC 1, ¶ 32.

9

38.     As the Chief Equity and Diversity Officer for the District, Defendant Garcia-Pusateri is responsible for Defendant District's Department of Equity and Diversity. *See* Exh. C, ¶ 30; and Exh. D, ¶ 19; and Exh. G, p. 15, l. 1-14; and Exh. E, ¶ 2, DEX 2.03; and DOC 1, ¶ 32.

39.     When Defendant Garcia-Pusateri arrived in the District in "2019, the District wanted to engage in equity work. . . and the best way to start engaging in that work [was] to start doing professional learning around the topics so that all staff had an understanding of what equity is and how it might have positive impacts in the classroom and in the workplace" including improvements such as better attendance, improved academic outcomes and lower discipline rates, and helping students feel safe. *See* Exh. G, p. 54, l. 7-13; p. 55, l. 10-24.

40.     The job responsibilities of the Chief Equity and Diversity Officer are directly aligned with the purposes of the Department of Equity and Diversity in a number of ways, including but not limited to the following:

- Lead the implementation of the identified strategies for equity, diversity and inclusion, including reviewing the progress made to date, and developing and implementing subsequent phases of system-wide strategic work.
- Develop, implement and monitor programs and processes that promote and sustain equity, diversity and inclusion.
- Develop and implement strategies to monitor and evaluate district wide progress toward eliminating the achievement disparities among students of all racial and economic groups.

*See* Exh. C, ¶ 32; and Exh. D, ¶ 20; and Exh. E, ¶ 2, DEX 2.03.

41.     The Department of Equity and Diversity strives to meet "the unique needs of students and staff to ensure that they are finding their way to success." *See* Exh. G, p. 63, l. 15-20.

42.     Defendant District's Department of Equity and Diversity provides services and education focused on the diverse student populations in Defendant District which are defined as "under-represented and under-resourced students." *See* Exh. C, ¶ 31.

10

43.     "Under-represented students" include but are not limited to the following groups: students of color, students with disabilities, LGBTQ+ students, students who are English Language Learners and students who are from diverse religious backgrounds and belief systems. *See* Exh. C, ¶ 31.

44.     "Under-resourced students" include but are not limited to the following groups: students who qualify for and receive free and reduced lunch services and students who receive McKinney-Vento services. Students can be both under-represented and under-resourced, depending upon their personal circumstances. *See* Exh. C, ¶ 31.

45.     The terms "under-represented" and "under-resourced," are based on the student subgroup data (such as graduation data, discipline data and attendance data), the analysis of which allows Defendant District to create better educational practices that yield more equitable educational outcomes for the students. *See* Exh. G, p. 143, l. 11-22.

46.     The terms "under-represented" and "under-resourced" were already in use when Defendant Garcia-Pusateri joined Defendant District on July 1, 2021. *See* Exh. G, p. 136, l. 6-9.

### Amendment of the District's Strategic Plan
### May 19, 2020

47.     On May 19, 2020, Defendant Board of Education amended the District's Strategic Plan, consistent with the recommendations of the EDAC and Chief Equity and Diversity Officer Defendant Garcia-Pusateri. This amendment added Focus Area 5 – Equity and Diversity. Subsequently, the following five (5) Strategies were added to Focus Area 5:

Strategy 5.1.1:  Facilitate learning opportunities for staff and leaders that foster exploration of identity and self and create applications to demonstrate cultural consciousness in their work.

Strategy 5.1.2:  Develop and deploy improved recruitment, collaboration and communication structures to enhance and diversify the workforce.

Strategy 5.1.3:  Review, improve and expand programming and services for under-resourced and under-represented students.

11

Strategy 5.1.4:   Review and expand the curriculum to reflect student identities, lived experiences, cultural history and significant contributions.

Strategy 5.1.5:   Research, develop and deploy engagement and advocacy policy, practices, and programs that support students and staff, and foster greater community engagement.

*See* Exh. C, ¶ 33; and Exh. E, ¶ 2, DEX 3.06.

48.     Defendant Board of Education added Focus Area 5 because they "believed in the work of equity and diversity" and felt that the Focus Area and its strategies would help to address that work. Part of that training was the exploration of identity and self which was important knowledge for Defendant District's teachers, staff and leaders so they could "create more equitable working and learning environments for students and staff" which "helps us to better create more safety and support in the classroom, therefore having a stronger academic outcome." *See* Exh. G, p. 30, l. 12-15; p. 31, l. 2-9, 12-17.

**Training Provided to Defendant District's Staff**

49.     All certificated teachers and staff members are required to take training on various employment-related subjects each school year as a part of their required duties or in order to be qualified to perform their job. Training is often provided to teachers and staff on pre-selected "Professional Days" usually when students are not in school or virtually. *See* Exh. C, ¶ 34; and Exh. D, ¶ 21.

50.     Defendant District's employees receive their regular rate of pay for training that occurs on Professional Days provided the employees take and complete the required training, makeup the missed training or use appropriate leave. If one of these things does not occur, employees are subject to having their pay docked for missing the required training. *See* Exh. C, ¶ 34; and Exh. D, ¶ 21.

51.     During school year 2019-20, Chief Human Resources Officer Penney Rector was responsible for engaging in collective bargaining negotiations with certified or recognized

12

representatives of employee groups in the District. *See* Exh. C, ¶ 35; and Exh. D, ¶ 22; and Exh. E, ¶ 2, DEX 51.01.

52.     During school year 2019-2020, Rector met with the Springfield National Education Association ("SNEA"), the recognized representative for purposes of collective bargaining for the Teachers' Bargaining Unit, to negotiate changes to their Collective Bargaining Agreement, which would be effective during school year 2020-21. During these negotiations, the District agreed to the following language change for Article 16, Wages, Section 1 of the Teachers' Collective Bargaining Agreement:

> "The attached salary schedule includes the three tenths of one percent (.30%) salary increase which was implemented in School Year 2018-19 to support four (4) additional hours of training beyond the current contracted school days and hours. This annual training supplements all current trainings in place in the school district. These four hours of training may include seated, simulation and other such trainings as deemed necessary and appropriate to support the needs of the district."

*See* Exh. C, ¶ 35; and Exh. D, ¶ 22; and Exh. E, ¶ 2, DEX 51.01.

53.     The four (4) hours of "Supplemental" training referenced in this contractual language change was in addition to normal pay for training time on Professional Days and was scheduled to take effect in 2020. *See* Exh. C, ¶ 35; and Exh. D, ¶ 22; and Exh. E, ¶ 2, DEX 51.01.

54.     During school year 2020-21, Defendant District elected to use the negotiated four (4) hour "Supplemental" training stipend ("Supplemental Pay") to pay its staff to attend three training programs: (a) the two-hour Fall (2020) Equity Training; (b) a one-hour mental health training program; and, (c) a one-hour Alice Active-Shooter training program. *See* Exh. C, ¶ 36; and Exh. D, ¶ 23; and Exh. E, ¶ 2, DEX 51.01.

55.     During school year 2020-21, Defendant District required each District teacher and certificated staff member to attend and complete each of these three (3) training programs in order to qualify for the full four (4) hour "Supplemental Pay" training stipend. Employees who failed to

attend some but not all of the three (3) training programs would receive a portion of the "Supplemental Pay" training stipend depending on the training completed. For example, an employee who attended the one-hour mental health training program and the one-hour Alice Active-Shooter training program but did not attend the two-hour Fall (2020) Equity Training, would receive two hours of the four hour "Supplemental Pay" training stipend. *See* Exh. C, ¶ 37; and Exh. D, ¶ 24; and Exh. E, ¶ 2, DEX 51.01.

56.     On October 14, 2020, Plaintiff Henderson attended and completed the two (2) hour Fall (2020) Equity Training. *See* Exh. A, p. 16, l. 4-10; p. 54, l. 3-9; and Exh. C, ¶ 39; and Exh. D, ¶ 26; and; Exh. E, ¶ 2, DEX 13.02.

57.     During school year 2020-21, Plaintiff Henderson also attended and completed the one-hour mental health training program and the one-hour Alice Active-Shooter training program. *See* Exh. C, ¶ 39; and Exh. D, ¶ 26.

58.     Plaintiff Henderson received "credit" for taking and completing the two (2) hour Fall (2020) Equity Training and the one-hour mental health training program and the one-hour Alice Active-Shooter training program and received four hours of "Supplemental Pay".  *See* Exh. A, p. 43, l. 19 to p. 44, l. 10; and Exh. C, ¶ 39; and Exh. D, ¶ 26; and Exh. E, ¶ 2, DEX 13.02.

59.     On October 6, 2020, Plaintiff Lumley received "credit" for attending and completing the two (2) hour Fall (2020) Equity Training and was paid her regular rate of pay for attending and completing that training program. *See* Exh. B, p. 15, l. 8-20; and Exh. C, ¶ 38; and Exh. D, ¶ 25; and Exh. E, ¶ 2, DEX 13.03.

60.     During school year 2020-21 Plaintiff Lumley attended "all of the training sessions she alleges Defendant District required her to attend" and her pay was not reduced. *See* Exh. B, p. 15, l. 8-17.

61.     There were five (5) employees of Defendant District who did not attend the Fall (2020) Equity Training, did not attend a subsequent make-up training session or use approved leave. These five (5) employees did not receive "Supplemental Pay" for attending and completing the Fall (2020) Equity Training. *See* Exh. C, ¶ 40; and Exh. D, ¶ 27.

62.     Neither Plaintiff Henderson nor Plaintiff Lumley have received discipline from Defendant District. *See* Exh. C, ¶ 4; and Exh. D, ¶ 28.

63.     Plaintiffs did not know of anyone who got kicked out of a training session, was denied credit or was disciplined in some way based on their conduct during the training session. *See* Exh. A, p. 63, l. 6-12; and Exh. B, p. 19, l. 5-13.

64.     No employee of Defendant District was terminated from employment because the employee failed or refused to attend the Fall (2020) Equity Training or failed to complete the training program. *See* Exh. C, ¶ 41; and Exh. D, ¶ 29.

**The Fall (2020) Equity Training**

65.     The Fall (2020) Equity Training was a continuation of the Fall (2019) Equity Training conducted by Defendant District during the Fall of 2019. *See* Exh. G, p. 34, l. 12-16.

66.     The purpose of the Fall (2020) Equity Training was to:

- Improve engagement, safety, and attendance rates for under-resourced and under-represented student populations.
- Demonstrate annual growth in the core academic success (iReady, MAP, EOC, Common Assessments) for all students, with an intensive focus on closing performance gaps for under-resourced and under-represented students.
- Increase the graduation rate for all student populations, with an intensive focus on under-resourced and under-represented students.
- Recruit, hire, develop, support and retain an effective, qualified and diverse workforce of teachers, staff and leaders to better meet the needs of students.

*See* Exh. C, ¶ 42; and Exh. E, ¶ 2, DEX 3.06, 6.01.

15

67.     The purpose of the Fall (2020) Equity Training was to create more equitable environments for students by providing adults learning and understanding about the barriers to education that students and staff may encounter in school and understand how those barriers to learning impact the education of students in Defendant District. *See* Exh. G, p. 42, l. 20 to p. 43, l. 3, and l. 12-16; p. 44, l. 5-7.

68.     The Fall (2020) Equity Training was never designed, nor was it intended to be directly or indirectly used as curriculum for the students in Defendant District. *See* Exh. C, ¶ 45; and Exh. G, p. 326, l. 9-16; and Exh. E, ¶ 2, DEX 13.01.

69.     The concepts contained in the Fall (2020) Equity Training were designed for adults to "broaden their perspectives so they can find ways [to] better identify the barriers in [the] system that [are] impacting students" and were not designed for children or students. *See* Exh. G, p. 325, l. 11-15.

