**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| BROOKE HENDERSON and JENNIFER LUMLEY, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 6:21-cv-03219-MDH |
| v. | ) | |
| | ) | |
| SCHOOL DISTRICT OF SPRINGFIELD R-12, ET AL., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

---

**SUGGESTIONS IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT WITH**
**INCORPORATED STATEMENT OF UNCONTROVERTED MATERIAL FACTS**

---

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... iii

STATEMENT OF UNCONTROVERTED MATERIAL FACTS.................................. 1

INTRODUCTION ..................................................................................................... 22

STANDARD OF REVIEW ....................................................................................... 25

ARGUMENT ............................................................................................................ 25

   I.  SPS unconstitutionally compelled Plaintiffs' speech through its Equity Training and Canvas
      modules. .......................................................................................................... 25

      A.  SPS compelled Plaintiffs' speech during the Equity Training................................... 28

      B.  SPS also compelled Ms. Henderson's speech through online Canvas modules......... 33

  II. SPS engaged in unconstitutional viewpoint discrimination when it declared that all staff
      must hold certain views, chilling Plaintiffs' speech as a result............................................ 36

      A.  SPS discriminated against Plaintiffs' views through its Equity Training.................... 37

      B.  SPS discriminated against Ms. Henderson's views through its Canvas modules....... 38

      C. SPS's actions created a chilling effect that deterred Plaintiffs from sharing their real
      views............................................................................................................ 39

  III.SPS placed an unconstitutional condition on Plaintiffs' employment when it compelled their
      speech, discriminated against their views, and chilled their expression. .............................. 40

CONCLUSION.......................................................................................................... 41

CERTIFICATE OF SERVICE .................................................................................. 43

# TABLE OF AUTHORITIES

**Cases**

*281 Care Comm. v. Arneson*, 638 F.3d 621 (8th Cir. 2011)..............................37, 39, 40

*Am. Commc'ns Ass'n v. Douds*, 339 U.S. 382 (1950) ..........................................27, 32

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................25

*Axson-Flynn v. Johnson*, 356 F.3d 1277 (10th Cir. 2004) ......................................27, 32

*Boos v. Barry*, 485 U.S. 312 (1988)............................................................................36

*Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000) .......................................................25

*C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159 (3d Cir. 2005)........................27, 32, 35

*Doe v. United States*, 901 F.3d 1015 (8th Cir. 2018)............................................26, 31

*Frost & Frost Trucking Co. v. Railroad Comm'n. of Cal.*, 271 U.S. 583 (1926)........................40

*Grayned v. City of Rockford*, 408 U.S. 104 (1972)......................................................39

*Hurley v. Irish-American Gay, Lesbian and Bisexual Grp. of Boston, Inc.*,
  515 U.S. 557 (1995) ..................................................26, 32, 35, 37, 38, 39

*Janus v. AFSCME, Council 31*, 138 S. Ct. 2448 (2018)..................................25, 26, 31

*Keyishian v. Bd. of Regents*, 385 U.S. 589 (1967)................................................36, 40

*Laird v. Tatum*, 408 U.S. 1 (1972)..........................................................27, 37, 39, 40

*Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789 (1984) ..............36, 37

*Perry v. Sindermann*, 408 U.S. 593 (1972)..................................................................41

*Phelan v. Laramie Cnty. Cmty. Coll. Bd. of Trustees*, 235 F.3d 1243 (10th Cir. 2000).........27, 32

*Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968)...........................................................41

*Police Dep't of Chi. v. Mosley*, 408 U.S. 92 (1972) ...................................................37

*Riley v. Nat'l Fed'n of Blind*, 487 U.S. 781 (1988) ..............................................36, 38

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995) ...................................... 36

*Speech First, Inc. v. Schlissel*, 939 F.3d 756 (6th Cir. 2019) ........................................ 37, 39, 40

*Speiser v. Randall*, 357 U.S. 513 (1958) .................................................................................. 41

*Stahl v. City of St. Louis*, 687 F.3d 1038 (8th Cir. 2012) ........................................................ 39

*Telescope Media Grp. v. Lucero*, 936 F.3d 740 (8th Cir. 2019) ................................ 25, 26, 31, 38

*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) .................................................. 25, 35

*Wooley v. Maynard*, *430* U.S. 705 (1976) ................................................................. 26, 32, 35, 36

## **Rules**

Fed. R. Civ. P. 56 ................................................................................................................. 25

Case 6:21-cv-03219-MDH   Document 77   Filed 07/22/22   Page 4 of 47

**STATEMENT OF UNCONTROVERTED MATERIAL FACTS**

**<u>Parties</u>**

1.  At all relevant times, the School District of Springfield, R-12 ("SPS") has employed Brooke Henderson as a 504 Process Coordinator in the Special Services Department. She is a certificated employee. (Ex. 1, Joint Stipulation of Facts ("Stip.") ¶ 3.)

2.  SPS has employed Jennifer Lumley since July 9, 2020, first as a Secretary in the Special Services Department and later as a Secretary in SPS's Analytics, Accountability and Assessment Department. (Stip. ¶ 2.)

3.  SPS is an urban public school district and political subdivision of the State of Missouri which is governed by the Board of Education for the School District of Springfield, R-12 ("Board"). (*See* Defs.' Am. Answer (Doc. 31) ¶ 28.)

4.  The Board has seven elected members. The Missouri General Assembly empowers it to govern and control SPS. (*See* id. ¶ 29.)

5.  SPS has employed Grenita Lathan as its Superintendent of Schools since July 1, 2021. (Stip. ¶ 4.) She is responsible for all SPS departments, including the Office of Equity and Diversity. (Ex. 23, Grenita Lathan/SPS Dep. 17:23 to 18:2.)

6.  SPS has employed Yvania Garcia-Pusateri since September 2019 as the Chief Equity and Diversity Officer in SPS's Office of Equity and Diversity. Her current job duties include the overseeing of the implementation of equity training. (Stip. ¶ 5; Ex. 4, Yvania Garcia-Pusateri/SPS ("YGP/SPS") Dep. 15:6-14.)

7.  At all relevant times, SPS has employed Lawrence Anderson as a Coordinator in the Office of Equity and Diversity. In his role as a coordinator, he answers to Dr. Garcia-Pusateri. (Stip. ¶ 7; Ex. 14, Lawrence Anderson Dep. 12:13-16.)

1

**Plaintiffs' Beliefs**

8. Ms. Henderson and Ms. Lumley believe strongly in equality, and that all individuals should have equal rights and opportunities under the law as set forth in our nation's founding documents and our civil rights laws. (Ex. 2, Brooke Henderson Decl. ¶ 5; Ex. 3, Jennifer Lumley Decl. ¶ 5.)

9. They believe that law and society should be colorblind, meaning individuals should not be judged or assigned moral characteristics based on skin color. (Henderson Decl. ¶ 5; Lumley Decl. ¶ 5.)

10. They also believe as Christians that identity is found in Christ alone, that all lives matter, that we all have equal worth based on our status as God's creation, and that our value is not found in superficial characteristics like race and sex, all of which are irrelevant under a biblical worldview. (Henderson Decl. ¶¶ 6, 32; Lumley Decl. ¶¶ 6, 25.)

11. They reject the idea that America is divided into the categories of privileged oppressors and oppressed, as defined by race or sex. (Henderson Decl. ¶ 7; Lumley Decl. ¶ 7.)

12. They believe "equity," as SPS taught it, is a divisive concept that assigns characteristics based on immutable traits, like race or sex, and then categorizes people as privileged or oppressed. They believe it conditions individuals to attach undue importance to race, thereby deepening America's racial divide. (Henderson Decl. ¶ 7; Lumley Decl. ¶ 7.)

**SPS Required All Certificated Teachers and Staff
to Attend the Equity Training**

13. For the 2020-2021 school year, SPS required all of its certificated and hourly staff to attend four hours of professional development. (YGP/SPS Dep. 115:19-24.)

2

14. SPS required all of its certificated and hourly staff including Ms. Henderson and Ms. Lumley to attend a district-wide equity training during the Fall Semester of school year 2020-21 ("Equity Training"). (Stip. ¶ 8.)

15. SPS's certificated and hourly staff received required hours of professional development credit for attending the Equity Training. (Ex. 7, SPS Interrog. Answers, No. 10; Stip. ¶ 15.)

16. SPS informed Ms. Henderson and Ms. Lumley that if they did not attend the Equity Training, they would not receive the required hours of professional development credit. (Stip. ¶ 15; Henderson Decl. ¶ 11; Lumley Decl. ¶ 10; *see also* YGP/SPS Dep. 211:14-21)

17. Ms. Henderson and Ms. Lumley understood this to mean that if they did not attend the Equity Training, SPS would withhold their pay. (Henderson Decl. ¶ 11; Lumley Decl. ¶ 10; *see also* SPS Interrog. Answers, No. 10; Ex. 6, DEX 50-C009936 ("Staff members are required to complete training, or they will be docked pay."); Ex. 5 at PLS 0407-08 ("Please remember that if you do not attend this training, your pay will be docked.").)

**Plaintiffs Received Materials Before the Equity Training**

18. On June 2, 2020, about three months before SPS launched its Equity Training, Dr. Garcia-Pusateri emailed SPS's certificated teachers and staff informing them that it was their "responsibility to be equity champions" and announced SPS's intention to expand its equity and diversity training. The email stated, in part:

> In our role as SPS educators, it is our responsibility to be equity champions for all students and to create learning environments that are inclusive and affirming of all identities and lived experiences. The following resources are designed to help us better understand the challenges we face in order to better serve and support our students and colleagues. I encourage you to read, reflect and engage . . ..
>
> The learning should not stop with these resources, but continue to expand. . . . This is also why training and professional learning will continue throughout the district.

