**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| BROOKE HENDERSON and JENNIFER LUMLEY, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 6:21-cv-03219-MDH |
| v. | ) | |
| | ) | |
| SCHOOL DISTRICT OF SPRINGFIELD R-12, ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

---

**PLAINTIFFS' SUGGESTIONS IN OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. iii

RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS ..... 1

ADDITIONAL STATEMENT OF UNCONTROVERTED MATERIAL FACTS.................... 65

ARGUMENT ...................................................................................................................... 70

    I.  Plaintiffs have standing to challenge SPS's equity programming. ...................................... 70

    II. SPS violated Plaintiffs' freedom of speech. ........................................................ 72

        A.  SPS's messages about equity and anti-racism during the 2020-2021 school year were not ordinarily within the scope of Plaintiffs' official job duties. ............................... 75

        B.  SPS's messages on equity and anti-racism were unlawful. ....................................... 78

        C.  SPS cannot meet its high burden under the First Amendment. ................................. 80

    III.  Plaintiffs are entitled to equitable relief, nominal damages, and attorney's fees. ............. 82

        A.  Plaintiffs are entitled to equitable relief.................................................................... 82

        B.  Plaintiffs are entitled to nominal damages................................................................ 83

        C.  Only Plaintiffs are entitled to attorney's fees. ........................................................ 84

CONCLUSION.................................................................................................................... 84

CERTIFICATE OF SERVICE ............................................................................................ 86

# TABLE OF AUTHORITIES

**Cases**

*Altman v. Minn. Dep't of Corr.*, 251 F.3d 1199 (8th Cir. 2001)............................................. 75, 77

*Ashcroft v. ACLU*, 542 U.S. 656 (2004) ........................................................................... 81

*Axson-Flynn v. Johnson*, 356 F.3d 1277 (10th Cir. 2004) ................................................. 71

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963).......................................................... 72

*Barrett v. Claycomb*, 705 F.3d 315 (8th Cir. 2013) ........................................................... 82

*Bell v. Maryland*, 378 U.S. 226 (1964)......................................................................... 79, 80

*Boos v. Barry*, 485 U.S. 312 (1988)................................................................................... 81

*C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159 (3d Cir. 2005).......................................... 71

*Carson v. Makin*, 142 S. Ct. 1987 (2022) ......................................................................... 82

*City of Mesquite v. Aladdin's Castle*, 455 U.S. 283 (1982)............................................... 82

*Cole v. Richardson*, 405 U.S. 676 (1972) ......................................................................... 80

*Connick v. Myers*, 461 U.S. 138 (1983)............................................................................. 75

*Cressman v. Thompson*, 719 F.3d 1139 (10th Cir. 2013) (*Cressman I*) ....................... 70

*Cressman v. Thompson*, 798 F.3d 938 (10th Cir. 2015) (*Cressman II*)......................... 71

*Felts v. Reed*, No. 4:20-cv-00821 JAR,
    2022 U.S. Dist. LEXIS 112048 (E.D. Mo. June 24, 2022)................................... 84

*Fox v. Vice*, 563 U.S. 826 (2011).................................................................................... 84

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000) ............... 83

*Garcetti v Ceballos*, 547 U.S. 410 (2006) .................................................... 73, 74, 75

*Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410 (1979)....................................... 75

*Guffey v. Duff*, 459 F. Supp. 3d 227 (D.D.C. 2020) .................................................. 73

iii

*Hershey v. Curators of the Univ. of Mo.*, No. 2:20-CV-04239-MDH,
   2022 U.S. Dist. LEXIS 68121 (W.D. Mo. Apr. 13, 2022) ...................................................... 71

*Hilsenrath v. Sch. Dist. of the Chathams*, 500 F. Supp. 3d 272 (D.N.J. 2020) ............................ 84

*Hurley v. Irish-Am. Gay, Lesbian, and Bisexual Grp. of Boston, Inc.*,
   515 U.S. 557 (1995) ................................................................................................ 70, 80, 82

*Janus v. AFSCME, Council 31*, 138 S. Ct. 2448 (2018) ............................................ 71, 73, 74, 82

*Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407 (2022) ...................................... 73, 74, 75, 77

*Knox v. SEIU, Loc. 1000*, 567 U.S. 298 (2012) ............................................................................ 82

*Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595 (2013) ............................................ 71

*Lane v. Franks*, 573 U.S. 228 (2014) ............................................................................................ 75

*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021) ...................................................... 70, 75, 80

*Miller v. Thurston*, 967 F.3d 727 (8th Cir. 2020) ........................................................................ 82

*Nagel v. City of Jamestown*, 952 F.3d 923 (8th Cir. 2020) ............................................ 74, 77, 80

*Neitzke v. Williams*, 490 U.S. 319 (1989) .................................................................................... 84

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007) ................. 79, 80

*Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968) ........................................................................... 73

*Plessy v. Ferguson*, 163 U.S. 537 (1896) ..................................................................................... 79

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) ......................................................................... 70

*Speech First, Inc. v. Schlissel*, 939 F.3d 756 (6th Cir. 2019) ...................................................... 72

*Steffel v. Thompson*, 415 U.S. 452 (1974) ................................................................................... 72

*Thomas v. Collins*, 323 U.S. 516 (1945) ...................................................................................... 81

*United States v. Classic*, 313 U.S. 299 (1941) ............................................................................ 80

*Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (2021) ............................................................... 70, 84

*Wooley v. Maynard*, 430 U.S. 705 (1977) .............................................................. 74, 80, 82, 83

iv

**Statutes**

42 U.S.C. § 2000d *et seq*............................................................................................................ 78

# RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS

Brooke Henderson and Jennifer Lumley ("Plaintiffs") respond to Defendants' Statement of Undisputed Material Facts ("SUMF") as follows:

1.      Plaintiff Brooke Henderson ("Plaintiff Henderson") has been employed by Defendant District since 2008. Since school year 2012-13, Plaintiff Henderson has been classified as a Special Education Process Coordinator and later as a 504 Process Coordinator in Defendant District's Special Services Department. *See* Brooke Henderson deposition attached and hereinafter referred to as Exhibit A, p. 4, l. 4-13; Affidavit of Dr. John Jungmann attached and hereinafter referred to as Exhibit C, ¶ 4; Affidavit of Penney Rector attached and hereinafter referred to as Exhibit D, ¶ 5; Affidavit of Tammi Harrington attached and hereinafter referred to as Exhibit E, ¶ 2, DEX 2.07; and Deposition of Dr. Tanya Rapert attached and hereinafter referred to as Exhibit F, p. 12, l. 1-16.

**RESPONSE: Admitted.**

2.      The 504 Process Coordinator position is an exempt, certificated position, but is not a classroom teaching position. As a 504 Process Coordinator, Plaintiff Henderson is responsible for facilitating District educational processes to implement and maintain educational programs and services which provide accommodations for students who have met the eligibility requirements to be considered "students with disabilities" pursuant to Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et. seq.* ("Section 504"). *See* Exh. A, p. 5, l. 19-21; p. 7, l. 24 to p. 8, l. 24; p. 72, l. 17 to p. 73, l. 6; and Exh. C, ¶¶ 4, 5; and Exh. D, ¶¶ 5, 6; and Exh. E, ¶ 2, DEX 2.07.

**RESPONSE: Admitted.**

3.      Plaintiff Henderson has not received discipline during her employment with Defendant District. *See* Exh. C, ¶ 4; and Exh. D, ¶¶ 5, 28; and Exh. F, p. 13, l. 23 to p. 14, l. 4.

**RESPONSE: Admitted.**

1

4.    Plaintiff Jennifer Lumley ("Plaintiff Lumley") was hired by Defendant District on July 9, 2020 as a District Level Departmental Secretary in Defendant District's Special Services Department. During her employment with Defendant District, Plaintiff Lumley has always been a non-exempt, non-certificated employee. *See* Deposition of Jennifer Lumley attached and hereinafter referred to as Exhibit B, p. 3, l. 23 to p. 4, l. 4; *also see* Exh. C, ¶ 6; and Exh. D, ¶ 7; and Exh. E, ¶ 2, DEX 2.06, DEX 12.02.

**RESPONSE: Admitted.**

5.    Effective on September 13, 2021, Plaintiff Lumley received a transfer to the position of full-time Secretary in Defendant District's Analytics, Accountability and Assessment Department. This transfer resulted in an approximate pay rate increase of two dollars fifty cents per hour for Plaintiff Lumley. *See* Exh. B, p. 4, l. 15-19; p. 5, l. 11-13; and Exh. D, ¶ 7; and Exh. E, ¶ 2, DEX 2.06, DEX 12.02.

**RESPONSE: Admitted.**

6.     Plaintiff Lumley has not received discipline during her employment with Defendant District. *See* Exh. D, ¶¶ 7, 28; and Exh. F, p. 14, l. 9-18.

**RESPONSE: Admitted.**

7.    Defendant District is an urban public school district and a political subdivision of the State of Missouri as provided in Sections 162.461 *et seq*. RSMo. Defendant District is also referred to as: "Springfield Public Schools" or "SPS." *See* Exh. C, ¶ 7; and Exh. D, ¶ 8; and DOC 1, ¶ 28.

**RESPONSE: Admitted.**

8.    During school year 2020-21, Defendant District had in excess of 24,000 enrolled students, 2,200 certificated staff and another 1,300 non-certificated staff. During school year 2020-21, Defendant District operated fifty-two instructional buildings and was the largest school district

2

in the State of Missouri. Defendant District maintains its principal offices in Kraft Administrative Center, 1359 E. Saint Louis Street, Springfield, Missouri, 65802. *See* Exh. C, ¶ 8; and Exh. D, ¶ 8; and DOC 1, ¶ 28.

**RESPONSE: Admitted.**

9.      Defendant District is governed by a seven-member Board of Education ("Defendant Board") which currently consists of the following individuals: Dr. Denise Fredrick (President), Dr. Maryam Mohammadkahni (Vice-President), Mr. Kelley Byrne, Mr. Scott Crise, Ms. Danielle Kincaid, Mr. Steve Makoski and Dr. Shurita Thomas-Tate. Plaintiffs have named Defendant Board in its official capacity but have not individually named any of the members of Defendant Board. *See* Exh. C, ¶ 9; and Exh. D, ¶ 9; and DOC 1, ¶ 29.

**RESPONSE: Admitted.**

10.     Defendant Dr. Grenita Lathan ("Defendant Lathan") is currently the Superintendent of Schools for Defendant District and has been in that position since July 1, 2021. Defendant Lathan is sued in her official capacity only. *See* Exh. C, ¶ 12; and Exh. D, ¶ 10; and DOC 1, ¶ 30.

**RESPONSE: Admitted.**

11.     Defendant Dr. Martha Doennig ("Defendant Doennig") is the Director of the Department of Learning Development for Defendant District. She was sued in her official capacity only but has been dismissed from the lawsuit. *See* Exh. C, ¶ 11; and Exh. D, ¶ 11; and Exh. E, ¶ 2, DEX 2.02; DOC 1, ¶ 31; and DOC 72 and 73.

**RESPONSE: Admitted.**

12.     Defendant Dr. Yvania Garcia-Pusateri ("Defendant Garcia-Pusateri") has been the Chief Equity and Diversity Officer for Defendant District since she was hired on September 9, 2019. Defendant Garcia-Pusateri is being sued in her official capacity only. *See* Deposition of Yvania

3

Garcia-Pusateri attached and hereinafter referred to as Exhibit G, p. 15, l. 1-5; *also see* Exh. C, ¶ 12; and Exh. D, ¶ 12; and Exh. E, ¶ 2, DEX 2.03; and DOC 1, ¶ 32.

**RESPONSE: Admitted.**

13.     Defendant Garcia-Pusateri holds a bachelor's degree in communication studies with an emphasis in journalism, a master's degree in college counseling and student development from Azusa Pacific University and a Ph.D. in educational leadership from Miami University of Ohio. *See* Exh. G, p. 10, l. 22 to p. 11, l. 5.

**RESPONSE: Admitted.**

14.     As Chief Equity and Diversity Officer, Defendant Garcia-Pusateri is responsible for working with Defendant District's Executive Leadership Team "to oversee initiatives and programs focused on equity and diversity." *See* Exh. G, p. 15, l. 6-14; p. 25, l. 16-24.

**RESPONSE: Admitted.**

15.     Defendant Lawrence Anderson ("Defendant Anderson") is a Coordinator in Defendant District's Department of Equity and Diversity. Defendant Anderson is being sued in his official capacity only. *See* Deposition of Lawrence Anderson attached and hereinafter referred to as Exhibit H, p. 12, l. 13-16; *also see* Exh. C, ¶ 13; and Exh. D, ¶ 13; and DOC 1, ¶ 33.

**RESPONSE: Admitted.**

16.     Defendant Anderson was first employed by Defendant District in June, 2013. As a Coordinator in the Department of Equity and Diversity, Defendant Anderson provides professional learning for staff and works with under-represented and under-resourced students to help them connect with the staff in their buildings and the community. *See* Exh. H, p. 10, l. 2-4; p. 12, l. 17 to p. 13, l. 1.

**RESPONSE: Admitted.**

4

17.     Defendant Anderson holds a bachelor's degree from Southwest Missouri State University (now Missouri State University) in recreation with a minor in political science and a master's degree in education from Drury University. *See* Exh. H, p. 7, l. 8-21.

**RESPONSE: Admitted.**

18.     Prior to May 19, 2020, the District's Board of Education developed a Strategic Plan, which resulted from the work of study groups that engaged parents, educators and administrators in conversations about what the District's students both needed and wanted out of their school experience and asked those groups how they would define student and school system success and the measures they believed should be used to evaluate progress. *See* Exh. C, ¶14; and Exh. E, ¶ 2, DEX 3.06.

**RESPONSE: Admitted but immaterial.**

19.     Prior to school year 2018-19, Defendant District's Strategic Plan consisted of the following four (4) "Focus Areas:"

Focus Area 1 – Student Success and Learning Support
Focus Area 2 – Empowered and Effective Teachers, Leaders and Support Personnel
Focus Area 3 – Financial Sustainability and Operational Efficiency
Focus Area 4 – Communication and Engagement

*See* Exh. C, ¶ 15; and Exh. D, ¶ 15; and Exh. E, ¶ 2, DEX 3.06.

**RESPONSE: Admitted but immaterial.**

20.     Each Focus Area had multiple goal areas. The purpose of these Focus Areas and the strategic goals set forth therein, was to establish goals to meet the legal and educational responsibilities of the District as determined by federal and state law with the input of the District's educators, parents and community members. *See* Exh. C, ¶ 15; and Exh. D, ¶ 15; and Exh. E, ¶ 2, DEX 3.06.

5

**RESPONSE: Controverted insofar as Paragraph 20 suggests that federal and state law "determined" the Focus Areas and "strategic goals set forth therein." What the legal and educational responsibilities of the District were as determined by federal and state law is a question of law and neither Dr. Jungmann nor Dr. Lathan is competent to testify thereto. Further responding, SPS's Strategic Plan (Defs.' MSJ Ex. E ¶ 2, DEX 3.06) makes no reference to state or federal law. (*See also* Defs.' MSJ Ex. E at 188.) Otherwise, Paragraph 20 is admitted but immaterial.**

21.     During school year 2018-19 Defendant District experienced a series of disturbing events that impacted the District's students, staff, parents and the school community. The acts targeted several District students, specifically students of color and LGBTQ+ students, and represented what the District's Board believed to be "opposition to basic human rights and to a learning environment defined by inclusivity and respect for every individual." *See* Exh. C, ¶ 16.

**RESPONSE: Controverted. Further responding, Plaintiffs object to Paragraph 21 of on the basis that the cited paragraph of Dr. Jungmann's affidavit is hearsay, conclusory, and unsubstantiated. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) ("The object of [Fed. R. Civ. P. 56(e)] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."); *Postscript Enters. v. Bridgeton*, 905 F.2d 223, 226 (8th Cir. 1990) (summary judgment affidavits "must be made on personal knowledge, must set forth facts which would be admissible in evidence, and must show affirmatively that the affiant is competent to testify to the matters stated" to comply with Rule 56(e)); *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (summary judgment affidavits cannot be conclusory or based upon hearsay); *Ruffin v. Shaw Indus.*, 149 F.3d 294, 302 (4th Cir. 1998) ("[w]ithout a factual basis for the conclusory comments" in a summary**

6

**judgment affidavit, the affiant was not competent "to testify about an allegedly defective product);** *TIG Ins. Co. v. James*, **276 F.3d 754, 759 (5th Cir. 2002) ("Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial.").**

22.      In response to these events, Defendant Board issued a definitive statement opposing racism, bigotry and disrespect in any form and on May 21, 2019 passed a Resolution to Affirm Commitment to Equity and Inclusivity in all District operations during an open meeting of Defendant Board. *See* Exh. C, ¶ 17; and Exh. E, ¶ 2, DEX 26.02.

**RESPONSE: Admitted but immaterial.**

23.      In August, 2019, a forty-six (46) person citizen's committee composed of residents of the District, present and former members of the District's Board of Education, educators and administrators was gathered by Defendant District to serve as the Equity and Diversity Advisory Council ("EDAC"). *See* Exh. C, ¶ 18; and Exh. D, ¶ 16.

**RESPONSE: Admitted but immaterial.**

24.      Dr. Nicole Holt, Director of Defendant District's Learning Development Department (at that time) was the facilitator and Stephen Hall, (Chief Communications Officer), Defendant

Garcia-Pusateri and Penney Rector (Chief Human Resources Officer) served as liaisons between the EDAC and the District's Administration. *See* Exh. C, ¶ 18; and Exh. D, ¶ 16.

**RESPONSE: Admitted but immaterial.**

25.      The EDAC had eight (8) meetings beginning in August, 2019 and ending in April, 2020 when it issued a Final Report. *See* Exh. C, ¶ 19; and Exh. E, ¶ 2, DEX 6.01-6.09.

**RESPONSE: Admitted but immaterial.**

26.     During these meetings, the EDAC members studied the "driving question" given

to them by Defendant Board of Education and Dr. Jungmann, which was:

> "What actions should the district deploy to ensure that all students excel through
> purposeful engagement, rigorous instruction, cultural awareness and relevant
> education experiences with an intentional focus on historically under-
> represented and under-resourced groups?"

*See* Exh. C, ¶ 20; and Exh. E, ¶ 2, DEX 6.02.

**RESPONSE: Admitted but immaterial.**

27.     The EDAC Council Members were also asked by the Superintendent to "bring

forth a specific list of recommendations and action steps the District should deploy to positively

impact the following four strategies which are part of the District's strategic plan:

- The district will research, develop, and deploy strategies that improve
  engagement, safety, and attendance rates for under-resourced and
  under- represented student populations.
- The District will demonstrate annual growth in the core academic success
  (iReady, MAP, EOC, Common Assessments) of all students, with an
  intensive focus on closing performance gaps for under-resourced and
  under- represented students.
- The District will research, develop and deploy actions to increase the
  graduation rate of all student populations, with an intensive focus on
  under- resourced and under-represented students.
- Recruit, hire, develop, support and retain an effective, qualified and
  diverse workforce of teachers, staff and leaders to better meet the needs
  of students."

