**Page 1**

UNITED STATES DISTRICT COURT
OF THE WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

BROOKE HENDERSON and
JENNIFER LUMLEY,

    Plaintiffs,

            CASE NUMBER:
vs.      6:21-CV-03219

SCHOOL DISTRICT OF
SPRINGFIELD, R-12; BOARD OF
EDUCATION FOR THE SCHOOL
DISTRICT OF SPRINGFIELD,
R-12; DR. GRENITA LATHAN;
MARTHA DOENNING;
YVANIA GARCIA-PUSATERI; and
LAWRENCE ANDERSON,

    Defendants.

DEPOSITION OF MS. MARIAN BROOKE HENDERSON,
produced, sworn, and examined on Wednesday,
May 18, 2022, at 9:00 a.m. of that day, at
Ellis, Ellis, Hammons & Johnson, 2808 South Ingram
Mill Road, Suite A104, Springfield, Missouri, before
me, DEBBI BAILEY, CCR, in the above-captioned cause;
taken on behalf of the Defendants.

ALPHA REPORTING & VIDEO
1911 South National, Suite 405
Springfield, Missouri 65804
(417) 887-4110

**Page 2**

APPEARANCES

For      MR. BRADEN BOUCEK and
Plaintiffs:   MR. JEFF CLAYMAN (By Zoom)
        SOUTHEASTERN LEGAL FOUNDATION
        560 West Crossville Road
        Suite 104
        Roswell, Georgia 30075
        (615) 478-4695

For      MR. RANSOM ELLIS, III
Defendants:  and *MR. RYAN OLSON
        ELLIS, ELLIS, HAMMONS & JOHNSON
        2808 South Ingram Mill Road
        Suite A104
        Springfield, Missouri 65804
        (417) 866-5091

Also present:  Ms. Jennifer Lumley

INDEX

Testimony of:
MS. MARIAN BROOKE HENDERSON      PAGE

Examination By Mr. Ellis:      3
Examination By Mr. Boucek:   124

REPORTER'S CERTIFICATE: 127

* Not continuously present.

**Page 3**

1    Whereupon,
2        MS. MARIAN BROOKE HENDERSON,
3    being produced, sworn, and examined, testified as
4    follows:
5        EXAMINATION
6    BY MR. ELLIS:
7    Q. Ms. Henderson, I think you and I know each other.
8    We've known each other for quite a while.  I'm
9    Ransom Ellis.  I represent the school district.
10   You're aware of that; right?
11   A. Yes.
12   Q. I'm going to be taking your deposition today in this
13   matter.  I'll ask you questions.  If you don't
14   understand any question I ask or a word I use in the
15   question, I want you to tell me as soon as you can
16   preferably before we get -- before we exhaust the
17   answer on that particular question so that we can fix
18   it.
19   A. Okay.
20   Q. Is that okay?
21   A. Yes.
22   Q. If you need a break, will you tell me, and we'll be
23   glad to give you a break.  I just would like to have
24   you complete any answer that's hanging out there at
25   the time.  Is that acceptable to you?

**Page 4**

1    A. Yes, sir.
2    Q. All right.  Can you give me your full name.
3    A. Marian Brooke Henderson.
4    Q. And you're employed by the school district?
5    A. Yes.
6    Q. Springfield School District?
7    A. Yes.
8    Q. And how long have you been employed by the
9    Springfield School District?
10   A. Since 2008.
11   Q. All right.  Your current position is 504 process
12   coordinator?
13   A. Yes.
14   Q. What other titles have you had -- job titles have you
15   had since you became employed by the district?
16   A. Special education teacher; the curriculum coordinator
17   for the special ed. department also known as a
18   learning coach, a math coach, literacy coach; IDEA
19   process coordinator; and 504 process coordinator.
20   Q. How many years did you teach in the classroom?
21   A. In Springfield?
22   Q. Yes.
23   A. Approximately four or five.  I can't recall exactly
24   when I went over to the office.
25   Q. Prior to coming to Springfield -- your employment in

**EXHIBIT 26**

1 (Pages 1 to 4)

Page 5

1    Springfield, were you employed as a teacher in
2    another district?
3    A. Yes.
4    Q. And what district was that?
5    A. Chandler School District.
6    Q. Not in Missouri; correct?
7    A. Correct.
8    Q. Arizona?
9    A. Yes.
10   Q. Were you a classroom teacher?
11   A. Yes.
12   Q. How long were you a classroom teacher in
13       Chandler, Arizona?
14   A. Eight years.
15   Q. Do you know if you're considered by the district to
16       be a tenured teacher in the Springfield School
17       District?
18   A. Yes.
19   Q. Your current job is not, though, however, a teaching
20       job; right? You're not considered a teacher?
21   A. Correct. I don't know exactly.
22   Q. Okay. This is my view. I'll just tell you what my
23       view is. My view is that your employment as a
24       504 process coordinator is not a classroom teaching
25       position. As such -- and it really doesn't matter

Page 6

1    for this case. I just am trying to tie down this
2    answer for me. So let's talk about what you do as a
3    504 process coordinator. What is your primary
4    function?
5    A. To oversee compliance and provide -- complete
6    evaluations, determine eligibility, and oversee
7    Section 504 plans.
8    Q. Okay. Have you seen the job description that I
9    provided as a part of the process -- the discovery
10   process in this case for a 504 process coordinator?
11   A. I have.
12   Q. I believe it's marked DEX -- that's District
13   Exhibit -- 2.07. Do you need to look at that?
14   A. Yes.
15            (Discussion off record.)
16   Q. (By Mr. Ellis) So is it correct that students are
17   assigned to you who have disabilities either -- well,
18   let's put it this way. Students who have
19   disabilities currently determined by the district
20   might be assigned to you as a part of your caseload?
21   A. No.
22   Q. Okay. Are you doing only kids that are coming in,
23   asking to be determined to be a child with a
24   disability under 504?
25   A. Yes.

Page 7

1    Q. Okay. And so how does that work? Does a parent come
2    to you and ask for -- I mean, a parent comes to the
3    district and says "I want my kid to have a 504
4    service plan." So --
5    A. There's multiple ways. There's a referral link that
6    we have on the district website that a parent can
7    access. Under the SPS website under "Parents," it's
8    the top tab under "Resources." So a parent can
9    complete that referral form or under Child Find. A
10   school district also has an obligation, if they
11   suspect a student has a disability that would be
12   eligible for Section 504, that they would also
13   complete that link. And then that student would be
14   assigned to my caseload and would then hold an
15   eligibility meeting with the 504 team and determine
16   eligibility under Section 504.
17   Q. I'm sorry. Section 504 is Section 504 of the
18   Rehabilitation Act of 1973; is that correct?
19   A. Yes, sir.
20   Q. All right. And that's a federal statute that
21   guarantees certain rights to students in a district
22   who have physical or mental disabilities?
23   A. Yes, sir.
24   Q. So your task is to run the process -- the
25   introductory or come-in process, the acceptance

Page 8

1    process, under 504?
2    A. Yes.
3    Q. And at some point in time, you -- who makes the
4    determination on that? Is it some team, or is that
5    you?
6    A. We discuss it as a team, and there are specific
7    criteria. We look for an impact on major life
8    activities. And if the disability has an impact on
9    major life activities and they need a Section 504,
10   under the law, in order to access their general
11   education, then we would determine them eligible.
12   Q. So are you determining as a team the lawful and
13   appropriate services that the district is required to
14   provide under 504?
15   A. Yes.
16   Q. And that may result in accommodations to the child of
17   some kind?
18   A. Yes.
19   Q. Could it also involve determining that the child
20   needs more than 504 accommodations?
21   A. Yes.
22   Q. At which time they would be pushed into the IDEA
23   process?
24   A. Yes.
25   Q. Do you any -- I mean, other than coordinating that

2  (Pages 5 to 8)

Alpha Reporting & Video
417-887-4110                          www.alphareportingservice.com                          417-887-4110
Case 6:21-cv-03219-MDH   Document 78-3   Filed 08/12/22   Page 2 of 34

Page 9

1  move of the child's data and everything, do you do
2  anything with respect to the IDEA determination?
3  A. No.
4  Q. I want to talk for a minute about any discussions
5  you've had with members of the board of education.
6  During the timeline that's involved in this case,
7  there have been a number of board members. So my
8  question to you is have you ever had discussions
9  with -- and I'm going to tell you the name of the
10  person who's a board member -- about your concerns
11  associated with the districtwide -- 2020 districtwide
12  equity training program or the Canvas modules that
13  you accessed during 2020 that were put on the Canvas
14  system by the district's office of equity and
15  diversity? Do you understand what I'm asking about?
16  A. Yes.
17  Q. It's very specific to the facts of this case. Have
18  you ever talked -- did you ever talk directly with
19  Dr. Alina Lehnert about those things?
20  A. Yes.
21  Q. Okay. How many times did you do that?
22  A. Approximately two, I believe.
23  Q. Were either of those two occasions occasions where
24  you were one-on-one with Dr. Lehnert?
25  A. No.

Page 10

1  Q. Tell me the context of when you would have talked to
2  her about that.
3  A. After I spoke at the board meeting.
4  Q. Which board meeting was that?
5  A. The June board meeting.
6  Q. 2020? 2021?
7  A. 2021.
8  Q. Okay. Are you saying that, during that presentation
9  to the board in June 2021, you raised issues
10  associated with the training program that I
11  referenced that you took back in 2020 or the Canvas
12  modules?
13  A. Yes.
14  Q. All right. What do you remember saying?
15  A. I remember saying that the district had not been
16  honest about the 2020 equity, that the fact was that
17  the district told us that we had to vote for
18  socialism, that we were told that adults were
19  oppressors of children. I discussed a student that
20  had attempted to commit suicide that I had found out
21  about because he felt bad about being white when the
22  district trained him. I talked about being told that
23  parents are supposed to -- and teachers are supposed
24  to not support students who want to dress up as their
25  favorite Disney costume for Halloween. Dr. Lehnert

Page 11

1  was not present that day.
2  Q. Okay. But that's what you said to the board?
3  A. Yes.
4  Q. All right. And who was on the board at that time?
5  Let me give you names because I think I know.
6  Dr. Denise Fredrick?
7  A. Yes.
8  Q. Dr. Charles Taylor?
9  A. Yes.
10  Q. Dr. Shurita Thomas-Tate?
11  A. Yes.
12  Q. And Dr. Lehnert. And I'm missing somebody.
13  A. Danielle Kincaid.
14  Q. And Scott Crise?
15  A. Crise. Dr. Mohammadkhani.
16  Q. Was she on the board at that time?
17  A. Yes.
18  Q. Okay. When is the next time that you spoke with
19  Dr. Lehnert? You said there were two.
20  A. She wasn't present at that school board meeting.
21  Dr. Fredrick was acting as the chair of the meeting
22  on that day. But because the board removed me prior
23  to my time being up, I followed up with an E-mail to
24  the board.
25  Q. So that would have been to all of the board members

Page 12

1  at that time?
2  A. Yes, sir.
3  Q. And sometime after June 2021?
4  A. That would have been in June. It was immediately
5  following the board meeting.
6  Q. The child you talked about that tried to commit
7  suicide, was that a child that was a student in this
8  district?
9  A. Yes.
10  Q. And at the time that you spoke about the child, was
11  that child still in the district?
12  A. No.
13  Q. So it was a former child in the district?
14  A. Yes.
15  Q. And you're familiar with the requirements under the
16  Family Educational Rights and Privacy Act about
17  providing personally identifiable information about
18  students?
19  A. Yes.
20  Q. Present or former?
21  A. Yes.
22  Q. And you did not think that that was a violation of
23  FERPA?
24  A. I didn't reveal any identifying information. I also
25  had permission from the family.

3 (Pages 9 to 12)

Alpha Reporting & Video
417-887-4110          www.alphareportingservice.com          417-887-4110
Case 6:21-cv-03219-MDH   Document 78-3   Filed 08/12/22   Page 3 of 34

Page 13

| | |
|---|---|
| 1 | Q. All right. Dr. Denise -- have we exhausted all the |
| 2 | times you spoke with Dr. Lehnert or communicated with |
| 3 | her? |
| 4 | A. Yes. |
| 5 | Q. About the matters that we discussed? |
| 6 | A. Yes. |
| 7 | Q. How about Dr. Fredrick? And she was obviously at the |
| 8 | June '21 meeting. So I'm going to count that as one |
| 9 | time. And she would have received the E-mail. Were |
| 10 | there any other occasions when you talked to |
| 11 | Dr. Fredrick? |
| 12 | A. No. |
| 13 | Q. All right. How about Dr. Taylor? Any other times |
| 14 | that you spoke with Dr. Taylor? |
| 15 | A. No. |
| 16 | Q. Dr. Thomas-Tate -- were there any other times you |
| 17 | spoke with Dr. Thomas-Tate? |
| 18 | A. No. |
| 19 | Q. Mr. Crise -- any other times you spoke with him? And |
| 20 | when I say "spoke," communicated with him -- E-mail |
| 21 | or direct conversation. |
| 22 | A. No. |
| 23 | Q. How about Danielle Kincaid? Any other times you've |
| 24 | spoken with Danielle Kincaid or communicated with |
| 25 | her? |

Page 14

| | |
|---|---|
| 1 | A. No. |
| 2 | Q. All right. And Dr. Mohammadkhani -- are there any |
| 3 | other times that you spoke with her about your |
| 4 | situation? |
| 5 | A. Yes. |
| 6 | Q. How many? |
| 7 | A. I don't recall. |
| 8 | Q. More than five? |
| 9 | A. Yes. |
| 10 | Q. More than 10? |
| 11 | A. Yes. |
| 12 | Q. More than 15? |
| 13 | A. Yes. |
| 14 | Q. More than 25? I'm going to jump a little bit so we |
| 15 | don't go every five. |
| 16 | A. I don't recall. |
| 17 | Q. So somewhere between 15 and 20. Would that be fair? |
| 18 | A. Yes. |
| 19 | Q. And what would the occasions have been when you spoke |
| 20 | with Dr. Mohammadkhani about your situation that |
| 21 | occurred back in 2020 going to the training or the |
| 22 | Canvas training that you accessed? |
| 23 | A. The conversations were generally what was included in |
| 24 | them. |
| 25 | Q. So between 15 and 20 conversations that were the |

Page 15

| | |
|---|---|
| 1 | same? |
| 2 | A. Yes, the same subject. |
| 3 | Q. Okay. When would you have first talked with |
| 4 | Dr. Mohammadkhani about that? |
| 5 | A. Before she was on the board or after she was on the |
| 6 | board? |
| 7 | Q. The first time, whenever it was. |
| 8 | A. November 2020 prior to her running for the board. |
| 9 | Q. Okay. And what did you tell her in that |
| 10 | conversation? |
| 11 | A. Actually, I believe it was December 2020, around that |
| 12 | timeline. She heard somebody speak at a board |
| 13 | meeting that raised concerns, and she asked me if I |
| 14 | had those same concerns; and what was in the |
| 15 | training, she'd been hearing people that were upset. |
| 16 | Q. What were the concerns? |
| 17 | A. That it violated my rights because we were told that |
| 18 | we had to vote for a certain politician -- not |
| 19 | politician but for a certain political party; that we |
| 20 | were told that socialism is a good thing; that we |
| 21 | were to feel bad about being an American citizen and |
| 22 | who might we be harming if we're proud to be an |
| 23 | American; and that as a teacher, I felt that it was |
| 24 | not the job of a teacher or any educator to tell |
| 25 | kids impart -- to push our personal agenda or our |

Page 16

| | |
|---|---|
| 1 | beliefs upon a student and that those rights belong |
| 2 | to the parent. If a student knows what political |
| 3 | party I'm in, I'm not doing a good job. |
| 4 | Q. And are you saying that those topics came up during |
| 5 | the fall 2020 districtwide equity training? |
| 6 | A. Yes. |
| 7 | Q. So that would have been for you on October 14, 2020? |
| 8 | A. Yes. |
| 9 | Q. And you took that training virtually? |
| 10 | A. Yes. |
| 11 | Q. And at the time, most of the people in that |
| 12 | training -- was everybody in that training virtual? |
| 13 | Was it a totally virtual training for that group of |
| 14 | people? |
| 15 | A. Yes. |
| 16 | Q. And the people that were in that training were |
| 17 | primarily -- were they all from the special services |
| 18 | department? |
| 19 | A. No. |
| 20 | Q. Did you know most of them? |
| 21 | A. Yes. |
| 22 | Q. So who was it at the meeting that said that about |
| 23 | socialism? Who was that? |
| 24 | A. Yvania Garcia-Pusateri. |
| 25 | Q. Okay. Did anyone else talk about socialism? |

