**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **Brooke Henderson and Jennifer Lumley,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 6:21-CV-03219** |
| | ) | |
| **School District of Springfield, R-12; Board** | ) | |
| **of Education for the School District of** | ) | |
| **Springfield R-12; Dr. Grenita Lathan;** | ) | |
| **Dr. Yvania Garcia-Pusateri; and** | ) | |
| **and Lawrence Anderson,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## SUGGESTIONS IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Defendants School District of Springfield, R-12; Board of Education for the School District of Springfield, R-12; Dr. Grenita Lathan; Dr. Yvania Garcia-Pusateri; and Lawrence Anderson, by and through counsel, offer the attached Suggestions in Opposition to Plaintiffs' Motion for Summary Judgment.

Respectfully submitted,

ELLIS, ELLIS, HAMMONS & JOHNSON, P.C.

By:   _/s/ Ransom A Ellis, III_
      Ransom A Ellis, III    MBN:  29129
      rellis3@eehjfirm.com
      Todd A. Johnson    MBN:  38363
      tjohnson@eehjfirm.com
      Tina G. Fowler    MBN:  48522
      tfowler@eehjfirm.com
      2808 S. Ingram Mill Road, Suite A104
      Springfield, MO  65804
      Phone:  417-866-5091
      Fax:  417-866-1064
      *Attorneys for Defendants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………………………………………..ii

I. INTRODUCTION……………………………………………………………………1

II. DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT
OF UNCONTROVERTED MATERIAL FACTS……………………………………2

III. DEFENDANTS' ADDITIONAL RESPONSE TO PLAINTIFFS'
STATEMENT OF UNCONTROVERTED MATERIAL FACTS………………..…62

IV. ARGUMENT…………………………………………………………………..65

    A.    PLAINTIFFS' MOTION MUST BE DENIED
        FOR LACK OF STANDING…………………………………………………65

    B.    PLAINTIFFS ARE NOT ENTITLED TO JUDGMENT
        AS A MATTER OF LAW ON ANY OF THEIR
        SEPARATE CLAIMS…………………………………………………………67

        1.    Plaintiffs' motion as to their Count I claim
            must be denied…………………………………………………………67

        2.    Plaintiffs' motion as to their Count II claim
            must be denied…………………………………………………………75

        3.    Plaintiffs' motion as to their Count III claim
            must be denied…………………………………………………………79

    C.    DEFENDANTS ARE ENTITLED TO THEIR COSTS
        AND ATTORNEYS' FEES………………………………………………………80

V. CONCLUSION………………………………………………………….....80

i

## <u>TABLE OF AUTHORITIES</u>

**United States Supreme Court**

*Board of Directors of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537 (1987)………...………79

*Bob Jones Univ. v. U.S.*, 461 U.S. 574, 103 S.Ct. 2017 (1983)…………………………………..…73

*Christian Legal Soc. Chap. of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 130 S.Ct. 2971 (2010)……………………………………………………………..…79

*Garcetti v. Ceballos*, 547 U.S. 410, 126 S.Ct. 1951 (2006)………………………...……67, 71, 72

*Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002)……………………………………………...……1, 2

*Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 121 S.Ct. 2093 (2001)…………………..……78

*Grayned v. City of Rockford,* 408 U.S. 104 (1971)………………………………………………77

*Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 108 S.Ct. 562 (1988)……………………..73, 78

*Heart of Atlanta Motel, Inc. v. U.S.*, 379 U.S. 241, 85 S.Ct. 348 (1964)…………………………73

*Hurley v. Irish-American Gay, Lesbian and Bisexual Grp. of Boston,* 515 U.S. 557 (1995)..…68, 70

*Janus v. AFSCME,* 138 S.Ct. 2448 (2018)………………………………………………………68

*Keyishian v. Bd. of Regents,* 385 U.S. 589 (1967)………………………………………..76, 77

*Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 119 S.Ct. 2118 (1999)…………………………...…79

*L.L. Nelson Enterprises, Inc. v. County of St. Louis, Mo.*, 673 F.3d 799 (8th Cir. 2012)…………..…1

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130 (1992)………………………………65

*Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831 (1974)…………...…………67, 70

*Pacific Gas v. Pub. Utilities Comm. of Ca.*, 475 U.S. 1, 106 S.Ct. 903 (1986)……………...……67

*Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 92 S.Ct. 2694 (1972)…………….…………79

*Pleasant Grove City v. Summum*, 555 U.S. 460, 129 S.Ct. 1125 (2009)……………………75

*Plessy v. Ferguson,* 163 U.S. 537 (1896)……………………………………..…………73

*Pickering v. Bd. of Edu. of Twp. High Sch. Dist.*, 205, 391 U.S. 563, 88 S.Ct. 1731 (1968)………..67

*Police Dept. of Chicago v. Mosley*, 408 U.S. 92 (1972)……………………………………77

*Regents of the Univ. of Cal. v. Bakke,* 438 U.S. 265 (1978)………………………………...74

*Roberts v. U.S. Jaycees*, 468 U.S. 609, 104 S.Ct. 3244 (1984)……………………………………79

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 115 S.Ct. 2510 (1995)…………...75

*U.S. v. O'Brien,* 391 U.S. 367 (1968)…………….………………………………………68

ii

*Waters v. Churchill*, 511 U.S. 661 (1994)……………………………………………………………71

*West Virginia State Bd. of Edu. v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178 (1943)…………………..67

*Wooley v. Maynard*, 430 U.S. 705, 97 S.Ct. 1428 (1977)………………………………………...67, 68

**United States Courts of Appeals**

*ACLU of Fla. V. Miami-Dade Cty. Sch. Bd.*, 557 F.3d 1177 (11th Cir. 2009)………………....…75

*Altman v. Minn. Dpt. of Corr.*, 251 F.3d 1199 (8th Cir. 2001)……………………………….....…67

*Axson-Flynn v. Johnson*, 356 F.3d 1277 (10th Cir. 2004)………………………………………69

*Bryant v. Bell Atl. Md., Inc.,* 288 F.3d 124 (2002)…………………………………………………74

*C.N. v. Ridgewood Bd. of Edu.*, 430 F.3d 159 (3rd Cir. 2005)………………………………………...71

*Doe v. U.S.,* 901 F.3d 1015 (8th Cir. 2018)…………………………………………………………...68

*Keefe v. Adams*, 840 F.3d 523 (8th Cir. 2016)………………………………………………....……73

*Keeton v. Anderson-Wiley*, 664 F.3d 865 (11th Cir. 2011)………………………………72, 75, 78

*Lee v. York Cty. Sch. Div.,* 484 F.3d 687 (4th Cir. 2007)………………………………....……………73

*McAllum v. Cash*, 585 F.3d 214 (5th Cir. 2009)…………………………………………………...74

*Morrison v. Bd. of Educ. of Boyd County*, 521 F.3d 602 (6th Cir. 2008)……………………………66

*Padilla v. South Harrison R-II Sch. Dist.*, 181 F.3d 992 (8th Cir. 1999)……………………………75

*Parker v. Hurley*, 514 F.3d 87 (1st Cir. 2008)……………………………………………………...73

*Phelan v. Laramie County Comm. Coll. Bd. of Trustees*, 235 F.3d 1243 (10th Cir. 2000)…………69

*Robertson v. Anderson Mill Elem. Sch.*, 989 F.3d 282 (4th Cir. 2021)…………..…………………75

*Saxe v. State College Area Sch. Dist.*, 240 F.3d 200 (3rd Cir. 2001)………………………....…78

*Stahl v. City of St. Louis*, 687 F.3d 1038 (8th Cir. 2012)…………………………………………77

*Telescope Media v. Lucero*, 936 F.3d 740 (8th Cir. 2019)…………………………………....…68, 70

*U.S. v. Sindel*, 53 F.3d 874 (8th Cir. 1995)………………………………………………………67

*Williams v. Wendler*, 530 F.3d 584 (7th Cir. 2008)………………………………………...……74

**United States Federal District Courts**

*Benitez v. Tyson Fresh Meats, Inc.*, 2022 WL 1283087 (M.D. Tenn. 2022)…………………..……74

*Don't Shoot Portland v. City of Portland,* 2022 WL 2700307 (D. Oregon 2022)…………..……72

*Duren v. Byrd*, 2021 WL 3848105 (M.D. Tenn. 2021)………………………………………………70

iii

*Hanover Cty. Unit of the NAACP v. Hanover Cty.*, 461 F.Supp.3d 280 (M.D. Tenn. 2021)...........69

*Menders v. Loudoun Cty. Sch. Bd.*, 2022 WL 179597 (E.D. Va. 2022)…………..……………66, 75

*Preskar v. U.S.*, 248 F.R.D. 576 (E.D. Cal. 2008)…………………………………………………66

**Federal and State Statutes and Regulations**

20 U.S.C. §1681 *et seq.* (Title IX)………………………………………………………………77

29 U.S.C. § 701 *et seq.* (Section 504)……………………………………………………………77

42 U.S.C. § 1983 (Section 1983)……………………………………………………….......…..1

42 U.S.C. § 1988(a)……………………………………………………………………80

42 U.S.C. § 2000d *et seq.* (Title VI)………………………………………………………74, 77

42 U.S.C. §§ 2000e *et seq.* (Title VII)……………………………………………………74, 78

42 U.S.C. §§ 12132 *et seq.* (Title II of the ADA)……………………………………....…77

RSMo. § 213.010 *et seq*……………………………………...…………………………....…..78

**Other Resources**

Olwyn Conway, *Are There Stories Prosecutors Shouldn't Tell?: The Duty
to Avoid Racialized Trial Narratives*, 98 Denv. L. Rev. 457 (2021)………………………..……73

Ralph Richard Banks, *Beyond Colorblindness: Neo-Racialism and the Future of Race
and Law Scholarship*, 25 Harv. BlackLetter L.J. 41 (2009)…………………………………..……74

Russlynn Ali, OCR Dear Colleague Letter (Apr. 4, 2011)………………………………………77

EEOC Compliance Manual, §§ 15-II and 15-III (2006)…………………………………………74

# I. **INTRODUCTION**

Plaintiffs Brooke Henderson and Jennifer Lumley ("Plaintiffs") bring their 42 U.S.C. § 1983 action, individually, not as a class. Plaintiffs allege that their rights under the First Amendment of the United States Constitution were violated when the School District of Springfield, R12 (the "District")[1] required Plaintiffs, as non-teacher employees, to attend mandatory equity and diversity training in the fall of 2020. They support their motion with their opinions and political arguments rather than facts. They claim that they, as Christians, believe in colorblindness, meaning individuals should not be judged or assigned moral characteristics based on skin color. The crux of their claims is that because of their beliefs, the District, through its trainings, considers them white supremacists, and that because of their skin color, the District considers them privileged. Based on these personal assumptions, they balk at the District's request during trainings to be anti-racist staff and to commit to equity. They make absolutely no quarrel with the fact that they do not agree with those views. And, because they do not agree, they claim that during the trainings the District engaged in content and viewpoint discrimination and compelled their speech either by (1) requiring Plaintiffs to repeat the District's views, (2) denying Plaintiffs credit and pay if they expressed their own views, or (3) labeling Plaintiffs as white supremacists if they did not speak. In short, they claim these actions were wrongful and placed an unconstitutional condition on Plaintiffs' employment.

To prevail under Section 1983, however, Plaintiffs are required to show that the alleged wrongful conduct deprived each Plaintiff, individually, of a constitutionally protected right. *L.L. Nelson Enterprises, Inc. v. County of St. Louis, Mo*., 673 F.3d 799, 805 (8th Cir. 2012). Nothing short of an unambiguously conferred right will support a Section 1983 action. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002). "Section 1983 provides a remedy only for the deprivation of 'rights,

---

[1] Plaintiffs also named the Board of Education and certain employees in their official capacities.

privileges, or immunities secured by the Constitution and laws' of the United States ... [I]t is *rights*, not the broader or vaguer 'benefits' or 'interests,' that may be enforced under the authority of that section." *Id.* (emphasis in original). Plaintiffs cannot make this showing. Plaintiffs were not disciplined or penalized for their conduct during trainings, received credit and were paid for the trainings, and remain employees of the District. The First Amendment does not prohibit a school district from implementing a policy against racism and from requesting that its staff be anti-racist. The District's actions aimed at eliminating discrimination and creating inclusion did not infringe upon Plaintiff's constitutional rights. For the reasons below, Plaintiffs' motion must be denied.

## II.  DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED MATERIAL FACTS

Defendants respectfully offer the following admissions or denials:

1.  At all relevant times, the School District of Springfield, R-12 ("SPS") has employed Brooke Henderson as a 504 Process Coordinator in the Special Services Department. She is a certificated employee. (Ex. 1, Joint Stipulation of Facts ("Stip.") ¶ 3.)

Response:  Defendants admit this Paragraph.

2.  SPS has employed Jennifer Lumley since July 9, 2020, first as a Secretary in the Special Services Department and later as a Secretary in SPS's Analytics, Accountability and Assessment Department. (Stip. ¶ 2.)

Response:  Defendants admit this Paragraph and the following additional facts:

A.  During her employment with the District, Lumley[2] has always been a non-exempt, non-certificated employee. (Jungmann Affd, DEX C, ¶ 6; Rector Affd, DEX D, ¶¶ 6, 7; Lumley depo, DEX B, p. 3, lns 23-25, p. 4, lns 1-4; Rapert depo, DEX F, p. 14; Harrington Affd, DEX E, ¶ 2; DEX 2.06; DEX 12.02).

---

[2] Hereinafter, and solely for brevity and ease of discussion, when Plaintiffs or Defendants are referred to individually only their last names will be used. No disrespect is intended.

2

B.     Effective on September 13, 2021, Lumley received a transfer to the position

of full-time Secretary in the District's Analytics, Accountability and Assessment

Department. This transfer resulted in an approximate pay rate increase of two dollars fifty

cents per hour for Lumley. (Rector Affd, DEX D, ¶¶ 7, 34; Lumley depo, DEX B, pp. 4, lns

15-19, p. 5, lns.11-13; Harrington Affd, DEX E, ¶ 2; DEX 2.06; DEX 12.02).

**3.**     SPS is an urban public school district and political subdivision of the State of Missouri which is governed by the Board of Education for the School District of Springfield, R-12 ("Board"). (See Defs.' Am. Answer (Doc. 31) ¶ 28.)

<u>Response</u>:     Defendants admit this Paragraph.

**4.**     The Board has seven elected members. The Missouri General Assembly empowers it to govern and control SPS. (See id. ¶ 29.)

<u>Response</u>:     Defendants admit this Paragraph.

**5.**     SPS has employed Grenita Lathan as its Superintendent of Schools since July 1, 2021. (Stip. ¶ 4.) She is responsible for all SPS departments, including the Office of Equity and Diversity. (Ex. 23, Grenita Lathan/SPS Depo. 17:23 to 18:2.)

<u>Response</u>:     Defendants admit this Paragraph.

**6.**     SPS has employed Yvania Garcia-Pusateri since September 2019 as the Chief Equity and Diversity Officer in SPS's Office of Equity and Diversity. Her current job duties include the overseeing of the implementation of equity training. (Stip. ¶ 5; Ex. 4, Yvania Garcia-Pusateri/SPS ("YGP/SPS") Dep. 15:6-14.)

<u>Response</u>:     Defendants admit the first sentence in this Paragraph but deny the second

sentence. Defendants provide the following additional facts:

A.     Garcia-Pusateri has been employed by the District since September, 2019 as

the Chief Equity and Diversity Office in the District's Office of Equity and Diversity. (Stip.

¶ 5).

B.     Garcia-Pusateri's "job duties [are] to supervise [her] team, work with the

superintendent and her cabinet as well as executive leadership team to oversee initiatives

and programs focused on equity and diversity, supporting the District when it comes to ...

3

academics, HR, curriculum, learning, and ... provide a perspective on what it means to create initiatives that are going to be equitable for all students." (Garcia-Pusateri depo, DEX. G, p. 15, lns 7-14)

C.     As Chief Equity and Diversity Officer for the District, Garcia-Pusateri was responsible for working with the District's Executive Leadership Team "to oversee initiatives and programs focused on equity and diversity." (Garcia-Pusateri depo, DEX G, p. 25, lns 16-24).

**7.**     At all relevant times, SPS has employed Lawrence Anderson as a Coordinator in the Office of Equity and Diversity. In his role as a coordinator, he answers to Dr. Garcia-Pusateri. (Stip. ¶ 7; Ex. 14, Lawrence Anderson Dep. 12:13-16.)

Response:     Defendants admit this Paragraph.

**8.**     Ms. Henderson and Ms. Lumley believe strongly in equality, and that all individuals should have equal rights and opportunities under the law as set forth in our nation's founding documents and our civil rights laws. (Ex. 2, Brooke Henderson Decl. ¶ 5; Ex. 3, Jennifer Lumley Decl. ¶ 5.)

Response:     Defendants deny this Paragraph in that it only contains Plaintiffs' opinions and political argument rather than facts.

**9.**     They believe that law and society should be colorblind, meaning individuals should not be judged or assigned moral characteristics based on skin color. (Henderson Decl. ¶ 5; Lumley Decl. ¶ 5.)

Response:     Defendants deny this Paragraph in that it only contains Plaintiffs' opinions and political argument rather than facts.

**10.**     They also believe as Christians that identity is found in Christ alone, that all lives matter, that we all have equal worth based on our status as God's creation, and that our value is not found in superficial characteristics like race and sex, all of which are irrelevant under a biblical worldview. (Henderson Decl. ¶¶ 6, 32; Lumley Decl. ¶¶ 6, 25.)

Response:     Defendants deny this Paragraph in that it only contains Plaintiffs' opinions and political argument rather than facts.

4

**11.** They reject the idea that America is divided into the categories of privileged oppressors and oppressed, as defined by race or sex. (Henderson Decl. ¶ 7; Lumley Decl. ¶ 7.)

<u>Response</u>: Defendants deny this Paragraph in that it only contains Plaintiffs' opinions and political argument rather than facts.

**12.** They believe "equity," as SPS taught it, is a divisive concept that assigns characteristics based on immutable traits, like race or sex, and then categorizes people as privileged or oppressed. They believe it conditions individuals to attach undue importance to race, thereby deepening America's racial divide. (Henderson Decl. ¶ 7; Lumley Decl. ¶ 7.)

<u>Response</u>: Defendants deny this Paragraph in that it only contains Plaintiffs' opinions and political argument rather than facts.

**13.** For the 2020-2021 school year, SPS required all of its certificated and hourly staff to attend four hours of professional development. (YGP/SPS Dep. 115:19-24.)

<u>Response</u>: Defendants deny this Paragraph in that the use of the term "SPS" constitutes argument which is unaccompanied by citation. Defendants admit the following:

A. All certificated teachers and staff members are required to take training on various employment-related subjects each school year as a part of their required duties or in order to be qualified to perform their job. Training is often provided to teachers and staff on pre-selected "Professional Days" usually when students are not in school or virtually. (Jungmann Affd, DEX C, ¶ 34; Rector Affd, DEX D, ¶ 21).

B. The District's employees receive their regular rate of pay for training that occurs on Professional Days provided the employees take and complete the required training, makeup the missed training or use appropriate leave. If one of these things does not occur, employees are subject to having their pay docked for missing the required training. (Jungmann Affd, DEX C, ¶ 34; Rector Affd, DEX D, ¶ 21).

C. During school year 2019-20, Chief Human Resources Officer Penney Rector was responsible for engaging in collective bargaining negotiations with certified or

5

recognized representatives of employee groups in the District. (Jungmann, DEX C, Affd ¶ 35; Rector Affd, DEX D, ¶ 22; Harrington Affd, DEX E, ¶ 2; DEX 51.01).

     D.     During school year 2019-2020, Rector met with the Springfield National Education Association ("SNEA"), the recognized representative for collective bargaining for the Teachers' Bargaining Unit, to negotiate changes to their Collective Bargaining Agreement, which would be effective during school year 2020-21. During the negotiations, the District agreed to the following language change for Article 16, Wages, Section 1 of the Teachers' Collective Bargaining Agreement: "The attached salary schedule includes the three tenths of one percent (.30%) salary increase which was implemented in School Year 2018-19 to support four (4) additional hours of training beyond the current contracted school days and hours. This annual training supplements all current trainings in place in the school district. These four hours of training may include seated, simulation and other such trainings as deemed necessary and appropriate to support the needs of the district." (Jungmann, DEX C, Affd ¶ 35; Rector Affd, DEX D, ¶ 22; Harrington Affd, DEX E, ¶ 2; DEX 51.01).

     E.     The four (4) hours of "Supplemental" training referenced in this contractual language change was in addition to normal pay for training time on Professional Days and was scheduled to take effect in 2020. (Jungmann, DEX C, Affd ¶ 35; Rector Affd, DEX D, ¶ 22; Harrington Affd, DEX E, ¶ 2; DEX 51.01).