70.     The Fall (2020) Equity Training began immediately following the beginning of the regular school year in early September 2020. During September 2020, the first three training programs were presented at Bingham Elementary, Bissett Elementary and Boyd Elementary Schools. Changes were made to the Fall 2020 Equity Training materials and as of October 1, 2020, the version of the Fall 2020 Equity Training that was in use when the Plaintiffs took the Fall (2020) Equity Training is marked as DEX 13.01. *See* Exh. C, ¶ 43; and Exh. G, p. 19, l. 11-21; and Exh. E, ¶ 2, DEX 13.01.

71.     In early October, 2020 Defendant Garcia-Pusateri informed Rector that she had learned that some teachers were wanting to use "supplemental equity content" in their classrooms that they found on their own. Rector shared this information with Dr. Jungmann. On October 3, 2020, Dr. Jungmann sent an email to Defendant Garcia-Pusateri which stated:

"Thanks for the message I would ask that we pause and reflect a bit more on this

16

message.

1.     All re-entry Modules are designed for adults not students. We have no idea what age group teachers are delivering them to and if they are developmentally appropriate - remember we have 5-18 year olds in our classrooms.

2.     I am not confident our teachers are ready to deliver this content to our students, when we deliver curriculum in SPS we have identified and approved standards and resources delivered by teachers certified in the content area.

3.     As we consider content for our students and classrooms we must deploy a process that is both thoughtful and strategic or we risk damaging the work underway.

In general I don't think our teachers should have permission to proceed with equity content in our classrooms until this work is complete."

*See* Exh. C, ¶ 46; and Exh. D, ¶¶ 30, 31; and Exh. E, ¶ 2, DEX 50.01.

72.     The statements made by Dr. Jungmann in his email to Defendant Garcia-Pusateri are consistent with Defendant Board's Policy IF Curriculum Development, which explains Defendant District's "curriculum development process" in greater detail. *See* Exh. C, ¶ 47; and Exh. D, ¶ 31; and Exh. E, ¶ 2, DEX 32.02, DEX 51.01.

73.     No audio or video recordings of the Fall (2020) Equity Training sessions were made by Defendants, on Defendants' behalf or have come into the possession of Defendants. *See* Exh. H, p. 93, l. 11-19.

74.     No audio or video recordings of the October 6, 2020 Fall (2020) Equity Training session were made by Plaintiffs. *See* Exh. B, p. 20, l. 13-16.

**The Fall (2020) Equity Training Attended by Plaintiff Lumley**
**October 6, 2020**

75.     Plaintiff Lumley attended the Fall (2020) Equity Training on October 6, 2020.  The training was conducted in person. There were a total of eight (8) persons who received the training, including Plaintiff Lumley. The training session was held in a conference room in Defendant District's Bentley Building where Plaintiff Lumley worked. Seating in the conference room was

17

spaced apart due to concerns about Covid-19. *See* Exh. B, p. 6, l. 6-9 and 17-25; p. 7, l. 1-4; p. 8, l. 6-15; p. 9, l. 9-15; and Exh. E, ¶ 2, DEX 13.03.

76.     The only equity training program Plaintiff Lumley attended was the Fall (2020) Equity Training that was held on October 6, 2020. *See* Exh. B, p. 9, l. 9-13.

77.     Defendant Garcia-Pusateri, Defendant Anderson and Equity and Diversity Department Coordinator Jimi Sodi were the trainers for the October 6, 2020 Fall (2020) Equity Training attended by Plaintiff Lumley. *See* Deposition of Cecil Mooney attached and hereinafter referred to as Exhibit I, p. 8, l. 14-19; *also see* Exh. B, p. 7, l. 5-6.

78.     Employee Cecil Mooney attended the October 6, 2020 Fall (2020) Equity Training that was attended by Plaintiff Lumley. *See* Exh. I, p. 8, l. 5-8; and Exh. E, ¶ 2, DEX 13.03.

79.     The training materials used for the Fall (2020) Equity Training on October 6, 2020 consisted of a handout and a power point presentation. *See* Exh. E, ¶ 2, DEX 13.01.

80.     Employee Hale was responsible for creating the packets and handing out the written training materials to employees in the Department of Special Services which were used for the Fall (2020) Equity Training on October 6 and 14, 2020. These training materials consisted of the exhibits marked as Exhibit 2 at Hale's deposition, but did not include the "agree, disagree, strongly agree, or strongly disagree signs" marked as Exhibit 3 at Hale's deposition. Hale had not seen the documents marked as "Exhibit 3" before the exhibit was shown to him at his deposition on June 16, 2022. *See* Deposition of Phillip Hale attached and hereinafter referred to as Exhibit J, p. 9, l. 12-15; p. 11, l. 2-25; p. 16, l. 14 to p. 17, l. 6; *also see* Exhibit 3 attached to Exhibit J.

81.     Plaintiff Lumley was not provided with signs that read "agree, disagree, strongly agree, or strongly disagree" for the October 6, 2020 Fall (2020) Equity Training session. Exh. B, p. 19, l. 14-17.

18

82.     The October 6, 2020 Fall (2020) Equity Training session attended by Plaintiff Lumley involved "viewing the George Floyd video, identifying where [the employee] fell on the oppression matrix, understanding covert and overt white supremacy and engaging in small and large group discussions about the lessons." *See* Exh. B, p. 19, l. 21-25; p. 20 l. 1-12.

83.     After viewing the George Floyd video during the October 6, Fall (2020) Equity Training session Plaintiff Lumley went to a "small group session" with one other employee for about three minutes and each shared their "opinions" with the other about the video. Plaintiff Lumley did not think there was anything wrong with what happened in the small group session where the George Floyd video was discussed. *See* Exh. B, p. 20, l. 17-25; and p. 22, l. 2-10.

84.     When the George Floyd video small group session ended, there was a large group session on the video during which the other employee in Plaintiff Lumley's small group gave her opinion, but did not share Plaintiff Lumley's opinion, which did not matter to Plaintiff Lumley, nor was Plaintiff Lumley asked for her opinion. *See* Exh. B, p. 22, l. 15 to p. 23, l. 7.

85.     Employee Cecil Mooney, who was also present in the October 6, 2020 Training session, said that the presenters "asked for comments or let people volunteer" but he "did not remember them calling on any one individual . . . it was open for individuals to speak." *See* Exh. I, p. 11, 8-17.

86.     The October 6, 2020 Training session attended by Plaintiff Lumley also contained a discussion about the oppression matrix, but the participants did not have to rate themselves on the oppression matrix slide, no small group session was held on the oppression matrix presentation and Plaintiff Lumley was not asked her opinion about the oppression matrix. *See* Exh. B, p. 23, l. 12 to p. 24, l. 7.

87.     The October 6, 2020 Training session attended by Plaintiff Lumley also contained a discussion about the white supremacy chart. No small group session was held on the white

19

supremacy chart. No one called Plaintiff Lumley's name or asked her directly if she understood the white supremacy chart. Plaintiff Lumley was not asked to affirm or agree to anything that had been presented about the white supremacy chart or to write anything down. Rather, the participants were told that they could look at the white supremacy chart on their own time. *See* Exh. B, p. 24, l. 12 to p. 25, l. 18.

88.    The October 6, 2020 Training session attended by Plaintiff Lumley also contained a discussion about the social identities chart. No small group session was held to discuss the social identities chart and the participants were told that they could look at the social identities chart on their own time. Plaintiff Lumley was not asked about her opinion on the social identities chart, how she would have filled it out or how she fit in on it, nor was anyone else. *See* Exh. B, p. 25, l. 19 to p. 26, l. 14.

89.    During the October 6, 2020 training session attended by Plaintiff Lumley, between the discussion about the oppression matrix and the covert/overt white supremacy sheet Plaintiff Lumley "spoke up" and shared her "opinion" that she thought the presenters:

> ". . . were painting a broad-brush stroke of white people as racist, and I said that that was wrong. I said not all white people are racist. I said there's racism across the board. And, . . . my nephew married a Black woman, and they have children together. And there are Black people that tell her she doesn't count as Black anymore because she married a white man and has children with him. And I said that I grew up in a broken home, a poor home with government handouts. I wasn't born into white privilege. And they said because I was white, I was born into white privilege."

*See* Exh. B, p. 27, l. 10-23; p. 28, l. 9-13.

90.    Plaintiff Lumley admitted that she and other attendees, as well as the presenters, were expressing their opinions or "saying what they felt." *See* Exhibit B, p. 28, l. 9-19.

91.    After completing the Fall (2020) Equity Training on October 6, 2020, Plaintiff Lumley did not file an internal grievance pursuant to Defendant Board's Policy AC – Prohibition

20

Against Illegal Discrimination, Harassment and Retaliation or otherwise complain to Penney Rector, Defendant District's Chief Human Resources Officer and Compliance Officer, concerning any aspect of the training she received during the October 6, 2020 Fall (2020) Equity Training. *See* Exh. D, ¶ 32; and Exh. E, ¶ 2, DEX 32.01.

92.     The first notice the District received that Plaintiff Henderson and Plaintiff Lumley was alleging that Defendants had violated their First Amendment Rights was when the District received the Complaint in August, 2021, more than ten (10) months after they had attended the Fall (2020) Equity Training. *See* Complaint, DOC 1; and Return of Service, DOC 10.

## The Fall (2020) Equity Training Attended by Plaintiff Henderson
## October 14, 2020

93.     Plaintiff Henderson attended the Fall (2020) Equity Training on October 14, 2020. The training was conducted virtually. There were a total of at least thirty-one (31) persons who received the training, including Plaintiff Henderson. *See* Exh. A, p. 16, l. 7-15; Exh. E, ¶ 2, DEX 13.02.

A.     Dr. Tanya Rapert, the Director of the Special Services Department and Plaintiff Henderson's departmental supervisor was present at the virtual October 14, 2020 Fall (2020) Equity Training. *See* Exh. F, p. 16, l. 13-18; and Exh. E, ¶ 2, DEX 13.02.

B.     Employee Phil Hale attended the October 14, 2020 Fall (2020) Equity Training. *See* Exh. J, p. 13, l. 22 to p. 14, l. 2.

C.     Defendant Garcia-Pusateri and Defendant Anderson were the trainers for the October 14, 2020 Fall (2020) Equity Training attended by Plaintiff Henderson. *See* Exh. F, p. 39, l. 12-15.

94.     Prior to the October 14, 2020 Fall (2020) Equity Training Dr. Tanya Rapert told a meeting of Special Education Process Coordinators, including Plaintiff Henderson, that it was

"mandatory" that the staff attend the training and be respectful and they needed to sign up for a time to take the training, either a virtual or in-person session; Plaintiff Henderson had no problem doing that. *See* Exh. A, p. 68, l. 15 to p. 69, l. 8; p. 70, l. 4-6.

       A.     Plaintiff Henderson did not believe that being told it was "mandatory" for her to attend the Fall (2020) Equity Training Session and to be respectful violated her rights in any way. *See* Exh. A, p. 70, l. 4-11.

       B.     Prior to the October 14, 2020 Fall (2020) Equity Training Dr. Tanya Rapert "assumed" that the content of the October 14 Equity Training was going to be about "awareness of equity and diversity," but she did not know anything specific about the content of the training. *See* Exh. F, p. 22, l. 9-13.

95.     Henderson alleged in the Complaint that prior to the October 14, 2020 Fall (2020) Equity Training, she and her colleagues were provided with "four paper signs each" that read "Strongly Agree, Agree, Disagree and Strongly Disagree." (DOC 1, ¶ 78) and her Department Supervisor told the staff that they would be asked to hold up the signs in response to prompts during the Zoom training. (DOC 1, ¶ 79).

       A.     According to Plaintiff Henderson, the "Strongly Agree, Agree, Disagree and Strongly Disagree" signs were given to her by fellow Department employee Hale, by placing them on her desk, although she did not see him place the signs there. *See* Exh. A, p. 64, l. 9-21.

       B.     Hale was responsible for preparing and handing out the training materials used for the Fall (2020) Equity Training on October 14, 2020 which consisted of a handout and a power-point presentation but did not contain the "agree-disagree" signs. *See* Exh. J, p. 9, l. 12-15; p. 11, l. 2-25; p. 16, l. 14 to p. 17, l. 6; and Exh. E, ¶ 2, DEX 13.01.