(Ex. 8 at PLS 0334; *see* Henderson Decl. ¶ 9.)

3

19. Dr. Garcia-Pusateri's June 2, 2020 email also included hyperlinks to a series of articles about equity and diversity including: (1) "Stop Asking People Of Color to Explain Racism—Pick Up One of These Books Instead," (2) "For Our White Friends Desiring to Be Allies," and (3) "The Anti-Racist Reading List: Because allyship can't be proven with a few social media posts." (Ex. 8 at PLS 0335-99.)

20. "For Our White Friends Desiring to Be Allies," discusses "six things you can do to be stronger allies," including:

> [S]top talking about colorblindness. . . . It will never be possible for us to be colorblind, and we shouldn't ever want to be. . . . We have to name these things, acknowledge them, and begin to do the deep work of transformation, restoration – and reparation. . . . Privilege means that you owe a debt. . . . It is up to you whether you choose to acknowledge the work that is yours to do. It is up to you whether you choose to pay this debt and how you choose to do so. . . . I urge you to pursue this work, knowing that a system of white privilege afforded you access to opportunities while denying them to so many others.

(Id. at PLS 0383-86.)

21. "Stop Asking People of Color to Explain Racism—Pick Up One of These Books Instead," states:

> When I call [white people] on their racism, they practically come unglued. They swear they "didn't mean anything by it" and "don't have a racist bone" in their bodies. They might pipe up some ridiculous white sh— about black-on-black crime, the fact that they once dated a black person, the race card, colorblindness, All Lives Matter, or reverse racism. I can predict in almost every situation what the person is going to say before they say it. . . . Many of us are parents, and if we're going to change the tide for future generations, we have to tackle race head-on instead of evading it or pretending we are, as many white people have told me, all- one- race- the-human-race.

(Id. at PLS 0387-89.)

22. SPS also provided Ms. Henderson and Ms. Lumley a packet of printed materials before their Equity Training sessions, which included these handouts:

   a. Land Acknowledgement;

4

b. Guiding Principles;

c. "Greetings!";

d. Focus Area V;

e. Fall Training Note Sheet;

f. Oppression Matrix;

g. Covert/Overt White Supremacy graphic;

h. Social Identity Map; and

i. Terminology sheet.

(Ex. 9; Stip. ¶¶ 16-17; *see also* Ex. 10, Philip Hale Dep. 15:4-7, dep. ex. 2.)

23. SPS made Ms. Henderson's packet of handouts available to her two days before her Equity Training session. (Stip. ¶ 16; *see also* Hale Dep. 9:12 to 10:17, dep. ex. 1.)

24. SPS provided substantially the same packet of printed materials to all SPS employees before their respective Equity Training sessions. (YGP/SPS Dep. 128:9-11.)

25. The "Greetings!" handout stated, in part, "[Equity and diversity] is more than a value, but now part of our work and job responsibilities. . . . [W]e all are now accountable in this work as well. Growing a deeper sense of cultural consciousness is something we must commit to, not just for ourselves but for all our students. As with any presentation, I ask that you remain engaged and professional and provide our trainers complete attention and respect." (Ex. 9 at PLS 0425.)

26. According to SPS, "cultural consciousness" refers to "[t]he deeper sense of awareness of other people and the identities they hold," including awareness of race. (YGP/SPS Dep. 103:18-25.)

5

27. The Covert/Overt White Supremacy graphic indicated that "colorblindness," "All Lives Matter," and "white silence" constituted white supremacy. (Ex. 9 at PLS 0425.)

28. According to SPS, colorblindness is not an equitable concept, colorblindness can have harmful ramifications, and equality "takes in colorblindness." (YGP/SPS Dep. 66:16 to 67:6, 68:7-9, 70:19 to 71:16, 96:4-7.)

29. According to SPS, colorblindness "is a form of white supremacy." (YGP/SPS Dep. 115:12-18; Ex. 9 at PLS 425.)

30. The "Oppression Matrix" handout listed types of oppression and included racism and sexism as categories. It also listed the privileged social group under racism as "White People" and the oppressed social groups as "Asian, black, Latina/o, native people." It listed the privileged social group under sexism as "Male assigned at birth," and the oppressed social group as "Female assigned at birth." (Ex. 9 at PLS 0424.)

31. SPS communicated the following guiding principles for the Equity Training in the "Guiding Principles" handout:

    a. Stay Engaged;

    b. Lean into your discomfort;

    c. Speak YOUR Truth and from YOUR Lived Experiences;

    d. Acknowledge YOUR privileges;

    e. Seek to Understand;

    f. Hold YOURSELF accountable; and

    g. Be Professional.

    (Id. at PLS 0428.)

6

**Equity Training**

32. On October 6, 2020, Ms. Lumley attended the Equity Training in person with around seven other employees from the Special Services Department. (Stip. ¶ 11.)

33. Dr. Garcia-Pusateri, Mr. Anderson, and Mr. Sode conducted the October 6, 2020 Equity Training session that Ms. Lumley attended. (Stip. ¶ 12.)

34. On October 14, 2020, Ms. Henderson attended virtually the Equity Training with around thirty other employees from the Special Services Department. (Stip. ¶ 13.)

35. Dr. Garcia-Pusateri and Mr. Anderson conducted the October 14, 2020 Equity Training session Ms. Henderson attended. (Stip. ¶ 14.)

36. SPS expected staff attending virtual Equity Training sessions to keep their computer cameras on during the entirely of the training. (YGP/SPS Dep. 167:12-20, dep. ex. 9 at 1-2; Ex. 11, Brooke Henderson Dep. 57:12-21; *see also* Ex. 12, Tanya Rapert Dep. 27:25 to 28:13 ("[Trainers] kept stressing to people to turn their cameras on.").)

37. SPS's trainers showed the Equity Training attendees a PowerPoint slide presentation during the Equity Training. (Stip. ¶¶ 1(g), 9; Ex. 13.)

38. SPS used substantially the same slide presentation for all Equity Training sessions, including the Equity Training sessions that Ms. Lumley and Ms. Henderson attended. (Stip. ¶ 9; *see also* Anderson Dep. 16:2 to 17:8.)

39. The SPS trainers also used a "Script & Slide Breakdown" ("Script"), attached hereto as Exhibit 15, in connection with the slide presentation, which they largely followed in each Equity Training session. (Ex. 15; YGP/SPS Dep. 21:11 to 23:13, dep. ex. 3; Anderson Dep. 20:7 to 21:4, 31:10-14, dep. ex. 1.)

7

40. The Equity Training slide presentation also contained speaker notes that the SPS trainers relied upon. A version of the slide presentation with speaker notes is attached hereto as Exhibit 16. (Ex. 16; Stip. ¶¶ 1(i), 9; YGP/SPS Dep. 125:20 to 126:3, 155:3-8.)

41. At the start of the Equity Training sessions, SPS asked that a school administrator or leader read the same statement contained in the "Greetings!" handout to reinforce that equity was "now part of our work and job responsibilities" and that "we must commit to [it]." (*Compare* Ex. 17, DEX 50A-000388-91 at 391 *with* Ex. 9 at PLS 0425; *see also* YGP/SPS Dep. 101:11-22, dep. ex. 7.)

42. According to SPS, equity means "to identify the specific and unique needs of an individual such as a student and provide the supports needed for them to be successful." A student's needs, according to SPS, are "based on their identity and their lived experiences." SPS defines "identity" to "[i]nclude race as well as other aspects of identity." And, according to SPS, a black student's lived experience "may look different than for someone who is white." (YGP/SPS Dep. 64:11 to 66:15.)

43. According to SPS, equality "is just to treat – with race to treat everyone the same and see them as all the same." (YGP/SPS Dep. 67:25 to 68:6, *see also* 65:18-20 ("Equity is looking at specific unique needs. Equality is ensuring that everyone gets the same.").)

44. SPS never told staff that silence was an option during the Equity Training. (YGP/SPS Dep. 151:22-25.)

45. Throughout the Equity Training, SPS continuously taught that silence on the part of "white people" was a form of white supremacy. (YGP/SPS Dep. 157:11-18.)

46. Mr. Anderson told participants he would call on them if they did not speak out. (Anderson Dep. 33:23 to 34:9, 50:4-13; YGP/SPS Dep. 229:19 to 230:14.)

8

47. The "Guiding Principles" handout was also repeated early in the slide presentation but with the addition of "Be Professional – *Or be Asked to Leave with No Credit*." (*Compare* Ex. 13 at 7 *with* Ex. 9 at PLS 0428; Stip. ¶¶ 1(g), 9.)

48. When the SPS trainers showed staff the Guiding Principles slide, they told staff to "Stay Engaged in the discussion," "stay locked into the conversations," "lean into that discomfort . . . don't try to push it down," "share your personal experiences, and "it is important that during this time we commit to the success of our district and our students, which is why we must commit to these following principles." (Ex. 15 at 6.)

49. The Equity Training slide presentation also included an "Overview of Training" slide that stated that participants will "[e]ngage in identity development and understanding" and would "[r]eceive tools on how to become Anti-Racist educators, leaders and staff members at SPS," among other statements. (Ex. 13 at 8; Stip. ¶¶ 1(g), 9; Henderson Dep. 57:1-5 ("[W]e had to be an ally and it was part of our job duty to be an antiracist educator.").)