*See* Exh. C, ¶ 21; and Exh. E, ¶ 2, DEX 6.01-6.09.

**RESPONSE: Admitted but immaterial.**

28.      During the EDAC meetings held in August and September 2019, Mr. Wes Pratt,

the Chief Equity Officer and Assistant to the President of Missouri State University presented

"Mini- Diversity Workshop Sessions" which were designed to provide the EDAC Members

with  a definitional understanding of the equity and diversity issues that can impact the classroom

8

delivery of educational learning for under-represented and under-resourced student groups. *See* Exh. C, ¶ 22; and Exh. E, ¶ 2, DEX 6.01-6.03, 6.09.

**RESPONSE: Admitted but immaterial.**

29.     During the EDAC meeting on September 24, 2019, District Staff provided an overview of the staffing in the District which focused on the current staffing demographics in Defendant District's teachers and staff members in order to provide the Council Members with "hard data" showing the challenges to recruiting, hiring and retaining an effective, qualified and diverse workforce of teachers, staff and leaders to better meet the needs all District students. *See* Exh. C, ¶ 23; and Exh. E, ¶ 2, DEX 6.04.

**RESPONSE: Controverted insofar as SPS did not consider data or studies showing that Equity Training would better meet the needs of all District students. (*See* Pls.' MSJ Ex. 4, Yvania Garcia-Pusateri/SPS ("YGP/SPS") Dep. 60:5-22.)[1] Otherwise, Paragraph 29 is admitted but immaterial.**

30.     During the EDAC meeting on October 18, 2019, the Council focused on improving high school student engagement and attendance and were provided with research briefs for improving student engagement and attendance in high school and an analysis of chronic absence data. *See* Exh. C, ¶ 24; and Exh. E, ¶ 2, DEX 6.05.

**RESPONSE: Admitted but immaterial.**

31.     During the EDAC meeting on October 22, 2019, the Council focused on Instructional Strategies to reduce achievement gaps in all areas of the District. A large part of this discussion dealt with: (a) the need to acknowledge students and their cultural heritage; (b) the need to connect the

---

[1] **"Pls.' MSJ Ex." refers to the exhibits Plaintiffs filed with their Suggestions in Support of Summary Judgment (Doc. 77).**

curriculum to what students already know, their heritage and communities, so they feel comfortable and included in the classroom; and, (c) the need to accommodate diverse learning styles. *See* Exh. C, ¶ 25; and Exh. E, ¶ 2, DEX 6.06.

**RESPONSE: Admitted but immaterial.**

32.    During the EDAC meeting on November 12, 2019, the Council prepared Initial Focus Area Strategies and Recommendations for Defendant District and Defendant Board. Included in these Focus Area Strategies and Recommendations were the following: (a) the need for teacher cultural competence; (b) teacher training on culturally competent teaching strategies; and (c) teachers who show value and concern for students. *See* Exh. C, ¶ 26; and Exh. E, ¶ 2, DEX 6.07.

**RESPONSE: Admitted but immaterial.**

33.    In April, 2020, the EDAC issued its Final Report which included its final recommendations to Defendant Board and Defendant District. Included in the final recommendations were recommendations for: (a) ensuring that Defendant District was assessing the gaps in equity as it impacts each student's learning and experience; (b) development of affirming and supportive policies for all students, their identities and lived experiences; and (c) development of ongoing Identity and Equity training for Defendant District's students, staff, faculty and leaders. *See* Exh. C, ¶ 27; and Exh. E, ¶ 2, DEX 6.09.

**RESPONSE: Admitted but immaterial.**

34.    During the Fall of school year 2019-20 Defendant District provided Equity Training for its employees in order to further reaffirm its commitment to equity and inclusivity within the District and provide employee understanding concerning: (a) the "complex issues facing marginalized students in our system;" and (b) the "ethical responsibility" of Defendant District's

employees to "positively influence the trajectory of all of our student's lives." *See* Exh. C, ¶ 28; and Exh. D, ¶ 17; and Exh. E, ¶ 2, DEX 25.03.

**RESPONSE: Admitted but immaterial.**

35.     In the Complaint, Plaintiffs have not alleged that Defendant District's Fall (2019) Equity Training violated any provision of Federal or State law. *See* Exh. D, ¶ 18; and DOC 1.

**RESPONSE: Admitted but immaterial.**

36.     No complaints were received by Defendant District concerning its "Equity Training Fall 2019." *See* Exh. C, ¶ 29; and Exh. D, ¶ 18; and Exh. E, ¶ 2, DEX 25.03.

**RESPONSE: Admitted but immaterial.**

37.     On September 9, 2019, Defendant Board hired Defendant Garcia-Pusateri as the Chief Equity and Diversity Officer for Defendant District. *See* Exh. C, ¶ 30; and Exh. D, ¶ 19; and DOC 1, ¶ 32.

**RESPONSE: Admitted.**

38.     As the Chief Equity and Diversity Officer for the District, Defendant Garcia-Pusateri is responsible for Defendant District's Department of Equity and Diversity. *See* Exh. C, ¶ 30; and Exh. D, ¶ 19; and Exh. G, p. 15, l. 1-14; and Exh. E, ¶ 2, DEX 2.03; and DOC 1, ¶ 32.

**RESPONSE: Admitted.**

39.     When Defendant Garcia-Pusateri arrived in the District in "2019, the District wanted to engage in equity work. . . and the best way to start engaging in that work [was] to start doing professional learning around the topics so that all staff had an understanding of what equity is and how it might have positive impacts in the classroom and in the workplace" including improvements such as better attendance, improved academic outcomes and lower discipline rates, and helping students feel safe. *See* Exh. G, p. 54, l. 7-13; p. 55, l. 10-24.

11

**RESPONSE: Controverted but immaterial. Dr. Garcia-Pusateri testified:**

**Q.      So is it fair – and I'm not trying to put words in your mouth – the District just thinks equity is an end goal in and of itself?**

**A.      To my understanding, at that time, 2019, the District wanted to engage in equity work.  And the best way to start engaging in that work is to start doing professional learning around the topics so that all staff had an understanding of what equity is and how it might have positive impacts in the classroom and in the workplace.**

(Pls.' MSJ Ex. 4, YGP/SPS Dep. 54:4-13.) First, because Dr. Garcia-Pusateri has not been qualified as an expert witness under Fed. R. Evid. 702 she should not be permitted to offer her opinion as to "the best way to start engaging" in "equity work." Second, Paragraph 39 mischaracterizes Dr. Garcia-Pusateri's testimony in that she did not testify unequivocally to what SPS wanted, but rather to her "understanding" of what occurred before SPS hired her on September 9, 2019. (*See supra* ¶ 12.)

40.      The job responsibilities of the Chief Equity and Diversity Officer are directly aligned with the purposes of the Department of Equity and Diversity in a number of ways, including but not limited to the following:

- Lead the implementation of the identified strategies for equity, diversity and inclusion, including reviewing the progress made to date, and developing and implementing subsequent phases of system-wide strategic work.
- Develop, implement and monitor programs and processes that promote and sustain equity, diversity and inclusion.
- Develop and implement strategies to monitor and evaluate district wide progress toward eliminating the achievement disparities among students of all racial and economic groups.

*See* Exh. C, ¶ 32; and Exh. D, ¶ 20; and Exh. E, ¶ 2, DEX 2.03.

**RESPONSE: Admitted but immaterial.**

41.      The Department of Equity and Diversity strives to meet "the unique needs of students and staff to ensure that they are finding their way to success." *See* Exh. G, p. 63, l. 15-20.

12

**RESPONSE: Controverted on the basis that it mischaracterizes Dr. Garcia-Pusateri's testimony. She was testifying to the District's definition of "equity," not the goals or mission of SPS's Department of Equity and Diversity:**

> **Q.  When you and the District used the term "equity," how did it define the term?**
>
> **A.  I would say there's been no formalized manner in defining it. But the way that we define it as a department and the way that we work with equity is to ensure that we are meeting the unique needs of students and staff to ensure that they're finding their way to success.**

**(Pls.' MSJ Ex. 4, YGP/SPS Dep. 63:13 to 63:20.)**

42.     Defendant District's Department of Equity and Diversity provides services and education focused on the diverse student populations in Defendant District which are defined as "under-represented and under-resourced students." *See* Exh. C, ¶ 31.

**RESPONSE: Admitted.**

43.     "Under-represented students" include but are not limited to the following groups: students of color, students with disabilities, LGBTQ+ students, students who are English Language Learners and students who are from diverse religious backgrounds and belief systems. *See* Exh. C, ¶ 31.

**RESPONSE: Admitted.**

44.     "Under-resourced students" include but are not limited to the following groups: students who qualify for and receive free and reduced lunch services and students who receive McKinney-Vento services. Students can be both under-represented and under-resourced, depending upon their personal circumstances. *See* Exh. C, ¶ 31.

**RESPONSE: Admitted.**

13

45.     The terms "under-represented" and "under-resourced," are based on the student subgroup data (such as graduation data, discipline data and attendance data), the analysis of which allows Defendant District to create better educational practices that yield more equitable educational outcomes for the students. *See* Exh. G, p. 143, l. 11-22.

**RESPONSE: Controverted. Dr. Garcia-Pusateri did not use the term "educational" in reference to "better practices that have more equitable outcomes":**

> **Q.     Goal, Slide 5, second paragraph underrepresented or facing difficult issues. My question to you, are those difficult issues the ones you outlined previously?**
>
> **A.     Yes. Based on the data the District has, so graduation data, discipline data, attendance data.**
>
> **Q.     And it's everyone's responsibility at SPS to address those shortfalls; right?**
>
> **A.     Yes. To look at the data and to see where the barriers are for our students and then figure out ways how we can create better practices that have more equitable outcomes.**

**(Pls.' MSJ Ex. 4, YGP/SPS Dep. 143:11-22.)**

46.     The terms "under-represented" and "under-resourced" were already in use when Defendant Garcia-Pusateri joined Defendant District on July 1, 2021. *See* Exh. G, p. 136, l. 6-9.

**RESPONSE: Admitted but immaterial.**

47.     On May 19, 2020, Defendant Board of Education amended the District's Strategic Plan, consistent with the recommendations of the EDAC and Chief Equity and Diversity Officer Defendant Garcia-Pusateri. This amendment added Focus Area 5 – Equity and Diversity. Subsequently, the following five (5) Strategies were added to Focus Area 5:

Strategy 5.1.1:     Facilitate learning opportunities for staff and leaders that foster exploration of identity and self and create applications to demonstrate cultural consciousness in their work.

14

|  | Strategy 5.1.2: | Develop and deploy improved recruitment, collaboration and communication structures to enhance and diversify the workforce. |
|  | Strategy 5.1.3: | Review, improve and expand programming and services for under-resourced and under-represented students. |
|  | Strategy 5.1.4: | Review and expand the curriculum to reflect student identities, lived experiences, cultural history and significant contributions. |
|  | Strategy 5.1.5: | Research, develop and deploy engagement and advocacy policy, practices, and programs that support students and staff, and foster greater community engagement. |

*See* Exh. C, ¶ 33; and Exh. E, ¶ 2, DEX 3.06.

**RESPONSE: Admitted but immaterial.**

48.     Defendant Board of Education added Focus Area 5 because they "believed in the work of equity and diversity" and felt that the Focus Area and its strategies would help to address that work. Part of that training was the exploration of identity and self which was important knowledge for Defendant District's teachers, staff and leaders so they could "create more equitable working and learning environments for students and staff" which "helps us to better create more safety and support in the classroom, therefore having a stronger academic outcome." *See* Exh. G, p. 30, l. 12-15; p. 31, l. 2-9, 12-17.

**RESPONSE: Admitted but immaterial.**

49.     All certificated teachers and staff members are required to take training on various employment-related subjects each school year as a part of their required duties or in order to be qualified to perform their job. Training is often provided to teachers and staff on pre-selected "Professional Days" usually when students are not in school or virtually. *See* Exh. C, ¶ 34; and Exh. D, ¶ 21.

**RESPONSE: Admitted.**

50.     Defendant District's employees receive their regular rate of pay for training that occurs on Professional Days provided the employees take and complete the required training, makeup the missed training or use appropriate leave. If one of these things does not occur, employees are subject to having their pay docked for missing the required training. *See* Exh. C, ¶ 34; and Exh. D, ¶ 21.

**RESPONSE: Admitted.**

51.     During school year 2019-20, Chief Human Resources Officer Penney Rector was responsible for engaging in collective bargaining negotiations with certified or recognized representatives of employee groups in the District. *See* Exh. C, ¶ 35; and Exh. D, ¶ 22; and Exh. E, ¶ 2, DEX 51.01.

**RESPONSE: Admitted.**

52.     During school year 2019-2020, Rector met with the Springfield National Education Association ("SNEA"), the recognized representative for purposes of collective bargaining for the Teachers' Bargaining Unit, to negotiate changes to their Collective Bargaining Agreement, which would be effective during school year 2020-21. During these negotiations, the District agreed to the following language change for Article 16, Wages, Section 1 of the Teachers' Collective Bargaining Agreement:

> "The attached salary schedule includes the three tenths of one percent (.30%) salary increase which was implemented in School Year 2018-19 to support four (4) additional hours of training beyond the current contracted school days and hours. This annual training supplements all current trainings in place in the school district. These four hours of training may include seated, simulation and other such trainings as deemed necessary and appropriate to support the needs of the district."

*See* Exh. C, ¶ 35; and Exh. D, ¶ 22; and Exh. E, ¶ 2, DEX 51.01.

**RESPONSE: Admitted.**

16

53.     The four (4) hours of "Supplemental" training referenced in this contractual language change was in addition to normal pay for training time on Professional Days and was scheduled to take effect in 2020. *See* Exh. C, ¶ 35; and Exh. D, ¶ 22; and Exh. E, ¶ 2, DEX 51.01.

**RESPONSE: Admitted.**

54.     During school year 2020-21, Defendant District elected to use the negotiated four (4) hour "Supplemental" training stipend ("Supplemental Pay") to pay its staff to attend three training programs: (a) the two-hour Fall (2020) Equity Training; (b) a one-hour mental health training program; and, (c) a one-hour Alice Active-Shooter training program. *See* Exh. C, ¶ 36; and Exh. D, ¶ 23; and Exh. E, ¶ 2, DEX 51.01.

**RESPONSE: Controverted insofar as it characterizes a salary increase for additional mandatory training as "Supplemental Pay."**

55.     During school year 2020-21, Defendant District required each District teacher and certificated staff member to attend and complete each of these three (3) training programs in order to qualify for the full four (4) hour "Supplemental Pay" training stipend. Employees who failed to attend some but not all of the three (3) training programs would receive a portion of the "Supplemental Pay" training stipend depending on the training completed. For example, an employee who attended the one-hour mental health training program and the one-hour Alice Active-Shooter training program but did not attend the two-hour Fall (2020) Equity Training, would receive two hours of the four hour "Supplemental Pay" training stipend. *See* Exh. C, ¶ 37; and Exh. D, ¶ 24; and Exh. E, ¶ 2, DEX 51.01.

**RESPONSE: Controverted insofar as it characterizes a salary increase for additional mandatory training as "Supplemental Pay."**

56.     On October 14, 2020, Plaintiff Henderson attended and completed the two (2) hour Fall (2020) Equity Training. *See* Exh. A, p. 16, l. 4-10; p. 54, l. 3-9; and Exh. C, ¶ 39; and Exh. D, ¶ 26; and; Exh. E, ¶ 2, DEX 13.02.

**RESPONSE: Admitted.**

57.     During school year 2020-21, Plaintiff Henderson also attended and completed the one-hour mental health training program and the one-hour Alice Active-Shooter training program. *See* Exh. C, ¶ 39; and Exh. D, ¶ 26.

**RESPONSE: Admitted.**

58.     Plaintiff Henderson received "credit" for taking and completing the two (2) hour Fall (2020) Equity Training and the one-hour mental health training program and the one-hour Alice Active-Shooter training program and received four hours of "Supplemental Pay". *See* Exh. A, p. 43, l. 19 to p. 44, l. 10; and Exh. C, ¶ 39; and Exh. D, ¶ 26; and Exh. E, ¶ 2, DEX 13.02.

**RESPONSE: Controverted insofar as it characterizes a salary increase for additional mandatory training as "Supplemental Pay."**

59.     On October 6, 2020, Plaintiff Lumley received "credit" for attending and completing the two (2) hour Fall (2020) Equity Training and was paid her regular rate of pay for attending and completing that training program. *See* Exh. B, p. 15, l. 8-20; and Exh. C, ¶ 38; and Exh. D, ¶ 25; and Exh. E, ¶ 2, DEX 13.03.

**RESPONSE: Admitted.**

60.     During school year 2020-21 Plaintiff Lumley attended "all of the training sessions she alleges Defendant District required her to attend" and her pay was not reduced. *See* Exh. B, p. 15, l. 8-17.

**RESPONSE: Admitted.**

18

61.     There were five (5) employees of Defendant District who did not attend the Fall (2020) Equity Training, did not attend a subsequent make-up training session or use approved leave. These five (5) employees did not receive "Supplemental Pay" for attending and completing the Fall (2020) Equity Training. *See* Exh. C, ¶ 40; and Exh. D, ¶ 27.

**RESPONSE: Controverted insofar as it characterizes a salary increase for additional mandatory training as "Supplemental Pay." Otherwise, Paragraph 61 is admitted.**

62.     Neither Plaintiff Henderson nor Plaintiff Lumley have received discipline from Defendant District. *See* Exh. C, ¶ 4; and Exh. D, ¶ 28.

**RESPONSE: Admitted but immaterial.**

63.     Plaintiffs did not know of anyone who got kicked out of a training session, was denied credit or was disciplined in some way based on their conduct during the training session. *See* Exh. A, p. 63, l. 6-12; and Exh. B, p. 19, l. 5-13.

**RESPONSE: Admitted but immaterial.**

64.     No employee of Defendant District was terminated from employment because the employee failed or refused to attend the Fall (2020) Equity Training or failed to complete the training program. *See* Exh. C, ¶ 41; and Exh. D, ¶ 29.

**RESPONSE: Admitted but immaterial.**

65.     The Fall (2020) Equity Training was a continuation of the Fall (2019) Equity Training conducted by Defendant District during the Fall of 2019. *See* Exh. G, p. 34, l. 12-16.