4 (Pages 13 to 16)

Alpha Reporting & Video
417-887-4110                  www.alphareportingservice.com                  417-887-4110
Case 6:21-cv-03219-MDH   Document 78-3   Filed 08/12/22   Page 4 of 34

Page 17

```
 1   A. Not that I recall.
 2   Q. What do you remember her saying?
 3   A. That we need to -- she talked about socialism because
 4      we need to spread resources around and that it came
 5      up in topic with using property taxes to pay for
 6      schools and how some school -- people can live side
 7      by side but they may end up at different schools, and
 8      so the outcomes for students aren't the same.  And as
 9      the election was coming up, we should consider
10      socialism not in a bad way but a good way.  And,
11      again, with the election coming up, that it's our
12      duty to ensure that we vote for socialist politicians
13      to ensure that the outcomes for our students are
14      equal.
15   Q. Did Dr. Garcia-Pusateri ask you for your opinion on
16      that?
17   A. She did not.  She told us it's our job to do that.
18   Q. So it was a pronouncement of her opinion?
19   A. It was not her opinion.  I believe it was the opinion
20      of the district because she said that was our job as
21      educators to ensure that happened.
22   Q. Did she say it was the district's opinion?
23   A. She said it was the job of educators.
24   Q. Okay.  But she didn't -- I'll ask again.  Did she say
25      that it was the district's opinion?
```

Page 18

```
 1   A. No.
 2   Q. Okay.  Did she ask you to discuss it at any time,
 3      that topic?
 4   A. No.
 5   Q. Didn't ask for your opinion, didn't cause you to say
 6      yes or no on her statements?  I mean, did you have to
 7      agree with it?
 8   A. Yes.
 9   Q. How did you agree with it?
10   A. Because if we disagreed with any point of the topic,
11      and we were already told ahead of time that we had to
12      agree --
13   Q. No.  I'm asking you how you were to agree or
14      disagree.  That's all I'm asking.
15   A. Okay.  We were told ahead of time that we had to
16      agree with the statements of the district.
17   Q. I'm asking you how you had to agree or disagree.  How
18      did you make your opinion known?
19   A. By not speaking.
20   Q. So no comment by you meant that you agreed with it.
21      Is that what you're saying?
22   A. Yes.
23   Q. And is that what Dr. Garcia-Pusateri said to you?
24   A. No.
25   Q. She didn't, in fact, say anything about agreeing with
```

Page 19

```
 1      her or not agreeing with her.  She just made a bold
 2      statement about these things.  Is that true really?
 3   A. Yes.
 4   Q. Who made the statement about -- sorry.  I didn't get
 5      it down.  Property taxes -- was that not a part of --
 6      is it correct that that was a discussion about
 7      property taxes and its effect on schools was one of
 8      the videos or things in that programming on the
 9      districtwide equity program in 2020?
10   A. Yes.
11   Q. All right.  I'm sure we'll get into these again.  And
12      you've never talked to Ms. Kincaid.  Kelly Byrne --
13      have you ever spoken with Kelly Byrne?
14   A. Yes.
15   Q. About the matters that we've discussed?
16   A. I don't recall.
17   Q. When I say "matters we've discussed," I'm talking
18      about the fall districtwide 2020 equity program that
19      you attended or the Canvas modules that you looked at
20      in 2020 that were published there by the office of
21      equity and diversity for the district.
22   A. I don't recall.
23   Q. Okay.  How about Steve Makoski?  Have you ever talked
24      to Steve Makoski about those issues?
25   A. I don't recall.
```

Page 20

```
 1      (Discussion off record.)
 2   Q. (By Mr. Ellis)  We were talking about
 3      Dr. Mohammadkhani, and you told me this one -- it
 4      looks like it was a recurring conversation you had
 5      with her about different matters.  Oh, I know what it
 6      is.  Somebody said adults are oppressors of children.
 7      Who was that?
 8   A. Yvania Garcia-Pusateri.
 9   Q. Okay.  And what did she say in total about that?
10   A. It was in a context of a slide that talked about
11      sexism, ageism, ableism.  And in the ageism section
12      at the very bottom of the slide, she talked about how
13      adults of a certain age range can be oppressors of
14      either their children or they can also be oppressors
15      of an older generation.  So it referred to a certain
16      age range and that parents can be oppressors to their
17      children by not allowing them to do things that they
18      want to do or have a say or a voice in what they
19      would like to do.
20   Q. Did you express any opinion during the meeting about
21      that?
22   A. No.
23   Q. Were you asked for your opinion?
24   A. Yes.
25   Q. During the meeting?
```

5  (Pages 17 to 20)

Alpha Reporting & Video
417-887-4110                www.alphareportingservice.com                417-887-4110
Case 6:21-cv-03219-MDH   Document 78-3   Filed 08/12/22   Page 5 of 34

Page 21

1   A. Yes.
2   Q. Directly asked?
3   A. I was asked to share my opinion, yes.
4   Q. Who did that?
5   A. I don't recall if it was LA Anderson or Yvania.
6   Q. And they just said, "Brooke" -- did they call you by
7      name and say what's your opinion on this?
8   A. No.
9   Q. Okay. How did that happen? How did they ask you for
10     your opinion?
11  A. They asked us how we felt in response to that chart
12     and that we had to discuss it with small groups.
13  Q. Okay. What chart are we talking about now?
14  A. It's the chart that had the different -- I believe
15     the oppression matrix. I can't recall the specific
16     chart.
17  Q. I'm going to get into that in more detail here in a
18     minute.
19  A. Okay.
20  Q. So it was in the context of a discussion of one of
21     the charts in the programming, then?
22  A. Yes. And we had to discuss it with a small group.
23  Q. But was it a general call for people to go and
24     discuss that rather than a direct call to you to
25     discuss it? I mean, did you say -- did they pull

Page 22

1      you out, so to speak, by saying, "Brooke, tell us
2      what your opinion is on this. We want to know"?
3   A. No.
4   Q. Okay. So was it more of you're going to go into a
5      small group, and these are topics for discussion or
6      something like that?
7   A. Yes, with specific questions.
8   Q. We're going to have plenty opportunity because I want
9      to hone in on each one of those things because I
10     think they're important facts. All right. And
11     then -- okay. We were still talking about
12     Dr. Mohammadkhani. Is there anything else that you
13     remember that you talked to Dr. Mohammadkhani about
14     considering the issues that we've discussed?
15  A. I don't recall.
16  Q. I missed three people. Bruce Renner -- have you ever
17     talked to Bruce Renner about those issues?
18  A. No.
19  Q. Have you ever talked with Jill Patterson about those
20     issues?
21  A. No.
22  Q. Have you ever talked with Tim Rosenbury about the
23     issues?
24  A. No.
25  Q. Have you ever had a conversation with Dr. Lathan

Page 23

1      about your case?
2   A. No.
3   Q. Have you ever had a discussion with Dr. Doenning
4      about those issues?
5   A. No.
6   Q. You have had discussions with Dr. Garcia-Pusateri in
7      that you were in meetings with her, and I'll talk
8      about those later. Lawrence Anderson -- how long
9      have you known Lawrence Anderson?
10  A. I don't know specifically the number of years. From
11     the time that he started working for the district,
12     but I don't recall the exact date.
13  Q. And have you ever spoken with him about the issues
14     associated with -- your issues associated with the
15     programming other than during one of the meetings?
16  A. Yes.
17  Q. Outside of the equity meeting in 2020 -- training
18     session in 2020, what did you talk to -- LA is what
19     he goes by. What did you talk to LA about?
20  A. I E-mailed and asked for a copy of the presentation
21     for a recollection of my records so I could refer
22     back to it, as I did in 2019 which he provided. He
23     didn't respond; but he did stop by my desk, and he
24     did tell me that he couldn't provide a copy of this
25     because the Conservatives and Republicans had gotten

Page 24

1      hold of it, and they wanted to make sure that none of
2      it got sent out because they were up in arms. I had
3      a conversation because my Canvas modules that were
4      required stopped working, and I wasn't able to submit
5      my final answer. And so we had conversations around
6      helping me get that issue resolved.
7   Q. Okay. Let's start with the first one. You asked
8      perhaps shortly after you took the training or was it
9      later for a copy of the training?
10  A. Shortly after.
11  Q. And you did that by E-mail; correct?
12  A. Yes.
13  Q. And you were asking for actually a copy of -- let's
14     just talk about the training.
15     MR. ELLIS: Do you have 13.01?
16     MR. BOUCEK: That's the training?
17     MR. ELLIS: Yes.
18     MR. BOUCEK: Yes, I do. Just a second. You
19     want 13.01 and not 13.04?
20     MR. ELLIS: No. I want 13.01.
21  Q. (By Mr. Ellis) Do you recognize 13.01 as the fall
22     districtwide equity training for 2020 that you took?
23  A. It is a very similar version to the one that I took,
24     yes.
25  Q. Okay. Have you looked at 13.01 before today?

6 (Pages 21 to 24)

Alpha Reporting & Video
417-887-4110                www.alphareportingservice.com                417-887-4110
Case 6:21-cv-03219-MDH   Document 78-3   Filed 08/12/22   Page 6 of 34

Page 25

1    A. Yes.
2    Q. All right. And you say it's similar. What
3       difference was there?
4    A. I don't -- I don't remember -- recall seeing in 13.01
5       the pyramid.
6    Q. It's not -- there is not a pyramid in here?
7    A. Correct. I had a pyramid in my training.
8    Q. Your training, you say, had the pyramid?
9    A. Yes.
10   Q. Okay. The pyramid being -- that would be the
11      overt/covert white supremacy. No?
12   A. No. Is that what you're looking at right there, sir?
13   Q. Yes.
14   A. No. I did have --
15   Q. No. I understand there was a pyramid of it in a
16      previous version. I agree with that.
17   A. Right. It was in my version, and I also had that
18      that you're looking at.
19   Q. I'm looking at 13.01 -- and I don't have a page
20      number on it -- white supremacy overt/covert -- it's
21      overt -- we're calling it the overt/covert white
22      supremacy document.
23      MR. BOUCEK: Slide 22.
24      MR. ELLIS: Yeah.
25   Q. (By Mr. Ellis) So your statement is that -- I don't

Page 26

1       have it.
2       MR. ELLIS: Is it 13.04?
3       MR. BOUCEK: Do you want 13.04?
4       MR. ELLIS: Yeah. What slide is it?
5       MR. BOUCEK: Slide 22.
6       MR. ELLIS: Okay. Same slide? Will you turn
7    it around so I can see if --
8       MR. BOUCEK: Yeah. It's the same slide number,
9    if that's what you mean.
10      MR. ELLIS: It just says "white supremacy" on
11   the top of it.
12      MR. BOUCEK: "White supremacy" on top of the
13   slide with a caption for "Overt white supremacy
14   socially unacceptable" and "Covert white supremacy
15   socially acceptable."
16   Q. (By Mr. Ellis) And that was in your training in
17      the -- did you receive some hand -- some copied
18      information?
19   A. Yes.
20   Q. And did that have a separate page of the original one
21      that I showed -- the overt/covert page? Was that in
22      there?
23   A. Yes.
24   Q. And then on the actual training, did they flip those
25      slides up on the screen like a PowerPoint?

Page 27

1    A. Yes.
2    Q. And it had -- you're saying it had the pyramid?
3    A. It had the pyramid. It didn't have that exact
4       pyramid, but it did have a pyramid.
5    Q. What was the difference?
6    A. The "Make America great again" statement was not on
7       my pyramid.
8    Q. Was BLM on there? Is BLM on that?
9    A. I don't recall.
10   Q. So what other differences were there between the two
11      trainings -- the training that you have in 13.01
12      that's in the book?
13   A. Can I refresh my memory on 13.01, please?
14   Q. Absolutely. We'll go off the record for a second.
15      You look at that.
16          (Pause in proceedings.)
17   A. Another difference is the environmental scan.
18   Q. What slide was that?
19      MR. BOUCEK: Slide 14 of the video.
20   Q. (By Mr. Ellis) It says on the top of it "Scan of
21      local, national, and global events since March 2020"?
22   A. Yes.
23   Q. And was that Slide 14 in the presentation that you
24      saw on October 14th?
25   A. Yes.

Page 28

1    Q. All right. And it's in 13.01?
2    A. Correct.
3    Q. Okay. So 13.01 is correct as far as that page goes?
4    A. No.
5    Q. Was it different, what you saw?
6    A. Yes.
7    Q. Are you talking about what you observed on the
8       PowerPoint, or are you talking about some other
9       document that you might have received?
10   A. The PowerPoint.
11   Q. Okay. What was that page?
12   A. The scan of local and national and global events
13      actually has multiple slides, and this only shows the
14      cover.
15   Q. Okay. So there was like 14A, B, C or something like
16      that?
17   A. It took us to, like, another link, and then it went
18      through multiple pictures. This just shows one
19      picture.
20   Q. And was there anything about those documents that
21      were of concern to you?
22   A. Yes.
23   Q. Okay. And what do you remember seeing in there?
24   A. I saw some local events, the BLM protest in
25      Springfield.

7  (Pages 25 to 28)

Alpha Reporting & Video
417-887-4110          www.alphareportingservice.com          417-887-4110
Case 6:21-cv-03219-MDH   Document 78-3   Filed 08/12/22   Page 7 of 34

Page 29

1  Q. And what was said about them?
2  A. That our local community was supportive of
3     Black Lives Matter and that their protests were very
4     peaceful.
5  Q. Okay. And what else?
6  A. There was also a slide with Kyle Rittenhouse.
7  Q. And what did it show?
8  A. It showed a picture of him, and I believe he had the
9     gun. I can't recall the exact specifics of the
10    picture.
11 Q. Okay. And what was said about it?
12 A. That he had murdered an innocent person that was
13    protesting for -- was an ally of the Black community.
14 Q. Who made that comment?
15 A. I believe Yvania.
16 Q. Who made the comments about the BLM Springfield?
17 A. Yvania.
18 Q. And what did she say? It was peaceful?
19 A. It was peaceful and that our community came out and
20    we needed to be an ally.
21 Q. Okay. What else?
22 A. Then they showed screenshots from different places
23    around the nation including other protests.
24 Q. Which protest?
25 A. I don't recall. I don't recall the specific

Page 30

1     locations of the other protests.
2  Q. All right. What was the context given on those?
3  A. That people had the right to be angry and that some
4     of the protests -- you know, I don't recall the exact
5     words.
6  Q. Okay.
7  A. There was also one -- I believe it was from Charlotte
8     and how we needed to disavow and condemn the actions
9     that happened in -- I believe it was Charlotte and
10    how that was white supremacist.
11 Q. Okay. Who said that?
12 A. Yvania.
13 Q. Okay. She was leading that portion of the meeting?
14 A. Yes.
15 Q. Okay. And what did she say? What you just said?
16 A. Yes.
17 Q. What else?
18 A. That's what I recall.
19 Q. Okay. And those were each little subslides to
20    Slide 14 in Exhibit 13.01; is that correct?
21 A. Yes.
22 Q. Okay. Anything else about 13.01 that was different?
23 A. Not that I recall currently.
24 Q. Okay. When these matters were discussed or these
25    statements were made by Dr. Garcia-Pusateri that

Page 31

1     you've testified about, did she call you out
2     personally to give a comment about your opinion on
3     any of these things?
4  A. No.
5  Q. Were you told to go discuss these and you had to
6     give -- you were required to give your opinion?
7  A. Yes.
8  Q. You were told you were required to give your opinion?
9  A. Yes.
10 Q. And who told you that?
11 A. I believe it was Yvania. It may have been LA. They
12    rotated between the directions and the content.
13 Q. All right. And was that one of the large or small
14    group meetings?
15 A. Small group.
16 Q. Okay. And who did you choose -- did you choose who
17    you paired up with on the small groups?
18 A. No.
19 Q. How did that work? You were virtual. How did you
20    get in a small group?
21 A. Right. LA hit a button to randomize the groups and
22    limit the size of the groups. So it just zoomed us
23    out into a small group; and then we were there for a
24    certain time, and then it zoomed us back into a large
25    group.

Page 32

1  Q. Okay. So you went, like, into a separate room, so to
2     speak?
3  A. Yes.
4  Q. And who did you end up with?
5  A. I don't recall.
6  Q. And what were the directions about the small group
7     meeting -- that small group meeting?
8  A. That small group? That we needed to discuss what we
9     recognized from the events, what we were familiar
10    with, how we felt about the events.
11 Q. And you didn't know the people that you were placed
12    with?
13 A. I knew the -- I didn't know all of the people in each
14    of my groups. I knew most of the people. I can't
15    recall who was in each individual group.
16 Q. Do you remember who was -- any of the people that
17    were in the group that you went in after the scan of
18    local, national, and global events?
19 A. I don't recall.
20 Q. Do you remember anything you said during that small
21    group meeting?
22 A. I don't recall what I said during the small group
23    meeting. I had concerns. I don't remember the exact
24    specific language. I didn't talk much in the small
25    groups because we were really afraid to speak.