     F.     During school year 2020-21, the District elected to use the negotiated four (4) hour "Supplemental" training stipend ("Supplemental Pay") to pay its staff to attend three training programs: (a) the two hour Fall (2020) Equity Training; (b) a one hour mental health training program; and, (c) a one hour Alice Active-Shooter training program. (Jungmann Affd, DEX C, ¶ 36; Rector Affd, DEX D, ¶ 23; Harrington Affd, DEX E, ¶ 2; DEX 51.01).

6

G.     During school year 2020-21, the District required teacher and staff to attend and complete each of these three (3) training programs in order to qualify for the full four (4) hour "Supplemental Pay" training stipend. Employees who failed to attend some but not all of the three (3) training programs would receive a portion of the "Supplemental Pay" training stipend depending on the training completed. For example, an employee who attended the one hour mental health training program and the one hour Alice Active-Shooter training program, but did not attend the two hour Fall (2020) Equity Training, would receive two hours of the four hour "Supplemental Pay" training stipend. (Jungmann Affd., DEX C, ¶ 37; Rector Affd, DEX D, ¶ 24; Harrington Affd, DEX E, ¶ 2; DEX 51.01).

**14.**     SPS required all of its certificated and hourly staff including Ms. Henderson and Ms. Lumley to attend a district-wide equity training during the Fall Semester of school year 2020-21 ("Equity Training"). (Stip. ¶ 8.)

Response:     Defendants deny this Paragraph in that the use of the term "SPS" constitutes argument which is unaccompanied by citation, and Plaintiffs' statement of Stipulation ¶ 8 does not correctly state the stipulation entered into by the parties. Defendants admit Stipulation 8, which states:  "Defendant District required all of its certificated and hourly staff (including Plaintiffs Henderson and Lumley), but not including leadership staff, to attend the Fall (2020) District-Wide Equity Training during the Fall Semester of school year 2020-21." (PEX 1, Stip ¶ 8).

**15.**     SPS's certificated and hourly staff received required hours of professional development credit for attending the Equity Training. (Ex. 7, SPS Interrog. Answers, No. 10; Stip. ¶ 15.)

Response:     Defendants deny this Paragraph, but agree to the following facts:

A.     "During School Year 2020-21, District employees who completed four (4) hours of additional training designated by the District – which were above and beyond the training built into their salaries – received an additional three tenths of one percent (.3%) of their salary. During School Year 2020-21, two of the designated training programs were the

7

Fall (2020) Equity Training (SPS Discovery Exh. 13.01) and an Active Shooter program." (EX. 7, SPS Interrog. Answer No. 10).

B. The four (4) hours of "Supplemental" training referenced in the negotiated language in the Teacher Collective Bargaining Agreement, was in addition to normal pay for training time on Professional Days and was scheduled to take effect in 2020. (Jungmann, DEX C, Affd ¶ 35; Rector Affd, DEX D, ¶ 22; Harrington Affd, DEX E, ¶ 2; DEX 51.01).

C. During school year 2020-21, the District elected to use the negotiated four (4) hour "Supplemental" training stipend ("Supplemental Pay") to pay its staff to attend three training programs: (a) the two hour Fall (2020) Equity Training program; (b) a one hour mental health training program; and, (c) a one hour Alice Active-Shooter training program. (Jungmann Affd, DEX C, ¶ 36; Rector Affd, DEX D, ¶ 23; Harrington Affd, DEX E, ¶ 2; DEX 51.01; DEX 13.01).

D. During school year 2020-21, the District required teacher and staff to attend and complete these three (3) training programs in order to qualify for the four (4) hour "Supplemental Pay" training stipend. Employees who failed to attend some but not all of the training programs would receive a portion of the "Supplemental Pay" training stipend depending on the training completed. For example, an employee who attended the one hour mental health training and the one hour Alice Active-Shooter training, but did not attend the two hour Fall (2020) Equity Training, would receive two hours of the four hour "Supplemental Pay" training stipend. (Jungmann Affd., DEX C, ¶ 37; Rector Affd, DEX D, ¶ 24; Harrington Affd, DEX E, ¶ 2; DEX 51.01).

**16.** SPS informed Ms. Henderson and Ms. Lumley that if they did not attend the Equity Training, they would not receive the required hours of professional development credit. (Stip. ¶ 15; Henderson Decl. ¶ 11; Lumley Decl. ¶ 10; see also YGP/SPS Dep. 211:14-21)

<u>Response</u>:      Defendants deny this Paragraph in that the use of the term "SPS" constitutes argument which is unaccompanied by citation. Defendants admit the following:

A.      Defendants agree with the language of Stipulation ¶ 15, which states: "On October 15, 2020, David Whitson, Associate Director of Special Services for the District, sent an email to thirty-two (32) of the District's Special Services employees, including Henderson, which stated in pertinent part:

'Several participants [sic] did not sign in to yesterday's Equity and Diversity training. If you attended yesterday and did not sign in, please swing by Phil Hale's desk and complete the sign-in sheet. ***This is the only way you will receive credit for your attendance in the training***. If the sign-in sheet is not completed, you will be asked to attend a make-up session in the coming weeks.' (Emphasis added).

(Stip. ¶ 15).

B.      During school year 2020-21, the District required teacher and staff to attend and complete three (3) training programs (the Fall (2020) Equity Training); the Alice active shooter training and a mental health training) in order to qualify for the four (4) hour "Supplemental Pay" training stipend. Employees who failed to attend some but not all of the three (3) training programs would receive a portion of the "Supplemental Pay" training stipend depending on the training programs they completed. For example, an employee who attended the one hour mental health training and the one hour Alice Active-Shooter training, but did not attend the two hour Fall (2020) Equity Training, would receive two hours of the four hour "Supplemental Pay" training stipend. (Jungmann Affd., DEX C, ¶ 37; Rector Affd, DEX D, ¶ 24; Harrington Affd, DEX E, ¶ 2; DEX 51.01).

**17.**     Ms. Henderson and Ms. Lumley understood this to mean that if they did not attend the Equity Training, SPS would withhold their pay. (Henderson Decl. ¶ 11; Lumley Decl. ¶ 10; see also SPS Interrog. Answers, No. 10; Ex. 6, DEX 50-C009936 ("Staff members are required to complete training, or they will be docked pay."); Ex. 5 at PLS 0407-08 ("Please remember that if you do not attend this training, your pay will be docked.")).

9

Response:    Defendants deny this Paragraph, in that it contains the opinions and suppositions of Plaintiffs which do not constitute a statement of fact and are not relevant to any issue in this case and the "statement of fact." Defendants further deny this Paragraph as Exhibits 5 and 6 to Plaintiffs' motion (1) were not sent to Plaintiffs and (2) were sent "after" Plaintiffs had completed their trainings (i.e. the emails were sent on February 8, 2021 and March 1, 2021). Defendants agree to the following statements of fact which are supported by citation:

A.    On October 6, 2020, Lumley received "credit" for attending and completing the two (2) hour Fall (2020) Equity Training and was paid her regular rate of pay for attending and completing that training program. (Jungmann Affd, DEX C, ¶ 38; Rector Affd, DEX D, ¶ 25; Lumley depo, DEX B, p. 15, lns. 8-13; Harrington Affd, DEX E, ¶ 2; DEX 13.03, 51.01).

B.    During school year 2020-21 Lumley attended "all of the training sessions she alleges the District required her to attend" and her pay was not reduced. (Lumley depo, DEX B, pp. 8-13).

C.    After completing the Fall (2020) Equity Training on October 6, 2020, Lumley did not file an internal grievance pursuant to the Board's Policy AC – Prohibition Against Illegal Discrimination, Harassment and Retaliation or otherwise complain to Rector, Chief Human Resources Officer and Compliance Officer, concerning any aspect of the training she received during the October 6, 2020 Equity Training. (Lumley depo, DEX B, pp. 27-28; Rector Affd, DEX D, ¶ 34; Harrington Affd, DEX E, ¶ 2; DEX 32.01).

D.    On October 14, 2020, Henderson attended and completed the two (2) hour Fall (2020) Equity Training. (Jungmann Affd, DEX C, ¶ 39; Rector Affd, DEX D, ¶ 26; Henderson depo, DEX A, p. 16, lns 4-10, p. 54, lns. 3-9; Harrington Affd, DEX E, ¶ 2; DEX 13.02, 51.01).

10

E.	During school year 2020-21, Henderson also attended and completed the one hour mental health training program and the one hour Alice Active-Shooter training program. (Jungmann Affd, DEX C, ¶ 39; Rector Affd, DEX D, ¶ 26; Henderson depo, DEX A, p. 44, lns. 2-10).

F.	Henderson received "credit" for taking and completing the two (2) hour Fall (2020) Equity Training and the one hour mental health training program and the one hour Alice Active-Shooter training program and received four hours of "Supplemental Pay". (Jungmann Affd, DEX C, ¶ 39; Rector Affd, DEX D, ¶ 26; Henderson depo, DEX A, p. 44, lns. 2-10); Harrington Affd, DEX E, ¶ 2; DEX 13.02, 51.01). Henderson's pay was also never reduced. (Henderson depo, DEX A, p. 50, l. 20 to p. 51, l. 8; p. 51, l. 19-21).

G.	On October 15, 2020, the day after completing the Fall (2020) Equity Training, Henderson sent an email to Anderson which thanked him for presenting at the equity training she attended but made no comments alleging that the District or anyone else had violated her First Amendment Rights during the training. (DEX 51.04).

H.	After completing the Fall (2020) Equity Training on October 14, 2020, Henderson did not file an internal grievance pursuant to Board of Education Policy AC – Prohibition Against Illegal Discrimination, Harassment and Retaliation or otherwise complain (verbally or in writing) to Rector, Chief Human Resources Officer or Compliance Officer for the District concerning any aspect of the training she received during the October 14, 2020 Equity Training. (Rector Affd, DEX C, ¶ 33; (DEX 32.01).

I.	Lumley has not received discipline during her employment with the District. (Rector Affd, DEX D, ¶¶ 7, 28; Rapert depo, DEX F, p. 14, lns. 9-18).

J.      Henderson has not received discipline during her employment with the District. (Jungmann Affd, DEX C, ¶¶ 4, 28; Rector Affd, DEX D, ¶¶ 5, 28; Rapert depo, DEX F, p. 13, lns. 19-25, p.14, lns 1-4; DEX 2.07).

K.      Effective on September 13, 2021, Lumley received a transfer to the position of full-time Secretary in the District's Analytics, Accountability and Assessment Department. This transfer resulted in an approximate pay rate increase of two dollars fifty cents per hour for Lumley. (Rector Affd, DEX D, ¶¶ 7, 34; Lumley depo, DEX B, pp. 4, lns 15-19, p. 5, lns.11-13; Harrington Affd, DEX E, ¶ 2; DEX 2.06; DEX 12.02). This transfer, promotion and increase in pay occurred after Plaintiffs filed their Complaint (DOC 1).

L.      Plaintiffs did not know of anyone who got kicked out of a training session, was denied credit or was disciplined in some way based on their conduct during the training session. (Henderson Depo, DEX A, p. 63, l. 6-12; and Lumley depo, DEX B, p. 19, l. 5-13).

M.      No employee of the District was terminated from employment because the employee failed or refused to attend the Fall (2020) Equity Training or failed to complete the training program. (Jungmann Affd, DEX C, ¶ 41; and Rector Affd, DEX D, ¶ 29).

**18.**      On June 2, 2020, about three months before SPS launched its Equity Training, Dr. Garcia-Pusateri emailed SPS's certificated teachers and staff informing them that it was their "responsibility to be equity champions" and announced SPS's intention to expand its equity and diversity training. The email stated, in part:

"In our role as SPS educators, it is our responsibility to be equity champions for all students and to create learning environments that are inclusive and affirming of all identities and lived experiences. The following resources are designed to help us better understand the challenges we face in order to better serve and support our students and colleagues. I encourage you to read, reflect and engage . . .. The learning should not stop with these resources, but continue to expand. . . . This is also why training and professional learning will continue throughout the district."

(Ex. 8 at PLS 0334; see Henderson Decl. ¶ 9.)

Response:      Defendants admit this Paragraph, except for the use of the word "SPS's intention" which constitutes argument and is unaccompanied by citation.

**19.**     Dr. Garcia-Pusateri's June 2, 2020 email also included hyperlinks to a series of articles about equity and diversity including: (1) "Stop Asking People Of Color to Explain Racism—Pick Up One of These Books Instead," (2) "For Our White Friends Desiring to Be Allies," and (3) "The Anti-Racist Reading List: Because allyship can't be proven with a few social media posts." (Ex. 8 at PLS 0335-99.)

Response:     Defendants admit this Paragraph.

**20.**     "For Our White Friends Desiring to Be Allies," discusses "six things you can do to be stronger allies," including:

[S]top talking about colorblindness. . . . It will never be possible for us to be colorblind, and we shouldn't ever want to be. . . . We have to name these things, acknowledge them, and begin to do the deep work of transformation, restoration – and reparation. . . . Privilege means that you owe a debt. . . . It is up to you whether you choose to acknowledge the work that is yours to do. It is up to you whether you choose to pay this debt and how you choose to do so. . . . I urge you to pursue this work, knowing that a system of white privilege afforded you access to opportunities while denying them to so many others.

(Id. at PLS 0383-86.)

Response:     Defendants deny this Paragraph in that it contains opinion and political argument and is not relevant to any issue raised in Plaintiffs Complaint.

**21.**     "Stop Asking People of Color to Explain Racism—Pick Up One of These Books Instead," states:

When I call [white people] on their racism, they practically come unglued. They swear they "didn't mean anything by it" and "don't have a racist bone" in their bodies. They might pipe up some ridiculous white sh— about black-on-black crime, the fact that they once dated a black person, the race card, color blindness, All Lives Matter, or reverse racism. I can predict in almost every situation what the person is going to say before they say it. . . . Many of us are parents, and if we're going to change the tide for future generations, we have to tackle race head-on instead of evading it or pretending we are, as many white people have told me, all- one-race the-human-race.

(Id. at PLS 0387-89.)

Response:     Defendants admit this Paragraph.

**22.**     SPS also provided Ms. Henderson and Ms. Lumley a packet of printed materials before their Equity Training sessions, which included these handouts:

a.     Land Acknowledgement;
b.     Guiding Principles;
c.     "Greetings!";
d.     Focus Area V;
e.     Fall Training Note Sheet;
f.     Oppression Matrix;

13

g.     Covert/Overt White Supremacy graphic;

h.     Social Identity Map; and

i.     Terminology sheet.

(Ex. 9; Stip. ¶¶ 16-17; see also Ex. 10, Philip Hale Dep. 15:4-7, dep. ex. 2.)

<u>Response</u>:     Defendants deny this Paragraph in that it contains opinion and political argument by use of the word "SPS also provided" which is unaccompanied by citation. Defendants admit this Paragraph if it is changed to read: "Ms. Henderson and Ms. Lumley received a packet of printed materials before their Equity Training sessions, which included these handouts." Defendants provide the following response:

A.     Employee Phil Hale was responsible for handing out the written training materials to employees in the Department of Special Services which were used for the Fall (2020) Equity Training on October 14, 2020. (Hale depo, DEX J, p. 9, lns. 12-15; p. 13, lns. 16-21; Hale depo, DEX J, Exh.2).

B.     These training materials consisted of the exhibits marked as Hale depo, DEX J, Exh 2, but did not include the "agree, disagree, strongly agree, or strongly disagree signs" marked as "Hale depo, DEX J, Exh 3". Hale had not seen the documents marked as "Exh 3" (Hale depo, DEX J, Exh 3) before the exhibit was shown to him at his deposition on June 16, 2022. (Hale depo, J, pp. 11-12; 14-17).

C.     Lumley was not provided with signs that read "agree, disagree, strongly agree, or strongly disagree" for the October 6, 2020 Equity Training. (Lumley depo, DEX B, p. 19, lns. 14-17).

D.     Dr. Tayna Rapert, who attended the October 14, 2020 Equity Training with Henderson, did not receive a copy of any signs that said, "agree, disagree, strongly agree, or strongly disagree" when she received her packet of training materials from Hale (Rapert

14

depo, DEX F, p. 19, lns. 9-19) or during the Fall (2020) Equity Training on October 14, 2020

(Rapert depo DEX F, p. 19, lns. 20-23).

      E.     None of the presenters had or used the "agree, disagree" signs at the October

14, 2020 training. (Garcia-Pusateri depo, DEX G, p. 129, lns. 12-13).

**23.**    SPS made Ms. Henderson's packet of handouts available to her two days before her
Equity Training session. (Stip. ¶ 16; see also Hale Dep. 9:12 to 10:17, dep. ex. 1.)

    <u>Response</u>:    Defendants deny this Paragraph in that the use of the term "SPS" constitutes

argument which is unaccompanied by citation. Defendants agree to the language in the parties' PEX

1, Stipulation ¶ 16 rather than Plaintiffs' interpretation of that stipulation:

> "On October 12, 2020, Phillip Hale, an Administrative Assistant in Defendant
> District's Special Services Department, sent an email to thirty (30) Special Services
> employees, including Henderson, which stated in pertinent part: 'Your Equity and
> Diversity Training Packets are available at my desk starting Monday, October 12,
> 2020.'"

(PEX 1, Stipulation ¶ 16)

**24.**    SPS provided substantially the same packet of printed materials to all SPS employees
before their respective Equity Training sessions. (YGP/SPS Dep. 128:9-11.)

    <u>Response</u>:    Defendants deny this Paragraph in that the use of the term "SPS" constitutes

argument which is unaccompanied by citation. Defendants admit the following additional facts:

      A.     The "packet" of handouts for the October 14, 2020 Equity Training that was

attended by Henderson was distributed by employee Hale to the Special Services employees

beginning on October 12, 2020. (Hale depo, DEX J, p 12-13; Hale depo, DEX J, Exh 2.)

      B.     These training materials consisted of the exhibits marked as Hale depo, DEX

J, Exh 2, but did not include the "agree, disagree, strongly agree, or strongly disagree signs"

marked as "Hale depo, DEX J, Exh 3". Hale had not seen the documents marked as "Exh 3"

(Hale depo, DEX J, Exh 3) before the exhibit was shown to him at his deposition on June

16, 2022. (Hale depo, J, pp. 11-12; 14-17; Garcia-Pusateri depo, DEX G, p. 128, lns 9-11.)

15

C.     Lumley was not provided with signs that read "agree, disagree, strongly agree, or strongly disagree" for the October 6, 2020 Equity Training. (Lumley depo, DEX B, p. 19, lns. 14-17).

**25.**     The "Greetings!" handout stated, in part, "[Equity and diversity] is more than a value, but now part of our work and job responsibilities. ... [W]e all are now accountable in this work as well. Growing a deeper sense of cultural consciousness is something we must commit to, not just for ourselves but for all our students. As with any presentation, I ask that you remain engaged and professional and provide our trainers complete attention and respect." (Ex. 9 at PLS 0425.)

<u>Response</u>:     Defendants deny this Paragraph, in that it adds certain words to the text of the document. Defendants agree to the following fact statement: "The "Greetings!" handout stated in part:

> "... This means that this is more than a value, but now part of our work and job responsibilities. As the district will be held accountable to ensure Equity and Diversity take place and is affirmed in our schools, we all are now accountable in this work as well. Growing a deeper sense of consciousness is something we must commit to, not just for ourselves but for all our students. As with any presentation, I ask that you remain engaged and professional and provide our trainers complete attention and respect."

(PEX Ex. 9 at PLS 0425).

**26.**     According to SPS, "cultural consciousness" refers to "[t]he deeper sense of awareness of other people and the identities they hold," including awareness of race. (YGP/SPS Dep. 103:18-25.)

<u>Response</u>:     Defendants deny this Paragraph in that it uses the term "SPS" which constitutes argument and is unaccompanied by citation. Defendants admit that Garcia-Pusateri gave her opinion as stated below, but deny that such opinion was that of any other Defendant in this case. Defendants provide the following response:

A.     Garcia-Pusateri stated her opinion that "cultural consciousness" means "having a deeper sense of the awareness of other people and the identities they hold."

(Garcia-Pusateri depo, DEX G, p. 103, lns. 18-22).

16

27.     The Covert/Overt White Supremacy graphic indicated that "colorblindness," "All Lives Matter," and "white silence" constituted white supremacy. (Ex. 9 at PLS 0425.)

Response:       Defendants deny this Paragraph in that it is materially inaccurate on its face. The Covert/Overt White Supremacy graphic, as stated by the trainers during training, indicated that colorblindness, All Lives Matter, and white silence "can support th[e] structural system of white supremacy." Garcia-Pusateri depo, DEX G, p. 21, l. 12 to p. 22, l. 18; and its deposition exhibit no. 3, p. 13; *also see* Plaintiffs' Uncontroverted Facts, ¶ 39, and Plaintiffs' Exhibit 15, p. 13. Further, trainees were told that they were not being called "as an individual a white supremacist." *See id.*

 Defendants provide the following additional response:

A.      The October 6, 2020 Training session attended by Lumley did not contain a discussion about the white supremacy chart. No small group session was held on the chart. No one called Lumley's name or asked her directly if she understood the chart. Lumley was not asked to affirm or agree to anything that had been presented about the chart or to write anything down. Rather, the participants were told that they could look at the chart on their own time. (Lumley depo, DEX B, p. 24, lns. 12-25, p. 25, lns. 1-18).