22

C. According to Hale, the "agree, disagree signs" (*see* Exh. J, and its Exhibit 3) were not used during the October 14, 2020 Fall (2020) Equity Training attended by Plaintiff Henderson. *See* Exh. J, p. 16, l. 14 to p. 17, l. 6.

D. Hale had not seen the "agree-disagree signs" (*see* Exh. J, and its Exhibit 3) before they were shown to him at his deposition on June 16, 2022. *See* Exh. J, p. 16, l. 14 to p. 17, l. 6.

E. During the October 14, 2020 Fall (2020) Equity Training Hale did not have to "agree or disagree with certain statements that were made on a slide or were spoken by a trainer." *See* Exh. J, p. 18, l. 24 to p. 19, l. 8.

F. Dr. Rapert was not told that the participants in the October 14, 2020 training session for the Fall (2020) Equity Training would be provided with "agree-disagree signs." *See* Exh. F, p. 20, l. 21-24.

G. Prior to the October 14, 2020 Fall (2020) Equity Training Dr. Rapert did not tell anyone in her department that they would be asked to hold up the "agree-disagree signs" (*see* Exh. 3 attached to Exh. I) "in response to prompts during the Fall (2020) Equity Training session" or otherwise respond to prompts (*see* Exh. F, p. 21, l. 14-24).

H. Dr. Rapert did not receive a copy of any signs that said, "agree, disagree, strongly agree, or strongly disagree" when she received her packet of training materials from Hale (*see* Exh. F, p. 19, l. 9-19) or during the Fall (2020) Equity Training on October 14, 2020 (*see* Exh. F, p. 19, l. 20-23).

I. Dr. Rapert was not required to hold up an "agree-disagree sign" during the Fall (2020) Equity Training on October 14, 2020. *See* Exh. F, p. 19, l. 24-25; p. 20, l. 1.

J. None of the presenters had or used the "agree, disagree" signs at the October 14, 2020 training. *See* Exh. G, p. 129, l. 12-13.

23

96.     During the October 14, 2020 Fall (2020) Equity Training session a video about the

George Floyd incident was played and according to Plaintiff Henderson the following occurred:

A.      Defendant Garcia-Pusateri introduced the video and told the attendees:

"That [the video] was going to be difficult to watch, but we needed to watch it, and
it was important for us to see it without the additional noise and that we just needed
to focus in to imagine if we were in that position that Derek Chauvin -- could we
imagine having somebody place a knee on our neck and not letting up and these are
your final words."

*See* Exh. A, p. 87, l. 16 to p. 88, l. 6.

B.      After the George Floyd video was shown, the attendees were broken up into

small three person groups to share their thoughts on the video. *See* Exh. A, p. 89, l. 24 to p.

90, l. 11.

C.      During the small group discussion about the George Floyd incident Plaintiff

Henderson volunteered that she "felt that the video was taken out of context and it was only

reflecting one side of the incident by removing all the other . . . context.  So they removed

all the other language out of that and just put that in isolation." *See* Exh. A, p. 94, l. 2-7.

D.      In Plaintiff Henderson's breakout session all of the attendees who spoke

agreed that "it was hard to make any determination out of context." *See* Exh. A, p. 94, l. 11-

15. In the large group session, she was not asked to provide any information nor did she. *See*

Exh. A, p. 96, l. 10-14.

E.      Plaintiff Henderson did not feel that being asked to watch the George Floyd

video violated her rights. *See* Exh. A, p. 89, l. 14-21.

97.     During the October 14, 2020 Fall (2020) Equity Training session the presenters went

through terminology to help build the awareness of the attendees. *See* Exh. F, p. 26, l. 3-17. The

presenters "asked for volunteers to give examples of their understanding of what certain terms

meant;" Dr. Rapert volunteered an example in a group discussion, which was not exactly what the

24

presenter was thinking, but that was "okay" per Dr. Rapert and she did not believe her example was wrong. *See* Exh. F, p. 26, l. 12 to p. 27, l. 20.

98.     During the October 14, 2020 Fall (2020) Equity Training session, although others expressed their opinions, Plaintiff Henderson was never called on by the trainers (whether it be Garcia-Pusateri or Anderson) to answer questions during the large group sessions. *See* Exh. A, p. 30, l. 24 to p. 31, l. 4; p. 59, l. 4-21.

99.     During the October 14, 2020 Fall (2020) Equity Training session Plaintiff Henderson claims she was told that "teachers are supposed to not support students who want to dress up as their favor Disney costume for Halloween." *See* Exh. A, p. 10, l. 22-25. Dr. Rapert recalled Henderson asking a question concerning the best way to respond to a young child who wanted to wear a Pocahontas costume at Halloween to which the presenter responded that one might try to explain to the child another way the child could learn about Native Americans rather than by dressing ups as Pocahontas.  *See* Exh. F, p. 28, l. 19 to p. 29, l. 3; p. 30, l. 1-7.

100.     Plaintiff Henderson alleged that during the October 14, 2020 Fall (2020) Equity Training Defendant Garcia-Pusateri told the attendees that they should vote for a "certain political party" and that "socialism is a good thing." *See* Exh. A, p. 15, l. 17 to p. 16, l. 6; p. 16, l. 22-24. These comments were part of a discussion about socialism and school funding using property taxes so "the outcomes for students aren't the same."  *See* Exh. A, p. 17, l. 3-8.

A.     Defendant Garcia-Pusateri stated she did not recall a discussion about socialists or socialism at the October 14, 2020 Fall (2020) Equity Training session. *See* Exh. G, p. 275, l. 8-10.

B.     Dr. Rapert did not recall the subject of socialism coming up during the October 14, 2020 Fall (2020) Equity Training. *See* Exh. F, p. 32, l. 6-8.

C.      Dr. Rapert did not recall discussions during the October 14, 2020 Fall (2020) Equity Training session concerning "how you should not vote for property taxes funding schools or school funding and voting" or that "we had to vote a certain way."  *See* Exh. F, p. 37, 20 to p. 38, l. 3.

D.      Plaintiff Henderson was not asked for her opinion on socialism during the training (*see* Exh. A, p. 17, l. 15-17), was not asked to vote on the subject or affirm it (*see* Exh. A, p. 79, l. 6-12), and Defendant Garcia-Pusateri "didn't say anything about agreeing with her or not agreeing with her, she just made a bold statement about these things." *See* Exh. A, p. 18, l. 25 to p. 19, l. 3.

E.      When Plaintiff Henderson met with Dr. Tanya Rapert shortly after the October 14, 2020 Fall (2020) Equity Training session, Plaintiff Henderson did not express any concerns or complaints about alleged comments made at the training by Defendant Garcia-Pusateri or others concerning "socialism." *See* Exh. F, p. 51, l. 18-24; p. 52, l. 15-16.

101.    Plaintiff Henderson alleged that during the October 14, 2020 Fall (2020) Equity Training Defendant Garcia-Pusateri told the attendees that "adults of a certain age range can be oppressors of either their children or they can also be oppressors of an older generation" and that they oppress their children when they raise them to vote a certain way. *See* Exh. A, p. 20, l. 6-19; p. 78, l. 9-13.

A.      Defendant Garcia-Pusateri did not recall saying that parents were oppressors of their children during the October 14, 2020 Fall (2020) Equity Training session. *See* Exh. G, p. 240, l. 25 to p. 241, l. 9.

B.      Plaintiff Henderson did not express any opinion during the training session about the statements (*see* Exh. A, p. 20, l. 20-22), no one called on her to give her opinion

26

(*see* Exh. A, p. 21, l. 23 to p. 22, l. 3), and she was also not asked to affirm the statements (*see* Exh. A, p. 78, l. 17-25).

        C.      Dr. Rapert did not recall any statements being made by the trainers that "parents could be oppressors of their children." *See* Exh. F, p. 32, l. 24 to p. 33, l. 2; p. 35, l. 21-25; p. 36, l. 7-11.

        D.      Dr. Rapert did recall a discussion during the October 14, 2020 Fall (2020) Equity Training session that centered around "oppression" which was about people who have been oppressed and "how [the [past oppression] could change the perceptions or the experiences that they have." *See* Exh. F, p. 35, l. 1-6.

        E.      When Plaintiff Henderson met with Dr. Tanya Rapert shortly after the October 14, 2020 Fall (2020) Equity Training session, Plaintiff Henderson did not express any concerns or complaints about alleged comments made at the training by Defendant Garcia-Pusateri or others concerning: "parent oppression" or "parents oppressing children" or "parents raising their children to vote a certain way" or "white people oppressing black people. *See* Exh. F, p. 51, l. 18-24; p. 52, l. 24 to p. 53, l. 13.

102.    Plaintiff Henderson alleged that during the October 14, 2020 Fall (2020) Equity Training Defendant Garcia-Pusateri told the attendees that "our local community was supportive of Black Lives Matter and that their protests were very peaceful," (*see* Exh. A, p. 29, l. 1-4) and that Kyle Rittenhouse had murdered an innocent man that was . . . an ally of the Black community (*see* Exh. A, p. 29, l. 5-13) and we needed to "disavow and condemn" the actions of the white supremacists in Charlotte (*see* Exh. A, p. 30, l. 7-12).

        A.      Defendant Garcia-Pusateri did not recall a discussion concerning Kyle Rittenhouse during the October 14, 2020 Fall (2020) Equity Training session. *See* Exh. G, p. 229, l. 1-10.

27

B.    Plaintiff Henderson claimed that the attendees were told to discuss these events in their small group meeting. *See* Exh. A, p. 31, l. 5-9. When the small groups were randomly selected by the computer, the attendees were told "that [they] needed to discuss what [they] recognized from the events, what [they] were familiar with [and] how [they] felt about the events." *See* Exh. A, p. 31, l. 19-25; p. 32, l. 6-10.

C.    Plaintiff Henderson stated she had "concerns" but when asked to state what she said during the small group meeting she testified that she "did not recall" any concerns she had (*see* Exh. A, p. 32, l. 20 to p. 33, l. 7; p. 34, l. 2-8), but remembered that someone else raised concerns about showing the violence and about the Black Lives Matter protest in Springfield. *See* Exh. A, p. 33, l. 12-22.

103.    Plaintiff Henderson alleged that during the October 14, 2020 Fall (2020) Equity Training the attendees received a handout that stated that they needed to remember that America was founded on violence and that there were marginalized people that have suffered great harm and so that, when we show our pride in being an American, that other people may not feel the same and we may be harming somebody else. *See* Exh. A, p. 84, l. 22 to p. 85, l. 4; p. 85, l. 18 to p. 86, l. 1.

A.    The handout was not discussed, Plaintiff Henderson was not asked to give her opinion on the handout and she did not otherwise comment on the handout. *See* Exh. A, p. 86, l. 11-14.

B.    During the October 14, 2020 Fall (2020) Equity Training session no one said "anything to the effect that by celebrating nationalism and showing pride in America's history, that you're harming people." *See* Exh. F, p. 40, l. 14-18.

C.    When Plaintiff Henderson met with Dr. Tanya Rapert shortly after the October 14, 2020 Fall (2020) Equity Training session, Plaintiff Henderson did not express any concerns or complaints about alleged comments made at the training by Defendant

28

Garcia-Pusateri or others concerning "marginalized groups," *See* Exh. F, p. 51, l. 18-24; p. 52, l. 17-19.

104.     Plaintiff Henderson alleged that during the October 14, 2020 Fall (2020) Equity Training the attendees received an "Indigenous Peoples" statement which began with the following, "As we begin our training, we want to acknowledge and honor the Native and Indigenous people whose land we currently gather on. [SPS] is built on the ancestral territory of the Osage, Delaware, and Kickapoo Nations and Peoples. *See* Exh. A, p. 73, l. 24 to p. 74, l. 9.