50. Through its Equity Training, SPS defined "anti-racism," and in turn being an anti-racist, to mean "bucking norms." SPS further explained that "anti-racism" is a "proactive element" that requires not being silent and "advocating for changes in political, economic, and social life." (Ex. 13 at 31-32; Stip. ¶¶ 1(g), 9; YGP/SPS Dep. 86:25 to 89:4, 97:8-19.)

51. Through its Equity Training, SPS expected staff to commit to the concept of becoming "anti-racist" educators. (YGP/SPS Dep. 86:11-24, 94:14 to 95:14, 97:23 to 98:19, 99:15 to 100:1, dep. ex. 7 at 1.)

52. According to SPS, equality on the basis of race and colorblindness do not correspond with anti-racism. (*Id.* 89:13-19, *see also* 96:4-7 ("We talked about colorblindness and other ways of how it can have harmful effects.").)

9

53. According to SPS, not acknowledging people's race or saying that a person does not see color "goes against anti-racism." (Id. 89:10-17.)

54. The first interactive exercise of the Equity Training took place after SPS showed a "George Floyd – Reflection Video" consisting of a black screen with the final words of George Floyd subtitled for eight minutes and 48 seconds. (Ex. 13 at 11; Stip. ¶¶ 1(g), 9.)

55. Following the "George Floyd-Reflection Video," the SPS trainers separated staff into small groups and directed them to discuss their feelings and thoughts about the video. (Ex. 13 at 12; Stip. ¶¶ 1(g), 9; Ex. 15 at 8.)

56. After several minutes, the SPS trainers brought staff back to the larger group to share their thoughts about the video. (Ex. 13 at 12; Stip. ¶¶ 1(g), 9; Ex. 15 at 8.)

57. SPS showed staff a slideshow called the "Environmental Scan" that "showcase[d] pictures of major events that have impacted our country from March [2020] until now." (Ex. 13 at 14; Stip. ¶¶ 1(g), 9; Ex. 15 at 9.) The slideshow images are attached hereto as Exhibit 18. (Ex. 18.)

58. Following the "Environmental Scan," the SPS trainers started the "Environmental Scan Activity." They broke staff out into small groups and directed them to discuss several questions about the images, including what it felt like to see them. SPS trainers told trainees that when they returned to the large group, they would be calling on two individuals to share their thoughts. (Ex. 13 at 15; Stip. ¶¶ 1(g), 9; Ex. 15 at 10.)

59. For the small group breakout, Ms. Lumley partnered with the same person as she did for the George Floyd breakout. Ms. Lumley participated in the small group discussion because she did not want to remain silent due to SPS's instruction that staff have courageous conversations, stay engaged, lean into their discomfort, share their personal experiences, and

share their truth. Nor did Ms. Lumley want to be considered a white supremacist by remaining silent. (Lumley Decl. ¶ 22; Ex. 19, Jennifer Lumley Dep. 20:24 to 21:4.)

60. Ms. Henderson and others in her small group expressed to each other that they did not believe the "Environmental Scan" slideshow was completely accurate because even though the exercise showed the summer 2020 protests as peaceful, riots also took place in Missouri and across the country. (Henderson Decl. ¶ 23.)

61. After several minutes, the SPS trainers brought staff back to the larger group. (Ex. 13 at 15; Stip. ¶¶ 1(g), 9; Ex. 15 at 10; *see also* Henderson Decl. ¶ 24; Lumley Decl. ¶ 22.)

62. Once they returned to the large group, Mr. Anderson reminded staff that he would call on people if they remained silent. (YGP/Dist. Dep. 229:13 to 230:14.)

63. In Ms. Henderson's large group, they discussed Kyle Rittenhouse. Ms. Henderson said that she had heard he was defending himself from the rioters, and that she thought he had been hired to defend a business. Dr. Garcia-Pusateri told Ms. Henderson that she was wrong, and then told her that she was confused. Dr. Garcia-Pusateri then told Ms. Henderson that Mr. Rittenhouse murdered an innocent person. (Henderson Decl. ¶ 24.)

64. After the Environmental Scan, SPS covered the topics of oppression, systemic racism, and white supremacy. (Ex. 13 at 16-23; Stip. ¶¶ 1(g), 9.)

65. During this portion of the training, SPS taught staff that "[s]ociety's institutions, such as government, education, and culture, all contribute or reinforce the oppression of marginalized social groups while elevating dominant social groups." (Ex. 13 at 16; Stip. ¶¶ 1(g), 9.)

66. Through its Equity Training, SPS taught that "systems of oppressions [sic] are woven into the very fabric of the United States and form the foundation of the American culture and its laws." (Ex. 13 at 16; Stip. ¶¶ 1(g), 9; Ex. 15 at 10.)

67. As part of the training on oppression, SPS showed staff the same "Oppression Matrix" they received before the session which indicates, among others, that following groups are oppressed: "Asian, Black, Latina/o, Native People," and "Female[s] assigned at birth." (*Compare* Ex. 13 at 17 *with* Ex. 9 at PLS 0424; Stip. ¶¶ 1(g), 9.)

68. The "Oppression Matrix" categorized white people and males assigned at birth as the privileged social group under the categories of racism and sexism, respectively. (Ex. 13 at 17; Stip. ¶¶ 1(g), 9.)

69. As part of its Equity Training, SPS further taught that systemic racism "identifies dimensions of our history and culture that have allowed privileges associated with 'whiteness' and disadvantages associated with 'color' to endure and adapt over time." (Ex. 13 at 18; Stip. ¶¶ 1(g), 9.)

70. Likewise, in its Equity Training, SPS showed a <u>video</u> which explained, "You can see evidence of systemic racism in every area of life. . . . As a result, we should support systemic changes" to allow "equal access to resources." (Ex. 13 at 19; Stip. ¶¶ 1(g), 9, 10(d).)

71. As part of its Equity Training, SPS taught that "white supremacy is a highly descriptive term for the culture we live in; a culture which positions white people and all that is associated with them (whiteness) as ideal." (Ex. 13 at 20; Stip. ¶¶ 1(g), 9; Ex. 15 at 12.)

72. Participants then watched a <u>video</u> about white supremacy, which depicted a cartoon character dressed as a member of the Ku Klux Klan while the narrator described eradicating white supremacy. (Ex. 13 at 21; Stip. ¶¶ 1(g), 9.)

73. As part of the presentation on white supremacy, SPS also showed a slide with the same "Covert/Overt White Supremacy" graphic it handed out before the training. (*Compare* Ex. 13 at 22 *with* Ex. 9 at PLS 0425; Stip. ¶ 1(g), 9.) SPS also showed a slide that declared,

"Privilege is a set of unearned benefits given to people who fit into a specific social group," and it required staff to "Acknowledge YOUR privileges." (Ex. 13 at 26; Stip. ¶ 1(g), 9.)

74. This graphic stated that "white silence," "colorblindness," "BIPOC [Black, Indigenous, People of Color] as Halloween Costumes," and "all lives matter" constitute white supremacy. (Ex. 13 at 22; Stip. ¶ 1(g), 9.)

75. Dr. Garcia-Pusateri also told Ms. Henderson's Equity Training session that staff can't be blind to color because colorblindness is white supremacy, as is denying one's white privilege. She also said that they cannot sit on the sidelines and be silent, that they must be an ally and take action. (Henderson Decl. ¶ 33.)

76. Through the Equity Training, SPS conducted another interactive exercise called the "Major Terminology Groups Share." (Ex. 13 at 23; Stip. ¶ 1(g), 9; Ex. 15 at 14.)

77. In this exercise, SPS directed staff to "[s]pend the next 4 minutes discussing with your partner any of the major terms (Oppression, Systemic Racism, or White Supremacy). Also discuss how your chosen topic has taken place in our community." (Ex. 13 at 23; Stip. ¶ 1(g), 9; Ex. 15 at 14.)

78. Ms. Henderson did not speak in the small group because she feared that debating these issues would polarize her co-workers and compromise their work relationship. (Henderson Decl. ¶ 35.)

79. In her Equity Training session, Ms. Lumley spoke out because of how SPS was assigning characteristics based on race. She stated that all humans are all equal. Ms. Lumley stated that she is not a racist, and that not all white people are racist; that racism is something that any person of a particular race could be guilty of; and that not just white people are racist. (Lumley Decl. ¶ 27; Lumley Dep. 27:9 to 28:6.)

13

80. Ms. Lumley also used a personal example of how racism can exist within any community by sharing that her nephew married a black woman, but that some black people had told her nephew's wife that she did not "count" as black anymore. Mr. Sode told Ms. Lumley that black people cannot be racist. When she questioned his statement, he responded that black people can be prejudiced but not racist. (Lumley Decl. ¶ 27; Lumley Dep. 27:9 to 28:6.)

81. Ms. Lumley also stated that she did not grow up in white privilege; that she came from a poor family, a broken home, and received government handouts. One of the SPS trainers responded that because Ms. Lumley is white, she was born into white privilege. (Lumley Decl. ¶ 28; Lumley Dep. 27:9 to 28:6.)

82. One of the SPS trainers also told Ms. Lumley that the training wasn't just singling out white people, but then she pointed to the screen that discussed white supremacy. The trainers responded by telling Ms. Lumley that she needed to reflect on herself some more. (Lumley Decl. ¶ 28; Lumley Dep. 27:9 to 28:6.)

83. Others also disagreed with Ms. Lumley. When other participants raised their voices and told Ms. Lumley that she didn't understand what the trainers were saying about oppression, systemic racism, and white supremacy, the SPS trainers did not stop or correct her fellow participants. As a result of this exchange with the trainers and co-participants, Ms. Lumley shut down and no longer participated in any of the discussions. (Lumley Decl. ¶ 29; Lumley Dep. 28:17 to 30:4.)