**RESPONSE: Admitted but immaterial.**

66.     The purpose of the Fall (2020) Equity Training was to:

- Improve engagement, safety, and attendance rates for under-resourced and under-represented student populations.
- Demonstrate annual growth in the core academic success (iReady, MAP, EOC, Common Assessments) for all students, with an intensive

focus on closing performance gaps for under-resourced and under-represented students.

- Increase the graduation rate for all student populations, with an intensive focus on under-resourced and under-represented students.
- Recruit, hire, develop, support and retain an effective, qualified and diverse workforce of teachers, staff and leaders to better meet the needs of students.

*See* Exh. C, ¶ 42; and Exh. E, ¶ 2, DEX 3.06, 6.01.

**RESPONSE: Controverted. SPS's goals for equity training were: (1) prioritize equity for its own sake; (2) make students and staff feel safe; and (3) improve academic outcomes. (Pls.' MSJ Ex. 4, YGP/SPS Dep. 55:25 to 56:17; Pls.' MSJ Ex. 23, Lathan/SPS Dep. 24:24 to 25:12.) Additionally, the "Goals" PowerPoint slide described the Equity Training's goals as:**

> ***To create shared understanding around the following:***
>
> - **Identity and Self - Who we are and how identity shows up in our roles at SPS**
> - **Complex issues of Systemic Racism and Xenophobia**
>   - **And how we should address it in our school system.**
> - **Our ethical responsibility to make SPS an inclusive and equitable learning environment for ALL students[.]**

**(Pls.' MSJ Ex. 13 at 5.)**

67.     The purpose of the Fall (2020) Equity Training was to create more equitable environments for students by providing adults learning and understanding about the barriers to education that students and staff may encounter in school and understand how those barriers to learning impact the education of students in Defendant District. *See* Exh. G, p. 42, l. 20 to p. 43, l. 3, and l. 12-16; p. 44, l. 5-7.

**RESPONSE: Controverted. See Response to Paragraph 66 which is incorporated here by reference.**

20

68.     The Fall (2020) Equity Training was never designed, nor was it intended to be directly or indirectly used as curriculum for the students in Defendant District. *See* Exh. C, ¶ 45; and Exh. G, p. 326, l. 9-16; and Exh. E, ¶ 2, DEX 13.01.

**RESPONSE: Controverted but immaterial. The "Greetings!" handout and statement read by a school leader or administrator stated, in part, "[Equity and diversity] is more than a value, but now <u>part of our work and job responsibilities</u>. . . . [W]e all are now <u>accountable</u> in this work as well. Growing a deeper sense of cultural consciousness is something we must commit to, not just for ourselves but <u>for all our students</u>. As with any presentation, I ask that you remain engaged and professional and provide our trainers complete attention and respect." (Pls.' MSJ Ex. 9 at 10; Ex. 17, DEX 50A-000388-91 at 391.) Through its Equity Training, SPS also expected staff to commit to the concept of becoming "anti-racist" educators. (Pls.' MSJ Ex. 4, YGP/SPS Dep. 86:11-24, 94:14 to 95:14, 97:23 to 98:19, 99:15 to 100:1, dep. ex. 7 at 1.) Regarding anti-racism, Dr. Garcia-Pusateri also testified:**

> **Q.     Was the District hoping to promote political and social change across the board or just in education?**
>
> **A.     I think within that definition that is the definition that was used for anti-racism, but for the means of that concept is to understand <u>what are some methods from this definition that can apply to the classroom</u>, what are some ways teachers can do more to support their students and make them safe and supported in the classroom.**

**(Id. 104:19 to 105:2.) Additionally, the Canvas Modules, which were meant "to keep the momentum going as anti-racist educators" after the fall training (Pls.' MSJ Ex. 21, DEX 50B-004071), included material for use in the classroom. (*See, e.g.*, Pls.' MSJ Ex. 20 at 4 ("BrainPOP has created a video to help facilitate discussion with your students about BLM protests. Please complete the pretest before watching the video to assist in preparing you to have this courageous conversation <u>with your students</u>."), 5 ("Please watch the following video**

21

[about race] and reflect on how you may be able to address this question <u>in your classroom</u>.”),
7 (“Module 3 was designed to help show how ‘cultural consciousness <u>in the classroom</u>’ can
be implemented.”), 8 (entitled “Discussing Race, Racism and Other Critical Topics with
Students”), 15-24 (entitled and with resources for “Teaching About Race, Racism, and Police
Violence”), 25 (“Explore the drop-downs below to build your capacity for utilizing diverse
texts and strategies to address racial injustice <u>in your classroom</u>.”), 26 (“This last and final
section will focus on developing staff’s understanding of racial injustice . . . and how to
address this <u>in the classroom</u>.”), 27 (“Below is a list of texts (hyperlinked) to help students
understand racial injustice and would be good <u>to read to your classes</u>.”), 34 (“Addressing
Social Emotional Learning needs will also better prepare teachers to welcome back students
in meaningful ways while preparing teachers to address Covid-19, racial injustice caused by
the pandemic, and other social issues <u>in the classroom</u>.”), 52-59 & 71-81 (providing classroom
resources and stating in the introduction, “This last and final section will focus on developing
staff’s understanding of racial injustice and how it impacts underrepresented and under-
resourced students and how to address this <u>in the classroom</u>.”)

    69.    The concepts contained in the Fall (2020) Equity Training were designed for adults
to “broaden their perspectives so they can find ways [to] better identify the barriers in [the] system
that [are] impacting students” and were not designed for children or students. *See* Exh. G, p. 325,
l. 11-15.

    **RESPONSE: Controverted but immaterial. See Responses to Paragraphs 66 through
68 which are incorporated here by reference.**

    70.    The Fall (2020) Equity Training began immediately following the beginning of the
regular school year in early September 2020. During September 2020, the first three training

programs were presented at Bingham Elementary, Bissett Elementary and Boyd Elementary Schools. Changes were made to the Fall 2020 Equity Training materials and as of October 1, 2020, the version of the Fall 2020 Equity Training that was in use when the Plaintiffs took the Fall (2020) Equity Training is marked as DEX 13.01. *See* Exh. C, ¶ 43; and Exh. G, p. 19, l. 11-21; and Exh. E, ¶ 2, DEX 13.01.

**RESPONSE: Controverted insofar as SPS used substantially the same slide presentation for all Equity Training sessions, including the Equity Training sessions that Ms. Lumley and Ms. Henderson attended. (Pls.' MSJ Ex. 1, Joint Stipulation of Facts ("Stip.") ¶ 9;** *see also* **Pls.' MSJ Ex. 14, Lawrence Anderson Dep. 16:2 to 17:8.)**

71.    In early October, 2020 Defendant Garcia-Pusateri informed Rector that she had learned that some teachers were wanting to use "supplemental equity content" in their classrooms that they found on their own. Rector shared this information with Dr. Jungmann. On October 3, 2020, Dr. Jungmann sent an email to Defendant Garcia-Pusateri which stated:

> "Thanks for the message I would ask that we pause and reflect a bit more on this message.
>
> 1.    All re-entry Modules are designed for adults not students. We have no idea what age group teachers are delivering them to and if they are developmentally appropriate - remember we have 5-18 year olds in our classrooms.
>
> 2.    I am not confident our teachers are ready to deliver this content to our students, when we deliver curriculum in SPS we have identified and approved standards and resources delivered by teachers certified in the content area.
>
> 3.    As we consider content for our students and classrooms we must deploy a process that is both thoughtful and strategic or we risk damaging the work underway.
>
> In general I don't think our teachers should have permission to proceed with equity content in our classrooms until this work is complete."

*See* Exh. C, ¶ 46; and Exh. D, ¶¶ 30, 31; and Exh. E, ¶ 2, DEX 50.01.

23

Case 6:21-cv-03219-MDH   Document 78   Filed 08/12/22   Page 28 of 91

**RESPONSE: Admitted but immaterial.**

72.     The statements made by Dr. Jungmann in his email to Defendant Garcia-Pusateri are consistent with Defendant Board's Policy IF Curriculum Development, which explains Defendant District's "curriculum development process" in greater detail. *See* Exh. C, ¶ 47; and Exh. D, ¶ 31; and Exh. E, ¶ 2, DEX 32.02, DEX 51.01.

**RESPONSE: Admitted but immaterial.**

73.     No audio or video recordings of the Fall (2020) Equity Training sessions were made by Defendants, on Defendants' behalf or have come into the possession of Defendants. *See* Exh. H, p. 93, l. 11-19.

**RESPONSE: Admitted.**

74.     No audio or video recordings of the October 6, 2020 Fall (2020) Equity Training session were made by Plaintiffs. *See* Exh. B, p. 20, l. 13-16.

**RESPONSE: Admitted.**

75.     Plaintiff Lumley attended the Fall (2020) Equity Training on October 6, 2020. The training was conducted in person. There were a total of eight (8) persons who received the training, including Plaintiff Lumley. The training session was held in a conference room in Defendant District's Bentley Building where Plaintiff Lumley worked. Seating in the conference room was spaced apart due to concerns about Covid-19. *See* Exh. B, p. 6, l. 6-9 and 17-25; p. 7, l. 1-4; p. 8, l. 6-15; p. 9, l. 9-15; and Exh. E, ¶ 2, DEX 13.03.

**RESPONSE: Admitted.**

76.     The only equity training program Plaintiff Lumley attended was the Fall (2020) Equity Training that was held on October 6, 2020. *See* Exh. B, p. 9, l. 9-13.

**RESPONSE: Admitted.**

77.     Defendant Garcia-Pusateri, Defendant Anderson and Equity and Diversity Department Coordinator Jimi Sodi were the trainers for the October 6, 2020 Fall (2020) Equity Training attended by Plaintiff Lumley. *See* Deposition of Cecil Mooney attached and hereinafter referred to as Exhibit I, p. 8, l. 14-19; *also see* Exh. B, p. 7, l. 5-6.

**RESPONSE: Admitted.**

78.     Employee Cecil Mooney attended the October 6, 2020 Fall (2020) Equity Training that was attended by Plaintiff Lumley. *See* Exh. I, p. 8, l. 5-8; and Exh. E, ¶ 2, DEX 13.03.

**RESPONSE: Admitted.**

79.     The training materials used for the Fall (2020) Equity Training on October 6, 2020 consisted of a handout and a power point presentation. *See* Exh. E, ¶ 2, DEX 13.01.

**RESPONSE: Controverted insofar as the materials included more than one handout. (Pls.' MSJ Ex. 9; Pls.' MSJ Ex. 1, Stip. ¶¶ 16-17; *see also* Pls.' MSJ Ex. 10, Philip Hale Dep. 15:4-7, dep. ex. 2.)**

80.     Employee Hale was responsible for creating the packets and handing out the written training materials to employees in the Department of Special Services which were used for the Fall (2020) Equity Training on October 6 and 14, 2020. These training materials consisted of the exhibits marked as Exhibit 2 at Hale's deposition, but did not include the "agree, disagree, strongly agree, or strongly disagree signs" marked as Exhibit 3 at Hale's deposition. Hale had not seen the documents marked as "Exhibit 3" before the exhibit was shown to him at his deposition on June 16, 2022. *See* Deposition of Phillip Hale attached and hereinafter referred to as Exhibit J, p. 9, l. 12-15; p. 11, l. 2-25; p. 16, l. 14 to p. 17, l. 6; *also see* Exhibit 3 attached to Exhibit J.

**RESPONSE: Paragraph 80 contains multiple facts in contravention of L.R. 56.1(a). Paragraph 80 is controverted insofar as the testimony of Mr. Hale indicates that he was**

responsible for "assimilat[ing]" or "collat[ing]" copies of papers provided to him into packets for the October 14, 2020 Equity Training session. There is no evidence Mr. Hale "was responsible for creating the packets" or had any involvement with the packets for the October 6, 2020 Equity Training session. Paragraph 80 is admitted insofar as Mr. Hale testified that he had not previously seen Exhibit 3 to his deposition.

81.     Plaintiff Lumley was not provided with signs that read "agree, disagree, strongly agree, or strongly disagree" for the October 6, 2020 Fall (2020) Equity Training session. Exh. B, p. 19, l. 14-17.

**RESPONSE: Admitted.**

82.     The October 6, 2020 Fall (2020) Equity Training session attended by Plaintiff Lumley involved "viewing the George Floyd video, identifying where [the employee] fell on the oppression matrix, understanding covert and overt white supremacy and engaging in small and large group discussions about the lessons." *See* Exh. B, p. 19, l. 21-25; p. 20 l. 1-12.

**RESPONSE: Admitted.**

83.     After viewing the George Floyd video during the October 6, Fall (2020) Equity Training session Plaintiff Lumley went to a "small group session" with one other employee for about three minutes and each shared their "opinions" with the other about the video. Plaintiff Lumley did not think there was anything wrong with what happened in the small group session where the George Floyd video was discussed. *See* Exh. B, p. 20, l. 17-25; and p. 22, l. 2-10.

**RESPONSE: Controverted on the basis that it mischaracterizes Ms. Lumley's testimony. Ms. Lumley's testimony about there not being "anything wrong" refers to her exchange of opinions with the other employee, and not "anything" in the small group session:**

**Q.     Okay.  Did you lead off in that discussion, or did she lead off?**

A.      I believe she did.

Q.      Okay.  And so she said what she said about her husband, and then you
        followed with what you testified to a minute ago?

A.      Yes.

Q.      She gave her opinion, and you gave your opinion?

A.      Yes.

Q.      Is there anything wrong with what happened there in your mind?

A.      I don't think so.  No.

(Pls.' Opp'n Ex. 24, Jennifer Lumley Dep. 21:24 to 22:10.)[2] Additionally, as Ms. Lumley

attested to:

> I complied with SPS's directive that I share my thoughts and feelings about
> the George Floyd video in my small group because I did not want to remain
> silent due to SPS's instruction that we have courageous conversations, stay
> engaged, lean into our discomfort, share our personal experiences, and share
> our truth. Nor did I want to be considered a white supremacist by remaining
> silent.

(Pls.' MSJ Ex. 3, Jennifer Lumley Decl. ¶ 16.) She further attested that following the

"Environmental Scan Reflection," she was again paired with the other employee and:

> I was reluctant at this point to engage in further discussions given the exchange
> during our last small group discussion about George Floyd. But I participated
> in the small group discussion because I did not want to remain silent due to
> SPS's instruction that we have courageous conversations, stay engaged, lean into
> our discomfort, share our personal experiences, and share our truth. Nor did I
> want to be considered a white supremacist by remaining silent. Ms. Hawkins
> again spoke on behalf of our group at the large group discussion. Even though I
> disagreed with Ms. Hawkins, I refrained from speaking out of concern for how
> my comments would be received by SPS.

---

[2] "Pls.' Opp'n Ex." refers to the exhibits Plaintiffs are filing with the instant Suggestions in
Opposition to Defendants' Motion for Summary Judgment. These exhibits begin with No. 24 as
they are numbered sequentially to the exhibits filed with their Suggestions in Support of Motion
for Summary Judgment (Doc. 77).

27

**(Pls.' MSJ Ex. 3, Jennifer Lumley Decl. ¶ 22.)**

84.    When the George Floyd video small group session ended, there was a large group session on the video during which the other employee in Plaintiff Lumley's small group gave her opinion, but did not share Plaintiff Lumley's opinion, which did not matter to Plaintiff Lumley, nor was Plaintiff Lumley asked for her opinion. *See* Exh. B, p. 22, l. 15 to p. 23, l. 7.

**RESPONSE: Admitted but immaterial.**

85.    Employee Cecil Mooney, who was also present in the October 6, 2020 Training session, said that the presenters "asked for comments or let people volunteer" but he "did not remember them calling on any one individual . . . it was open for individuals to speak." *See* Exh. I, p. 11, 8-17.

**RESPONSE: Controverted on the basis that it mischaracterizes Mr. Mooney's testimony in that it omits Mr. Mooney qualifying his statements with "I think" and "I don't specifically remember," which were consistent with his general lack of recall about the October 6, 2020 Equity Training session (testifying that he didn't remember or recall at least 37 times in 24 pages of testimony):**

> **Q.    Do you remember them actually calling on people at any point in time?**
>
> **A.    I think they asked for comments or let people volunteer. I don't specifically remember them calling on any one individual. I think it was open for individuals to speak.**

**(Pls.' Opp'n Ex. 25, Cecil Mooney Dep. 11:12-17.)**

86.    The October 6, 2020 Training session attended by Plaintiff Lumley also contained a discussion about the oppression matrix, but the participants did not have to rate themselves on the oppression matrix slide, no small group session was held on the oppression matrix presentation

and Plaintiff Lumley was not asked her opinion about the oppression matrix. *See* Exh. B, p. 23, l. 12 to p. 24, l. 7.

**RESPONSE: Admitted.**

87. The October 6, 2020 Training session attended by Plaintiff Lumley also contained a discussion about the white supremacy chart. No small group session was held on the white supremacy chart. No one called Plaintiff Lumley's name or asked her directly if she understood the white supremacy chart. Plaintiff Lumley was not asked to affirm or agree to anything that had been presented about the white supremacy chart or to write anything down. Rather, the participants were told that they could look at the white supremacy chart on their own time. *See* Exh. B, p. 24, l. 12 to p. 25, l. 18.

**RESPONSE: Paragraph 87 contains multiple facts in contravention of L.R. 56.1(a). Paragraph 87 is controverted because it is unsupported by the cited testimony. First, Paragraph 87 refers ambiguously to "the white supremacy chart," whereas Ms. Lumley's testimony at pages 24:12 to 25:18 was specific to the Covert/Overt White Supremacy graphic. Second, Paragraph 87 misstates Ms. Lumley's testimony in that she did not testify that "participants were told they could look at the white supremacy chart on their own time." Ms. Lumley's testimony about looking at a chart on her own time at page 25:19-25 was presumably in reference to the Social Identities circle (no exhibit was attached nor referred to during this portion Ms. Lumley's examination). (*See* Pls.' MSJ Ex. 13 at 28.)**

88. The October 6, 2020 Training session attended by Plaintiff Lumley also contained a discussion about the social identities chart. No small group session was held to discuss the social identities chart and the participants were told that they could look at the social identities chart on their own time. Plaintiff Lumley was not asked about her opinion on the social identities chart, how

she would have filled it out or how she fit in on it, nor was anyone else. *See* Exh. B, p. 25, l. 19 to p. 26, l. 14.