8  (Pages 29 to 32)

Alpha Reporting & Video
417-887-4110          www.alphareportingservice.com          417-887-4110
Case 6:21-cv-03219-MDH   Document 78-3   Filed 08/12/22   Page 8 of 34

Page 33

1   Q. Well, I don't want you telling me about what other
2       people said unless they told you they were afraid.  I
3       want to know what you said.  And so tell me the best
4       you can say about what you said when you went to the
5       small group on the scan of local, national, and
6       global events.
7   A. I don't recall.
8   Q. Were there other people who were participants in that
9       particular small group meeting who did not share an
10      opinion?
11  A. I don't recall specifically in that group.
12  Q. Were there other people that shared an opinion?
13  A. I believe so.  Yes.
14  Q. Do you remember who they were?
15  A. No, I don't recall.
16  Q. What opinions do you remember hearing?
17  A. Concerns about showing a lot of the violence, and
18      there were concerns about the Black Lives Matter
19      protest in Springfield.
20  Q. And when you say concerns about it, what did they say
21      specifically?
22  A. I don't recall.
23  Q. So you don't remember really anything specifically
24      that was said, just that there was a topic raised by
25      somebody?

Page 34

1   A. Correct.
2   Q. And, again, right you don't remember anything that you
3       said; is that right?
4   A. I don't re- --
5   Q. On this one small group.  You may remember on
6       something else, but I'm talking about this one small
7       group.
8   A. Correct.  I don't recall.
9   Q. So other than the things that we've discussed that
10      are differences, we have the face page, Number 14,
11      but we don't have -- in the Exhibit 13.01, we don't
12      have the subdocuments or the sub -- whatever they
13      were.  Were they links?
14  A. It was a video that they showed -- images slowly.
15  Q. Okay.  So they got to this, and somebody said here
16      are some examples or something like that.  Is that
17      the way it worked?
18  A. Yes.
19  Q. And so they gave you -- I think you listed four for
20      me -- local Black Lives Matter protests,
21      the Kyle Rittenhouse matter, protests, something
22      about people had the right to be angry, and then
23      Charlotte?
24  A. Yes.
25  Q. Did I miss anything?

Page 35

1   A. I don't exactly recall because I can't see each of
2       the individual slides on there.  I do know that, when
3       I reviewed these and I was able to look at the slide,
4       it was different than the one that was presented at
5       the meeting.  Kyle Rittenhouse was removed from this
6       video.
7   Q. Now I'm lost.  You saw something at the meeting on
8       October 14th?
9   A. Yes.
10  Q. And you've told me what was in the subparts to
11      Slide 14 --
12  A. Yes.
13  Q. -- during the October 14, 2020, training that you
14      were present at; right?
15  A. Yes.
16  Q. And then you said something was missing?
17  A. Correct.  In 13.01, the subslides -- the video
18      pictures, the one of Kyle Rittenhouse was no longer
19      included.
20          MR. BOUCEK:  Can I help you a little bit,
21      Ransom?
22          MR. ELLIS:  Yeah, help me.
23          MR. BOUCEK:  So if you look at 13.04 in the
24      speaker notes, it just reflects that they're going to
25      be showcasing pictures of major events that have

Page 36

1       impacted our country.  "Sit quietly and reflect on
2       these events and write down thoughts you might have."
3       Is that helpful?
4           MR. ELLIS:  Yes.  Let's go off the record.
5           (Break in proceedings.)
6   Q. (By Mr. Ellis) I'm going to come back to this because
7       I think we're going to have to go through the entire
8       training for obvious reasons, but we've already
9       started on it.  I want to know if you have had any
10      discussions with Dr. John Jungmann about these
11      trainings.
12  A. Yes.
13  Q. Other than where he would have been present during a
14      board meeting when you were commenting on this?
15  A. No.
16  Q. Okay.  Now let's talk about this October 14, 2020,
17      districtwide equity training.  Actually, I have 13.04
18      now, but I don't have the ability to click it because
19      it's paper.  So there are places you're saying on the
20      electronic copy of that that allow you to -- and I
21      assume we'll maybe both agree -- that you can look at
22      the various subparts?
23          MR. BOUCEK:  I don't know how active every
24      single link you're going to want to see is, but I'll
25      do my best to try and make them work.

9  (Pages 33 to 36)

Alpha Reporting & Video
417-887-4110          www.alphareportingservice.com          417-887-4110
Case 6:21-cv-03219-MDH   Document 78-3   Filed 08/12/22   Page 9 of 34

Page 37

```
 1   Q. (By Mr. Ellis) Have we gone through the equity
 2      training program -- looking at 13.04, is that the
 3      equity training program that you received on the
 4      slides, I mean, other than not having the subparts on
 5      Slide 14?
 6         MR. BOUCEK:  What do you want me to show her?
 7      13.04 or 13.01?
 8         MR. ELLIS:  13.04.
 9   A. Are you asking me if I had 13.04 or if I had 13.01?
10   Q. (By Mr. Ellis) I'm asking you what PowerPoint you
11      had.
12   A. To the best of my recollection, I had a combination
13      of 13.01 and 13.04.  They're not exact copies of what
14      I had.
15   Q. Okay.  And we identified one being the overt/covert
16      pyramid; correct?
17   A. Correct.
18   Q. We identified a second difference as being neither of
19      the paper documents has the subparts that were the
20      reflection -- maybe the reflection items, the
21      Kyle Rittenhouse, the BLM protest that came with
22      Panel No. 14?
23   A. The pictures.
24   Q. Right.  What other differences were there between
25      what you had on October 14th -- what you observed on
```

Page 38

```
 1      October 14th during the training that was shared with
 2      you and Exhibit 13.04?
 3   A. I believe -- I don't recall specifically at this
 4      time.
 5   Q. All right.  I'm going to ask you to make -- give your
 6      opinion here.  Any other differences that you
 7      observed during the training -- substantive
 8      differences to what's been marked as 13.04 and what
 9      we've discussed?
10   A. In the content?  Is that what you're asking?
11   Q. Yes.
12   A. The content is essentially correct with the subtle
13      differences that we discussed.
14   Q. Okay.  And I guess the biggest one to me is the four
15      subparts in Frame 14.  I mean, there's definitely
16      some information there that's not in the hard copy?
17   A. Correct.
18   Q. Okay.  So if we have a basic understanding of what --
19      I mean, it's important for us to have a basic
20      understanding of what you saw during your training.
21   A. Yes.
22   Q. Do you have a copy of your complaint?
23   A. I do not.
24   Q. I'll give you one.  That, I have.
25   A. Thank you.
```

Page 39

```
 1   Q. Do you recognize --
 2         MR. ELLIS:  And this is not marked, but can we
 3      agree that this is a copy of the complaint for --
 4         MR. BOUCEK:  If it's got stamping on it, I'm
 5      fine with it.
 6         MR. ELLIS:  It is.  It's Document 1, and it was
 7      filed on August 18, 2021.
 8   Q. (By Mr. Ellis) If you look down at the bottom of the
 9      page --
10         MR. BOUCEK:  I can't answer.
11   Q. (By Mr. Ellis) -- the stamp at the bottom is the
12      stamp of the court.
13   A. Yes.
14   Q. And that was 10 months after you had the training?
15   A. Correct.
16   Q. Okay.  First of all, Paragraph 96 -- let me ask this
17      first.  Look at Paragraph 71.  Is that the
18      understanding white supremacy continued pyramid
19      paragraph or document that you had in your training
20      on October 14th?
21   A. No.
22   Q. Okay.  So this is another whole iteration of that
23      pyramid, I guess?  Do you know when this document --
24      do you have any idea when this document occurred?
25   A. I do not recall.
```

Page 40

```
 1   Q. Well, if it was, it wasn't something that you saw at
 2      the time; right?
 3   A. Correct.
 4   Q. Is it fair to say that over time you've seen other
 5      variations of documents that you never saw in 2020?
 6   A. Yes.
 7   Q. Or reviewed in 2020?
 8   A. Correct.
 9   Q. And an example of that would be the Canvas ELT
10      modules.  Have you seen those?
11   A. I don't recall that I've seen a Canvas ELT module.
12   Q. Okay.  Good.  That's one less thing to ask about.
13         MR. BOUCEK:  Do you mind -- what does ELT stand
14      for?
15         MR. ELLIS:  It means executive leadership team.
16   Q. (By Mr. Ellis) Okay.  96 says "As a 504 process
17      coordinator, Brooke was required to complete Canvas
18      modules"; right?
19   A. Yes.
20   Q. And then 97 says "There were approximately 25 modules
21      for each staff member to complete on their own time";
22      correct?
23   A. That's what it says, yes.
24   Q. All right.  And 98 says "If staff did not complete
25      the modules, they were told they would not receive
```

## Page 41

1  credit and their pay would be docked"?
2  A. Yes, that's what it says.
3  Q. Okay. So let's start with 96. As a 504 process
4     coordinator, you were required to complete Canvas
5     modules; right?
6  A. Yes, sir.
7  Q. And Canvas is a learning location?
8  A. Yes.
9  Q. And do you understand that, in the Canvas system,
10    lots of learning modules are loaded onto that?
11 A. Yes.
12 Q. By various different segments of the school district?
13 A. Yes.
14 Q. And in particular, there were Canvas modules that
15    were put on there by the office of equity and
16    diversity for the school district; right?
17 A. Yes.
18 Q. And there probably were Canvas modules that were put
19    on there by your department?
20 A. Yes.
21 Q. Various training kind of programs that they wanted
22    you to access as a member of the special services
23    department?
24 A. Yes.
25 Q. And there were general Canvas modules that dealt with

## Page 42

1  various things that were happening in the school
2     district like a change in policy -- a board policy or
3     a change in -- or a training about a particular type
4     of -- like sexual harassment, for example, and things
5     like that?
6  A. No.
7  Q. No? You didn't have any of those?
8  A. No, not in Canvas.
9  Q. Okay. So in the school year 2020-'21, were you
10    notified that the office of equity and diversity for
11    the school district had placed several Canvas modules
12    online for you in particular to review?
13 A. Yes.
14 Q. And when I say you, it would be for teachers or
15    people that were working with teachers like you;
16    correct?
17 A. Yes.
18 Q. But there were other people in the school district
19    like clericals who were not -- did not have to review
20    those Canvas modules; right?
21 A. I can't state what other employees had to do or not
22    do.
23 Q. Do you have training -- you're given training by the
24    school district on a number of things every year;
25    right?

## Page 43

1  A. Yes.
2  Q. A number of types of topics?
3  A. Yes.
4  Q. And some of those are training that you would
5     routinely see every year maybe or maybe -- did you
6     get the sexual harassment training then and stuff
7     like that?
8  A. Yes.
9  Q. And it's 13.03, is it? And, of course, I don't have
10    it.
11       MR. ELLIS: Do you happen to have 13.03?
12       MR. BOUCEK: Yep.
13 Q. (By Mr. Ellis) Is that not the training that you
14    received over the past three or four years?
15       MR. BOUCEK: This is what 13.03 looks like, to
16    make this easy.
17       MR. ELLIS: No. Off the record.
18       (Discussion off record.)
19 Q. (By Mr. Ellis) Were you aware that, in the school
20    year '20-'21, the teachers agreed with the school
21    district to give -- for the school district to give
22    extra money to the teachers in particular to do four
23    extra hours of training and that four extra hours
24    ended up being the two hours of the equity training
25    program in 2020 and then two other hours that was to

## Page 44

1  cover other different training that you were given?
2     ALICE training -- are you familiar with ALICE
3     training?
4  A. I am.
5  Q. And you took that in 2020?
6  A. Yes, I did.
7  Q. And as a part of that, you received additional money
8     above and beyond what your salary would have been.
9     Did you know that?
10 A. Yes.
11 Q. So what's this 25 modules for each staff member to
12    complete? Is that correct?
13 A. Can you define "modules."
14 Q. That's in your complaint. So I'm assuming that
15    that's something you knew.
16 A. Within the Canvas training, I believe that you
17    referred to three modules. So I think it's a matter
18    of words, but there were approximately 25 different
19    lessons or slides within Canvas.
20 Q. Well, let's talk about what you actually did, then,
21    during 2020-'21. Is it correct that you accessed
22    some equity and diversity Canvas modules?
23 A. Yes.
24 Q. And the Canvas modules you accessed were -- how many
25    did you access?

11 (Pages 41 to 44)

Alpha Reporting & Video
417-887-4110          www.alphareportingservice.com          417-887-4110
Case 6:21-cv-03219-MDH   Document 78-3   Filed 08/12/22   Page 11 of 34

Page 45

1    A. I believe there were a couple of modules -- within
2       that module there were separate other modules --
3       components which is what I'm referring to as the
4       modules.
5    Q. So would there have been one for elementary and one
6       for secondary?
7    A. Yes.
8    Q. Okay. Those would be the primary two modules that
9       you're talking about?
10   A. No.
11   Q. Okay. What were the two?
12   A. So one would have been cultural consciousness.
13   Q. Okay.
14   A. And another one would have been -- I think it was
15      titled maybe racial injustice -- social and emotional
16      learning through an equity lens.
17   Q. Actually, did you access overview of social and
18      emotional learning from an equity lens?
19   A. Yes.
20   Q. And did you access elementary social and emotional
21      learning as it relates to racial injustice?
22   A. Yes.
23   Q. Did you access secondary social and emotional
24      learning as it relates to racial injustice?
25   A. Yes.

Page 46

1    Q. And did you access elementary social and emotional
2       learning as it relates to COVID-19?
3    A. Yes.
4    Q. And did you access secondary social and emotional
5       learning as it relates to COVID-19?
6    A. Yes.
7    Q. Were there any other Canvas modules that you accessed
8       during the school year '20-'21 that were placed on
9       there by the district's office of equity and
10      diversity?
11   A. Not that I recall.
12   Q. Okay. Did you complete all of these Canvas modules
13      during the school year '20-'21 that I just mentioned?
14   A. Yes.
15   Q. And I think you mentioned earlier that you
16      encountered problems with the Canvas modules in
17      '20-'21 -- these five Canvas modules. Do you
18      remember what those problems were?
19   A. Yes.
20   Q. And what were they?
21   A. When you had to complete the module, there was a
22      final reflection page, and I couldn't access that one
23      page. And that was the final to sign off on
24      completing the entire module.
25   Q. All right. And is this when you went to

Page 47

1       Defendant Anderson by E-mail?
2    A. Yes.
3    Q. And asked him to see if he couldn't find a way for
4       you -- I think you were asking him whether or not you
5       had completed or is there something more you needed
6       to do to complete the module. Would that be correct?
7       Let's put it this way. In order to get credit for
8       completing the module, you had to complete it?
9    A. Yes, sir.
10   Q. All right. And so you were having difficulty
11      completing the module or you felt you were?
12   A. Yes, sir.
13   Q. And what did you do?
14   A. I E-mailed my director -- Tanya Rapert, Yvania,
15      LA Anderson. Penny Rector may have been on there.
16      If I look at who I sent it to, I could tell
17      you. -- saying that I had trouble accessing, and I
18      could not access -- my computer would not open the
19      final page for me to sign off on the final reflection
20      and could they accept my E-mail as documentation for
21      completion.
22   Q. And what happened?
23   A. I got a response back telling me with a PDF how you
24      can find where you left off and how Canvas saves your
25      answers. And so if you have begun them, it showed

Page 48

1       directions on how to return into the Canvas modules
2       for completion. I responded that I had completed it.
3       I knew how the Canvas modules worked. I just
4       couldn't access the last page. LA asked me to give
5       him a call because he was having trouble finding me
6       in the system, and I called. We had a lengthy
7       discussion about the Canvas modules. We realized why
8       -- that I actually had two Canvas accounts in my
9       name, and that's where the problem was.
10   Q. Okay. Long story short, did LA correct the problem
11      and tell you that you had completed the module and
12      everything was fine?
13   A. Yes.
14   Q. Was there anything about the telephone conversation
15      you had with Defendant Anderson that you felt was
16      improper?
17   A. Can you refer to which conversation?
18   Q. Okay. Let's talk about the first one. When was it?
19   A. In December 2020.
20   Q. Okay. And was that about Canvas?
21   A. Yes.
22   Q. All right. Go over -- what did you ask him at that
23      time?
24   A. I didn't ask him -- I asked him if he could send me a
25      screenshot showing that I had two Canvas modules --

12 (Pages 45 to 48)

Page 49

1    two Canvas accounts so that we could document what
2    the concern was and that I had two Canvas accounts
3    assigned to me in my name. I asked him if he could
4    E-mail back the conversation so that I could receive
5    credit for completing the Canvas training. That's
6    what I asked him.
7    Q. Okay. And was that in essence the nature of that
8    conversation?
9    A. I had to -- he asked me to recall and I had to review
10   the specific sections of the Canvas training to
11   indeed prove that I had completed the course.
12   Q. Was there anything about that process that caused you
13   a problem?
14   A. That I had two Canvas accounts in my name.
15   Q. That's never happened to you before, has it?
16   A. Yes.
17   Q. What I'm getting at is, the questions you were asked
18   by LA, did you feel that those were questions that
19   were appropriate so that he could get to the bottom
20   of whatever your concerns were?
21   A. Yes.
22   Q. And as a result of you telling him that, at that time
23   he did get to the bottom of the issue and corrected
24   it, and you got credit for the Canvas?
25   A. Yes, sir.