B.      During the October 14, 2020 Equity Training, Henderson was never called on by the trainers to answer questions during the large group sessions. (Henderson depo, DEX A, p. 59, lns. 4-11).

C.      During the October 14, 2020 Equity Training Henderson asked a presenter a question concerning the best way to respond to a young child who wanted to wear a Pocahontas costume at Halloween to which the presenter responded that one might try to explain to the child another way the child could learn about Native Americans rather than by dressing up as Pocahontas. (Rapert depo, DEX F, p. 28-30). Henderson did not consider

17

that the conversation with the trainers about her questions to be a violation of her constitutional rights. (Henderson depo. DEX A, p. 106, lns. 12-14, 17-20).

**28.** According to SPS, colorblindness is not an equitable concept, colorblindness can have harmful ramifications, and equality "takes in colorblindness." (YGP/SPS Dep. 66:16 to 67:6, 68:7-9, 70:19 to 71:16, 96:4-7.)

<u>Response</u>: Defendants deny this Paragraph in that the use of the term "SPS" constitutes argument which is unaccompanied by citation. Defendants admit that Garcia-Pusateri gave her opinion as stated below, but deny that such opinion was that of any other Defendant in this case. Defendants provide the following response:

      A. Garcia-Pusateri expressed the following opinions during her deposition: (1) "Colorblindness" says "that I see you as just the person rather than seeing you with everything that you come with." (Garcia-Pusateri depo, DEX G, p. 66, lns. 18-20); (2) Colorblindness "can have harmful impacts" because "it can make someone feel like you do not want to see them for their identity or their lived experience." (Garcia-Pusateri depo, DEX G, p. 66, ln. 25; 67, lns. 2-3); (3) "Equality. ... [treats] everyone the same and sees them as all the same [w]hereas, equity is about seeing their whole selves and their whole personhood." (Garcia-Pusateri depo, DEX G, p. 68, lns. 3-6); (4) "I don't think equality is harmful. I think there is a better way [to make] people feel safe and supported." (Garcia - Pusateri depo, DEX G, p. 68, lns. 13-15).

**29.** According to SPS, colorblindness "is a form of white supremacy." (YGP/SPS Dep. 115:12-18; Ex. 9 at PLS 425.)

<u>Response</u>: Defendants deny this Paragraph in that it constitutes argument in that use of the term "SPS" constitutes argument which is unaccompanied by citation. Defendants admit that Garcia-Pusateri gave her opinion as stated below but deny that such opinion was that of any other

Defendant in this case. Defendants provide the following response:  Garcia-Pusateri expressed the

following opinions during her deposition:

> (1)    "[T]he goal [of the training] is to have [employees] learn more about it
> and question ... their practices ... so it ends up helping students become more safe and
> supported. But it is not to change people – no one can change people's hearts and minds
> without having them review certain things, provide some learning for them to start
> thinking about things. And then ultimately it's their decision." (Garcia-Pusateri depo
> DEX G, p. 114, lns. 23-25; p. 115, lns. 1-5).

> (2)    "It's to think about how colorblindness might have been the concept that
> people may have said, "Oh, it's just better to do that." But then to see how it might be
> hurtful, yes, and that it is a form of white supremacy." (Garcia-Pusateri depo DEX G, p.
> 115, lns. 14-18).

**30.**    The "Oppression Matrix" handout listed types of oppression and included racism and
sexism as categories. It also listed the privileged social group under racism as "White People" and
the oppressed social groups as "Asian, black, Latina/o, native people." It listed the privileged social
group under sexism as "Male assigned at birth," and the oppressed social group as "Female assigned
at birth." (Ex. 9 at PLS 0424.)

Response:    Defendants deny this Paragraph in that it constitutes opinion and is not

relevant to any matter that is contained in Plaintiffs' Complaint. Defendants provide the following

fact statements:

> A.    The October 6, 2020 Equity Training attended by Lumley contained a

discussion about the oppression matrix, but the participants did not have to rate themselves

on the oppression matrix slide, no small group session was held on the oppression matrix

presentation and Lumley was not asked her opinion about the oppression matrix. (Lumley

depo, DEX B, p. 23, lns. 12-25, p. 24, lns. 1-7).

> B.    The October 14, 2020 Equity Training attended by Henderson contained a

discussion about the oppression matrix and a small group session. Henderson did not recall

if the employees in her small group session revealed where they were on the Matrix and

Henderson could not recall if she revealed where she had placed herself on the Matrix.

(Henderson depo DEX A, p. 100, lns. 16-20; p. 102, lns. 19-22).

C.    The Oppression Matrix includes other types of oppression including transgender oppression, heterosexism, classism, ableism, religious oppression, and ageism. Attendees were told that the trainers themselves had privileges. Garcia-Pusateri depo, DEX G, p. 21, l. 12 to p. 22, l. 18; and its deposition exhibit no. 3, p. 6; also see Plaintiffs' Uncontroverted Facts, ¶ 39, and Plaintiffs' Exhibit 15, p. 6.

**31.**    SPS communicated the following guiding principles for the Equity Training in the "Guiding Principles" handout:
a.    Stay Engaged;
b.    Lean into your discomfort;
c.    Speak YOUR Truth and from YOUR Lived Experiences;
d.    Acknowledge YOUR privileges;
e.    Seek to Understand;
f.    Hold YOURSELF accountable; and
g.    Be Professional.
(Id. at PLS 0428.)

Response:    Defendants deny this Paragraph in that the use of the term "SPS" constitutes argument which is unaccompanied by citation. Defendants provide the following response:

A.    The "Guiding Principles" document was contained in a "handout" distributed by Hale to the Special Services employees beginning on October 12, 2020. (Hale depo DEX J, p 12-13; depo Exh 2).

B.    The "handout" consisted of the exhibits marked as Hale depo, DEX J, Exh 2, but did not include the "agree, disagree, strongly agree, or strongly disagree signs" marked as "Hale depo, DEX J, Exh 3". Hale had not seen the documents marked as "Exh 3" (Hale depo, DEX J, Exh 3) before the exhibit was shown to him at his June 16, 2022 deposition. (Hale depo, DEX J, pp. 11-12; 14-17; Garcia-Pusateri depo, DEX G, p. 128, lns 9-11; p. 129, lns. 12-16).

**32.**    On October 6, 2020, Ms. Lumley attended the Equity Training in person with around seven other employees from the Special Services Department. (Stip. ¶ 11.)

Response:     Defendants deny this Paragraph, in that it does not contain the correct language of the parties' Stipulation 11. Defendants agree to the language contained in Stipulation ¶ 11 which states:

> "On October 6, 2020, Plaintiff Lumley attended in person, the approximately two hour Fall (2020) District-Wide Equity Training with approximately seven (7) other employees from the Special Services Department. (SPS Discovery Exhibit 13.03)."

(Stip. ¶ 11).

Defendants also state that there were a total of eight (8) persons who received the training, including Lumley. (Lumley depo, DEX B, pp. 6-8; Harrington Affd, DEX E, ¶ 2; DEX 13.03).

**33.**     Dr. Garcia-Pusateri, Mr. Anderson, and Mr. Sode conducted the October 6, 2020 Equity Training session that Ms. Lumley attended. (Stip. ¶ 12.)

Response:     Defendants deny this Paragraph, in that it does not contain the correct language of the parties' Stipulation 12. PEX 1, Stipulation ¶ 12 states:

> "The October 6, 2020 Fall (2020) District-Wide Equity Training attended by Plaintiff Lumley was conducted by Garcia-Pusateri, Anderson and Jimi Sode, who is a former Coordinator in the Office of Equity and Diversity."

(PEX 1, Stipulation ¶ 12).

**34.**     On October 14, 2020, Ms. Henderson attended virtually the Equity Training with around thirty other employees from the Special Services Department. (Stip. ¶ 13.)

Response:     Defendants deny this Paragraph in that it does not contain the correct language of the parties' Stipulation 13. PEX 1, Stipulation ¶ 13 states:

> "On October 14, 2020, Plaintiff Henderson virtually attended the approximately two hour Fall (2020) District-Wide Equity Training with approximately thirty (30) other employees from the Special Services Department. (SPS Discovery Exhibit 13.02)."

(PEX 1, Stip. ¶ 13).

In addition, Henderson attended the Fall (2020) Equity Training on October 14, 2020 virtually. There were at least thirty-one (31) persons who received the training with her. (Henderson depo, DEX A, p. 14, lns. 7-10; Harrington Affd, DEX E, ¶ 2; DEX 13.02; Stip, ¶ 13).

**35.** Dr. Garcia-Pusateri and Mr. Anderson conducted the October 14, 2020 Equity Training session Ms. Henderson attended. (Stip. ¶ 14.)

<u>Response</u>: Defendants deny this Paragraph in that it does not contain the correct language of the parties' Stipulation 14.

A. Defendants agree to the correct language of Stipulation 14 below:

"The October 14, 2020, Fall (2020) District-Wide Equity Training attended by Plaintiff Henderson was conducted by Defendant Garcia-Pusateri and Defendant Anderson."

(Stip. ¶ 14.)

B. Garcia-Pusateri and Anderson were the trainers for the October 14, 2020 Equity Training attended by Henderson. (Rapert depo, DEX F, p. 39, lns. 12-15).

**36.** SPS expected staff attending virtual Equity Training sessions to keep their computer cameras on during the entirely of the training. (YGP/SPS Dep. 167:12-20, dep. ex. 9 at 1-2; Ex. 11, Brooke Henderson Dep. 57:12-21; see also Ex. 12, Tanya Rapert Dep. 27:25 to 28:13 ("[Trainers] kept stressing to people to turn their cameras on.").

<u>Response</u>: Defendants deny this Paragraph in that the use of the term "SPS" constitutes argument which is unaccompanied by citation. Defendants admit that Garcia-Pusateri gave her opinion as stated below but deny that such opinion was that of any other Defendant in this case. Defendants provide the following response:

A. The presenters at the October 14, 2020 Equity Training attended by Henderson asked the participants to make sure their screen cameras were turned on. Because the session was virtual, the only way the presenters could measure whether the participants were present was if their cameras were turned on. Department Director Rapert spoke up to let the presenters know that there were some participants who did not have cameras attached

22

to their computers and therefore could not turn a camera image on. (Garcia-Pusateri depo, DEX G, p. 167; Henderson depo, DEX A, p. 57; Rapert depo, DEX F, p. 28).

**37.**    SPS's trainers showed the Equity Training attendees a PowerPoint slide presentation during the Equity Training. (Stip. ¶¶ 1(g), 9; Ex. 13.)

Response:    Defendants deny this Paragraph in that it is vague. Defendants agree to the following fact statement:

A.    Participants in the October 6, 2020 Equity Training attended by Plaintiff Lumley, and the October 14, 2020 Equity Training, attended by Plaintiff Henderson were shown a Power-Point slide presentation. (DEX 13.01; PEX 1, Stipulation ¶ 9).

**38.**    SPS used substantially the same slide presentation for all Equity Training sessions, including the Equity Training sessions that Ms. Lumley and Ms. Henderson attended. (Stip. ¶ 9; see also Anderson Dep. 16:2 to 17:8.)

Response:    Defendants deny this Statement of Fact in that the use of the term "SPS" constitutes argument which is unaccompanied by citation. Defendants admit that Anderson gave his opinion as stated below, but deny that such opinion was that of any other Defendant in this case. Defendants agree to the following statement of fact:  Participants in the October 6, 2020 Equity Training attended by Lumley, and the October 14, 2020 Equity Training, attended by Henderson were shown a Power-Point slide presentation. (DEX 13.01; PEX 1, Stipulation ¶ 9).

**39.**    The SPS trainers also used a "Script & Slide Breakdown" ("Script"), attached hereto as Exhibit 15, in connection with the slide presentation, which they largely followed in each Equity Training session. (Ex. 15; YGP/SPS Dep. 21:11 to 23:13, dep. ex. 3; Anderson Dep. 20:7 to 21:4, 31:10-14, dep. ex. 1.)

Response:    Defendants admit this paragraph.

**40.**    The Equity Training slide presentation also contained speaker notes that the SPS trainers relied upon. A version of the slide presentation with speaker notes is attached hereto as Exhibit 16. (Ex. 16; Stip. ¶¶ 1(i), 9; YGP/SPS Dep. 125:20 to 126:3, 155:3-8.)

Response: Defendants deny this Paragraph in that it is vague and it is immaterial whether the "speaker notes" were used in the other Fall (2020) Equity Training sessions that were not attended by Plaintiffs. Defendants agree with the following statements of fact:

A. The October 6, 2020 and October 14, 2020 Fall Equity Training programs were essentially the same throughout the presentation. (Garcia-Pusateri depo. DEX G, p. 125, lns. 20-25; p. 126, lns. 1-3).

41. At the start of the Equity Training sessions, SPS asked that a school administrator or leader read the same statement contained in the "Greetings!" handout to reinforce that equity was "now part of our work and job responsibilities" and that "we must commit to [it]." (Compare Ex. 17, DEX 50A-000388-91 at 391 with Ex. 9 at PLS 0425; see also YGP/SPS Dep. 101:11¬22, dep. ex. 7.)

Response: Defendants deny this Paragraph in that the use of the term "SPS" constitutes argument which is unaccompanied by citation. Defendants admit that Garcia-Pusateri gave her opinion as stated below, but deny that such opinion was that of any other Defendant in this case. Defendants provide the following response:

A. In an email letter to the Principal of Bissett Elementary School regarding the Fall (2020) Equity Training at that school, a location where neither Henderson nor Lumley were present, Garcia-Pusateri requested that the Principal read a statement at the beginning of the training session which said in part:

"This is the second year SPS is going through fall district wide equity training and it's important we continue this significant work for your own personal and professional development but also for our work with our students."

(Garcia-Pusateri depo, DEX G, p. 101, lns. 11-22; Exh. 7)

42. According to SPS, equity means "to identify the specific and unique needs of an individual such as a student and provide the supports needed for them to be successful." A student's needs, according to SPS, are "based on their identity and their lived experiences." SPS defines "identity" to "[i]nclude race as well as other aspects of identity." And, according to SPS, a black student's lived experience "may look different than for someone who is white." (YGP/SPS Dep. 64:11 to 66:15.)

24

Response:    Defendants deny this Paragraph in that use of the term "SPS" constitutes argument which is unaccompanied by citation. Defendants admit that Garcia-Pusateri gave her opinion as stated below, but deny that such opinion was that of any other Defendant in this case. Defendants provide the following response:

A.    Defendants admit that Garcia-Pusateri stated her opinion as follows:

(1)    "Equity is to identify the specific and unique needs of an individual such as a student and provide the supports needed for them to be successful" (Garcia-Pusateri depo, p. 64, lns. 13-15) and means "treating people with the things that they need." (Garcia-Pusateri depo, DEX G, p. 64, lns. 17-18).

(2)    A student who is Black "is going to have a different lived experience than a White student [and] ... will have different needs and supports that will still get them to success."

Q.    So in order to give a student of color what they need under an equity definition that means treating them differently from a student of another race?
A.    It means providing the supports that they need.
Q.    And is that different based on race?
A.    I think it's based on their identity and their lived experiences." ...
Q    And people of different races need things differently; correct?
A.    I believe people have different lived experiences ... it's based on ... different things. ... A student in a wheelchair is always going to need something different than a person who is able-bodied.
Q.    I'm not talking about a student in a wheelchair."

(Garcia-Pusateri depo, DEX G, p. 65, lns. 1-11; 21-25; p. 66, lns. 1-4).

B.    Defendants deny the remaining allegations not supported by citation.

**43.**    According to SPS, equality "is just to treat – with race to treat everyone the same and see them as all the same." (YGP/SPS Dep. 67:25 to 68:6, see also 65:18-20 ("Equity is looking at specific unique needs. Equality is ensuring that everyone gets the same.").

25

Response:    Defendants deny this Paragraph in that use of the term "SPS" constitutes argument which is unaccompanied by citation. Defendants admit that Garcia-Pusateri gave her opinion as stated below, but deny that such opinion was that of any other Defendant in this case. Defendants provide the following response:

A.    Defendants admit that Garcia-Pusateri stated her opinion as follows:

"Q.    And how is [equity] different from equality? Under equality would people have a different approach to race?

A.    Equality ... with race ... treat[s] everyone the same and see[s] them as all the same. Whereas, equity is about seeing their whole selves and their whole personhood.

Q.    So equality is colorblindness; correct?

A.    I would say maybe it does take in aspects of colorblindness. I don't think [colorblindness is] part of the definition, but it probably takes in colorblindness. ...

Q.    And equality is harmful; correct?

A.    I don't think equality is harmful. I think there's a better way ... of making ... people feel safe and supported."

(Garcia-Pusateri depo DEX G, Exh. 4, p. 67, ln. 25; p. 66, lns. 1-15).

B.    Defendants deny the remaining statements in the Paragraph in that they are not supported by citation.

**44.**    SPS never told staff that silence was an option during the Equity Training. (YGP/SPS Dep. 151:22-25.)

Response:    Defendants deny this Paragraph in that the use of the term "SPS" constitutes argument which is unaccompanied by citation. Defendants admit that Garcia-Pusateri gave her opinion as stated below but deny that such opinion was that of any other Defendant in this case. Defendants admit that Garcia-Pusateri gave her opinion in the cited passage as follows:

A.    "I think if someone calls on you, it's the hope that you will contribute. But if some were to say "I don't feel I can speak at this time," it would not be my notion that we would then do anything to that person."

Q.    Well, if ... a trainer called on somebody and said 'I'm asking you to speak,' and the person said "I'm not speaking," wouldn't that be unprofessional?

26

A. ... I would be disappointed that they did not want to contribute. But ... to say that's unprofessional – I do now recall a training where we did ask someone ... 'Do you have a comment? Would you mind sharing what you're talking about?' And they're like, 'I don't feel like I can at this time.' And it's like, 'Okay. That's fine. Thank you for letting us know.' ...

Q. So did the District in any of this training that you witnessed ever tell people that "You don't have to participate. Silence is optional?

A. No one ever said silence is optional."

(Garcia-Pusateri depo, DEX G, p. 150, lns. 15-25; p. 151).

**45.** Throughout the Equity Training, SPS continuously taught that silence on the part of "white people" was a form of white supremacy. (YGP/SPS Dep. 157:11-18.)

Response: Defendants deny this Statement of Fact in that use of the term "SPS" constitutes argument which is unaccompanied by citation. Defendants admit that Garcia-Pusateri gave her opinion as stated below, but deny that such opinion was that of any other Defendant in this case. Defendants provide the following response:

A. Defendants admit that Garcia-Pusateri gave her opinion that "silence means acceptance, so it is important when [an educator] sees things happen in the classroom, that [they] address it." (Garcia-Pusateri depo, Exh 4, p. 157).

B. Defendants deny the remaining statements in this paragraph.

**46.** Mr. Anderson told participants he would call on them if they did not speak out. (Anderson Dep. 33:23 to 34:9, 50:4-13; YGP/SPS Dep. 229:19 to 230:14.)

Response: Defendants admit portions of the Paragraph as follows:

A. Garcia-Pusateri recalled Anderson stating that he was going to call on people if they were silent, in order to encourage conversation. (Garcia-Pusateri depo DEX G, p. 229, lns. 23-25).

B. Anderson testified as follows:

Q. "Did you tell anybody in Ms. Lumley's training ... that if nobody spoke up, you would call on people?

A. I don't remember saying that. I don't recollect that.

27

Q.      Did any of the trainers in Ms. Lumley's session say that?
A.      Not that I can recall."

(Anderson depo, DEX H, p. 33, lns. 23-25; p. 34, lns. 1-5).

C.      Lumley admitted that during the Equity Training she attended that:

(1)     After viewing the George Floyd video during the training session Lumley went to a "small group session" with one other employee and both of them shared their opinions with each other about the video. The George Floyd video small group session lasted about three minutes. Lumley did not think there was anything wrong with what happened in the small group session where the George Floyd video was discussed. (Lumley depo, DEX B, p. 20, lns. 17-25, p. 22, lns. 1-10).

(2)     When the George Floyd video small group session ended, there was a large group session on the George Floyd video during which the other employee in Lumley's small group gave her opinion, but did not share Lumley's opinion, which did not matter to Lumley. (Lumley depo, DEX B, p. 22, lns. 15-25, p. 23, lns. 1-5).

(3)     There was a discussion about the oppression matrix, but the participants did not have to rate themselves on the oppression matrix slide, no small group session was held on the oppression matrix presentation and Lumley was not asked her opinion about the oppression matrix. (Lumley depo, DEX B, p. 23, lns. 12-25, p. 24, lns. 1-7).