     A.     Plaintiff Henderson felt the statement "referred to that the land was stolen" and that it "violated her rights" because the statement said that "we affirm or agree . . . that the nation's history is dark and violent, specifically American history" (*see* Exh. A, p. 74, l. 10 to p. 75, l. 1), and "we didn't have the opportunity to not affirm. We were told that we were affirming this statement." *See* Exh. A, p. 76, l. 1-4.

     B.     Plaintiff Henderson was not asked if she agreed with the statement and that she "gave no statement one way or another" concerning the statement. *See* Exh. A, p. 76, l. 8-15.

105.     Plaintiff Henderson alleged that during the October 14, 2020 Fall (2020) Equity Training Defendant Garcia-Pusateri stated white people must accept their privilege and own their whiteness in the context of the white supremacy chart and oppression matrix. *See* Exh. A, p. 84, l. 4-9. Henderson was not asked to state or give her opinion about the alleged statements. *See* Exh. A, p. 84, l. 18-21.

106.     Plaintiff Henderson alleged that during the October 14, 2020 Fall (2020) Equity Training she was to identify where she fell on the oppression matrix. *See* Exh. A, p. 98, l. 3-6. She admits, however, she did not express any opinion on the matrix, she did not share where she would

place herself on the matrix, and she did not recall the presenters calling anyone out. *See* Exh. A, p. 102, l. 19-21; p. 103, l. 10-17.

107.    Plaintiff Henderson alleged that during the October 14, 2020 Fall (2020) Equity Training she was to locate herself on the social identities chart. *See* Exh. A, p. 107, l. 14-25. She admits, however, that she did not fill the chart out, that it was her choice to fill it out or not do so. *See* Exh. A, p. 108, l. 20-22. Plaintiff Henderson was also not asked anything about the chart but others did share where they fell on the chart. *See* Exh. A, p. 109, l. 16-20; p. 110, l. 1-12.

108.    Plaintiff Henderson alleged that during the October 14, 2020 Fall (2020) Equity Training four corners exercise was the only time she was required to hold up her agree/disagree signs in response to questions, to which she always "agreed," which included, by way of example:

- I believe my students or staff feel safe at SPS.
- I believe SPS provides an engaging, relevant, collaborative, learning, and working environment.
- I believe all students should be treated equitably.

*See* Exh. A, p. 110, p. 13-25; p. 111, l. 21 to p. 113, l. 7; p. 114, l. 19 to p. 116, l. 1 (for brevity, the remaining questions can be found on the cited deposition pages of Exhibit A).

109.    Plaintiff Henderson claimed she disagreed with  the following questions:

- I believe my identities and lived experiences are affirmed and supported by the District.
- I believe our district policies are inclusive and supportive of student identities and lived experiences.
- I feel safe at SPS.
- I believe in the strategic plan.
- I believe my students or staff is represented in the District.
- I feel represented in the District.

*See* Exh A, p. 116, l. 2 to p. 117, l. 7; p. 118, l. 13-14; p. 119, l. 1-2.

110.    According to others in attendance during the October 14, 2020 Fall (2020) Equity Training session, the presenters read through two four corners slides, but did not request that anyone

30

respond to any of the questions on the slides or do any of the four corners activities. *See* Exh. F, p. 43, l. 16 to p. 45, l. 11.

111. Attendees at the Fall (2020) Equity Training sessions were not compelled to speak during the training. If an employee was called on during the training and indicated that they did not feel comfortable answering or if they said "I cannot answer," or " I disagree" it was "completely fine" and if they said or indicated they did not want to talk "I'm not going to force them . . . Our hope was that some people would be able to talk about what was talked about in the groups if they felt comfortable to do so." *See* Exh. G, p. 211, l. 22 to p. 212, l. 11; p. 217, l. 15-20.

112. During the October 14, 2020 Fall (2020) Equity Training session, Plaintiff Henderson's camera image was upside down, and shortly after the training session, Plaintiff Henderson came to Dr. Rapert's office and:

> "wanted to let me know that she didn't know how that happened. And that during the training she was trying to figure out how to flip her image back from being upside down.. . . She didn't want anyone to think that she wasn't taking the training seriously. I tried to reassure her that no one thought anything with her image being upside down. I offered to reach out to the presenters to let them know she was having some camera difficulties, computer difficulties. [Plaintiff Henderson] followed up with me about a week later to ask me if I had reached out to the presenters. I told her that I did and everything was okay."

*See* Exh. F, p. 24, l. 1 to p. 25, l. 22.

113. On October 15, 2020, the day after completing the Fall (2020) Equity Training, Plaintiff Henderson sent an email to Defendant Anderson which thanked him for presenting at the October 14, 2020, Fall (2020) Equity Training she attended but made no comments alleging that Defendant District or anyone else had violated her First Amendment Rights during the training. *See* Exh. E, ¶ 2, DEX 51.04.

114. After completing the Fall (2020) Equity Training on October 14, 2020, Plaintiff Henderson did not file an internal grievance pursuant to Board of Education Policy AC – Prohibition

31

Against Illegal Discrimination, Harassment and Retaliation or otherwise complain (verbally or in writing) to Penney Rector in her capacities of Chief Human Resources Officer or Compliance Officer for the District concerning any aspect of the training she received during the October 14, 2020 Fall (2020) Equity Training. *See* Exh. D, ¶ 33; and Exh. E, ¶ 2, DEX 32.01.

**Canvas Training Modules in 2020**

115.    The Canvas Learning Management System ("Canvas") is a computer location on Defendant District's computer servers where numerous learning modules are loaded by various departments of Defendant District including but not limited to the Department of Special Services and the Department of Equity and Diversity. *See* Affidavit of Robert Douglas attached and hereinafter referred to as Exhibit K, ¶¶ 2-4; and Exh. A, p. 41, l. 3-24.

116.    During the Summer of 2020, Superintendent Dr. John Jungmann identified equity and access as a topic for inclusion in Defendant District's return to learning plan since it was consistent with the newly amended Strategic Plan – Focus Area V and its Strategy 5.1.1 which states:

> "Strategy 5.1.1 – Facilitate learning opportunities for staff and leaders that foster exploration of identity and self, and create applications to demonstrate cultural consciousness in their work."

*See* Exh. C, ¶¶ 33, 42; and Exh. G, p. 28, l. 24 to p. 29, l. 9.

117.    During school year 2020-21, the Department of Equity and Diversity published the following five (5) training modules ("Five Canvas Modules") on its Canvas Learning Management System ("Canvas"):

(a)    Overview of Social Emotional Learning from an Equity Lens
(DEX 20.06)
(b)    Elementary Social Emotional Learning as it Relates to Covid-19
(DEX 20.06.01)
(c)    Elementary Social Emotional Learning as it Relates to Racial Injustice
(DEX 20.07.01)
(d)    Secondary Social Emotional Learning as it Relates to Covid-19

32

(DEX 20.08.01)

(e)     Secondary Social Emotional Learning as it Relates to Racial Injustice
        (DEX 20.09.01)

*See* Exh. C, ¶ 48; and Exh. E, ¶ 2, DEX 20.06, 20.06.01, 20.07.01, 20.08.01, 20.09.01.

118.    Defendant District's purpose for the five (5) Canvas Training Modules was to further Defendant District's Focus Area 5, Strategy 5.1.1. by "facilitat[ing] learning opportunities for staff and leaders that foster exploration of identity and self and create applications to demonstrate cultural consciousness in their work" in order to:

- Improve engagement, safety, and attendance rates for under-resourced and under-represented student populations.
- Demonstrate annual growth in the core academic success (iReady, MAP, EOC, Common Assessments) for all students, with an intensive focus on closing performance gaps for under-resourced and under-represented students.
- Increase the graduation rate for all student populations, with an intensive focus on under-resourced and under-represented students.

*See* Exh. C, ¶ 49; and Exh. E, ¶ 2, DEX 3.06, 20.06, 20.06.01, 20.07.01, 20.08.01, 20.09.01.

119.    Defendant Garcia-Pusateri defined the Department of Equity and Diversity's goal for the five (5) Canvas Modules was to create more equitable environments for students by providing learning about and understanding of the barriers to education that students and staff may encounter in school and understand how those barriers to learning impact the education of students in Defendant District. *See* Exh. G, p. 42, l. 23 to p. 43, l. 3; p. 43, l. 12-16; p. 44, l. 5-7.

120.    The five (5) Canvas Training Modules could only be accessed by certificated employees of Defendant District. *See* Exh. C, ¶ 50; and Exh. K, ¶¶ 3, 5, DEX 20.06, 20.06.01, 20.07.01, 20.08.01, 20.09.01.

121.    Plaintiff Lumley could not access any of the five (5) Canvas Training Modules because she was not a certificated employee. *See* Exh. C, ¶ 51; and Exh. K, ¶ 5, DEX 20.06, 20.06.01, 20.07.01, 20.08.01, 20.09.01.

33

122.    Plaintiff Lumley did not access the "Five Canvas Modules." *See* Exh. B, p. 9, l. 25 to p. 10, l. 19.

123.    Plaintiff Henderson did access the "Five Canvas Modules." *See* Exh. A, p. 45, l. 17 to p. 46, l. 6. Plaintiff Henderson did not recall accessing any other Canvas Modules during school year 2020-21 that were placed on Canvas by the District's Office of Equity and Diversity. *See* Exh. A, p. 46, l. 7-11.

124.    In December, 2020, Plaintiff Henderson encountered problems completing each of the "Five Canvas Modules" in that she could not access the final page and she sought help from Defendant Anderson. *See* Exh. A, p. 46, l. 15 to p. 47, l. 2.

125.    After a telephone conversation with Defendant Anderson wherein Plaintiff Henderson discussed the Canvas training sections, Defendant Anderson was able to correct the problem (i.e. Plaintiff Henderson had two Canvas accounts). *See* Exh. A, p. 47, l. 22 to p. 48, l. 13.

126.    Plaintiff Henderson had no concerns or issues with reference to her call with Defendant Anderson and he was able to correct the issue and confirm her credit. *See* Exh. A, p. 49, l. 17-25).

127.    On December 4, 2020, Defendant Anderson confirmed by email that Plaintiff Henderson received credit for completing the Five Canvas Modules. *See* Exh. A, p. 123, l. 18 to p. 124, l. 2.

128.    On December 4, 2020, Plaintiff Henderson, by return email, thanked Defendant Anderson for his assistance and did not raise any issues or concerns regarding the Canvas training. *See* Exh. A, p. 124, l. 2-4; *also see* Exhibit DEX 51.05 attached to Exhibit A.

129.    Each of the Five Canvas Modules utilize pages with guided navigation to progress through the learning options. See Exh. K, ¶ 6.

130.    Each of the Five Canvas Modules contain one (1) "Quick Check" question which has

two possible answers as follows:

(a)    The Elementary and Secondary Social and Emotional Learning as it relates to Racial Injustice modules (DEX 20.07.01 and DEX 20.09.01) each contain the following "Quick Check" question:

"When you witness racism and xenophobia in the classroom, how should you respond?
○    Address the situation in private after it has passed.
○    Address the situation the moment you realize it is happening."

(b)    The Elementary and Secondary Social and Emotional Learning as it relates to Covid-19 (DEX 20.05 and DEX 20.08) each contain the following "Quick Check" question:

"Acknowledging and addressing students' social emotional needs in relation to Covid-19 is whose responsibility?
○    All caregivers and stakeholders.
○    Guardians and counselors."

(c)    The Overview of Social Emotional Learning from an Equity Lens (DEX 20.06) The Elementary and Secondary Social and Emotional Learning as it relates to Covid-19 (DEX 20.06) contains the following "Quick Check" question:

"How does the addition of Focus Area V impact how you serve the students and staff of SPS?
○    It provides suggested guidance regarding equity and diversity issues.
○    It cements equity and diversity as a district priority that must be followed by all staff."

*See* Exh. K, ¶ 7.

131.    The "Quick Check" questions on these Five (5) Canvas Modules were not designated

by the Equity and Diversity Department as a graded assignment or quiz within Canvas. Therefore,

the answers to the "Quick Check" questions on the modules that were given by the user are not

tracked or recorded by Canvas and cannot be checked or reviewed by anyone because no record of

the answers exists. *See* Exh. K, ¶ 8.