84. During the discussion over "major terms," Ms. Henderson also spoke up and asked Dr. Garcia-Pusateri what staff should say to a student who wanted to dress like a BIPOC character, such as Pocahontas, considering that Halloween was approaching. (Henderson Decl. ¶ 36.)

14

85.  In response, Dr. Garcia-Pusateri told Ms. Henderson that if she had a daughter who wanted to dress as a BIPOC character such as Disney's Moana, that it would not be nice, and that Ms. Henderson should use it as teaching opportunity to explain to the child why it is not okay to dress as a BIPOC character. (Henderson Decl. ¶ 37.)

86.  SPS responded differently to participants depending on the participant's viewpoint. (YGP/SPS Dep. 202:8 to 208:2.)

87.  Two more interactive exercises followed the Major Terminology Group Share—the "Social Identity Map" and the "Four Corners" exercise. The Social Identity Map required staff to "explore [their] identities," e.g., their race, ethnicity, gender, sexual orientation, etc., while the "Four Corners" exercise was "an interactive game centered around Identity, Beliefs and Values." (Ex. 13 at 28-29, 42; Stip. ¶ 1(g), 9; Ex. 16 at 34-37; Stip. ¶¶ 1(i), 9; YGP/SPS Dep. 302:15 to 305:3.)

88.  The Four Corners exercise required participants to answer a series of statements with one of four responses: "strongly agree," "agree," "disagree," and "strongly disagree." (Ex. 13 at 29-30, 42; Stip. ¶ 1(g), 9; Ex. 16 at 35-36; Stip. ¶¶ 1(i), 9.)

89.  Statements included, "I believe all students should be treated equitably," "Learning about my identity makes me better in my role," "I am prepared to have conversations with my students or staff about identity or equity," I believe my identities and lived experiences are affirmed and supported by the district," and "I feel represented in the district." (Ex. 13 at 29-30; Stip. ¶ 1(g), 9; Ex. 16 at 35-36; Stip. ¶¶ 1(i), 9.)

90.  Ms. Lumley did not participate in the Four Corners exercise with her small group because she had shut down and no longer wanted to participate because of the earlier exchange she

had with the SPS trainers and co-participants. (Lumley Decl. ¶ 30; Lumley Dep. 29:10-32:13.)

91. Ms. Henderson did not agree with several Four Corners statements. (Henderson Decl. ¶ 40; Henderson Dep. 116:2 to 119:10.)

92. Although Ms. Henderson disagreed with several of the Four Corners statements, she did not express her disagreement in her Equity Training session because she knew by that point in the training session that SPS did not accept alternate viewpoints, and that if she voiced her true views, she would be corrected or considered unprofessional. (Henderson Decl. ¶ 41.)

93. The Equity Training then addressed "anti-racism," defining it as "advocating for changes in political, economic, and social life." (Ex. 13 at 31; Stip. ¶ 1(g), 9.)

94. SPS stated in its training, "The most important thing to reiterate here is that we will actively oppose racism by advocating for change. There is a proactive element in place to no longer remain silent or inactive." (Ex. 15 at 18.)

95. Additionally, according to SPS, "To fight against systemic racism means to buck norms." (Ex. 13 at 32; Stip. ¶ 1(g), 9.)

96. Moreover, according to SPS, as part their commitment to anti-racism, "Staff . . . at every level must be willing to be uncomfortable in their struggle for black students, recognizing students' power and feeding it by honoring their many contributions to our schools." (Ex. 13 at 33; Stip. ¶ 1(g), 9.)

97. SPS concluded its Equity Training with the "Anti-Racist/Solo Write" or "Anti-Racist/Group Share," where SPS directed staff to answer three questions about being an anti-racist educator: "How does this statement impact your role at SPS? What steps will you take to

16

become an Anti-Racist? What tools/support will you need to be Anti-Racist?" (Ex. 13 at 38-9; Stip. ¶ 1(g), 9.)

98. The three "Anti-Racist/Solo Write" questions were reproduced on the Note Sheet handout staff received before the training so that participants could write out their responses. (Ex. 9 at PLS 0422; Ex. 15 at 3; Hale Dep., dep. ex. 2; YGP/SPS Dep. 317:4 to 318:17.)

99. In Ms. Lumley's and Ms. Henderson's Equity Training sessions, because they were short on time, the SPS trainers directed staff to write their answers on their own time. Neither Ms. Lumley nor Ms. Henderson completed it because they were unwilling to commit to becoming "anti-racist educators," as they understood the term to mean. (Lumley Decl. ¶ 32; Henderson Decl. ¶ 45.)

## Ms. Henderson Also Had to Complete Equity-Based Canvas Modules

100. During the fall semester of the 2020-2021 school year, SPS also required Ms. Henderson, as part of her professional development, to complete seven equity-based computer modules on the Canvas platform, consisting of three Social Emotional Learning modules and four Cultural Consciousness modules ("Canvas Modules"). (Ex. 20; Stip. ¶¶ 19, 21.)

101. Together with the Cultural Consciousness modules, Ms. Henderson completed the following Social Emotional Learning modules: Overview of Social Emotional Learning from an Equity Lens; Elementary Social Emotional Learning as it Relates to Racial Injustice; Secondary Social Emotional Learning as it Relates to Racial Injustice; Elementary Social Emotional Learning as it Relates to Covid-19; and Secondary Social Emotional Learning as it Relates to Covid-19. (Henderson Decl. ¶ 48; Henderson Dep. 44:20 to 46:6.)

102. A team of SPS employees that included Dr. Garcia-Pusateri and Mr. Anderson created the modules. (Ex. 7, SPS Interrog. Answers, No. 2.)

17

103. As one of the creators of the Canvas Modules stated, "Now that we have our Fall district-wide equity training completed, it's import[ant] to keep the momentum going as anti-racist educators." (Ex. 21, DEX 50B-004071.)

104. The Canvas Modules addressed topics including white supremacy, anti-racism, social justice, and systemic racism. (Ex. 20.)

105. The Cultural Consciousness modules required Ms. Henderson to watch several videos, including:

    a. "Black Lives Matter Protests | BrainPOP" video;

    b. "What You Should Know About #BlackLivesMatter" video;

    c. The same "Systemic Racism Explained" video that was in the Equity Training, which said that systemic racism is evident "in every area of life" and that staff should do something about it by supporting "systemic changes" to allow "equal access to resources," beginning at 3:16;

    d. "Debunking The Most Common Myths White People Tell About Race" video, which included statements like "I don't see color"; "I have black friends"; "Race has nothing to do with it. It's about class"; and "Focusing on race is what divides us";

    e. "Advice For White People from Anti-Racism Trainer" video, which said that "anti-racism depends on white America asking itself the critical question of are you still willing to receive these privileges, most of which . . . can be extended to all people without you losing those privileges," beginning at 3:37, and declared that "in everything we do we have to think about is this increasing the burden that's on the black body . . . and try[] to find acts in your life that you can take to decrease that burden. Go grocery shopping for a black person this week," beginning at 4:20; and

18

f. "Are Teachers Unintentionally Racist?" <u>video</u>.

(Stip. ¶ 22; Ex. 20 at PLS 0260-62, 0268-70.)

106. The Cultural Consciousness modules included a "Cultural Competence Self-assessment Checklist" and a "Self Assessment Reflection" which had to be completed to finish the module. (Stip. ¶ 24; Ex. 20 at PLS 0264-65, 0332-33.)

107. Dr. Garcia-Pusateri advised Ms. Henderson that the Cultural Competence modules' reflection questions were a requirement. (Ex. 22, DEX 50F-0012919-20; Henderson Dep. 121:17 to 122:21.)

108. The "Cultural Competence Self-assessment Checklist" stated that "[t]his self-assessment tool is designed to explore individual competence." On a scale from "Never" to "Always/Very Well," the assessment required Ms. Henderson to rate her "Awareness" of whether "I have a clear sense of my own ethnic, cultural, and racial identity," "I am aware of my stereotypes as they arise and have developed personal strategies for reducing the harm they cause," and "If I am a White person working with a person of color, I will likely be perceived as a person with power and racial privilege, and that I [may] not be seen as 'unbiased' or as an ally." (Ex. 20 at PLS 0332-33.)

109. After Ms. Henderson rated herself for each prompt, the assessment instructed Ms. Henderson to calculate a final score for how "culturally competent" she was. (Id.)

110. Even though Ms. Henderson disagreed with the statement "If I am a White person working with a person of color, I will likely be perceived as a person with power and racial privilege, and that I [may] not be seen as 'unbiased' or as an ally," because she does not treat people differently based on their skin color, she answered with "Always/Very Well" or "Fairly

19

Often/Pretty Well" because she thought SPS would review her responses and that was how it expected her to respond. (Henderson Decl. ¶ 53.)

111. The Social Emotional Learning Modules had "Quick Check" Questions that staff had to answer correctly to complete the modules. (Stip. ¶ 23.)

112. The Elementary and Secondary Social Emotional Learning as it Relates to Racial Injustice modules' "Quick Check" question was: "When you witness racism and xenophobia in the classroom, how should you respond?" (Ex. 20 at 58, 93, 80-81, 103-04.)

113. The two choices for answers were: "Address the situation in private after it has passed," and "Address the situation the moment you realize it is happening." If staff selected the first possible answer, they received the following message: "Incorrect! It is imperative adults speak up immediately and address the situation with those involved. Being an anti-racist requires immediate action." If they selected the second possible answer, they received the following message and completed the module: "Correct! Being an anti-racist requires immediate action." (Id. at 93, 103-04.)