**RESPONSE: Paragraph 88 contains multiple facts in contravention of L.R. 56.1(a). Paragraph 88 is controverted insofar as the cited testimony is not that the "the participants were told that they could look at the social identities chart on their own time," but that SPS "told us to look at it ourselves and fill it out basically on our own time." (Defs.' MSJ Ex. B, Jennifer Lumley Dep. 25:22-25.)**

89.     During the October 6, 2020 training session attended by Plaintiff Lumley, between the discussion about the oppression matrix and the covert/overt white supremacy sheet Plaintiff Lumley "spoke up" and shared her "opinion" that she thought the presenters:

> ". . . were painting a broad-brush stroke of white people as racist, and I said that that was wrong. I said not all white people are racist. I said there's racism across the board. And, . . . my nephew married a Black woman, and they have children together. And there are Black people that tell her she doesn't count as Black anymore because she married a white man and has children with him. And I said that I grew up in a broken home, a poor home with government handouts. I wasn't born into white privilege. And they said because I was white, I was born into white privilege."

*See* Exh. B, p. 27, l. 10-23; p. 28, l. 9-13.

**RESPONSE: Admitted.**

90.     Plaintiff Lumley admitted that she and other attendees, as well as the presenters, were expressing their opinions or "saying what they felt." *See* Exhibit B, p. 28, l. 9-19.

**RESPONSE: Controverted.  Paragraph 90 misstates Ms. Lumley's testimony in that she did not testify that "other attendees . . . were expressing their opinions or 'saying what they felt.'" (Pls.' MSJ Ex. 19, Lumley Dep. 27:24 to 30:2.)**

91.     After completing the Fall (2020) Equity Training on October 6, 2020, Plaintiff Lumley did not file an internal grievance pursuant to Defendant Board's Policy AC – Prohibition

Against Illegal Discrimination, Harassment and Retaliation or otherwise complain to Penney Rector, Defendant District's Chief Human Resources Officer and Compliance Officer, concerning any aspect of the training she received during the October 6, 2020 Fall (2020) Equity Training. *See* Exh. D, ¶ 32; and Exh. E, ¶ 2, DEX 32.01.

**RESPONSE: Admitted but immaterial.**

92.     The first notice the District received that Plaintiff Henderson and Plaintiff Lumley was alleging that Defendants had violated their First Amendment Rights was when the District received the Complaint in August, 2021, more than ten (10) months after they had attended the Fall (2020) Equity Training. *See* Complaint, DOC 1; and Return of Service, DOC 10.

**RESPONSE: Controverted but immaterial. The cited pleadings do not support the facts alleged in Paragraph 92.**

93.     Plaintiff Henderson attended the Fall (2020) Equity Training on October 14, 2020. The training was conducted virtually. There were a total of at least thirty-one (31) persons who received the training, including Plaintiff Henderson. *See* Exh. A, p. 16, l. 7-15; Exh. E, ¶ 2, DEX 13.02.

**RESPONSE: Admitted.**

A.     Dr. Tanya Rapert, the Director of the Special Services Department and Plaintiff Henderson's departmental supervisor was present at the virtual October 14, 2020 Fall (2020) Equity Training. *See* Exh. F, p. 16, l. 13-18; and Exh. E, ¶ 2, DEX 13.02.

**RESPONSE: Admitted.**

B.     Employee Phil Hale attended the October 14, 2020 Fall (2020) Equity Training. *See* Exh. J, p. 13, l. 22 to p. 14, l. 2.

**RESPONSE: Admitted.**

31

C. Defendant Garcia-Pusateri and Defendant Anderson were the trainers for the October 14, 2020 Fall (2020) Equity Training attended by Plaintiff Henderson. *See* Exh. F, p. 39, l. 12-15.

**RESPONSE: Admitted.**

94. Prior to the October 14, 2020 Fall (2020) Equity Training Dr. Tanya Rapert told a meeting of Special Education Process Coordinators, including Plaintiff Henderson, that it was "mandatory" that the staff attend the training and be respectful and they needed to sign up for a time to take the training, either a virtual or in-person session; Plaintiff Henderson had no problem doing that. *See* Exh. A, p. 68, l. 15 to p. 69, l. 8; p. 70, l. 4-6.

**RESPONSE: Admitted but immaterial.**

A. Plaintiff Henderson did not believe that being told it was "mandatory" for her to attend the Fall (2020) Equity Training Session and to be respectful violated her rights in any way. *See* Exh. A, p. 70, l. 4-11.

**RESPONSE: Controverted. This is not a statement of fact capable of admission; it is a legal conclusion, and whether Plaintiffs' constitutional rights were violated is a question of law for the court.**

B. Prior to the October 14, 2020 Fall (2020) Equity Training Dr. Tanya Rapert "assumed" that the content of the October 14 Equity Training was going to be about "awareness of equity and diversity," but she did not know anything specific about the content of the training. *See* Exh. F, p. 22, l. 9-13.

**RESPONSE: Admitted but immaterial.**

95. Henderson alleged in the Complaint that prior to the October 14, 2020 Fall (2020) Equity Training, she and her colleagues were provided with "four paper signs each" that read

"Strongly Agree, Agree, Disagree and Strongly Disagree." (DOC 1, ¶ 78) and her Department Supervisor told the staff that they would be asked to hold up the signs in response to prompts during the Zoom training. (DOC 1, ¶ 79).

**RESPONSE: Admitted but immaterial.**

A.      According to Plaintiff Henderson, the "Strongly Agree, Agree, Disagree and Strongly Disagree" signs were given to her by fellow Department employee Hale, by placing them on her desk, although she did not see him place the signs there. *See* Exh. A, p. 64, l. 9- 21.

**RESPONSE: Admitted.**

B.      Hale was responsible for preparing and handing out the training materials used for the Fall (2020) Equity Training on October 14, 2020 which consisted of a handout and a power-point presentation but did not contain the "agree-disagree" signs. *See* Exh. J, p. 9, l. 12-15; p. 11, l. 2-25; p. 16, l. 14 to p. 17, l. 6; and Exh. E, ¶ 2, DEX 13.01.

**RESPONSE: Controverted insofar as the testimony of Mr. Hale indicates that he was responsible for "assimilat[ing]" or "collat[ing]" copies of papers provided to him into packets for the October 14, 2020 Equity Training session. There is no evidence Mr. Hale was responsible in any way for the PowerPoint presentation. Furthermore, the materials included more than one handout. (Pls.' MSJ Ex. 9; Pls.' MSJ Ex. 1, Stip. ¶¶ 16-17; *see also* Pls.' MSJ Ex. 10, Philip Hale Dep. 15:4-7, dep. ex. 2.) Paragraph 90(B) is admitted insofar as Mr. Hale testified that he had not previously seen Exhibit 3 to his deposition.**

33

C.      According to Hale, the "agree, disagree signs" (*see* Exh. J, and its Exhibit 3) were not used during the October 14, 2020 Fall (2020) Equity Training attended by Plaintiff Henderson. *See* Exh. J, p. 16, l. 14 to p. 17, l. 6.

**RESPONSE: Admitted but immaterial.**

D.      Hale had not seen the "agree-disagree signs" (*see* Exh. J, and its Exhibit 3) before they were shown to him at his deposition on June 16, 2022. *See* Exh. J, p. 16, l. 14 to p. 17, l. 6.

**RESPONSE: Admitted but immaterial.**

E.      During the October 14, 2020 Fall (2020) Equity Training Hale did not have to "agree or disagree with certain statements that were made on a slide or were spoken by a trainer." *See* Exh. J, p. 18, l. 24 to p. 19, l. 8.

**RESPONSE: Admitted but immaterial.**

F.      Dr. Rapert was not told that the participants in the October 14, 2020 training session for the Fall (2020) Equity Training would be provided with "agree-disagree signs." *See* Exh. F, p. 20, l. 21-24.

**RESPONSE: Admitted but immaterial.**

G.      Prior to the October 14, 2020 Fall (2020) Equity Training Dr. Rapert did not tell anyone in her department that they would be asked to hold up the "agree-disagree signs" (*see* Exh. 3 attached to Exh. I) "in response to prompts during the Fall (2020) Equity Training session" or otherwise respond to prompts (*see* Exh. F, p. 21, l. 14-24).

**RESPONSE: Controverted but immaterial. (Pls.' Opp'n Ex. 26, Brooke Henderson Dep. 65:5 to 66:8.)**

34

H. Dr. Rapert did not receive a copy of any signs that said, "agree, disagree, strongly agree, or strongly disagree" when she received her packet of training materials from Hale (*see* Exh. F, p. 19, l. 9-19) or during the Fall (2020) Equity Training on October 14, 2020 (*see* Exh. F, p. 19, l. 20-23).

**RESPONSE: Admitted but immaterial.**

I. Dr. Rapert was not required to hold up an "agree-disagree sign" during the Fall (2020) Equity Training on October 14, 2020. *See* Exh. F, p. 19, l. 24-25; p. 20, l. 1.

**RESPONSE: Admitted but immaterial.**

J. None of the presenters had or used the "agree, disagree" signs at the October 14, 2020 training. *See* Exh. G, p. 129, l. 12-13.

**RESPONSE: Controverted but immaterial. Dr. Garcia-Pusateri testified:**

**Q. Tell me what you remember [about agree/disagree signs].**

**A. I can't recall. It was for an activity that we were going to do, but then we switched it over to a Kahoot activity. It was going to be a lot easier to do that and allow participants to have – it would just be a lot more accessible for them to do than move around in a room.**

**(Pls.' MSJ Ex. 4, YGP/SPS Dep. 129:17 to 129:23.) Lawrence Anderson testified:**

**Q. Okay. Did the packets for the virtual trainings contain agree, disagree, strongly agree, or strongly disagree signs?**

**A. If they did, that was something we thought about doing earlier on. And as Dr. Garcia-Pusateri stated earlier, it was something we ended up changing and not doing. So there could have been possibly some signs that may have been put in there, but there would not have been enough in there for the entire group to have used those, if that makes sense.**

**(Pls.' MSJ Ex. 14, Lawrence Anderson Dep., 23:19 to 24:3.)**

35

96.     During the October 14, 2020 Fall (2020) Equity Training session a video about the George Floyd incident was played and according to Plaintiff Henderson the following occurred:

A.      Defendant Garcia-Pusateri introduced the video and told the attendees:

"That [the video] was going to be difficult to watch, but we needed to watch it, and it was important for us to see it without the additional noise and that we just needed to focus in to imagine if we were in that position that Derek Chauvin -- could we imagine having somebody place a knee on our neck and not letting up and these are your final words."

*See* Exh. A, p. 87, l. 16 to p. 88, l. 6.

**RESPONSE: Admitted.**

B.      After the George Floyd video was shown, the attendees were broken up into small three person groups to share their thoughts on the video. *See* Exh. A, p. 89, l. 24 to p. 90, l. 11.

**RESPONSE: Admitted.**

C.      During the small group discussion about the George Floyd incident Plaintiff Henderson volunteered that she "felt that the video was taken out of context and it was only reflecting one side of the incident by removing all the other . . . context.  So they removed all the other language out of that and just put that in isolation." *See* Exh. A, p. 94, l. 2-7.

**RESPONSE: Admitted.**

D.      In Plaintiff Henderson's breakout session all of the attendees who spoke agreed that "it was hard to make any determination out of context." *See* Exh. A, p. 94, l. 11-15. In the large group session, she was not asked to provide any information nor did she. *See* Exh. A, p. 96, l. 10-14.

**RESPONSE: Admitted.**

36

E.      Plaintiff Henderson did not feel that being asked to watch the George Floyd video violated her rights. *See* Exh. A, p. 89, l. 14-21.

**RESPONSE: Controverted. This is not a statement of fact capable of admission; it is a legal conclusion, and whether Plaintiffs' constitutional rights were violated is a question of law for the court.**

97.      During the October 14, 2020 Fall (2020) Equity Training session the presenters went through terminology to help build the awareness of the attendees. *See* Exh. F, p. 26, l. 3-17. The presenters "asked for volunteers to give examples of their understanding of what certain terms meant;" Dr. Rapert volunteered an example in a group discussion, which was not exactly what the presenter was thinking, but that was "okay" per Dr. Rapert and she did not believe her example was wrong. *See* Exh. F, p. 26, l. 12 to p. 27, l. 20.

**RESPONSE: Paragraph 97 contains multiple facts in contravention of L.R. 56.1(a). Paragraph 97 is controverted insofar as it misstates Dr. Rapert's testimony in that she testified that she "assum[ed]" the SPS trainers went through terminology to build awareness. (Defs.' MSJ Ex. F, Tanya Rapert Dep. 26:3-17.) Paragraph 97 is also controverted insofar as it misstates Dr. Rapert's testimony in that she testified that the SPS trainers "asked for volunteers to give examples of our understanding of what certain terms *were*." (Id.) Paragraph 97 is also controverted insofar as it misstates Dr. Rapert's testimony in that she testified:**

**Q.     Okay.**

**A.     I tried to relate it to something that I thought was a connection. I was a little off, because the presenter then came back in and – I don't remember exactly how he said it, but let me know it was kind of – it was almost, but maybe not quite the right example.**

**Q.     Okay. But it was – it was the wrong example that you gave?**

37

**A.     Well, I don't know that it was wrong.**

**(Id. 27:11 to 27:20.)**

98.     During the October 14, 2020 Fall (2020) Equity Training session, although others expressed their opinions, Plaintiff Henderson was never called on by the trainers (whether it be Garcia-Pusateri or Anderson) to answer questions during the large group sessions. *See* Exh. A, p. 30, l. 24 to p. 31, l. 4; p. 59, l. 4-21.

**RESPONSE: Controverted on the basis that it mischaracterizes the cited testimony. Ms. Henderson did not testify that "although others expressed their opinions, [she] was never called on by the trainers . . . to answer questions during the large group sessions." Rather, she testified that she was not called on by Dr. Garcia-Pusateri to respond when "these matters were discussed, or these statements were made by Dr. Garcia-Pusateri" referring specifically to statements Dr. Garcia-Pusateri made in connection with the Environmental Scan exercise. (Pls.' Opp'n Ex. 26, Henderson Dep. 27:20 to 31:15.) Paragraph 98 is admitted insofar as Mr. Anderson did not call on Ms. Henderson during the Equity Training session she attended.**

99.     During the October 14, 2020 Fall (2020) Equity Training session Plaintiff Henderson claims she was told that "teachers are supposed to not support students who want to dress up as their favor Disney costume for Halloween." *See* Exh. A, p. 10, l. 22-25. Dr. Rapert recalled Henderson asking a question concerning the best way to respond to a young child who wanted to wear a Pocahontas costume at Halloween to which the presenter responded that one might try to explain to the child another way the child could learn about Native Americans rather than by dressing ups as Pocahontas. *See* Exh. F, p. 28, l. 19 to p. 29, l. 3; p. 30, l. 1-7.

**RESPONSE: Admitted.**

100.     Plaintiff Henderson alleged that during the October 14, 2020 Fall (2020) Equity Training Defendant Garcia-Pusateri told the attendees that they should vote for a "certain political party" and that "socialism is a good thing." *See* Exh. A, p. 15, l. 17 to p. 16, l. 6; p. 16, l. 22-24. These comments were part of a discussion about socialism and school funding using property taxes so "the outcomes for students aren't the same." *See* Exh. A, p. 17, l. 3-8.

**RESPONSE: Admitted.**

A.     Defendant Garcia-Pusateri stated she did not recall a discussion about socialists or socialism at the October 14, 2020 Fall (2020) Equity Training session. *See* Exh. G, p. 275, l. 8-10.

**RESPONSE: Admitted.**

B.     Dr. Rapert did not recall the subject of socialism coming up during the October 14, 2020 Fall (2020) Equity Training. *See* Exh. F, p. 32, l. 6-8.Dr. Rapert did not recall discussions during the October 14, 2020 Fall (2020) Equity Training session concerning "how you should not vote for property taxes funding schools or school funding and voting" or that "we had to vote a certain way." *See* Exh. F, p. 37, 20 to p. 38, l. 3.

**RESPONSE: Admitted.**

C.     Plaintiff Henderson was not asked for her opinion on socialism during the training (*see* Exh. A, p. 17, l. 15-17), was not asked to vote on the subject or affirm it (*see* Exh. A, p. 79, l. 6-12), and Defendant Garcia-Pusateri "didn't say anything about agreeing with her or not agreeing with her, she just made a bold statement about these things." *See* Exh. A, p. 18, l. 25 to p. 19, l. 3.

**RESPONSE: Admitted.**

D.     When Plaintiff Henderson met with Dr. Tanya Rapert shortly after the October 14, 2020 Fall (2020) Equity Training session, Plaintiff Henderson did not express any concerns or complaints about alleged comments made at the training by Defendant Garcia-Pusateri or others concerning "socialism." *See* Exh. F, p. 51, l. 18-24; p. 52, l. 15-16.

**RESPONSE: Admitted but immaterial**

101.     Plaintiff Henderson alleged that during the October 14, 2020 Fall (2020) Equity Training Defendant Garcia-Pusateri told the attendees that "adults of a certain age range can be oppressors of either their children or they can also be oppressors of an older generation" and that they oppress their children when they raise them to vote a certain way. *See* Exh. A, p. 20, l. 6-19; p. 78, l. 9-13.

**RESPONSE: Admitted.**

A.     Defendant Garcia-Pusateri did not recall saying that parents were oppressors of their children during the October 14, 2020 Fall (2020) Equity Training session. *See* Exh. G, p. 240, l. 25 to p. 241, l. 9.

**RESPONSE: Admitted.**

B.     Plaintiff Henderson did not express any opinion during the training session about the statements (*see* Exh. A, p. 20, l. 20-22), no one called on her to give her opinion (*see* Exh. A, p. 21, l. 23 to p. 22, l. 3), and she was also not asked to affirm the statements (*see* Exh. A, p. 78, l. 17-25).

**RESPONSE: Controverted. Ms. Henderson testified that she was asked to share her opinion. (Pls.' Opp'n Ex. 26, Henderson Dep. 20:9 to 22:7.) Regarding affirmation of "the statements," the cited testimony is that Ms. Henderson was not**

40

**asked to affirm the statements "parents are the oppressors of their children" and "parents oppress their children when they raise their children to vote a certain way." (Id. 78:17-25.)**

C.     Dr. Rapert did not recall any statements being made by the trainers that "parents could be oppressors of their children." *See* Exh. F, p. 32, l. 24 to p. 33, l. 2; p. 35, l. 21-25; p. 36, l. 7-11.

**RESPONSE: Admitted.**

D.     Dr. Rapert did recall a discussion during the October 14, 2020 Fall (2020) Equity Training session that centered around "oppression" which was about people who have been oppressed and "how [the [past oppression] could change the perceptions or the experiences that they have." *See* Exh. F, p. 35, l. 1-6.

**RESPONSE: Admitted.**

E.     When Plaintiff Henderson met with Dr. Tanya Rapert shortly after the October 14, 2020 Fall (2020) Equity Training session, Plaintiff Henderson did not express any concerns or complaints about alleged comments made at the training by Defendant Garcia-Pusateri or others concerning: "parent oppression" or "parents oppressing children" or "parents raising their children to vote a certain way" or "white people oppressing black people. *See* Exh. F, p. 51, l. 18-24; p. 52, l. 24 to p. 53, l. 13.