Page 50

1    Q. And, again, during 2020-'21, you've told me all of
2    the Canvas modules you accessed that were prepared by
3    the office of equity and diversity that you're
4    complaining about in this lawsuit?
5    A. Yes. In this lawsuit, yes.
6    Q. In 2021-'22, have you accessed any Canvas modules
7    that were placed there by the office of equity and
8    diversity?
9    A. No.
10   Q. Have you been asked to do that?
11   A. No.
12   Q. In Paragraph 98 of the complaint, you state that "If
13   staff did not complete the modules, they were told
14   they would not receive credit and their pay would be
15   docked." Who told you that?
16   A. The E-mails from Yvania stated that we would not
17   receive credit. Our directors of my department
18   stated in process coordinator meetings that we would
19   not receive credit and that they were mandatory.
20   Q. All right. They were mandatory to take those five
21   modules?
22   A. Yes.
23   Q. And you did that?
24   A. Yes, sir.
25   Q. And you completed them?

Page 51

1    A. Yes, sir.
2    Q. And you got credit?
3    A. Yes, sir.
4    Q. And you got all the money that you were supposed to
5    get?
6    A. I didn't get paid additional.
7    Q. Well --
8    A. Yes, my pay was not docked.
9    Q. Right.
10   A. Yes, sir.
11   Q. Okay. I think there's a difference of opinion with
12   respect to this money and how it went in. I'll say
13   school districts historically give money and then
14   dock it for whatever reason if you don't comply with
15   whatever the rules are.
16   A. Yes.
17   Q. But I'm not frankly -- okay. It doesn't matter.
18   A. Okay.
19   Q. As far as you know, you received all the money you
20   were supposed to get?
21   A. Yes, sir.
22   Q. Okay. So the only person that you mentioned, you
23   mentioned Dr. Garcia-Pusateri told you that you had
24   to -- in a written document that you had to complete
25   the Canvas modules or you would not receive credit;

Page 52

1    right?
2    A. Yes.
3    Q. And then who told you in your department that that
4    was the case?
5    A. Dave Whitson and Tanya Rapert.
6    Q. And they told you it was mandatory to do the five --
7    they may not have said five but to do those
8    particular Canvas modules?
9    A. Yes.
10   Q. Did you do any -- did you access any Canvas modules
11   that were placed there by the office of -- the
12   district's office of equity and diversity during
13   school year 2019-'20?
14   A. No.
15   Q. Is there any training -- equity training that you
16   received during 2019-'20 that you're complaining
17   about in this lawsuit?
18   A. I believe this lawsuit specifically refers to the
19   2020 training.
20   Q. Right. Which there was just one training; right?
21   Other than the Canvas. You have Canvas over here.
22   A. Yes, sir.
23   Q. You have the -- you were either seated or you were in
24   virtual training on the fall districtwide equity
25   training; right?

13  (Pages 49 to 52)

Alpha Reporting & Video
417-887-4110          www.alphareportingservice.com          417-887-4110
Case 6:21-cv-03219-MDH   Document 78-3   Filed 08/12/22   Page 13 of 34

Page 53

1    A. Yes, sir.
2    Q. And that training and then the Canvas training -- the
3       five Canvas modules that we're talking about now --
4       were the only trainings that you're complaining about
5       in your complaint; right?  That you are complaining
6       about.
7    A. Can I have a moment just to review?
8    Q. Absolutely.
9    A. Thank you.
10            (Pause in proceedings.)
11   A. I don't believe that this -- I believe that in this
12      statement we refer to the training that occurred in
13      the school year 2020-2021.  Yes.
14   Q. Right.  And it would not be '19-'20?
15   A. Correct.
16   Q. It's school year '20-'21?
17   A. Yes.
18   Q. And so far we've identified the October training that
19      you received and five Canvas training modules that
20      you completed.  Are there any other modules or
21      training where you went and got -- sat down and
22      trained?  Because there were a number of trainings
23      out there.  Are there any others that you're
24      complaining about in your complaint?
25   A. In this written complaint?

Page 54

1    Q. Yes.
2    A. No.
3    Q. All right.  Let's talk about the October 14, 2020,
4       training just a little bit more.  Exhibit 13.02 has a
5       list of the employees that signed up for the training
6       that you took on October 14, 2020.
7            MR. ELLIS:  Can you show her that.
8    Q. (By Mr. Ellis) Do you see your signature on there?
9    A. Yes.
10   Q. And you must have signed that at some other time.
11      How did you go about signing that because you were
12      virtual?
13   A. They sent an E-mail to Dave Whitson.  I believe it
14      came from LA Anderson to Dave Whitson and asked if
15      he'd collect signatures because he was not able to
16      capture the signatures of people that were attending
17      in the Zoom training.  So we had to sign after the
18      training.
19   Q. Okay.  And so the people that are listed on there, it
20      looked to me like they were mostly special services
21      department people with a scatter of some other
22      people?
23   A. Yes.
24   Q. Those would be people that you work with?
25   A. Yes.

Page 55

1    Q. And included in that meeting was your department
2       supervisor, Tanya Rapert?
3    A. Yes.
4    Q. And you're also supervised by Pam Marion?
5    A. Yes.
6    Q. There were other names that I was very familiar with.
7       Nancy McBride?
8    A. Yes.
9    Q. She was a psychologist at the time.  She's retired
10      now?
11   A. Yes.
12   Q. And Les Dean, another psychologist?
13   A. Yes.
14   Q. Lori Sheets, is she another psychologist that was
15      there?
16   A. She was a psychologist for the district, yes.
17   Q. And was she at that meeting -- at that session?
18   A. I can review the document and tell you.
19   Q. That's fine.  As far as you know, the people that
20      signed that are all people that were present at the
21      October 14th meeting?
22   A. Yes, sir.
23   Q. Now, where did you take that meeting from?  It's
24      virtual.  Where was your computer that you were using
25      to access that meeting?

Page 56

1    A. At my desk in the Bentley Building.
2    Q. Okay.  And that's obviously different from -- where
3       is your desk located?  What floor?
4    A. First.
5    Q. And is that a situation where you are -- there are a
6       bunch of you kind of in a row?  I noticed the other
7       day when I passed you over at -- well, that is
8       Bentley.
9    A. Yes, sir.
10   Q. Is that the same place you were?
11   A. Yes.
12   Q. Kind of on the end of an aisle, but it's a whole row
13      of people who have computer service there?
14   A. Yes, sir.
15   Q. How many people were around you?  And I mean
16      physically around you.
17   A. In my row specifically?
18   Q. Were there a lot of people that were taking this
19      particular program -- this particular training that
20      were right there by you?
21   A. Yes.
22   Q. Okay.  When the programming started, do you remember
23      anything being said about the format of the program?
24      I mean, did they give an introduction?
25   A. Yes.

14  (Pages 53 to 56)

Alpha Reporting & Video
417-887-4110            www.alphareportingservice.com            417-887-4110
Case 6:21-cv-03219-MDH   Document 78-3   Filed 08/12/22   Page 14 of 34

Page 57

1  Q. Is there anything about the introduction that
2     bothered you that you're complaining about?
3  A. That we had to agree or we would lose credit and that
4     we had to be an ally and it was part of our job duty
5     to be an antiracist educator.
6  Q. And who said that?
7  A. I believe it was Yvania Garcia-Pusateri.
8  Q. And that was in the introduction?
9  A. Yes.
10 Q. Were you told that you had to keep your camera on?
11 A. Not in the introduction.
12 Q. Okay.  During the meeting, were you told to keep your
13    camera on?
14 A. Yes.
15 Q. Did they say why?
16 A. Yes.  Because some people in our -- yes.
17 Q. No.  Go ahead.
18 A. Because some people in our training didn't have
19    access to cameras on their computer.  And they said
20    it was disrespectful if we didn't have our cameras
21    on, but not everybody had access to a camera.
22 Q. Okay.  But you did?
23 A. I did, yes.
24 Q. And you were having difficulty with your camera that
25    day; is that correct?

Page 58

1  A. With my Zoom account, yes.
2  Q. The Zoom account on your particular machine -- the
3     machine that was assigned to you by the district?
4  A. Yes, sir.
5  Q. Did it have you upside-down?
6  A. Yes, sir.
7  Q. How long were you upside-down that you know of?
8  A. I don't recall.  It was for a bit.
9  Q. Okay.  Did you make some effort to get that corrected
10    while the meeting was going on?
11 A. Yes.
12 Q. How did you do that?
13 A. I found the setting in my Zoom account that had been
14    changed and was able to change the setting to flip
15    myself back right-side up.
16 Q. All right.  But nonetheless, you left your camera on
17    the whole time?
18 A. Yes, sir.
19 Q. So how did that -- tell me how that meeting went
20    after that.  What happened next in how the training
21    went?
22 A. In the -- can you give me some specifics.  I'm not
23    sure what you're asking.
24 Q. I'm interested in what you were told in the way of
25    directions at the beginning other than what you've

Page 59

1     already said.
2  A. Okay.  At the beginning?
3  Q. Yeah.
4  A. That we would be sent out to Zoom groups.  Within
5     that Zoom group, we had to have conversations within
6     our group that we would be required to answer when we
7     came back to the larger group.  LA Anderson stated
8     that he wasn't afraid to call on people if they did
9     not answer.
10 Q. Okay.  Did he ever call on you?
11 A. No.
12 Q. Did he ever call on anybody?
13 A. Yes.
14 Q. Did some people respond to whatever he was asking?
15 A. Yes.
16 Q. Did some people not respond?
17 A. No.
18 Q. Or respond "I don't have an opinion"?
19 A. No.
20 Q. So everybody had an opinion?
21 A. Everybody had an opinion.
22 Q. Okay.  When you're sitting there in the
23    Bentley Building virtual with the October 14, 2020,
24    program, how many people could you see on your
25    monitor?

Page 60

1  A. I could see approximately, I believe, six at a
2     time -- one in the middle and five down the side.  It
3     changed according to who was speaking.  So it
4     changed -- so over the course of the entire thing, we
5     could see everybody.
6  Q. Okay.  So when they were doing introductions --
7  A. Yes.
8  Q. -- or the introduction part that you discussed --
9  A. Yes.
10 Q. -- would you just see the person doing the
11    introduction?
12 A. No.
13 Q. You would see all the other people?
14 A. A number of them, yes.
15 Q. Yeah.  Okay.  And that was randomized.  Is that what
16    you're saying to me?
17 A. The way that we could see things?
18 Q. Yeah.
19 A. I assume.  I don't -- yes.
20 Q. I mean, there were so many.  How many people do you
21    think there were?  30 roughly?  However many are on
22    13.02 on that exhibit?
23 A. Yes.
24 Q. But that's a number.  There's a page and another page
25    there.  So more than 20?

15 (Pages 57 to 60)

Alpha Reporting & Video
417-887-4110          www.alphareportingservice.com          417-887-4110
Case 6:21-cv-03219-MDH   Document 78-3   Filed 08/12/22   Page 15 of 34

Page 61

```
 1   A. Yes.
 2   Q. And I suppose that some of them could see you?
 3   A. Yes, sir.
 4   Q. Were you physically located where you could see
 5      people that were online in this virtual training?
 6   A. Yes.
 7   Q. Okay.  Who could you see physically?
 8   A. Physically I could see Amber Hawkins next to me
 9      although she wasn't participating in the training at
10      the time.  And I could see Stephanie Council.
11   Q. Now, she was, wasn't she?
12   A. She was, yes.  So people that were down my
13      peripheral.
14   Q. And you're kind of on the end of the row?
15   A. Yes.
16   Q. So you're looking to your left, and you can see
17      people down the row --
18   A. Yes.
19   Q. -- that may be on it?  Can you tell if people are
20      attending to the program?
21   A. Yes.
22   Q. Do you know -- could you hear -- was Stephanie
23      talking to the program?
24   A. I don't recall that she answered.
25   Q. Did she speak to you orally between the two of you?
```

Page 62

```
 1   A. No.
 2   Q. Did you speak to anyone else while you were doing it?
 3   A. No.
 4   Q. So basically all of your input was from your screen?
 5   A. Yes.
 6   Q. Have you attended any other virtual training programs
 7      like this?  Not equity -- not like equity, but have
 8      you attended any other school district training --
 9      not Canvas -- training programs where you had
10      somebody live that was broadcasting and you were
11      connecting to them by Zoom?
12   A. Yes.
13   Q. So it's a pretty familiar situation; right?
14   A. Yes.
15   Q. On Paragraph 76 of the complaint, you say that staff
16      was reminded -- I think is the way it said -- if you
17      do not participate completely, you will get kicked
18      out and will not get credit?
19   A. Yes.
20   Q. Who said that?
21   A. During the training?
22   Q. Yes.
23   A. Yvania Garcia-Pusateri.
24   Q. Okay.  Anyone else?
25   A. Not that I recall.
```

Page 63

```
 1   Q. Okay.  What was that in the context of?  Did she say?
 2   A. That would have been in the original instructions.
 3   Q. Okay.
 4   A. And, again, when they discussed making sure that our
 5      cameras were turned on.
 6   Q. Okay.  Do you know anybody that attended this
 7      meeting -- attended this training who did not get all
 8      the credit?
 9   A. No.
10   Q. Do you know anybody that attended this meeting who
11      got kicked out?
12   A. No.
13   Q. In any of the other equity training programs -- have
14      you attended any other equity training programs for
15      the district?  I think we've covered this.  The
16      answer's no?
17   A. Correct.  No.
18   Q. In Paragraph 77 you say "Staff were instructed to
19      show they were participating by always keeping their
20      cameras on."  And you said that was also
21      Dr. Garcia-Pusateri?
22   A. And Dr. Anderson -- or LA Anderson.  I don't think
23      it's --
24   Q. He'll be happy to know that you called him a doctor.
25      Maybe not.  I don't know.
```

Page 64

```
 1      And did anybody explain the context of why they
 2      said that to you?
 3   A. It would be disrespectful -- it would be seen as a
 4      sign of disrespect, and they would not be able to
 5      tell if we were fully engaging with the training.
 6   Q. There we go.  They want to see the whites of your
 7      eyes, I guess?
 8   A. I guess.
 9   Q. No one here, I'm sure, has done a Zoom training where
10      they didn't totally engage.  Paragraph 78 says "Prior
11      to the training, Brooke's department provided Brooke
12      and her colleagues with four paper signs each.  The
13      paper signs read strongly agree, agree, disagree, and
14      strongly disagree"; is that correct?
15   A. Yes.
16   Q. Who gave those to you?
17   A. Phil Hale.
18   Q. And how did he give them to you?
19   A. He placed them on my desk.
20   Q. Did you see him place those on your desk?
21   A. I did not.
22   Q. What else did you get at the same time, if anything,
23      about the training?
24   A. We got the covert/overt, the land acknowledge
25      agreement, the social identity chart, the
```

16 (Pages 61 to 64)

Alpha Reporting & Video
417-887-4110                    www.alphareportingservice.com                    417-887-4110
Case 6:21-cv-03219-MDH   Document 78-3   Filed 08/12/22   Page 16 of 34

Page 65

1  terminology, the oppression matrix, and I believe
2  there were some general directions.
3  Q. Did it have a big paper clip on them?
4  A. Yes, sir.
5  Q. Look at Paragraph 79. "The department supervisor
6  notified the staff that they would be asked to hold
7  up the signs in response to prompts during the Zoom
8  training"?
9  A. Yes.
10  Q. Who was that?
11  A. Tanya Rapert.
12  Q. When did that occur? When did she tell you that?
13  A. She told me personally in the corridor -- the
14  hallway. And, also, that was direction given during
15  a process coordinator meeting.
16  Q. Okay. When did she tell you personally in the
17  corridor?
18  A. I don't recall the exact date.
19  Q. How close was it to the training?
20  A. I would say, to the best of my recollection, within a
21  week or two.
22  Q. What was the context? Why would she just come out
23  with that? Did you ask her a question or what?
24  A. She was going over the directions of what we needed
25  to do to receive credit for the training.