(4)     There was a discussion about the white supremacy chart. No small group session was held on the white supremacy chart. No one called Lumley's name or asked her directly if she understood the white supremacy chart. Lumley was not asked to affirm or agree to anything that had been presented about the white supremacy chart or to write anything down. Rather, the participants were told that they could look at the white supremacy chart on their own time. (Lumley depo, DEX B, p. 24, lns. 12-25, p. 25, lns. 1-18).

(5)     There was a discussion about the social identities chart. No small group session was held to discuss the social identities chart and the participants were told that they could look at the social identities chart on their own time. Lumley was not asked about her opinion on the social identities chart, how she would have filled it out or how she fit in on it. (Lumley depo, DEX B, p. 25, lns. 19-25, p. 26, lns. 1-12).

D.      Employee Cecil Mooney, who was also present in the October 6, 2020

Training session, said that the presenters "asked for comments or let people volunteer" but

he "did not remember them calling on any one individual ... it was open for individuals to speak." (Mooney depo, DEX I, p. 11, lns. 14-17).

    E.    Henderson admitted that during the Equity Training she attended that:

    (1)    She was never called on by the trainers to answer questions during the large group sessions. (Henderson depo, DEX A, p. 59, lns. 4-11).

    (2)    During the small group discussion about the George Floyd incident Henderson volunteered that she "felt that the video was taken out of context and it was only reflecting one side of the incident by removing all the other . . . context. So they removed all the other language out of that and just put that in isolation." (Henderson depo, DEX A, p. 94, lns. 3-7; Rapert depo, DEX F, p. 26-27).

    (3)    During the George Floyd breakout session all of the attendees who spoke agreed that "it was hard to make any determination out of context." (Henderson depo, DEX A, p. 94, lns. 13-15).

    (4)    She did not feel that being asked to watch the George Floyd video violated her rights. (Henderson depo, DEX A, p. 89, lns. 14-21).

**47.**    The "Guiding Principles" handout was also repeated early in the slide presentation but with the addition of "Be Professional – Or be Asked to Leave with No Credit." (Compare Ex. 13 at 7 with Ex. 9 at PLS 0428; Stip. ¶¶ 1(g), 9.)

    <u>Response</u>:    Defendants admit this Paragraph.

**48.**    When the SPS trainers showed staff the Guiding Principles slide, they told staff to "Stay Engaged in the discussion," "stay locked into the conversations," "lean into that discomfort . . . don't try to push it down," "share your personal experiences, and "it is important that during this time we commit to the success of our district and our students, which is why we must commit to these following principles." (Ex. 15 at 6.)

    <u>Response</u>:    Defendants admit that Exhibit 15, at p. 6 states: "Stay Engaged in the discussion"..."please try and stay locked into the conversations"..."As I mentioned earlier, some of the things we will be covering today can be uncomfortable at times. Lean into that discomfort to learn and grow. Don't try to push it down."..."I encourage you to share your personal experiences"..."it is important that during this time we commit to the success of our district and our students, which is why we must commit to these following principles." (PEX Exh. 15, at p. 6).

Defendants deny that the cited reference states "[w]hen the SPS trainers showed staff the Guiding Principles slide, they told staff to."

**49.** The Equity Training slide presentation also included an "Overview of Training" slide that stated that participants will "[e]ngage in identity development and understanding" and would "[r]eceive tools on how to become Anti-Racist educators, leaders and staff members at SPS," among other statements. (Ex. 13 at 8; Stip. ¶¶ 1(g), 9; Henderson Dep. 57:1-5 ("[W]e had to be an ally and it was part of our job duty to be an antiracist educator.").)

Response: Defendants respond as follows:

A. Defendants admit the following portions of this Paragraph:

(1) The "Overview of Training" slide contained in the Fall (2020) Equity Training presentation, page 8, states that: "Participants will engage in identity development and understanding" and will "receive tools on how to become Anti-Racist educators, leaders and staff members of SPS." (DEX 13.01, p. 8).

(2) Henderson stated in her deposition that she "was bothered" that "we had to agree or we would lose credit and that we had to be an ally and it was part of our job duty to be an antiracist educator." (Henderson depo, DEX A, p. 57, lns. 1-5).

B. Defendants deny the remaining allegations not supported by citation.

**50.** Through its Equity Training, SPS defined "anti-racism," and in turn being an anti-racist, to mean "bucking norms." SPS further explained that "anti-racism" is a "proactive element" that requires not being silent and "advocating for changes in political, economic, and social life." (Ex. 13 at 31-32; Stip. ¶¶ 1(g), 9; YGP/SPS Dep. 86:25 to 89:4, 97:8-19.)

Response: Defendants deny this Statement of Fact in that use of the term "SPS" constitutes argument which is unaccompanied by citation. Defendants admit that Garcia-Pusateri gave her opinion as stated below, but deny that such opinion was that of any other Defendant in this case. Defendants provide the following response:

A. Defendants admit that PEX 13, pages 31-32 defines the term "anti-racism as:

"Anti-Racism is defined as the work of actively opposing racism by advocating for changes in political, economic, and social life. Anti-racism

30

tends to be an individualized approach, and set up in opposition to individual racist actions." and "anti-racism – to fight against systemic racism means to buck norms." (Exh. 13, pp. 31-32).

B. Defendants admit that the slide addressing "buck[ing] norms" included a quote from Holocaust survivor and Jewish author, Elie Wiesel. (Exh. 13, p. 31).

C. Defendants admit that Garcia-Pusateri provided her opinion regarding the term "anti-racism" as follows:

"Anti-racism is defined as the work of actively opposing racism by advocating for changes in political or economic and social life. Anti-racism tends to be an individualized approach and set up in opposition to individual racist behaviors and impacts." (Garcia-Pusateri depo, Exh 4, p. 87, lns, 10-15).

D. Defendants deny the remaining allegations in the Paragraph.

**51.** Through its Equity Training, SPS expected staff to commit to the concept of becoming "anti-racist" educators. (YGP/SPS Dep. 86:11-24, 94:14 to 95:14, 97:23 to 98:19, 99:15 to 100:1, dep. ex. 7 at 1.)

<u>Response</u>:    Defendants deny this Paragraph in that use of the term "SPS" constitutes argument which is unaccompanied by citation. Defendants admit that Garcia-Pusateri gave her opinion as stated below, but deny that such opinion was that of any other Defendant in this case. Defendants provide the following response:

A. Garcia-Pusateri stated her opinion that the Fall (2020) Equity Training was asking the participants to commit to "understanding what anti-racism is ... and to learn more about it." (Garcia-Pusateri depo. DEX G, p. 86, lns. 15-19; p. 95, lns. 13-16).

B. Garcia-Pusateri stated her opinion that the Fall (2020) Equity Training was asking participants to commit to "being an anti-racist educator" (Garcia-Pusateri depo. DEX G, p. 86, lns. 15-19; p. 95, lns. 13-16;) and learning about how to address barriers to students in the classroom, (Garcia-Pusateri depo, DEX G, p. 97, lns. 19-22) such as how to handle the use of a racial epithets in the classroom. (Garcia-Pusateri depo, DEX G, p. 97, lns. 4-7).

31

C. Garcia-Pusateri stated her opinion that the Fall (2020) Equity Training was not asking anyone to engage in political activity or political advocacy. (Garcia-Pusateri depo. DEX G, p. 97, lns. 19-20).

**52.** According to SPS, equality on the basis of race and color blindness do not correspond with anti-racism. (Id. 89:13-19, see also 96:4-7 ("We talked about colorblindness and other ways of how it can have harmful effects.").

<u>Response</u>: Defendants deny this Paragraph in that use of the term "SPS" constitutes argument which is unaccompanied by citation. Defendants admit that Garcia-Pusateri gave her opinion as stated below but deny that such opinions were that of any other Defendant in this case. Defendants provide the following response:

A. Garcia-Pusateri expressed the following opinions during her deposition: (1) "Colorblindness" says "that I see you as just the person rather than seeing you with everything that you come with." (Garcia-Pusateri depo, DEX G, p. 66, lns. 18-20); (2) Colorblindness "can have harmful impacts" because "it can make someone feel like you do not want to see them for their identity or their lived experience." (Garcia - Pusateri depo, DEX G, p. 66, ln. 25; 67, lns. 2-3); (3) "Equality. ... [treats] everyone the same and sees them as all the same [w]hereas, equity is about seeing their whole selves and their whole personhood." (Garcia -Pusateri depo, DEX G, p. 68, lns. 3-6); (4) "I don't think equality is harmful. I think there is a better way [to make] people feel safe and supported." (Garcia - Pusateri depo, DEX G, p. 68, lns. 13-15).

**53.** According to SPS, not acknowledging people's race or saying that a person does not see color "goes against anti-racism." (Id. 89:10-17.)

<u>Response</u>: Defendants deny this Paragraph in that use of the term "SPS" constitutes argument which is unaccompanied by citation. Defendants admit that Garcia-Pusateri gave her

32

opinion in the cited portion of her deposition but deny that such opinion was that of any other Defendant in this case.

54. The first interactive exercise of the Equity Training took place after SPS showed a "George Floyd – Reflection Video" consisting of a black screen with the final words of George Floyd subtitled for eight minutes and 48 seconds. (Ex. 13 at 11; Stip. ¶¶ 1(g), 9.)

Response: Defendants deny this Paragraph in that use of the term "SPS" constitutes argument which is unaccompanied by citation. Defendants admit the following:

A. Defendants admit that the George Floyd – Reflection Video was shown during the October 6 and October 14 Fall (2020) Equity Training Programs which were attended by Plaintiffs.

B. Defendants admit that the George Floyd – Reflection Video consisted of a black screen with what purports to be the final words of George Floyd subtitled on the screen for eight minutes and 48 seconds.

55. Following the "George Floyd-Reflection Video," the SPS trainers separated staff into small groups and directed them to discuss their feelings and thoughts about the video. (Ex. 13 at 12; Stip. ¶¶ 1(g), 9; Ex. 15 at 8.)

Response: Defendants admit that following the "George Floyd-Reflection Video," the Plaintiffs were separated into small groups with other employees to share their opinions about the video. Defendants deny the remainder of the Paragraph. Defendants provide the following:

A. During the October 6, 2020 Equity Training Lumley attended after viewing the George Floyd video, Lumley went to a "small group session" with one other employee and both of them shared their opinions with each other about the video. The George Floyd video small group session lasted about three minutes. Lumley did not think there was anything wrong with what happened in the small group session where the George Floyd video was discussed. (Lumley depo, DEX B, p. 20, lns. 17-25, p. 22, lns. 1-10).

B. During the October 14, 2020 Equity Training Henderson attended a video about the George Floyd incident was played. Garcia-Pusateri introduced the video and told the attendees:

> "That [the video] was going to be difficult to watch, but we needed to watch it, and it was important for us to see it without the additional noise and that we just needed to focus in to imagine if we were in that position that Derek Chauvin --could we imagine having somebody place a knee on our neck and not letting up and these are your final words."

> (Henderson depo, DEX A, p. 87, ln. 25, p. 88, lns. 1- 6).

C. During Henderson's small group discussion about the George Floyd incident she volunteered that she "felt that the video was taken out of context and it was only reflecting one side of the incident by removing all the other . . . context. So they removed all the other language out of that and just put that in isolation." (Henderson depo, DEX A, p. 94, lns. 3-7; Rapert depo, DEX F, p. 26-27).

D. During Henderson's George Floyd breakout session all of the attendees who spoke agreed that "it was hard to make any determination out of context." (Henderson depo, DEX A, p. 94, lns. 13-15).

E. Henderson did not feel that being asked to watch the George Floyd video violated her rights. (Henderson depo, DEX A, p. 89, lns. 14-21).

**56.** After several minutes, the SPS trainers brought staff back to the larger group to share their thoughts about the video. (Ex. 13 at 12; Stip. ¶¶ 1(g), 9; Ex. 15 at 8.)

<u>Response</u>: Defendants admit the Paragraph. Defendants provide the following:

A. During the October 6, 2020 Equity Training that Lumley attended, after viewing the George Floyd video, Lumley went to a "small group session" with one other employee and both of them shared their opinions with each other about the video. The George Floyd video small group session lasted about three minutes. Lumley did not think

there was anything wrong with what happened in the small group session where the George

Floyd video was discussed. (Lumley depo, DEX B, p. 20, lns. 17-25, p. 22, lns. 1-10).

      B.    When the George Floyd video small group session ended, there was a large

group session on the George Floyd video during which the other employee in Lumley's small

group gave her opinion, but did not share Lumley's opinion, which did not matter to Lumley.

(Lumley depo, DEX B, p. 22, lns. 15¬25, p. 23, lns. 1-5).

    **57.**    SPS showed staff a slideshow called the "Environmental Scan" that "showcase[d]
pictures of major events that have impacted our country from March [2020] until now." (Ex. 13 at
14; Stip. ¶¶ 1(g), 9; Ex. 15 at 9.) The slideshow images are attached hereto as Exhibit 18. (Ex. 18.)

<u>Response</u>:    Defendants deny this Paragraph in that use of the term "SPS" constitutes

argument which is unaccompanied by citation. Defendants would admit this Paragraph if its first

line was rewritten to read: "SPS trainers ... ."

    **58.**    Following the "Environmental Scan," the SPS trainers started the "Environmental
Scan Activity." They broke staff out into small groups and directed them to discuss several questions
about the images, including what it felt like to see them. SPS trainers told trainees that when they
returned to the large group, they would be calling on two individuals to share their thoughts. (Ex.
13 at 15; Stip. ¶¶ 1(g), 9; Ex. 15 at 10.)

<u>Response</u>:    Defendants admit that during the October 6, 2020 and October 14, 2020

Equity Trainings attended by Plaintiffs, following the "Environmental Scan" video, the participants

broke into small groups to discuss their thoughts about the video with their colleagues. Defendants

deny the remainder of the Paragraph. Defendants provide the following:

      A.    The purpose of the Environmental Scan activity was to: ". . . capture a small

snapshot of what was happening. Could we capture everything else that was happening that

Summer? No. But it was just a snapshot of some of these things that were having a large

impact." (Garcia-Pusateri depo, DEX G, p. 227, lns. 13-17).

      B.    During the Environmental Scan video, the participants were given the

"opportunity if they wanted" to write down their thoughts and questions (Garcia-Pusateri

35

depo, DEX G, p. 224, lns. 18-21) and were told to "Feel free to write down thoughts or questions you may have." (Garcia-Pusateri depo, DEX G, p. 225, lns. 20-21).

  C.  Any notes made by the participants during the training were not collected by the District. (Garcia-Pusateri depo, DEX G, p. 224, lns. 7-10; p. 228, Lns. 23-25).

  D.  The purpose of the small group session was for the participants "to talk about their take aways" from the Environmental Scan video. (Garcia-Pusateri depo, DEX G, p. 226, lns. 24-25; p. 227, ln. 1).

  **59.**  For the small group breakout, Ms. Lumley partnered with the same person as she did for the George Floyd breakout. Ms. Lumley participated in the small group discussion because she did not want to remain silent due to SPS's instruction that staff have courageous conversations, stay engaged, lean into their discomfort, share their personal experiences, and share their truth. Nor did Ms. Lumley want to be considered a white supremacist by remaining silent. (Lumley Decl. ¶ 22; Ex. 19, Jennifer Lumley Dep. 20:24 to 21:4.)

  <u>Response</u>:  Defendants deny this Paragraph in that use of the term "SPS" constitutes argument which is unaccompanied by citation. Defendants will admit this Paragraph if the words "SPS's instruction" is deleted. Defendants provide the following:

  A.  Defendants admit that Lumley was paired with another participant for a small group discussion on the Environmental Scan slideshow:

> "... to discuss several questions about the slideshow, including how it made us feel to see the images, whether we recognized the images, and how the events shown impacted our work in SPS."

(Henderson Declaration, Doc. 77-3, ¶ 21.

  B.  Defendants admit that Lumley, in her sworn Declaration, stated that:

> "I participated in the small group discussion because I did not want to remain silent due to SPS's instruction that we have courageous conversations, stay engaged, lean into our discomfort, share our personal experiences, and share our truth. Nor did I want to be considered a white supremacist by remaining silent."

(Lumley Declaration, Doc. 77-3, ¶ 23.

**60.** Ms. Henderson and others in her small group expressed to each other that they did not believe the "Environmental Scan" slideshow was completely accurate because even though the exercise showed the summer 2020 protests as peaceful, riots also took place in Missouri and across the country. (Henderson Decl. ¶ 23.)

Response: Defendants provide the following response:

A. Defendants admit that Henderson, though appearing virtually, was paired with other participants for a small group discussion on the Environmental Scan slideshow:

"... to discuss several questions about the slideshow, including how it made us feel to see the images, whether we recognized the images, and how the events shown impacted our work in SPS."

(Henderson Declaration, Doc. 77-2, ¶ 22.

B. Defendants admit that Henderson, in her sworn Declaration, stated that:

"I, along with others in my small group, expressed among ourselves that we did not believe the "Environmental Scan" slideshow images were completely accurate because even though the exercise showed the Summer 2020 protests as peaceful, riots also took place in Missouri and across the country."

(Henderson Declaration, Doc. 77-3, ¶ 23.

**61.** After several minutes, the SPS trainers brought staff back to the larger group. (Ex. 13 at 15; Stip. ¶¶ 1(g), 9; Ex. 15 at 10; see also Henderson Decl. ¶ 24; Lumley Decl. ¶ 22.)

Response: Defendants admit this Paragraph.

**62.** Once they returned to the large group, Mr. Anderson reminded staff that he would call on people if they remained silent. (YGP/Dist. Dep. 229:13 to 230:14.)

Response: Defendants admit this Paragraph. Defendants provide the following additional facts.

A. Garcia-Pusateri recalled Anderson stating that he was going to call on people if they were silent, in order to encourage conversation. (Garcia-Pusateri depo DEX G, p. 229, lns. 23-25).

B. Anderson testified as follows:

37

Q.      "Did you tell anybody in Ms. Lumley's training ... that if
         nobody spoke up, you would call on people?
A.      I don't remember saying that. I don't recollect that.
Q.      Did any of the trainers in Ms. Lumley's session say that?
A.      Not that I can recall."

(Anderson depo, DEX H, p. 33, lns. 23-25; p. 34, lns. 1-5).

  C.      Employee Cecil Mooney, who was also present in the October 6, 2020

Training session, said that the presenters "asked for comments or let people volunteer" but

he "did not remember them calling on any one individual ... it was open for individuals to

speak." (Mooney depo, DEX I, p. 11, lns. 14-17).

  D.      During the October 14, 2020 Equity Training Henderson attended she was

never called on by the trainers to answer questions during the large group sessions.

(Henderson depo, DEX A, p. 59, lns. 4¬11). Henderson testified:

A.      "(Plaintiff Henderson) ... LA Anderson stated that
         he wasn't afraid to call on people if they did not answer.
Q.      (By Mr. Ellis) ... Did he ever call on you?
A.      No.
Q.      Did he ever call on anybody?
A.      Yes.
Q.      Did some people respond to whatever he was asking?
A.      Yes.
Q.      Did some people not respond?
A.      No.
Q.      Or respond "I don't have an opinion"?
A.       No.
Q.      So everybody had an opinion?
A.      Everybody had an opinion."

(Henderson depo, DEX A, p. 59, lns. 7-21)

  **63.**      In Ms. Henderson's large group, they discussed Kyle Rittenhouse. Ms. Henderson
said that she had heard he was defending himself from the rioters, and that she thought he had been
hired to defend a business. Dr. Garcia-Pusateri told Ms. Henderson that she was wrong, and then
told her that she was confused. Dr. Garcia-Pusateri then told Ms. Henderson that Mr. Rittenhouse
murdered an innocent person. (Henderson Decl. ¶ 24.)

Response:    Defendants admit that this Paragraph is consistent with Henderson's sworn statements in her Declaration (Doc 77-2).

**64.**    After the Environmental Scan, SPS covered the topics of oppression, systemic racism, and white supremacy. (Ex. 13 at 16-23; Stip. ¶¶ 1(g), 9.)

Response:    Defendants deny this Paragraph in that: (1) the use of the term "SPS" constitutes argument which is unaccompanied by citation; and (2) this Paragraph does not specify whether it refers to the October 6, 2020, October 14, 2020 or some other Fall (2020) Equity Training session. Defendants provide these additional facts.

A.    During the October 6, 2020 Equity Training attended by Lumley, after viewing the George Floyd video, the training discussed the oppression matrix and covert and overt white supremacy (Lumley depo DEX B p. 19, lns. 21-25; p. 20 lns. 1-12).

B.    During the October 14, 2020 Equity Training attended by Henderson, the participants viewed the George Floyd video, had a small group discussion for several minutes and a large group discussion. (Henderson depo, DEX A, p. 96, lns. 7-9). Henderson was not asked to provide information during the discussion and did not provide information. (Henderson depo, DEX A, p. 96, lns. 10-14).