35

**Equity Training During School Year 2021-2022**

132.    Shortly after Dr. Lathan assumed the position of Superintendent of Defendant District, she reviewed the Equity Training that had taken place during the Fall of 2020 and the Equity Training that was proposed to take place during the Fall of 2021. *See* Deposition of Grenita Lathan attached and hereinafter referred to as Exhibit L, p. 19, l. 3-23.

133.    Upon review of the Fall (2020) Equity Training program history and materials, Defendant Lathan determined that the purpose of the Equity Training was "for staff members to understand the students that we serve and to create an environment and a culture where all students feel that they belong and for staff members to be able to demonstrate that." *See* Exh. L, p. 25, l. 2-5.

134.    The Equity Training that was proposed to take place during the Fall of 2021 was proposed to be mandatory for all employees of Defendant District and would have been delivered virtually or in person. *See* Exh. L, p. 38, l. 1-14.

135.    In August, 2021, Defendant Lathan decided to cancel the Fall (2021) Equity Training (Lathan, depo pp. 43-44), because she felt Defendant District's "staff needed to be more well-versed in presenting and addressing topics of this nature, and so I wanted to make sure that they knew what they were doing before they presented" (*see* Exh. L, p. 43, l. 20 to p. 44, l. 16) and she further stated, "When you provide a training, especially an all-staff training, participants that are leading that training need to be qualified and equipped to provide that training. When I made the decision to not allow the all-staff training to move forward, it was based on my observation and evaluation of the performance of the DEI department." *See* Exh. L, p. 48, l. 2-10.

136.    During school year 2021-22, Dr. Rapert did not attend an equity training and such training was not offered by Defendant District. *See* Exh. F, p. 41, l. 12-17.

36

**Alleged Damages**

137.    Lumley admitted that she attended all of the training sessions that Defendant District

required her to attend during school year 2020-21 and her pay for school year 2020-21 was not

reduced.  Plaintiff Lumley stated:

> "Q.    Did you attend all the training sessions you allege defendant district
>         required you to attend during the school year '20-'21?
> A.     Yes, I did.
> Q.     Was your pay reduced during the school year '20-'21?
> A.     No, it was not."

*See* Exh. B, p. 15, l. 8-13.

138.    Plaintiff Lumley admitted that the sole monetary damages she was requesting was

an award of nominal damages. Plaintiff Lumley stated the following in her deposition:

> "Q.    (By Mr. Ellis) Page 26 of the Complaint (DOC 1) . . . says that you are
>         asking the Court to enter each plaintiff an award of nominal damages of $1
>         per day of mandatory equity training . . . Is that the sole monetary damages
>         that you're requesting in this lawsuit?
> A.     (By Plaintiff Lumley) Yes."

*See* Exh B, p. 34, l. 5-10.

139.    Plaintiff Henderson admitted that the sole monetary damages she was requesting was

an award of nominal damages.  Plaintiff Henderson stated the following in her deposition:

> "Q.    Is it correct that the only monetary damages you're requesting through your
>         claims in this complaint are set out in Paragraph E which states enter each
>         plaintiff an award for nominal damages of $1 per day of mandatory equity
>         training? . . .
> A.     Yes.
> Q.     (By Mr. Ellis) That's all the monetary damages you're requesting?
> A.     Yes."

*See* Exh. A, p. 124, l. 7-17.

140.    On October 14, 2020, Plaintiff Henderson attended and completed the two (2) hour

Fall (2020) Equity Training (DEX 13.02) and at a different time, completed the one-hour mental

health training program and the one-hour Alice Active-Shooter training program. As a result,

37

Plaintiff Henderson received "credit" for taking and completing all three training programs and received four hours of "Supplemental Pay". *See* Exh. A, p. 43, l. 19 to p. 44, l. 10; and Exh. C, ¶ 39; and Exh. D, ¶ 26; and Exh. E, ¶ 2, DEX 13.02.

141.    Plaintiff Henderson admitted that she attended all of the training sessions that Defendant District required her to attend during school year 2020-21, including the online training modules and her pay was not reduced. Plaintiff Henderson stated:

"Q.    (By Mr. Ellis) They were mandatory to take those five modules?
A.    Yes…
Q.    And you completed them?
A.    Yes, sir.
Q.    And you got credit?
A.    Yes, sir.
Q.    And you got all the money that you were supposed to get? …
A.    Yes, my pay was not docked…
Q.    …you received all the money you were supposed to get?
A.    Yes, sir."

*See* Exh. A, p. 50, l. 20 to p. 51, l. 8; *also see* Exh. A, p. 51, l. 19-21.

142.    Neither Plaintiff Henderson nor Plaintiff Lumley have received discipline from Defendant District. *See* Exh. C, ¶ 4; and Exh. D, ¶ 28.

143.    Plaintiffs did not know of anyone who got kicked out of a training session, was denied credit or was disciplined in some way based on their conduct during the training session. *See* Exh. A, p. 63, l. 6-12; and Exh. B, p. 19, l. 5-13.

144.    No employee of Defendant District was terminated from employment because the employee failed or refused to attend the Fall (2020) Equity Training program or failed to complete the training program. *See* Exh. C, ¶ 41; and Exh. D, ¶ 29.

## III. STANDARD OF REVIEW

Summary Judgment is appropriate if the record shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56(a), FRCP; *Krenik v. Cty. of LeSueur*, 47 F.3d 953 (8th Cir. 1995). The moving party has the burden of showing both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. *O'Rourke v. Duncan*, 2011 WL 1297546 at*3 (E.D. Mo 2011). A fact is material only when its resolution affects the outcome of the case. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986). The nonmoving party must then demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik*, *supra*, 47 F.3d at 957. However, a party opposing a properly supported summary judgment motion "may not rest upon mere allegations or denials ... but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, *supra*, 477 U.S. at 256. A dispute is "genuine" if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *Id*. at 252. The court must draw all reasonable inferences in favor of the non-moving party, without resort to speculation. *Dunn v. Nexgrill Industries, Inc*., 636 F.3d 1049 (8th Cir. 2011).

## IV. ARGUMENT

To prevail under Section 1983, Plaintiffs are required to show that the alleged wrongful conduct deprived each Plaintiff, individually, of a constitutionally protected right. *L.L. Nelson Enterprises, Inc. v. County of St. Louis, Mo*., 673 F.3d 799, 805 (8th Cir. 2012). Nothing short of an unambiguously conferred right will support a Section 1983 action. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002). "Section 1983 provides a remedy only for the deprivation of 'rights, privileges, or immunities secured by the Constitution and laws' of the United States ... [I]t is *rights*, not the broader or vaguer 'benefits' or 'interests,' that may be enforced under the authority of that section." *Id*. (emphasis in original). Plaintiffs cannot show that they were deprived of a constitutionally protected right. Plaintiffs were not disciplined or penalized for their conduct during the training, received

credit and were paid for the training, and remain employees of the District. The First Amendment does not prohibit a school district from implementing and enforcing an antidiscrimination, equity and diversity policy and associated training. At bottom, Plaintiffs sustained no injury or damage and the District's actions aimed at eliminating discrimination and creating inclusion did not infringe upon Plaintiffs' constitutional rights. For the reasons below, Defendants' motion must be granted.

## A. PLAINTIFFS HAVE NOT SUFFERED AN "INJURY IN FACT"; THEIR CLAIMS MUST BE DISMISSED FOR LACK OF STANDING.

Plaintiffs seek to strike down the District's equity and diversity training. However, "[t]he federal courts are not empowered to seek out and strike down any governmental act that they deem to be repugnant to the Constitution. Rather, federal courts sit solely, to decide on the rights of individuals,…and must refrain from passing upon the constitutionality of an act...unless…the question is raised by a party whose interests entitle him to raise it." *Hein v. Freedom From Religion Found.*, 551 U.S. 587, 598 (2007) (internal quotations, citations omitted). "Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.' " *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014) (*quoting* U.S. Const. Art. III, § 2). The doctrine of standing serves as "[o]ne of those landmarks" in identifying "the 'Cases' and 'Controversies' that are of the justiciable sort referred to in Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To invoke federal court jurisdiction, Plaintiffs "must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Church of the Word v. St. Louis Cty.*, 2020 WL 97230256 at *1 (E.D. Mo. 2020).

Plaintiffs cannot satisfy the case or controversy requirement of Article III, which is the irreducible constitutional minimum of standing, as Plaintiffs cannot show the first required element, injury in fact. *See Lujan*, *supra*, 504 U.S. at 560-61 (party invoking federal jurisdiction bears burden

of establishing injury in fact, causation, and redressability).[3] Plaintiffs have not "suffered an 'injury in fact' – an invasion of a legally protected interest which is (a) concrete and particularized,…and (b) actual or imminent, not conjectural or hypothetical." *Id*. at 560 (internal quotations, citations omitted). Plaintiffs were not penalized, disciplined or subjected to adverse consequences during or after the equity training. ¶¶ 3, 6, 62, 142. Further, Henderson,[4] who attended equity training virtually and completed online modules, received credit for the trainings, additional pay for the equity training (¶¶ 51-58, 140), and her pay was never reduced. ¶ 141. Likewise, Lumley attended all trainings required of her and her pay was not reduced. ¶¶ 59-60, 137. Plaintiffs also remain employed and in fact, Lumley was promoted "after" the instant lawsuit was served on Defendants. ¶¶ 1, 2, 4, 5. Plus, Plaintiffs cannot show that they would have been subjected to harm had they refused to participate. No employee who attended the training was dismissed, removed or failed to get credit, and no adverse action was taken against any employee that did not attend. ¶¶ 61, 63-64, 143, 144.

Simply said, Plaintiffs do not seek redress for concrete injuries. Rather, Plaintiffs, without setting forth a scintilla of harm, adverse consequence or damage, take issue with allegedly being required to affirm beliefs about "so-called racial equity," engage in conversations about that topic, and being demanded to embrace equity as a settled fact in order to become "anti-racist educators." *See* Complaint, Doc. 1. This is akin to Plaintiffs claiming they were "infiltrated by 'diversity thinking.' " *See Preskar v. U.S*., 248 F.R.D. 576, 582 (E.D. Cal. 2008). But, a school district can and must instruct employees about racism as anti-racism is the law. In short, Plaintiffs lack standing as their allegations are so obscure that it is impossible to discern any actual injury and how a

---

[3] Nor can Plaintiffs show causation or redressability. *See* Sections IV.B and IV.C, *infra*.

[4] Hereinafter, and solely for brevity and ease of discussion, when Plaintiffs or Defendants are referred to individually only their last names will be used. No disrespect is intended.

favorable decision would redress it.[5] *See id.* at 582 (former teacher and parent who sought elimination of school district's "diversity education" by challenging "methodology used in diversity programs" on constitutional grounds had no standing to litigate; "allegations amount[ed] to little more than a generalized grievance against 'diversity thinking.' ").

Further, even if Plaintiffs affirmed beliefs about so-called racial equity,[6] they did so based solely on their "perception" that they would be disciplined for not doing so. Where, as here, a First Amendment plaintiff in the absence of concrete harm "only alleges inhibition of speech, the federal courts routinely hold that no standing exists." *Morrison v. Bd. of Educ. of Boyd Cty.*, 521 F.3d 602, 609 (6th Cir. 2008) (distinguishing a "chilling effect" from the immediate threat of concrete, harmful action) (citations omitted). A litigant alleging chill must still establish that a concrete harm occurred or is imminent. *Id.* at 610 (citations omitted). Clearly, Plaintiffs have not shown concrete harm <u>nor</u> have they shown that concrete harm was imminent. They and others who attended the trainings provided their opinions (¶¶ 97, 99), some of which were critical (¶¶ 89, 90), and no one was removed or suffered a loss of credit (¶¶ 61, 63, 64, 143, 144). Absent a concrete act on the part of Defendants, Plaintiffs' "allegations fall squarely within the ambit of 'subjective chill' that the Supreme Court definitely rejected for standing purposes." *Id.* (no justiciable injury where plaintiff's own subjective apprehension counseled him to choose caution and where he assumed, solely on the basis of defendant's policies, without specific action by defendant that were he to speak, punishment would result) (*citing Laird v. Tatum*, 408 U.S. 1, 13 (1972) (no justiciable controversy as plaintiffs complained of no specific action against them)).