114. Ms. Henderson disagreed with the "correct" answer because, having worked with students and been in special education for over 20 years, she believes any response must be tailored to the situation and student. Even so, she selected the "correct" answer so that she could complete the module and receive credit. (Henderson Decl. ¶ 57.)

115. The Elementary and Secondary Social Emotional Learning as it Relates to Covid-19 modules' "Quick Check" question was: "Acknowledging and addressing students' social emotional needs in relation to Covid-19 is whose responsibility?" (Ex. 20 at 51, 70, 90, 98.)

116. The two choices for answers were: "All caregivers and stakeholders," and "Guardians and counselors." If staff selected the first possible answer, they received the following message

and completed the module: "Correct! In these trying times, we must all work together to ensure that all students are having their social emotional needs met." If they selected the second possible answer, they received the following message: "Incorrect! In these trying times, we must all work together to ensure that all students are having their social emotional needs met." (Id. at 90, 98.)

117. Ms. Henderson disagreed with the "correct" answer because she believes that parents (or guardians if they have been appointed) should be the decisionmakers for their children, while SPS's "correct" response suggested that the school is an equal decisionmaker to the parent. Even so, she selected the "correct" answer so that she could complete the module and receive credit. (Henderson Decl. ¶ 60.)

118. Ms. Henderson timely completed the Canvas Modules, as required by SPS. (Stip. ¶ 20.)

# INTRODUCTION

Brooke Henderson and Jennifer Lumley are colleagues at Springfield Public Schools ("SPS") who share certain values and worldviews. Both women believe in equality and equal opportunity as stated in our nation's founding documents and civil rights laws. (Statement of Uncontroverted Material Facts ("SUMF") ¶ 8.) They believe, as part of their Christian faith, that identity is found in God and that all individuals have equal worth in God's eyes. (Id. ¶ 10.) They believe in colorblindness, meaning individuals should not be judged or assigned moral characteristics based on skin color. (Id. ¶ 9.) They reject the ideas that America is fundamentally racist or is divided into classes based on skin color, where white people are privileged oppressors and non-white people are oppressed. (Id. ¶ 11.)

But in the summer of 2020, as the COVID-19 pandemic and Black Lives Matter protests gripped the nation, SPS declared that all staff members have a "responsibility to be equity champions." (Id. ¶ 18.) According to SPS, equity is different from equality: "Equity is looking at specific unique needs. Equality is ensuring that everyone gets the same." (Id. ¶ 43.) While calling on staff to be "equity champions," SPS directed staff to articles about white supremacy, systems of oppression, white privilege, and anti-racism. (Id. ¶¶ 18-19.) One author wrote, "When I call [white people] on their racism, they practically come unglued. They swear they 'didn't mean anything by it' and 'don't have a racist bone' in their bodies. They might pipe up some ridiculous white sh—[.]" (Id. ¶ 21.) Another wrote, "Privilege means that you owe a debt. . . . It is up to you whether you choose to pay this debt and how you choose to do so. . . . [A] system of white privilege afforded you access to opportunities while denying them to so many others." (Id. ¶ 20.)

But that was not all. SPS also advised staff that their "learning should not stop with these resources, but continue to expand." (Id. ¶ 18.) It notified staff that "training and professional

learning will continue throughout the district." (Id.) True to its word, SPS implemented a district-wide equity training that fall ("Equity Training"). SPS required every certificated and hourly staff member, including Ms. Henderson and Ms. Lumley, to attend a training session. (Id. ¶ 14.) SPS warned, and Plaintiffs understood, that SPS would dock their pay and they would not receive professional development credit if they did not attend the training. (Id. ¶¶ 16, 17.)

Before the training started, SPS provided handouts to staff that discussed equity and said, "[W]e all are now accountable in this work as well. Growing a deeper sense of cultural consciousness is something we must commit to[.]" (Id. ¶ 25.)[1] SPS also gave staff an Oppression Matrix that labeled white people as privileged oppressors and "Asian, Black, Latina/o, and Native People" as oppressed (id. ¶ 30), while another handout instructed staff to "Acknowledge YOUR privileges." (Id. ¶ 31.) It also directed staff to "remain engaged" or "Stay Engaged" and to "Lean into your discomfort." (Id. ¶¶ 25, 31.) Finally, in a handout titled "Covert/Overt White Supremacy," SPS warned staff that "white silence" constituted white supremacy. (Id. ¶ 27.) Through the handouts, SPS made clear that the training sessions would be an extension of its summer missive about equity, white supremacy, oppression, and anti-racism. The handouts also made clear that SPS expected staff not only to attend but to actively engage. If not, staff—especially white staff—risked being labeled white supremacists.

In the training itself, SPS reinforced the contents of the pre-distributed handouts through slides, images, and videos. Starting with a command to "Be Professional—Or be Asked to leave with No Credit," (id. ¶ 47) SPS provided staff with "tools" that it deemed necessary to "become Anti-Racist educators, leaders and staff members at SPS." (Id. ¶ 49.) SPS told staff that being

---

[1] According to SPS, having a deeper sense of cultural consciousness means having a "deeper sense of awareness of other people and the identities that they hold," including race. (SUMF ¶ 26.)

"anti-racist" meant "advocating for changes in political, economic, and social life." (Id. ¶ 50.) It informed staff that colorblindness and saying "All Lives Matter" is white supremacy. (Id. ¶¶ 74-75.) As the training progressed, SPS's position on equity and anti-racism crystallized: staff "must commit" to becoming anti-racist by denouncing colorblindness in favor of equity, which—by the district's own admission—is not equality. (Id. ¶¶ 43, 49-53, 71, 93.)

SPS did not stop there. After establishing its views, SPS often broke staff into small and large group discussions to talk about topics like white supremacy, oppression, and racism while instructing staff to participate or be asked to leave. (Id. ¶¶ 55, 58-60, 78.) It also required many staff members, including Ms. Henderson, to participate in online training modules through Canvas. (Id. ¶ 100.) In these modules, SPS built on the foundation it laid in the Equity Training. Through videos linked to the modules, SPS taught that white people tell myths about race (id. ¶ 105(d)) and that "anti-racism depends on white America asking itself the critical question of are you still willing to receive these privileges, most of which . . . can be extended to all people without you losing those privileges." (Id. ¶ 105(e).) The modules also included questions with "correct" and "incorrect" answers; staff could not move forward with the training unless they gave the answer SPS deemed correct. (Id. ¶¶ 106, 111.) SPS even required staff to take a self-assessment and rate whether they understood, "If I am a White person working with a person of color, I will likely be perceived as a person with power and racial privilege, and that I [may] not be seen as 'unbiased' or as an ally." (Id. ¶ 108.)

SPS told all staff they "must commit to" equity and anti-racism. But Ms. Henderson and Ms. Lumley do not agree with those views. Thus, SPS put Plaintiffs in a no-win situation: (1) express their true views (at the risk of being denied professional development credit and pay); (2) not speak at all (at the risk of being labeled white supremacists); or (3) repeat what they understood

24

SPS wanted to hear (in conflict with their own beliefs). In doing so, SPS unconstitutionally compelled Plaintiffs' speech, engaged in viewpoint discrimination by favoring one viewpoint over another, and chilled Plaintiffs from expressing their views. And by tying the equity programming to Plaintiffs' jobs, it placed an unconstitutional condition on their employment.

## LEGAL STANDARD

Summary judgment is appropriate when the pleadings show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Motions for summary judgment may be supported by affidavits, declarations, and other materials in the record. Fed. R. Civ. P. 56(c)(1)(A)–(B).

## ARGUMENT

**I.      SPS unconstitutionally compelled Plaintiffs' speech through its Equity Training and Canvas modules.**

"The Supreme Court has 'held time and again that freedom of speech includes both the right to speak freely and the right to refrain from speaking at all.'" *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 752 (8th Cir. 2019) (quoting *Janus v. AFSCME, Council 31*, 138 S. Ct. 2448 (2018)). "Forcing free and independent individuals to endorse ideas they find objectionable is always demeaning, and for this reason, one of our landmark free speech cases said that a law commanding 'involuntary affirmation' of objected-to beliefs would require 'even more immediate and urgent grounds' than a law demanding silence." *Janus*, 138 S. Ct. at 2464 (quoting *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 633 (1943)). Because the "choice of a speaker not to propound a particular point of view . . . is presumed to lie beyond the government's power to control," the right to refrain from speaking is held sacred. *Id*. (quoting *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 654 (2000)).

And because the choice to refrain from speaking lies beyond the government's control, there can *never* be a compelling interest in forcing individuals to affirm viewpoints they oppose. The Supreme Court made this clear in *Wooley v. Maynard*: "[W]here the State's interest is to disseminate an ideology, no matter how acceptable to some, such interest *cannot outweigh* an individual's First Amendment right to avoid becoming the courier for such message." 430 U.S. 705, 717 (1976) (emphasis added) (striking down requirement that citizens display state motto on their license plates without applying strict scrutiny); *accord Hurley v. Irish-American Gay, Lesbian and Bisexual Grp. of Boston, Inc.*, 515 U.S. 557, 579 (1995) ("The very idea that a noncommercial speech restriction be used to produce thoughts and statements acceptable to some groups . . . grates on the First Amendment, for it amounts to nothing less than a proposal to limit speech in the service of orthodox expression. The Speech Clause has no more certain antithesis."). Given that any government interest in forcing an individual to speak "cannot outweigh" the individual's right to avoid speaking, compelled speech is *per se* unconstitutional.