**RESPONSE: Admitted but immaterial**

102.     Plaintiff Henderson alleged that during the October 14, 2020 Fall (2020) Equity Training Defendant Garcia-Pusateri told the attendees that "our local community was supportive of Black Lives Matter and that their protests were very peaceful," (*see* Exh. A, p. 29, l. 1-4) and that Kyle Rittenhouse had murdered an innocent man that was . . . an ally of the Black community

41

(*see* Exh. A, p. 29, l. 5-13) and we needed to "disavow and condemn" the actions of the white supremacists in Charlotte (*see* Exh. A, p. 30, l. 7-12).

RESPONSE: Admitted.

A.      Defendant Garcia-Pusateri did not recall a discussion concerning Kyle Rittenhouse during the October 14, 2020 Fall (2020) Equity Training session. *See* Exh. G, p. 229, l. 1-10.

RESPONSE: Admitted.

B.      Plaintiff Henderson claimed that the attendees were told to discuss these events in their small group meeting. *See* Exh. A, p. 31, l. 5-9. When the small groups were randomly selected by the computer, the attendees were told "that [they] needed to discuss what [they] recognized from the events, what [they] were familiar with [and] how [they] felt about the events." *See* Exh. A, p. 31, l. 19-25; p. 32, l. 6-10.

RESPONSE: Admitted.

C.      Plaintiff Henderson stated she had "concerns" but when asked to state what she said during the small group meeting she testified that she "did not recall" any concerns she had (*see* Exh. A, p. 32, l. 20 to p. 33, l. 7; p. 34, l. 2-8), but remembered that someone else raised concerns about showing the violence and about the Black Lives Matter protest in Springfield. *See* Exh. A, p. 33, l. 12-22.

**RESPONSE: Controverted. Paragraph 102(C) misstates Ms. Henderson's testimony in that she did not testify that she did not recall concerns she had about the Environmental Scan exercise. Rather, Ms. Henderson testified that she had concerns, but didn't recall specifically what she said in the small group discussion. (Pls.' Opp'n Ex. 26, Henderson Dep. 32:16 to 33:7.)**

42

103.    Plaintiff Henderson alleged that during the October 14, 2020 Fall (2020) Equity Training the attendees received a handout that stated that they needed to remember that America was founded on violence and that there were marginalized people that have suffered great harm and so that, when we show our pride in being an American, that other people may not feel the same and we may be harming somebody else. *See* Exh. A, p. 84, l. 22 to p. 85, l. 4; p. 85, l. 18 to p. 86, l. 1.

**RESPONSE: Admitted.**

A.    The handout was not discussed, Plaintiff Henderson was not asked to give her opinion on the handout and she did not otherwise comment on the handout. *See* Exh. A, p. 86, l. 11-14.

**RESPONSE: Controverted. Paragraph 103(A) misstates Ms. Henderson's testimony in that she did not testify that SPS's trainers did not discuss the Terminology handout. (*See* Pls.' MSJ Ex. 9 at 6). Rather, Ms. Henderson testified:**

**Q.    Oh, okay.  All right.  And is that on 13.04, or is it something else?**

**A.    It's in the terminology handout.**

**Q.    That you received?**

**A.    Yes.  And they reviewed the terminology during the training.**

**Q.    Was there any – did anybody mention that?**

**A.    No.**

**Q.    So it was just a document that you received and had that as a definition?**

**A.    They mentioned it in the training.  The trainers mentioned that in going over the definitions and the terminology.**

**Q.    Explain what they were saying to you.**

**A.    That we needed to remember that America was founded on violence  and  that  there  were  marginalized  people  that  have**

> **suffered great harm and so that, when we show our pride in
> being an American, that we may – other people may not feel the
> same and we may be harming somebody else. And so it was
> important to remember who was being harmed by our pride in
> America.**

**(Pls.' Opp'n Ex. 26, Henderson Dep. 85:5 to 86:1.)**

B.  During the October 14, 2020 Fall (2020) Equity Training session no one said "anything to the effect that by celebrating nationalism and showing pride in America's history, that you're harming people." *See* Exh. F, p. 40, l. 14-18.

**RESPONSE: Controverted. See Response Paragraph 103(A) which is incorporated here by reference.**

C.  When Plaintiff Henderson met with Dr. Tanya Rapert shortly after the October 14, 2020 Fall (2020) Equity Training session, Plaintiff Henderson did not express any concerns or complaints about alleged comments made at the training by Defendant Garcia-Pusateri or others concerning "marginalized groups," *See* Exh. F, p. 51, l. 18-24; p. 52, l. 17-19.

**RESPONSE: Admitted but immaterial.**

104.  Plaintiff Henderson alleged that during the October 14, 2020 Fall (2020) Equity Training the attendees received an "Indigenous Peoples" statement which began with the following, "As we begin our training, we want to acknowledge and honor the Native and Indigenous people whose land we currently gather on. [SPS] is built on the ancestral territory of the Osage, Delaware, and Kickapoo Nations and Peoples. *See* Exh. A, p. 73, l. 24 to p. 74, l. 9.

**RESPONSE: Admitted.**

A.  Plaintiff Henderson felt the statement "referred to that the land was stolen" and that it "violated her rights" because the statement said that "we affirm or agree . . . that

44

the nation's history is dark and violent, specifically American history" (*see* Exh. A, p. 74, l. 10 to p. 75, l. 1), and "we didn't have the opportunity to not affirm. We were told that we were affirming this statement." *See* Exh. A, p. 76, l. 1-4.

**RESPONSE: Admitted.**

B.      Plaintiff Henderson was not asked if she agreed with the statement and that she "gave no statement one way or another" concerning the statement. *See* Exh. A, p. 76, l. 8-15.

**RESPONSE: Admitted.**

105.    Plaintiff Henderson alleged that during the October 14, 2020 Fall (2020) Equity Training Defendant Garcia-Pusateri stated white people must accept their privilege and own their whiteness in the context of the white supremacy chart and oppression matrix. *See* Exh. A, p. 84, l. 4-9. Henderson was not asked to state or give her opinion about the alleged statements. *See* Exh. A, p. 84, l. 18-21.

**RESPONSE: Paragraph 105 contains multiple facts in contravention of L.R. 56.1(a). Paragraph 105 is controverted insofar as it omits certain parts of Ms. Henderson's testimony regarding when Dr. Garcia-Pusateri's stated that "white people must accept their privilege and own their whiteness." Ms. Henderson testified:**

Q.      **In what context?**

A.      **There were several contexts. There was the white supremacy chart, oppression matrix. There were statements – a statement by Robin DiAngelo.  I believe that's how you say the name.  I'm not – Delgado? I don't know.  There were several points within that presentation.**

Q.      **Did she say it more than once?**

A.      **Yes.**

Q.      **How many times do you think she said it?**

45

**A.	If I had to guess, I would say at least five.**

**(Pls.' Opp'n Ex. 26, Henderson Dep. 84:7 to 84:17.)**

106.	Plaintiff Henderson alleged that during the October 14, 2020 Fall (2020) Equity Training she was to identify where she fell on the oppression matrix. *See* Exh. A, p. 98, l. 3-6. She admits, however, she did not express any opinion on the matrix, she did not share where she would place herself on the matrix, and she did not recall the presenters calling anyone out. *See* Exh. A, p. 102, l. 19-21; p. 103, l. 10-17.

**RESPONSE: Paragraph 106 contains multiple facts in contravention of L.R. 56.1(a). Paragraph 106 is controverted on the basis that it mischaracterizes Ms. Henderson's testimony in that it omits certain of her testimony regarding the Oppression Matrix. Ms. Henderson testified:**

> **Q.	I mean, you were just asked to look at [the Oppression Matrix]?  Isn't it – what were you asked to do?**
>
> **A.	We were asked to identify in which category that we fell in on that oppression matrix and that we can identify with more than one category.  And so we had to identify with it, and then we had to reflect on it, and then we had a conversation in small groups.**
>
> **. . .**
>
> **Q.	Tell me what you discussed in that room.  Let me ask you this.  Were you asked to reveal what your rating was in that room?**
>
> **A.	We were asked to reveal the different categories that we belonged to. It wasn't a rating.**
>
> **Q.	And how would you tell the others what group you were in?**
>
> **A.	Well –**
>
> **Q.	I mean, some of them are obvious.**
>
> **A.	I was going to say some of them are really obvious.**

46

**Q.     Maybe they're not.  I don't know.**

**A.     And how did we feel about being assigned to those, how did we feel about that.  And, you know, it was a reflection on where we fell in recognizing that we had – some people had more privileges than other people just by being born into them.**

**(Pls.' Opp'n Ex. 26, Henderson Dep. 98:15 to 100:12.)**

107.     Plaintiff Henderson alleged that during the October 14, 2020 Fall (2020) Equity Training she was to locate herself on the social identities chart. *See* Exh. A, p. 107, l. 14-25. She admits, however, that she did not fill the chart out, that it was her choice to fill it out or not do so. *See* Exh. A, p. 108, l. 20-22. Plaintiff Henderson was also not asked anything about the chart but others did share where they fell on the chart. *See* Exh. A, p. 109, l. 16-20; p. 110, l. 1-12.

**RESPONSE: Paragraph 107 contains multiple facts in contravention of L.R. 56.1(a). Paragraph 107 is controverted insofar as Ms. Henderson did not testify that she "was . . . not asked anything about the [Social Identities] chart." Ms. Henderson testified:**

**Q.     Do you remember anything that was said during that large group discussion [about the Social Identities chart]?**

**A.     I do. They actually referred us back to the 2019-2020 training that had somewhat similar social identities charts. And I believe it was LA that led this part of the discussion because he was the trainer for 2019-2020. In that we talked about how people's social identities can change over time and that we needed to rate ourselves for where we – look at where we were and look at where we currently are and how our identities are very fluid and they can be shaped.**

. . .

**Q.     They're talking about it and discussing it but don't ask any questions?**

**A.     I believe that they did ask people to share where they fell on the identity chart, yes.**

**(Pls.' Opp'n Ex. 26, Henderson Dep. 109:4 to 110:4.)**

47

108.    Plaintiff Henderson alleged that during the October 14, 2020 Fall (2020) Equity Training four corners exercise was the only time she was required to hold up her agree/disagree signs in response to questions, to which she always "agreed," which included, by way of example:

- I believe my students or staff feel safe at SPS.
- I believe SPS provides an engaging, relevant, collaborative, learning, and working environment.
- I believe all students should be treated equitably.

*See* Exh. A, p. 110, p. 13-25; p. 111, l. 21 to p. 113, l. 7; p. 114, l. 19 to p. 116, l. 1 (for brevity, the remaining questions can be found on the cited deposition pages of Exhibit A).

**RESPONSE: Admitted.**

109.    Plaintiff Henderson claimed she disagreed with the following questions:

- I believe my identities and lived experiences are affirmed and supported by the District.
- I believe our district policies are inclusive and supportive of student identities and lived experiences.
- I feel safe at SPS.
- I believe in the strategic plan.
- I believe my students or staff is represented in the District.
- I feel represented in the District.

*See* Exh A, p. 116, l. 2 to p. 117, l. 7; p. 118, l. 13-14; p. 119, l. 1-2.

**RESPONSE: Admitted.**

110.    According to others in attendance during the October 14, 2020 Fall (2020) Equity Training session, the presenters read through two four corners slides, but did not request that anyone respond to any of the questions on the slides or do any of the four corners activities. *See* Exh. F, p. 43, l. 16 to p. 45, l. 11.

**RESPONSE: Controverted. Paragraph 110 mischaracterizes the evidence when it states, "According to <u>others</u> in attendance . . . ." but cites to the testimony of only one**

48

participant in attendance on October 14, 2020. Paragraph 110 is further controverted by Ms. Henderson's testimony. (Pls.' Opp'n Ex. 26, Henderson Dep. 110:21 to 115:24.)

111.     Attendees at the Fall (2020) Equity Training sessions were not compelled to speak during the training. If an employee was called on during the training and indicated that they did not feel comfortable answering or if they said "I cannot answer," or "I disagree" it was "completely fine" and if they said or indicated they did not want to talk "I'm not going to force them . . . Our hope was that some people would be able to talk about what was talked about in the groups if they felt comfortable to do so." *See* Exh. G, p. 211, l. 22 to p. 212, l. 11; p. 217, l. 15-20.

**RESPONSE: Controverted. First, that attendees at the Equity Training were not compelled to speak is not a statement of fact capable of admission. Whether the facts rise to the level of compulsion is a question of law for the court. *See, e.g.*, *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 425 (6th Cir. 2019) ("No material facts are in dispute here, so this matter turns on a pure question of law: does [the legislation] compel a doctor's speech in violation of the First Amendment?"). This is a legal conclusion on the ultimate issue is not rationally based on the witness's perceptions or helpful to understanding the witness's testimony or a fact in issue. Fed. R. Evid. 701. Second, Dr. Garcia-Pusateri did not testify that "[a]ttendees at the Fall (2020) Equity Training sessions were not compelled to speak during the training" (*see* Defs.' MSJ Ex. G) nor is she competent to testify on questions of law before the court. Third, the cited excerpts of Dr. Garcia-Pusateri's testimony are directly contradicted by the following facts:**

- **The Guiding Principles slide directed trainees to "Speak YOUR Truth and from YOUR Lived Experiences." (Pls.' MSJ Ex. 13 at 7.)**

49

- When the SPS trainers showed staff the Guiding Principles slide, they told staff to "Stay Engaged in the discussion," "stay locked into the conversations," "lean into that discomfort . . . don't try to push it down," "share your personal experiences, and "it is important that during this time we commit to the success of our district and our students, which is why we must commit to these following principles." (Pls.' MSJ Ex. 15 at 6.)

- SPS "directed" staff to have conversations in their small groups after showing the George Floyd video. (Pls.' MSJ Ex. 4, YGP/SPS Dep. 216:17-20.)

- SPS "directed" staff to have conversations in their small groups after showing the Environmental Scan. (Id. 226:20 to 227:1.)

- SPS "directed" staff to have conversations after viewing the systemic racism video. (Id. 254:20-25.)

- SPS "directed" staff to respond to questions about being an anti-racist educator—the anti-racist solo write. (Id. 318:10-17.)

- SPS asked staff to turn in their response to the anti-racist solo write. (Id. 314:2-22 (""You can email them to us' or what have you.").)

- SPS never told staff that silence was an option during the Equity Training. (Id. 151:22-25.)

- Throughout the Equity Training, SPS continuously taught that silence on the part of "white people" was a form of white supremacy. (Id. 157:11-18.)

- SPS responded differently to participants during Equity Training depending on the participant's viewpoint. (Id. 202:8 to 208:2.)

- Several participants in an Equity Training session:

50

"expressed to [the principal] that they felt like if they said anything in the training they would have a 'target on their back' and that it would make for a hostile work environment as the topics were very political. They expressed to [the principal] that it was not a safe space for them to express their feelings/opinions <u>as they were asked and expected to do</u>."

**(Id. dep. ex. 9.)**

112.     During the October 14, 2020 Fall (2020) Equity Training session, Plaintiff Henderson's camera image was upside down, and shortly after the training session, Plaintiff Henderson came to Dr. Rapert's office and:

"wanted to let me know that she didn't know how that happened. And that during the training she was trying to figure out how to flip her image back from being upside down.     She didn't want anyone to think that she wasn't taking the training seriously. I tried to reassure her that no one thought anything with her image being upside down. I offered to reach out to the presenters to let them know she was having some camera difficulties, computer difficulties. [Plaintiff Henderson] followed up with me about a week later to ask me if I had reached out to the presenters. I told her that I did and everything was okay."

*See* Exh. F, p. 24, l. 1 to p. 25, l. 22.

**RESPONSE: Admitted.**

113.     On October 15, 2020, the day after completing the Fall (2020) Equity Training, Plaintiff Henderson sent an email to Defendant Anderson which thanked him for presenting at the October 14, 2020, Fall (2020) Equity Training she attended but made no comments alleging that Defendant District or anyone else had violated her First Amendment Rights during the training. *See* Exh. E, ¶ 2, DEX 51.04.

**RESPONSE: Admitted but immaterial.**

114.     After completing the Fall (2020) Equity Training on October 14, 2020, Plaintiff Henderson did not file an internal grievance pursuant to Board of Education Policy AC – Prohibition Against Illegal Discrimination, Harassment and Retaliation or otherwise complain (verbally or in

writing) to Penney Rector in her capacities of Chief Human Resources Officer or Compliance Officer for the District concerning any aspect of the training she received during the October 14, 2020 Fall (2020) Equity Training. *See* Exh. D, ¶ 33; and Exh. E, ¶ 2, DEX 32.01.

**RESPONSE: Admitted but immaterial.**

115. The Canvas Learning Management System ("Canvas") is a computer location on Defendant District's computer servers where numerous learning modules are loaded by various departments of Defendant District including but not limited to the Department of Special Services and the Department of Equity and Diversity. *See* Affidavit of Robert Douglas attached and hereinafter referred to as Exhibit K, ¶¶ 2-4; and Exh. A, p. 41, l. 3-24.

**RESPONSE: Admitted.**

116. During the Summer of 2020, Superintendent Dr. John Jungmann identified equity and access as a topic for inclusion in Defendant District's return to learning plan since it was consistent with the newly amended Strategic Plan – Focus Area V and its Strategy 5.1.1 which states:

> "Strategy 5.1.1 – Facilitate learning opportunities for staff and leaders that foster exploration of identity and self, and create applications to demonstrate cultural consciousness in their work."

*See* Exh. C, ¶¶ 33, 42; and Exh. G, p. 28, l. 24 to p. 29, l. 9.

**RESPONSE: Admitted. Plaintiffs note, however, that the citation to Dr. Garcia-Pusateri's deposition transcript is not to the correct testimony.**

117. During school year 2020-21, the Department of Equity and Diversity published the following five (5) training modules ("Five Canvas Modules") on its Canvas Learning Management System ("Canvas"):

(a) Overview of Social Emotional Learning from an Equity Lens
(DEX 20.06)

| | |
|---|---|
| (b) | Elementary Social Emotional Learning as it Relates to Covid-19 (DEX 20.06.01) |
| (c) | Elementary Social Emotional Learning as it Relates to Racial Injustice (DEX 20.07.01) |
| (d) | Secondary Social Emotional Learning as it Relates to Covid-19 (DEX 20.08.01) |
| (e) | Secondary Social Emotional Learning as it Relates to Racial Injustice (DEX 20.09.01) |

*See* Exh. C, ¶ 48; and Exh. E, ¶ 2, DEX 20.06, 20.06.01, 20.07.01, 20.08.01, 20.09.01.