Page 66

1  Q. This is your conversation in the corridor?
2  A. In the corridor.
3  Q. Yeah.
4  A. I don't recall the exact conversation, but she said
5  it would be disrespectful, and she didn't want
6  anybody to be seen as disrespectful. So --
7  Q. It would be disrespectful to what?
8  A. Not agree. And please do what they asked.
9  Q. How many times during the training were you asked to
10  hold up one of these signs?
11  A. During the four-corner activity, there was a variety
12  of statements made.
13  Q. Okay.
14  A. I don't recall the exact number.
15  Q. Did you see anybody that did not hold up a sign? I
16  mean, you could see a random group of people on your
17  screen. Did any of them not hold up a sign?
18  A. No.
19  Q. They all agreed?
20  A. Yes. I don't know what each person's sign said.
21  Q. Oh, you couldn't see the sign?
22  A. You could see the sign, yes.
23  Q. So there might have been people that were saying
24  "agree somewhat"?
25  A. I don't recall specifically what each person held up.

Page 67

1  Q. Okay. Do you recall -- you don't know one way or
2  another?
3  A. I don't know one way or another, no, sir.
4  Q. You know what you did?
5  A. Yes, sir.
6  Q. And you always put up "agree"?
7  A. I always put up the sign that agreed most with what
8  their statement was depending on the statement -- the
9  sign that I felt was the appropriate answer for the
10  district to be in agreement.
11  Q. Do you have any reason to believe that anybody was
12  keeping track of your responses?
13  A. Yes.
14  Q. All right. How do you know that?
15  A. I believe that LA was writing down responses. He was
16  taking notes while we were in the training was what I
17  understood.
18  Q. And he was writing down the responses of the people
19  that were engaged in the training?
20  A. I don't know what he wrote down.
21  Q. Oh, okay. So you don't really know?
22  A. No. Correct.
23  Q. And when I say you don't really know, you
24  don't really know if anybody was keeping tabs on how
25  the votes were?

Page 68

1  A. Correct.
2  Q. Look at 80 and 81 in your complaint -- paragraphs.
3  "However, the supervisor told Brooke and her
4  colleagues not to hold up the" -- this is your issue
5  with Tanya Rapert; right?
6  A. Yes.
7  Q. And did you say there was someone else that told you
8  the same thing or just Ms. Rapert? She told you
9  twice?
10  A. Yes.
11  Q. In the corridor, and then when was the other time?
12  A. Yes.
13  Q. When was the other time?
14  A. Process coordinator meeting.
15  Q. Okay. So all the process coordinators were there?
16  A. I can't recall if everybody was in attendance.
17  Q. Okay. How many do you remember being there?
18  A. The majority.
19  Q. Okay. And do you remember when that was?
20  A. We had multiple meetings every Friday.
21  Q. So was it the Friday before the -- immediately before
22  October 14th or what?
23  A. I don't recall the specific meeting.
24  Q. Okay. Do you remember anybody that was there?
25  A. I don't recall specifically who was in the room.

17 (Pages 65 to 68)

Alpha Reporting & Video
417-887-4110        www.alphareportingservice.com        417-887-4110
Case 6:21-cv-03219-MDH   Document 78-3   Filed 08/12/22   Page 17 of 34

## Page 69

1    Q. Okay. And other than Tanya Rapert, was Pam Marion
2       there?
3    A. I don't specifically recall.
4    Q. So at some point in time during that meeting,
5       Dr. Rapert discussed the fact that there was going to
6       be the Zoom -- the virtual training on
7       October 14, 2020; right?
8    A. Yes.
9    Q. And what did she say in relation to it? Just tell me
10      everything you remember her saying in relation to
11      that subject.
12   A. Please be respectful. If we weren't respectful, we
13      would be removed without credit. She didn't want
14      anybody in her department to be removed; so please
15      agree with whatever they're saying. It was
16      mandatory.
17   Q. Attendance at the meeting?
18   A. At the training -- at the PC meeting or the Zoom
19      training?
20   Q. You said "It was mandatory." And I didn't know if
21      that was a reference to what Dr. Rapert was saying or
22      a reference to the meeting.
23   A. It was a reference to what she was saying about the
24      equity, diversity, and inclusion training.
25   Q. So are you saying that Dr. Rapert said it was

## Page 70

1       mandatory that you agree with everything that they're
2       saying?
3    A. No.
4    Q. Okay. Tell me what you were saying.
5    A. That it was mandatory that we attended and that we
6       were respectful and polite.
7    Q. And you didn't have any trouble doing that, did you?
8    A. No.
9    Q. Did you find that the meeting being mandatory
10      violated your rights in any way?
11   A. No.
12      MR. BOUCEK: Objection. That calls for a legal
13   conclusion.
14      MR. ELLIS: She's given an answer; so I'll
15   accept that.
16   Q. (By Mr. Ellis) And you've already told me no one
17      got -- to your knowledge, got kicked out of the
18      meeting. Complaint No. 83, this is about the
19      meeting -- the actual training. There are two
20      statements here that are listed. The first one is
21      "Equity and diversity within SPS is no longer just a
22      value but part of the district's strategic plan with
23      measurable goals and outcomes to ensure we are
24      creating an inclusive, equitable, accessible, and
25      affirming learning and working environment for all

## Page 71

1       students and staff"; right?
2    A. Yes.
3    Q. And that was made at the first of the meeting?
4    A. Yes.
5    Q. Was that also Dr. Garcia-Pusateri, if you remember?
6    A. I don't remember specifically.
7    Q. Was it read?
8    A. Yes.
9    Q. And it was probably also flashed up on the screen.
10      Was it one of the panels?
11   A. I believe so, yes.
12   Q. Is there anything about that statement that you
13      actually disagree with?
14   A. Yes.
15   Q. Okay. What do you disagree about?
16   A. I disagree that we can provide students with equal
17      outcomes. It's our goal to get great outcomes, but
18      we can't guarantee an outcome.
19   Q. I don't see those words in here.
20   A. With measurable goals and outcomes.
21   Q. Did you consider that those were measurable goals and
22      outcomes to the strategic plan because that's what
23      it's saying?
24      MR. BOUCEK: I'll object to the form of the
25   question there.

## Page 72

1    Q. (By Mr. Ellis) You can answer.
2       MR. ELLIS: If she can, she can answer. I
3    understand you have an objection to the form.
4    A. Can you restate your question, please.
5    Q. (By Mr. Ellis) Sure. This says equity and diversity
6       within SPS is no longer just a value. Do you agree
7       with that part of it -- the sentence?
8    A. Yes, they stated that.
9    Q. All right. But part of the district's strategic plan
10      with measurable goals and outcomes to ensure -- and
11      then it talks about what you're ensuring.
12   A. Yes, I agree that's what was stated.
13   Q. Well, I'm saying do you find that to be something you
14      could not agree with?
15   A. As it's written, there are portions that I cannot
16      agree with.
17   Q. All right. Is it correct that, as a special services
18      employee in particular dealing with kids who are 504,
19      you are dealing with accessibility issues all the
20      time?
21   A. Yes.
22   Q. And you're dealing with inclusion issues all the
23      time?
24   A. Yes.
25   Q. And you're dealing with equitable programming for

Alpha Reporting & Video
417-887-4110          www.alphareportingservice.com          417-887-4110
Case 6:21-cv-03219-MDH   Document 78-3   Filed 08/12/22   Page 18 of 34

Page 73

1  kids all the time?
2  A. Yes.
3  Q. And would you agree that in a sense you're
4  responsible for also providing a learning environment
5  for those students?
6  A. Yes.
7  Q. All right. So those parts of the equity and
8  diversity statement that is in Paragraph 83, you can
9  agree with and you're fine with it?
10 A. No.
11 Q. I said the parts that I just mentioned.
12 A. Oh, yes.
13 Q. So your only concern about that was the issue of
14 measurable goals?
15 A. Not measurable goals. And the other part was the
16 specific -- you said the word equity versus
17 equitable. Mine was the outcomes and equity as the
18 district defines it versus equitable.
19 Q. Okay. And you don't agree with that?
20 A. I do not agree with that.
21 Q. Okay. Were you asked to agree with it?
22 A. No. They just made the statement. There was no
23 opportunity.
24 Q. Then the next one is "As we begin our training, we
25 want to acknowledge and honor the Native and

Page 74

1  Indigenous people whose land we currently gather on.
2  Springfield Public Schools is built on the ancestral
3  territory of the Osage, Delaware, and
4  Kickapoo Nations and Peoples. In doing social
5  justice work, it is important we acknowledge the dark
6  history and violence against Native and Indigenous
7  people across the world. In this work we are
8  committed to promoting, supporting, and affirming all
9  communities especially those that are marginalized."
10 Did you have a problem with that statement?
11 A. Yes.
12 Q. What about it?
13 A. As part of this acknowledgment, it was also referred
14 to that the land was stolen.
15 Q. Well, here I'm talking about what's written in your
16 complaint. I'll ask you about the other parts.
17 A. Okay.
18 Q. If they said something, that's something different.
19 Did you have a concern with this statement?
20 A. Yes. I don't -- yes.
21 Q. Do you think it violated your rights?
22 A. Yes.
23 Q. How?
24 A. To affirm or agree to the beliefs that the nation's
25 history is dark and violent, specifically American

Page 75

1  history, and that we affirm to this belief.
2  Q. Okay. Do you think this issue is a matter of public
3  concern -- this B is a matter of public concern?
4  MR. BOUCEK: I'll object to the form there too.
5  Q. (By Mr. Ellis) I mean, are people all up in arms in
6  Springfield, Missouri, about these issues?
7  A. Some people are.
8  Q. Okay. Do you see this all the time in the news?
9  A. I see it in the news on some news stations.
10 Q. So do you think that actually -- is it your belief
11 that the history of the United States is not full of
12 violence against Native and Indigenous people?
13 A. Is it my belief that the nation is not --
14 Q. No. I said the history of the United States is not
15 full of violence against Native and Indigenous
16 people.
17 A. I don't believe that it's full of violence.
18 Q. How much history did you take in school?
19 MR. BOUCEK: Objection. You're getting abusive
20 here with a couple questions.
21 MR. ELLIS: I'll leave it at that.
22 Q. (By Mr. Ellis) Were you asked to affirm this
23 statement?
24 A. Yes.
25 Q. In what way?

Page 76

1  A. We were asked to -- it was stated that we were -- as
2  a district, we didn't have the opportunity to not
3  affirm. We were told that we were affirming this
4  statement.
5  Q. That the district was affirming it?
6  A. And that, as each employee, we must affirm this
7  statement as a district employee.
8  Q. But you weren't asked if you agreed with that?
9  A. No.
10 Q. And you gave no statement --
11 A. Correct.
12 Q. -- one way or another?
13 A. No, sir.
14 Q. Is that correct?
15 A. Correct.
16 Q. You kind of alluded to oral statements associated
17 with Statement B on the Native and Indigenous people.
18 What else was said during the meeting about this?
19 A. That the land was stolen and that, in fact, we have
20 some schools within our own district that are
21 reflective of the names but that we're not paying --
22 that it may be disrespectful, and specifically
23 Kickapoo High School was mentioned and their mascot
24 and that we have to acknowledge that the land was
25 stolen from the Native Americans.

19 (Pages 73 to 76)

Alpha Reporting & Video
417-887-4110            www.alphareportingservice.com            417-887-4110
Case 6:21-cv-03219-MDH   Document 78-3   Filed 08/12/22   Page 19 of 34

Page 77

1  Q. Fortunately they didn't reference my alma mater,
2     Delaware. I take it that you did not agree with
3     those statements that you just mentioned?
4  A. Correct.
5  Q. Were you asked if you agreed?
6  A. No.
7  Q. You just sat and listened?
8  A. Yes.
9  Q. With your monitor on?
10 A. Yes, sir.
11 Q. Paragraph 84, "Brooke did not agree with the
12    statements. However, because her superior warned her
13    not to disagree, Brooke held up 'agree' signs when
14    each statement was made." Now, that followed 83; so
15    I guess I came to the conclusion that you -- by
16    reading the complaint that you were asked to agree or
17    disagree with your sign. Is that incorrect?
18 A. I don't recall on those statements that we held up
19    the signs.
20 Q. Okay. 85 has a list of different things that were
21    said during the training on October 14th. I assume
22    it was on October 14th.
23 A. Yes.
24 Q. There are two of you -- two plaintiffs, and you
25    attended at different times. "Parents are the

Page 78

1     oppressors of their children." Who said that?
2  A. Yvania Garcia-Pusateri.
3  Q. And when did she say that?
4  A. In the chart that referred to ageism.
5  Q. Okay. And which chart was that on ageism? Was that
6     a social identities chart?
7  A. I don't recall without looking at the documents in
8     front of me.
9  Q. "Parents oppress their children when they raise their
10    children to vote a certain way"?
11 A. Yes.
12 Q. Okay. And so who made that statement?
13 A. Yvania Garcia-Pusateri.
14 Q. In connection with what discussion?
15 A. With the discussion around socialism and by not
16    giving children the freedom to vote.
17 Q. With respect to parents are oppressors of their
18    children, were you asked to affirm that statement?
19 A. No.
20 Q. So once again, you sat and listened?
21 A. Yes.
22 Q. With respect to the statement parents oppress their
23    children when they raise their children to vote a
24    certain way, were you asked to affirm that statement?
25 A. No.

Page 79

1  Q. And when I say affirm, I mean either orally or by
2     holding up a sign or whatever it took to say --
3     holding up your thumb or giving a thumbs down --
4     whatever it takes to affirm, oral or by some action.
5  A. No.
6  Q. "Educators have a duty to vote for socialist
7     politicians." Who said that?
8  A. Yvania Garcia-Pusateri.
9  Q. Were you asked to vote on that?
10 A. No.
11 Q. Or affirm it?
12 A. No.
13 Q. "Educators have a duty to make sure students
14    understand socialism is a good thing." Was that
15    Dr. Garcia-Pusateri?
16 A. Yes.
17 Q. Anyone else?
18 A. No.
19 Q. What connection was that?
20 A. In that nationalism can harm people, there were
21    several points in that and that, in order to make
22    sure that students have equal outcomes, that we need
23    to spread the wealth.
24 Q. Dealing with property taxes?
25 A. Dealing with multiple resources. Not just property

Page 80

1     taxes, no.
2  Q. Okay. And were you asked to affirm that statement?
3  A. No.
4  Q. "White people are oppressors." Were you asked to
5     affirm that statement?
6  A. No.
7  Q. Who made it?
8  A. Yvania Garcia-Pusateri.
9  Q. Was she pretty much conducting this entire meeting?
10 A. Yes.
11 Q. Okay. And in what connection was this statement
12    made?
13 A. With the oppression matrix and also with the -- it
14    also referred to the social identities chart. So it
15    was a combination.
16 Q. And if I didn't ask you, I'm asking it again. Were
17    you asked to affirm this statement?
18 A. No. May I ask a question -- a clarifying question?
19 Q. You may.
20 A. When you're asking if we had to affirm, it's
21    affirmation by not speaking -- we had to affirm by
22    not speaking up. Are you asking if I was directly
23    asked to verbally or physically --
24 Q. I'm asking you if you were directly -- in some way
25    directly asked what your opinion was and to affirm it

Alpha Reporting & Video
417-887-4110      www.alphareportingservice.com      417-887-4110

Case 6:21-cv-03219-MDH   Document 78-3   Filed 08/12/22   Page 20 of 34

Page 81

1  or deny it or to accept it.  You know, affirm means
2  to accept it in principle and, yeah, I agree with it.
3  I'm asking you if you were put on the spot to say
4  what your position was and you chose a position,
5  whatever it was, either to go along with whatever she
6  said or -- you had four options as far as I'm
7  concerned.  You can go along with it.  You can say I
8  don't agree with it.  You can say nothing and look
9  blank, or I guess you can deny it like all other.
10 A. Right.
11 Q. So that's all I'm asking.  Affirming, when I say that
12    and I've said it all along, means you're being asked
13    to directly put yourself out and say I agree with
14    this or I don't agree with this in essence.  Does
15    that help answer your question?
16 A. Yes.
17 Q. Okay.  So yes what?
18 A. That answered my question.
19 Q. So I'll ask it again.  Were you asked to affirm the
20    statement that white people are oppressors?
21 A. I was not asked to verbally or hold up a sign and
22    affirm that.
23 Q. Okay.  Did my explanation of what I meant by affirm
24    change your answers on the first ones of these that I
25    asked you about?