C.    Henderson could not remember the format that was used during the October 14, 2020 Equity Training, following the George Floyd large group discussion. (Henderson depo, DEX A, p. 97, lns. 23-25; p. 98, lns. 1-2).

D.    Henderson recalled a discussion about the Oppression Matrix as follows:

(1)    Henderson had received a copy of the Oppression Matrix in her "packet" from Phil Hale. (Henderson depo, DEX A, p. 98, lns. 1-2). She was not asked to fill out the Oppression Matrix. (Henderson depo, DEX A, p. 98, lns. 13-14).

(2)    A small group discussion about the Oppression Matrix followed but Henderson did not recall the specifics of that discussion (Henderson depo, DEX A, p. 100, lns. 15-23). Though she did generally recall her personal objections to rating

39

herself on the Oppression Matrix, she did not recall if she expressed her opinion at the meeting. (Henderson depo. DEX A, p. 101, lns 23¬25; p. 102, lns. 1-21).

(3)     During the large group discussion about the Oppression Matrix, Henderson did not recall whether she made a specific statement about where she fell on the Matrix (Henderson depo. DEX A, p. 103, lns 10-14) or whether the presenters "called anyone out" or "called on a group member to give a summary of the conversation" during their small group discussion. (Henderson depo. DEX A, p. 103, lns. 15-22).

E.     Henderson's discussion of White Supremacy took place in one large group setting led by Garcia-Pusateri. (Henderson depo. DEX A, p. 104, lns. 2-12). During the discussion, Garcia-Pusateri introduced white supremacy terms and asked if anyone in the group had questions. (Henderson depo. DEX A, p. 104, lns. 14-24).

(1)     Henderson raised a question concerning BIPOC Halloween costumes. (Henderson depo. DEX A, p. 105, lns. 14-22; Rapert depo, DEX F, p. 28-30).

(2)     Henderson admitted that there was nothing about the "back-and-forth discussion" that she had with the presenter during the white supremacy large meeting that she considered to have been a violation of her constitutional rights. (Henderson depo. DEX A, p. 106, lns. 8-20).

F.     Henderson indicated that one of the presenters asked the attendees to fill out the Social Identities chart. (Henderson depo. DEX A, p. 107, lns. 14-25). Henderson chose to not fill out the chart. (Henderson depo. DEX A, p. 108; p. 109, lns. 13-22).

(1)     Henderson did not recall whether there was a breakout session (Henderson depo. DEX A, p. 109, lns. 23-24).

(2)     During the large session, the presenters asked attendees to share where they fell on their identity chart. (Henderson depo. DEX A, p. 110, lns. 1-4. Henderson did not offer any information without being asked and was not asked to share her identity chart information. (Henderson depo. DEX A, p. 109, lns. 19-20; p. 110, lns. 11-12).

(3)     Any notes made by the participants during the training were not collected by the District. (Garcia-Pusateri depo, DEX G, p. 224, lns. 7-10; p. 228, lns. 23-25).

65.     During this portion of the training, SPS taught staff that "[s]ociety's institutions, such as government, education, and culture, all contribute or reinforce the oppression of marginalized social groups while elevating dominant social groups." (Ex. 13 at 16; Stip. ¶¶ 1(g), 9.)

Response:     Defendants deny this Paragraph in that: (1) the use of the term "SPS" constitutes argument which is unaccompanied by citation; (2) this Paragraph does not specify whether it refers to the October 6, 2020, October 14, 2020 or some other Fall (2020) Equity Training; and, (3) the Paragraph constitutes political argument.

66.     Through its Equity Training, SPS taught that "systems of oppressions [sic] are woven into the very fabric of the United States and form the foundation of the American culture and its laws." (Ex. 13 at 16; Stip. ¶¶ 1(g), 9; Ex. 15 at 10.)

Response:     Defendants deny this Paragraph in that: (1) the use of the term "SPS" constitutes argument which is unaccompanied by citation; (2) this Paragraph does not specify whether it refers to the October 6, 2020, October 14, 2020 or some other Fall (2020) Equity Training; and, (3) the Paragraph constitutes political argument.

67.     As part of the training on oppression, SPS showed staff the same "Oppression Matrix" they received before the session which indicates, among others, that following groups are oppressed: "Asian, Black, Latina/o, Native People," and "Female[s] assigned at birth." (Compare Ex. 13 at 17 with Ex. 9 at PLS 0424; Stip. ¶¶ 1(g), 9.)

Response:     Defendants deny this Paragraph in that: (1) the use of the term "SPS" constitutes argument which is unaccompanied by citation; (2) this Paragraph does not specify whether it refers to the October 6, 2020, October 14, 2020 or some other Fall (2020) Equity Training; (3) the Paragraph constitutes political argument; and (4) Neither Lumley nor Henderson expressed a concern for the terminology specified in this Paragraph.

68.     The "Oppression Matrix" categorized white people and males assigned at birth as the privileged social group under the categories of racism and sexism, respectively. (Ex. 13 at 17; Stip. ¶¶ 1(g), 9.)

Response:     Defendants deny this Paragraph in that: (1) the Paragraph does not specify whether it refers to the October 6, October 14, 2020 or some other Fall (2020) Equity Training; (2)

the Paragraph constitutes political argument; and (3) Neither Lumley nor Henderson expressed a concern for the terminology specified in this Paragraph.

**69.** As part of its Equity Training, SPS further taught that systemic racism "identifies dimensions of our history and culture that have allowed privileges associated with 'whiteness' and disadvantages associated with 'color' to endure and adapt over time." (Ex. 13 at 18; Stip. ¶¶ 1(g), 9.)

Response: Defendants deny this Paragraph in that: (1) the use of the term "SPS" constitutes argument which is unaccompanied by citation; (2) this Paragraph does not specify whether it refers to the October 6, 2020, October 14, 2020 or some other Fall (2020) Equity Training; (3) the Paragraph constitutes political argument and (4) Neither Lumley nor Henderson expressed a concern for the terminology specified in this Paragraph.

**70.** Likewise, in its Equity Training, SPS showed a video which explained, "You can see evidence of systemic racism in every area of life. . . . As a result, we should support systemic changes" to allow "equal access to resources." (Ex. 13 at 19; Stip. ¶¶ 1(g), 9, 10(d).)

Response: Defendants deny this Paragraph in that: (1) the use of the term "SPS" constitutes argument which is unaccompanied by citation; (2) this Paragraph does not specify whether it refers to the October 6, 2020, October 14, 2020 or some other Fall (2020) Equity Training; (3) the Paragraph constitutes political argument; and (4) Neither Lumley nor Henderson expressed a concern for the terminology specified in this Paragraph.

**71.** As part of its Equity Training, SPS taught that "white supremacy is a highly descriptive term for the culture we live in; a culture which positions white people and all that is associated with them (whiteness) as ideal." (Ex. 13 at 20; Stip. ¶¶ 1(g), 9; Ex. 15 at 12.)

Response: Defendants deny this Paragraph in that: (1) the use of the term "SPS" constitutes argument which is unaccompanied by citation; (2) this Paragraph does not specify whether it refers to the October 6, 2020, October 14, 2020 or some other Fall (2020) Equity Training; (3) the Paragraph constitutes political argument. Defendants provide the following:

A.    The October 6, 2020 Training session attended by Lumley did not contain a discussion about the white supremacy chart. No small group session was held on the white supremacy chart. No one called Lumley's name or asked her directly if she understood the white supremacy chart. Lumley was not asked to affirm or agree to anything that had been presented about the white supremacy chart or to write anything down. Rather, the participants were told that they could look at the white supremacy chart on their own time. (Lumley depo, DEX B, p. 24, lns. 12-25, p. 25, lns. 1-18).

B.    During the October 14, 2020 Equity Training, Henderson was never called on by the trainers to answer questions during the large group sessions. (Henderson depo, DEX A, p. 59, lns. 4-11).

**72.**    Participants then watched a video about white supremacy, which depicted a cartoon character dressed as a member of the Ku Klux Klan while the narrator described eradicating white supremacy. (Ex. 13 at 21; Stip. ¶¶ 1(g), 9.)

<u>Response</u>:    Defendants deny this Paragraph in that: (1) this Paragraph does not specify whether it refers to the October 6, 2020, October 14, 2020 or some other Fall (2020) Equity Training; (2) the Paragraph constitutes political argument; and (3) Neither Lumley nor Henderson expressed a concern for the terminology specified in this Paragraph.

**73.**    As part of the presentation on white supremacy, SPS also showed a slide with the same "Covert/Overt White Supremacy" graphic it handed out before the training. (Compare Ex. 13 at 22 with Ex. 9 at PLS 0425; Stip. ¶ 1(g), 9.) SPS also showed a slide that declared, "Privilege is a set of unearned benefits given to people who fit into a specific social group," and it required staff to "Acknowledge YOUR privileges." (Ex. 13 at 26; Stip. ¶ 1(g), 9.)

<u>Response</u>:    Defendants deny this Paragraph in that: (1) the use of the term "SPS" constitutes argument which is unaccompanied by citation; (2) this Paragraph does not specify whether it refers to the October 6, 2020, October 14, 2020 or some other Fall (2020) Equity Training; (3) the Paragraph constitutes political argument; and (4) Neither Lumley nor Henderson expressed a concern for the terminology specified in this Paragraph.

43

**74.** This graphic stated that "white silence," "colorblindness," "BIPOC [Black, Indigenous, People of Color] as Halloween Costumes," and "all lives matter" constitute white supremacy. (Ex. 13 at 22; Stip. ¶ 1(g), 9.)

<u>Response</u>: Defendants deny this Paragraph in that: (1) this Paragraph does not specify whether it refers to the October 6, 2020, October 14, 2020 or some other Fall (2020) Equity Training; (2) the Paragraph constitutes political argument. Defendants further deny this Paragraph for this graphic, as stated by the trainers during training, indicated that colorblindness, All Lives Matter, and white silence "can support th[e] structural system of white supremacy." Garcia-Pusateri depo, DEX G, p. 21, l. 12 to p. 22, l. 18; and its deposition exhibit no. 3, p. 13; *also see* Plaintiffs' Uncontroverted Facts, ¶ 39, and Plaintiffs' Exhibit 15, p. 13. Further, trainees were told that they were not being called "as an individual a white supremacist." *See id.*

**75.** Dr. Garcia-Pusateri also told Ms. Henderson's Equity Training session that staff can't be blind to color because colorblindness is white supremacy, as is denying one's white privilege. She also said that they cannot sit on the sidelines and be silent, that they must be an ally and take action. (Henderson Decl. ¶ 33.)

<u>Response</u>: Defendants deny this Paragraph for the following reasons:

A. The comments attributed to Garcia-Pusateri were not made at the October 6, 2020 training session attended by Lumley and even if they were made there, they do not constitute compelled speech or a violation of the First Amendment because: (1) the session did not contain a discussion about the white supremacy chart; (2) no one called Lumley's name or asked her directly if she understood the chart; (3) Lumley was not asked to affirm or agree to anything that had been presented about the white supremacy chart or to write anything down; and (4) the participants were told that they could look at the white supremacy chart on their own time. (Lumley depo, DEX B, p. 24, lns. 12-25, p. 25, lns. 1-18).

B. The comments attributed to Garcia-Pusateri were not made at the October 14, 2020 training session and even if they were, they did not constitute compelled speech or a

First Amendment violation because Henderson was never called on by the trainers to answer questions during the large group sessions. (Henderson depo, DEX A, p. 59, lns. 4-11).

        C.      Defendants admit that Garcia-Pusateri gave the following opinions during her deposition: (1) "Colorblindness" says "that I see you as just the person rather than seeing you with everything that you come with." (Garcia-Pusateri depo, DEX G, p. 66, lns. 18-20); (2) Colorblindness "can have harmful impacts" because "it can make someone feel like you do not want to see them for their identity or their lived experience." (Garcia-Pusateri depo, DEX G, p. 66, ln. 25; 67, lns. 2-3); (3) "Equality. ... [treats] everyone the same and sees them as all the same [w]hereas, equity is about seeing their whole selves and their whole personhood." (Garcia-Pusateri depo, DEX G, p. 68, lns. 3-6); (4) "I don't think equality is harmful. I think there is a better way [to make] people feel safe and supported." (Garcia -Pusateri depo, DEX G, p. 68, lns. 13-15).

       **76.**      Through the Equity Training, SPS conducted another interactive exercise called the "Major Terminology Groups Share." (Ex. 13 at 23; Stip. ¶ 1(g), 9; Ex. 15 at 14.)

    <u>Response</u>:      Defendants deny this Paragraph in that: (1) the use of the term "SPS" constitutes argument which is unaccompanied by citation; and (2) this Paragraph does not specify whether it refers to the October 6, 2020, October 14, 2020 or some other Fall (2020) Equity Training; and, (3) the only supporting citation about the facts contained in this Paragraph is to the training materials (PEX 13) and the Script (PEX 15).

       **77.**      In this exercise, SPS directed staff to "[s]pend the next 4 minutes discussing with your partner any of the major terms (Oppression, Systemic Racism, or White Supremacy). Also discuss how your chosen topic has taken place in our community." (Ex. 13 at 23; Stip. ¶ 1(g), 9; Ex. 15 at 14.)

    <u>Response</u>:      Defendants deny this Paragraph in that: (1) the use of the term "SPS" constitutes argument which is unaccompanied by citation; and (2) this Paragraph does not specify whether it refers to the October 6, 2020, October 14, 2020 or some other Fall (2020) Equity Training;

45

and, (3) the only supporting citation about the facts contained in this Paragraph is to the training

materials (PEX 13) and the Script (PEX 15).

78.    Ms. Henderson did not speak in the small group because she feared that debating these issues would polarize her co-workers and compromise their work relationship. (Henderson Decl. ¶ 35.)

<u>Response</u>:        Defendants admit that Henderson says in her Declaration that she "feared that

debating these issues would polarize my co-workers and compromise our work relationship."

Defendants further respond that Henderson apparently did not "fear" that she would "polarize" her

co-workers when: (1) she "shared her beliefs" in her small group meeting regarding the George

Floyd video (Henderson Declaration PEX 2, ¶ 18); or when (2) she expressed her opinions regarding

the Environmental Scan slideshow images in her shall group meeting (Henderson Declaration PEX

2, ¶ 23); or when (3) she spoke up in a large group meeting to say that she thought that Kyle

Rittenhouse was defending himself from rioters (Henderson Declaration PEX 2, ¶ 24); or when (4)

she asked a presenter "what we should say to a student who wanted to dress like a BIPOC character,

such as Pocahontas," for Halloween (Henderson Declaration PEX 2, ¶ 36).

79.    In her Equity Training session, Ms. Lumley spoke out because of how SPS was assigning characteristics based on race. She stated that all humans are all equal. Ms. Lumley stated that she is not a racist, and that not all white people are racist; that racism is something that any person of a particular race could be guilty of; and that not just white people are racist. (Lumley Decl. ¶ 27; Lumley Dep. 27:9 to 28:6.)

<u>Response</u>:        Defendants deny this Paragraph. Defendants admit the following:

A.    During her deposition, Lumley stated that during the October 6, 2020

Training session, between the discussion about the oppression matrix and the covert/overt

white supremacy sheet she "spoke up" and shared that she thought the presenters:

". . . were painting a broad-brush stroke of white people as racist, and I said that that was wrong. I said not all white people are racist. I said there's racism across the board. And, . . . my nephew married a Black woman, and they have children together. And there are Black people that tell her she doesn't count as Black anymore because she married a white man and has

46

children with him. And I said that I grew up in a broken home, a poor home with government handouts. I wasn't born into white privilege. And they said because I was white, I was born into white privilege."

(Lumley depo, DEX B, p. 27, lns. 10-23).

**80.** Ms. Lumley also used a personal example of how racism can exist within any community by sharing that her nephew married a black woman, but that some black people had told her nephew's wife that she did not "count" as black anymore. Mr. Sode told Ms. Lumley that black people cannot be racist. When she questioned his statement, he responded that black people can be prejudiced but not racist. (Lumley Decl. ¶ 27; Lumley Dep. 27:9 to 28:6.)

Response: Defendants deny this Paragraph but admit Defendants' response provided in

paragraph 79, *supra*, incorporated herein by reference.

**81.** Ms. Lumley also stated that she did not grow up in white privilege; that she came from a poor family, a broken home, and received government handouts. One of the SPS trainers responded that because Ms. Lumley is white, she was born into white privilege. (Lumley Decl. ¶ 28; Lumley Dep. 27:9 to 28:6.)

Response: Defendants deny this Paragraph but admit Defendants' response provided in

paragraph 79, *supra*, incorporated herein by reference.

**82.** One of the SPS trainers also told Ms. Lumley that the training wasn't just singling out white people, but then she pointed to the screen that discussed white supremacy. The trainers responded by telling Ms. Lumley that she needed to reflect on herself some more. (Lumley Decl. ¶ 28; Lumley Dep. 27:9 to 28:6.)

Response: Defendants admit this paragraph.

**83.** Others also disagreed with Ms. Lumley. When other participants raised their voices and told Ms. Lumley that she didn't understand what the trainers were saying about oppression, systemic racism, and white supremacy, the SPS trainers did not stop or correct her fellow participants. As a result of this exchange with the trainers and co-participants, Ms. Lumley shut down and no longer participated in any of the discussions. (Lumley Decl. ¶ 29; Lumley Dep. 28:17 to 30:4.)

Response: Defendants deny this Paragraph. Defendants provide the following: Lumley

stated during her deposition that during the October 6, 2020 Training session, one participant,

Amber Hawkins, "was yelling at me," Lumley stated: "I don't know what [Amber Hawkins] said, I

just know that she was yelling at me. ... I wasn't listening to her." (Lumley depo, DEX B, p. 28, lns. 17-24; p. 29, lns. 2-4).

84.     During the discussion over "major terms," Ms. Henderson also spoke up and asked Dr. Garcia-Pusateri what staff should say to a student who wanted to dress like a BIPOC character, such as Pocahontas, considering that Halloween was approaching. (Henderson Decl. ¶ 36.)

Response:      Defendants admit this Paragraph.

85.     In response, Dr. Garcia-Pusateri told Ms. Henderson that if she had a daughter who wanted to dress as a BIPOC character such as Disney's Moana, that it would not be nice, and that Ms. Henderson should use it as a teaching opportunity to explain to the child why it is not okay to dress as a BIPOC character. (Henderson Decl. ¶ 37.)

Response:      Defendants deny this Paragraph. Defendants provide the following:

A.     Garcia-Pusateri does not recall that Henderson said anything at the covert/overt white supremacy portion of the training. (Garcia-Pusateri depo. DEX G, p. 208, lns. 11-14).

B.     Garcia-Pusateri recalled Henderson saying something about costumes, but did not remember everything that was said or how she responded. (Garcia-Pusateri depo, DEX G, p. 283, lns. 2-16.

C.     Garcia-Pusateri's concerns about BIPOC costumes "are more about adults wearing costumes of people of color that portray them in a negative way." (Garcia-Pusateri depo. DEX G, p. 284, lns. 14-15).

86.     SPS responded differently to participants depending on the participant's viewpoint. (YGP/SPS Dep. 202:8 to 208:2.)

Response:      Defendants deny this Paragraph in that: (1) the use of the term "SPS" constitutes argument which is unaccompanied by citation; and (2) this Paragraph does not specify whether it refers to the October 6, 2020, October 14, 2020 or some other Fall (2020) Equity Training. Defendants provide the following:

A.    Garcia-Pusateri stated that "[w]hen it comes to this learning, we are open to people's perspective but also [to help] them understand how they can think broader with those perspectives." (Garcia-Pusateri depo. DEX G, p. 203, lns. 3-6).

B.    Garcia-Pusateri stated that "the approach" of the training might look different, "but [the training] would come back to the goal of understanding these concepts and having the [attendees] understand these [concepts] are directly related to barriers our students are facing" ... and "ensuring our students feel safe and supported in the classroom." (Garcia-Pusateri depo. DEX G, p. 206, lns. 2-6, 12-13).

C.    Garcia-Pusateri stated that "To me personally ... it's about engaging that person, talking to them, trying to understand their perspective as I would hope they would do ... with their students, and then helping them with the thinking and posing questions and, ... thinking about this broadly and then coming back to the common value of ensuring our students feel safe and supported in the classroom." (Garcia-Pusateri depo. DEX G, p. 207, lns. 3-10).

**87.**    Two more interactive exercises followed the Major Terminology Group Share—the "Social Identity Map" and the "Four Corners" exercise. The Social Identity Map required staff to "explore [their] identities," e.g., their race, ethnicity, gender, sexual orientation, etc., while the "Four Corners" exercise was "an interactive game centered around Identity, Beliefs and Values." (Ex. 13 at 28-29, 42; Stip. ¶ 1(g), 9; Ex. 16 at 34-37; Stip. ¶¶ 1(i), 9; YGP/SPS Dep. 302:15 to 305:3.)