---

[5] For example, even if the District changed its policy and training, unless that policy promoted discrimination, employees that disagreed with that policy also would not have standing.

[6] Notably, Plaintiffs admit they were not personally called out or asked to give opinions during the virtual training (Henderson) or during the in-person training (Lumley). ¶¶ 75, 76, 84, 86-88, 93, 98.

Plus, Plaintiffs' request for nominal damages cannot redress their alleged injuries. ¶¶ 138, 139. As previously shown, Plaintiffs were paid for the training and their pay was not reduced. Thus, "[t]o confer nominal damages here would have *no* effect on the parties' legal rights." *Morrison*, *supra*, 521 F.3d at 611 (emphasis in original) (*citing Utah Animal Rights Coal. V. Salt Lake City Corp.*, 371 F.3d 1248 (2004 ) ("Where…the challenged past conduct did not give rise to a compensable injury and there is no realistic possibility of a recurrence, nominal damages have no more legal effect than would injunctive or declaratory relief in the same case.").

Finally, federal courts do not have jurisdiction when the parties have no legally cognizable interest in the outcome. *McCarthy v. Ozark Sch. Dist.*, 359 F.3d 1029 (8th Cir. 2004). Past exposure to harm will not confer standing to obtain equitable relief "[a]bsent a sufficient likelihood that [one] will again be wronged in a similar way." *City of Los Angeles v. Lyons*, 461 U.S. 95, 104 (1983). The core of Plaintiffs' Complaint is that they did not express their views, or did not express them in full, for fear of adverse action. But, as noted in a very recent district court opinion, "that self-censorship would exist separate and apart from the [training they attended]…and the mere prospect of future injury through the [training] is not sufficient to confer standing." *Menders v. Loudoun Cty. Sch. Bd.*, 2022 WL 179597 at *9 (E.D. Va. 2022) (emphasis added). Plus, the training has not been repeated (¶¶ 132-136), and Plaintiffs have not shown that they would not be paid for future training, nor have they shown that they would be disciplined for not attending or for expressing their opinions. Without these showings, this Court lacks jurisdiction over Plaintiffs' claims.[7] Hence, "[t]his case should be

---

[7] *See, e.g.*, *Brown v. Hot, Sexy & Safer Prod.*, 68 F.3d 525, 539 (1st Cir. 1995) (standing lacking for parents/students to seek declaration that sexually explicit AIDS awareness assembly violated constitutional rights where they did not allege, nor did it appear, they would be subjected to activities again); and *New York State Rifle & Pistol Ass'n v. City of New York, N.Y.*, — U.S. —, 140 S. Ct. 1525, 1526 (2020) (declining to consider moot claim). Mootness is akin to standing because the "requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *McCarthy*, *supra*, 359 F.3d at 1035.

43

over. Allowing it to proceed to determine the constitutionality of a [lawful[8] policy and practice] –
in the hope of awarding the [P]laintiff[s] a single dollar – vindicates no interest and trivializes the
important business of the federal courts." *Morrison*, *supra*, 521 F.3d at 611.

**B. NONE OF PLAINTIFFS' SEPARATE CLAIMS HAVE MERIT; DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW.**

Even if Plaintiffs had standing, Plaintiffs' claims fail as a matter of law.

**1. Plaintiffs' Count I Claim, Compelled Speech in Violation of the First Amendment, Fails as a Matter of Law.**

In *Turner Broadcasting Sys., Inc. v. FCC*, the Supreme Court explained that "[a]t the heart
of the First Amendment lies the principle that each person should decide for himself or herself the
ideas and beliefs deserving of expression, consideration, and adherence." 512 U.S. 622, 641 (1994).
Government action that requires utterance of a particular message that the government favors
contravenes the First Amendment right to refrain from speaking.[9] *Id.* at 641. However, the Supreme
Court has found a "First Amendment protection against compelled speech…<u>only</u> in the context of
governmental compulsion to disseminate a particular political or ideological message." *U.S. v.
Sindel*, 53 F.3d 874, 878 (8th Cir. 1995) (citations omitted) (emphasis added); *see*, *e.g.*, *Pacific Gas
v. Pub. Utilities Comm. of Ca.*, 475 U.S. 1 (1986) (state may not order utility company to distribute
literature of hostile groups with its newsletters); *Wooley v. Maynard*, 430 U.S. 705 (1977) (state
may not require citizen to display state motto on license plate); *Miami Herald Pub. Co. v. Tornillo*,
418 U.S. 241 (1974) (state statute requiring newspapers to publish replies of political candidates

---

[8] The District has an affirmative duty to ensure racial justice and to advocate for/teach proper race
relations in the workplace and in its teachings. *See* Sections IV.B.2 and IV.B.3, *infra*.

[9] The First Amendment protects a government employee's speech (1) made as a citizen (2) on a
matter of public concern (3) if the employee's right to speak outweighs the government's interest as
an employer in an efficient workplace. *See Garcetti v. Ceballos*, 547 U.S. 410 (2006); and *Pickering
v. Bd. of Edu. of Twp. High Sch. Dist.*, 205, 391 U.S. 563 (1968).

whom they criticized unconstitutional); and *West Va. State Bd. of Edu. v. Barnette*, 319 U.S. 624 (1943) (state may not compel schoolchildren to salute the flag at school). "[T]he Complaint <u>must do more than allege</u> that [plaintiffs] 'are <u>dissuaded</u> from participating in' " the message. *Hanover Cty. Unit of the NAACP v. Hanover Cty.*, 461 F.Supp.3d 280 (M.D. Tenn. 2021) (emphasis added).

Here, Plaintiffs allege they were compelled to speak as private citizens on matters of public concern[10] when the District required them to affirm beliefs about "so-called racial equity" during mandatory trainings. Plaintiffs claim, *inter alia*, "white silence" is a form of white supremacy, that they were put in a no-win situation of wondering whether to speak (at risk of being asked to leave), repeat what the District wanted to hear (in conflict with their own beliefs), or not speak at all (at the risk of being labeled a white supremacist). Plaintiffs also allege they were required to disclose personal details about their identities,[11] and to self-censor. *See* Complaint, Doc. 1.

Plaintiffs' allegations do not support a compelled speech claim. First, and although compulsion does not have to be a direct threat,[12] a violation of the right against compelled speech occurs only in the context of actual compulsion. *Phelan v. Laramie Cty. Comm. Coll. Bd. of*

---

[10] Even if it were a matter of public concern, the District can still require and implement policies related to antidiscrimination and associated training. *And cf. Altman v. Minn. Dpt. of Corr.*, 251 F.3d 1199 (8th Cir. 2001) (although conduct of state employees in silently reading their bibles during training regarding gays in the workplace involved speech on matter of public concern, government could under First Amendment impose discipline if speech impeded employee's ability to perform their responsibilities, undermined office relationships, or disrupted office operations).

[11] This allegation implicates the First Amendment and its protections for privacy concerns. *See*, *e.g.*, *Brown v. Socialist Workers '74 Campaign Comm.*, 459 U.S. 87, 91 (1982) ("The Constitution protects against the compelled disclosure of political associations and beliefs."); and *Shelton v. Tucker*, 364 U.S. 479, 485-86 (1960) (statute compelling teachers to file annually an affidavit listing without limitation organizations to which they belonged was unconstitutional).

[12] In *Axson-Flynn v. Johnson*, 356 F.3d 1277 (10th Cir. 2004), the court found compulsion as the university "made it abundantly clear that [the student] would not be able to continue in the [acting] program if she refused to say the words with which she was uncomfortable." Conversely, here, no employee was penalized for their conduct during training or their non-attendance. ¶¶ 142-144.

*Trustees*, 235 F.3d 1243, 1247 (10th Cir. 2000) (to compel speech, government must punish, or threaten to punish, protected speech by action that is "regulatory, proscriptive, or compulsory in nature") (*quoting Laird*, *supra*, 408 U.S. at 11). In *Hanover*, *supra*, by way of example, the NAACP sued after Confederate symbols were placed on athletic uniforms. Yet, the court found there were insufficient allegations of compulsion as there was "no allegation that the students refused to wear the schools' uniforms or otherwise objected to the school … [and] no allegation that the schools punished, threatened, or 'made it abundantly clear that [the students] would not be able to continue in the program' if they did not comply with the uniform requirements." 461 F.Supp.3d at 293. Similarly, in *Phelan*, *supra*, a governmental board found that a trustee violated its ethics policy and requested that she not do it again. 235 F.3d at 1246. However, "[t]heir statement carried no penalties; it did not prevent her from performing her official duties or restrict her opportunities to speak, such as her right to vote as a Board member, her ability to speak before the Board … [or] to the public." *Id.* at 1248. Thus, the Board's censure was not a penalty that infringed on her free speech rights. *Id.*

Plaintiffs have likewise not shown the compulsion necessary. Even if the training was mandatory (which Henderson admits did not violate her rights (¶¶ 94, 94A)), there is no evidence that Plaintiffs would have been penalized for not taking the training (¶¶ 142-144), no evidence Plaintiffs would have been penalized if certain opinions were or were not given,[13] and no evidence

---

[13] For example, Plaintiffs admit other attendees expressed their opinions and knew of no attendee who was removed or did not get credit. ¶¶ 89, 90, 98. Lumley herself expressed an opinion that the trainers were painting white people as racist and admitted others expressed their opinion on that topic. ¶ 89. Henderson commented on the Black Lives Matter protests (as did others per Henderson) although Henderson could not remember what she expressed. ¶¶ 102, 102B, 102C. Henderson also asked how to respond to a student wanting to wear a Disney Halloween costume. ¶ 99. Other attendees were not deterred from speaking (¶¶ 90, 97) and stated that the discussion was open for individuals (i.e. volunteers) to speak (¶ 85). This is consistent with statements from the trainers that it was "completely fine" if attendees "disagreed" or did not want to speak. ¶¶ 77, 93C, 111.

46

that Plaintiffs were prevented from doing their job duties.[14] In short, there is no evidence of compulsion.[15] Plaintiffs were only required to attend the trainings to receive credit and in Henderson's case, additional pay. ¶¶ 56-60. The fact that no employee suffered adverse action is dispositive. ¶¶ 142-144. Plaintiffs' mere speculation that they would suffer adverse action does not suffice. *Duren v. Byrd*, 2021 WL 3848105 at *19 (M.D. Tenn. 2021) ("Coercion will not be found if…plaintiff just assumed that there would be punishment for not complying with what…plaintiff claims in litigation was an actual requirement…[I]f…plaintiff merely perceived that there would be punishment, there was no coercion to speak, but rather only a request or suggestion to speak.").

Second, the disclosure required for a constitutional violation of the First Amendment's protection against compelled disclosure of private information has not been shown. Plaintiffs' answers or responses were not recorded (¶¶ 73, 74, 131), nor were Plaintiffs penalized for their answers (¶¶ 3, 6, 62, 142). Moreover, Plaintiffs admitted that they were not asked to provide personal information regarding the social identities chart, the oppression matrix, or the white supremacy chart, nor did they provide such information. ¶¶ 86-88, 105-107. In sum, there is no evidence that Plaintiffs provided or disclosed any personal information and a constitutional violation cannot be found. *See*, *e.g.*, *C.N. v. Ridgewood Bd. of Edu.*, 430 F.3d 159, 189-190 (3rd Cir. 2005) (although

---

[14] Plaintiffs remain employed and Lumley was promoted. ¶¶ 1, 2, 4, 6. Plus, Henderson as 504 Process Coordinator is to, consistent with the District's strategic focus on under-represented students, address accessibility and inclusion issues for students with disabilities. ¶ 2.