The Eighth Circuit Court of Appeals has held that the government cannot "'coerce [speakers] into betraying their convictions' and promoting 'ideas they find objectionable[.]'" *Telescope Media*, 936 F.3d at 758 (holding speakers would likely prevail on First Amendment pre-enforcement challenge to state law directing videographers to make videos for same-sex weddings) (quoting *Janus*, 138 S. Ct. at 2463). It has also held that there is a risk of compulsion when an individual is required "to express, adopt, or risk association with any particular viewpoint." *Doe v. United States*, 901 F.3d 1015, 1024 (8th Cir. 2018) (holding that coins bearing the national motto did not violate the First Amendment because the motto was associated purely with the government and not with an individual, nor were individuals required to publicly display the currency).

Similarly, other courts consider whether the government has taken action that is "regulatory, proscriptive, or compulsory in nature." *Phelan v. Laramie Cnty. Cmty. Coll. Bd. of Trustees*, 235 F.3d 1243, 1247 (10th Cir. 2000) (holding college board of trustees did not violate the First Amendment when it censured a member for encouraging the public to vote against a board measure because the censure was merely a statement that carried no risk of penalty or consequence for speaking) (quoting *Laird v. Tatum*, 408 U.S. 1, 11 (1972)). But compulsion "need not take the form of a direct threat or a gun to the head." *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1290 (10th Cir. 2004) (finding "no question" that compulsion was present when a university required a student to recite a script with language she opposed because, even though the school never "explicitly threatened her," it was clear that the student would be forced to leave if she did not repeat the script); *see also C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 189 (3d Cir. 2005) (stating compulsion would exist if a school imposed "some type of disincentive or penalty" for failure to complete a mandatory survey). The government need not threaten a severe consequence; an "indirect discouragement" that effectively coerces speech is enough. *Phelan*, 235 F.3d at 1247 (quoting *Am. Commc'ns Ass'n v. Douds*, 339 U.S. 382, 402 (1950)).

As explained below, SPS coerced Plaintiffs into betraying their convictions and promoting ideas they find objectionable. Through emails, statements, images, exercises, and handouts given to staff before and during the Equity Training, SPS made its views on equity, anti-racism, and related topics clear. And in doing so, it silenced opposing views. Ms. Henderson and Ms. Lumley did not agree with the views relayed during the training. But because SPS directed all staff to adopt these views as "more than a value, but now part of our work and job responsibilities," (SUMF ¶¶ 25, 41) it gave Ms. Henderson and Ms. Lumley three options: (1) speak their minds and risk losing pay and credit; (2) refrain from speaking and risk being labeled white supremacists; or (3) err on

27

the side of caution and say what SPS wanted to hear. Likewise, through Canvas modules that reinforced the lessons from the Equity Training, SPS compelled Ms. Henderson's speech when it required her to respond to prompts in a manner that affirmed the district's views.

### A.  SPS compelled Plaintiffs' speech during the Equity Training.

After SPS set the tone for the Equity Training in the summer of 2020, Ms. Henderson and Ms. Lumley each attended a mandatory training session. For virtual sessions like Ms. Henderson's, SPS told staff to keep their computer cameras on. (SUMF ¶ 36.) Throughout the training, SPS repeatedly reminded staff that they "must commit" to equity. (*See* id. ¶¶ 25, 41, 48.) It instructed staff to "stay engaged in the discussion," "stay locked into the conversations," and "lean into that discomfort . . . don't try to push it down." (Id. ¶¶ 47-48.) SPS told staff that they would learn "how to become Anti-Racist educators." (Id. ¶ 49.) It defined "anti-racist" as "the work of actively opposing racism by advocating for changes in political, economic, and social life." (*See* id. ¶ 93.) SPS directed staff to be active, outspoken anti-racists: "The most important thing to reiterate here is that we will actively oppose racism by advocating for change. There is a proactive element in place to no longer remain silent or inactive." (Id. ¶ 94.)

SPS also required staff to watch videos and slides about oppression, systemic racism, and white supremacy. It explained, "In the United States, systems of oppressions [sic] (like systemic racism) are woven into the very foundation of American culture, society, and laws. . . . Society's institutions, such as government, education, and culture, all contribute or reinforce the oppression of marginalized social groups while elevating dominant social groups." (Id. ¶ 65.) It displayed the same Oppression Matrix from the handouts which labeled white people as privileged oppressors and "Asian, Black, Latina/o, and Native People" as oppressed. (Id. ¶ 67.)

28

SPS also showed a video to staff about white supremacy where a cartoon character, dressed as a member of the Ku Klux Klan, waved while the narrator described eradicating white supremacy. (Id. ¶ 72.) Then, SPS taught that white supremacy is not just a label for the KKK—it includes *anyone* who believes in colorblindness or says that all lives matter. (Id. ¶¶ 73-74.) During Ms. Henderson's training, SPS warned staff that denying one's white privilege is in itself white supremacy. (Id. ¶ 75.) It declared, "Privilege is a set of unearned benefits given to people who fit into a specific social group," and it required staff to "Acknowledge YOUR privileges." (Id. ¶ 73.) Thus, SPS instructed white staff to acknowledge that they received unearned benefits at the expense of other groups; if they refused, they could be called white supremacists.

Following those images and videos, SPS instructed staff to break into small groups to discuss oppression, systemic racism, and white supremacy. (*See* id. ¶¶ 76-77.) Similarly, SPS required staff to watch a video of the final minutes of George Floyd's life, followed by a series of images depicting major events that occurred in 2020 such as the COVID-19 pandemic and BLM protests. (Id. ¶¶ 54, 57.) As it did after the slides about oppression and white supremacy, SPS broke staff into small groups to discuss their reactions to the George Floyd video and the scenes from 2020. Each time it broke staff into small discussion groups, SPS warned that it would bring staff back to a larger group, where it expected two people to share what they discussed. (Id. ¶¶ 55-58, 61.) SPS even informed staff that they would be called on if they remained silent. (Id. ¶¶ 46, 62.)

Ms. Henderson and Ms. Lumley each tried to share their views with the larger group once. Following the slides with images depicting BLM protests, SPS placed Ms. Henderson into a small group to discuss what she observed. (Id. ¶ 60.) Ms. Henderson and her group did not believe the slideshow was completely accurate because it showed the protests as peaceful and left out images depicting riots that occurred during the summer of 2020. (Id.) When SPS brought the groups back

29

together, Ms. Henderson spoke up to say she believed that Kyle Rittenhouse was defending himself from rioters during the BLM protests. (Id. ¶ 63.) In response, Dr. Garcia-Pusateri told Ms. Henderson that she was confused and wrong. (Id.)

Following the lessons on white supremacy and oppression, Ms. Lumley expressed to the larger group that SPS was improperly assigning characteristics based on race and that not all white people are racist. (Id. ¶ 79.) Ms. Lumley disagreed with SPS's position that she was racist simply because she was white, and she shared a personal story about black people saying her relative did not count as black after marrying a white man. (Id. ¶¶ 79-80.) SPS trainers told Ms. Lumley that black people can be prejudiced but not racist. (Id. ¶ 80.) And when Ms. Lumley expressed that she did not grow up with white privilege because she came from a poor, broken home, SPS corrected her and said that she needed to reflect on herself more. (Id. ¶¶ 81-82.) Ms. Lumley's coworkers berated her during this exchange, but SPS did not intervene. (Id. ¶ 83.)

After the responses SPS gave Ms. Lumley and Ms. Henderson, they did not share their real views again.[2] In another exercise called "Four Corners," SPS listed prompts like "I believe all students should be treated equitably," "Learning about my identity makes me better in my role," and "I am prepared to have conversations with my students or staff about identity or equity." (Id. ¶¶ 87-88.) Ms. Henderson did not agree with several prompts but did not voice her concerns aloud. (Id. ¶ 91-92.) And although SPS directed Ms. Lumley and her colleagues to discuss the prompts, Ms. Lumley shut down and did not speak after SPS's reaction to her views. (Id. ¶¶ 89-90.)

SPS made clear that it would not tolerate Ms. Henderson's and Ms. Lumley's views, much like the government in *Telescope Media* refused to tolerate the belief that marriage is between one

---

[2] Ms. Henderson asked a clarifying question about whether a student could dress as Pocahontas for Halloween. Dr. Garcia-Pusateri informed her that dressing as a BIPOC character would not be acceptable. (SUMF ¶¶ 84-85.)

man and one woman and directed wedding videographers to make videos for same-sex couples. 936 F.3d at 748, 758 (holding videographers would likely prevail because state law went "too far" in regulating speech). And like the government in *Telescope Media*, SPS coerced Ms. Henderson and Ms. Lumley into betraying their convictions. *Id*. at 753; *see also Janus* 138 S. Ct. at 2459-60 (holding that public sector unions could not compel non-members to subsidize speech on matters of public concern). Ms. Henderson and Ms. Lumley do not accept that racism is woven into our nation's fabric, nor do they agree that oppression is part of the American experience. They believe that colorblindness and equality are worthy ideals, that those concepts are enshrined in our Constitution and civil rights laws, and that individuals should not be categorized by immutable characteristics like race. But SPS coerced them into betraying those convictions when it demanded that staff be anti-racists who reject colorblindness in favor of so-called equity.