**RESPONSE: Admitted that the Department of Equity and Diversity published these five Canvas modules; however, controverted insofar as (as stipulated to by Defendants) SPS published and required certificated staff to take *seven* equity-based computer modules on the Canvas platform, consisting of three Social Emotional Learning modules (two of which had Elementary and Secondary versions) and four Cultural Consciousness modules. (Pls.' MSJ Ex. 1, Stip. ¶¶ 19, 21; Pls.' MSJ Ex. 2, Henderson Decl. ¶ 48; Pls.' MSJ Ex. 11, Henderson Dep. 44:20 to 46:6; Pls.' MSJ Ex. 14, Lawrence Anderson Dep., dep. ex. 8; Pls.' MSJ Ex. 20; Pls.' MSJ Ex. 22, DEX 50F-012919-20, at 12920; Pls.' Opp'n Ex. 26, Henderson Dep. 124:22 to 125:13; Pls.' Opp'n Ex. 27, DEX 50A-002037-39; Pls.' Opp'n Ex. 28, DEX 50B-007711-30.)**

118.    Defendant District's purpose for the five (5) Canvas Training Modules was to further Defendant District's Focus Area 5, Strategy 5.1.1. by "facilitat[ing] learning opportunities for staff and leaders that foster exploration of identity and self and create applications to demonstrate cultural consciousness in their work" in order to:

- Improve engagement, safety, and attendance rates for under-resourced and under-represented student populations.
- Demonstrate annual growth in the core academic success (iReady, MAP, EOC, Common Assessments) for all students, with an intensive focus on closing performance gaps for under-resourced and under-represented students.

- Increase the graduation rate for all student populations, with an intensive focus on under-resourced and under-represented students.

*See* Exh. C, ¶ 49; and Exh. E, ¶ 2, DEX 3.06, 20.06, 20.06.01, 20.07.01, 20.08.01, 20.09.01.

**RESPONSE: Controverted. First, SPS published and required certificated staff to take seven equity-based computer modules as set forth in Response to Paragraph 117, which is incorporated here by reference. Second, Paragraph 118 is controverted insofar as it conflicts with the goals and purpose of the Canvas modules as stated by Dr. Garcia-Pusateri in Pls.' MSJ Ex. 22, DEX 50F-012919-20, at 12920 and Pls.' Opp'n Ex. 27, DEX 50A-002037-39. Third, the Canvas Modules were meant "to keep the momentum [of the fall equity training] going as anti-racist educators" (Pls.' MSJ Ex. 21, DEX 50B-004071), and the goals for the fall equity training were: (1) prioritize equity for its own sake; (2) make students and staff feel safe; and (3) improve academic outcomes. (Pls.' MSJ Ex. 4, YGP/SPS Dep. 55:25 to 56:17; Pls.' MSJ Ex. 23, Lathan/SPS Dep. 24:24 to 25:12.)**

119.    Defendant Garcia-Pusateri defined the Department of Equity and Diversity's goal for the five (5) Canvas Modules was to create more equitable environments for students by providing learning about and understanding of the barriers to education that students and staff may encounter in school and understand how those barriers to learning impact the education of students in Defendant District. *See* Exh. G, p. 42, l. 23 to p. 43, l. 3; p. 43, l. 12-16; p. 44, l. 5-7.

**RESPONSE: Controverted. Paragraph 119 is controverted for the reasons set forth in Response to Paragraph 118, which are incorporated here by reference. Additionally, Paragraph 119 is controverted because the cited testimony of Dr. Garcia-Pusateri refers to the Fall 2020 Equity Training and not the Canvas modules.**

54

120.    The five (5) Canvas Training Modules could only be accessed by certificated employees of Defendant District. *See* Exh. C, ¶ 50; and Exh. K, ¶¶ 3, 5, DEX 20.06, 20.06.01, 20.07.01, 20.08.01, 20.09.01.

**RESPONSE: Admitted that the Canvas modules could only be accessed by certificated staff; however, controverted but immaterial insofar as SPS published and required certificated staff to take seven equity-based computer modules as set forth in Response to Paragraph 117, which is incorporated here by reference.**

121.    Plaintiff Lumley could not access any of the five (5) Canvas Training Modules because she was not a certificated employee. *See* Exh. C, ¶ 51; and Exh. K, ¶ 5, DEX 20.06, 20.06.01, 20.07.01, 20.08.01, 20.09.01.

**RESPONSE: Admitted that Ms. Lumley could not access the Canvas modules; however, controverted but immaterial insofar as SPS published and required certificated staff to take seven equity-based computer modules as set forth in Response to Paragraph 117, which is incorporated here by reference.**

122.    Plaintiff Lumley did not access the "Five Canvas Modules." *See* Exh. B, p. 9, l. 25 to p. 10, l. 19.

**RESPONSE: Admitted that Ms. Lumley did not access the Canvas modules; however, controverted but immaterial insofar as SPS published and required certificated staff to take seven equity-based computer modules as set forth in Response to Paragraph 117, which is incorporated here by reference.**

123.    Plaintiff Henderson did access the "Five Canvas Modules." *See* Exh. A, p. 45, l. 17 to p. 46, l. 6. Plaintiff Henderson did not recall accessing any other Canvas Modules during school

year 2020-21 that were placed on Canvas by the District's Office of Equity and Diversity. *See* Exh. A, p. 46, l. 7-11.

**RESPONSE: Controverted. As stipulated to by Defendants SPS published and required certificated staff, including Ms. Henderson, to take seven equity-based computer modules as set forth in Response to Paragraph 117, which is incorporated here by reference. Ms. Henderson took and completed all modules. (Pls.' MSJ Ex. 1, Stip. ¶¶ 19, 21; Pls.' MSJ Ex. 2, Henderson Decl. ¶ 48; Pls.' MSJ Ex. 11, Henderson Dep. 44:20 to 46:6; Pls.' MSJ Ex. 14, Lawrence Anderson Dep., dep. ex. 8; Pls.' MSJ Ex. 22, DEX 50F-012919-20, at 12920; Pls.' Opp'n Ex. 26, Henderson Dep. 124:22 to 125:13.)**

124.    In December, 2020, Plaintiff Henderson encountered problems completing each of the "Five Canvas Modules" in that she could not access the final page and she sought help from Defendant Anderson. *See* Exh. A, p. 46, l. 15 to p. 47, l. 2.

**RESPONSE: Admitted that Ms. Henderson encountered problems completing the Canvas modules in that she could not access the final page and sought help from Mr. Anderson; however, controverted insofar as SPS published and required certificated staff to take seven equity-based computer modules as set forth in Response to Paragraph 117, which is incorporated here by reference and insofar Ms. Henderson took and completed all modules, as set forth in Response to Paragraph 123, which is also incorporated here by reference.**

125.    After a telephone conversation with Defendant Anderson wherein Plaintiff Henderson discussed the Canvas training sections, Defendant Anderson was able to correct the problem (i.e. Plaintiff Henderson had two Canvas accounts). *See* Exh. A, p. 47, l. 22 to p. 48, l. 13.

**RESPONSE: Admitted.**

56

126.    Plaintiff Henderson had no concerns or issues with reference to her call with Defendant Anderson and he was able to correct the issue and confirm her credit. *See* Exh. A, p. 49, l. 17-25.

**RESPONSE: Controverted on the basis that it mischaracterizes Ms. Henderson's testimony in that Ms. Henderson did not testify that she had no concerns or issues with reference to her call with Defendant Anderson. Rather, Ms. Henderson testified:**

**Q.      What I'm getting at is, the questions you were asked by LA, did you feel that those were questions that were appropriate so that he could get to the bottom of whatever your concerns were?**

**A.      Yes.**

**(Pls.' Opp'n Ex. 26, Henderson Dep. 49:17 to 49:21.)**

127.    On December 4, 2020, Defendant Anderson confirmed by email that Plaintiff Henderson received credit for completing the Five Canvas Modules. *See* Exh. A, p. 123, l. 18 to p. 124, l. 2.

**RESPONSE: Admitted that Mr. Anderson confirmed by e-mail on December 4, 2020 that Ms. Henderson received credit for completing the Canvas Modules; however, controverted but immaterial insofar as SPS published and required certificated staff to take seven equity-based computer modules as set forth in Response to Paragraph 117, which is incorporated here by reference and insofar Ms. Henderson took and completed all modules, as set forth in Response to Paragraph 123, which is also incorporated here by reference.**

128.    On December 4, 2020, Plaintiff Henderson, by return email, thanked Defendant Anderson for his assistance and did not raise any issues or concerns regarding the Canvas training. *See* Exh. A, p. 124, l. 2-4; *also see* Exhibit DEX 51.05 attached to Exhibit A.

**RESPONSE: Admitted.**

57

129.    Each of the Five Canvas Modules utilize pages with guided navigation to progress through the learning options. See Exh. K, ¶ 6.

**RESPONSE: Admitted that the Canvas modules utilize pages with guided navigation to progress through learning options; however, controverted but immaterial insofar as SPS published and required certificated staff to take seven equity-based computer modules as set forth in Response to Paragraph 117, which is incorporated here by reference.**

130.    Each of the Five Canvas Modules contain one (1) "Quick Check" question which has two possible answers as follows:

(a)    The Elementary and Secondary Social and Emotional Learning as it relates to Racial Injustice modules (DEX 20.07.01 and DEX 20.09.01) each contain the following "Quick Check" question:

"When you witness racism and xenophobia in the classroom, how should you respond?
○    Address the situation in private after it has passed.
○    Address the situation the moment you realize it is happening."

(b)    The Elementary and Secondary Social and Emotional Learning as it relates to Covid-19 (DEX 20.05 and DEX 20.08) each contain the following "Quick Check" question:

"Acknowledging and addressing students' social emotional needs in relation to Covid-19 is whose responsibility?
○    All caregivers and stakeholders.
○    Guardians and counselors."

(c)    The Overview of Social Emotional Learning from an Equity Lens (DEX 20.06) The Elementary and Secondary Social and Emotional Learning as it relates to Covid-19 (DEX 20.06) contains the following "Quick Check" question:

"How does the addition of Focus Area V impact how you serve the students and staff of SPS?
○    It provides suggested guidance regarding equity and diversity issues.
○    It cements equity and diversity as a district priority that must be followed by all staff."

58

*See* Exh. K, ¶ 7.

**RESPONSE: Admitted that the Social Emotional Learning modules contained Quick Check questions with two possible answers; however, controverted insofar as SPS published and required certificated staff to take seven equity-based computer modules as set forth in Response to Paragraph 117, which is incorporated here by reference.**

131.    The "Quick Check" questions on these Five (5) Canvas Modules were not designated by the Equity and Diversity Department as a graded assignment or quiz within Canvas. Therefore, the answers to the "Quick Check" questions on the modules that were given by the user are not tracked or recorded by Canvas and cannot be checked or reviewed by anyone because no record of the answers exists. *See* Exh. K, ¶ 8.

**RESPONSE: Controverted but immaterial insofar as SPS published and required certificated staff to take seven equity-based computer modules as set forth in Response to Paragraph 117, which is incorporated here by reference. Paragraph 131 is further controverted on the basis that SPS staff had to correctly answer the Quick Check questions to complete the Social Emotional Learning modules required of them (Pls.' MSJ Ex. 1, Stip. ¶¶ 19, 21, 23) and, in Ms. Henderson's case, Mr. Anderson personally ascertained that Ms. Henderson completed the Canvas modules. (*See supra* ¶ 127.)**

132.    Shortly after Dr. Lathan assumed the position of Superintendent of Defendant District, she reviewed the Equity Training that had taken place during the Fall of 2020 and the Equity Training that was proposed to take place during the Fall of 2021. *See* Deposition of Grenita Lathan attached and hereinafter referred to as Exhibit L, p. 19, l. 3-23.

59

**RESPONSE: Controverted insofar as the cited testimony makes no reference to equity training that was proposed for fall 2021, nor is there evidence that Dr. Lathan reviewed said training.**

133.    Upon review of the Fall (2020) Equity Training program history and materials, Defendant Lathan determined that the purpose of the Equity Training was "for staff members to understand the students that we serve and to create an environment and a culture where all students feel that they belong and for staff members to be able to demonstrate that." *See* Exh. L, p. 25, l. 2-5.

**RESPONSE: Controverted insofar as the cited testimony describes Dr. Lathan's "understanding of the goals of the fall 2020 equity training," and Dr. Lathan did not dispute that SPS's goals for equity training were: (1) prioritize equity for its own sake; (2) make students and staff feel safe; and (3) improve academic outcomes. (Pls.' MSJ Ex. 23, Lathan/SPS Dep. 24:24 to 25:12.)**

134.    The Equity Training that was proposed to take place during the Fall of 2021 was proposed to be mandatory for all employees of Defendant District and would have been delivered virtually or in person. *See* Exh. L, p. 38, l. 1-14.

**RESPONSE: Admitted.**

135.    In August, 2021, Defendant Lathan decided to cancel the Fall (2021) Equity Training (Lathan, depo pp. 43-44), because she felt Defendant District's "staff needed to be more well-versed in presenting and addressing topics of this nature, and so I wanted to make sure that they knew what they were doing before they presented" (*see* Exh. L, p. 43, l. 20 to p. 44, l. 16) and she further stated, "When you provide a training, especially an all-staff training, participants that are leading that training need to be qualified and equipped to provide that training. When I made the decision to not

60

allow the all-staff training to move forward, it was based on my observation and evaluation of the performance of the DEI department." *See* Exh. L, p. 48, l. 2-10.

**RESPONSE: Controverted in that mischaracterizes Dr. Lathan's testimony by only relating her partial reasoning, omitting that she canceled Fall (2021) Equity Training based, in part, on litigation risks. Dr. Lathan testified:**

> **Q.    And you didn't mention litigation?**
>
> **A.    Litigation to the – to – with her department and her leadership and the format that things have been prepared in could lead us to future litigation, if that's –**
>
> **Q.    Okay.  So –**
>
> **A.    – what you're – yeah.**
>
> **Q.    So you did discuss litigation with her, didn't you?**
>
> **A.    Yes.  I said we discussed litigation.  I said that earlier.**
>
> **Q.    You – you discussed litigation with her as a reason why the fall 2021 equity training was not going forward; isn't that right?**
>
> **A.    Litigation in the sense of until their department understood and were trained in how to lead trainings so that we didn't enter into anyone misunderstanding what they were presenting and addressing – trying to address equity issues in our district.**
>
> **Q.    Okay.  So, Dr. Lathan, if Dr. Garcia-Pusateri recollected you bringing up litigation, that is not a false statement, was it?**
>
> **A.    No, it is not.**
>
> **Q.    So you're changing your earlier statement, aren't you?**
>
> **A.    I'm not changing my earlier statement.  I want to make sure that it's clear that there were concerns about previous presentations, and that until – they needed to – we needed to make sure those presentations did not cause us any further issues.**
>
> **Q.    Issues with litigation, correct?**

A. **Litigation or otherwise.**

**(Pls.' MSJ Ex. 23, Lathan/SPS Dep. 50:12 to 51:18.)**

136.    During school year 2021-22, Dr. Rapert did not attend an equity training and such training was not offered by Defendant District. *See* Exh. F, p. 41, l. 12-17.

**RESPONSE: Admitted.**

137.    Lumley admitted that she attended all of the training sessions that Defendant District required her to attend during school year 2020-21 and her pay for school year 2020-21 was not reduced. Plaintiff Lumley stated:

> "Q.    Did you attend all the training sessions you allege defendant district required you to attend during the school year '20-'21?
> A.    Yes, I did.
> Q.    Was your pay reduced during the school year '20-'21?
> A.    No, it was not."

*See* Exh. B, p. 15, l. 8-13.

**RESPONSE: Admitted.**

138.    Plaintiff Lumley admitted that the sole monetary damages she was requesting was an award of nominal damages. Plaintiff Lumley stated the following in her deposition:

> "Q.    (By Mr. Ellis) Page 26 of the Complaint (DOC 1) . . . says that you are asking the Court to enter each plaintiff an award of nominal damages of $1 per day of mandatory equity training . . . Is that the sole monetary damages that you're requesting in this lawsuit?
> A.    (By Plaintiff Lumley) Yes."

*See* Exh B, p. 34, l. 5-10.

**RESPONSE: Controverted insofar as Plaintiffs' Complaint (Doc. 1) sets forth the nature and scope of damages they are seeking in the premises of this action.**

139.    Plaintiff Henderson admitted that the sole monetary damages she was requesting was an award of nominal damages. Plaintiff Henderson stated the following in her deposition:

62

> "Q.    Is it correct that the only monetary damages you're requesting through
> your claims in this complaint are set out in Paragraph E which states
> enter each plaintiff an award for nominal damages of $1 per day of
> mandatory equity training? . . .
> A.    Yes.
> Q.    (By Mr. Ellis) That's all the monetary damages you're requesting?
> A.    Yes."

*See* Exh. A, p. 124, l. 7-17.

**RESPONSE: Controverted insofar as Plaintiffs' Complaint (Doc. 1) sets forth the
nature and scope of damages they are seeking in the premises of this action.**

140.    On October 14, 2020, Plaintiff Henderson attended and completed the two (2) hour
Fall (2020) Equity Training (DEX 13.02) and at a different time, completed the one-hour mental
health training program and the one-hour Alice Active-Shooter training program. As a result,
Plaintiff Henderson received "credit" for taking and completing all three training programs and
received four hours of "Supplemental Pay". *See* Exh. A, p. 43, l. 19 to p. 44, l. 10; and Exh. C, ¶ 39;
and Exh. D, ¶ 26; and Exh. E, ¶ 2, DEX 13.02.

**RESPONSE: Admitted.**

141.    Plaintiff Henderson admitted that she attended all of the training sessions that
Defendant District required her to attend during school year 2020-21, including the online training
modules and her pay was not reduced. Plaintiff Henderson stated:

> "Q.    (By Mr. Ellis) They were mandatory to take those five modules?
> A.    Yes…
> Q.    And you completed them?
> A.    Yes, sir.
> Q.    And you got credit?
> A.    Yes, sir.
> Q.    And you got all the money that you were supposed to get? …
> A.    Yes, my pay was not docked…
> Q.    …you received all the money you were supposed to get?
> A.    Yes, sir."

*See* Exh. A, p. 50, l. 20 to p. 51, l. 8; *also see* Exh. A, p. 51, l. 19-21.

**RESPONSE: Admitted.**

142.     Neither Plaintiff Henderson nor Plaintiff Lumley have received discipline from Defendant District. *See* Exh. C, ¶ 4; and Exh. D, ¶ 28.

**RESPONSE: Admitted but immaterial.**

143.     Plaintiffs did not know of anyone who got kicked out of a training session, was denied credit or was disciplined in some way based on their conduct during the training session. *See* Exh. A, p. 63, l. 6-12; and Exh. B, p. 19, l. 5-13.