Page 82

1  A. Yes.  I was not asked to verbally or physically hold
2     up a sign to affirm it.
3  Q. Yeah.  Well, I'm asking -- it could be making a
4     verbal statement.
5  A. Correct.
6  Q. Okay.  I'm not limiting it to your signs.
7  A. Right.
8  Q. It could be the signs because you say you had signs.
9     It could be that, like I said, you put a thumbs up or
10    a thumbs down for it and in some way say this is my
11    opinion, yes or no.
12 A. Correct.  By not speaking against it, we were
13    affirming.
14 Q. Well, let's talk about that in a minute.
15 A. Okay.
16 Q. I'm asking you if --
17 A. Okay.  I'm sorry.  I misunderstood.
18 Q. Let's start over again.
19 A. Okay.  I'm sorry.
20 Q. What I want to know on these is -- I'm asking you for
21    the statement that was made.  I'm asking you who made
22    it and approximately what context it was made.  And I
23    want to know if, after being asked that, you
24    personally as an individual were asked in some way to
25    make some -- it could be an action.  It could be

Page 83

1  words.  It could be holding up the sign saying "yes,"
2  "no," "strongly agree," "strongly disagree," or
3  whatever -- in some way endorse that statement that's
4  being made or not.
5  A. Okay.
6  Q. And does that change any of your statements so far
7     about these statements?
8  A. By remaining silent, I was affirming that their
9     statements were correct.
10 Q. Well, how did they know that?
11 A. I didn't speak.
12 Q. Not speaking is a constitutional right.
13    MR. BOUCEK:  Objection to the form of the
14    question.
15 A. I felt that, by the questions that were asked and the
16    directions that were given, if we spoke out, it would
17    be not affirming and disrespectful and we would be
18    removed.  So therefore I remained silent.  And by my
19    silence and by other members' silence, it was
20    implicated that we were affirming to these beliefs.
21 Q. (By Mr. Ellis) Well, you know what you were thinking.
22    How do you know what anybody else is thinking?  I
23    mean, how can you say other people were thinking the
24    same thing?  They may have been; but you don't know
25    that, do you?

Page 84

1  A. At that moment in time with these specific
2     statements, I don't -- I cannot state what other
3     people were thinking.
4  Q. Okay.  "White people must accept their privilege and
5     own their whiteness."  Who said that?
6  A. Yvania Garcia-Pusateri, to the best of my knowledge.
7  Q. In what context?
8  A. There were several contexts.  There was the white
9     supremacy chart, oppression matrix.  There were
10    statements -- a statement by Robin DiAngelo.  I
11    believe that's how you say the name.  I'm not --
12    Delgado?  I don't know.  There were several points
13    within that presentation.
14 Q. Did she say it more than once?
15 A. Yes.
16 Q. How many times do you think she said it?
17 A. If I had to guess, I would say at least five.
18 Q. Okay.  Were you asked to state your opinion?
19 A. No.
20 Q. Or to give an opinion?
21 A. No.
22 Q. "By celebrating nationalism and showing pride in
23    America's history, staff should think about who they
24    are harming."
25 A. Yes.

21 (Pages 81 to 84)

Alpha Reporting & Video
417-887-4110          www.alphareportingservice.com          417-887-4110
Case 6:21-cv-03219-MDH   Document 78-3   Filed 08/12/22   Page 21 of 34

## Page 85

1  Q. Is this Dr. Garcia-Pusateri again?
2  A. It's in a statement on a handout that they presented.
3  Q. You say it's a misstatement?
4  A. It's a statement in a handout.
5  Q. Oh, okay. All right. And is that on 13.04, or is it
6     something else?
7  A. It's in the terminology handout.
8  Q. That you received?
9  A. Yes. And they reviewed the terminology during the
10    training.
11 Q. Was there any -- did anybody mention that?
12 A. No.
13 Q. So it was just a document that you received and had
14    that as a definition?
15 A. They mentioned it in the training. The trainers
16    mentioned that in going over the definitions and the
17    terminology.
18 Q. Explain what they were saying to you.
19 A. That we needed to remember that America was founded
20    on violence and that there were marginalized people
21    that have suffered great harm and so that, when we
22    show our pride in being an American, that we may --
23    other people may not feel the same and we may be
24    harming somebody else. And so it was important to
25    remember who was being harmed by our pride in

## Page 86

1  America.
2  Q. Okay. Did they mention who?
3  A. Did they mention who might be harmed?
4  Q. Yeah, who the marginalized people were.
5  A. Blacks.
6  Q. Only?
7  A. That was the only person they mentioned, yes.
8  Q. And that was because of what? What was the
9     explanation?
10 A. Slavery.
11 Q. Were you asked for your opinion on this?
12 A. No.
13 Q. Did you express an opinion?
14 A. No.
15 Q. Paragraph 86, "SPS required Brooke to participate in
16    exercises described above including viewing the
17    George Floyd video, identifying where she falls on
18    the oppression matrix, understanding covert and overt
19    white supremacy, filling out the social identities
20    chart, and engaging in small and large group
21    discussions about the lessons." That's Paragraph 86
22    of your complaint?
23 A. Yes.
24 Q. All of the exercises you're talking about here
25    happened in the fall 2020 districtwide equity

## Page 87

1  training; right?
2  A. Yes.
3  Q. All right. Let's talk about the George Floyd video.
4     Would it be essentially correct to state that the
5     George Floyd video was a several minute video --
6     somebody can probably tell me how many minutes
7     here -- but several minutes of video that had very
8     little content in it?
9  A. Yes.
10 Q. It was mostly video and not audio?
11 A. With words on a screen, yes.
12 Q. "I can't breathe"?
13 A. Yes.
14 Q. Did you watch that video?
15 A. Yes.
16 Q. Did anyone call on you or direct you individually to
17    watch that video? Were you told it was going to come
18    on and that you needed to watch it?
19 A. Yes.
20 Q. And who was that?
21 A. I believe it was Yvania.
22 Q. One of these days you might change your story; so I
23    need to know who that was. What did she say about
24    it?
25 A. That it was going to be difficult to watch, but we

## Page 88

1  needed to watch it, and it was important for us to
2  see it without the additional noise and that we just
3  needed to focus in to imagine if we were in that
4  position that Derek Chauvin -- could we imagine
5  having somebody place a knee on our neck and not
6  letting up and these are your final words.
7  Q. Was there anybody in a position to tell if you were
8     actually watching the video?
9  A. I don't know. We had to have our cameras on, and we
10    were facing our camera.
11 Q. So I guess if your eyes were open, you were watching
12    it?
13 A. Yes.
14 Q. All right. Do you know if anybody was making sure
15    that your eyes were open? Seriously. I'm serious
16    about that.
17 A. No, I don't know for sure that they were doing that.
18 Q. Checking who was naughty and nice, I guess.
19 A. I don't have any way to know.
20 Q. Okay. Were you in a position to determine if anyone
21    else was actually watching the video?
22 A. Yes.
23 Q. And how did you do that? The people on your screen,
24    they had their eyes open?
25 A. I was watching the video and not people on the

22 (Pages 85 to 88)

Alpha Reporting & Video
417-887-4110          www.alphareportingservice.com          417-887-4110
Case 6:21-cv-03219-MDH   Document 78-3   Filed 08/12/22   Page 22 of 34

Page 89

1    screen.  But they sent us to a small group, and we
2    had to discuss what we saw in the video.
3    Q. Okay.  But I'm talking about while the video is
4    running.
5    A. Oh, no.
6    Q. So while the video is running, all you can see is the
7    video?
8    A. Yes.  I believe that's correct, yes.
9    Q. Did you have a line of people down the side of your
10    screen, or was your screen completely filled with the
11    video?
12    A. I believe the screen was completely filled with the
13    video.
14    Q. By being asked to watch that video, do you consider
15    that to be a violation of your rights?
16        MR. BOUCEK:  Object to the form.
17    Q. (By Mr. Ellis) You can answer if you know.
18    A. By watching the video?
19    Q. Yeah, by being asked to watch the video.
20        MR. BOUCEK:  Objection to form.
21    A. No.
22    Q. (By Mr. Ellis) Did you understand the question?
23    A. Yes.
24    Q. Did you have a breakout session after the
25    George Floyd video?

Page 90

1    A. Yes.
2    Q. Was it specific to the George Floyd video, or was it
3    later with other elements involved?
4    A. Specific to the George Floyd video.
5    Q. Okay.  How long was that breakout session?
6    A. Several minutes.
7    Q. How many people do you remember being in your
8    breakout -- is breakout room a good term for that?
9    A. Yes.
10    Q. How many people were in your breakout room?
11    A. I believe three.
12    Q. Do you remember any of the people that were there?
13    A. I don't remember specifically who was in that group.
14    I believe Stephanie Luhm was in that group.
15    Q. L-u-m-i-n, I think?
16    A. I think it's -- I don't know.
17    Q. Go ahead and guess.
18    A. It might be L-u-h-m.  I don't know.  I don't recall.
19    Q. Were there any of the presenters in your room -- in
20    your breakout room?
21    A. No.
22    Q. Were there any supervisors in your breakout room?
23    Supervisors -- I'm talking about district
24    supervisors.  You already said that there were two at
25    least who were in this meeting -- Pam Marion and

Page 91

1    Dr. Rapert.
2    A. I said Tanya Rapert was in the meeting.  I don't
3    recall if Pam Marion was there.
4    Q. I asked you, and you said she was.  But if you don't
5    think she was, that's fine.
6    A. I don't recall.  I think you were talking -- I
7    thought you were talking about the department --
8    PC department meeting.
9    Q. Okay.
10    A. Sorry.
11    Q. That's all right.  Do you think Pam Marion was in the
12    October 14th virtual training with you?
13    A. If her name's on the list, then, yes, I do.
14    Q. It is.
15    A. Yes.
16    Q. Okay.  So I take it neither of those two supervisors
17    were in your breakout room?
18    A. No.
19    Q. Is that correct?
20    A. Correct.
21    Q. Okay.  Sorry.  So what was discussed?
22    A. Our reaction to the George Floyd video.  And I do
23    believe Lisa Searles was in my group as well.
24    Q. Okay.  That's S-e-a-r-l-e-s?
25    A. I believe so.

Page 92

1    Q. And she's the administrative assistant for the office
2    of -- for the district's office of equity and
3    diversity; is that correct?
4    A. Yes.
5    Q. So what was discussed?
6    A. We had to discuss how it made us feel, could we
7    imagine being in that position.  We had to share our
8    thoughts on the video with our small group.
9    Q. Okay.  And did you share anything?
10    A. I did.
11    Q. What did you say?
12    A. I said that I felt like it was really out of context
13    without the additional language and that it was very
14    isolating and that it was presented in a format that
15    didn't provide all the context and it felt like it
16    was shaped to lead us in one direction with a
17    conclusion before we knew the entire facts.
18    Q. Is it fair to say that that was a critical opinion of
19    the presentation?  Were you being critical is what
20    I'm saying?
21    A. At the presentation?
22    Q. Yes.
23    A. No, not at the presentation.
24    Q. Were you affirming or approving of the presentation
25    with your statement?

Case 6:21-cv-03219-MDH   Document 78-3   Filed 08/12/22   Page 23 of 34

## Page 93

1   A. No.
2   Q. Okay. And this is the way I heard you. I heard you
3      say that you had concerns about the way -- the
4      context of the video and that it was not -- that it
5      was -- and I hate to use the word "not appropriate,"
6      but it wasn't appropriate. You didn't say that
7      but --
8   A. I didn't say that. And I thought you were -- when
9      you asked the question, I wasn't sure if you were
10     referring just to that video presentation or the
11     entire presentation.
12  Q. Let's back up.
13  A. I'm sorry.
14  Q. Don't be sorry. We need to communicate.
15  A. Yes.
16  Q. And I'm trying to get your opinion -- honest opinion,
17     and I know you're giving them to me.
18  A. Yes.
19  Q. The question I'm asking you is -- what I asked you
20     was what did you say, I think. And so you then told
21     me what you said during the meeting when you were --
22     I think the question -- the group was asked what did
23     you think about the video or --
24  A. Right, in the breakout session.
25  Q. In the breakout session. That's what I'm saying.

## Page 94

1   A. Yes.
2   Q. So why don't you tell me again what you said.
3   A. That I felt that the video was taken out of context
4      and it was only reflecting one side of the incident
5      by removing all the other -- all the other context.
6      So they removed all the other language out of that
7      and just put that in isolation.
8   Q. All right. Did anyone else offer different
9      statements about it in your breakout?
10  A. No.
11  Q. So there were people that had no opinion and made no
12     statements?
13  A. In my breakout session, as I recall, the people that
14     spoke agreed that it was hard to make any
15     determination out of context.
16  Q. Was anything else said about the video during that
17     breakout session by the people in your meeting?
18  A. We had to discuss how it made us feel watching it.
19  Q. Okay. Did you discuss how it made you feel?
20  A. Yes.
21  Q. And what did you say?
22  A. It made me feel bad but that, again, just watching it
23     in that one setting, you feel bad. I wasn't in the
24     setting when it happened, and so just seeing it from
25     that aspect made me feel bad but that I wish that

## Page 95

1   there had been additional context.
2   Q. What do you mean by "context," I guess, is what I
3      should ask?
4   A. That we had all the additional components of it
5      because the picture as a whole is important, and we
6      were only seeing certain words in isolation from one
7      person's perspective.
8   Q. In other words, you weren't seeing the
9      police officers' necessarily. You weren't seeing
10     what they were going through. You weren't seeing
11     the crowd around them. You weren't seeing people
12     yelling, screaming, and whatever was going on that
13     street at that time?
14  A. Correct.
15  Q. Okay. And so you felt that it -- I think what you
16     said earlier is that it pushed you to a conclusion
17     that may not have been correct?
18  A. I felt like it was trying to push us to a conclusion
19     that may not have been correct.
20  Q. Okay. And you stated all that during the meeting?
21  A. I didn't state that it was pushing us to a conclusion
22     in those specific words. But in my breakout session,
23     I stated that I thought that it was in isolation and
24     not in complete context.
25  Q. Gotcha. And that was your opinion at the time?

## Page 96

1   A. Yes.
2   Q. Still is?
3   A. Yes.
4   Q. So you came -- then you zoomed back into the big
5      meeting. And what was the next thing that happened?
6      Was it the oppression matrix discussion?
7   A. We had a large group discussion.
8   Q. Oh, about the video?
9   A. Yes.
10  Q. Were you asked to provide any information during that
11     discussion?
12  A. Not by name, no.
13  Q. Did you provide information?
14  A. No.
15  Q. Did other people provide information?
16  A. Yes.
17  Q. All right. What do you remember?
18  A. That LA Anderson said that he was calling on
19     individual Zoom groups and that he wanted a person
20     from each group to state how our breakout group
21     collectively -- what were the thoughts of our group
22     and what was discussed within our group.
23  Q. And who got tapped for that?
24  A. I don't recall the specific people.
25  Q. But somebody summarized everything that was said?

24  (Pages 93 to 96)

Alpha Reporting & Video
417-887-4110          www.alphareportingservice.com          417-887-4110
Case 6:21-cv-03219-MDH   Document 78-3   Filed 08/12/22   Page 24 of 34

Page 97

1   A. Yes.
2   Q. And did they summarize what you said?
3   A. I don't recall specifically what they said.
4   Q. Were you offended by it in any way, what was said? I
5       mean, do you have that recollection of being, wow, I
6       didn't like what they said about me; or they didn't
7       identify you, but I didn't like what our person said?
8   A. I don't recall that. No, I don't recall that they --
9   Q. So did some groups not respond? Did every group
10      respond?
11  A. Every group that was called on responded.
12  Q. And how did LA call on them?
13  A. By the --
14  Q. The group number?
15  A. Uh-huh.
16  Q. You're like number one, number two, whatever it was?
17  A. Correct.
18  Q. About how long was that breakout session?
19  A. The breakout session?
20  Q. My bad. About how long was the full session with the
21      discussion about what the breakout sessions --
22  A. Several minutes. I don't have a specific time.
23  Q. What was the next topic that was discussed in that
24      meeting? Was it the oppression matrix?
25  A. I don't --

Page 98

1   Q. You don't remember?
2   A. I don't remember the exact format.
3   Q. Well, let's just do it this way. You allege that you
4       were asked to identify where you fell on the
5       oppression matrix?
6   A. Yes.
7   Q. And you had a separate copy of the oppression matrix;
8       right?
9   A. Yes.
10  Q. I mean, that was one of the documents you got from
11      Phil Hale?
12  A. Yes.
13  Q. So were you asked to fill it out?
14  A. No.
15  Q. I mean, you were just asked to look at it? Isn't
16      it -- what were you asked to do?
17  A. We were asked to identify in which category that we
18      fell in on that oppression matrix and that we can
19      identify with more than one category. And so we had
20      to identify with it, and then we had to reflect on
21      it, and then we had a conversation in small groups.
22  Q. So you looked at it first. Then you went to a small
23      group to the breakout session, had a discussion about
24      it, and then came back to a full group discussion?
25  A. Yes.