<u>Response</u>:    Defendants agree that the Social Identity Map and the Four Corners exercise were two interactive exercises contained in the Fall (2020) Equity Training materials.

Defendants deny that the Social Identities Map activity was conducted during the October 6, 2020 Equity Training. Per Garcia-Pusateri it was very rare that the District ever got to have participants engage in the Social Identity map. (Garcia-Pusateri depo. DEX G, p. 301, lns. 18-20). Lumley admitted that the October 6, 2020 training session did not go over the Social Identities map and the participants were "told to look at it ourselves and fill it out basically on our own time."

49

Lumley was not asked about her opinion on the social identities map, how she would have filled it out or how she fit in on it. (Lumley depo DEX B, p. 25, lns. 19-25; p. 26, lns. 1-12).

Defendants admit that the Social Identities Map activity was conducted during the October 14, 2020 Equity Training. Per Henderson the participants at the training session were asked to fill out the Social Identities Map, but she did not fill it out. (Henderson depo, DEX A, p. 108, lns. 13-24). Henderson was not asked to say anything about the Social Identities Map and did not say anything or offer to say anything. (Henderson depo. DEX A, p. 109, lns. 16-25; p. 110, lns. 11-12).

Defendants agree that the Four Corners activity was originally designed to have the participants move to one of four corners in the room to signify whether they strongly agree, agree, disagree or strongly disagree with a statement. However, because of Covid and virtual learning, the process was changed and the exercise was put into Kahoot, which is just an on-line tool where participants can log in with their devices and participate in the activity. (Garcia-Pusateri depo. DEX G, p. 302, lns 17-25; p. 303, ln 1, lns. 6-25; p. 304, lns 1-4).

Defendants deny that a Four Corners Activity was conducted during the October 14, 2020 Equity Training. Per Rapert the participants did not do a four corners exercise during the October 14, 2020 Equity Training. The slides were read through, but the participants were not asked to respond to any of the questions. Nor did the trainers ask anybody to respond to any of the questions during the session she attended. (Rapert depo. DEX F, p. 44, lns. 8-12, lns. 21- 25; p. 45, lns. 3-6). Any notes made by the participants during the training were not collected by the District. (Garcia-Pusateri depo, DEX G, p. 224, lns. 7-10; p. 228, Lns. 23-25).

**88.** The Four Corners exercise required participants to answer a series of statements with one of four responses: "strongly agree," "agree," "disagree," and "strongly disagree." (Ex. 13 at 29-30, 42; Stip. ¶ 1(g), 9; Ex. 16 at 35-36; Stip. ¶¶ 1(i), 9.)

<u>Response</u>:     Defendants admit this Paragraph.

50

89.     Statements included, "I believe all students should be treated equitably," "Learning about my identity makes me better in my role," "I am prepared to have conversations with my students or staff about identity or equity," I believe my identities and lived experiences are affirmed and supported by the district," and "I feel represented in the district." (Ex. 13 at 29-30; Stip. ¶ 1(g), 9; Ex. 16 at 35-36; Stip. ¶¶ 1(i), 9.)

Response:     Defendants admit that the Four Corners exercise contained the following statements:

> "I believe my students or staff feel safe at SPS"
> "I believe my students or staff feel safe in Springfield"
> "I feel safe at SPS" "I feel safe in Springfield"
> "I believe SPS provides an engaging, relevant and collaborative learning and working environment"
> "I believe in the SPS strategic plan"
> "I was aware of the new Focus V Goal before today"
> "I believe my students or staff is represented in the district"
> "I feel represented in the district"

(DEX 13.01, p. 42).

90.     Ms. Lumley did not participate in the Four Corners exercise with her small group because she had shut down and no longer wanted to participate because of the earlier exchange she had with the SPS trainers and co-participants. (Lumley Decl. ¶ 30; Lumley Dep. 29:10- 32:13.)

Response:     Defendants deny this Paragraph. The testimony cited does not state that Lumley did not participate in the Four Corners exercise with her small group. Defendants admit that Lumley testified about her interchange with Amber Hawkins which ostensibly caused her to "Mentally Shutdown." (Lumley depo DEX B, pp. 29-30). Lumley then testified:

> "We had another breakout session after that happened. Amber was my breakout partner. It felt very hostile. I almost didn't turn around; but I did, and she apologized for yelling at me. And I told her that we all have a voice and that we need to be there for each other."

(Lumley depo DEX B, p. 30, lns. 7-12).

91.     Ms. Henderson did not agree with several Four Corners statements. (Henderson Decl. ¶ 40; Henderson Dep. 116:2 to 119:10.)

Response:     Defendants deny this Paragraph. Defendants deny that a Four Corners Activity was conducted during the October 14, 2020 Equity Training. Per Rapert the participants

51

did not do a four corners exercise during that training. The slides were read through, but the participants were not asked to respond to questions. Nor did the trainers ask anybody to respond to questions during that session. (Rapert depo. DEX F, p. 44, lns. 8-12, lns. 21- 25; p. 45, lns. 3-6).

**92.**     Although Ms. Henderson disagreed with several of the Four Corners statements, she did not express her disagreement in her Equity Training session because she knew by that point in the training session that SPS did not accept alternate viewpoints, and that if she voiced her true views, she would be corrected or considered unprofessional. (Henderson Decl. ¶ 41.)

Response:          Defendants deny this Paragraph in that the use of the term "SPS" constitutes argument which is unaccompanied by citation Defendants deny that a Four Corners Activity was conducted during the October 14, 2020 Equity Training. Per Rapert the participants did not do a four corners exercise during that training. The slides were read through, but the participants were not asked to respond to any questions. Nor did the trainers ask anybody to respond to any of the questions during the session she attended. (Rapert depo. DEX F, p. 44, lns. 8-12, lns. 21- 25; p. 45, lns. 3-6). During that equity training session, Henderson was never called on by the trainers to answer questions during the large group sessions. (Henderson depo, DEX 52.01, p. 59, lns. 4-11).

**93.**     The Equity Training then addressed "anti-racism," defining it as "advocating for changes in political, economic, and social life." (Ex. 13 at 31; Stip. ¶ 1(g), 9.)

Response:          Defendants deny this Paragraph. Defendants provide the following response:

A.     Garcia-Pusateri stated her opinion that the Fall (2020) Equity Training was asking the participants to commit to "understanding what anti-racism is ... and to learn more about it." (Garcia-Pusateri depo. DEX G, p. 86, lns. 15-19; p. 95, lns. 13-16).

B.     Garcia-Pusateri stated her opinion that the Fall (2020) Equity Training was asking participants to commit to "being an anti-racist educator" (Garcia-Pusateri depo. DEX G, p. 86, lns. 15-19; p. 95, lns. 13-16;) and learning about how to address barriers to students in the classroom, (Garcia-Pusateri depo, DEX G, p. 97, lns. 19-22) such as how to handle the use of a racial epithets in the classroom. (Garcia-Pusateri depo, DEX G, p. 97, lns. 4-7).

52

C.      Garcia-Pusateri stated her opinion that the Fall (2020) Equity Training was not asking anyone to engage in political activity or political advocacy. (Garcia-Pusateri depo. DEX G, p. 97, lns. 19-20).

94.     SPS stated in its training, "The most important thing to reiterate here is that we will actively oppose racism by advocating for change. There is a proactive element in place to no longer remain silent or inactive." (Ex. 15 at 18.)

Response:      Defendants deny this Paragraph in that the use of the term "SPS" constitutes argument which is unaccompanied by citation. Defendants admit that PEX 15 makes the cited statement.

95.     Additionally, according to SPS, "To fight against systemic racism means to buck norms." (Ex. 13 at 32; Stip. ¶ 1(g), 9.)

Response:      Defendants deny this Paragraph in that the use of the term "SPS" constitutes argument which is unaccompanied by citation. Defendants admit that PEX 13 makes the cited statement.

96.     Moreover, according to SPS, as part their commitment to anti-racism, "Staff . . . at every level must be willing to be uncomfortable in their struggle for black students, recognizing students' power and feeding it by honoring their many contributions to our schools." (Ex. 13 at 33; Stip. ¶ 1(g), 9.)

Response:      Defendants deny this Paragraph in that the use of the term "SPS" constitutes argument which is unaccompanied by citation. Defendants admit that PEX 13 makes the cited statement.

97.     SPS concluded its Equity Training with the "Anti-Racist/Solo Write" or "Anti-Racist/Group Share," where SPS directed staff to answer three questions about being an anti-racist educator: "How does this statement impact your role at SPS? What steps will you take to become an Anti-Racist? What tools/support will you need to be Anti-Racist?" (Ex. 13 at 38- 9; Stip. ¶ 1(g), 9.)

Response:      Defendants deny this Paragraph in that the use of the term "SPS" constitutes argument which is unaccompanied by citation. Defendants deny that an "Anti-Racist Solo Write

53

was conducted during the October 6 or October 14, 2020 Equity Training sessions." (Lumley Decl. ¶ 32; Henderson Decl. ¶ 45).

98. The three "Anti-Racist/Solo Write" questions were reproduced on the Note Sheet handout staff received before the training so that participants could write out their responses. (Ex. 9 at PLS 0422; Ex. 15 at 3; Hale Dep., dep. ex. 2; YGP/SPS Dep. 317:4 to 318:17.)

Response:    Defendants admit that Henderson received a note sheet with the packet of materials she received from Hale prior to the October 14, 2020 Equity Training. Defendants admit that Henderson could use the supplied note sheet to collect their notes if they wanted to. (Garcia-Pusateri depo. DEX G, p. 129, lns. 7-11). Defendants deny the remainder of this Paragraph.

99. In Ms. Lumley's and Ms. Henderson's Equity Training sessions, because they were short on time, the SPS trainers directed staff to write their answers on their own time. Neither Ms. Lumley nor Ms. Henderson completed it because they were unwilling to commit to becoming "anti-racist educators," as they understood the term to mean. (Lumley Decl. ¶ 32; Henderson Decl. ¶ 45.)

Response:    Defendants admit this Paragraph.

100. During the fall semester of the 2020-2021 school year, SPS also required Ms. Henderson, as part of her professional development, to complete seven equity-based computer modules on the Canvas platform, consisting of three Social Emotional Learning modules and four Cultural Consciousness modules ("Canvas Modules"). (Ex. 20; Stip. ¶¶ 19, 21.)

Response:    Defendants deny this Paragraph in that the use of the term "SPS" constitutes argument which is unaccompanied by citation. Defendants admit that:

A. During school year 2020-21, the Department of Equity and Diversity published the following five (5) training modules ("Five Canvas Modules") on its Canvas Learning Management System ("Canvas"): (1) Overview of Social Emotional Learning from an Equity Lens (DEX 20.06); (2) Elementary Social Emotional Learning as it Relates to Covid-19 (DEX 20.06.01); (3) Elementary Social Emotional Learning as it Relates to Racial Injustice (DEX 20.07.01); (4) Secondary Social Emotional Learning as it Relates to Covid-19 (DEX 20.08.01); (5) Secondary Social Emotional Learning as it Relates to Racial

54

Injustice (DEX 20.09.01). (Jungmann Affd, DEX C, ¶ 48; Harrington Affd, DEX E, ¶ 2; DEX 20.06; 20.06.01; 20.07.01; 20.08.01; 20.09.01).

B. Henderson did access the "Five Canvas Modules." (Henderson depo, DEX A, p. 45, lns. 17-25; p. 46, lns. 1-11; DEX 20.06; 20.06.01; 20.07.01; 20.08.01; 20.09.01).

C. Henderson did not recall accessing any other Canvas Modules during school year 2020-21 that were placed on Canvas by the District's Office of Equity and Diversity. (Henderson depo, DEX A, p. 46, lns. 7-11).

Defendants deny any remaining statements in this Paragraph.

**101.** Together with the Cultural Consciousness modules, Ms. Henderson completed the following Social Emotional Learning modules: Overview of Social Emotional Learning from an Equity Lens; Elementary Social Emotional Learning as it Relates to Racial Injustice; Secondary Social Emotional Learning as it Relates to Racial Injustice; Elementary Social Emotional Learning as it Relates to Covid-19; and Secondary Social Emotional Learning as it Relates to Covid-19. (Henderson Decl. ¶ 48; Henderson Dep. 44:20 to 46:6.)

Response:     Defendants admit that:

A. Henderson accessed and completed the "Five Canvas Modules." (Henderson depo, DEX A, p. 45, lns. 17-25; p. 46, lns. 1-11; DEX 20.06; 20.06.01; 20.07.01; 20.08.01; 20.09.01).

B. Henderson did not recall accessing any other Canvas Modules during school year 2020-21 that were placed on Canvas by the District's Office of Equity and Diversity. (Henderson depo, DEX A, p. 46, lns. 7-11).

Defendants deny any remaining statements in this Paragraph.

**102.** A team of SPS employees that included Dr. Garcia-Pusateri and Mr. Anderson created the modules. (Ex. 7, SPS Interrog. Answers, No. 2.)

Response:     Defendants admit this Paragraph.

**103.** As one of the creators of the Canvas Modules stated, "Now that we have our Fall districtwide equity training completed, it's import[ant] to keep the momentum going as anti-racist educators." (Ex. 21, DEX 50B-004071.)

Response:     Defendants admit this Paragraph.

**104.** The Canvas Modules addressed topics including white supremacy, anti-racism, social justice, and systemic racism. (Ex. 20.)

Response:     Defendants admit that the Five Canvas Modules address the topics contained in them. DEX 20.06; 20.06.01; 20.07.01; 20.08.01; 20.09.01). Defendants deny any additional facts contained in this Paragraph.

**105.** The Cultural Consciousness modules required Ms. Henderson to watch several videos, including: a. "Black Lives Matter Protests | BrainPOP" video; b. "What You Should Know About #BlackLivesMatter" video; c. The same "Systemic Racism Explained" video that was in the Equity Training, which said that systemic racism is evident "in every area of life" and that staff should do something about it by supporting "systemic changes" to allow "equal access to resources," beginning at 3:16; d. "Debunking The Most Common Myths White People Tell About Race" video, which included statements like "I don't see color"; "I have black friends"; "Race has nothing to do with it. It's about class"; and "Focusing on race is what divides us"; e. "Advice For White People from Anti-Racism Trainer" video, which said that "anti-racism depends on white America asking itself the critical question of are you still willing to receive these privileges, most of which . . . can be extended to all people without you losing those privileges," beginning at 3:37, and declared that "in everything we do we have to think about is this increasing the burden that's on the black body . . . and try[] to find acts in your life that you can take to decrease that burden. Go grocery shopping for a black person this week," beginning at 4:20; and f. "Are Teachers Unintentionally Racist?" video. (Stip. ¶ 22; Ex. 20 at PLS 0260-62, 0268-70.)

Response:     Defendants deny this Paragraph in that Henderson testified that she did not recall accessing any other than the Five Canvas Modules during school year 2020-21 that were placed on Canvas by the District's Office of Equity and Diversity. (Henderson depo, DEX A, p. 46, lns. 7-11). Defendants deny any remaining statements in this Paragraph.

**106.** The Cultural Consciousness modules included a "Cultural Competence Self-assessment Checklist" and a "Self-Assessment Reflection" which had to be completed to finish the module. (Stip. ¶ 24; Ex. 20 at PLS 0264-65, 0332-33.)

Response:     Defendants deny this Paragraph in that Henderson testified that she did not recall accessing any other than the Five Canvas Modules during school year 2020-21 that were placed on Canvas by the District's Office of Equity and Diversity. (Henderson depo, DEX A, p. 46, lns. 7-11). Defendants deny any remaining statements in this Paragraph.

**107.** Dr. Garcia-Pusateri advised Ms. Henderson that the Cultural Competence modules' reflection questions were a requirement. (Ex. 22, DEX 50F-0012919-20; Henderson Dep. 121:17 to 122:21.)

Response:    Defendants admit that:

A. On September 17, 2020 at 1:30 pm Garcia-Pusateri advised Henderson that she had to fill in the text boxes for the reflection questions on the Equity Focused Canvas Modules. (*See* Plaintiffs' Exhibit 22, DEX 50F-0012919).

B. On September 17, 2020 at 2:44 pm Henderson emailed Garcia-Pusateri and again requested to know if the Reflection Questions had to be answered [to complete the module]. (*See* Plaintiffs' Exhibit 22, DEX 50F-0012919).

C. On September 17, 2020 at 3:42 pm Garcia-Pusateri checked with Jeremy Sullivan, one of the District employees who helped to prepare the modules, to see if Reflection Questions had to be answered [to complete the module]. (*See* Plaintiffs' Exhibit 22, DEX 50F-0012919).

D. On September 17, 2020 at 4:17 pm, Mr. Sullivan responded to Garcia-Pusateri and stated: "There aren't. They reflect on their own. We decided we didn't want them to submit stuff except the confirmation at the end." Defendants deny any additional facts contained in this Paragraph. (*See* Plaintiffs' Exhibit 22, DEX 50F-0012919).

**108.** The "Cultural Competence Self-assessment Checklist" stated that "[t]his self-assessment tool is designed to explore individual competence." On a scale from "Never" to "Always/Very Well," the assessment required Ms. Henderson to rate her "Awareness" of whether "I have a clear sense of my own ethnic, cultural, and racial identity," "I am aware of my stereotypes as they arise and have developed personal strategies for reducing the harm they cause," and "If I am a White person working with a person of color, I will likely be perceived as a person with power and racial privilege, and that I [may] not be seen as 'unbiased' or as an ally." (Ex. 78 20 at PLS 0332-33.)

Response:    Defendants deny this Paragraph in that Henderson testified that she did not recall accessing any other Canvas Modules during school year 2020-21 that were placed on Canvas

57

by the District's Office of Equity and Diversity. (Henderson depo, DEX A, p. 46, lns. 7-11). Any notes made by the participants during the training were not collected by the District. (Garcia-Pusateri depo, DEX G, p. 224, lns. 7-10; p. 228, Lns. 23-25). Defendants deny any remaining statements in this Paragraph.

**109.** After Ms. Henderson rated herself for each prompt, the assessment instructed Ms. Henderson to calculate a final score for how "culturally competent" she was. (Id.)

Response: Defendants deny this Paragraph in that Henderson testified that she did not recall accessing any other Canvas Modules during school year 2020-21 that were placed on Canvas by the District's Office of Equity and Diversity. (Henderson depo, DEX A, p. 46, lns. 7-11). Any notes made by the participants during the training were not collected by the District. (Garcia-Pusateri depo, DEX G, p. 224, lns. 7-10; p. 228, Lns. 23-25). Defendants deny any remaining statements in this Paragraph.

**110.** Even though Ms. Henderson disagreed with the statement "If I am a White person working with a person of color, I will likely be perceived as a person with power and racial privilege, and that I [may] not be seen as 'unbiased' or as an ally," because she does not treat people differently based on their skin color, she answered with "Always/Very Well" or "Fairly Often/Pretty Well" because she thought SPS would review her responses and that was how it expected her to respond. (Henderson Decl. ¶ 53.)

Response: Defendants deny this Paragraph in that Henderson testified that she did not recall accessing any other Canvas Modules during school year 2020-21 that were placed on Canvas by the District's Office of Equity and Diversity. (Henderson depo, DEX A, p. 46, lns. 7-11). Any notes made by the participants during the training were not collected by the District. (Garcia-Pusateri depo, DEX G, p. 224, lns. 7-10; p. 228, Lns. 23-25). Defendants deny any remaining statements in this Paragraph.

**111.** The Social Emotional Learning Modules had "Quick Check" Questions that staff had to answer correctly to complete the modules. (Stip. ¶ 23.)

Response:    Defendants deny this Paragraph in that it misstates Stipulation 23 in the parties' stipulations. Defendants admit to the correct wording of Stipulation 23 as follows: "The Social Emotional Learning modules had "quick check" questions which a person had to answer correctly in order to complete the module."

Defendants admit to the following:

A. Each of the Five Canvas Modules utilize pages with guided navigation to progress through the learning options. (Douglas Affd, DEX K, ¶ 6).

B. Each of the Five Canvas Modules contain one (1) "Quick Check" question which has two possible answers.

(1) The Elementary and Secondary Social and Emotional Learning as it relates to Racial Injustice modules (DEX 20.07.01 and DEX 20.09.01) each contain the following "Quick Check" question:
"When you witness racism and xenophobia in the classroom, how should you respond?
- Address the situation in private after it has passed.
- Address the situation the moment you realize it is happening."

(2) The Elementary and Secondary Social and Emotional Learning as it relates to Covid-19 (DEX 20.05 and DEX 20.08) each contain the following "Quick Check" question:
"Acknowledging and addressing students' social emotional needs in relation to Covid-19 is whose responsibility?
- All caregivers and stakeholders.
- Guardians and counselors."