[15] Plaintiffs repeatedly admitted they were not asked to comment on or affirm what they described as statements relating to socialism, oppression, marginalized people, or white supremacy. ¶¶ 75, 76, 84, 86-88, 93, 98, 100, 100A-100D, 101, 101A-101D, 103, 103A-103B. Further, Lumley had no issue with the George Floyd video, her small group discussion or the fact that her opinion was not shared with the large group. ¶¶ 82-84. Henderson believed the video was taken out of context but did not believe watching it violated her rights. ¶¶ 96A-96E. While Henderson believed the Indigenous Peoples statement referred to "the land was stolen" and violated her rights, she was not asked if she agreed with the statement. ¶¶ 104, 104A-104B.

school survey asked students to rate level of importance of political concepts like racial equity, hunger, poverty, and religion, no constitutional violation was found where the information was safeguarded and released only in the aggregate).

Further, Plaintiffs' right to speak does not outweigh the District's interest in an efficient and discrimination-free environment. The District requested nothing more than Plaintiffs' adherence to nondiscrimination, diversity and equity principles.[16] To be clear, government efforts aimed at eradicating discrimination have consistently been found not to infringe upon constitutional rights. *See*, *e.g.*, *Bob Jones Univ. v. U.S.*, 461 U.S. 574, 604 (government's interest in eradicating racial discrimination outweighed plaintiffs' free exercise claim; denying tax-exempt status to private schools with discriminatory admission standards); *Heart of Atlanta Motel, Inc. v. U.S.*, 379 U.S. 241, 260 (1964) ("[I]n a long line of cases this Court has rejected the claim that the prohibition of racial discrimination…interferes with personal liberty."); *Keeton v. Anderson-Wiley*, 664 F.3d 865, 879 (11th Cir. 2011) (requiring plaintiff to affirm LGBTQ+ conduct in counseling setting per school's code of ethics reasonably related to legitimate pedagogical concerns; code required those wishing to be counselors to separate personal beliefs from work); and *McAllum v. Cash*, 585 F.3d 214, 222-24 (5th Cir. 2009) (racial tension/hostility at school justified policy prohibiting display of Confederate flag); *also see Keefe v. Adams*, 840 F.3d 523, 532 (8th Cir. 2016) ("Foremost among a school's speech is its selection and implementation of a curriculum…and public schools have

---

[16] In keeping with these tenets, the District had, and has, a compelling interest in prohibiting discrimination through policies and trainings designed to make a school environment free from the effects of discrimination and harassment. *Also see* Sections IV.B.2 and IV.B.3, *infra*. Courts routinely uphold similar governmental action aimed at prohibiting discrimination. *See*, *e.g.*, *303 Creative, LLC v. Elenis*, 6 F.4th 1160 (10th Cir. 2021) (state antidiscrimination law did not impermissibly compel speech of website designer who intended to refuse services for same-sex marriages); and *Parker v. Hurley*, 514 F.3d 87 (1st Cir. 2008) (school curriculum encouraging respect for gay parents did not violate plaintiffs' free exercise rights; school was not obligated to shield students from ideas which were potentially religiously offensive).

48

broad discretion in making these choices;" holding First Amendment did not bar school from dismissing nursing student for Facebook posts which violated code of ethics).

Finally, any non-responses or answers Plaintiffs may have given are not comparable to government compulsion of a political or ideological message. The District merely required lawful antidiscrimination training which included benign, philosophical questions,[17] as well as answers[18] to which there can be just one preferred answer when correctly implementing a lawful policy. The District not only has a right, but the duty,[19] to fight racism and other forms of discrimination by ensuring acceptance and inclusion within its workforce in order to ensure the same for its students. The District is charged with that responsibility under federal law. *See* Sections IV.B.2, IV.B.3, *infra*. At bottom, Plaintiffs were not compelled to speak a particular message and the District's interest in ensuring diversity and equity amongst its employees and students far outweighs any right the Plaintiffs may have had to speak.

---

[17] For example, and although others in attendance including Hale who was responsible for preparing and handing out the training materials consistently stated that there were no "agree" or "disagree" signs during virtual training (¶¶ 80, 95B-95J, 110, 111), Henderson claims she held up "agree" signs in response to questions during the four corners activity such as "I believe our district policies are inclusive and supportive of student identities and lived experiences." ¶¶ 95, 95A, 108, 109. Henderson's camera was upside down as well, but she was not penalized for this. ¶ 112. Lumley admits there were no signs during her training. ¶¶ 79, 81.

[18] Although it was not graded (¶¶ 115-120, 123), when completing the online modules Henderson was asked questions for which there were two possible answers. ¶¶ 115-120, 123. For example, "When you witness racism and xenophobia in the classroom, how should you respond? Address the situation in private after it has passed; or Address the situation the moment you realize it is happening." ¶¶ 129, 130. Lumley did not complete any online training. ¶¶ 121, 122.

[19] Courts routinely recognize the various duties a school district owes to its students at all levels. *See*, *e.g.*, *Padilla v. South Harrison R-II Sch. Dist*., 181 F.3d 992, 997 (8th Cir. 1999) "School[s]…not only have a legitimate interest in forbidding and seeking to prevent teacher-student sexual relationships, *they have a duty to do so*, in default whereof they may be subjected to suits for substantial damages) (emphasis added).

49

### 2. Plaintiffs' Count II Claim, Content and Viewpoint Discrimination in Violation of the First Amendment, Fails as a Matter of Law.

The government may not regulate speech based on its substantive content or the message it conveys. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). When the government targets not subject matter, but particular views, it engages in viewpoint discrimination, an egregious form of content discrimination. *Id.* at 829 (citation omitted). "The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.* However, schools may impose speech restrictions that are reasonable and viewpoint neutral. *Pleasant Grove City v. Summum*, 555 U.S. 460, 470 (2009) ("[W]here government creates a forum that is limited to use by certain groups or dedicated to the discussion of certain subjects … it may impose reasonable and viewpoint-neutral restrictions."); *also see Menders*, *supra*, 2022 WL 179597 at * 6 (E.D. Va. 2022) ("[A]ddressing 'racist and hateful behavior,' … 'dismantle[ing] systemic racism,'… and 'amplify[ing] the voices of students of color' with respect to stories/experiences regarding issues of racism, injustice and inequity,' … are clearly legitimate pedagogical/state purposes."); and *Robertson v. Anderson Mill Elem. Sch.*, 989 F.3d 282, 289 (4th Cir. 2021) ("school boards, not the courts, have the responsibility and obligation to assess how best to advance those pedagogical concerns.").

Plaintiffs allege that the District engaged in content discrimination by singling out equity as a priority and engaged in viewpoint discrimination by treating equity as a settled fact rather than opinion. Plaintiffs claim that the District demanded staff commit to equity and become anti-racist educators (with "equity" being "code-speak for a much bigger and more dangerous picture: the practice of conditioning individuals to see each other's skin color first and foremost, then pitting

different racial groups against each other"),[20] and that in order for Plaintiffs to be anti-racist, they were to advocate for changes in political, economic and social life. They also allege the District taught, *inter alia*, that colorblindness is a form of white supremacy.[21]

Plaintiffs' allegations do not support a content or viewpoint discrimination claim. The "crucial or ultimate fact that will determine" such claims is the District's "motivation for imposing" the training. *Keeton, supra*, 664 F.3d at 872 (*citing ACLU of Fla. V. Miami-Dade Cty. Sch. Bd.*, 557 F.3d 1177, 1206-07 (11th Cir. 2009)). There is no evidence that the District implemented the equity training because the District personally disagreed with Plaintiffs' expressed personal views, or that the goal of the training was to alter Plaintiffs' personally held views. The training was implemented[22] to facilitate learning opportunities for employees to improve engagement, safety, attendance rates, core academic success, and graduation rates with a focus on under-resourced and under-represented student populations. ¶¶ 42, 66. These populations include students of color, students with disabilities, LGBTQ+ students, students who qualify for free/reduced lunches, students who receive McKinney-Vento services, students from diverse religious backgrounds, and English language learners. ¶¶ 43-46. Thus, the training concerned how these issues would be

_____

[20] Notably, these allegations were stricken by the Court's own motion as such statements are purely political advocacy. *See* Doc. 30; *also see* 2021 WL 5397475.

[21] This is a political statement. Were the District to adopt this policy, there are employees who would likely disagree with that interpretation. Such decisions should be left to the school board. *See Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988) ("This standard is consistent with our oft-expressed view that the education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges.").

[22] In May 2020, based on recommendations from a citizen committee and the Chief Equity and Diversity Officer, Garcia-Pusateri, the District added Focus Area 5 to its strategic plan. ¶¶ 18-20. 23-33, 37-41, 47-48. The Fall 2020 equity training was conducted with an emphasis on this area as a continuation of the Fall 2019 equity training (for which no complaint was received). ¶¶ 34-36, 65, 70. Staff were to learn about barriers to education that students and staff may encounter in order to create an environment and culture where all students felt that they belonged. ¶¶ 67, 69. It was not used as part of the student curriculum. ¶¶ 68, 71, 72.

addressed in the school system. It was not designed to suppress ideas or viewpoints. It was designed to apply regardless of the viewpoint an employee may possess.[23]

Moreover, the District's training is consistent with, if not mandated by, law. Specifically, Title VI, 42 U.S.C. § 2000d *et seq.*, prohibits discrimination against students on the basis of race, color, and national origin in programs that receive federal financial assistance, such as public schools. Title IX of the Education Amendments, 20 U.S.C. §1681 *et seq.*, prohibits discrimination against students on the basis of sex in any federally funded education program, such as public schools. Similarly, Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act of 1990 prohibits discrimination against students on the basis of disability.

The U.S. Department of Justice's Civil Rights Division (CRD) and the U.S. Department of Education's Office for Civil Rights (OCR) enforce these federal civil rights laws. "School districts may violate these civil rights statutes and the [CRD's and OCR's] implementing regulations when peer harassment based on race, color, national origin, sex, or disability is sufficiently serious that it creates a hostile environment and such harassment is encouraged, tolerated, not adequately addressed, or ignored by school employees." *See* Russlynn Ali, Dear Colleague Letter, OCR at 1 (Apr. 4, 2011) (school districts should provide training for perpetrators and the school community to ensure students, their families, and staff recognize harassment and know how to respond).

To help school districts identify discrimination or harassment, or potential violations of law, the CRD and OCR issue guidance. Recent guidance makes it clear that school districts may not deny access to an education to any child based on any protected status and that school districts have a

---

[23] For example, a no tolerance sexual harassment policy can be more restrictive than an employee's viewpoint on sexual harassment and not violate the law.

responsibility to investigate and address discrimination or harassment.[24] In keeping with this guidance and to ensure its compliance with federal law, the District, on the heels of a series of disturbing events which targeted students of color and LGBTQ+ students, and consistent with a recent resolution from the Board opposing racism, bigotry and disrespect in any form, amended its strategic plan to include an equity and diversity component and it provided paid training. ¶¶ 21, 22. There is no evidence that the training was unlawful or that it was provided because the District disagreed with Plaintiffs' views or wanted to change their views.[25] While Plaintiffs were free to express disagreement, which they did at times (¶ 89), they were not free to block the District's attempts to ensure its employees' compliance, as part of their job duties, with its lawful policies. "Certainly, preventing discrimination in the workplace—and in the schools—is not only a legitimate, but a compelling, government interest." *Saxe v. State College Area Sch. Dist.*, 240 F.3d 200, 209 (3rd Cir. 2001).[26] Said another way, Plaintiffs' attendance at antidiscrimination training is

---

[24] *See*, *e.g*., CRD/OCR Fact Sheets: Confronting Discrimination Based on National Origin and Immigration Status (August 19, 2021) (recognizing students may face barriers due to limited English proficiency or because they or their parents/guardians are not U.S. citizens); Confronting LGBTQ+ Harassment in Schools (June 23, 2021) (recognizing LGBTQ+ students reported bullying and harassment by classmates due to their perceived or actual sexual orientation and gender identity); and Confronting COVID-19-Related Harassment in Schools (May 10, 2021) (recognizing Asian American/Pacific Islander students reported bullying/harassment by classmates due to their race/national origin/ethnicity/ancestry/language). *Also see* OCR Policy Guidance on Religious Discrimination (November 13, 2018) (stating that while none of the laws OCR enforces expressly address religious discrimination, Title VI protects students from such discrimination).