This is a far cry from carrying a coin with the government's motto in one's pocket. *Doe*, 901 F.3d at 1024. Unlike the plaintiffs in *Doe* who suffered no compulsion because they were not required to display currency publicly, Ms. Henderson and Ms. Lumley were instructed to engage in political, social, and economic advocacy to further SPS's message on a public issue. (SUMF ¶¶ 50, 93.) And while the Eighth Circuit held in *Doe* that there was no risk that a motto on currency would be associated with any one individual, the focus of the Equity Training was to prepare each and every staff member to "become Anti-Racist" by "advocating for changes in political, economic, and social life." (Id. ¶¶ 50, 93.) SPS fully expected Ms. Henderson and Ms. Lumley to adopt its views on equity in violation of the First Amendment. *Doe*, 901 F.3d at 1024.

At no point during *any* exercise did SPS tell staff that silence was an option. (SUMF ¶ 44.) Instead, SPS told staff that both "white silence" and denying white privilege are forms of white supremacy, making it impossible for white staff to dispute or question the district's views *or* to

31

remain silent without risking being called white supremacists. *See Ridgewood*, 430 F.3d at 189 (holding that although speakers failed to state a First Amendment claim, a risk of compulsion exists when there is "some type of disincentive or penalty" for refusing to speak).

On top of that, SPS stated plainly that staff would "be Asked to leave with No Credit" if they did not remain "professional," (SUMF ¶ 47) similar to the university in *Axson-Flynn* that required a participant to read a script or leave the program. 356 F.3d at 1290 (holding speech was compelled even though the university never threatened to expel or suspend the student). When SPS issued the directive to remain professional, it also commanded staff to "stay engaged in the discussion," "stay locked into the conversations," and "lean into that discomfort." (Id. ¶ 48.) And if a session was virtual rather than in-person, SPS required staff to keep their cameras on so SPS could ensure they were engaged. (Id. ¶ 36.) Thus, SPS dictated not only what views staff should adopt, but it also discouraged staff from holding opposing views by commanding that they remain "professional" and engaged. Such discouragement is compulsion as a matter of law. *See Phelan*, 235 F.3d at 1247 (holding that speech is compelled when the government threatens a consequence that indirectly discourages speech); *Douds*, 339 U.S. at 402 ("Under some circumstances, indirect 'discouragements' undoubtedly have the same coercive effect upon the exercise of First Amendment rights as imprisonment, fines, injunctions or taxes.").

Opinions vary—often quite strongly—on the subject matter discussed in the Equity Training. SPS may be allowed to adopt a point of view on current events, but it cannot make Ms. Henderson and Ms. Lumley the "courier[s] for its message." *Wooley*, 430 U.S. at 717. As the Supreme Court held in *Hurley*, the government "is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government." 515 U.S. at 579 (striking down

32

government demand to include lesbian, gay, and bisexual group in parade). But through statements by SPS, images shown on the screen, and small and large group discussions, SPS discouraged Ms. Henderson and Ms. Lumley from sharing their true views and coerced them into becoming couriers for its own message in violation of the First Amendment.

**B. SPS also compelled Ms. Henderson's speech through online Canvas modules.**

Following the Equity Training, SPS declared that "it's import[ant] to keep the momentum going as anti-racist educators." (SUMF ¶ 103.) It then required Ms. Henderson, as part of her professional development, to complete online training modules that adopted the same or similar points of view as the Equity Training. These trainings—consisting of several Social Emotional Learning and Cultural Consciousness modules—drew heavily from videos and articles on white supremacy, anti-racism, and systemic racism, including some of the same articles and videos used in the Equity Training. (*See* id. ¶¶ 104-05.)

The online modules contained interactive exercises, including open-ended prompts and multiple choice "Quick Check" questions. First, SPS required Ms. Henderson to watch several videos. One video—a repeat from the Equity Training—told staff that systemic racism is evident "in every area of life" and that staff should do something about it by supporting "systemic changes" to allow "equal access to resources." (Id. ¶ 105(c).) Another video called "Advice for White People from an Anti-Racism Trainer" taught that "anti-racism depends on white America asking itself the critical question of are you still willing to receive these privileges, most of which . . . can be extended to all people without you losing those privileges." (Id. ¶ 105(e).) It also declared that "in everything we do we have to think about is this increasing the burden that's on the black body . . . and try[] to find acts in your life that you can take to decrease that burden. Go grocery shopping for a black person this week." (Id.) SPS required staff to watch a video called "Debunking the

Most Common Myths White People Tell About Race." (Id. ¶ 105(d).) According to the video, common myths include: "I don't see color"; "I have black friends"; "Race has nothing to do with it. It's about class"; and "Focusing on race is what divides us." (Id.)

After Ms. Henderson watched the videos reinforcing SPS's views on equity, racism, and white supremacy, SPS required her to participate in modules with Quick Check questions like, "Acknowledging and addressing students' social emotional needs in relation to COVID-19 is whose responsibility?" SPS provided two choices: (1) "All caregivers and stakeholders," or (2) "Guardians and counselors." (Id. ¶¶ 111, 115-16.) If Ms. Henderson selected the first choice, SPS responded, "Correct! In these trying times, we must all work together to ensure that all students are having their social emotional needs met." (Id. ¶ 116.) If she selected the second choice, SPS responded, "Incorrect! In these trying times, we must all work together to ensure that all students are having their social emotional needs met." (Id.) Ms. Henderson disagreed with both options because she believes that parents and guardians should address their children's social emotional needs. But to move on and receive credit, Ms. Henderson selected the "correct" answer: caregivers and stakeholders. (Id. ¶ 117.)

Another Quick Check question asked, "When you witness racism and xenophobia in the classroom, how should you respond?" (Id. ¶ 112.) SPS provided two options: (1) "Address the situation in private after it has passed," or (2) "Address the situation in the moment you realize it is happening." (Id. ¶ 113.) Ms. Henderson believes that such a situation should be addressed privately in many instances, so she selected option one. (Id. ¶¶ 113-14.) SPS responded, "Incorrect! It is imperative adults speak up immediately and address the situation with those involved. Being an anti-racist requires immediate action." (Id. ¶ 113.) Ms. Henderson then selected the second answer, to which SPS responded, "Correct! Being an anti-racist requires immediate action." (Id.)

34

She did not agree with this answer, but she selected it to move on and receive credit for completing the module. (Id. ¶ 114.)

If Ms. Henderson did not answer a Quick Check question correctly, she could not finish a module. If she could not finish a module, SPS would penalize her by not giving her credit for participating. Unlike in *Ridgewood*, where the government did not actually threaten "some type of disincentive or penalty" if students failed to complete a school survey, SPS clearly established a penalty for failure to complete the Canvas modules. 430 F.3d at 189. Thus, SPS compelled Ms. Henderson's speech when it required her to answer the modules a certain way to receive professional development credit, even though she disagreed with the "correct" responses. And by requiring Ms. Henderson to select the "correct" answer, SPS forced her to be a courier for its message. *See Wooley*, 430 U.S. at 717.

By framing the "correct" Quick Check response around being an anti-racist, SPS again demanded that Ms. Henderson become an anti-racist, as it defined this term. As the videos in the modules established, anti-racism required examining white privilege and supporting systemic changes. Thus, SPS unconstitutionally compelled Ms. Henderson's speech by requiring her to accept that she must take "immediate action" to be anti-racist. *See Barnette*, 319 U.S. at 633 (striking down compulsory law that "requires the individual to communicate by word and sign his acceptance of the political ideas it thus bespeaks").

All of this followed the Equity Training, where SPS already firmly made its position known that white staff could not remain silent. As a result of SPS's consistent reinforcement of favorable views—which resulted in the indirect discouragement of others—Ms. Henderson understood that she could only express views SPS wanted to hear when completing the modules. *Hurley*, 515 U.S. at 579. Through the Canvas modules and the Equity Training, SPS unconstitutionally compelled

Ms. Henderson and Ms. Lumley to affirm its viewpoints on political and social matters. Whatever interest SPS may assert in forcing Plaintiffs to accept these beliefs, that interest can *never* outweigh their right to choose silence without fear of reprimand. *Wooley*, 430 U.S. at 717.

## II. SPS engaged in unconstitutional viewpoint discrimination when it declared that all staff must hold certain views, chilling Plaintiffs' speech as a result.

"It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of U. of Va.*, 515 U.S. 819, 828 (1995). Any time the government compels speech, it regulates speech based on content; that is because "[m]andating speech that a speaker would not otherwise make necessarily alters the content of the speech." *Riley v. Nat'l Fed'n of Blind*, 487 U.S. 781, 795 (1988). And "[w]hen the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger*, 515 U.S. at 829. Viewpoint discrimination is thus "an egregious form of content discrimination." *Id.* at 829-30. Any attempts by the government to regulate a speaker's views—whether by demanding affirmation or forbidding dissent—is a form of viewpoint discrimination which is "presumptively unconstitutional."[3] *Id.* at 829-30.

Likewise, when the government deters an individual from sharing her message without directly prohibiting expression, it imposes an unconstitutional chilling effect on her speech. *Keyishian v. Bd. of Regents*, 385 U.S. 589, 604 (1967) (striking down policy requiring teachers to

---

[3] Content-based discrimination is subject to strict scrutiny, where the burden is on the government to show that the restriction is narrowly tailored to serve a compelling interest. *Boos v. Barry*, 485 U.S. 312, 324 (1988). But because viewpoint discrimination is a more egregious form of content discrimination, it is *per se* unconstitutional; there is never a circumstance in which the government can regulate speech based on viewpoint. *See Rosenberger*, 515 U.S. at 829-30 (finding viewpoint discrimination without conducting strict scrutiny analysis); *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984) ("[T]he First Amendment *forbids* the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others.") (emphasis added).

sign anti-Communist oath). Similar to compulsion, a chilling effect need only have an "indirect effect" on a speaker to violate the First Amendment. *Laird*, 408 U.S. at 12-13; *see also Speech First, Inc. v. Schlissel*, 939 F.3d 756, 764 (6th Cir. 2019). "Self-censorship can itself constitute injury in fact." *281 Care Comm. v. Arneson*, 638 F.3d 621, 627 (8th Cir. 2011).