**RESPONSE: Admitted but immaterial.**

144.     No employee of Defendant District was terminated from employment because the employee failed or refused to attend the Fall (2020) Equity Training program or failed to complete the training program. *See* Exh. C, ¶ 41; and Exh. D, ¶ 29.

**RESPONSE: Admitted but immaterial.**

64

## ADDITIONAL STATEMENT OF UNCONTROVERTED MATERIAL FACTS

Pursuant to Local Rule 56.1(b)(2), Plaintiffs provide the following Additional Statement of Uncontroverted Material Facts ("SUMF") which preclude summary judgment in favor of Defendants:

145. SPS focused its Equity Training "on current issues that have impacted our society nationally and globally (i.e., Covid-19 and Protests against Systemic Racism towards the Black Community)." (Pls.' MSJ Ex. 9 at 10; Pls.' MSJ Ex. 13 at 8; Pls.' Opp'n Ex. 29, DEX 50C-008301-29 at 8314.)

146. SPS told staff that they were "required to complete training, or they will be docked pay." (Pls.' MSJ Ex. 6, DEX 50C-009935-40, at 9937.)

147. SPS also told staff that the training was "not an invitation to participate in, it is a requirement for staff to participate in which they also are compensated for." (Pls.' MSJ Ex. 4, YGP/SPS Dep. ex. 7, at DEX 50A-000388 (emphasis in original).)

148. SPS provided Ms. Henderson and Ms. Lumley a packet of handouts before their Equity Training sessions. (Pls.' MSJ Ex. 9; Stip. ¶¶ 16-17; *see also* Pls.' MSJ Ex. 10, Hale Dep. 15:4-7, dep. ex. 2.)

149. SPS provided substantially the same handouts to all SPS employees before their respective Equity Training sessions. (Pls.' MSJ Ex. 4, Pls.' MSJ Ex. 4, YGP/SPS Dep. 128:9-11.)

150. The "Greetings!" handout, which was the same statement a school administrator or leader was to read at the start of Equity Training sessions, stated, in part, "It is important that we continue this significant work for our own personal and professional development . . . . [Equity and diversity] is more than a value, but now part of our work and job responsibilities. . . . [W]e all are now accountable in this work as well. Growing a deeper sense of cultural consciousness is something we must commit to, not just for ourselves but for all our students. As with any

65

presentation, I ask that you remain engaged and professional and provide our trainers complete attention and respect." (Pls.' MSJ Ex. 4, YGP/SPS Dep. 101:11-22, dep. ex. 7; Pls.' MSJ Ex. 9 at 10.)

151.    SPS's trainers showed the Equity Training attendees a PowerPoint slide presentation during the Equity Training. (Pls.' MSJ Ex. 1, Stip. ¶¶ 1(g), 9; Pls.' MSJ Ex. 13.)

152.    SPS used substantially the same slide presentation for all Equity Training sessions, including the Equity Training sessions that Ms. Lumley and Ms. Henderson attended. (Pls.' MSJ Ex. 1, Stip. ¶ 9; *see also* Pls.' MSJ Ex. 14, Anderson Dep. 16:2 to 17:8.)

153.    The SPS trainers also used a "Script & Slide Breakdown" ("Script") in connection with the slide presentation, which they largely followed in each Equity Training session. (Pls.' MSJ Ex. 15; Pls.' MSJ Ex. 4, YGP/SPS Dep. 21:11 to 23:13, dep. ex. 3; Pls.' MSJ Ex. 14, Anderson Dep. 20:7 to 21:4, 31:10-14, dep. ex. 1.)

154.    SPS communicated the following "Guiding Principles" in the "Guiding Principles" handout and slide: "Speak YOUR Truth and from YOUR Lived Experiences"; "Acknowledge YOUR privileges"; and "Hold YOURSELF Accountable." (Pls.' Ex. 9 at 8; Pls.' Ex. 13 at 7.)

155.    The Equity Training slide presentation included an "Overview of Training" slide that stated that participants would "[r]eceive tools on how to become Anti-Racist educators, leaders and staff members at SPS," among other statements. (Pls.' MSJ Ex. 13 at 8; Pls. MSJ Ex. 4, Henderson Dep. 57:1-5 ("[W]e had to be an ally and it was part of our job duty to be an antiracist educator.").)

156.    In connection with the Equity Training overview, SPS informed staff that "we are more than likely going to see more issues come to light with a divisive election upon us." (Pls. MSJ Ex. 15 at 7.)

66

157.    During portion of the Equity Training about "Oppression," SPS taught staff that "[s]ociety's institutions, such as government, education, and culture, all contribute or reinforce the oppression of marginalized social groups while elevating dominant social groups." (Pls.' MSJ Ex. 13 at 16.)

158.    The Oppression Matrix handout and slide labeled white people as oppressors and non-white people as oppressed. (Pls. MSJ Ex. 9 at 4; Pls.' MSJ Ex. 13 at 17.)

159.    Through a video, SPS stated that white supremacy needed to be eradicated and claimed that white supremacy had "White House Allies" in the Trump administration. (Pls.' MSJ Ex. 13 at 21; Pls.' MSJ Ex. 1 Stip. ¶ 10(e); Pls.' MSJ Ex. 4, YGP/SPS Dep. 267:18 to 268:9, 269:21-25, dep. ex. 12.)

160.    The Covert/Overt White Supremacy handout and slide indicated that "colorblindness," "All Lives Matter," and "white silence" constituted white supremacy. (Pls. MSJ Ex. 9 at 5; Pls.' MSJ Ex. 13 at 22.)

161.    Through its Equity Training, SPS taught that "systems of oppressions [sic] are woven into the very fabric of the United States and form the foundation of the American culture and its laws." (Pls.' MSJ Ex. 13 at 16; Pls.' MSJ Ex. 15 at 10.)

162.    The Equity Training defined "anti-racism" as "advocating for changes in political, economic, and social life." (Pls.' MSJ Ex. 13 at 31.)

163.    SPS has admitted that the Black Lives Matter slogan and saying colorblindness is white supremacy are overtly political statements. (Pls.' MSJ Ex. 4, YGP/SPS Dep. 331:15 to 332:22, dep. ex. 13; Defs.' Sugg. in Supp. MSJ 51 n.21.)

164.    SPS reminded staff that the Equity Training was made for "personal *and* professional development." (Pls.' MSJ Ex. 4, YGP/SPS Dep. 101:11-22, dep. ex. 7; Pls.' MSJ Ex.

9 at 10.)

165.    The speech SPS paid Ms. Henderson for during the 2020-2021 school year included advocating for individuals with physical or mental disabilities pursuant to Section 504 of the Rehabilitation Act. (Pls.' Opp'n Ex. 26, Henderson Dep. 5:22 to 9:3; Defs.' MSJ Ex. E at 18-20.)

166.    The speech SPS paid Ms. Lumley for at the time of the 2020-2021 school year included secretarial work that involved managing and producing student records. (Defs.' MSJ Ex. E at 15-17.)

167.    SPS warned staff that colorblindness is harmful and believes that students should be treated differently based on race. (Pls.' MSJ Ex. 4, YGP/SPS Dep. 64:13 to 68:6; Pls. MSJ Ex. 13 at 22.)

168.    According to SPS, colorblindness is not an equitable concept and equality "takes in colorblindness." (Pls.' MSJ Ex. 4, YGP/SPS Dep. 66:16 to 67:6, 68:7-9, 70:19 to 71:16, 96:4-7.)

169.    SPS defined white supremacy as "the all-encompassing centrality and assumed superiority of people defined and perceived as white." (Pls.' MSJ Ex. 13 at 20; Pls.' MSJ Ex. 4, YGP/SPS Dep. 202:2-4.)

170.    SPS's Chief Equity and Diversity Officer does not know a single staff member that she would characterize as a white supremacist. (Pls.' MSJ Ex. 4, YGP/SPS Dep. 260:1-3.)

171.    SPS admitted that it did not consider any studies or scholarship when building the Equity Training and Canvas modules. (Pls.' MSJ Ex. 4, YGP/SPS Dep. 57:22 to 58:3, 60:5-22.)

172.    Although it collected data that showed "gaps" in student experiences, SPS did not conduct any studies about how equity programming could and would address those gaps. (Id.)

173.    SPS did not consider any alternatives to the equity programming that could address its goals. (Id. 60:23 to 62:5.)

68

174. SPS found no evidence that the equity programming achieved any of its stated goals, such as increasing student achievement or making students feel more safe, secure, and supported. (Pls.' MSJ Ex. 23, Lathan/SPS Dep. 66:16 to 67:5, 68:8-13, 69:18 to 70:7, 75:3 to 77:24.)

175. SPS admitted that it achieved those goals in 2021 without mandatory equity programming. (Id. 66:16 to 67:5, 78:5-18.)

176. SPS admitted that it did not conduct equity training during the 2021-2022 school year due, in part, to litigation. (Id. 50:12 to 51:18; Pls.' Opp'n Ex. 30, DEX 50G-014815.)

177. SPS admitted that the "district will resume equity training at some point." (Id. 53:5-11.)

**ARGUMENT**

**I.    Plaintiffs have standing to challenge SPS's equity programming.**

Article III standing requires a plaintiff to maintain a personal interest in the matter "[a]t all stages of litigation[.]" *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 796 (2021). "The doctrine of standing generally assesses whether that interest exists at the outset, while the doctrine of mootness considers whether it exists throughout the proceedings." *Id*. Standing requires showing an injury that is fairly traceable to the government action and a remedy that can redress the injury. *Id*.

Under the First Amendment, an injury exists when the government, through an action or regulation, impermissibly burdens speech. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011).[3] As Plaintiffs explain in their opening brief, SPS burdened Ms. Henderson's and Ms. Lumley's speech when, through its equity programming, it presented them with three choices: (1) say what SPS wanted to hear by affirming anti-racism and equity; (2) refrain from speaking and risk being labeled white supremacists; or (3) speak out and risk losing professional development credit and pay. This dilemma is an injury in itself. *See Cressman v. Thompson*, 719 F.3d 1139, 1145 (10th Cir. 2013) (*Cressman I*) (holding injury existed where the government presented a speaker with three choices: display the government message, pay to avoid displaying the message, or refuse to speak and face the consequences); *Meriwether v. Hartop*, 992 F.3d 492, 517 (6th Cir. 2021)

---

[3] To be clear, Plaintiffs support all anti-discrimination efforts that treat individuals equally without regard to skin color, as required by the Civil Rights Act of 1964 and the Equal Protection Clause. But as explained more fully below, SPS goes beyond regulating the conduct of its staff by directing them to affirm its views on current events in the name of so-called anti-racism. In this way, it unconstitutionally targets speech. *See Hurley v. Irish-Am. Gay, Lesbian, and Bisexual Grp. of Boston, Inc.*, 515 U.S. 557, 579 (1995) ("While the law is free to promote all sorts of conduct in place of harmful behavior, it is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government.").

70

(finding coercion where a university presented a professor with a "Hobson's Choice" of affirming a student's preferred pronouns contrary to his sincerely held beliefs or face punishment).

When compulsion is involved, "additional damage is done." *Janus v. AFSCME, Council 31*, 138 S. Ct. 2448, 2464 (2018). Courts find compulsion when the government imposes an "indirect discouragement" that forces a speaker to choose between saying the government's message or self-censoring. *See Cressman v. Thompson*, 798 F.3d 938, 948 (10th Cir. 2015) (*Cressman II*) (holding that challenger did not need to actually possess the government license plate he was challenging); *see also Axson-Flynn v. Johnson*, 356 F.3d 1277, 1290 (10th Cir. 2004) (holding that compulsion was present when a student had to choose between reading a script or leaving a university acting program); *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 189 (3d Cir. 2005) (concluding compulsion would exist if a school imposed "some type of disincentive or penalty" for failure to complete a mandatory survey).

Not only did SPS compel Plaintiffs' speech, but it also chilled their expression when it warned them that white silence is white supremacy, demanded that staff stay engaged and be professional, and corrected them on the one occasion they each tried to express themselves. (Pls.' Sugg. in Supp. MSJ (Doc. 77) 39-40.) This Court has held that such a chilling effect is an injury in fact. *Hershey v. Curators of the Univ. of Mo.*, No. 2:20-CV-04239-MDH, 2022 U.S. Dist. LEXIS 68121, at *10-11 (W.D. Mo. Apr. 13, 2022). It is irrelevant whether Ms. Henderson and Ms. Lumley actually suffered a penalty for attending the training.[4] A speaker need not suffer any

---

[4] SPS tries to characterize the pay tied to the equity programming as "supplemental." But that is incorrect. SPS told staff that they were "required to complete training, or they will be docked pay," (SUMF ¶ 146) and that the training was "not an invitation to participate in, it is a requirement for staff to participate in which they also are compensated for." (SUMF ¶ 147.) Even if the pay were supplemental, it would not matter for purposes of establishing injury here. It is well settled that the government need not actually deny a benefit for a constitutional violation to arise; a mere threat to withhold one is enough. *See Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 606 (2013)

71

consequences for a constitutional violation to arise. *Steffel v. Thompson*, 415 U.S. 452, 459 (1974) (holding speaker had standing to challenge a law that deterred him from speaking even though he was not punished under the law). A chilling effect exists even when an implicit threat causes a fear of harm. *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 765 (6th Cir. 2019) (holding that even though meetings with bias response team were voluntary, students feared that "failure to meet could result in far-reaching consequences, including reputational harm or administrative action"). Putting pay and professional development credit aside, simply calling equity programming mandatory—as SPS did—would lead staff to wonder what would happen if they did not attend. The mere appearance of authority is enough to chill speech and confer standing. *Id*. at 764 (collecting cases). For this reason, it is also irrelevant that SPS did not punish staff members who did not participate in equity programming. Ms. Henderson and Ms. Lumley did not and could not have known whether their colleagues suffered a loss of pay or professional development credit at the time of the training. SPS gave every appearance that if staff did not participate in the equity programming, there would be a consequence. In these ways, Plaintiffs suffered an injury in fact.

## II.    SPS violated Plaintiffs' freedom of speech.

Although SPS never identifies a standard to apply to Plaintiffs' First Amendment claims, it appears to suggest that this Court should apply a balancing test to determine whether its interests as an employer outweighed their interests in speaking. (Defs.' Sugg. in Supp. MSJ 49 n.9.) But such a balancing test applies only when an employee speaks out on the job and causes a disruption;

---

("[R]egardless of whether the government ultimately succeeds in pressuring someone into forfeiting a constitutional right, the unconstitutional conditions doctrine forbids burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them."). And the fact that Ms. Henderson and Ms. Lumley complied with SPS's command to participate in the equity programming only underscores its compulsory nature. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 68 (1963) (finding speaker's compliance with a government order involuntary because "[p]eople do not lightly disregard public officers' thinly veiled threats").

it does not apply when an employee does not wish to speak. *See Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 572-73 (1968) (holding that an employee's interest "in commenting upon matters of public concern" must be weighed against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees" and concluding that a teacher's speech criticizing a school board tax proposal was protected because it did not impede the "proper performance of his daily duties"); *Garcetti v Ceballos*, 547 U.S. 410, 413-14, 420-22 (2006) (holding that an employer could punish an employee for distributing a memorandum that caused a disruption because the employee spoke "pursuant to [his] official duties" when he challenged the validity of a search warrant); *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2415 (2022) (holding that when an employee speaks "as a citizen addressing a matter of public concern," a court must conduct "a delicate balancing of the competing interests surrounding the speech and its consequences," and concluding that a football coach's religious speech was protected when he prayed by himself after football games because the school district did not pay him to pray but to instruct players, discuss strategy, and assess athletic performance). In each of these cases, the employee *wanted* to engage in speech *and did so*. The question before the Supreme Court was whether the government, as employer, could remedy the effects of that speech by disciplining the employee. *See Guffey v. Duff*, 459 F. Supp. 3d 227, 240 (D.D.C. 2020) ("The *Pickering* test developed in cases where a public employer sanctioned an individual employee for past expression.").

The Supreme Court has never applied the *Pickering* framework when employees want to remain silent. *See Janus*, 138 S. Ct. at 2473. In *Janus*, a member of a public-sector union claimed that the union compelled his speech as a public employee when it required him to pay a fee for collective bargaining and other policy matters. *Id.* at 2460-61. Considering the challenger's status

as a public employee, the Supreme Court held that "the *Pickering* framework fits much less well where the government compels speech or speech subsidies in support of third parties," unlike instances where the government seeks to remedy past, disruptive speech. *Id*. at 2473. "When a public employer does not simply restrict potentially disruptive speech but commands that its employees mouth a message on its own behalf, the calculus is very different." *Id*. Noting that it has "never applied *Pickering* in such a case," the Court held that "it is not easy to imagine a situation in which a public employer has a legitimate need to demand that its employees recite words with which they disagree." *Id*.

Like the employee in *Janus*, Ms. Henderson and Ms. Lumley do not want to recite words with which they disagree. And as the Supreme Court held in *Wooley v. Maynard*, there can never be a government interest that outweighs an individual's right to remain silent. 430 U.S. 705, 717 (1977). Indeed, in *Janus* the Supreme Court suggested only one narrow exception when compulsion *might* be legitimate: "if the speech in question is part of an employee's official duties, the employer may insist that the employee deliver any lawful message."[5] 138 S. Ct. at 2473. Here, however, SPS's equity programming was not part of Ms. Henderson's and Ms. Lumley's official duties, nor was the message lawful.

---

[5] At first glance, the second part of this rule seems to *lower* the standard for compelled employee speech by holding that if a message is lawful, a court should allow it. That opens the door for the government to compel an employee to affirm any number of lawful messages, from "cats are superior to dogs" to "vaccines cause autism." Knowing this, the Court made the official job duties test the key inquiry to an employee's compelled speech claim, which must be interpreted narrowly. *See Garcetti*, 547 U.S. at 424 (holding that employers cannot create "excessively broad job descriptions" to sweep all employee speech within their control). Under this test, the government can only require employees to convey a message on the subject for which they are employed. *See Kennedy*, 142 S. Ct. at 2424 (holding that coach's religious speech was protected because the district paid him to call plays and instruct players, and prayer fell outside the scope of his duties); *see also Nagel v. City of Jamestown*, 952 F.3d 923, 929-30 (8th Cir. 2020) (holding that a public employee was speaking within the scope of his duties when he acted as spokesperson for police).

### A. SPS's messages about equity and anti-racism during the 2020-2021 school year were not ordinarily within the scope of Plaintiffs' official job duties.