Page 99

1   Q. Okay. So what's the deal with the oppression matrix?
2       Tell me about it.
3   A. Can you be specific.
4   Q. Tell me about it.
5           MR. BOUCEK: Object to the form.
6   Q. (By Mr. Ellis) I'll be specific. Where did you rate
7       yourself on the oppression matrix?
8   A. They told us to look at it. They define what each
9       category was. So I had to rate myself, because I'm a
10      white person, into the privileged social group. I
11      didn't have to rate myself because I wasn't a white
12      male. So as a female, I could also fall into an
13      oppressed group. And then I had to look at -- we had
14      to look at each -- so if we were heterosexual or not
15      this gender, then we would be more privileged. And
16      then depending on how many categories we were would
17      tell us how privileged we had to admit to being.
18  Q. Okay. And so once you looked at that and these
19      people -- all the people around you had looked at
20      that, then they put you in a breakout room?
21  A. To the best of my knowledge, yes.
22  Q. Tell me what you discussed in that room. Let me ask
23      you this. Were you asked to reveal what your rating
24      was in that room?
25  A. We were asked to reveal the different categories that

Page 100

1       we belonged to. It wasn't a rating.
2   Q. And how would you tell the others what group you were
3       in?
4   A. Well --
5   Q. I mean, some of them are obvious.
6   A. I was going to say some of them are really obvious.
7   Q. Maybe they're not. I don't know.
8   A. And how did we feel about being assigned to those,
9       how did we feel about that. And, you know, it was a
10      reflection on where we fell in recognizing that we
11      had -- some people had more privileges than other
12      people just by being born into them.
13  Q. Or deciding that you are in it even if you're not?
14      I'm sorry. That's a side comment.
15          Okay. So did everyone -- was there like a big
16      reveal here in the breakout session with everybody
17      saying, well, I'm a this and I'm a that and I'm not
18      that? I mean, did everybody reveal where they were
19      on that chart?
20  A. I don't recall.
21  Q. And you don't remember having to do that?
22  A. I don't remember what the conversation -- the
23      specific conversation was.
24  Q. That's what I'm trying to get at.
25  A. Yeah.

Alpha Reporting & Video
417-887-4110        www.alphareportingservice.com        417-887-4110

Page 101

1  Q. You know, what you were asked to do. And so you were
2     actually discussing these things one at a time, it
3     sounds like?
4  A. Yes.
5  Q. Was there anybody in your breakout session that
6     didn't want to discuss this?
7  A. Yes.
8  Q. And who would that be?
9  A. I don't recall. This was -- I don't recall.
10 Q. Okay. Did you have trouble discussing it?
11 A. Yes.
12 Q. Can you generally tell me what your problem was with
13    discussing these issues? I'm not asking you
14    specifically what you put down. Just generally tell
15    me what your concerns were.
16 A. That I had to automatically admit or affirm that I
17    had white privilege; that if I was white and I
18    wasn't -- if I was white and I was this gender, then
19    I had additional privileges. If I was white and I
20    was this gender and I fell into a certain age group,
21    then I had even more privilege. Are you asking me
22    specifically what I objected to?
23 Q. Yes, whatever you'll tell me.
24 A. Yes. I objected to being told that, if I was white,
25    I could not say that I was an antiracist; that as an

Page 102

1     educator and as a parent, that I might be oppressive
2     to children or to my children or even to elderly
3     people. My parents would fall into that elderly
4     category, and I am very respectful to my parents.
5     And just because I was born one way doesn't make me
6     any more privileged than another person.
7  Q. Did you express that opinion in the meeting?
8  A. No.
9  Q. So you just said what you had to say and didn't say
10    what you didn't want to say?
11 A. Yes, sir.
12 Q. It must have been a short conference if everybody was
13    the same way.
14 A. It was a --
15 Q. That's not a fair statement. That's not a fair
16    question. What I'm saying is it seems like you may
17    not have said very much?
18 A. Correct.
19 Q. And did you even share where you set yourself on the
20    form?
21 A. I don't recall that I did, no.
22 Q. And you didn't remember anybody that -- you didn't
23    really remember what other people said?
24 A. No.
25 Q. Okay. So you're back in the full room. What happens

Page 103

1     next?
2  A. They asked if anybody cared to share their feelings
3     on the matrix.
4  Q. Did people share their opinions?
5  A. I --
6  Q. Their feelings, I think is what you said.
7  A. Yeah, their feelings. Not that I recall, no.
8  Q. Okay. So they were met with loud silence?
9  A. Yes, sir.
10 Q. And from your statement, I assume that -- well, let
11    me just ask. It would appear that you made no
12    statement about where you fell on the oppression
13    matrix.
14 A. I don't recall specific statements, no.
15 Q. Okay. Did anybody -- did any of the presenters call
16    anyone out?
17 A. I don't recall in this particular slide.
18 Q. Okay. Did any of the presenters do what they did in
19    the previous slide where they called on a group --
20    have a group member give a summary of the
21    conversation?
22 A. I don't recall on this specific slide.
23 Q. That's fine. The next item that is in the
24    complaint is the covert and overt white supremacy
25    chart.

Page 104

1  A. Yes.
2  Q. Tell me how this chart was handled in the -- I mean,
3     is it the same format? You have a discussion. Then
4     you go to a breakout room in a small group. Then you
5     come back to a full group. Or was it something
6     different?
7  A. This, to the best of my recollection, was a full
8     group and -- a full group.
9  Q. Okay. So you never broke out?
10 A. Not that I recall.
11 Q. Tell me who led this discussion. What presenter?
12 A. Dr. Yvania Garcia-Pusateri.
13 Q. What did she say about it?
14 A. She said that we might not all be familiar with these
15    terms on this covert/overt white supremacy chart.
16    She discussed specifically what overt white supremacy
17    meant. And then she said we're all very familiar
18    with overt white supremacy, but we may not -- people
19    may not be as familiar with other ways that they can
20    fall into the white supremacist category. She
21    specifically talked about the BIPOC Halloween
22    costumes, tokenism, the white savior complex,
23    color-blind. She talked about the English-only
24    initiatives. And those are the ones that she -- and,
25    again, the education funding from the property tax.

26 (Pages 101 to 104)

Alpha Reporting & Video
417-887-4110          www.alphareportingservice.com          417-887-4110
Case 6:21-cv-03219-MDH   Document 78-3   Filed 08/12/22   Page 26 of 34

Page 105

1  Those were the main ones.
2       COURT REPORTER: I'm sorry. What kind of
3  Halloween costumes did you say?
4  A. B-I-P-O-C.
5  Q. (By Mr. Ellis) Why don't you tell me what that means.
6  A. Being a person of another culture.
7  Q. Good to know. So did this chart -- I mean, this is
8     in a couple of different ways. It's the pyramid?
9  A. Yes.
10 Q. And you also had the side-by-side?
11 A. Yes.
12 Q. There was nothing you had to do. It was just a
13    discussion about the types of white supremacy?
14 A. Yes, they did ask for responses to any of the terms
15    on there. They asked if we were familiar with all
16    the terms and if there were terms that we weren't
17    familiar with.
18 Q. Did you ask questions?
19 A. Yes.
20 Q. All right. What was your question?
21 A. I asked the question about the BIPOC Halloween
22    costume.
23 Q. Thank you. I wasn't the only one that didn't know.
24    And what was their definition of that?
25 A. That if you dress up as another culture for

Page 106

1  Halloween -- as somebody from another culture for
2  Halloween, that it was considered a form of white
3  supremacy.
4  Q. Okay. Were you asked any questions -- other than you
5     asked that question, were you asked to provide any
6     information?
7  A. No.
8  Q. Was there anything about being -- I mean, they
9     asked -- it was a general call does anybody have a
10    question about definitions kind of?
11 A. Correct.
12 Q. And you responded. Was there anything about that
13    back-and-forth discussion that you considered to be a
14    violation of your rights?
15       MR. BOUCEK: Object to the form
16 Q. (By Mr. Ellis) You may answer.
17 A. I felt that -- a violation of my constitutional
18    rights by having a conversation?
19 Q. Yeah, by being asked what your question was.
20 A. No.
21 Q. The discussion that was had, did you have a concern
22    that that violated your rights --
23       MR. BOUCEK: Object to the form.
24 Q. (By Mr. Ellis) -- about the discussion about
25    covert/overt and white supremacy?

Page 107

1       MR. BOUCEK: Object to the form.
2  A. Yes.
3  Q. (By Mr. Ellis) And what was it you did not like about
4     that?
5  A. I don't agree with many of the statements that are on
6     there. Specifically I don't affirm to the fact that,
7     if we are color-blind, that we're racist; if we see
8     every human as a human being instead of specifically
9     looking at each person as a color, that we're racist.
10    I also disagreed with the conversation about the
11    Halloween costumes.
12       MR. ELLIS: Off the record.
13       (Discussion off record.)
14 Q. (By Mr. Ellis) Social identities chart -- was that
15    next?
16 A. To the best of my recollection, yes. In some order
17    on there, yes.
18 Q. Tell me about the social identities chart. What were
19    you asked to do?
20 A. We were asked to locate ourselves within the circle
21    of the social identities, and we had to put ourselves
22    into each of the categories. So we had to answer
23    those questions that were in that center box and then
24    put ourselves in the different categories of social
25    identities.

Page 108

1  Q. All right. Did you fill this one out?
2  A. No.
3  Q. Were you asked to?
4  A. We were on Zoom --
5  Q. Let me get the context of how this discussion
6     happened. At some point in time during the training,
7     you came to the part where they wanted to discuss the
8     social identities chart?
9  A. Yes.
10 Q. And I think the social identities chart is set forth
11    on Paragraph 72?
12 A. Yes, sir.
13 Q. And so did they ask you to fill out the social
14    identities chart?
15 A. Yes.
16 Q. And who was that? Yvania?
17 A. I don't recall who asked us to fill that out.
18 Q. One of the presenters?
19 A. One of the presenters, yes.
20 Q. Okay. And so you could choose to do it or not do it,
21    and you chose not to do it?
22 A. Yes.
23 Q. Was there a breakout session?
24 A. I don't recall specifically.
25 Q. Okay. Was there a large group discussion about it?

27 (Pages 105 to 108)

Alpha Reporting & Video
417-887-4110          www.alphareportingservice.com          417-887-4110
Case 6:21-cv-03219-MDH   Document 78-3   Filed 08/12/22   Page 27 of 34

Page 109

1   A. Yes.
2   Q. Who led that?
3   A. I don't recall if that was LA or Yvania.
4   Q. Do you remember anything that was said during that
5       large group discussion?
6   A. I do.  They actually referred us back to the
7       2019-2020 training that had somewhat similar social
8       identities charts.  And I believe it was LA that led
9       this part of the discussion because he was the
10      trainer for 2019-2020.  In that we talked about how
11      people's social identities can change over time and
12      that we needed to rate ourselves for where we -- look
13      at where we were and look at where we currently are
14      and how our identities are very fluid and they can be
15      shaped.
16  Q. Okay.  Were you asked specifically to say anything
17      during that part of the meeting?
18  A. No.
19  Q. Did you offer anything without being asked?
20  A. No.
21  Q. Were there other people that didn't speak?
22  A. Yes.
23  Q. Or was this just basically a lecture thing?  Do you
24      understand what I'm saying?
25  A. Yes, I do.

Page 110

1   Q. They're talking about it and discussing it but don't
2       ask any questions?
3   A. I believe that they did ask people to share where
4       they fell on the identity chart, yes.
5   Q. Did people agree to do that or not agree to do that?
6       What happened?  What was the mix?
7   A. Some people, as far as I recall, did agree.  People
8       participated.  I don't know if they -- I can't say if
9       they agreed or disagreed, but I believe -- they
10      provided participation.
11  Q. But you weren't asked?
12  A. I was not asked specifically, no.
13  Q. Okay.  Were there any other small or large group
14      discussions that we haven't discussed?
15  A. The four corners.
16  Q. Okay.  Let's talk about the four corners.  What was
17      that?  Is that the one with the goldfish?
18  A. Yes.
19  Q. With a fin?
20  A. Yes.
21  Q. Tell me about the four corners.  What is that about?
22  A. They read a series of statements, and we had to hold
23      up our -- this is where we had to hold up our
24      agree/disagree signs.  There was a series of
25      statements.

Page 111

1   Q. What were the statements that you were asked to agree
2       or disagree to?
3   A. To have a copy of the presentation.
4           MR. BOUCEK:  I can show her the slide if you
5       want me to.
6           MR. ELLIS:  Is this the list in the complaint?
7           MR. BOUCEK:  I'll have to look and see.  I
8       don't know that that's specifically laid out in the
9       complaint.  Just for the sake of the record, I'm in
10      Exhibit 13.01.  Ms. Henderson is seeing Slide 30
11      entitled "Identity/Beliefs/Values Four Corners
12      Reflection."
13  Q. (By Mr. Ellis) Read the first one.
14  A. Those weren't the questions.  That's the reflection
15      after the questions were asked.  I think it's in
16      13.04 at the end.
17          MR. BOUCEK:  Is it 31 and 32 here, Brooke?
18          THE WITNESS:  Yes.
19          MR. BOUCEK:  So for the record, this is
20      Slide 31 and 32 in Exhibit 13.04.
21  Q. (By Mr. Ellis) Okay.  Read the first one.
22  A. "I believe my students or staff feel safe at SPS."
23  Q. Okay.  And what were you asked to do with that?
24  A. Hold up our sign.
25  Q. Okay.  And you agreed -- did you agree to everything?

Page 112

1       You said you didn't.  You said earlier -- I don't
2       think you actually did the "agree" every time.
3   A. I did agree.
4   Q. All right.  What's the next one?
5   A. "I believe my students or staff feel safe in
6       Springfield."
7   Q. Okay.  And you answered?
8   A. Agree.
9   Q. The next one.
10  A. "I feel safe at SPS."
11  Q. And you answered?
12  A. Agree.
13  Q. The next one.
14  A. "I feel safe in Springfield."
15  Q. Your answer?
16  A. I agree.
17  Q. The next one.
18  A. "I believe SPS provides an engaging, relevant,
19      collaborative, learning, and working environment."
20  Q. And your answer?
21  A. I agreed.  "I believe in the SPS strategic plan."  I
22      agreed.
23  Q. Okay.  Next one.
24  A. "I was aware of the new Focus Area 5 goal before
25      today."  I agreed.

28 (Pages 109 to 112)

Alpha Reporting & Video
417-887-4110          www.alphareportingservice.com          417-887-4110
Case 6:21-cv-03219-MDH   Document 78-3   Filed 08/12/22   Page 28 of 34

Page 113

1  Q. Was that true?
2  A. Yes.
3  Q. Okay.  The next one.
4  A. "I believe my students or staff is represented in the
5     district." I agreed.
6  Q. Okay.
7  A. "I feel represented in the district." I agreed.
8  Q. Okay.  The next one.
9  A. Is that the last one?
10    MR. BOUCEK:  I think one of the other versions
11  that you've provided, 13.06, has additional
12  questions.  Do you want me to show her those?
13    MR. ELLIS:  If that's what she saw.
14    (Discussion off record.)
15  Q. (By Mr. Ellis) Is 13.06 what you saw during the
16  October 14, 2020, equity training?
17  A. Parts of it, yes.
18  Q. Well, look in particular at what we're talking about
19  now with the four corners.
20    MR. BOUCEK:  Are we at 13.06?
21    MR. ELLIS:  She just said parts of it.  So now
22  I'm honing down to what we're talking about right now
23  which is the four corners.
24    MR. BOUCEK:  Right.  In 13.06 or 13.04?
25    MR. ELLIS:  06.  I think we've done all the

Page 114

1  04s; right?
2    MR. BOUCEK:  That's correct.  Yes.
3    MR. ELLIS:  So 13.06.
4  A. Yes.  To the best of my recollection, those were also
5     asked.
6  Q. (By Mr. Ellis) How many were there extra?
7  A. Eight.
8  Q. Okay.  Give me the first one.
9    MR. BOUCEK:  Well, and there's this other slide
10  here.
11    THE WITNESS:  Those were the same, I believe.
12    MR. BOUCEK:  Right.  I think for the record,
13  just to keep it clear, Slide 28 of 13.06, she's
14  saying has additional questions from the ones in
15  13.04 that she just read.  Slide 29, I think, is the
16  questions from 13.04 that she just listed.  Have I
17  summarized that correctly?
18    THE WITNESS:  Yes.
19  Q. (By Mr. Ellis) Okay.  So let's hear about Slide 28.
20  A. "I believe all students should be treated equally."
21     I agreed.
22  Q. Okay.
23  A. "I believe all students should be treated equitably."
24     I agreed.
25     "I believe there's a difference between equity

Page 115

1  and equality." I agreed.
2     "I believe students' identities and lived
3  experiences should be supported in the school
4  environment." I agreed.
5     "I believe our district policies are inclusive
6  and supportive of student identities and lived
7  experiences." I agreed.
8     "I believe my identities and lived experiences
9  are affirmed and supported by the district." I
10  agreed.
11    "Learning about my identity makes me better in
12  my role." I agreed.
13    "I am prepared to have conversations with my
14  students and/or staff about identity or equity." I
15  agreed.
16    MR. BOUCEK:  And before we -- can I run to the
17  restroom just very quickly.
18    MR. ELLIS:  Sure.
19    (Break in proceedings.)
20  Q. (By Mr. Ellis) Have we discussed all of the responses
21  that you made on the four corners?
22  A. I believe so, yes.
23  Q. And the responses being by holding up a sign?
24  A. Yes.
25  Q. And in all cases I think you agreed?