(3) The Overview of Social Emotional Learning from an Equity Lens (DEX 20.06) The Elementary and Secondary Social and Emotional Learning as it relates to Covid-19 (DEX 20.06) contains the following "Quick Check" question:
"How does the addition of Focus Area V impact how you serve the students and staff of SPS?
- It provides suggested guidance regarding equity and diversity issues.
- It cements equity and diversity as a district priority that must be followed by all staff."

(Douglas Affd, DEX K ¶ 7).

59

C. The "Quick Check" questions on these Five (5) Canvas Modules were not designated by the Equity and Diversity Department as a graded assignment or quiz within Canvas. Therefore, the answers to the "Quick Check" questions on the modules that were given by the user are not tracked or recorded by Canvas and cannot be checked or reviewed by anyone because no record of the answers exists. (Douglas Affd, DEX K ¶ 8).

**112.** The Elementary and Secondary Social Emotional Learning as it Relates to Racial Injustice modules' "Quick Check" question was: "When you witness racism and xenophobia in the classroom, how should you respond?" (Ex. 20 at 58, 93, 80-81, 103-04.)

<u>Response</u>: Defendants admit the paragraphs contained in Defendants' Response to Paragraph 111, *supra*, incorporated herein by reference.

**113.** The two choices for answers were: "Address the situation in private after it has passed," and "Address the situation the moment you realize it is happening." If staff selected the first possible answer, they received the following message: "Incorrect! It is imperative adults speak up immediately and address the situation with those involved. Being an anti-racist requires immediate action." If they selected the second possible answer, they received the following message and completed the module: "Correct! Being an anti-racist requires immediate action." (Id. at 93, 103-04.)

<u>Response</u>: Defendants admit this Paragraph.

**114.** Ms. Henderson disagreed with the "correct" answer because, having worked with students and been in special education for over 20 years, she believes any response must be tailored to the situation and student. Even so, she selected the "correct" answer so that she could complete the module and receive credit. (Henderson Decl. ¶ 57.)

<u>Response</u>: Defendants admit that Henderson Declaration ¶ 57 expresses this opinion in this Paragraph. Defendants deny that this Paragraph expresses a fact. Defendants admit that the "Quick Check" questions on these Five (5) Canvas Modules were not designated by the Equity and Diversity Department as a graded assignment or quiz within Canvas. The answers to the "Quick Check" questions that were given by the user are not tracked or recorded by Canvas and cannot be checked or reviewed by anyone as no record of the answers exists. (Douglas Affd, DEX K ¶ 8)

60

**115.** The Elementary and Secondary Social Emotional Learning as it Relates to Covid-19 modules' "Quick Check" question was: "Acknowledging and addressing students' social emotional needs in relation to Covid-19 is whose responsibility?" (Ex. 20 at 51, 70, 90, 98.)

Response:     Defendants admit the following:

A. The Elementary and Secondary Social and Emotional Learning as it relates to Covid-19 (DEX 20.05 and DEX 20.08) each contain the following "Quick Check" question:

> "Acknowledging and addressing students' social emotional needs in relation to Covid-19 is whose responsibility?
> - All caregivers and stakeholders.
> - Guardians and counselors."

(Douglas Affd, DEX K ¶ 7).

B. The "Quick Check" questions on these Five (5) Canvas Modules were not designated by the Equity and Diversity Department as a graded assignment or quiz within Canvas. The answers to the "Quick Check" questions that were given by the user are not tracked or recorded by Canvas and cannot be checked or reviewed by anyone as no record of the answers exists. (Douglas Affd, DEX K ¶ 8).

**116.** The two choices for answers were: "All caregivers and stakeholders," and "Guardians and counselors." If staff selected the first possible answer, they received the following message and completed the module: "Correct! In these trying times, we must all work together to ensure that all students are having their social emotional needs met." If they selected the second possible answer, they received the following message: "Incorrect! In these trying times, we must all work together to ensure that all students are having their social emotional needs met." (Id. at 90, 98.)

Response:     Defendants admit this Paragraph.

**117.** Ms. Henderson disagreed with the "correct" answer because she believes that parents (or guardians if they have been appointed) should be the decisionmakers for their children, while SPS's "correct" response suggested that the school is an equal decisionmaker to the parent. Even so, she selected the "correct" answer so that she could complete the module and receive credit. (Henderson Decl. ¶ 60.)

Response:     Defendants admit that Henderson Declaration ¶ 57 expresses her opinion in this Paragraph. Defendants deny that this Paragraph expresses a fact. Defendants admit that the

"Quick Check" questions on these Five (5) Canvas Modules were not designated by the Equity and Diversity Department as a graded assignment or quiz within Canvas. Therefore, the answers to the "Quick Check" questions on the modules that were given by the user are not tracked or recorded by Canvas and cannot be checked or reviewed by anyone because no record of the answers exists. (Douglas Affd, DEX K ¶ 8)

118.    Ms. Henderson timely completed the Canvas Modules, as required by SPS. (Stip. ¶ 20.)

Response:    Defendants deny this Paragraph in that it contains opinion and political argument by use of the word "SPS also provided" which is unaccompanied by citation. Defendants admit that Henderson completed the Five Canvas Modules. Defendants deny any additional facts stated in this Paragraph.

## III. DEFENDANTS' ADDITIONAL RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED MATERIAL FACTS

119.    During school year 2018-19 the District experienced a series of disturbing events that impacted the District's students, staff, parents and the school community. The acts targeted several District students, specifically students of color and LGBTQ+ students, and represented what the District's Board believed to be "opposition to basic human rights and to a learning environment defined by inclusivity and respect for every individual." Jungmann Affd, DEX C, ¶ 16.

120.    In response to these events, the Board issued a definitive statement opposing racism, bigotry and disrespect in any form and on May 21, 2019 passed a Resolution to Affirm Commitment to Equity and Inclusivity in all District operations during an open meeting of the Board. Jungmann Affd, DEX C, ¶ 17; and Harrington Affd, DEX E, ¶ 2, DEX 26.02.

121.    In August, 2019, a forty-six (46) person citizen's committee composed of residents of the District, present and former members of the District's Board of Education, educators and

62

administrators was gathered by the District to serve as the Equity and Diversity Advisory Council ("EDAC"). Jungmann Affd, DEX C, ¶ 18; and Rector Affd, DEX D, ¶ 16.

**122.** On May 19, 2020, the Board of Education amended the District's Strategic Plan, consistent with the recommendations of EDAC and Chief Equity and Diversity Officer Garcia-Pusateri. This amendment added Focus Area 5 – Equity and Diversity. Subsequently, the following five (5) Strategies were added to Focus Area 5:

Strategy 5.1.1: Facilitate learning opportunities for staff and leaders that foster exploration of identity and self, and create applications to demonstrate cultural consciousness in their work.

Strategy 5.1.2: Develop and deploy improved recruitment, collaboration and communication structures to enhance and diversify the workforce.

Strategy 5.1.3: Review, improve and expand programming and services for under-resourced and under-represented students.

Strategy 5.1.4: Review and expand the curriculum to reflect student identities, lived experiences, cultural history and significant contributions.

Strategy 5.1.5: Research, develop and deploy engagement and advocacy policy, practices, and programs that support students and staff, and foster greater community engagement.

Jungmann Affd, DEX C, ¶ 33; and Harrington Affd, DEX E, ¶ 2, DEX 3.06.

**123.** The purpose of the Fall (2020) Equity Training was to:

- Improve engagement, safety, and attendance rates for under-resourced and under-represented student populations.
- Demonstrate annual growth in the core academic success (iReady, MAP, EOC, Common Assessments) for all students, with an intensive focus on closing performance gaps for under-resourced and under-represented students.
- Increase the graduation rate for all student populations, with an intensive focus on under-resourced and under-represented students.
- Recruit, hire, develop, support and retain an effective, qualified and diverse workforce of teachers, staff and leaders to better meet the needs of students.

Jungmann Affd, DEX C, ¶ 42; and Harrington Affd, DEX E, ¶ 2, DEX 3.06, 6.01.

**124.** "Under-represented students" include, but are not limited to the following groups: students of color, students with disabilities, LGBTQ+ students, students who are English Language

63

Learners and students who are from diverse religious backgrounds and belief systems. Jungmann Affd, DEX C, ¶ 31.

125. "Under-resourced students" include, but are not limited to the following groups: students who qualify for and receive free and reduced lunch services and students who receive McKinney-Vento services. Students can be both under-represented and under-resourced, depending upon their personal circumstances. Jungmann Affd, DEX C, ¶ 31.

126. The terms "under-represented" and "under-resourced," are based on the student subgroup data (such as graduation data, discipline data and attendance data), the analysis of which allows the District to create better educational practices that yield more equitable educational outcomes for the students. Garcia-Pusateri depo, DEX G, p. 143, l. 11-22.

127. The purpose of the Fall (2020) Equity Training was to create more equitable environments for students by providing adults learning and understanding about the barriers to education that students and staff may encounter in school and understand how those barriers to learning impact the education of students in the District. Garcia-Pusateri depo, DEX G, p. 42, l. 20 to p. 43, l. 3, and l. 12-16; p. 44, l. 5-7.

128. The concepts contained in the Fall (2020) Equity Training were designed for adults to "broaden their perspectives so they can find ways [to] better identify the barriers in [the] system that [are] impacting students." Garcia-Pusateri depo, DEX G, p. 325, l. 11-15.

64

## IV.  ARGUMENT

As discussed, Plaintiffs' motion must be denied and judgment as a matter of law is mandated in favor of Defendants. *See* Defendants' Motion for Summary Judgment (DOC 74 and DOC 75).

### A. PLAINTIFFS' MOTION MUST BE DENIED FOR LACK OF STANDING.

Plaintiffs seek to strike down the District's equity and diversity training. As discussed in Defendants' Suggestions in Support of their Motion for Summary Judgment (DOC 75) (incorporated herein by reference), Plaintiffs cannot satisfy the case or controversy requirement of Article III of the Constitution. Plaintiffs cannot show the first required element, injury in fact. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Plaintiffs have not "suffered an 'injury in fact' – an invasion of a legally protected interest which is (a) concrete and particularized,…and (b) actual or imminent, not conjectural or hypothetical." *Id*. at 560. Plaintiffs were not penalized, disciplined or subjected to adverse consequences during or after training. ¶¶ 17I, 17J. Henderson, who attended training virtually and completed online modules, received credit, additional pay for the equity training and her pay was not reduced. ¶¶ 17D-F. Likewise, Lumley attended all trainings required of her and her pay was not reduced. ¶¶ 17A-B. Plaintiffs also remain employed and Lumley was promoted "after" the instant lawsuit was served. ¶¶ 1, 2, 2B, 17K. Plus, Plaintiffs cannot show that they would have been subjected to harm. No employee who attended was dismissed, removed or failed to get credit, and no adverse action was taken against anyone not attending. ¶¶ 17L-M.

Nor can Plaintiffs show that concrete harm was imminent. Even if Plaintiffs affirmed beliefs about so-called racial equity with which they did not agree,[3] they did so based solely on their "perception" that they would be disciplined for not doing so. A litigant alleging chill must still

---

[3] Notably, Plaintiffs admit they were not personally called out or asked to give opinions during the trainings. ¶¶ 27A-B, 30 A-B, 46C, 46E, 64D, 64F-G, 71A-B, and 75A.

establish that a concrete harm occurred or is imminent. *Morrison v. Bd. of Educ. of Boyd Cty.*, 521 F.3d 602, 610 (6th Cir. 2008). Plaintiffs have not shown concrete harm was imminent. They and others who attended the trainings provided their opinions (¶¶ 46 C-E, 55 A-E, 56 A-B, 62C, 78-81) and no one was removed or suffered a loss of credit (¶¶ 17L-M). Absent a concrete act on the part of Defendants, Plaintiffs' "allegations fall squarely within the ambit of 'subjective chill' that the Supreme Court definitely rejected for standing purposes." *Id.* (no injury where plaintiffs' subjective apprehension counseled him to choose caution and where he assumed he would be punished).

Finally, affirming beliefs about "so-called racial equity" does not give Plaintiffs' standing as it amounts to no more than Plaintiffs claiming they were "infiltrated by 'diversity thinking.' " *See Preskar v. U.S.*, 248 F.R.D. 576, 582 (E.D. Cal. 2008) (teacher and parent who sought elimination of school's "diversity education" by challenging "methodology used in diversity programs" on constitutional grounds had no standing to litigate; "allegations amount[ed] to little more than a generalized grievance against 'diversity thinking.' "). Likewise, not expressing their views about "so-called racial equity" or not expressing them in full for fear of adverse action does not give rise to standing. As noted in a very recent district court opinion, "that self-censorship would exist separate and apart from the [training they attended]…and the mere prospect of future injury through the [training] is not sufficient to confer standing." *Menders v. Loudoun Cty. Sch. Bd.*, 2022 WL 179597 at *9 (E.D. Va. 2022) (emphasis added). Hence, "[t]his case should be over. Allowing it to proceed to determine the constitutionality of a [lawful policy and practice] – in the hope of awarding the [P]laintiff[s] a single dollar – vindicates no interest and trivializes the important business of the federal courts." *Morrison*, *supra*, 521 F.3d at 611.

## B. PLAINTIFFS ARE NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON ANY OF THEIR SEPARATE CLAIMS

Even if Plaintiffs had standing, Plaintiffs' motion must be denied for the reasons below.

### 1. Plaintiffs' motion as to their Count I claim must be denied.

The Supreme Court has found a "First Amendment protection against compelled speech…only in the context of governmental compulsion to disseminate a particular political or ideological message." *U.S. v. Sindel*, 53 F.3d 874, 878 (8th Cir. 1995) (citations omitted) (emphasis added); *see*, *e.g*., *Pacific Gas v. Pub. Utilities Comm. of Ca*., 475 U.S. 1 (1986) (state may not order utility company to distribute literature of hostile groups with its newsletters); *Wooley v. Maynard*, 430 U.S. 705 (1977) (state may not require citizen to display state motto on license plate); *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241 (1974) (statute requiring newspapers to publish replies of political candidates whom they criticized unconstitutional); and *West Va. State Bd. of Edu. v. Barnette*, 319 U.S. 624 (1943) (state may not compel schoolchildren to salute the flag at school).

Moreover, when a citizen enters government service as an employee, the employee "by necessity must accept certain limitations on…her freedom." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) (citation omitted). This is because the First Amendment only protects a government employee's speech (1) made as a citizen (2) on a matter of public concern (3) if the employee's right to speak outweighs the government's interest as an employer in an efficient workplace. *See id.* at 418-20; and *Pickering v. Bd. of Edu. of Twp. High Sch. Dist*., 391 U.S. 563 (1968); *also see Altman v. Minn. Dpt. of Corr*., 251 F.3d 1199 (8th Cir. 2001) (although employees' conduct in silently reading bibles during training regarding gays in the workplace involved matter of public concern, government could under First Amendment impose discipline if speech impeded employee's ability to perform their responsibilities, undermined office relationships, or disrupted office operations).

67

Here, Plaintiffs state that they are Christians who believe that their identity is found in Christ.[4] They claim to believe that colorblindness and equality are worthy ideals and that individuals should not be categorized by immutable characteristics like race. They allege the District coerced them into betraying those convictions by demanding that they "be anti-racists who reject colorblindness in favor of so-called equity." In support, they primarily rely on non-germane cases which do not involve public sector employees and which involve state laws that were challenged. *See Hurley v. Irish-American Gay, Lesbian and Bisexual Grp. of Boston*, 515 U.S. 557 (1995);[5] *Telescope Media v. Lucero*, 936 F.3d 740 (8th Cir. 2019) (discussed *infra*); *Doe v. U.S.*, 901 F.3d 1015 (8th Cir. 2018);[6] and *Janus v. AFSCME*, 138 S.Ct. 2448 (2018).[7]

In addition to the bulk of their case law not being germane, Plaintiff's allegations do not support a compelled speech claim for three primary reasons. <u>First</u>, Plaintiffs cannot show the

---

[4] It is important to note that this case is not about Plaintiffs' rights as individuals to worship freely or speak openly about their faith. It is about their rights as employees of a public school district.

[5] *Hurley* is a public accommodation case. The Court held the state could not use its public accommodation law to require private parade organizers to include gays and lesbians who wanted to carry their own banner. 515 U.S. at 572-73. Thus, the issue was not whether the individuals could march; it was whether they could march with a message that contravened the organizers' message. *Also see Wooley*, *supra*, 430 U.S. at 717 (recognizing an automobile is readily associated with its operator). The instant case, conversely, concerns anti-discrimination training, not private expressive association. Conduct does not become protected speech just because the person engaging in the conduct intends to express an idea. *See U.S. v. O'Brien*, 391 U.S. 367, 376 (1968).

[6] *Doe* too considered private expressive association and found no violation in that carrying coins bearing the national motto were not readily associated with the individual. 901 F.3d at 1024.

[7] Although *Janus* did concern public sector employees, the employees challenged action by the state and public sector unions. The Court struck down a state law that authorized the unions to charge fair share dues to non-members. Contrary to the facts here, the Court found compulsion as money was being taken from the non-members without their clear and affirmative consent. 138 S.Ct. at 2486.

required compulsion. A constitutional violation occurs only in the context of actual[8] compulsion.

*Phelan v. Laramie Cty. Comm. Coll. Bd. of Trustees*, 235 F.3d 1243 (10th Cir. 2000) (government must punish or threaten to punish speech by action that is "regulatory, proscriptive, or compulsory in nature"). "[T]he Complaint must do more than allege that [plaintiffs] 'are dissuaded from participating in' " the message. *Hanover Cty. Unit of the NAACP v. Hanover Cty*., 461 F.Supp.3d 280 (M.D. Tenn. 2021). In *Hanover*, the NAACP sued after Confederate symbols were placed on athletic uniforms. Its holding is particularly instructive as the court found mere dissuasion, as here, insufficient to show compulsion. In so holding, the court found "no allegation that the students refused to wear the…uniforms or otherwise objected to the school…[and] no allegation that the school punished, threatened, or 'made it abundantly clear that [students] would not be able to continue in the program' if they did not comply with the uniform requirements." *Id.* at 293.

Plaintiffs likewise have not shown the compulsion necessary. Even if the training was mandatory, there is no evidence that Plaintiffs would have been penalized for not taking the training (¶¶ 17L, 17M), no evidence Plaintiffs would have been penalized if certain opinions were or were not given,[9] and no evidence that Plaintiffs were prevented from doing their job duties. In short, there is no evidence of compulsion.[10] Plaintiffs were only required to attend trainings to receive credit

---

[8] *Cf. Axson-Flynn v. Johnson*, 356 F.3d 1277 (10th Cir. 2004) (university "made it abundantly clear that [student] would not be able to continue in the program if she refused to say…words with which she was uncomfortable."). Here, no employee was penalized for conduct/non-attendance. ¶ 17L-M.

[9] Others expressed their opinions and no attendee was removed or did not get credit. ¶¶ 17L-M. Lumley expressed an opinion that trainers were painting white people as racist and admitted others expressed opinions. ¶¶ 80-81. Henderson commented on Black Lives Matter protests and claims she commented on Kyle Rittenhouse. ¶ 78. Henderson also asked how to respond to a student wanting to wear a Disney Halloween costume. ¶ 27C. Plus, per the trainers it was fine if attendees did not want to speak. ¶ 44A. Others indicated you could volunteer, it was open to speak. ¶¶ 46D, 62C.

[10] Plaintiffs repeatedly admitted they were not asked to comment on or affirm what they described as statements relating to socialism, oppression, marginalized people, or white supremacy. ¶¶ 27A, 30A-B, 46C, 64D, 64F-G, 71A-B, and 75A.

69

and in Henderson's case, extra pay. ¶¶ 17 D-F. The fact that no employee suffered adverse action is dispositive. ¶ 17M. Plaintiffs' mere speculation that they would suffer adverse action does not suffice. *Duren v. Byrd*, 2021 WL 3848105 at *19 (M.D. Tenn. 2021) ("Coercion will not be found if…plaintiff just assumed that there would be punishment for not complying with what…plaintiff claims in litigation was an actual requirement…[I]f…plaintiff merely perceived that there would be punishment, there was no coercion to speak, but rather only a request or suggestion to speak.").

Nor does Plaintiffs' primary authority support the required compulsion. *Telescope Media* is a public accommodation case by private business owners who sought to prevent enforcement of a Minnesota law which required them to produce same-sex wedding videos even if the message conflicted with their beliefs. 936 F.3d at 747. In finding for the owners, the court refused to declare "political affiliation or ideology to be a protected characteristic," *Id.* at 756, and relying on *Tornillo* and *Hurley*, *supra,* recognized that a government cannot demand a newspaper to publish a response, or require organizers of a private parade to allow all to participate. *Id.* at 752. "Speech is not conduct just because the government [or Plaintiffs here] says it is." *Id.* In doing so, the court took note of antidiscrimination laws that "target conduct, which are generally constitutional even when they incidentally affect speech" stating, "An employment-discrimination law…can unquestionably 'require an employer to take down a sign reading 'White Applicants Only'.' " *Id.* at 757 (citations omitted). The court then stated:

> Consistent with the Supreme Court's instruction that antidiscrimination laws "do not, as a general matter, violate the First…Amendment[ ]," *Hurley*, 515 U.S. at 572 …, our holding leaves intact other applications of the MHRA that do not regulate speech based on its content or otherwise compel an individual to speak. But when, as here, Minnesota seeks to regulate speech itself as a public accommodation, it has gone too far under *Hurley* and its interest must give way to…the First Amendment.