[25] In fact, neither Plaintiff complained prior to the training, nor did they file a grievance after the training. ¶¶ 91, 100E, 101E, 103C, 114. Notably, Henderson sent Anderson a thank note after the training. ¶ 113. She also later thanked him for assisting her with getting credit for the online modules and expressed no concerns about the content of any training. ¶¶ 124-128, The District first found out that Plaintiffs believed their constitutional rights were violated when their Complaint was filed, more than ten (10) months after the training. ¶ 92.

[26] *Also see Keeton*, *supra*, 664 F.3d at 872-73 (requirement that graduate student complete a remediation plan to participate in university's counseling practicum did not violate First Amendment; school did not impose plan due to student's views on homosexuality, but rather, as she expressed an intent to impose her personal religious views on her clients).

a neutral, lawful requirement under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"); *also see* Missouri Human Rights Act, RSMo. § 213.010 *et seq.* ("MHRA"). The District may, as it did, take action to ensure its employees understand the policies against discrimination in the workplace without violating the First Amendment. *Also see* Section IV.B.3, *infra.* Otherwise, Title VII and the MHRA would be in conflict with the First Amendment.

Additionally, and particularly in the context of a school environment, even if the training were found to be restrictive, it was a reasonable restriction on speech. *See Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 114 (2001) ("For the 'guarantee of neutrality is respected, not offended, when the government, following neutral criteria and evenhanded policies, extends benefits to recipients whose ideologies and viewpoints…are broad and diverse.' ") (citation omitted). This is consistent with *Hazelwood*, *supra* n. 21, 484 U.S. at 262-64, where the Supreme Court found the school did not violate the First Amendment by deleting pages of student articles discussing teenage pregnancy and the impact of divorce. It is also consistent with the government's ability to advance permissible goals, such as nondiscrimination principles. *See Rust v. Sullivan*, 500 U.S. 173, 194 (1991) ("To hold that the Government unconstitutionally discriminates on the basis of viewpoint when it chooses to fund a program dedicated to advance certain permissible goals, because the program in advancing those goals necessarily discourages alternative goals, would render numerous Government programs constitutionally suspect.").

At bottom, efforts to prohibit discrimination and promote equity and diversity, such as those here, have been found not to constitute content or viewpoint discrimination. *Christian Legal Soc. Chap. of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 668 (2010) (school's policy requiring officially recognized student groups to comply with school's nondiscrimination policy did not violate student group's First Amendment rights); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984) (state's nondiscrimination law forbidding discrimination on basis of sex in places

54

of public accommodation did not "distinguish between prohibited and permitted activity on the basis of viewpoint."); and *Bd. of Dir. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 549 (1987) (state's nondiscrimination law did not violate First Amendment by requiring club to admit women).

### 3. Plaintiffs' Count III Claim, Unconstitutional Condition of Employment in Violation of the First Amendment, Fails as a Matter of Law.

Plaintiffs claim the District created an unconstitutional condition of employment by demanding that staff understand and promote "so-called racial equity" as part of their jobs, by making reduced pay and credit hours the consequences for failure to participate in equity training, and by implying that non-participation may have resulted in consequences, including dismissal.

*Perry v. Sindermann*, 408 U.S. 593 (1972) has been described as the "locus classicus of the 'unconstitutional conditions' doctrine." *Kinney v. Weaver*, 367 F.3d 337, 357 (5th Cir. 2004). Perry involved a non-tenured professor who alleged his contract was not renewed because he publicly criticized the university's policies. 408 U.S. at 594–95. The Supreme Court held these allegations presented a bona fide First Amendment claim because the denial of a government benefit, such as a teaching position, cannot be predicated on the exercise of a constitutional right, and stated:

> For at least a quarter-century, this Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech.

408 U.S. at 597. The Court also stated, "[M]ost often, we have applied the principles to denials of public employment … [and] We have applied the principle regardless of the public employee's contractual or other claim to a job." *Id.* (*citing*, *inter alia*, *Pickering*, *supra* n. 9, 391 U.S. at 568).

Clearly Plaintiffs' claims fail. Plaintiffs were not denied any benefit. In fact, Plaintiffs still work for the District (with Lumley being promoted), Plaintiffs have received all of the pay to which they are entitled and they have never been penalized. ¶¶ 137, 140-142. The mere implication that

55

any such loss or penalty may result is insufficient to establish an unconstitutional condition of employment, and this is particularly true given that there is no First Amendment violation.

Plus, it would be contrary to Title VII and the MHRA to allege that antidiscrimination training, which is part of the District's required training on various employment-related topics (¶¶ 49-50), is an unconstitutional condition of employment. Such training is a lawful requirement of the District as an employer. Title VII prohibits discrimination against employees on the basis of race, color, religion, sex, or national origin. *See* 42 U.S.C. § 2000e-2(a)(1). The U.S. Equal Employment Opportunity Commission (EEOC) enforces Title VII. Per EEOC guidance, employers have an affirmative obligation to ensure that the workplace is free from discrimination, harassment and retaliation.[27] Hence, should the District fail to meet its affirmative obligations, and should a supervisor be involved, the District would be vicariously liable for punitive damages "where an employee serving in a 'managerial capacity' committed the wrong while 'acting in the scope of employment.' " *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 543 (1999). The District would only "not be vicariously liable … where th[o]se decisions are contrary to the employer's good faith efforts to comply with Title VII." *Id*. at 545 (quotations omitted). Thus, to avail itself of the good-faith-compliance standard, the District "must at least 1) 'adopt antidiscrimination policies;' 2) '<u>make a good faith effort to educate its employees about these policies and the statutory prohibitions</u>'; and 3) make good faith efforts to enforce an antidiscrimination policy.' " *McInnis v. Fairfield Comm., Inc.*, 458 F.3d 1129, 1138 (10th Cir. 2006) (citation omitted) (emphasis added). In short, without a

---

[27] *See*, *e.g*., EEOC Fact Sheet: Preventing Discrimination is Good Business (February 25, 2016) (asking employers to ensure work policies and practices do not disproportionately exclude people of a particular race, color, religion, sex, national origin, disability or age and requesting that they respond promptly and adequately to discrimination complaints); *also see Bostock v. Clayton Cty., Ga*., — U.S. —, 140 S. Ct. 1731 (2020) (adding homosexual and transgender protections).

showing of damage or a loss of a benefit, a process which is legal and mandated by law cannot be an unconstitutional condition of employment.

### C. PLAINTIFFS ALSO CANNOT SUCCEED ON THEIR REQUEST FOR INJUNCTIVE OR DECLARATORY RELIEF.

Because none of Plaintiffs' separate claims have merit, they cannot succeed in their requests for a permanent injunction[28] or declaratory relief. As for the latter, the Declaratory Judgment Act does not provide an independent source of jurisdiction. It provides that, "[i]n a case of actual controversy within its jurisdiction ... any court of the United States ... <u>may</u> declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a) (emphasis added). "If a district court, in the sound exercise of its judgment, <u>determines after a complaint is filed that a declaratory judgment will serve no useful purpose</u>, it cannot be incumbent upon that court to proceed to the merits before staying or dismissing the action." *Wilton v. Seven Falls Co*., 515 U.S. 277, 288 (1995) (emphasis added). The Act is "an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant." *Id.* at 287-88 ("By the…Act, Congress sought to place a remedial arrow in the district court's quiver; it created an opportunity, rather than a duty, to grant a new form of relief to qualifying litigants.").

Here, and as discussed in Section IV.B, *supra*, none of Plaintiffs' separate claims have any merit, nor have they shown (as discussed in Section IV.A, *supra*) harm which "is certain and great and of such imminence that there is a clear and present need for equitable relief." *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013). In the absence of an actual dispute between the

---

[28] The standard for equitable relief includes: (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties; (3) the probability that movant will succeed on the merits; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc*., 640 F.2d 109, 114 (8th Cir. 1981). The final factor weighs heavily in favor of Defendants. There can be little doubt that the public interest heavily favors the District's ability to take steps to implement and enforce equity and diversity training.

parties, this Court has no jurisdiction to entertain a request for equitable relief and Plaintiffs' requests for relief must be denied. *See MedImmune, Inc. v. Genentech, Inc*., 549 U.S. 118, 126 (2007) (noting the Act provides for declaratory judgments only in cases "of actual controversy"); *see also Dataphase*, *supra* n. 28, 640 F.2d at 113 (injunctive relief may not issue absent a showing of likelihood of success on the merits); and *Barrett v. Claycomb*, 705 F.3d 315, 320 (8th Cir. 2013) (likelihood of success on the merits is the most significant factor) (citation omitted).

### D. DEFENDANTS ARE ENTITLED TO COSTS AND ATTORNEYS' FEES.

Defendants respectfully request the Court to dismiss Plaintiffs' Complaint in its entirety and grant Defendants their costs and attorneys' fees. *See* 42 U.S.C. § 1988(a).

### V. <u>CONCLUSION</u>

Plaintiffs cannot satisfy the case or controversy requirement of Article III of the Constitution as there is no actual injury traceable to Defendants. But, even if they could, Plaintiffs' allegations fail to support the First Amendment constitutional claims they allege in Counts I, II and III of their Complaint and their requests for relief. Defendants are entitled to judgment as a matter of law.

Respectfully submitted,

ELLIS, ELLIS, HAMMONS & JOHNSON, P.C.

By*:   /s/ Ransom A Ellis, III*
   Ransom A Ellis, III   MBN:  29129
   rellis3@eehjfirm.com
   Todd A. Johnson   MBN: 38363
   tjohnson@eehjfirm.com
   Tina G. Fowler   MBN: 48522
   tfowler@eehjfirm.com
   2808 S. Ingram Mill Road, Suite A104
   Springfield, MO  65804
   Phone:  417-866-5091
   Fax:  417-866-1064
   *Attorneys for Defendants*

<u>**CERTIFICATE OF SERVICE**</u>

       I hereby certify that on this 22nd day of July 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, and a copy was made available to all electronic filing participants.

Derek H. MacKay
Knight Nicastro MacKay, LLC
304 W. 10th Street
Kansas City, MO 64105

Celia H. O'Leary
Southeastern Legal Foundation
560 W. Crossville Rd., Suite 104
Roswell, GA 30075

Kimberly S. Hermann
Southeastern Legal Foundation
560 W. Crossville Rd., Suite 104
Roswell, GA 30075

Jeffrey A. Clayman
Southeastern Legal Foundation
560 W. Crossville Rd., Suite 104
Roswell, GA 30075

Braden H. Boucek
Southeastern Legal Foundation
560 W. Crossville Rd., Suite 104
Roswell, GA 30075

*/s/ Ransom A Ellis, III*
Attorney of Record

59

Case 6:21-cv-03219-MDH   Document 75   Filed 07/22/22   Page 64 of 64

<u>**CERTIFICATE OF SERVICE**</u>

       I hereby certify that on this 22nd day of July 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, and a copy was made available to all electronic filing participants.

Derek H. MacKay
Knight Nicastro MacKay, LLC
304 W. 10th Street
Kansas City, MO 64105

Celia H. O'Leary
Southeastern Legal Foundation
560 W. Crossville Rd., Suite 104
Roswell, GA 30075

Kimberly S. Hermann
Southeastern Legal Foundation
560 W. Crossville Rd., Suite 104
Roswell, GA 30075

Jeffrey A. Clayman
Southeastern Legal Foundation
560 W. Crossville Rd., Suite 104
Roswell, GA 30075

Braden H. Boucek
Southeastern Legal Foundation
560 W. Crossville Rd., Suite 104
Roswell, GA 30075

*/s/ Ransom A Ellis, III*
Attorney of Record

59