SPS violated the First Amendment when it not only regulated the content of Plaintiffs' speech but also stifled Plaintiffs' viewpoints through its equity programming. On the single occasion Ms. Henderson and Ms. Lumley each shared their views, SPS shut down their speech. Additionally, SPS's consistent reinforcement of certain views, along with reminders that those views were now a professional requirement, worked together to chill Plaintiffs' speech.

### A. SPS discriminated against Plaintiffs' views through its Equity Training.

The government "is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government." *Hurley*, 515 U.S. at 579 (holding that even a seemingly legitimate end of eliminating bias is unconstitutional when the government promotes approved views and discourages others); *accord Vincent*, 466 U.S. at 804 ("[T]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others.") Indeed, the government "may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views." *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 96 (1972).

Through its equity programming, SPS consistently taught and reinforced the view that America is fundamentally racist, that white people are the privileged oppressors of other racial groups, that colorblindness is harmful, that saying "All Lives Matter" is white supremacy, and that white people are inherently more privileged than other races. It also expressly stated that such views were "now part of our work and job responsibilities" and that staff "must commit to [them]."

In adopting certain views on current events and setting the expectation that staff share those views, SPS rendered opposing views unacceptable. *Hurley*, 515 U.S. at 577-79.

When Ms. Henderson and Ms. Lumley tried to express themselves, SPS outright rejected their points of view. Ms. Lumley expressed, from personal experience, that not all white people are born into privilege, and SPS told her to work on herself more. And when Ms. Henderson expressed a view about Kyle Rittenhouse, Dr. Garcia-Pusateri informed Ms. Henderson that she was confused and wrong. In these ways, SPS promoted its views on equity and anti-racism while discouraging Ms. Henderson's and Ms. Lumley's beliefs in equality and colorblindness. It took a position on current events and required staff to share those views. If not for the training, Ms. Henderson and Ms. Lumley would have never adhered to the views SPS expressed. *See Riley*, 487 U.S. at 795, 803 (holding that when the government compels a speaker to express a message she would not normally share, it unconstitutionally alters the content of speech); *Telescope Media*, 936 F.3d at 753 (holding that even when a law does not regulate the content of speech on its face, it is a content-based restriction if it compels speech or exacts a penalty based on the expressive message). By demanding that they become anti-racists who "must commit" to equity, SPS compelled Ms. Henderson's and Ms. Lumley's speech while also regulating their viewpoints.

### B. SPS discriminated against Ms. Henderson's views through its Canvas modules.

Just as SPS used the Equity Training to promote its own views on current events while silencing others, it also relied on the Canvas modules to do the same. In the modules, SPS directed staff to acknowledge bias, support "systemic changes," and debunk myths white people tell about race, while at the same time discouraging staff from saying things like "I don't see color." (SUMF ¶ 105.) In this way, it unconstitutionally favored one viewpoint over others. *Riley*, 487 U.S. at 789. And each time Ms. Henderson selected the "wrong" answer to a Quick Check question, SPS

38

corrected her. In this way, SPS "alter[ed] the expressive content" of Ms. Henderson's speech, just as the government in *Hurley* altered the content of a parade when it required organizers to include messages they did not support. 515 U.S. at 572-73. "[H]owever enlightened" SPS may think its equity programming is, the Supreme Court has held that regulating expression to promote an approved message or discourage a disfavored one is "fatal." *Id.* at 579. Even where the government seeks to eliminate bias and discrimination, it can never come at a speaker's expense. *Id.*

## C. SPS's actions created a chilling effect that deterred Plaintiffs from sharing their real views.

In demanding that staff share its views on current events, SPS also chilled Plaintiffs' speech. The Supreme Court has found "in a number of cases that constitutional violations may arise from the deterrent, or 'chilling,' effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights." *Laird*, 408 U.S. at 11-13; *Arneson*, 638 F.3d at 628 (holding that a state law banning false statements about proposed ballot initiatives chilled speech when it deterred speakers from participating in a debate); *Schlissel*, 939 F.3d at 765 (holding that students had standing to bring First Amendment challenge because even though a Bias Response Team could not take any concrete action to punish the students, it "act[ed] by way of implicit threat of punishment and intimidation to quell speech"). The vagueness and uncertainty associated with a chilling effect "inevitably lead citizens to steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked." *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972); *Stahl v. City of St. Louis*, 687 F.3d 1038, 1041 (8th Cir. 2012).

SPS made its views known to staff before and during the Equity Training. (SUMF ¶¶ 18-31.) In summer of 2020, SPS told staff that they must be "equity champions" and that training would follow to solidify this message. (Id. ¶ 18.) SPS directed staff to "remain engaged," "Lean into your discomfort," and "Acknowledge YOUR privileges." (*See* id. ¶ 47.) SPS warned that

trainers would call on staff if they were silent, while warning that silence was white supremacy. (Id. ¶¶ 46, 62.) It also told staff that denying white privilege was white supremacy. (Id. ¶ 75.)

In these ways, SPS caused Ms. Henderson and Ms. Lumley to self-censor. *See Arneson*, 638 F.3d at 627. Rather than risk being labeled white supremacists, they tried engaging in the group conversations. But when they did so, SPS corrected their beliefs. In fact, Ms. Lumley's colleagues even berated her, and SPS did not stop them. On top of this, SPS threatened to remove staff from the training if they were unprofessional, and staff risked losing pay for being asked to leave. SPS thus put Ms. Henderson and Ms. Lumley in an impossible bind that deterred them from speaking. *Laird*, 408 U.S. at 12-13; *Schlissel*, 939 F.3d at 764-65.

Just as the government used loyalty oaths in the 1950s to ensure that staff were anti-Communists, SPS used its equity programming to compel staff to become anti-racists. *See Keyishian*, 385 U.S. at 604. But SPS cannot use the full weight of its authority to coerce staff into adopting a point of view or to deter them from expressing their true views. A chilling effect does not require a direct threat, but merely a government action that indirectly deters a speaker from expressing her views. *See Laird*, 408 U.S. at 11; *Arneson*, 638 F.3d at 627. Just like with compelled speech, it does not matter whether SPS took concrete steps to stop Plaintiffs from speaking. Ms. Henderson and Ms. Lumley understood that SPS espoused certain views on current events, and that if they dissented, they risked losing pay, being called unprofessional, and even being labeled white supremacists. Those consequences simply were not worth the risk of sharing their true beliefs. SPS thus unconstitutionally chilled Plaintiffs' speech.

## III. SPS placed an unconstitutional condition on Plaintiffs' employment when it compelled their speech, discriminated against their views, and chilled their expression.

The government "may not impose conditions which require relinquishment of constitutional rights." *Frost & Frost Trucking Co. v. Railroad Comm'n of Cal.*, 271 U.S. 583, 594

40

(1926). This principle, known as the unconstitutional conditions doctrine, prevents the government from "deny[ing] a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). "For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to 'produce a result which [it] could not command directly.'" *Speiser v. Randall*, 357 U.S. 513, 526 (1958) (striking down state law requiring individuals to sign a loyalty oath as a condition to receive a tax exemption); *accord Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 574-75 (1968) (holding that the government could not restrict teachers' expression on matters of public concern as a condition of employment).

SPS is trying to produce a result which it cannot command directly: that staff members advocate for political, social, and economic change. SPS infringed on Plaintiffs' freedom of speech when, through its equity programming, it demanded that they accept certain beliefs, rejected the beliefs Plaintiffs hold, and led Plaintiffs to self-censor for fear of backlash from SPS. And because the equity programming was a job requirement—for which failure attend or be "professional" could result in a loss of pay—the resulting compulsion and censorship automatically became a condition of their employment. (*See* SUMF ¶¶ 13-18, 47.)  Thus, SPS placed an unconstitutional condition on Plaintiffs' employment when it required them to participate in the fall 2020 equity programming.

## CONCLUSION

This Court should grant Plaintiffs' Motion for Summary Judgment.

July 22, 2022

/s/ B. H. Boucek
KIMBERLY S. HERMANN*
GA Bar No. 646473
BRADEN H. BOUCEK*
TN BPR No. 021399
GA Bar No. 396831
CELIA H. O'LEARY*
GA Bar No. 747472
JEFFREY A. CLAYMAN*
LA Bar No. 30442
FL Bar No. 52017
Southeastern Legal Foundation
560 W. Crossville Road, Suite 104
Roswell, GA  30075
Telephone: (770) 977-2131
khermann@southeasternlegal.org
bboucek@southeasternlegal.org
coleary@southeasternlegal.org
jclayman@southeasternlegal.org

*Admitted Pro Hac Vice*

Derek H. MacKay MO #59078
Knight Nicastro MacKay, LLC
304 W. 10th Street
Kansas City, MO 64105
Phone: (816) 708-0105
mackay@knightnicastro.com

42

**CERTIFICATE OF SERVICE**

I hereby certify that on July 22, 2022 a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. Mail and/or facsimile. Parties may access the filing through the Court's electronic filing system.

/s/ B. H. Boucek
BRADEN H. BOUCEK