"If a public employee speaks 'pursuant to [his or her] official duties,' [the Supreme Court] has said the Free Speech Clause generally will not shield the individual from an employer's control and discipline because that kind of speech is—for constitutional purposes at least—the government's own speech." *Kennedy*, 142 S. Ct. at 2423. But the Supreme Court has also warned that the government cannot create "excessively broad job descriptions" to sweep all employee speech under its control. *Garcetti*, 547 U.S. at 424. Whether speech falls within an official job duty should be a "practical" inquiry. *Id*. It is not enough for speech to "touch[] on matters related to public employment[.]" *Kennedy*, 142 S. Ct. at 2424. Instead, the speech must itself be "ordinarily within the scope of an employee's duties." *Id*. (quoting *Lane v. Franks*, 573 U.S. 228, 240 (2014)). If a court finds that an employee "speaks as a citizen addressing a matter of public concern," the speech is not within her official job duties. *See id*. at 2423 (quoting *Garcetti*, 547 U.S. at 423).

"When speech relates 'to any matter of political, social, or other concern to the community,' it addresses a matter of public concern." *Meriwether*, 992 F.3d at 508 (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983)); *accord Altman v. Minn. Dep't of Corr.*, 251 F.3d 1199, 1202 (8th Cir. 2001) (finding mandatory training on sexual orientation was a matter of public concern because even though it involved internal policies, it would affect how staff carried out their public duties). In addition to political matters, the Supreme Court has held that discussions about race and racial discrimination are "inherently a matter of public concern[.]" *Connick*, 461 U.S. at 148 n.8; *accord Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 415 (1979) (holding teacher had First Amendment right to challenge racial discrimination in school policies).

The messages SPS conveyed during the 2020-2021 equity programming were matters of public concern. SPS focused its Equity Training "on current issues that have impacted our society

nationally and globally (i.e., Covid-19 and Protests against Systemic Racism towards the Black Community)." (SUMF ¶ 145.) It made no secret that it expected staff to "advocat[e] for changes in *political*, *economic*, and *social* life" as anti-racists. (Id. ¶ 162 (emphasis added).) It informed staff that "we are more than likely going to see more issues come to light with a divisive election upon us." (Id. ¶ 156.) Through a video, it claimed that white supremacy had "White House Allies" in the Trump administration. (Id. ¶ 159.) Through its Canvas modules, it directed staff to support "systemic changes" and examine their white privilege. (Pls.' Sugg. in Supp. MSJ 33.) And most tellingly, SPS has admitted that the Black Lives Matter slogan and saying colorblindness is white supremacy are overtly political statements. (Id. ¶ 163.) SPS's politically charged statements on topics involving race and current events are inherently matters of public concern.

SPS forced Ms. Henderson and Ms. Lumley to speak as private citizens on these matters. SPS often reminded staff that the Equity Training was made for "personal *and* professional development." (Id. ¶ 150.) As part of staff's personal and professional development, SPS directed staff to become anti-racists by advocating for political change. (Id. ¶ 162.) Considering that political advocacy on school grounds violates state law, the most logical conclusion staff could draw here was that SPS intended staff to advocate for those changes on their own time. SPS also told staff that they "must commit to" its views on equity and anti-racism, not only for their students but "for ourselves." (Id. ¶ 150.) And the training itself was built around individual, personal experiences. SPS instructed staff to "Speak YOUR Truth and from YOUR Lived Experiences"; "Acknowledge YOUR privileges"; and "Hold YOURSELF Accountable." (Id. ¶ 154.)

Unlike in *Altman*, where the government specifically informed staff ahead of a mandatory sexual orientation training that "the training is *not* 'designed to tell you what your personal attitudes or beliefs should be,'" SPS made no such statement to staff prior to its equity

programming. 251 F.3d at 1201-02 (emphasis added) ("By making attendance at the training session mandatory, [the employer] created a context in which employees speaking out in opposition to their public employer's handling of this social issue should be considered speech on a matter of public interest and concern.") Thus, when Ms. Henderson and Ms. Lumley attended the Equity Training and heard that they could no longer support colorblindness or believe that all lives matter without being considered white supremacists, they understood that SPS required a commitment to those views in all areas of their lives. Although SPS may not have intended for staff to personally adopt its views, it never communicated that intention to staff.

Even if these commands were somehow related to Ms. Henderson's role as 504 process coordinator or Ms. Lumley's role as secretary, that is not enough. Speech in the workplace must do more than "touch[] on matters related to public employment . . . to render it government speech." *Kennedy*, 142 S. Ct. at 2424. SPS must show that Ms. Henderson and Ms. Lumley were hired to engage in speech on race and political matters. *See id.* (holding football coach was not engaged in official job duties when he prayed because the district paid him to produce certain speech as a coach, such as "instructing players, discussing strategy, [and] encouraging better on-field performance"); *Nagel*, 952 F.3d at 929-30 (8th Cir. 2020) (holding that a city could punish a police officer for disruptive speech during a public interview because he acted as spokesperson for the police). The speech SPS paid Ms. Henderson for during the 2020-2021 school year included advocating for individuals with physical or mental disabilities pursuant to Section 504 of the Rehabilitation Act. (SUMF ¶ 165.) The speech SPS paid Ms. Lumley for at the time of the 2020-2021 school year included secretarial work that involved managing and producing student

records.[6] (Id. ¶ 166.) SPS did not pay either Plaintiff to speak on matters involving race, anti-racism, oppression, or white supremacy, or other current events covered in its equity programming.

**B. SPS's messages on equity and anti-racism were unlawful.**

It is not within the scope of Ms. Henderson's or Ms. Lumley's official job duties to convey that colorblindness is harmful, that systems of oppression "are woven into the very foundation of American culture, society, and law," and that saying all lives matter is a form of white supremacy. (Id. ¶ 161.) But even if it were, these messages are unlawful. Anti-discrimination and equality are the law. Anti-racism and equity are not.

The Equal Protection Clause prevents the government from treating individuals differently based on the color of their skin. SPS is correct that it has an obligation to treat staff and students equally regardless of race. (*See* Defs.' Sugg. in Supp. MSJ 49.) Ms. Henderson and Ms. Lumley wholeheartedly support anti-discrimination on school grounds. But anti-discrimination is different from anti-racism, as SPS defines it.

First, discrimination refers to conduct, not speech. Title VI of the Civil Rights Act makes it illegal for public schools, like SPS, to treat individuals differently based on skin color. *See* 42 U.S.C. § 2000d *et seq.* Under federal law, employers have an obligation to maintain anti-discrimination policies and prevent staff from engaging in discriminatory conduct. SPS goes beyond regulating the conduct of its employees by directing staff to affirm its views on current events, equity, and anti-racism. Such a regulation targets pure speech.

---

[6] SPS argues that it promoted Ms. Lumley, as if to absolve itself from infringing on her freedom of speech. (Defs.' Sugg. in Supp. MSJ 41.) But Ms. Lumley's claim is for compulsion, not retaliation. That SPS has not retaliated against her fails to remedy the effects of the past harm or future harm she may suffer if the equity programming continues.

Second, the very views SPS holds about equity and anti-racism conflict with anti-discrimination principles. Not only did SPS warn staff that colorblindness is harmful despite its settled roots in the Equal Protection Clause, but it also believes that students *should* be treated differently based on race. (SUMF ¶ 167.) It admitted that equality—as enshrined in our Constitution and Title VI—is different from equity, and that equality "takes in colorblindness." (SUMF ¶ 168.) During the training, it used the Oppression Matrix to label white people as oppressors and non-white people as oppressed. (SUMF ¶ 158.) It defined white supremacy as "the all-encompassing centrality and assumed superiority of people defined and perceived as white." (Id. ¶ 169.) And finally, SPS told staff that choosing silence—a sacred First Amendment right—or believing that all lives matter equally—a sacred Fourteenth Amendment principle—were forms of white supremacy that needed to be "eradicate[d]." (Id. ¶¶ 159-160.)

But the law is settled: "Our Constitution is color-blind, and it neither knows nor tolerates classes among citizens." *Plessy v. Ferguson*, 163 U.S. 537, 559 (1896) (Harlan, J., dissenting). This principle is rooted in the Declaration of Independence, which "states the American creed: 'We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness.'" *Bell v. Maryland*, 378 U.S. 226, 286 (1964) (Goldberg, J., concurring). Colorblindness "was the rallying cry for the lawyers who litigated [*Brown v. Board of Education*]," and it has been the law since. *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 772 (2007) (Thomas, J., concurring).

"In light of this American commitment to equality and the history of that commitment, [the Thirteenth, Fourteenth, and Fifteenth] Amendments must be read not as 'legislative codes which are subject to continuous revision with the changing course of events, but as the revelation of the

79

great purposes which were intended to be achieved by the Constitution as a continuing instrument of government.'" *Bell*, 378 U.S. at 287 (quoting *United States v. Classic*, 313 U.S. 299, 316 (1941)). Try as it might, SPS cannot revise our Constitution by compelling its employees to affirm that the Declaration of Independence, Fourteenth Amendment, and civil rights laws "all contribute or reinforce the oppression of marginalized social groups while elevating dominant social groups." SUMF ¶ 157.) "Indeed, if our history has taught us anything, it has taught us to beware of elites bearing racial theories." *Parents Involved*, 551 U.S. at 780-81.

Not only did its equity programming fail to advance anti-discrimination efforts under the Civil Rights Act, but it undermined the law when it required staff to become active anti-racists who oppose colorblindness and all things associated with "whiteness." Although SPS may compel the Office of Equity and Diversity to convey its position on race and current events, *see Nagel*, 952 F.3d at 929-30, it did not hire Ms. Henderson or Ms. Lumley to convey those messages.[7]

### C. SPS cannot meet its high burden under the First Amendment.

As Plaintiffs explain in their opening brief, the government's interest in disseminating an ideology "*cannot outweigh* an individual's First Amendment right to avoid becoming the courier for such message," no matter how "enlightened" the ideology may seem. *Wooley*, 430 U.S. at 717; *accord Hurley*, 515 U.S. at 579. Because SPS compelled Plaintiffs' speech, and because SPS favored some views over others, the inquiry ends there. (*See* Pls.' Sugg. in Supp. MSJ 26, 32.) But even if this Court were to apply strict scrutiny to the equity programming, SPS cannot meet its

---

[7] For these reasons, presenting staff with the impossible choice of affirming equity and anti-racism or facing the consequences creates an unconstitutional condition on their employment. *See Cole v. Richardson*, 405 U.S. 676, 680 (1972) ("We have made clear that neither federal nor state government may condition employment on taking oaths that impinge on rights guaranteed by the First and Fourteenth Amendments respectively, as for example those relating to political beliefs."); *see also Meriwether*, 992 F.3d at 517 ("The effect of this Hobson's Choice is that Meriwether must adhere to the university's orthodoxy (or face punishment). This is coercion, at the very least of the indirect sort.").

high burden of showing that its speech was narrowly tailored to achieve a compelling interest. *See Boos v. Barry*, 485 U.S. 312, 324 (1988) (holding content-based sign ordinance was not narrowly tailored to serve a compelling interest).

First, SPS must prove that its equity programming serves a compelling interest. "Only the gravest abuses, endangering paramount interests, give occasion for permissible limitation" under this standard. *Thomas v. Collins*, 323 U.S. 516, 530 (1945). SPS has no compelling interest in commanding staff to forgo colorblindness and equality in favor of anti-racism and equity. SPS has not shown that staff engaged in *any* abuses that would justify restricting or compelling their speech—much less any grave abuses. (SUMF ¶¶ 21 (indicating "disturbing events" led to equity programming without elaborating), 170 (admitting not a single staff member at SPS is a white supremacist).) And SPS cannot make this showing when its message contradicts the Equal Protection Clause and our nation's civil rights laws. Ms. Henderson and Ms. Lumley simply want to support equality while remaining silent on matters like anti-racism and oppression. SPS lacks a compelling reason to show why it has not and will not tolerate their views.

Even if SPS can establish that it had a compelling interest in forcing staff to commit to anti-racism at the expense of colorblindness, it must prove that its equity programming was narrowly tailored, meaning it was "the least restrictive means among available, effective alternatives" to achieve that goal. *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004). SPS admitted that it did not consider any studies or scholarship when building the Equity Training and Canvas modules. (SUMF ¶ 171.) Although it collected data that showed "gaps" in student experiences, SPS did not conduct any studies about how equity programming could and would address those gaps. (SUMF ¶ 172.) And while SPS claimed that equity programming was necessary to remedy racist incidents that occurred in the past, it never identified what those incidents were, who

perpetrated them, or how equity programming would prevent such incidents in the future. Moreover, SPS did not consider any alternatives to the equity programming that could address its goals. (SUMF ¶ 173.) And finally, SPS found no evidence that the equity programming achieved *any* of its stated goals, such as increasing student achievement or making students feel more safe, secure, and supported. (SUMF ¶ 174.) In fact, SPS admitted that it achieved those goals in 2021 *without* mandatory equity programming. (SUMF ¶ 175.)

As the Supreme Court has held many times, the government can *never* justify approving one view and compelling its employees to share it. *Wooley*, 430 U.S. at 717; *Janus*, 138 S. Ct. at 2464; *Hurley*, 515 U.S. at 579. But at the very least, SPS must satisfy strict scrutiny. Its equity programming fails to further "interests of the highest order," nor is it "narrowly tailored in pursuit of those interests." *Carson v. Makin*, 142 S. Ct. 1987, 1997 (2022).

**III.    Plaintiffs are entitled to equitable relief, nominal damages, and attorney's fees.**

**A.  Plaintiffs are entitled to equitable relief.**

When a plaintiff seeks injunctive relief, a court will examine: "(1) the threat of irreparable harm to the moving party; (2) the balance of harms with any injury an injunction might inflict on other parties; and (3) the public interest."[8] *Miller v. Thurston*, 967 F.3d 727, 735-36 (8th Cir. 2020). First, SPS admitted that it did not conduct equity training during the 2021-2022 school year due, in part, to this lawsuit. (SUMF ¶ 176.) "It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of Mesquite v. Aladdin's Castle*, 455 U.S. 283, 289 (1982); *accord Knox v. SEIU, Loc. 1000*, 567 U.S. 298, 307-08 (2012) (finding live controversy where union offered a

---

[8] Plaintiffs' likelihood of success on the merits is irrelevant to a request for a permanent injunction and cannot provide a basis for dismissal. *Compare Miller*, 967 F.3d at 735-36 (permanent injunction) *with Barrett v. Claycomb*, 705 F.3d 315, 320 (8th Cir. 2013) (preliminary injunction).

refund on agency dues used for political advocacy following a First Amendment challenge). And under Supreme Court precedent, the defendant "bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000). But SPS has already admitted that it "will resume equity training at some point[.]" (SUMF ¶ 177.)

Thus, unless SPS can prove that equity programming in the district will never recur, this case is not moot. Ms. Henderson and Ms. Lumley will continue to face an impossible choice: affirm SPS's views; speak up and risk losing pay or credit; or remain silent and risk being labeled white supremacists. As the Supreme Court held in *Wooley*, the government's interest in forcing them to speak "cannot outweigh" their interest in remaining silent. 430 U.S. at 717. Thus, the equitable scales tip strongly in their favor. Moreover, injunctive relief would not harm other parties. Instead, it would require the government to treat its employees' views on matters of public concern neutrally and to refrain from compelling employees to adopt beliefs with which they disagree. Finally, SPS does not explain how equity programming serves a public interest. To the contrary, declaring that anti-racism is the law and demanding that staff be active anti-racists departs from settled precedent in our country. Forcing staff to become political advocates for a message so contrary to our nation's founding principles cannot serve a public interest.

### B. Plaintiffs are entitled to nominal damages.

Ms. Henderson and Ms. Lumley are entitled to nominal damages. For the reasons stated above, it does not matter whether SPS actually paid them. But pay is particularly irrelevant when it comes to nominal damages. Nominal damages provide relief where compensation is inadequate. "Nominal damages are not a consolation prize for the plaintiff who pleads, but fails to prove, compensatory damages. They are instead the damages awarded *by default* until the plaintiff establishes entitlement to some other form of damages, such as compensatory or statutory

83

damage." *Uzuegbunam*, 141 S. Ct. at 800-02 (emphasis added) (holding that even though a university changed its policy after a First Amendment challenge, the case was not moot). "Nominal damages reflect that the harm is non-quantifiable, not non-existent." *Hilsenrath v. Sch. Dist. of the Chathams*, 500 F. Supp. 3d 272, 287 (D.N.J. 2020).

Moreover, "a request for nominal damages satisfies the redressability element of standing where a plaintiff's claim is based on a completed violation of a legal right." *Uzuegbunam*, 141 S. Ct. at 802; *accord Felts v. Reed*, No. 4:20-cv-00821 JAR, 2022 U.S. Dist. LEXIS 112048, at *4 (E.D. Mo. June 24, 2022) (finding nominal damages available for free speech claim against former government official). In this way, nominal damages are backward-looking. They are intended to remedy past violations that may or may not recur. Even if SPS can meet its formidable burden of showing that equity programming will never recur, Ms. Henderson and Ms. Lumley are still entitled to nominal damages for the harm they incurred from the 2020-2021 equity programming.

### C. Only Plaintiffs are entitled to attorney's fees.

SPS concludes with the assertion that it is owed attorney's fees. But Section 1988, which allows for the recovery of attorney's fees for claims brought under Section 1983, is meant for prevailing plaintiffs. "[A] defendant may recover the reasonable attorney's fees he expended solely because of . . . frivolous allegations. And that is all." *Fox v. Vice*, 563 U.S. 826, 840-41 (2011). A claim is frivolous when "it lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). SPS has not so much as alleged that Ms. Henderson and Ms. Lumley brought their First Amendment claims with no basis in law or fact. For these reasons, Plaintiffs are entitled to equitable relief, nominal damages, and attorney's fees.

### CONCLUSION

This Court should deny Defendants' Motion for Summary Judgment and grant Plaintiffs' Motion for Summary Judgment.

August 12, 2022

/s/ B. H. Boucek
KIMBERLY S. HERMANN*
GA Bar No. 646473
BRADEN H. BOUCEK*
TN BPR No. 021399
GA Bar No. 396831
CELIA H. O'LEARY*
GA Bar No. 747472
JEFFREY A. CLAYMAN*
LA Bar No. 30442
FL Bar No. 52017
Southeastern Legal Foundation
560 W. Crossville Road, Suite 104
Roswell, GA  30075
Telephone: (770) 977-2131
khermann@southeasternlegal.org
bboucek@southeasternlegal.org
coleary@southeasternlegal.org
jclayman@southeasternlegal.org

*Admitted Pro Hac Vice

Derek H. MacKay MO #59078
Knight Nicastro MacKay, LLC
304 W. 10th Street
Kansas City, MO 64105
Phone: (816) 708-0105
mackay@knightnicastro.com

85

**CERTIFICATE OF SERVICE**

I hereby certify that on August 12, 2022, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. Mail and/or facsimile. Parties may access the filing through the Court's electronic filing system.

    August 12, 2022                   /s/ B. H. Boucek