Page 116

1  A. Yes.
2  Q. Were any of those answers that you gave to any of the
3  statements -- were any of those not truly your
4  opinion?
5  A. Yes.
6  Q. Okay.  Which ones?
7  A. "I believe my identities and lived experiences are
8     affirmed and supported by the district."
9  Q. Okay.  And that was the last one, wasn't it?
10  A. It was like the third from last.
11  Q. Okay.  Any others?
12  A. "I believe our district policies are inclusive and
13     supportive of student identities and lived
14     experiences."
15  Q. Okay.  I'd like to know why you don't think that to
16  be the case.
17  A. Because I believe that, when you call people racist
18  and you give them no option other than to agree or
19  affirm that, because you are born white, you're
20  racist, we're not giving an equal voice to all
21  students.
22  Q. Okay.  Got it.
23  A. "I feel safe at SPS."
24  Q. Okay.
25  A. I don't agree.

29  (Pages 113 to 116)

Alpha Reporting & Video
417-887-4110           www.alphareportingservice.com           417-887-4110
Case 6:21-cv-03219-MDH   Document 78-3   Filed 08/12/22   Page 29 of 34

## Page 117

1  Q. Okay.  Out of curiosity, why not?
2  A. I don't believe that this training specifically made
3     me feel safe.  I felt like we weren't safe to give
4     our opinion or we would be removed from the district.
5     So in regards to this training, it didn't feel safe.
6  Q. All right.
7  A. "I believe in the strategic plan."  I disagree.
8  Q. Strategic plan has a lot of things in it.
9  A. Correct.
10 Q. Do you disagree just with Focus Area 5 or one part of
11    Focus Area 5 or what?
12 A. Specific.  Not all of -- I don't disagree with the
13    entire strategic plan.
14 Q. Again, Focus Area 5 has to do with equity and
15    diversity?
16 A. Correct.  This statement asked if I believed in the
17    SPS strategic plan.
18 Q. Which there's five focus areas?
19 A. Yes.  Five, yes.
20 Q. I haven't heard you say anything about Focus Area 1
21    through 4.  So that's the only reason -- if your
22    concern was something about those, you know, I'd like
23    to know that.
24 A. Can you provide those to me so I could --
25 Q. No.  So all I'm saying is you had something in your

## Page 118

1     mind when you -- you just were agreeing to
2     everything, it sounds like?
3  A. I was just agreeing to everything, yes.
4  Q. And now in retrospect, you're saying that you didn't
5     agree with that really?
6  A. I didn't agree with it at the time.
7  Q. Okay.  Okay.  But you can't identify what area of the
8     strategic plan that you did not agree with?
9  A. Can I review the strategic plan?
10 Q. It's all right.  Let's go on.
11 A. Okay.
12 Q. Anything else about this?
13 A. "I believe my students or staff is represented in the
14    district."  Did I already answer that one?
15 Q. I don't know.
16 A. I don't believe that's the case because I believe
17    that not all students are represented in the
18    district.
19 Q. What kids do you think aren't represented?
20 A. I don't believe that fully represented are young
21    white boys who come from a Christian background.
22 Q. Okay.
23 A. I believe that Christian students aren't represented
24    in the district.
25 Q. Okay.

## Page 119

1  A. And "I feel represented in the district."  I don't
2     agree.
3  Q. Why not?
4  A. Because I feel like my voice at the time of this
5     training has not been heard.  My concerns have not
6     been heard.  And specifically this training, I was
7     told to agree.  So I felt like I was not being
8     represented because I either had to agree or be seen
9     as disrespectful, and my voice wasn't being
10    represented.
11 Q. Got it.  Anything else about this?
12 A. Not at this time, no.
13 Q. All right.  Let's take a break.
14    (Lunch recess taken.)
15 Q. (By Mr. Ellis) Earlier in your deposition today, we
16    discussed some times that you sought help for the
17    Canvas and had some communications with LA?
18 A. Yes.
19 Q. And E-mails.  And I've showed you -- I think you've
20    seen the three E-mails -- there's actually more than
21    three E-mails, but there's a thread E-mail.
22    MR. ELLIS:  Did you show those to her?
23    MR. BOUCEK:  She's reviewed them, yeah.
24 Q. (By Mr. Ellis) Why don't you mark the E-mail that the
25    front page -- the top says September 17, 2020,

## Page 120

1     Jeremy Sullivan.
2  A. Uh-huh.
3  Q. 30.01.
4  A. Okay.
5  Q. And the one -- the next one that's a single-page
6     October 15th E-mail from you to Lawrence Anderson as
7     30.02.  And the one that's December 4th -- it's got
8     two or three pages.  It's kind of a thread.  But the
9     last E-mail on it was December 4, 2020, as 30.03.
10    Okay.  I want to refer your attention to
11    DEX 30.01.  Do you recognize this as a series of
12    E-mails that involve you concerning and it's an
13    E-mail between you and Dr. Garcia-Pusateri?
14 A. I do not agree that I was involved in the E-mail with
15    Jeremy Sullivan.
16 Q. Okay.  Let's go through them all because I wasn't
17    asking you that actually.
18 A. Okay.
19 Q. But I see what your problem is.  Going back to the
20    last page which would be the first one in the string
21    is an E-mail from you to Dr. Garcia-Pusateri dated
22    September 17, 2020.  Actually -- yeah,
23    September 17, 2020.  Do you see that?
24 A. Yes.
25 Q. And it's at 12:11 p.m.?

Alpha Reporting & Video
417-887-4110          www.alphareportingservice.com          417-887-4110

Page 121

| | |
|---|---|
| 1 | A. Yes. |
| 2 | Q. And then there's another one right above that on |
| 3 | September 17th at 1:29 p.m. And on the second page |
| 4 | of this document, there's one on September 17, 2020, |
| 5 | at 1:29 p.m. That may be the same as the other. And |
| 6 | then one on September 17th at 1:31 p.m. Do you see |
| 7 | all those? |
| 8 | A. Yes. |
| 9 | Q. There's a whole series here. And it ends up -- the |
| 10 | question you were asking -- is it correct that the |
| 11 | question you were asking had to do with being able to |
| 12 | sign in at the end or confirm at the end of the |
| 13 | Canvas -- whatever Canvas module you were looking at |
| 14 | to be able to complete the Canvas module? Was that |
| 15 | the issue here? |
| 16 | A. No. |
| 17 | Q. Okay. What was it? |
| 18 | A. I was asking specifically in reference to her |
| 19 | direction that it was mandatory training if the |
| 20 | reflections were required. |
| 21 | Q. Right, the reflections. That's what it was. |
| 22 | A. Correct. |
| 23 | Q. So you got an answer -- |
| 24 | A. Yes. |
| 25 | Q. -- on the first one which was, yes, it is mandatory? |

Page 122

| | |
|---|---|
| 1 | A. Yes. |
| 2 | Q. And then you got -- Dr. Pusateri says -- on the |
| 3 | second page, middle, September 17, 2020, at |
| 4 | 1:30 p.m., she said "Yes, the reflection questions |
| 5 | are required"; right? |
| 6 | A. Yes. Correct. |
| 7 | Q. And then she actually sent an E-mail to |
| 8 | Jeremy Sullivan asking that same question, if you'll |
| 9 | look at the top, and he responded they aren't. That |
| 10 | is, the reflection questions aren't. "They reflect |
| 11 | on their own. We decided we didn't want them to |
| 12 | submit stuff except the confirmation at the end." Do |
| 13 | you see that? |
| 14 | A. Yes. |
| 15 | Q. Did you not get that particular part of this E-mail |
| 16 | string? |
| 17 | A. No, I did not. |
| 18 | Q. Okay. Did you ever get information back from |
| 19 | Dr. Garcia-Pusateri to tell you that, no, the |
| 20 | reflection area was not required? |
| 21 | A. No. |
| 22 | Q. Did you ever enter any reflection information on this |
| 23 | module? |
| 24 | A. Yes. |
| 25 | Q. Did it stick? Do you know? |

Page 123

| | |
|---|---|
| 1 | A. Yes. |
| 2 | Q. Then looking at DEX 30.02, do you recognize that as |
| 3 | an E-mail from you to LA? |
| 4 | A. Yes. |
| 5 | Q. And that was actually sent the day following the time |
| 6 | that you took the virtual programming? |
| 7 | A. Yes. |
| 8 | Q. All right. And then DEX 30.03 is an E-mail -- |
| 9 | several E-mails between you and Lawrence Anderson |
| 10 | concerning being able to complete one of the modules |
| 11 | on Canvas; correct? |
| 12 | A. No. |
| 13 | Q. Okay. What was it? |
| 14 | A. It was the reflection with the signature confirmation |
| 15 | at the very end. After the modules had been |
| 16 | completed, then you had a reflection and a signature |
| 17 | confirmation sheet. |
| 18 | Q. Okay. And he ended up telling you that he checked |
| 19 | and you had done everything you needed to do and you |
| 20 | were complete; right? At the top of the second page, |
| 21 | "Per our conversation, I was able to determine" -- |
| 22 | and he leaves words out. I think it means that he |
| 23 | was able -- "I was able to determine that you did |
| 24 | complete the module. Sorry for the confusion. Sorry |
| 25 | for the inconvenience. Please let me know if you |

Page 124

| | |
|---|---|
| 1 | have any other questions." |
| 2 | A. Yes, he did E-mail me that. |
| 3 | Q. Okay. And you said, no, thank you very much, and |
| 4 | that was the end of it. Okay. On page 26 of your |
| 5 | complaint, you set out a claim for relief? |
| 6 | A. Yes. |
| 7 | Q. Is it correct that the only monetary damages you're |
| 8 | requesting through your claims in this complaint are |
| 9 | set out in Paragraph E which states enter each |
| 10 | plaintiff an award for nominal damages of $1 per day |
| 11 | of mandatory equity training? |
| 12 | MR. BOUCEK: Object to the form. Answer if you |
| 13 | can. |
| 14 | A. Yes. |
| 15 | Q. (By Mr. Ellis) That's all the monetary damages you're |
| 16 | requesting? |
| 17 | A. Yes. |
| 18 | MR. BOUCEK: Object to the form. |
| 19 | MR. ELLIS: I'm done. |
| 20 | EXAMINATION |
| 21 | BY MR. BOUCEK: |
| 22 | Q. Ms. Henderson, did you E-mail -- receive an E-mail |
| 23 | from Dr. Garcia-Pusateri on September 17th about the |
| 24 | Canvas modules that you were required to take as |
| 25 | certified staff? |

31 (Pages 121 to 124)

Alpha Reporting & Video
417-887-4110          www.alphareportingservice.com          417-887-4110
Case 6:21-cv-03219-MDH   Document 78-3   Filed 08/12/22   Page 31 of 34

Page 125

```
 1   A. Yes.
 2   Q. Did that include social and emotional learning from
 3      an equity lens?
 4   A. Yes.
 5   Q. Did that include cultural consciousness in the
 6      classroom?
 7   A. Yes.
 8   Q. Did you take all the modules in social and emotional
 9      learning from an equity lens?
10   A. Yes.
11   Q. Did you take all of the modules in cultural
12      consciousness in the classroom?
13   A. Yes.
14      MR. BOUCEK:  That's all I have.
15      COURT REPORTER:  Signature?
16      MR. BOUCEK:  We'll read and sign.
17      (The deposition concluded at 1:18 p.m. on
18   May 18, 2022.)
19
20
21
22
23
24
25
```

Page 126

```
 1            DEPONENT'S SIGNATURE PAGE
 2
 3
 4
 5
 6   In Re:  Henderson vs. Springfield, et al.
        Case No. 6:21-CV-03219; USDC
 7
 8   Taken:  May 18, 2022
 9
        - - - - -
10
11
12
          _____
13        MARIAN BROOKE HENDERSON
14
15
16   Subscribed and sworn to before me this
17   _____ day of _____ , 20 ____.
18
19
          _____
20        Notary Public
21   My commission expires:
          _____
22
23
24
25
```

Page 127

```
 1       REPORTER'S CERTIFICATE
 2
     STATE OF MISSOURI     )
 3                         ) ss
     COUNTY OF CHRISTIAN   )
 4
 5       I, DEBBI BAILEY, Certified Court Reporter, do
     hereby certify that the witness was duly sworn by me;
 6   that the facts stated by me in the caption hereof are
     true; that the said witness did make the above and
 7   foregoing answers in response to questions propounded
     as shown; that I did, in stenotype, report said
 8   proceedings; and that the above and foregoing
     typewritten pages contain a full, true, and correct
 9   transcription of my shorthand notes taken on such
     occasion.  That presentment by me to the witness for
10   signature was waived; that the deposition will be
     thereafter by the witness read over, signed, and
11   sworn to on or before the date of trial; that said
     deposition is now herewith returned.
12
         I further certify that I am neither attorney
13   for, nor counsel for, nor related to, nor employed by
     any of the parties to the action in which this
14   deposition was taken; and, further, that I am not a
     relative or employee of any attorney or counsel
15   employed by the parties hereto, or financially
     interested in the action.
16
17
18
         _____
19          DEBBI BAILEY, CCR
            CCR No. 825
20
21
22
23
        ALPHA REPORTING & VIDEO
24      1911 South National, Suite 405
        Springfield, Missouri  65804
25         (417) 887-4110
```

32  (Pages 125 to 127)

Alpha Reporting & Video
417-887-4110              www.alphareportingservice.com              417-887-4110
Case 6:21-cv-03219-MDH   Document 78-3   Filed 08/12/22   Page 32 of 34

```
 1                  DEPONENT'S SIGNATURE PAGE          Page 126

 2

 3

 4

 5
        In Re:     Henderson vs. Springfield, et al.
 6                 Case No. 6:21-CV-03219; USDC

 7

 8      Taken:     May 18, 2022

 9

10                 - - - - -

11

12

13                    MARIAN  BROOKE  HENDERSON

14

15

16      Subscribed and sworn to before me this

17        7th    day of  June        , 2022 .

18

19                    Notary Public

20

21      My commission expires:

22      May 5 , 2025

23

24

25
```

TRENTON E BARGFREDE
Notary Public – Notary Seal
STATE OF MISSOURI
Greene County
My Commission Expires May 5, 2025
Commission #21382502

|     |     |                          |                          |                          |
| --- | --- | ------------------------ | ------------------------ | ------------------------ |

Page 128

1 | ERRATA SHEET FOR THE TRANSCRIPT OF:

2 | Case Name:   Henderson vs School District of Springfield, R-12

3 | Case Number: 6:21-CV-03219

4 | Dep. Date:   5/18/2022

5 | Deponent:    Marian Brooke Henderson

6 | CORRECTIONS:

7 | Pg.   Ln.   Now Reads              Should Read            Reasons Therefor

8 | _7_   _9_   under Child Find. A    under Child Find a      Should be one sentence.

9 | _10_  _23_  are supposed to --     are supposed to shame   Missing word.

10 | _29_  _13_  for --                 for Black Live Matter, Inc.   Missing word.

11 | _47_  _17_  you. -- saying         you. I emailed saying   Missing word.

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 | Marian Brooke Henderson

24 | ALPHA REPORTING & VIDEO

25 | 417-887-4110