*Id.* at 758. Comparatively here, the training targets employees' adherence to non-discrimination. It does not target what employees believe privately as did the state's action in *Telescope Media*. (i.e.

the law targeted what the owners expressed through their business). Thus, to sustain Plaintiffs' instant motion would impermissibly force the District to put forth Plaintiffs' views of racism.

Compulsion also cannot be shown by any answers Plaintiffs may have given. The District required lawful training which included benign, philosophical questions, as well as answers, to which there can be one preferred answer when implementing a lawful policy. This does not support a constitutional violation. Plaintiffs' responses were not recorded (¶¶ 58C, 99, 112), nor were Plaintiffs penalized for their answers (¶¶ 17I, 17J). Moreover, Plaintiffs admit that they were not asked to provide information regarding the social identities chart, the oppression matrix, or the white supremacy chart, nor did they provide any such information. ¶¶ ¶¶ 27A, 30A-B, 46C, 64D, 64F-G, 71A-B, and 75A. Hence, a constitutional violation cannot be found. *See C.N. v. Ridgewood Bd. of Edu.*, 430 F.3d 159 (3rd Cir. 2005) (although school survey asked students to rate level of importance of political concepts like racial equity, poverty, or religion, no violation was found where the information was safeguarded and released only in the aggregate).

Second, and moreover, Plaintiffs' right to speak, particularly as an employee of a public school district, does not outweigh the District's interest in a safe and discrimination-free environment for its students and staff. As the Supreme Court has repeatedly and aptly said:

> When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom. *See, e.g.*, *Waters v. Churchill*, 511 U.S. 661, 671, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (plurality opinion) ("[T]he government as employer indeed has far broader powers than does the government as sovereign"). Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services. *Cf. Connick*, *supra*, at 143, 103 S.Ct. 1684 ("[G]overnment offices could not function if every employment decision became a constitutional matter"). Public employees, moreover, often occupy trusted positions in society. When they speak out, they can express views that contravene governmental policies or impair the proper performance of governmental functions.

*Garcetti*, *supra*, 547 U.S. at 418-19 (emphasis added). Certainly, a school employee is a trusted position in society and they, by their speech, could impair proper school district functions.

In this vein, and in close proximity to school events that targeted students of color and LGBTQ+ students and national events relating to COVID-19 and racial unrest,[11] the District amended its strategic plan to include an equity and diversity component. Unbelievably, however, and most unfortunately, when during training the District requested Plaintiffs' attention to these events and to societal and political ideologies that could negatively impact students, Plaintiffs geared up behind the scenes for ten months and then filed the instant suit. They claim to reject that America is fundamentally racist and divided into categories of privileged oppressors or oppressed, as defined by race or sex. They claim that "law and society should be colorblind" and they reject that colorblindness may be a form of white supremacy. They assert the District through handouts/training coerced Plaintiffs into betraying these convictions and silenced opposing views.

But, and importantly, the District's interest in a safe and discrimination-free environment outweighs Plaintiffs' rights and views. The training was designed to increase graduation rates and improve engagement, safety, and attendance rates for under-resourced and under-represented students by increasing awareness of cultural issues that these students face and by informing staff

---

[11] Plaintiffs by stating that the District "demand[ed] that staff share its views on current events" (*see* DOC 77, p. 43 of 47) wholly disregard the 2020 national events precipitating the training and their potential adverse impacts on students. Events include, for example, "After the murder of George Floyd by a…police officer, thousands of people took to the streets across the United States to protest police brutality and call for reform. Protests began…on May 29, 2020 and continued almost daily through November 15, 2020." *See Don't Shoot Portland v. City of Portland*, 2022 WL 2700307 (D. Oregon July 12, 2022). The District was sensitive to the fact that events such as these could impact student views and perceptions and took great strides during trainings to educate employees to be on the lookout for concerning behaviors that could impact safety both in and outside of school.

about societal or political matters that <u>could</u> be offensive.[12] For example, one may view "white silence" or "colorblindness" as white supremacy, and therefore, employees should understandably be cognizant of this.[13] ¶¶ 27, 74. And as previously noted by Defendants (*see* DOC 75, n. 21), as some may disagree with that interpretation (as do Plaintiffs), such decisions should be left to the school board. "[I]t is not a court's obligation to determine which messages of social or moral values are appropriate…Instead, it is the school board, whose responsibility includes the well-being of the students that must make such determinations." *Lee v. York Cty. Sch. Div.*, 484 F.3d 687, 700 (4th Cir. 2007) (*citing Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988) ("[E]ducation…is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges.")); and *Keefe v. Adams*, 840 F.3d 523, 532 (8th Cir. 2016).

At bottom, the District requested nothing more than Plaintiffs' commitment to anti-racism. Such is certainly a compelling governmental interest and such efforts, aimed at eradicating discrimination, have consistently been found not to infringe upon constitutional rights. *See Bob Jones Univ. v. U.S.*, 461 U.S. 574 (1983) (interest in eradicating racial discrimination outweighed plaintiffs' free exercise claim; denying tax-exempt status to school with discriminatory admission standards); *Heart of Atlanta Motel, Inc. v. U.S.*, 379 U.S. 241 (1964) ("[I]n a long line of cases this Court has rejected the claim that the prohibition of racial discrimination…interferes with personal liberty."); *Keeton v. Anderson-Wiley*, 664 F.3d 865 (11th Cir. 2011) (requiring plaintiff to affirm

---

[12] *Cf. Parker v. Hurley*, 514 F.3d 87 (1st Cir. 2008) (school curriculum encouraging respect for gay parents did not violate plaintiffs' free exercise rights; school was not obligated to shield students from ideas which were potentially religiously offensive).

[13] For example, commentators, even very recently, have stated Justice Harlen in his dissenting opinion in *Plessy v. Ferguson*, 163 U.S. 537, 559 (1896) ("separate but equal"), "gave opponents of Black advancement the language of colorblindness to protect white supremacy while feigning a commitment to equality." Olwyn Conway, *Are There Stories Prosecutors Shouldn't Tell?: The Duty to Avoid Racialized Trial Narratives*, 98 Denv. L. Rev. 457, 467 (2021).

73

LGBTQ+ conduct in counseling setting per code of ethics reasonably related to legitimate pedagogical concerns); and *McAllum v. Cash*, 585 F.3d 214 (5th Cir. 2009) (racial tension/hostility at school justified policy prohibiting display of Confederate flag).

Third, and importantly, the crux of what Plaintiffs seek to speak would contravene the District's policies and impair the proper performance of the District's functions – Plaintiffs' views are not the law. The law protects "color." In the context of Title VII, 42 U.S.C. §§ 2000e, "Courts are clear that a color discrimination claim is separate[14] from a race or national origin discrimination claim." *Benitez v. Tyson Fresh Meats, Inc.*, 2022 WL 1283087 at *16 (M.D. Tenn. 2022). "Color discrimination arises when the particular hue of the plaintiff's skin is the cause of the discrimination, such as…where a dark-colored African-American individual is discriminated against in favor of a light-colored African-American." *Bryant v. Bell Atl. Md., Inc*., 288 F.3d 124, 132 n.5 (2002); *see also Williams v. Wendler*, 530 F.3d 584, 587 (7th Cir. 2008) ("Light-skinned Blacks sometimes discriminate against dark-skinned Blacks, and vice versa, and either form…is literally color discrimination."). The same is true in the context of Title VI.[15] "Title VI, like Title VII, forbids discrimination on the basis of 'color' as well as on the basis of 'race.' " *Id.* (*citing* 42 U.S.C. §

---

[14] "Even though race and color clearly overlap, they are not synonymous." EEOC Compliance Manual, § 15-III at 15-6 (2006). While Title VII does not define "color", courts and the EEOC "read 'color' to have its commonly understood meaning—pigmentation, complexion, or skin shade or tone." *Id.* § 15-III at 15-6. *Cf. id.* with *id*. § 15-II at 15-3 (referencing five racial categories provided by the OMB—American Indian or Alaska Native, Asian, Black or African American, Native Hawaiian or Other Pacific Islander, and White—and one ethnic category—Hispanic or Latino).

[15] As an aside, some believe that colorblindness in a school setting "can be used to prohibit policies such as affirmative action that benefit members of disadvantaged racial minority groups." Ralph Richard Banks, *Beyond Colorblindness: Neo-Racialism and the Future of Race and Law Scholarship*, 25 Harv. BlackLetter L.J. 41, 51 (2009) (citation omitted). Notably, in the Supreme Court's first full affirmative action case, *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 401 (1978), Justice Marshall urged the Court to reject colorblindness: "It is because of a legacy of unequal treatment that we now must permit the institutions of this society to give consideration to race in making decisions about who will hold the positions of influence, affluence, and prestige."

74

2000d). The District has an obligation and duty to prohibit discrimination at work and in school on the basis of color. It cannot be colorblind. It has a duty[16] to fight racism and other forms of discrimination by ensuring acceptance and inclusion. Plaintiffs' motion must be denied.

### 2. Plaintiffs' motion as to their Count II claim must be denied.

While the government may not regulate speech based on its substantive content or the message it conveys, *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995), schools may impose speech restrictions that are reasonable and viewpoint neutral. *Pleasant Grove City v. Summum*, 555 U.S. 460, 470 (2009); *also see Menders*, *supra*, 2022 WL 179597 at * 6 ("[A]ddressing 'racist and hateful behavior,'…'dismantle[ing] systemic racism,'…and 'amplify[ing] the voices of students of color' with respect to stories/experiences regarding issues of racism, injustice and inequity,'…are clearly legitimate pedagogical/state purposes."); and *Robertson v. Anderson Mill Elem. Sch.*, 989 F.3d 282, 289 (4th Cir. 2021) ("school boards, not the courts, have the responsibility and obligation to assess how best to advance those pedagogical concerns.").

Plaintiffs allege, *inter alia*, that the District taught America is fundamentally racist, that white people are the privileged oppressors of other racial groups, and that colorblindness is harmful. Plaintiffs' allegations do not support a content or viewpoint discrimination claim for four primary reasons. First, the "crucial or ultimate fact that will determine" such claims is the District's "motivation for imposing" the training. *Keeton*, *supra*, 664 F.3d at 872 (*citing ACLU of Fla. V. Miami-Dade Cty. Sch. Bd.*, 557 F.3d 1177 (11th Cir. 2009)). There is no evidence that the District implemented the training because the District personally disagreed with Plaintiffs' expressed

---

[16] Courts routinely recognize the various duties a school district owes to its students. *See Padilla v. South Harrison R-II Sch. Dist.*, 181 F.3d 992 (8th Cir. 1999) ("School[s]…not only have a legitimate interest in forbidding and seeking to prevent teacher-student sexual relationships, *they have a duty to do so*, in default whereof they may be subjected to…substantial damages) (emphasis added).

personal views, or that the goal of the training was to alter Plaintiffs' views. The training was implemented[17] to facilitate learning opportunities for staff to improve engagement, safety, attendance rates, core academic success, and graduation rates with a focus on under-resourced and under-represented students. ¶¶ 119-128. It concerned how these issues would be addressed in the school system. It applied regardless of one's viewpoint.[18] It was not based on Plaintiffs' views.

Second, and what is most likely the most important point in Defendants' instant brief, the District's policies and trainings were implemented and intended to ensure that staff were committed to being anti-racist, as the law requires. Thus, Defendants deeply struggle with how to respond to the following comments by Plaintiffs in Plaintiffs' supporting suggestions:

> Just as the government used loyalty oaths in the 1950s to ensure that staff were anti-Communists, SPS used its equity programming to compel staff to become anti-racists. *See Keyishian*, 385 U.S. at 604. But SPS cannot use the full weight of its authority to coerce staff into adopting a view or to deter them from expressing their true views.

*See* DOC no. 77, p. 44 of 47.

Regardless of how it is phrased, addressed, or referred to, anti-racism is the law. The District did not create racism, just as it did not create the terms oppression, marginalization, or white supremacy, or the fact that there are privileged members of our society. This is not a parade as in *Hurley*. This is a commitment to our youth. The District, as a keeper and protector of our youth, was, and is, very aware of the outside and inside influences and factors that can keep a student from attending school or from attaining the most out of their education. These negative influences can

---

[17] In May 2020, based on recommendations from a citizen committee the District added Focus Area 5 to its strategic plan. ¶¶ 121-122. The Fall 2020 equity training was conducted with an emphasis on this area. ¶ 123. Staff were to learn about barriers that students and staff may encounter in order to create an environment where all students felt that they belonged. ¶¶ 127-128.

[18] For example, a no tolerance sexual harassment policy can be more restrictive than an employee's viewpoint on sexual harassment and not violate the law.

and do arise out of one's personal views and can take the form of bullying or oppression in schools based not only on the protections the law recognizes such as race and color, but based on those presented through the District's trainings, but not often thought of, including status or wealth or perceived privilege. Plaintiffs are not fighting against a state law or ordinance as in *Keyishian*, *Mosley*, *Grayned*, or *Stahl*.[19] Plaintiffs are fighting against anti-racism. Thus, to find in Plaintiffs' favor would mean that being racist is permissible under the law – certainly, this is not acceptable under the District's policies, nor is it acceptable under the laws of this Nation. In fact, it's abhorrent.

Third, and importantly, the District's training is consistent with and mandated by law. Title VI, 42 U.S.C. § 2000d *et seq*., prohibits discrimination against students on the basis of race, color, and national origin in programs that receive federal financial assistance, such as public schools. Title IX of the Education Amendments, 20 U.S.C. §1681 *et seq*., prohibits discrimination against students on the basis of sex in any federally funded education program, such as public schools. Similarly, Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act of 1990 prohibits discrimination against students on the basis of disability.[20]

---

[19] These cases are inapposite. In *Keyishian v. Bd. of Regents*, 385 U.S. 589 (1967), per state law, the university required each professor as a condition of employment to sign a certificate swearing that "he was not a Communist." It involved a challenge of a law which prohibited the employment of anyone who "by word of mouth or writing willfully and deliberately advocates, advises or teaches the doctrine of forceful overthrow of the government." *Police Dept. of Chicago v. Mosley*, 408 U.S. 92 (1972) and *Grayned v. City of Rockford*, 408 U.S. 104 (1971) challenged ordinances distinguishing forms of picketing. *Stahl v. City of St. Louis*, 687 F.3d 1038 (8th Cir. 2012) challenged an ordinance for failure to provide fair notice to violators of what was forbidden.

[20] The U.S. Department of Justice's Civil Rights Division and the U.S. Department of Education's Office for Civil Rights enforce these laws. "School districts may violate these…when peer harassment based on race, color, national origin, sex, or disability is sufficiently serious that it creates a hostile environment and such harassment is…not adequately addressed, or ignored by school employees." *See* Russlynn Ali, Dear Colleague Letter, OCR at 1 (Apr. 4, 2011) (school districts should provide training to ensure staff recognize harassment and know how to respond).

77

To ensure its compliance with federal law, the District, on the heels of a series of disturbing events which targeted students of color and LGBTQ+ students, amended its strategic plan to include an equity component and training. ¶¶ 119-126. There is no evidence that the training was unlawful or that it was provided because the District disagreed with Plaintiffs' views.[21] While Plaintiffs were free to express disagreement, they were not free to block the District's attempts to ensure its employees' compliance, as part of their job duties, with lawful policies. "Certainly, preventing discrimination in the workplace—and in the schools—is not only a legitimate, but a compelling, government interest." *Saxe v. State College Area Sch. Dist*., 240 F.3d 200, 209 (3rd Cir. 2001). Plaintiffs' attendance at antidiscrimination training is a neutral, lawful requirement under Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e ("Title VII"); *also see* Missouri Human Rights Act, RSMo. § 213.010 ("MHRA"). The District may ensure staff understand and comply with nondiscrimination policies and not violate the First Amendment. *See Keeton*, *supra*, 664 F.3d at 872 (no violation as school did not impose remediation plan due to student's views on homosexuality, but rather due to fact that she expressed intent to impose her personal religious views on her clients).

Fourth, and particularly in the context of a school environment, even if the training was restrictive, it was a reasonable restriction. *See Good News Club v. Milford Cent. Sch*., 533 U.S. 984 (2001) ("For the 'guarantee of neutrality is respected, not offended, when the government, following neutral criteria and evenhanded policies, extends benefits to recipients whose ideologies and viewpoints…are broad and diverse.' "). This is consistent with *Hazelwood*, *supra*, 484 U.S. at 262, where the Supreme Court found the school did not violate the First Amendment by deleting pages of student articles discussing teenage pregnancy and the impact of divorce. At bottom, the District's efforts to prohibit discrimination do not constitute content or viewpoint discrimination. *See*, *e.g.*,

_____

[21] Plaintiffs did not complain prior to the training, nor did they file a grievance. ¶¶ 17C, 17G, 17H.

*Christian Legal Soc. Chap. of the Univ. of Cal., Hastings Coll. of Law v. Martinez*, 561 U.S. 661 (2010) (policy requiring officially recognized student groups to comply with school's nondiscrimination policy did not violate student group's rights); *Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) (state law forbidding discrimination on basis of sex in places of public accommodation did not "distinguish between prohibited and permitted activity on…basis of viewpoint."); and *Bd. of Dir. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537 (1987) (state law did not violate First Amendment by requiring club to admit women). Plaintiff's motion must be denied.

### 3. Plaintiffs' motion as to their Count III claim must be denied.

Plaintiffs claim the District placed an unconstitutional condition on their employment when it required their attendance during trainings. *Perry v. Sindermann*, 408 U.S. 593 (1972) sets forth the unconstitutional conditions doctrine. It involved a non-tenured professor who alleged his contract was not renewed because he criticized university policy. *Id.* at 594–95. The Court held these allegations presented a First Amendment claim because the denial of a government benefit, such as a teaching position, cannot be predicated on the exercise of a constitutional right. *Id.* at 597 (noting these principles having been applied most often to denials of public employment).

Plaintiffs' claims fail. Plaintiffs were not denied any benefit. Plaintiffs still work for the District, Plaintiffs received all of the pay to which they were entitled and have never been penalized. ¶¶ 17A-J. The mere implication that a penalty may result is insufficient. Plus, it would be contrary to Title VII and the MHRA to allege that antidiscrimination training is an unconstitutional condition. It is in fact mandated by law. *See* 42 U.S.C. § 2000e *et seq.*; RSMo. § 213.010 *et seq.*; *also see Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 543 (1999); and *McInnis v. Fairfield Comm.*, 458 F.3d 1129, 1138 (10th Cir. 2006) (to avail itself of the good-faith-compliance standard an employer must adopt antidiscrimination policies and make an effort to educate its employees about the policies). A process which is legal and mandated by law cannot be an unconstitutional condition of employment.

79

### C. DEFENDANTS ARE ENTITLED TO COSTS AND ATTORNEYS' FEES.

Defendants respectfully request the Court to deny Plaintiffs' motion and grant Defendants their costs and attorneys' fees. *See* 42 U.S.C. § 1988(a).

## V. <u>CONCLUSION</u>

For the reasons set forth above, Plaintiffs' motion must be denied and judgment as a matter of law is mandated in favor of Defendants.

Respectfully submitted,

ELLIS, ELLIS, HAMMONS & JOHNSON, P.C.

By*:   /s/ Ransom A Ellis, III*
    Ransom A Ellis, III      MBN: 29129
    <u>rellis3@eehjfirm.com</u>
    Todd A. Johnson      MBN: 38363
    <u>tjohnson@eehjfirm.com</u>
    Tina G. Fowler      MBN: 48522
    <u>tfowler@eehjfirm.com</u>
    2808 S. Ingram Mill Road, Suite A104
    Springfield, MO 65804
    Phone: 417-866-5091
    Fax: 417-866-1064
    *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of August 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, and a copy was made available to all electronic filing participants.

Derek H. MacKay
Knight Nicastro MacKay, LLC
304 W. 10th Street
Kansas City, MO 64105

Celia H. O'Leary
Southeastern Legal Foundation
560 W. Crossville Rd., Suite 104
Roswell, GA 30075

Kimberly S. Hermann
Southeastern Legal Foundation
560 W. Crossville Rd., Suite 104
Roswell, GA 30075

Jeffrey A. Clayman
Southeastern Legal Foundation
560 W. Crossville Rd., Suite 104
Roswell, GA 30075

Braden H. Boucek
Southeastern Legal Foundation
560 W. Crossville Rd., Suite 104
Roswell, GA 30075

_____*/s/ Ransom A Ellis, III*_____
Attorney of Record