## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
## SOUTHERN DIVISION

BROOKE HENDERSON and JENNIFER LUMLEY,

     Plaintiffs,

v.

SCHOOL DISTRICT OF SPRINGFIELD R-12, ET AL.,

     Defendants.

)
)
)
)
)
)
)
)
)
)
)

Case No. 6:21-cv-03219-MDH

---

## REPLY SUGGESTIONS IN FURTHER SUPPORT OF
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

---

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iii

STATEMENT OF UNCONTROVERTED MATERIAL FACTS................................................. 1

PLAINTIFFS' REPLY TO DEFENDANTS' ADDITIONAL RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED MATERIAL FACTS............................................. 123

ARGUMENT .......................................................................................................... 128

   I.  SPS violated Plaintiffs' freedom of speech. ........................................................ 128

      A.  SPS compelled Plaintiffs' speech, discriminated against their views, and chilled their expression. .................................................................................................. 130

      B.  The messages in SPS's equity programming were not ordinarily within the scope of Plaintiffs' official job duties, nor were they lawful. ................................................. 134

      C.  SPS cannot meet its high burden under the First Amendment. ............................... 135

   II. SPS placed an unconstitutional condition on Plaintiffs' employment. ............................... 136

CONCLUSION........................................................................................................ 137

CERTIFICATE OF SERVICE ...................................................................................... 139

Case 6:21-cv-03219-MDH   Document 82   Filed 08/26/22   Page 2 of 142

# TABLE OF AUTHORITIES

**Cases**

*Axson-Flynn v. Johnson*, 356 F.3d 1277 (10th Cir. 2004) .......................................... 131

*Bd. of Educ. v. Pico*, 457 U.S. 853 (1982) ................................................................. 136

*Cressman v. Thompson*, 719 F.3d 1139 (10th Cir. 2013) (*Cressman I*) ..................... 131

*Frost & Frost Trucking Co. v. Railroad Comm'n. of Cal.*, 271 U.S. 583 (1926) ....................... 137

*Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410 (1979) ..................................... 136

*Hanover Cnty. Unit of the NAACP v. Hanover Cnty.*,
    461 F. Supp. 3d 280 (E.D. Va. 2020) .................................................................. 131

*Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988) ......................................... 132

*Janus v. AFSCME, Council 31*, 138 S. Ct. 2448 (2018) ................................... 134, 135

*Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595 (2013) ........................... 137

*Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038 (2021) ......................................... 135

*Menders v. Loudoun Cnty. Sch. Bd.*
    No. 1:21-cv-669, 2022 U.S. Dist. LEXIS 10157 (E.D. Va. Jan. 1, 2022) ............... 128

*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021) ................................................. 131

*Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968) ......................................................... 136

*Preskar v. United States*, 248 F.R.D. 576 (E.D. Cal. 2008) ...................................... 128

*Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47 (2006) ............ 137

*Speech First, Inc. v. Schlissel*, 939 F.3d 756 (6th Cir. 2019) .................................... 133

*Telescope Media Grp. v. Lucero*, 936 F.3d 740 (8th Cir. 2019) ................................. 131

**Other Authorities**

Br. for Appellants in Nos. 1, 2, and 4 and for Resp'ts in No. 10 on Reargument,
    *Brown v. Bd. of Educ.*, 347 U.S. 483 (1954) ...................................................... 135

Pls.' Am. Compl., *Menders v. Loudoun Cnty. Sch. Bd.*,
    No. 1:21-cv-669 (Aug. 30, 2021) ......................................................................... 128

# STATEMENT OF UNCONTROVERTED MATERIAL FACTS[1]

1.    At all relevant times, the School District of Springfield, R-12 ("SPS") has employed Brooke Henderson as a 504 Process Coordinator in the Special Services Department. She is a certificated employee. (Ex. 1, Joint Stipulation of Facts ("Stip.") ¶ 3.)

    **RESPONSE**: Defendants admit this Paragraph.

2.    SPS has employed Jennifer Lumley since July 9, 2020, first as a Secretary in the Special Services Department and later as a Secretary in SPS's Analytics, Accountability and Assessment Department. (Stip. ¶ 2.)

    **RESPONSE**: Defendants admit this Paragraph and the following additional facts:

    A.    During her employment with the District, Lumley has always been a non-exempt, non-certificated employee. (Jungmann Affd, DEX C, ¶ 6; Rector Affd, DEX D, ¶¶ 6, 7; Lumley depo, DEX B, p. 3, lns 23-25, p. 4, lns 1-4; Rapert depo, DEX F, p. 14; Harrington Affd, DEX E, ¶ 2; DEX 2.06; DEX 12.02).

    **REPLY: Admitted.**

    B.    Effective on September 13, 2021, Lumley received a transfer to the position of full-time Secretary in the District's Analytics, Accountability and Assessment Department. This transfer resulted in an approximate pay rate increase of two dollars fifty cents per hour for Lumley. (Rector Affd, DEX D, ¶¶ 7, 34; Lumley depo, DEX B, pp. 4, lns 15-19, p. 5, lns.11-13; Harrington Affd, DEX E, ¶ 2; DEX 2.06; DEX 12.02).

    **REPLY: Admitted.**

---

[1] Defendants placed an introduction ahead of their Statement of Undisputed Material Facts and their Response to Plaintiffs' Statement of Uncontroverted Material Facts. Because each introduction incorporates argument, Defendants have exceeded the page limit for argument twice now. *See* L.R. 7.0(d).

1

3.  SPS is an urban public school district and political subdivision of the State of Missouri which is governed by the Board of Education for the School District of Springfield, R-12 ("Board"). (See Defs.' Am. Answer (Doc. 31) ¶ 28.)

> **RESPONSE**: Defendants admit this Paragraph.

4.  The Board has seven elected members. The Missouri General Assembly empowers it to govern and control SPS. (See id. ¶ 29.)

> **RESPONSE**: Defendants admit this Paragraph.

5.  SPS has employed Grenita Lathan as its Superintendent of Schools since July 1, 2021. (Stip. ¶ 4.) She is responsible for all SPS departments, including the Office of Equity and Diversity. (Ex. 23, Grenita Lathan/SPS Depo. 17:23 to 18:2.)

> **RESPONSE**: Defendants admit this Paragraph.

6.  SPS has employed Yvania Garcia-Pusateri since September 2019 as the Chief Equity and Diversity Officer in SPS's Office of Equity and Diversity. Her current job duties include the overseeing of the implementation of equity training. (Stip. ¶ 5; Ex. 4, Yvania Garcia-Pusateri/SPS ("YGP/SPS") Dep. 15:6-14.)

> **RESPONSE**: Defendants admit the first sentence in this Paragraph but deny the second sentence.

> **REPLY: Defendants' denial of the second sentence of Paragraph 6 is unsupported by contrary evidence. *See* L.R. 56.1(b)(2); *see also Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 792 (8th Cir. 2012) ("[T]he nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. . . . [W]here [relevant] evidence is uncontradicted, it can (and should) form the basis for a judgment.") Further replying, Defendants admitted that**

2

**Dr. Garcia-Pusateri "is responsible for overseeing and implementing training programs put on by the District's Office of Equity and Diversity" in their Amended Answer. (Doc. 31 at 7.)**

**Thus, Plaintiffs' SUMF Paragraph 6 should be deemed admitted.**

Defendants provide the following additional facts:

A.      Garcia-Pusateri has been employed by the District since September, 2019 as the Chief Equity and Diversity Office in the District's Office of Equity and Diversity. (Stip. ¶ 5).

**REPLY: Admitted.**

B.      Garcia-Pusateri's "job duties [are] to supervise [her] team, work with the superintendent and her cabinet as well as executive leadership team to oversee initiatives and programs focused on equity and diversity, supporting the District when it comes to ... academics, HR, curriculum, learning, and ... provide a perspective on what it means to create initiatives that are going to be equitable for all students." (Garcia-Pusateri depo, DEX. G, p. 15, lns 7-14).

**REPLY: Admitted that Paragraph 6(B) states additional job duties of Dr. Garcia-Pusateri.**

C.      As Chief Equity and Diversity Officer for the District, Garcia-Pusateri was responsible for working with the District's Executive Leadership Team "to oversee initiatives and programs focused on equity and diversity." (Garcia-Pusateri depo, DEX G, p. 25, lns 16-24).

**REPLY: Admitted that Dr. Garcia-Pusateri testified that she oversees the programming of the equity and diversity department. Plaintiffs note, however, that**

3

**the citation to Dr. Garcia-Pusateri's deposition transcript is not to the correct testimony.**

7. At all relevant times, SPS has employed Lawrence Anderson as a Coordinator in the Office of Equity and Diversity. In his role as a coordinator, he answers to Dr. Garcia-Pusateri. (Stip. ¶ 7; Ex. 14, Lawrence Anderson Dep. 12:13-16.)

       **RESPONSE**: Defendants admit this paragraph.

8. Ms. Henderson and Ms. Lumley believe strongly in equality, and that all individuals should have equal rights and opportunities under the law as set forth in our nation's founding documents and our civil rights laws. (Ex. 2, Brooke Henderson Decl. ¶ 5; Ex. 3, Jennifer Lumley Decl. ¶ 5.)

       **RESPONSE**: Defendants deny this Paragraph in that it only contains Plaintiffs' opinions and political argument rather than facts.

       **REPLY: First, Defendants' denial is mere argument without any legal authority and is insufficient to oppose summary judgment.** *Gannon Int'l, Ltd. v. Blocker***, 684 F.3d 785, 792 (8th Cir. 2012) ("[S]imply dismissing such evidence as 'self-serving' is precisely the sort of 'metaphysical doubt' that will not suffice to oppose summary judgment.") (citing** *Scott v. Harris***, 550 U.S. 372, 380 (2007) (quoting** *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.***, 475 U.S. 574, 586 (1986)));** *Larry Harmon Pictures Corp. v. Williams Rest. Corp.***, 929 F.2d 662, 663 n.1 (Fed. Cir. 1991) ("[Nonmovant] argues that [movant's] affidavit is 'biased and self serving' and 'suspect for many reasons.' The arguments of [non-movant's] counsel are insufficient to raise a genuine issue of material fact where there is an absence of probative evidence conflicting with the evidence presented by [movant].") (citing** *Anderson v.*

4

*Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). **Second, Defendants' denial is unsupported by contrary evidence.** *See* **L.R. 56.1(b)(2);** *see also Gannon Int'l, Ltd.*, **684 F.3d at 792 ("[T]he nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. . . . [W]here [relevant] evidence is uncontradicted, it can (and should) form the basis for a judgment.") Third, Plaintiffs' beliefs are relevant and material to their claims. Fed. R. Evid. 401;** *Davis v. Or. Cnty.*, **607 F.3d 543, 548 (8th Cir. 2010) ("A fact is material when it might affect the outcome of the suit under governing law.") (citing** *Anderson*, **477 U.S. at 248).**

**Thus, Plaintiffs' SUMF Paragraph 8 should be deemed admitted.**

9. They believe that law and society should be colorblind, meaning individuals should not be judged or assigned moral characteristics based on skin color. (Henderson Decl. ¶ 5; Lumley Decl. ¶ 5.)

**RESPONSE**: Defendants deny this Paragraph in that it only contains Plaintiffs' opinions and political argument rather than facts.

**REPLY: See Plaintiffs' Reply to Paragraph 8 which is incorporated here by reference. Thus, Plaintiffs' SUMF Paragraph 9 should be deemed admitted for the reasons set forth in Plaintiffs' Reply to Paragraph 8.**

10. They also believe as Christians that identity is found in Christ alone, that all lives matter, that we all have equal worth based on our status as God's creation, and that our value is not found in superficial characteristics like race and sex, all of which are irrelevant under a biblical worldview. (Henderson Decl. ¶¶ 6, 32; Lumley Decl. ¶¶ 6, 25.)

**RESPONSE**: Defendants deny this Paragraph in that it only contains Plaintiffs' opinions and political argument rather than facts.

**REPLY: See Plaintiffs' Reply to Paragraph 8 which is incorporated here by reference. Thus, Plaintiffs' SUMF Paragraph 10 should be deemed admitted for the reasons set forth in Plaintiffs' Reply to Paragraph 8.**

11. They reject the idea that America is divided into the categories of privileged oppressors and oppressed, as defined by race or sex. (Henderson Decl. ¶ 7; Lumley Decl. ¶ 7.)

**RESPONSE**: Defendants deny this Paragraph in that it only contains Plaintiffs' opinions and political argument rather than facts.

**REPLY: See Plaintiffs' Reply to Paragraph 8 which is incorporated here by reference. Thus, Plaintiffs' SUMF Paragraph 11 should be deemed admitted for the reasons set forth in Plaintiffs' Reply to Paragraph 8.**

12. They believe "equity," as SPS taught it, is a divisive concept that assigns characteristics based on immutable traits, like race or sex, and then categorizes people as privileged or oppressed. They believe it conditions individuals to attach undue importance to race, thereby deepening America's racial divide. (Henderson Decl. ¶ 7; Lumley Decl. ¶ 7.)

**RESPONSE**: Defendants deny this Paragraph in that it only contains Plaintiffs' opinions and political argument rather than facts.

**REPLY: See Plaintiffs' Reply to Paragraph 8 which is incorporated here by reference. Thus, Plaintiffs' SUMF Paragraph 12 should be deemed admitted for the reasons set forth in Plaintiffs' Reply to Paragraph 8.**

13. For the 2020-2021 school year, SPS required all of its certificated and hourly staff to attend four hours of professional development. (YGP/SPS Dep. 115:19-24.)

**RESPONSE**: Defendants deny this Paragraph in that the use of the term "SPS" constitutes argument which is unaccompanied by citation.

**REPLY: Defendants' denial is unsupported by contrary evidence. *See* L.R. 56.1(b)(2); *see also Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 792 (8th Cir. 2012). The instant paragraph is supported by the testimony of Dr. Garcia-Pusateri in her capacity as the Fed. R. Civ. P. 30(b)(6) representative of SPS. (Ex. 4, YGP/SPS Dep. 4:11-16, dep. ex. 1 at Topics 1-5; *see also* Defs.' Am. Answer ¶ 32 (Doc. 31 at 7) ("Defendants admit that Dr. Yvania Garcia-Pusateri . . . is responsible for overseeing and implementing training programs put on by the District's Office of Equity and Diversity. During all times material to this Complaint, [she] has been acting within the scope of her employment.").)**

**Thus, Plaintiffs' SUMF Paragraph 13 should be deemed admitted.**

Defendants admit the following:

A.     All certificated teachers and staff members are required to take training on various employment-related subjects each school year as a part of their required duties or in order to be qualified to perform their job. Training is often provided to teachers and staff on pre-selected "Professional Days" usually when students are not in school or virtually. (Jungmann Affd, DEX C, ¶ 34; Rector Affd, DEX D, ¶ 21).

**REPLY: Admitted.**

B.     The District's employees receive their regular rate of pay for training that occurs on Professional Days provided the employees take and complete the required training, makeup the missed training or use appropriate leave. If one of these things does

not occur, employees are subject to having their pay docked for missing the required training. (Jungmann Affd, DEX C, ¶ 34; Rector Affd, DEX D, ¶ 21).

**REPLY: Admitted.**

C.     During school year 2019-20, Chief Human Resources Officer Penney Rector was responsible for engaging in collective bargaining negotiations with certified  or recognized representatives of employee groups in the District. (Jungmann, DEX C, Affd ¶ 35; Rector Affd, DEX D, ¶ 22; Harrington Affd, DEX E, ¶ 2; DEX 51.01).

**REPLY: Admitted.**

D.     During school year 2019-2020, Rector met with the Springfield National Education Association ("SNEA"), the recognized representative for collective bargaining for the Teachers' Bargaining Unit, to negotiate changes to their Collective Bargaining Agreement, which would be effective during school year 2020-21. During the negotiations, the District agreed to the following language change for Article 16, Wages, Section 1 of the Teachers' Collective Bargaining Agreement: "The attached salary schedule includes the three tenths of one percent (.30%) salary increase which was implemented in School Year 2018-19 to support four (4) additional hours of training beyond the current contracted school days and hours. This annual training supplements all current trainings in place in the school district. These four hours of training may include seated, simulation and other such trainings as deemed necessary and appropriate to support the needs of the district." (Jungmann, DEX C, Affd ¶ 35; Rector Affd, DEX D, ¶ 22; Harrington Affd, DEX E, ¶ 2; DEX 51.01).

**REPLY: Admitted.**

E.     The four (4) hours of "Supplemental" training referenced in this contractual language change was in addition to normal pay for training time on Professional Days and was scheduled to take effect in 2020. (Jungmann, DEX C, Affd ¶ 35; Rector Affd, DEX D, ¶ 22; Harrington Affd, DEX E, ¶ 2; DEX 51.01).

**REPLY: Admitted.**

F.     During school year 2020-21, the District elected to use the negotiated four (4) hour "Supplemental" training stipend ("Supplemental Pay") to pay its staff to attend three training programs: (a) the two hour Fall (2020) Equity Training; (b) a one hour mental health training program; and, (c) a one hour Alice Active-Shooter training program. (Jungmann Affd, DEX C, ¶ 36; Rector Affd, DEX D, ¶ 23; Harrington Affd, DEX E, ¶ 2; DEX 51.01).

**REPLY: Controverted insofar as it characterizes a salary increase for additional mandatory training as "Supplemental Pay."**

G.     During school year 2020-21, the District required teacher and staff to attend and complete each of these three (3) training programs in order to qualify for the full four (4) hour "Supplemental Pay" training stipend. Employees who failed to attend some but not all of the three (3) training programs would receive a portion of the "Supplemental Pay" training stipend depending on the training completed. For example, an employee who attended the one hour mental health training program and the one hour Alice Active-Shooter training program, but did not attend the two hour Fall (2020) Equity Training, would receive two hours of the four hour "Supplemental Pay" training stipend. (Jungmann Affd., DEX C,¶ 37; Rector Affd, DEX D, ¶ 24; Harrington Affd, DEX E, ¶ 2; DEX 51.01).

**REPLY: Controverted insofar as it characterizes a salary increase for additional mandatory training as "Supplemental Pay."**

14. SPS required all of its certificated and hourly staff including Ms. Henderson and Ms. Lumley to attend a district-wide equity training during the Fall Semester of school year 2020-21 ("Equity Training"). (Stip. ¶ 8.)

**RESPONSE**: Defendants deny this Paragraph in that the use of the term "SPS" constitutes argument which is unaccompanied by citation, and Plaintiffs' statement of Stipulation ¶ 8 does not correctly state the stipulation entered into by the parties. Defendants admit Stipulation 8, which states: "Defendant District required all of its certificated and hourly staff (including Plaintiffs Henderson and Lumley), but not including leadership staff, to attend the Fall (2020) District-Wide Equity Training during the Fall Semester of school year 2020-21." (PEX 1, Stip ¶ 8).

**REPLY: Defendants' denial is unsupported by contrary evidence. *See* L.R. 56.1(b)(2); *see also Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 792 (8th Cir. 2012). Further replying, as a written document, the Joint Stipulation of Facts (Ex. 1) speaks for itself. Defendants point to no material or substantive difference between the above facts and the facts in the joint stipulation.**

**Thus, Plaintiffs' SUMF Paragraph 14 should be deemed admitted.**

15. SPS's certificated and hourly staff received required hours of professional development credit for attending the Equity Training. (Ex. 7, SPS Interrog. Answers, No. 10; Stip.¶ 15.)

**RESPONSE**: Defendants deny this Paragraph, but agree to the following facts:

**REPLY: Defendants' denial is unsupported by contrary evidence.** *See* **L.R. 56.1(b)(2);** *see also Gannon Int'l, Ltd. v. Blocker*, **684 F.3d 785, 792 (8th Cir. 2012). Thus, Plaintiffs' SUMF Paragraph 15 should be deemed admitted.**

A.      During School Year 2020-21, District employees who completed four (4) hours of additional training designated by the District – which were above and beyond the training built into their salaries – received an additional three tenths of one percent (.3%) of their salary. During School Year 2020-21, two of the designated training programs were the Fall (2020) Equity Training (SPS Discovery Exh. 13.01) and an Active Shooter program." (EX. 7, SPS Interrog. Answer No. 10).

**REPLY: Controverted insofar as it characterizes mandatory training as "additional training" that went "above and beyond" staff salaries.**

B.      The four (4) hours of "Supplemental" training referenced in the negotiated language in the Teacher Collective Bargaining Agreement, was in addition to normal pay for training time on Professional Days and was scheduled to take effect in 2020. (Jungmann, DEX C, Affd ¶ 35; Rector Affd, DEX D, ¶ 22; Harrington Affd, DEX E, ¶ 2; DEX 51.01).

**REPLY: See Plaintiffs' Reply to Paragraph 13(E) which is incorporated here by reference.**

C.      During school year 2020-21, the District elected to use the negotiated four (4) hour "Supplemental" training stipend ("Supplemental Pay") to pay its staff to attend three training programs: (a) the two hour Fall (2020) Equity Training program; (b) a one hour mental health training program; and, (c) a one hour Alice Active-Shooter

training program. (Jungmann Affd, DEX C, ¶ 36; Rector Affd, DEX D, ¶ 23; Harrington Affd, DEX E, ¶ 2; DEX 51.01; DEX 13.01).

**REPLY: See Plaintiffs' Reply to Paragraph 13(F) which is incorporated here by reference.**

      D.      During school year 2020-21, the District required teacher and staff to attend and complete these three (3) training programs in order to qualify for the four (4) hour "Supplemental Pay" training stipend. Employees who failed to attend some but not all of the training programs would receive a portion of the "Supplemental Pay" training stipend depending on the training completed. For example, an employee who attended the one hour mental health training and the one hour Alice Active-Shooter training, but did not attend the two hour Fall (2020) Equity Training, would receive two hours of the four hour "Supplemental Pay" training stipend. (Jungmann Affd., DEX C, ¶ 37; Rector Affd, DEX D,

¶ 24; Harrington Affd, DEX E, ¶ 2; DEX 51.01).

**REPLY: See Plaintiffs' Reply to Paragraph 13(G) which is incorporated here by reference.**

16.   SPS informed Ms. Henderson and Ms. Lumley that if they did not attend the Equity Training, they would not receive the required hours of professional development credit. (Stip. ¶ 15; Henderson Decl. ¶ 11; Lumley Decl. ¶ 10; see also YGP/SPS Dep. 211:14-21).

**RESPONSE**: Defendants deny this Paragraph in that the use of the term "SPS" constitutes argument which is unaccompanied by citation.

**REPLY: See Plaintiffs' Reply to Paragraph 13 which is incorporated here by reference. Thus, Plaintiffs' SUMF Paragraph 16 should be deemed admitted for the reasons set forth in Plaintiffs' Reply to Paragraph 13.**

Defendants admit the following:

A. Defendants agree with the language of Stipulation ¶ 15, which states: "On October 15, 2020, David Whitson, Associate Director of Special Services for the District, sent an email to thirty-two (32) of the District's Special Services employees, including Henderson, which stated in pertinent part:

'Several participants [sic] did not sign in to yesterday's Equity and Diversity training. If you attended yesterday and did not sign in, please swing by Phil Hale's desk and complete the sign-in sheet. ***This is the only way you will receive credit for your attendance in the training***. If the sign-in sheet is not completed, you will be asked to attend a make-up session in the coming weeks.' (Emphasis added).

(Stip. ¶ 15).

**REPLY: Plaintiffs admit that Defendants have accurately reproduced Paragraph 15 of the Joint Stipulation of Facts (with the addition of emphasis).**

B. During school year 2020-21, the District required teacher and staff to attend and complete three (3) training programs (the Fall (2020) Equity Training); the Alice active shooter training and a mental health training) in order to qualify for the four (4) hour "Supplemental Pay" training stipend. Employees who failed to attend some but not all of the three (3) training programs would receive a portion of the "Supplemental Pay" training stipend depending on the training programs they completed. For example, an employee who attended the one hour mental health training and the one hour Alice Active-Shooter training, but did not attend the two hour Fall (2020) Equity Training,

would receive two hours of the four hour "Supplemental Pay" training stipend. (Jungmann

Affd., DEX C, ¶ 37; Rector Affd, DEX D, ¶ 24; Harrington Affd, DEX E, ¶ 2; DEX 51.01).

      **REPLY: See Plaintiffs' Reply to Paragraph 13(G) which is incorporated here by reference.**

17.    Ms. Henderson and Ms. Lumley understood this to mean that if they did not attend the Equity Training, SPS would withhold their pay. (Henderson Decl. ¶ 11; Lumley Decl. ¶ 10; see also SPS Interrog. Answers, No. 10; Ex. 6, DEX 50-C009936 ("Staff members are required to complete training, or they will be docked pay."); Ex. 5 at PLS 0407-08 ("Please remember that if you do not attend this training, your pay will be docked.").

      **RESPONSE**: Defendants deny this Paragraph, in that it contains the opinions and suppositions of Plaintiffs which do not constitute a statement of fact and are not relevant to any issue in this case and the "statement of fact." Defendants further deny this Paragraph as Exhibits 5 and 6 to Plaintiffs' motion (1) were not sent to Plaintiffs and (2) were sent "after" Plaintiffs had completed their trainings (i.e. the emails were sent on February 8, 2021 and March 1, 2021).

      **REPLY: See Plaintiffs' Reply to Paragraph 8 which is incorporated here by reference. Further replying, Paragraph 17 is plainly supported by Plaintiffs' declarations (Exs. 2 & 3). Paragraph 17 is also supported by Defendants' admissions that the Equity Training was mandatory (*see* Defs.' Response to ¶ 14) and Plaintiffs would not receive pay to which they would otherwise be entitled if they did not attend. (*See* ¶¶ 13(B), 17(A) & (F).)**

      **Thus, Plaintiffs' SUMF Paragraph 17 should be deemed admitted.**

Defendants agree to the following statements of fact which are supported by citation:

A.      On October 6, 2020, Lumley received "credit" for attending and completing the two (2) hour Fall (2020) Equity Training and was paid her regular rate of pay for attending and completing that training program. (Jungmann Affd, DEX C, ¶ 38; Rector Affd, DEX D, ¶ 25; Lumley depo, DEX B, p. 15, lns. 8-13; Harrington Affd, DEX E, ¶ 2; DEX 13.03, 51.01).

**REPLY: Admitted.**

B.      During school year 2020-21 Lumley attended "all of the training sessions she alleges the District required her to attend" and her pay was not reduced. (Lumley depo, DEX B, pp. 8-13).

**REPLY: Admitted.**

C.      After completing the Fall (2020) Equity Training on October 6, 2020, Lumley did not file an internal grievance pursuant to the Board's Policy AC – Prohibition Against Illegal Discrimination, Harassment and Retaliation or otherwise complain to Rector, Chief Human Resources Officer and Compliance Officer, concerning any aspect of the training she received during the October 6, 2020 Equity Training. (Lumley depo, DEX B, pp. 27-28; Rector Affd, DEX D, ¶ 34; Harrington Affd, DEX E, ¶ 2; DEX 32.01).

**REPLY: Admitted but immaterial.**

D.      On October 14, 2020, Henderson attended and completed the two (2) hour Fall (2020) Equity Training. (Jungmann Affd, DEX C, ¶ 39; Rector Affd, DEX D, ¶ 26; Henderson depo, DEX A, p. 16, lns 4-10, p. 54, lns. 3-9; Harrington Affd, DEX E, ¶ 2; DEX 13.02, 51.01).

**REPLY: Admitted.**

E.     During school year 2020-21, Henderson also attended and completed the one hour mental health training program and the one hour Alice Active-Shooter training program. (Jungmann Affd, DEX C, ¶ 39; Rector Affd, DEX D, ¶ 26; Henderson depo, DEX A, p. 44, lns. 2-10).

**REPLY: Admitted.**

F.     Henderson received "credit" for taking and completing the two (2) hour Fall (2020) Equity Training and the one hour mental health training program and the one hour Alice Active-Shooter training program and received four hours of "Supplemental Pay". (Jungmann Affd, DEX C, ¶ 39; Rector Affd, DEX D, ¶ 26; Henderson depo, DEX A, p. 44, lns. 2-10); Harrington Affd, DEX E, ¶ 2; DEX 13.02, 51.01). Henderson's pay was also never reduced. (Henderson depo, DEX A, p. 50, l. 20 to p. 51, l. 8; p. 51, l. 19-21).

**REPLY: Controverted insofar as it characterizes a salary increase for additional mandatory training as "Supplemental Pay."**

G.     On October 15, 2020, the day after completing the Fall (2020) Equity Training, Henderson sent an email to Anderson which thanked him for presenting at the equity training she attended but made no comments alleging that the District or anyone else had violated her First Amendment Rights during the training. (DEX 51.04).

**REPLY: Admitted but immaterial.**

H.     After completing the Fall (2020) Equity Training on October 14, 2020, Henderson did not file an internal grievance pursuant to Board of Education Policy AC – Prohibition Against Illegal Discrimination, Harassment and Retaliation or otherwise

16

complain (verbally or in writing) to Rector, Chief Human Resources Officer or Compliance Officer for the District concerning any aspect of the training she received during the October 14, 2020 Equity Training. (Rector Affd, DEX C, ¶ 33; (DEX 32.01).

**REPLY: Admitted but immaterial.**

I.      Lumley has not received discipline during her employment with the District. (Rector Affd, DEX D, ¶¶ 7, 28; Rapert depo, DEX F, p. 14, lns. 9-18).

**REPLY: Admitted.**

J.      Henderson has not received discipline during her employment with the District. (Jungmann Affd, DEX C, ¶¶ 4, 28; Rector Affd, DEX D, ¶¶ 5, 28; Rapert depo, DEX F, p. 13, lns. 19-25, p.14, lns 1-4; DEX 2.07).

**REPLY: Admitted.**

K.      Effective on September 13, 2021, Lumley received a transfer to the position of full-time Secretary in the District's Analytics, Accountability and Assessment Department. This transfer resulted in an approximate pay rate increase of two dollars fifty cents per hour for Lumley. (Rector Affd, DEX D, ¶¶ 7, 34; Lumley depo, DEX B, pp. 4, lns 15-19, p. 5, lns.11-13; Harrington Affd, DEX E, ¶ 2; DEX 2.06; DEX 12.02). This transfer, promotion and increase in pay occurred after Plaintiffs filed their Complaint (DOC 1).

**REPLY: See Plaintiffs' Reply to Paragraph 2(B) which is incorporated here by reference. Further replying, Paragraph 17(K) is immaterial insofar as the "transfer, promotion and increase in pay occurred after Plaintiffs filed their Compalaint.**

L.     Plaintiffs did not know of anyone who got kicked out of a training session, was denied credit or was disciplined in some way based on their conduct during the training session. (Henderson Depo, DEX A, p. 63, l. 6-12; and Lumley depo, DEX B, p. 19, l. 5-13).

**REPLY: Admitted but immaterial.**

M.     No employee of the District was terminated from employment because the employee failed or refused to attend the Fall (2020) Equity Training or failed to complete the training program. (Jungmann Affd, DEX C, ¶ 41; and Rector Affd, DEX D, ¶ 29).

**REPLY: Admitted but immaterial.**

18.  On June 2, 2020, about three months before SPS launched its Equity Training, Dr. Garcia-Pusateri emailed SPS's certificated teachers and staff informing them that it was their "responsibility to be equity champions" and announced SPS's intention to expand its equity and diversity training. The email stated, in part:

> "In our role as SPS educators, it is our responsibility to be equity champions for all students and to create learning environments that are inclusive and affirming of all identities and lived experiences. The following resources are designed to help us better understand the challenges we face in order to better serve and support our students and colleagues. I encourage you to read, reflect and engage . . . The learning should not stop with these resources, but continue to expand.  This is also why training and professional learning will continue throughout the district."

(Ex. 8 at PLS 0334; see Henderson Decl. ¶ 9.)

**RESPONSE**: Defendants admit this Paragraph, except for the use of the word "SPS's intention" which constitutes argument and is unaccompanied by citation.

**REPLY: See Plaintiffs' Reply to Paragraph 8 which is incorporated here by reference.**

19. Dr. Garcia-Pusateri's June 2, 2020 email also included hyperlinks to a series of articles about equity and diversity including: (1) "Stop Asking People Of Color to Explain Racism— Pick Up One of These Books Instead," (2) "For Our White Friends Desiring to Be Allies," and (3) "The Anti-Racist Reading List: Because allyship can't be proven with a few social media posts." (Ex. 8 at PLS 0335-99.)

   **RESPONSE**: Defendants admit this Paragraph.

20. "For Our White Friends Desiring to Be Allies," discusses "six things you can do to be stronger allies," including:

   > [S]top talking about colorblindness. . . It will never be possible for us to be colorblind, and we shouldn't ever want to be . . . We have to name these things, acknowledge them, and begin to do the deep work of transformation, restoration – and reparation. . . . Privilege means that you owe a debt. . . . It is up to you whether you choose to acknowledge the work that is yours to do. It is up to you whether you choose to pay this debt and how you choose to do so. I urge you to pursue this work, knowing that a system of white privilege afforded you access to opportunities while denying them to so many others.

   (Id. at PLS 0383-86.)

   **RESPONSE**: Defendants deny this Paragraph in that it contains opinion and political argument and is not relevant to any issue raised in Plaintiffs Complaint.

   **REPLY: See Plaintiffs' Reply to Paragraph 8 which is incorporated here by reference. Further replying, as a written document, the ""For Our White Friends Desiring to Be Allies" article (Ex. 8 at PLS 0383-86) speaks for itself. Thus, Plaintiffs' SUMF Paragraph 20 should be deemed admitted for the reasons set forth in Plaintiffs' Reply to Paragraph 8.**

21. "Stop Asking People of Color to Explain Racism—Pick Up One of These Books Instead," states:

When I call [white people] on their racism, they practically come unglued. They swear they "didn't mean anything by it" and "don't have a racist bone" in their bodies. They might pipe up some ridiculous white sh— about black-on-black crime, the fact that they once dated a black person, the race card, color blindness, All Lives Matter, or reverse racism. I can predict in almost every situation what the person is going to say before they say it . . . Many of us are parents, and if we're going to change the tide for future generations, we have to tackle race head-on instead of evading it or pretending we are, as many white people have told me, all- one-race the-human-race.

(Id. at PLS 0387-89.)

      **RESPONSE**: Defendants admit this Paragraph.

22.   SPS also provided Ms. Henderson and Ms. Lumley a packet of printed materials before their Equity Training sessions, which included these handouts:

      a.      Land Acknowledgement;

      b.      Guiding Principles;

      c.      "Greetings!";

      d.      Focus Area V;

      e.      Fall Training Note Sheet;

      f.      Oppression Matrix;

      g.      Covert/Overt White Supremacy graphic;

      h.      Social Identity Map; and

      i.      Terminology sheet.

(Ex. 9; Stip. ¶¶ 16-17; see also Ex. 10, Philip Hale Dep. 15:4-7, dep. ex. 2.)

      **RESPONSE**: Defendants deny this Paragraph in that it contains opinion and political argument by use of the word "SPS also provided" which is unaccompanied by citation. Defendants admit this Paragraph if it is changed to read: "Ms. Henderson and Ms.

Lumley received a packet of printed materials before their Equity Training sessions, which included these handouts."

**REPLY: Defendants' denial is unsupported by contrary evidence.** *See* **L.R. 56.1(b)(2);** *see also Gannon Int'l, Ltd. v. Blocker***, 684 F.3d 785, 792 (8th Cir. 2012). Further replying, Dr. Lathan, Dr. Garcia-Pusateri, and Mr. Anderson were all sued in their official capacities, and all were acting within the scope of their employment at all times material to this action. (***See* Defs.' Am. Answer ¶¶ 30, 32-33 (Doc. 31 at 6-7).) Moreover, the facts contained in the above paragraph are supported by, among other evidence, the Joint Stipulation of Facts (Ex. 1), which was entered into by all Defendants (including SPS and its board).**

**Thus, Plaintiffs' SUMF Paragraph 22 should be deemed admitted.**

Defendants provide the following response:

A.  Employee Phil Hale was responsible for handing out the written training materials to employees in the Department of Special Services which were used for the Fall (2020) Equity Training on October 14, 2020. (Hale depo, DEX J, p. 9, lns. 12-15; p. 13, lns. 16-21; Hale depo, DEX J, Exh.2).

**REPLY: Admitted.**

B.  These training materials consisted of the exhibits marked as Hale depo, DEX J, Exh 2, but did not include the "agree, disagree, strongly agree, or strongly disagree signs" marked as "Hale depo, DEX J, Exh 3". Hale had not seen the documents marked as "Exh 3" (Hale depo, DEX J, Exh 3) before the exhibit was shown to him at his deposition on June 16, 2022. (Hale depo, J, pp. 11-12; 14-17).

**REPLY: Admitted insofar as Mr. Hale testified that he had not previously**

seen Exhibit 3 to his deposition. Otherwise, Paragraph 22(B) is controverted because Ms. Henderson attested to using agree/disagree signs and the materials included more than one handout. (Ex. 1, Stip. ¶¶ 16-17; Ex. 2, Henderson Decl. ¶ 39, Ex. 9; *see also* Ex. 10, Hale Dep. 15:4-7, dep. ex. 2.)

C.      Lumley was not provided with signs that read "agree, disagree, strongly agree, or strongly disagree" for the October 6, 2020 Equity Training. (Lumley depo, DEX B, p. 19, lns. 14-17).

**REPLY: Admitted.**

D.      Dr. Tayna Rapert, who attended the October 14, 2020 Equity Training with Henderson, did not receive a copy of any signs that said, "agree, disagree, strongly agree, or strongly disagree" when she received her packet of training materials from Hale (Rapert depo, DEX F, p. 19, lns. 9-19) or during the Fall (2020) Equity Training on October 14, 2020 (Rapert depo DEX F, p. 19, lns. 20-23).

**REPLY: Admitted but immaterial.**

E.      None of the presenters had or used the "agree, disagree" signs at the October 14, 2020 training. (Garcia-Pusateri depo, DEX G, p. 129, lns. 12-13).

**REPLY: Controverted but immaterial. (*See* Ex. 2, Henderson Decl. ¶ 39.) Further replying, Lawrence Anderson testified:**

> **Q.      Okay. Did the packets for the virtual trainings contain agree, disagree, strongly agree, or strongly disagree signs?**
>
> **A.      If they did, that was something we thought about doing earlier on. And as Dr. Garcia-Pusateri stated earlier, it was something we ended up changing and not doing. So there could have been possibly some signs that may have been put in there, but there would not have been enough in there for the entire group to have used those, if that makes sense.**

**(Ex. 14, Lawrence Anderson Dep., 23:19 to 24:3.).**

23. SPS made Ms. Henderson's packet of handouts available to her two days before her Equity Training session. (Stip. ¶ 16; see also Hale Dep. 9:12 to 10:17, dep. ex. 1.)

      **RESPONSE**: Defendants deny this Paragraph in that the use of the term "SPS" constitutes argument which is unaccompanied by citation. Defendants agree to the language in the parties' PEX 1, Stipulation ¶ 16 rather than Plaintiffs' interpretation of that stipulation:

> "On October 12, 2020, Phillip Hale, an Administrative Assistant in Defendant District's Special Services Department, sent an email to thirty (30) Special Services employees, including Henderson, which stated in pertinent part: 'Your Equity and Diversity Training Packets are available at my desk starting Monday, October 12, 2020.'"

(PEX 1, Stipulation ¶ 16.)

      **REPLY: See Plaintiffs' Reply to Paragraph 22 which is incorporated here by reference. Thus, Plaintiffs' SUMF Paragraph 23 should be deemed admitted for the reasons set forth in Plaintiffs' Reply to Paragraph 22.**

24. SPS provided substantially the same packet of printed materials to all SPS employees before their respective Equity Training sessions. (YGP/SPS Dep. 128:9-11.)

      **RESPONSE**: Defendants deny this Paragraph in that the use of the term "SPS" constitutes argument which is unaccompanied by citation.

      **REPLY: See Plaintiffs' Reply to Paragraph 22 which is incorporated here by reference. Thus, Plaintiffs' SUMF Paragraph 24 should be deemed admitted for the reasons set forth in Plaintiffs' Reply to Paragraph 22.**

      Defendants admit the following additional facts:

      A.     The "packet" of handouts for the October 14, 2020 Equity Training that was attended by Henderson was distributed by employee Hale to the Special Services

employees beginning on October 12, 2020. (Hale depo, DEX J, p 12-13; Hale depo, DEX J, Exh 2).

      **REPLY: Admitted.**

      B.     These training materials consisted of the exhibits marked as Hale depo, DEX J, Exh 2, but did not include the "agree, disagree, strongly agree, or strongly disagree signs" marked as "Hale depo, DEX J, Exh 3". Hale had not seen the documents marked as "Exh 3" (Hale depo, DEX J, Exh 3) before the exhibit was shown to him at his deposition on June 16, 2022. (Hale depo, J, pp. 11-12; 14-17; Garcia-Pusateri depo, DEX G, p. 128, lns 9-11). Lumley was not provided with signs that read "agree, disagree, strongly agree, or strongly disagree" for the October 6, 2020 Equity Training. (Lumley depo, DEX B, p. 19, lns. 14-17).

      **REPLY: See Plaintiffs' Reply to Paragraphs 22(B) and 22(C) which are incorporated here by reference.**

25.    The "Greetings!" handout stated, in part, "[Equity and diversity] is more than a value, but now part of our work and job responsibilities. . . . [W]e all are now accountable in this work as well. Growing a deeper sense of cultural consciousness is something we must commit to, not just for ourselves but for all our students. As with any presentation, I ask that you remain engaged and professional and provide our trainers complete attention and respect." (Ex. 9 at PLS 0425.)

      **RESPONSE**: Defendants deny this Paragraph, in that it adds certain words to the text of the document. Defendants agree to the following fact statement: "The "Greetings!" handout stated in part:

> "... This means that this is more than a value, but now part of our work and job responsibilities. As the district will be held accountable to ensure Equity and

Diversity take place and is affirmed in our schools, we all are now accountable in this work as well. Growing a deeper sense of consciousness is something we must commit to, not just for ourselves but for all our students. As with any presentation, I ask that you remain engaged and professional and provide our trainers complete attention and respect."

(PEX Ex. 9 at PLS 0425).

**REPLY: As a written document, the "Greetings!" handout (Ex. 9 at PLS 0425) speaks for itself.**

26. According to SPS, "cultural consciousness" refers to "[t]he deeper sense of awareness of other people and the identities they hold," including awareness of race. (YGP/SPS Dep. 103:18-25.)

**RESPONSE**: Defendants deny this Paragraph in that it uses the term "SPS" which constitutes argument and is unaccompanied by citation. Defendants admit that Garcia-Pusateri gave her opinion as stated below, but deny that such opinion was that of any other Defendant in this case.

**REPLY: See Plaintiffs' Reply to Paragraph 13 which is incorporated here by reference. That is, Defendants' denial is unsupported by contrary evidence. *See* L.R. 56.1(b)(2); *see also Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 792 (8th Cir. 2012). Further replying, Plaintiffs reiterate that Dr. Garcia-Pusateri testified not only in her individual capacity, but as SPS's representative pursuant to Fed. R. Civ. P. 30(b)(6) as to Topics 1-5 of the Amended Notice of Deposition of the School District of Springfield R-12, namely:**

> **1. The creation, content, implementation, and administration of trainings for District employees on the topics of equity, anti-racism, identity, cultural consciousness, social justice, and social emotion learning from 2020 to present.**

2. **Feedback and comments, including but not limited to survey results, from District employees relating to the Fall 2020 Districtwide Equity trainings and the equity-focused Canvas modules.**

3. **The Fall 2020 Districtwide Equity trainings on October 6, 2020 and October 14, 2020, including any documents and communications relating to these trainings.**

4. **The Canvas modules developed by the Office of Equity and Diversity consisting of three (3) Social Emotional Learning modules and four (4) Cultural Consciousness modules (the "Canvas Modules").**

5. **The implementation of the Fall 2020 Districtwide Equity training and the Canvas Modules and the attendance policies for staff and employees relating to these trainings, including any documents and communications relating thereto.**

**(Ex. 4, YGP/SPS Dep. 4:11-16, dep. ex. 1; *see also* Notice of Dep. of SPS (Doc. 60).)**

**Thus, Plaintiffs' SUMF Paragraph 26 should be deemed admitted.**

Defendants provide the following response:

A. Garcia-Pusateri stated her opinion that "cultural consciousness" means "having a deeper sense of the awareness of other people and the identities they hold." (Garcia-Pusateri depo, DEX G, p. 103, lns. 18-22).

**REPLY: See Plaintiffs' Reply to Paragraph 26 which is incorporated here by reference.**

27. The Covert/Overt White Supremacy graphic indicated that "colorblindness," "All Lives Matter," and "white silence" constituted white supremacy. (Ex. 9 at PLS 0425.)

**RESPONSE**: Defendants deny this Paragraph in that it is materially inaccurate on its face. The Covert/Overt White Supremacy graphic, as stated by the trainers during training, indicated that colorblindness, All Lives Matter, and white silence "can support th[e] structural system of white supremacy." Garcia-Pusateri depo, DEX G, p. 21, l. 12 to p.

26

22, l. 18; and its deposition exhibit no. 3, p. 13; *also see* Plaintiffs' Uncontroverted Facts, ¶ 39, and Plaintiffs' Exhibit 15, p. 13. Further, trainees were told that they were not being called "as an individual a white supremacist." *See id.*

**REPLY: As a written document, the Covert/Overt White Supremacy graphic (Ex. 9 at PLS 0425; Ex. 13 at 22) speaks for itself.**

Defendants provide the following additional response:

A.     The October 6, 2020 Training session attended by Lumley did not contain a discussion about the white supremacy chart. No small group session was held on the chart. No one called Lumley's name or asked her directly if she understood the chart. Lumley was not asked to affirm or agree to anything that had been presented about the chart or to write anything down. Rather, the participants were told that they could look at the chart on their own time. (Lumley depo, DEX B, p. 24, lns. 12-25, p. 25, lns. 1-18).

**REPLY: Controverted. First, Paragraph 27(A) contradicts, in part, Defendants' own Statement of Undisputed Facts, which states, "The October 6, 2020 Training session attend by Plaintiff Lumley also contained a discussion about the white supremacy chart." (Defs.' SUMF ¶ 87 (Doc. 75 at 19).) Second, Paragraph 27(A) refers ambiguously to "the white supremacy chart," whereas Ms. Lumley's testimony at pages 24:12 to 25:18 was specific to the Covert/Overt White Supremacy graphic. Third, Paragraph 27(A) misstates Ms. Lumley's testimony in that she did not testify that "participants were told they could look at the white supremacy chart on their own time." Ms. Lumley's testimony about looking at a chart on her own time at page 25:19-25 was presumably in reference to the Social Identities circle (no**

**exhibit was attached nor referred to during this portion Ms. Lumley's examination).**
**(*See* Ex. 13 at 28.)**

B. During the October 14, 2020 Equity Training, Henderson was never called on by the trainers to answer questions during the large group sessions. (Henderson depo, DEX A, p. 59, lns. 4-11).

**REPLY: Controverted on the basis that it mischaracterizes Ms. Henderson's testimony. Ms. Henderson did not testify that "[she] was never called on by the trainers to answer questions during the large group sessions." Rather, she testified that she was not called on by Dr. Garcia-Pusateri to respond when "these matters were discussed, or these statements were made by Dr. Garcia-Pusateri" referring specifically to statements Dr. Garcia-Pusateri made in connection with the Environmental Scan exercise. (*See* Pls.' Opp'n Ex. 26, Henderson Dep. 27:20 to 31:15.).[2]**

C. During the October 14, 2020 Equity Training Henderson asked a presenter a question concerning the best way to respond to a young child who wanted to wear a Pocahontas costume at Halloween to which the presenter responded that one might try to explain to the child another way the child could learn about Native Americans rather than by dressing up as Pocahontas. (Rapert depo, DEX F, p. 28-30). Henderson did not consider that the conversation with the trainers about her questions to be a violation of her constitutional rights. (Henderson depo. DEX A, p. 106, lns. 12-14, 17-20).

---

[2] "Pls.' Opp'n Ex." refers to the exhibits Plaintiffs filed with their Suggestions in Opposition to Defendants' Motion for Summary Judgment. *See* Docs. 78-1 to 78-7.

**REPLY: The first sentence of Paragraph 27(C) is controverted. (*See* Ex. 2, Henderson Decl. ¶¶ 36-37.) The second sentence of Paragraph 27(C) is controverted because it is not a statement of fact capable of admission; it is a legal conclusion, and whether Plaintiffs' constitutional rights were violated is a question of law for the court. *See, e.g.*, *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 425 (6th Cir. 2019) ("No material facts are in dispute here, so this matter turns on a pure question of law: does [the legislation] compel a doctor's speech in violation of the First Amendment?").**

28. According to SPS, colorblindness is not an equitable concept, colorblindness can have harmful ramifications, and equality "takes in colorblindness." (YGP/SPS Dep. 66:16 to 67:6, 68:7-9, 70:19 to 71:16, 96:4-7.)

   RESPONSE: Defendants deny this Paragraph in that the use of the term "SPS" constitutes argument which is unaccompanied by citation. Defendants admit that Garcia-Pusateri gave her opinion as stated below, but deny that such opinion was that of any other Defendant in this case.

   **REPLY: See Plaintiffs' Reply to Paragraph 26 which is incorporated here by reference. Thus, Plaintiffs' SUMF Paragraph 28 should be deemed admitted for the reasons set forth in Plaintiffs' Reply to Paragraph 26.**

   Defendants provide the following response:

   A. Garcia-Pusateri expressed the following opinions during her deposition: (1) "Colorblindness" says "that I see you as just the person rather than seeing you with everything that you come with." (Garcia-Pusateri depo, DEX G, p. 66, lns. 18-20); (2) Colorblindness "can have harmful impacts" because "it can make someone feel like you

do not want to see them for their identity or their lived experience." (Garcia-Pusateri depo, DEX G, p. 66, ln. 25; 67, lns. 2-3); (3) "Equality [treats] everyone the same and sees them as all the same [w]hereas, equity is about seeing their whole selves and their whole personhood." (Garcia-Pusateri depo, DEX G, p. 68, lns. 3-6); (4) "I don't think equality is harmful. I think there is a better way [to make] people feel safe and supported." (Garcia - Pusateri depo, DEX G, p. 68, lns. 13-15).

**REPLY: See Plaintiffs' Reply to Paragraph 26 which is incorporated here by reference. Further replying, Paragraph 28(A) is controverted to the extent it misstates Dr. Garcia-Pusateri's testimony. She testified:**

**Q. Is colorblindness harmful?**

**A. I believe it can have harmful impacts. Yes.**

**Q. What are those impacts?**

**A. It can make someone feel like you do not want to see them for their identity or their lived experience. And you just want to be treated as someone that don't have those experiences because those experiences also inform who you are and impact you.**

**(Ex. 4, YGP/SPS Dep. 66:24 to 67:6.)**

**Q. And how is that different from equality? Under equality would people have a different approach to race?**

**A. Equality probably is just to treat –** *with race* **to treat everyone the same and see them as all the same. Whereas, equity is about seeing their whole selves and their whole personhood.**

**(Id. 67:25 to 68:6) (emphasis added).**

29. According to SPS, colorblindness "is a form of white supremacy." (YGP/SPS Dep. 115:12-18; Ex. 9 at PLS 425.)

**RESPONSE**:        Defendants deny this Paragraph in that it constitutes argument in that use of the term "SPS" constitutes argument which is unaccompanied by citation. Defendants admit that Garcia-Pusateri gave her opinion as stated below but deny that such opinion was that of any other Defendant in this case. Defendants provide the following response:  Garcia-Pusateri expressed the following opinions during her deposition:

**REPLY: See Plaintiffs' Reply to Paragraph 26 which is incorporated here by reference. Thus, Plaintiffs' SUMF Paragraph 29 should be deemed admitted for the reasons set forth in Plaintiffs' Reply to Paragraph 26.**

(1)        "[T]he goal [of the training] is to have [employees] learn more about it and question ... their practices ... so it ends up helping students become more safe and supported. But it is not to change people – no one can change people's hearts and minds without having them review certain things, provide some learning for them to start thinking about things. And then ultimately it's their decision." (Garcia-Pusateri depo DEX G, p. 114, lns. 23-25; p. 115, lns. 1-5).

**REPLY: See Plaintiffs' Reply to Paragraph 26 which is incorporated here by reference. Further replying, Paragraph 29(1) is controverted on the basis it misrepresents Dr. Garcia-Pusateri's testimony. She testified:**

**Q.  I'm not saying they're required to.  I'm saying was the District's goal and hope that it would cause people to question and, therefore, change some of their long-held beliefs about race?**

**A.  I think the goal is to have them learn more about it and question maybe their practices or modify so that way it ends up helping students become more safe and supported.  But it is not to change people –  no one can change people's hearts and minds without having them review certain things, provide some learning for them to start thinking about things.  And then ultimately it's their decision.**

**No one is saying that you cannot believe X, nor can you believe Y.  It's about here are some concepts and here are some different ways on how you might think about it or how you might consider it differently.  And then, again, engaging in meaningful dialogue about it.**

31

**(Ex. 4, YGP/SPS Dep.14:19 to 115:11)**

  (2) "It's to think about how colorblindness might have been the concept that people may have said, "Oh, it's just better to do that." But then to see how it might be hurtful, yes, and that it is a form of white supremacy." (Garcia-Pusateri depo DEX G, p. 115, lns. 14-18).

  **REPLY: See Plaintiffs' Reply to Paragraph 26 which is incorporated here by reference. Further replying, Paragraph 29(2) is controverted on the basis it misrepresents Dr. Garcia-Pusateri's testimony by omitting the question to which she was responding. She testified:**

  **Q. And one of those concepts would be colorblindness is a form of white supremacy?**

  **A. It's to think about how colorblindness might have been the concept that people may have said, "Oh, it's just better to do that." But then to see how it might be hurtful, yes, and that it is a form of white supremacy.**

**(Id. 115:12 to 115:18.)**

30. The "Oppression Matrix" handout listed types of oppression and included racism and sexism as categories. It also listed the privileged social group under racism as "White People" and the oppressed social groups as "Asian, black, Latina/o, native people." It listed the privileged social group under sexism as "Male assigned at birth," and the oppressed social group as "Female assigned at birth." (Ex. 9 at PLS 0424.)

  **RESPONSE**: Defendants deny this Paragraph in that it constitutes opinion and is not relevant to any matter that is contained in Plaintiffs' Complaint. Defendants provide the following fact statements:

  **REPLY: Defendants' denial is unsupported by contrary evidence. *See* L.R. 56.1(b)(2); *see also Gannon Int'l, Ltd. V. Blocker*, 684 F.3d 785, 792 (8th Cir. 2012).**

**Further replying, as a written document, the "Oppression Matrix" (Ex. 9 at PLS 0424)**

**speaks for itself. As such, Plaintiffs' SUMF Paragraph 30 should be deemed admitted.**

A.      The October 6, 2020 Equity Training attended by Lumley contained

a discussion about the oppression matrix, but the participants did not have to rate

themselves on the oppression matrix slide, no small group session was held on the

oppression matrix presentation and Lumley was not asked her opinion about the

oppression matrix. (Lumley depo, DEX B, p. 23, lns. 12-25, p. 24, lns. 1-7).

**REPLY: Admitted.**

B.      The October 14, 2020 Equity Training attended by Henderson

contained a discussion about the oppression matrix and a small group session.

Henderson did not recall if the employees in her small group session revealed where

they were on the Matrix and Henderson could not recall if she revealed where she

had placed herself on the Matrix. (Henderson depo DEX A, p. 100, lns. 16-20; p.

102, lns. 19-22).

**REPLY: Controverted on the basis that it mischaracterizes Ms.**

**Henderson's testimony Ms. Henderson testified:**

> **Q.  I mean, you were just asked to look at [the Oppression
>        Matrix]?  Isn't it – what were you asked to do?**
>
> **A.  We were asked to identify in which category that we fell
>        in on that oppression matrix and that we can identify
>        with more than one category.  And so we had to identify
>        with it, and then we had to reflect on it, and then we had
>        a conversation in small groups.**
>
> **. . .**
>
> **Q.  Or deciding that you are in it even if you're not?  I'm
>        sorry.  That's a side comment. Okay.  So did everyone –
>        was there like a big reveal here in the breakout session**

with everybody saying, well, I'm a this and I'm a that and I'm not that? I mean, did everybody reveal where they were on that chart?

A. I don't recall.

. . .

Q. Tell me what you discussed in that room. Let me ask you this. Were you asked to reveal what your rating was in that room?

A. We were asked to reveal the different categories that we belonged to. It wasn't a rating.

Q. And how would you tell the others what group you were in?

A. Well –

Q. I mean, some of them are obvious.

A. I was going to say some of them are really obvious.

Q. Maybe they're not. I don't know.

A. And how did we feel about being assigned to those, how did we feel about that. And, you know, it was a reflection on where we fell in recognizing that we had – some people had more privileges than other people just by being born into them.

. . .

Q. And did you even share where you set yourself on the form?

A. I don't recall that I did, no.

Q. And you didn't remember anybody that – you didn't really remember what other people said?

A. No.

**(Pls.' Opp'n Ex. 26, Henderson Dep. 98:15 to 102:24.)**

C. The Oppression Matrix includes other types of oppression including transgender oppression, heterosexism, classism, ableism, religious oppression, and ageism. Attendees were told that the trainers themselves had privileges. Garcia-Pusateri depo, DEX G, p. 21, l. 12 to p. 22, l. 18; and its deposition exhibit no. 3, p. 6; also see Plaintiffs' Uncontroverted Facts, ¶ 39, and Plaintiffs' Exhibit 15, p. 6.

**REPLY: Admitted.**

31. SPS communicated the following guiding principles for the Equity Training in the "Guiding Principles" handout:

    a. Stay Engaged;

    b. Lean into your discomfort;

    c. Speak YOUR Truth and from YOUR Lived Experiences;

    d. Acknowledge YOUR privileges;

    e. Seek to Understand;

    f. Hold YOURSELF accountable; and

    g. Be Professional.

(Id. at PLS 0428.)

**RESPONSE**: Defendants deny this Paragraph in that the use of the term "SPS" constitutes argument which is unaccompanied by citation.

**REPLY: See Plaintiffs' Reply to Paragraph 22 which is incorporated here by reference. Thus, Plaintiffs' SUMF Paragraph 31 should be deemed admitted for the reasons set forth in Plaintiffs' Reply to Paragraph 22.**

Defendants provide the following response:

35

A. The "Guiding Principles" document was contained in a "handout" distributed by Hale to the Special Services employees beginning on October 12, 2020. (Hale depo DEX J, p 12-13; depo Exh 2).

**REPLY: Controverted. SPS provided attendees handouts in advance of both the October 6 and October 14, 2020 Equity Training sessions—supplying substantially the same packet of printed material to all SPS employees before their respective sessions. (Ex. 1, Stip. ¶¶ 16-17; Ex. 4, YGP/SPS Dep. 128:9-11.) Further replying, Mr. Hale only testified to distributing handouts in advance of the October 14 session. (Ex. 10, Hale Dep. 9:12 to 10:17, dep. ex. 1.)**

B. The "handout" consisted of the exhibits marked as Hale depo, DEX J, Exh 2, but did not include the "agree, disagree, strongly agree, or strongly disagree signs" marked as "Hale depo, DEX J, Exh 3". Hale had not seen the documents marked as "Exh 3" (Hale depo, DEX J, Exh 3) before the exhibit was shown to him at his June 16, 2022 deposition. (Hale depo, DEX J, pp. 11-12; 14-17; Garcia-Pusateri depo, DEX G, p. 128, lns 9-11; p. 129, lns. 12-16).

**REPLY: Admitted insofar as Mr. Hale testified that he had not previously seen Exhibit 3 to his deposition. Otherwise, Paragraph 31(B) is controverted because Ms. Henderson attested to using agree/disagree signs and the materials included more than one handout. (Ex. 1, Stip. ¶¶ 16-17; Ex. 2, Henderson Decl. ¶ 39, Ex. 9; *see also* Ex. 10, Hale Dep. 15:4-7, dep. ex. 2.)**

32. On October 6, 2020, Ms. Lumley attended the Equity Training in person with around seven other employees from the Special Services Department. (Stip. ¶ 11.)

**RESPONSE**: Defendants deny this Paragraph, in that it does not contain the correct language of the parties' Stipulation 11. Defendants agree to the language contained in Stipulation ¶ 11 which states:

"On October 6, 2020, Plaintiff Lumley attended in person, the approximately two hour Fall (2020) District-Wide Equity Training with approximately seven (7) other employees from the Special Services Department. (SPS Discovery Exhibit 13.03)."

(Stip. ¶ 11).

Defendants also state that there were a total of eight (8) persons who received the training, including Lumley. (Lumley depo, DEX B, pp. 6-8; Harrington Affd, DEX E, ¶ 2; DEX 13.03).

**REPLY: As a written document, the Joint Stipulation of Facts (Ex. 1) speaks for itself and Defendants point to no material or substantive difference between the above facts and the facts in the joint stipulation. Further replying, Plaintiffs would note that Ms. Lumley plus "seven other employees" totals eight persons.**

**Thus, Plaintiffs' SUMF Paragraph 32 should be deemed admitted.**

33. Dr. Garcia-Pusateri, Mr. Anderson, and Mr. Sode conducted the October 6, 2020 Equity Training session that Ms. Lumley attended. (Stip. ¶ 12.)

**RESPONSE**: Defendants deny this Paragraph, in that it does not contain the correct language of the parties' Stipulation 12. PEX 1, Stipulation ¶ 12 states:

"The October 6, 2020 Fall (2020) District-Wide Equity Training attended by Plaintiff Lumley was conducted by Garcia-Pusateri, Anderson and Jimi Sode, who is a former Coordinator in the Office of Equity and Diversity." (PEX 1, Stipulation ¶ 12).

**REPLY: As a written document, the Joint Stipulation of Facts (Ex. 1) speaks for itself and Defendants point to no material or substantive difference between the above facts and the facts in the joint stipulation.**

37

**Thus, Plaintiffs' SUMF Paragraph 33 should be deemed admitted.**

34. On October 14, 2020, Ms. Henderson attended virtually the Equity Training with around thirty other employees from the Special Services Department. (Stip. ¶ 13.)

    **RESPONSE**: Defendants deny this Paragraph in that it does not contain the correct language of the parties' Stipulation 13. PEX 1, Stipulation ¶ 13 states:

> "On October 14, 2020, Plaintiff Henderson virtually attended the approximately two hour Fall (2020) District-Wide Equity Training with approximately thirty (30) other employees from the Special Services Department. (SPS Discovery Exhibit 13.02)."

(PEX 1, Stip. ¶ 13).

    In addition, Henderson attended the Fall (2020) Equity Training on October 14, 2020 virtually. There were at least thirty-one (31) persons who received the training with her. (Henderson depo, DEX A, p. 14, lns. 7-10; Harrington Affd, DEX E, ¶ 2; DEX 13.02; Stip, ¶ 13).

    **REPLY: As a written document, the Joint Stipulation of Facts (Ex. 1) speaks for itself and Defendants point to no material or substantive difference between the above facts and the facts in the joint stipulation. Further replying, Plaintiffs would note that Ms. Henderson plus "thirty other employees" totals thirty-one persons.**

    **Thus, Plaintiffs' SUMF Paragraph 34 should be deemed admitted.**

35. Dr. Garcia-Pusateri and Mr. Anderson conducted the October 14, 2020 Equity Training session Ms. Henderson attended. (Stip. ¶ 14.)

    **RESPONSE**:   Defendants deny this Paragraph in that it does not contain the correct language of the parties' Stipulation 14.

    A.     Defendants agree to the correct language of Stipulation 14 below:

"The October 14, 2020, Fall (2020) District-Wide Equity Training attended by Plaintiff Henderson was conducted by Defendant Garcia-Pusateri and Defendant Anderson."

(Stip. ¶ 14.)

**REPLY: As a written document, the Joint Stipulation of Facts (Ex. 1) speaks for itself and Defendants point to no material or substantive difference between the above facts and the facts in the joint stipulation.**

**Thus, Plaintiffs' SUMF Paragraph 35 should be deemed admitted.**

B.      Garcia-Pusateri and Anderson were the trainers for the October 14, 2020 Equity Training attended by Henderson. (Rapert depo, DEX F, p. 39, lns. 12-15).

**REPLY: As a written document, the Joint Stipulation of Facts (Ex. 1) speaks for itself and Defendants point to no material or substantive difference between the above facts and the facts in the joint stipulation.**

**Thus, Plaintiffs' SUMF Paragraph 35 should be deemed admitted.**

36.  SPS expected staff attending virtual Equity Training sessions to keep their computer cameras on during the entirely of the training. (YGP/SPS Dep. 167:12-20, dep. ex. 9 at 1-2; Ex. 11, Brooke Henderson Dep. 57:12-21; see also Ex. 12, Tanya Rapert Dep. 27:25 to 28:13 ("[Trainers] kept stressing to people to turn their cameras on.").

**RESPONSE**: Defendants deny this Paragraph in that the use of the term "SPS" constitutes argument which is unaccompanied by citation. Defendants admit that Garcia-Pusateri gave her opinion as stated below but deny that such opinion was that of any other Defendant in this case.

**REPLY: See Plaintiffs' Reply to Paragraph 26 which is incorporated here by reference. Thus, Plaintiffs' SUMF Paragraph 36 should be deemed admitted for the reasons set forth in Plaintiffs' Reply to Paragraph 26.**

Defendants provide the following response:

A.     The presenters at the October 14, 2020 Equity Training attended by Henderson asked the participants to make sure their screen cameras were turned on. Because the session was virtual, the only way the presenters could measure whether the participants were present was if their cameras were turned on. Department Director Rapert spoke up to let the presenters know that there were some participants who did not have cameras attached to their computers and therefore could not turn a camera image on. (Garcia-Pusateri depo, DEX G, p. 167; Henderson depo, DEX A, p. 57; Rapert depo, DEX F, p. 28).

**REPLY: Controverted insofar as Paragraph 36(A) mischaracterizes the evidence, including that SPS expected staff to keep their cameras on to ensure that they were engaging. (Ex. 4, YGP/SPS Dep. 167:12-20, dep. ex. 9 at 1-2 ("[I]t is still concerning that others overtly did not engage by turning of their cameras. . . . Even if people felt uncomfortable speaking we will need their cameras to be on."); Ex. 11, Henderson Dep. 57:12-21; *see also* Ex. 12, Rapert Dep. 27:25 to 28:13 ("[Trainers] kept stressing to people to turn their cameras on.").**

37.  SPS's trainers showed the Equity Training attendees a PowerPoint slide presentation during the Equity Training. (Stip. ¶¶ 1(g), 9; Ex. 13.)

**RESPONSE**:  Defendants deny this Paragraph in that it is vague.

**REPLY: Defendants' denial is unsupported by contrary evidence.** *See* **L.R. 56.1(b)(2);** *see also Gannon Int'l, Ltd. v. Blocker***, 684 F.3d 785, 792 (8th Cir. 2012). Thus, Plaintiffs' SUMF Paragraph 37 should be deemed admitted.**

Defendants agree to the following fact statement:

A.      Participants in the October 6, 2020 Equity Training attended by Plaintiff Lumley, and the October 14, 2020 Equity Training, attended by Plaintiff Henderson were shown a Power-Point slide presentation. (DEX 13.01; PEX 1, Stipulation ¶ 9).

**REPLY: As a written document, the Joint Stipulation of Facts (Ex. 1) speaks for itself and Defendants point to no material or substantive difference between the above facts and the facts in the joint stipulation.**

38.   SPS used substantially the same slide presentation for all Equity Training sessions, including the Equity Training sessions that Ms. Lumley and Ms. Henderson attended. (Stip. ¶ 9; see also Anderson Dep. 16:2 to 17:8.)

**RESPONSE**:  Defendants deny this Statement of Fact in that the use of the term "SPS" constitutes argument which is unaccompanied by citation. Defendants admit that Anderson gave his opinion as stated below, but deny that such opinion was that of any other Defendant in this case. Defendants agree to the following statement of fact:  Participants in the October 6, 2020 Equity Training attended by Lumley, and the October 14, 2020 Equity Training, attended by Henderson were shown a Power-Point slide presentation. (DEX 13.01; PEX 1, Stipulation ¶ 9).

**REPLY: See Plaintiffs' Reply to Paragraph 22 which is incorporated here by reference. Further replying, as a written document, the Joint Stipulation of Facts (Ex.**

41

**1) speaks for itself and Defendants point to no material or substantive difference between the above facts and the facts in the joint stipulation.**

**Thus, Plaintiffs' SUMF Paragraph 38 should be deemed admitted.**

39. The SPS trainers also used a "Script & Slide Breakdown" ("Script"), attached hereto as Exhibit 15, in connection with the slide presentation, which they largely followed in each Equity Training session. (Ex. 15; YGP/SPS Dep. 21:11 to 23:13, dep. ex. 3; Anderson Dep. 20:7 to 21:4, 31:10-14, dep. ex. 1.)

**RESPONSE**: Defendants admit this paragraph.

40. The Equity Training slide presentation also contained speaker notes that the SPS trainers relied upon. A version of the slide presentation with speaker notes is attached hereto as Exhibit 16. (Ex. 16; Stip. ¶¶ 1(i), 9; YGP/SPS Dep. 125:20 to 126:3, 155:3-8.)

**RESPONSE**: Defendants deny this Paragraph in that it is vague and it is immaterial whether the "speaker notes" were used in the other Fall (2020) Equity Training sessions that were not attended by Plaintiffs.

**REPLY: Defendants' denial is unsupported by contrary evidence. *See* L.R. 56.1(b)(2); *see also Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 792 (8th Cir. 2012). Second, the speaker notes are relevant and material because the presentations, including the speaker notes, were all "substantially similar." (Ex 1., Stip. ¶ 9; Ex. 4, YGP/SPS Dep. 23:11-13; Ex. 14, Anderson Dep. 16:2 to 17:8.) Fed. R. Evid. 401; *Davis v. Or. Cnty.*, 607 F.3d 543, 548 (8th Cir. 2010) ("A fact is material when it might affect the outcome of the suit under governing law.") (citing *Anderson*, 477 U.S. at 248).**

**Thus, Plaintiffs' SUMF Paragraph 40 should be deemed admitted.**

Defendants agree with the following statements of fact:

A. The October 6, 2020 and October 14, 2020 Fall Equity Training programs were essentially the same throughout the presentation. (Garcia-Pusateri depo. DEX G, p. 125, lns. 20-25; p. 126, lns. 1-3).

**REPLY: Controverted insofar as the cited testimony refers specifically to the speaker notes being "essentially the same." (Ex. 4, YGP/SPS Dep. 125:20 to 126:3.; *see also* Defs.' Response to ¶ 38.)**

41. At the start of the Equity Training sessions, SPS asked that a school administrator or leader read the same statement contained in the "Greetings!" handout to reinforce that equity was "now part of our work and job responsibilities" and that "we must commit to [it]." (Compare Ex. 17, DEX 50A-000388-91 at 391 with Ex. 9 at PLS 0425; see also YGP/SPS Dep. 101:11-22, dep. ex. 7.)

**RESPONSE**: Defendants deny this Paragraph in that the use of the term "SPS" constitutes argument which is unaccompanied by citation. Defendants admit that Garcia-Pusateri gave her opinion as stated below, but deny that such opinion was that of any other Defendant in this case.

**REPLY: See Plaintiffs' Reply to Paragraph 26 which is incorporated here by reference. Thus, Plaintiffs' SUMF Paragraph 41 should be deemed admitted for the reasons set forth in Plaintiffs' Reply to Paragraph 26.**

Defendants provide the following response:

A. In an email letter to the Principal of Bissett Elementary School regarding the Fall (2020) Equity Training at that school, a location where neither Henderson nor Lumley were present, Garcia-Pusateri requested that the Principal read a statement at the beginning of the training session which said in part:

43

"This is the second year SPS is going through fall district wide equity training and it's important we continue this significant work for your own personal and professional development but also for our work with our students."

(Garcia-Pusateri depo, DEX G, p. 101, lns. 11-22; Exh. 7.)

**REPLY: Controverted insofar as Paragraph 41(A) suggests that the statement was only read at one session. Dr. Garcia-Pusateri testified that the cited email (Ex. 17, DEX 50A-000388-91) was "one of the boilerplate emails I sent to leaders when we were scheduling their trainings." (Ex. 4, YGP/SPS Dep. 100:25 to 101:14.) Further, as a written document, the email speaks for itself. (Ex. 17 at 391 ("We also want the statement below read by these individuals at the beginning of each session.").)**

42. According to SPS, equity means "to identify the specific and unique needs of an individual such as a student and provide the supports needed for them to be successful." A student's needs, according to SPS, are "based on their identity and their lived experiences." SPS defines "identity" to "[i]nclude race as well as other aspects of identity." And, according to SPS, a black student's lived experience "may look different than for someone who is white." (YGP/SPS Dep. 64:11 to 66:15.)

**RESPONSE**: Defendants deny this Paragraph in that use of the term "SPS" constitutes argument which is unaccompanied by citation. Defendants admit that Garcia-Pusateri gave her opinion as stated below, but deny that such opinion was that of any other Defendant in this case.

**REPLY: See Plaintiffs' Reply to Paragraph 26 which is incorporated here by reference. Thus, Plaintiffs' SUMF Paragraph 42 should be deemed admitted for the reasons set forth in Plaintiffs' Reply to Paragraph 26.**

Defendants provide the following response:

A.  Defendants admit that Garcia-Pusateri stated her opinion as follows:

(1)  "Equity is to identify the specific and unique needs of an individual such as a student and provide the supports needed for them to be successful" (Garcia- Pusateri depo, p. 64, lns. 13-15) and means "treating people with the things that they need." (Garcia-Pusateri depo, DEX G, p. 64, lns. 17-18).

**REPLY: See Plaintiffs' Reply to Paragraph 26 which is incorporated here by reference. Further replying, Plaintiffs note that the first question to which Dr. Garcia-Pusateri was responding was: "What is that understanding of *the District* [of what equity is]?" The second question to which she was responding was: "Does equity mean treating everybody the same?" (Ex. 4, YGP/SPS Dep. 64:11-18) (emphasis added).**

(2)  A student who is Black "is going to have a different lived experience than a White student [and] ... will have different needs and supports that will still get them to success."

Q.  So in order to give a student of color what they need under an equity definition that means treating them differently from a student of another race?
A.  It means providing the supports that they need.
Q.  And is that different based on race?
A.  I think it's based on their identity and their lived experiences." ...
Q  And people of different races need things differently; correct?
A.  I believe people have different lived experiences ... it's based on ... different things. A student in a wheelchair is always going to need something different than a person who is able-bodied.
Q.  I'm not talking about a student in a wheelchair."

(Garcia-Pusateri depo, DEX G, p. 65, lns. 1-11; 21-25; p. 66, lns. 1-4).

45

**REPLY: See Plaintiffs' Reply to Paragraph 26 which is incorporated here by reference. Further replying, Paragraph 42(A)(2) is controverted insofar as it misrepresents Dr. Garcia-Pusateri's testimony by omitting certain of her testimony. She testified:**

> **Q.    So in order to give a student of color what they need under an equity definition, that means treating them differently from a student of another race?**
>
> **A.    It means providing the supports that they need.**
>
> **Q.    And is that different based on race?**
>
> **A.    I think it's based on their identity and their lived experiences.**
>
> **Q.    *Which includes race; correct?***
>
> **A.    *It could, yeah.  But not all black students are the same.***
>
> **Q.    *Well, the District defines identity based on race to include race; correct?***
>
> **A.    *Include race as well as other aspects of identity.***
>
> **Q.    *Now, how is equity different from equality?***
>
> **A.    *Equity is looking at specific unique needs. Equality is ensuring that everyone gets the same.***
>
> **Q.    And people of different races need things differently; correct?**
>
> **A.    I believe people have different lived experiences whether it's based on how they identify and, therefore, they may need different things. A student in a wheelchair is always going to need something different than a person who is able-bodied.**

**(Ex. 4, YGP/SPS Dep. 65:5 to 66:3) (emphasis added).**

B.    Defendants deny the remaining allegations not supported by citation.

**REPLY: Defendants' denial is unsupported by contrary evidence.** *See* **L.R. 56.1(b)(2);** *see also Gannon Int'l, Ltd. v. Blocker*, **684 F.3d 785, 792 (8th Cir. 2012).**

43.    According to SPS, equality "is just to treat – with race to treat everyone the same and see them as all the same." (YGP/SPS Dep. 67:25 to 68:6, see also 65:18-20 ("Equity is looking at specific unique needs. Equality is ensuring that everyone gets the same.").

    **RESPONSE**: Defendants deny this Paragraph in that use of the term "SPS" constitutes argument which is unaccompanied by citation. Defendants admit that Garcia-Pusateri gave her opinion as stated below, but deny that such opinion was that of any other Defendant in this case.

    **REPLY: See Plaintiffs' Reply to Paragraph 26 which is incorporated here by reference. Thus, Plaintiffs' SUMF Paragraph 43 should be deemed admitted for the reasons set forth in Plaintiffs' Reply to Paragraph 26.**

    Defendants provide the following response:

    A.    Defendants admit that Garcia-Pusateri stated her opinion as follows:

    > "Q.   And how is [equity] different from equality? Under equality would people have a different approach to race?
    > A.   Equality ... with race ... treat[s] everyone the same and see[s] them as all the same. Whereas, equity is about seeing their whole selves and their whole personhood.
    > Q.    So equality is colorblindness; correct?
    > A.     I would say maybe it does take in aspects of colorblindness. I don't think [colorblindness is] part of the definition, but it probably takes in colorblindness. ...
    > Q.      And equality is harmful; correct?
    > A.  I don't think equality is harmful. I think there's a better way ... of making ... people feel safe and supported."

    (Garcia-Pusateri depo DEX G, Exh. 4, p. 67, ln. 25; p. 66, lns. 1-15).

REPLY: See Plaintiffs' Reply to Paragraph 26 which is incorporated here by reference. Further replying, Paragraph 43(A) is controverted insofar as it misrepresents Dr. Garcia-Pusateri's testimony by omitting certain of her testimony. She testified:

> Q. And how is that different from equality? Under equality would people have a different approach to race?
>
> A. Equality probably is just to treat – with race to treat everyone the same and see them as all the same. Whereas, equity is about seeing their whole selves and their whole personhood.
>
> Q. So equality is colorblindness; correct?
>
> A. I would say maybe it does take in aspects of colorblindness. I don't think it's part of the definition, but it probably takes in colorblindness. Yeah.
>
> Q. And equality is harmful; correct?
>
> A. I don't think equality is harmful. I think there's a better way in how to address – a way of making feel – making people feel safe and supported.

(Ex. 4, YGP/SPS Dep. 67:25 to 68:15.)

B.   Defendants deny the remaining statements in the Paragraph in that they are not supported by citation.

REPLY: Defendants' denial is unsupported by contrary evidence. *See* L.R. 56.1(b)(2); *see also Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 792 (8th Cir. 2012).

44.   SPS never told staff that silence was an option during the Equity Training. (YGP/SPS Dep. 151:22-25.)

48

**RESPONSE**: Defendants deny this Paragraph in that the use of the term "SPS" constitutes argument which is unaccompanied by citation. Defendants admit that Garcia-Pusateri gave her opinion as stated below but deny that such opinion was that of any other Defendant in this case. Defendants admit that Garcia-Pusateri gave her opinion in the cited passage as follows:

**REPLY: See Plaintiffs' Reply to Paragraph 26 which is incorporated here by reference. Thus, Plaintiffs' SUMF Paragraph 44 should be deemed admitted for the reasons set forth in Plaintiffs' Reply to Paragraph 26.**

A.  "I think if someone calls on you, it's the hope that you will contribute. But if some were to say "I don't feel I can speak at this time," it would not be my notion that we would then do anything to that person."

Q.  Well, if ... a trainer called on somebody and said 'I'm asking you to speak,' and the person said "I'm not speaking," wouldn't that be unprofessional?

A.  ... I would be disappointed that they did not want to contribute. But ... to say that's unprofessional – I do now recall a training where we did ask someone ... 'Do you have a comment? Would you mind sharing what you're talking about?' And they're like, 'I don't feel like I can at this time.' And it's like, 'Okay. That's fine. Thank you for letting us know.' ...

Q.  So did the District in any of this training that you witnessed ever tell people that "You don't have to participate. Silence is optional?

A.  No one ever said silence is optional."

(Garcia-Pusateri depo, DEX G, p. 150, lns. 15-25; p. 151).

**REPLY: See Plaintiffs' Reply to Paragraph 26 which is incorporated here by reference. Further replying, Defendants' Response to Paragraph 44 is controverted insofar as it misrepresents Dr. Garcia-Pusateri's testimony by omitting certain of her testimony. (*See* Ex. 4, YGP/SPS Dep. 150:13 to 151:25.) Further replying, Plaintiffs note that while Defendants denied Paragraph 44, they quoted the very testimony cited therein:**

> **Q.** Did the District in any of this training that you witnessed ever tell people that "You don't have to participate. Silence is optional"?
>
> **A.** No one ever said silence is optional.

(Id. 151:22 to 151:25)

45. Throughout the Equity Training, SPS continuously taught that silence on the part of "white people" was a form of white supremacy. (YGP/SPS Dep. 157:11-18.)

**RESPONSE**: Defendants deny this Statement of Fact in that use of the term "SPS" constitutes argument which is unaccompanied by citation. Defendants admit that Garcia-Pusateri gave her opinion as stated below, but deny that such opinion was that of any other Defendant in this case.

**REPLY: See Plaintiffs' Reply to Paragraph 26 which is incorporated here by reference. Thus, Plaintiffs' SUMF Paragraph 45 should be deemed admitted for the reasons set forth in Plaintiffs' Reply to Paragraph 26.**

Defendants provide the following response:

A. Defendants admit that Garcia-Pusateri gave her opinion that "silence means acceptance, so it is important when [an educator] sees things happen in the classroom, that [they] address it." (Garcia-Pusateri depo, Exh 4, p. 157).

**REPLY: See Plaintiffs' Reply to Paragraph 26 which is incorporated here by reference. Further replying, Paragraph 45(A) is controverted because it misquotes Dr. Garcia-Pusateri's testimony. She testified:**

> **Q.** Because silence would make them a white supremacist?
>
> **A.** Silence means that it's acceptance. So it's important that when you do see things, especially in the classroom, you do address it and speak up.

**(Ex. 4, YGP/SPS Dep. 158:13-16.)**

      B.    Defendants deny the remaining statements in this paragraph.

**REPLY: See Plaintiffs' Reply to Paragraph 43(B) which is incorporated here by reference.**

46.   Mr. Anderson told participants he would call on them if they did not speak out. (Anderson Dep. 33:23 to 34:9, 50:4-13; YGP/SPS Dep. 229:19 to 230:14.)

      **RESPONSE**: Defendants admit portions of the Paragraph as follows:

**REPLY: Defendants do not directly respond to Paragraph 46 as admitted or controverted. As such, Plaintiffs' SUMF Paragraph 46 should be deemed admitted. L.R. 56.1(b)(1).**

      A.    Garcia-Pusateri recalled Anderson stating that he was going to call on people if they were silent, in order to encourage conversation. (Garcia-Pusateri depo DEX G, p. 229, lns. 23-25).

      **REPLY: Admitted.**

      B.    Anderson testified as follows:

Q.    "Did you tell anybody in Ms. Lumley's training ...
        that if nobody spoke up, you would call on people?
A.    I don't remember saying that. I don't recollect that.
Q.    Did any of the trainers in Ms. Lumley's session say that?
A.    Not that I can recall."

(Anderson depo, DEX H, p. 33, lns. 23-25; p. 34, lns. 1-5).

**REPLY: Controverted insofar as it misrepresents Mr. Anderson's testimony by omitting certain of his testimony. He testified:**

      **Q.    Did any of the trainers in Ms. Lumley's session say that?**

      **A.    Not that I can recall.**

> Q.    Was that ever said during any of the trainings that you were a trainer in or attended?
>
> A.    *Oh, I'm sure I probably said that at some point in time in training.*
>
> Q.    Okay.  You just don't remember if that was specifically said in Ms. Lumley's session?
>
> A.    I do not.

**(Ex. 14, Anderson Dep. 34:3 to 34:12) (emphasis added). Further replying, Paragraph 46(B) is controverted by Ms. Lumley. (Ex. 3, Lumley Decl. ¶ 14 ("Mr. Anderson stated that he would call on people if they did not participate in the interactive parts of the training.").)**

> C.    Lumley admitted that during the Equity Training she attended that:
>
> (1)    After viewing the George Floyd video during the training session Lumley went to a "small group session" with one other employee and both of them shared their opinions with each other about the video. The George Floyd video small group session lasted about three minutes. Lumley did not think there was anything wrong with what happened in the small group session where the George Floyd video was discussed. (Lumley depo, DEX B, p. 20, lns. 17-25, p. 22, lns. 1-10).

**REPLY: Controverted on the basis that it mischaracterizes Ms. Lumley's testimony. Ms. Lumley's testimony about there not being "anything wrong" refers to her exchange of opinions with the other employee, and not "anything" in the small group session:**

> Q.    Okay.  Did you lead off in that discussion, or did she lead off?
>
> A.    I believe she did.
>
> Q.    Okay.  And so she said what she said about her husband, and then you followed with what you testified to a minute ago?
>
> A.    Yes.

**Q.** She gave her opinion, and you gave your opinion?

**A.** Yes.

**Q.** Is there anything wrong with what happened there in your mind?

**A.** I don't think so. No.

(Pls.' Opp'n Ex. 24, Lumley Dep. 21:24 to 22:10.) Additionally, as Ms. Lumley

attested to:

> I complied with SPS's directive that I share my thoughts and feelings about the George Floyd video in my small group because I did not want to remain silent due to SPS's instruction that we have courageous conversations, stay engaged, lean into our discomfort, share our personal experiences, and share our truth. Nor did I want to be considered a white supremacist by remaining silent.

(Ex. 3, Lumley Decl. ¶ 16.) She further attested that following the "Environmental

Scan Reflection," she was again paired with the other employee and:

> I was reluctant at this point to engage in further discussions given the exchange during our last small group discussion about George Floyd. But I participated in the small group discussion because I did not want to remain silent due to SPS's instruction that we have courageous conversations, stay engaged, lean into our discomfort, share our personal experiences, and share our truth. Nor did I want to be considered a white supremacist by remaining silent. Ms. Hawkins again spoke on behalf of our group at the large group discussion. Even though I disagreed with Ms. Hawkins, I refrained from speaking out of concern for how my comments would be received by SPS.

(Id. ¶ 22.)

> (2) When the George Floyd video small group session ended, there was a large group session on the George Floyd video during which the other employee in Lumley's small group gave her opinion, but did not share Lumley's opinion, which did not matter to Lumley. (Lumley depo, DEX B, p. 22, lns. 15-25, p. 23, lns. 1-5).
>
> **REPLY: Admitted but immaterial.**

(3)     There was a discussion about the oppression matrix, but the participants did not have to rate themselves on the oppression matrix slide, no small group session was held on the oppression matrix presentation and Lumley was not asked her opinion about the oppression matrix. (Lumley depo, DEX B, p. 23, lns. 12-25, p. 24, lns. 1-7).

        **REPLY: See Plaintiffs' Reply to Paragraph 30(A) which is incorporated here by reference.**

(4)     There was a discussion about the white supremacy chart. No small group session was held on the white supremacy chart. No one called Lumley's name or asked her directly if she understood the white supremacy chart. Lumley was not asked to affirm or agree to anything that had been presented about the white supremacy chart or to write anything down. Rather, the participants were told that they could look at the white supremacy chart on their own time. (Lumley depo, DEX B, p. 24, lns. 12- 25, p. 25, lns. 1-18).

        **REPLY: See Plaintiffs' Reply to Paragraph 27(A) which is incorporated here by reference.**

(5)     There was a discussion about the social identities chart. No small group session was held to discuss the social identities chart and the participants were told that they could look at the social identities chart on their own time. Lumley was not asked about her opinion on the social identities chart, how she would have filled it out or how she fit in on it. (Lumley depo, DEX B, p. 25, lns. 19-25, p. 26, lns. 1-12).

        **REPLY: Controverted insofar as the cited testimony is not that the "the participants were told that they could look at the social identities chart on their own time," but that SPS "told us to look at it ourselves and fill it out basically on our own time." (Defs.' Ex. B, Jennifer Lumley Dep. 25:22-25.)**

D.     Employee Cecil Mooney, who was also present in the October 6, 2020 Training session, said that the presenters "asked for comments or let people volunteer" but he "did not remember them calling on any one individual ... it was open for individuals to speak." (Mooney depo, DEX I, p. 11, lns. 14-17).

54

**REPLY: Controverted on the basis that it mischaracterizes Mr. Mooney's testimony in that it omits Mr. Mooney qualifying his statements with "I think" and "I don't specifically remember," which were consistent with his general lack of recall about the October 6, 2020 Equity Training session (testifying that he didn't remember or recall at least 37 times in 24 pages of testimony):**

> **Q.** Do you remember them actually calling on people at any point in time?
>
> **A.** I think they asked for comments or let people volunteer. I don't specifically remember them calling on any one individual. I think it was open for individuals to speak.

**(Pls.' Opp'n Ex. 25, Cecil Mooney Dep. 11:12-17.)**

E.   Henderson admitted that during the Equity Training she attended that:

(1)   She was never called on by the trainers to answer questions during the large group sessions. (Henderson depo, DEX A, p. 59, lns. 4-11).

**REPLY: See Plaintiffs' Reply to Paragraph 27(B) which is incorporated here by reference.**

(2)   During the small group discussion about the George Floyd incident Henderson volunteered that she "felt that the video was taken out of context and it was only reflecting one side of the incident by removing all the other . . . context. So they removed all the other language out of that and just put that in isolation." (Henderson depo, DEX A, p. 94, lns. 3-7; Rapert depo, DEX F, p. 26-27).

**REPLY: Admitted.**

(3)   During the George Floyd breakout session all of the attendees who spoke agreed that "it was hard to make any determination out of context." (Henderson depo, DEX A, p. 94, lns. 13-15).

**REPLY: Admitted.**

(4)     She did not feel that being asked to watch the George Floyd video violated her rights. (Henderson depo, DEX A, p. 89, lns. 14-21).

**REPLY: Controverted because it is not a statement of fact capable of admission; it is a legal conclusion, and whether Plaintiffs' constitutional rights were violated is a question of law for the court.** *See, e.g.*, *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, **920 F.3d 421, 425 (6th Cir. 2019) ("No material facts are in dispute here, so this matter turns on a pure question of law: does [the legislation] compel a doctor's speech in violation of the First Amendment?").**

47.     The "Guiding Principles" handout was also repeated early in the slide presentation but with the addition of "Be Professional – Or be Asked to Leave with No Credit." (Compare Ex. 13 at 7 with Ex. 9 at PLS 0428; Stip. ¶¶ 1(g), 9.)

**RESPONSE**:  Defendants admit this Paragraph.

48.  When the SPS trainers showed staff the Guiding Principles slide, they told staff to "Stay Engaged in the discussion," "stay locked into the conversations," "lean into that discomfort . . . don't try to push it down," "share your personal experiences, and "it is important that during this time we commit to the success of our district and our students, which is why we must commit to these following principles." (Ex. 15 at 6.)

**RESPONSE**: Defendants admit that Exhibit 15, at p. 6 states: "Stay Engaged in  the discussion"..."please try and stay locked into the conversations"..."As I mentioned earlier, some of the things we will be covering today can be uncomfortable at times. Lean into that discomfort to learn and grow. Dont try to push it down."..."I encourage you to share your personal experiences"..."it is important that during this time we commit to the success of our district and our students, which  is  why  we  must  commit  to  these  following

56

principles." (PEX Exh. 15, at p. 6). Defendants deny that the cited reference states "[w]hen the SPS trainers showed staff the Guiding Principles slide, they told staff to."

**REPLY: Defendants' denial is unsupported by contrary evidence. *See* L.R. 56.1(b)(2); *see also Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 792 (8th Cir. 2012). Further replying, Paragraph 48 is supported by Exhibit 15 which is the "Script & Slide Breakdown" that SPS trainers used connection with the slide presentation, and which they largely followed in each Equity Training session. (Ex. 15; YGP/SPS Dep. 21:11 to 23:13, dep. ex. 3; Anderson Dep. 20:7 to 21:4, 31:10-14, dep. ex. 1.) Plaintiffs' declarations further support Paragraph 48. (*See* Ex. 2 ¶ 16 & Ex. 3 ¶ 13.)**

**Thus, Plaintiffs' SUMF Paragraph 48 should be deemed admitted.**

49.     The Equity Training slide presentation also included an "Overview of Training" slide that stated that participants will "[e]ngage in identity development and understanding" and would "[r]eceive tools on how to become Anti-Racist educators, leaders and staff members at SPS," among other statements. (Ex. 13 at 8; Stip. ¶¶ 1(g), 9; Henderson Dep. 57:1-5 ("[W]e had to be an ally and it was part of our job duty to be an antiracist educator.").

**RESPONSE**:  Defendants respond as follows:

**REPLY: Defendants do not directly respond to Paragraph 49 as admitted or controverted. As such, Plaintiffs' SUMF Paragraph 49 should be deemed admitted. L.R. 56.1(b)(1).**

A.     Defendants admit the following portions of this Paragraph:

(1)     The "Overview of Training" slide contained in the Fall (2020) Equity Training presentation, page 8, states that: "Participants will engage in identity development and understanding" and will "receive tools on how to

57

become Anti- Racist educators, leaders and staff members of SPS." (DEX 13.01, p. 8).

**REPLY: As a written document, the "Overview of Training" slide speaks for itself. It states:**

**Participants will:**

**● Learn about Oppression, White Supremacy, and Systemic Racism**

**● Reflect on current issues that have impacted our society nationally and globally (i.e., Covid-19 and Protests against Systemic Racism towards the Black Community)**

**● Have a greater understanding of current terminology**

**● Engage in identity development and understanding**

**● Receive tools on how to become Anti-Racist educators, leaders and staff members of SPS**

**● Share and dialogue with larger and smaller groups**

**(Ex. 13 at 8.)**

(2)　　Henderson stated in her deposition that she "was bothered" that "we had to agree or we would lose credit and that we had to be an ally and it was part of our job duty to be an antiracist educator." (Henderson depo, DEX A, p. 57, lns. 1-5).

**REPLY: Admitted.**

B.　　Defendants deny the remaining allegations not supported by citation.

**REPLY: Defendants' denial is unsupported by contrary evidence. *See* L.R. 56.1(b)(2); *see also Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 792 (8th Cir. 2012).**

50. Through its Equity Training, SPS defined "anti-racism," and in turn being an anti- racist, to mean "bucking norms." SPS further explained that "anti-racism" is a "proactive element" that requires not being silent and "advocating for changes in political, economic, and social life." (Ex. 13 at 31-32; Stip. ¶¶ 1(g), 9; YGP/SPS Dep. 86:25 to 89:4, 97:8-19.)

      **RESPONSE**: Defendants deny this Statement of Fact in that use of the term "SPS" constitutes argument which is unaccompanied by citation. Defendants admit that Garcia-Pusateri gave her opinion as stated below, but deny that such opinion was that of any other Defendant in this case.

      **REPLY: See Plaintiffs' Reply to Paragraphs 22 and 26 which are incorporated here by reference. Thus, Plaintiffs' SUMF Paragraph 50 should be deemed admitted for the reasons set forth in Plaintiffs' Reply to Paragraphs 22 and 26.**

      Defendants provide the following response:

      A.     Defendants admit that PEX 13, pages 31-32 defines the term "anti-racism as:

    "Anti-Racism is defined as the work of actively opposing racism by advocating for changes in political, economic, and social life. Anti-racism tends to be an individualized approach, and set up in opposition to individual racist actions." and "anti-racism – to fight against systemic racism means to buck norms." (Exh. 13, pp. 31-32).

      **REPLY: Admitted.**

      B.     Defendants admit that the slide addressing "buck[ing] norms" included a quote from Holocaust survivor and Jewish author, Elie Wiesel. (Exh. 13, p. 31).

      **REPLY: Admitted.**

      C.     Defendants admit that Garcia-Pusateri provided her opinion regarding the term "anti-racism" as follows:

"Anti-racism is defined as the work of actively opposing racism by advocating for changes in political or economic and social life. Anti-racism tends to be an individualized approach and set up in opposition to individual racist behaviors and impacts." (Garcia-Pusateri depo, Exh 4, p. 87, lns, 10- 15).

**REPLY: See Plaintiffs' Reply to Paragraph 26 which is incorporated here by reference.**

D. Defendants deny the remaining allegations in the Paragraph.

**REPLY: Defendants' denial is unsupported by contrary evidence. *See* L.R. 56.1(b)(2); *see also Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 792 (8th Cir. 2012).**

51. Through its Equity Training, SPS expected staff to commit to the concept of becoming "anti-racist" educators. (YGP/SPS Dep. 86:11-24, 94:14 to 95:14, 97:23 to 98:19, 99:15 to 100:1, dep. ex. 7 at 1.)

RESPONSE: Defendants deny this Paragraph in that use of the term "SPS" constitutes argument which is unaccompanied by citation. Defendants admit that Garcia-Pusateri gave her opinion as stated below, but deny that such opinion was that of any other Defendant in this case.

**REPLY: See Plaintiffs' Reply to Paragraph 26 which is incorporated here by reference. Thus, Plaintiffs' SUMF Paragraph 51 should be deemed admitted for the reasons set forth in Plaintiffs' Reply to Paragraph 26.**

Defendants provide the following response:

A. Garcia-Pusateri stated her opinion that the Fall (2020) Equity Training was asking the participants to commit to "understanding what anti-racism is ... and to learn more about it." (Garcia-Pusateri depo. DEX G, p. 86, lns. 15-19; p. 95, lns. 13-16).

**REPLY: See Plaintiffs' Reply to Paragraph 26 which is incorporated here by reference. Further replying, Paragraph 51(A) is controverted on the basis it is an inaccurate summary of Dr. Garcia-Pusateri's testimony as representative of the District pursuant to Fed. R. Civ. P. 30(b)(6) as to Topics 1-5 of the notice. (Ex. 4, YGP/SPS Dep. 86:11-24, 94:14 to 95:14, 97:23 to 98:19, 99:15 to 100:1, dep. ex. 7 at 1.)**

B.     Garcia-Pusateri stated her opinion that the Fall (2020) Equity Training was asking participants to commit to "being an anti-racist educator" (Garcia-Pusateri depo. DEX G, p. 86, lns. 15-19; p. 95, lns. 13-16;) and learning about how to address barriers to students in the classroom, (Garcia-Pusateri depo, DEX G, p. 97, lns. 19-22) such as how to handle the use of a racial epithets in the classroom. (Garcia-Pusateri depo, DEX G, p. 97, lns. 4-7).Garcia-Pusateri stated her opinion that the Fall (2020) Equity Training was not asking anyone to engage in political activity or political advocacy. (Garcia-Pusateri depo. DEX G, p. 97, lns. 19-20).

**REPLY: See Plaintiffs' Reply to Paragraph 26 which is incorporated here by reference. Further replying, Paragraph 51(B) is controverted on the basis it is an inaccurate summary of Dr. Garcia-Pusateri's testimony as representative of the District pursuant to Fed. R. Civ. P. 30(b)(6) as to Topics 1-5 of the notice. (Ex. (YGP/SPS Dep. 86:11-24, 94:14 to 95:14, 97:23 to 98:19, 99:15 to 100:1, dep. ex. 7 at 1.)**

C.     Garcia-Pusateri stated her opinion that the Fall (2020) Equity Training was not asking anyone to engage in political activity or political advocacy. (Garcia-Pusateri depo. DEX G, p. 97, lns. 19-20).

**REPLY: See Plaintiffs' Reply to Paragraph 26 which is incorporated here by reference. Further replying, Paragraph 51(C) is controverted by the plain text of PowerPoint slides, the Script & Speaker Notes, the Speaker Notes, and Dr. Garcia-Pusateri's testimony that "advocating for changes in political, economic, and social life" was part of the definition of anti-racism that SPS taught. (Ex. 4, YGP/SPS Dep. 86:25 to 89:4, 97:8-19; Ex. 13 at 31-32, Ex. 15 at 18; Ex. 16 at 39-40.)**

52. According to SPS, equality on the basis of race and color blindness do not correspond with anti-racism. (Id. 89:13-19, see also 96:4-7 ("We talked about colorblindness and other ways of how it can have harmful effects.").

      **RESPONSE**: Defendants deny this Paragraph in that use of the term "SPS" constitutes argument which is unaccompanied by citation. Defendants admit that Garcia-Pusateri gave her opinion as stated below but deny that such opinions were that of any other Defendant in this case.:

      **REPLY: See Plaintiffs' Reply to Paragraph 26 which is incorporated here by reference. Thus, Plaintiffs' SUMF Paragraph 52 should be deemed admitted for the reasons set forth in Plaintiffs' Reply to Paragraph 26.**

      Defendants provide the following response

      A.     Garcia-Pusateri expressed the following opinions during her deposition: (1) "Colorblindness" says "that I see you as just the person rather than seeing you with everything that you come with." (Garcia-Pusateri depo, DEX G, p. 66, lns. 18-20); (2) Colorblindness "can have harmful impacts" because "it can make someone feel like you do not want to see them for their identity or their lived experience." (Garcia - Pusateri depo, DEX G, p. 66, ln. 25; 67, lns. 2-3); (3) "Equality [treats] everyone the same and

sees them as all the same [w]hereas, equity is about seeing their whole selves and their whole personhood." (Garcia -Pusateri depo, DEX G, p. 68, lns. 3-6); (4) "I don't think equality is harmful. I think there is a better way [to make] people feel safe and supported." (Garcia - Pusateri depo, DEX G, p. 68, lns. 13-15).

**REPLY: See Plaintiffs' Reply to Paragraphs 28(A) and 43(A) which are incorporated here by reference.**

53. According to SPS, not acknowledging people's race or saying that a person does not see color "goes against anti-racism." (Id. 89:10-17.)

**RESPONSE**:    Defendants deny this Paragraph in that use of the term "SPS" constitutes argument which is unaccompanied by citation. Defendants admit that Garcia-Pusateri gave her opinion in the cited portion of her deposition but deny that such opinion was that of any other Defendant in this case.

**REPLY: See Plaintiffs' Reply to Paragraph 26 which is incorporated here by reference. Thus, Plaintiffs' SUMF Paragraph 53 should be deemed admitted for the reasons set forth in Plaintiffs' Reply to Paragraph 26.**

54. The first interactive exercise of the Equity Training took place after SPS showed a "George Floyd – Reflection Video" consisting of a black screen with the final words of George Floyd subtitled for eight minutes and 48 seconds. (Ex. 13 at 11; Stip. ¶¶ 1(g), 9.)

**RESPONSE**: Defendants deny this Paragraph in that use of the term "SPS" constitutes argument which is unaccompanied by citation.

**REPLY: See Plaintiffs' Reply to Paragraph 22 which is incorporated here by reference. Thus, Plaintiffs' SUMF Paragraph 54 should be deemed admitted for the reasons set forth in Plaintiffs' Reply to Paragraph 22.**

Defendants admit the following:

A.     Defendants admit that the George Floyd – Reflection Video was shown during the October 6 and October 14 Fall (2020) Equity Training Programs which were attended by Plaintiffs.

B.     Defendants admit that the George Floyd – Reflection Video consisted of a black screen with what purports to be the final words of George Floyd subtitled on the screen for eight minutes and 48 seconds.

55.   Following the "George Floyd-Reflection Video," the SPS trainers separated staff into small groups and directed them to discuss their feelings and thoughts about the video. (Ex. 13 at 12; Stip. ¶¶ 1(g), 9; Ex. 15 at 8.)

RESPONSE: Defendants admit that following the "George Floyd-Reflection Video," the Plaintiffs were separated into small groups with other employees to share their opinions about the video. Defendants deny the remainder of the Paragraph.

REPLY: Defendants' denial is unsupported by contrary evidence. *See* **L.R. 56.1(b)(2);** *see also Gannon Int'l, Ltd. v. Blocker*, **684 F.3d 785, 792 (8th Cir. 2012). Further replying, Defendants point to no material or substantive difference between the above facts and the facts in the joint stipulation.**

**Thus, Plaintiffs' SUMF Paragraph 55 should be deemed admitted.**

Defendants provide the following:

A.     During the October 6, 2020 Equity Training Lumley attended after viewing the George Floyd video, Lumley went to a "small group session" with one other employee and both of them shared their opinions with each other about the video. The George Floyd video small group session lasted about three minutes. Lumley did not think

64

there was anything wrong with what happened in the small group session where the George Floyd video was discussed. (Lumley depo, DEX B, p. 20, lns. 17-25, p. 22, lns. 1-10).

> **REPLY: See Plaintiffs' Reply to Paragraph 46(C)(1) which is incorporated here by reference.**

B.     During the October 14, 2020 Equity Training Henderson attended a video about the George Floyd incident was played. Garcia-Pusateri introduced the video and told the attendees:

> "That [the video] was going to be difficult to watch, but we needed to watch it, and it was important for us to see it without the additional noise and that we just needed to focus in to imagine if we were in that position that Derek Chauvin --could we imagine having somebody place a knee on our neck and not letting up and these are your final words."

(Henderson depo, DEX A, p. 87, ln. 25, p. 88, lns. 1- 6).

> **REPLY: Admitted.**

C.     During Henderson's small group discussion about the George Floyd incident she volunteered that she "felt that the video was taken out of context and it was only reflecting one side of the incident by removing all the other . . . context. So they removed all the other language out of that and just put that in isolation." (Henderson depo, DEX A, p. 94, lns. 3-7; Rapert depo, DEX F, p. 26-27).

> **REPLY: See Plaintiffs' Reply to Paragraph 46(E)(2) which is incorporated here by reference.**

D.     During Henderson's George Floyd breakout session all of the attendees who spoke agreed that "it was hard to make any determination out of context." (Henderson depo, DEX A, p. 94, lns. 13-15).

**REPLY: See Plaintiffs' Reply to Paragraph 46(E)(3) which is incorporated here by reference.**

      E.      Henderson did not feel that being asked to watch the George Floyd video violated her rights. (Henderson depo, DEX A, p. 89, lns. 14-21).

**REPLY: See Plaintiffs' Reply to Paragraph 46(E)(4) which is incorporated here by reference.**

56.    After several minutes, the SPS trainers brought staff back to the larger group to share their thoughts about the video. (Ex. 13 at 12; Stip. ¶¶ 1(g), 9; Ex. 15 at 8.)

      **RESPONSE**: Defendants admit the Paragraph. Defendants provide the following:

      A.      During the October 6, 2020 Equity Training that Lumley attended, after viewing the George Floyd video, Lumley went to a "small group session" with one other employee and both of them shared their opinions with each other about the video. The George Floyd video small group session lasted about three minutes. Lumley did not think there was anything wrong with what happened in the small group session where the George Floyd video was discussed. (Lumley depo, DEX B, p. 20, lns. 17-25, p. 22, lns. 1-10).

      **REPLY: See Plaintiffs' Reply to Paragraph 46(C)(1) which is incorporated here by reference.**

      B.      When the George Floyd video small group session ended, there was a large group session on the George Floyd video during which the other employee in Lumley's small group gave her opinion, but did not share Lumley's opinion, which did not matter to Lumley. (Lumley depo, DEX B, p. 22, lns. 15¬25, p. 23, lns. 1-5).

**REPLY: See Plaintiffs' Reply to Paragraph 46(C)(2) which is incorporated here by reference.**

57. SPS showed staff a slideshow called the "Environmental Scan" that "showcase[d] pictures of major events that have impacted our country from March [2020] until now." (Ex. 13 at 14; Stip. ¶¶ 1(g), 9; Ex. 15 at 9.) The slideshow images are attached hereto as Exhibit 18. (Ex. 18.)

      **RESPONSE**:    Defendants deny this Paragraph in that use of the term "SPS" constitutes argument which is unaccompanied by citation. Defendants would admit this Paragraph if its first line was rewritten to read: "SPS trainers . . . . "

      **REPLY: See Plaintiffs' Reply to Paragraph 22 which is incorporated here by reference. Thus, Plaintiffs' SUMF Paragraph 57 should be deemed admitted for the reasons set forth in Plaintiffs' Reply to Paragraph 22.**

58. Following the "Environmental Scan," the SPS trainers started the "Environmental Scan Activity." They broke staff out into small groups and directed them to discuss several questions about the images, including what it felt like to see them. SPS trainers told trainees that when they returned to the large group, they would be calling on two individuals to share their thoughts. (Ex. 13 at 15; Stip. ¶¶ 1(g), 9; Ex. 15 at 10.)

      **RESPONSE**: Defendants admit that during the October 6, 2020 and October 14, 2020 Equity Trainings attended by Plaintiffs, following the "Environmental Scan" video, the participants broke into small groups to discuss their thoughts about the video with their colleagues. Defendants deny the remainder of the Paragraph. Defendants provide the following:

**REPLY: Defendants' denial is unsupported by contrary evidence.** *See* **L.R. 56.1(b)(2);** *see also Gannon Int'l, Ltd. v. Blocker*, **684 F.3d 785, 792 (8th Cir. 2012). Thus, Plaintiffs' SUMF Paragraph 58 should be deemed admitted.**

A.      The purpose of the Environmental Scan activity was to: ". . . capture a small snapshot of what was happening. Could we capture everything else that was happening that Summer? No. But it was just a snapshot of some of these things that were having a large impact." (Garcia-Pusateri depo, DEX G, p. 227, lns. 13-17).

**REPLY: Controverted. The cited testimony does not support Paragraph 58(A) because Dr. Garcia-Pusteri was not testifying about the purpose of the Environmental Scan. Dr. Garcia-Pusateri did testify about "the purpose of the discussion the District was directing [participants] to discuss with their [small group," which she stated was "[t]o talk about their takeaways." (Ex. 4, YPG/SPS 226:24 to 227:1.)**

B.      During the Environmental Scan video, the participants were given the "opportunity if they wanted" to write down their thoughts and questions (Garcia-Pusateri depo, DEX G, p. 224, lns. 18-21) and were told to "Feel free to write down thoughts or questions you may have." (Garcia-Pusateri depo, DEX G, p. 225, lns. 20-21).

**REPLY: Admitted.**

C.      Any notes made by the participants during the training were not collected by the District. (Garcia-Pusateri depo, DEX G, p. 224, lns. 7-10; p. 228, Lns. 23-25).

**REPLY: Admitted that SPS did not collect the notes from Ms. Henderson's session. Controverted insofar as there is no evidence whether SPS collected notes from any other sessions.[3]**

D.     The purpose of the small group session was for the participants "to talk about their take aways" from the Environmental Scan video. (Garcia-Pusateri depo, DEX G, p. 226, lns. 24-25; p. 227, ln. 1).

**REPLY: Admitted.**

59.   For the small group breakout, Ms. Lumley partnered with the same person as she did for the George Floyd breakout. Ms. Lumley participated in the small group discussion because she did not want to remain silent due to SPS's instruction that staff have courageous conversations, stay engaged, lean into their discomfort, share their personal experiences, and share their truth. Nor did Ms. Lumley want to be considered a white supremacist by remaining silent. (Lumley Decl. ¶ 22; Ex. 19, Jennifer Lumley Dep. 20:24 to 21:4.)

RESPONSE:     Defendants deny this Paragraph in that use of the term "SPS" constitutes argument which is unaccompanied by citation. Defendants will admit this Paragraph if the words "SPS's instruction" is deleted.

**REPLY: See Plaintiffs' Reply to Paragraph 22 which is incorporated here by reference. Thus, Plaintiffs' SUMF Paragraph 59 should be deemed admitted for the reasons set forth in Plaintiffs' Reply to Paragraph 22.**

Defendants provide the following:

---

[3] Plaintiffs note that, despite their multiple objections asserting that Dr. Garcia-Pusateri was not testifying on behalf of SPS (notwithstanding that she was a Fed. R. Civ. P. 30(b)(6) representative), Defendants claim here that her testimony was on behalf of SPS.

A.    Defendants admit that Lumley was paired with another participant for a small group discussion on the Environmental Scan slideshow:

"... to discuss several questions about the slideshow, including how it made us feel to see the images, whether we recognized the images, and how the events shown impacted our work in SPS."

(Henderson Declaration, Doc. 77-3, ¶ 21.

**REPLY: Admitted.**

B.    Defendants admit that Lumley, in her sworn Declaration, stated that:

"I participated in the small group discussion because I did not want to remain silent due to SPS's instruction that we have courageous conversations, stay engaged, lean into our discomfort, share our personal experiences, and share our truth. Nor did I want to be considered a white supremacist by remaining silent."

(Lumley Declaration, Doc. 77-3, ¶ 23.)

**REPLY: Admitted. However, Plaintiffs note that Paragraph 59(B) incorrectly cites to Paragraph 23 of Ms. Lumley's declaration; the correct citation is Paragraph 22.**

60.  Ms. Henderson and others in her small group expressed to each other that they did not believe the "Environmental Scan" slideshow was completely accurate because even though the exercise showed the summer 2020 protests as peaceful, riots also took place in Missouri and across the country. (Henderson Decl. ¶ 23.)

**RESPONSE**:  Defendants provide the following response:

**REPLY: Defendants do not directly respond to Paragraph 60 as admitted or controverted. Thus, Plaintiffs' SUMF Paragraph 60 should be deemed admitted. L.R. 56.1(b)(1).**

A.    Defendants admit that Henderson, though appearing virtually, was paired

70

with other participants for a small group discussion on the Environmental Scan slideshow:

> "... to discuss several questions about the slideshow, including how it made us feel to see the images, whether we recognized the images, and how the events shown impacted our work in SPS."
> (Henderson Declaration, Doc. 77-2, ¶ 22.)

**REPLY: Admitted.**

B.     Defendants admit that Henderson, in her sworn Declaration, stated that:

> "I, along with others in my small group, expressed among ourselves that we did not believe the "Environmental Scan" slideshow images were completely accurate because even though the exercise showed the Summer 2020 protests as peaceful, riots also took place in Missouri and across the country."

(Henderson Declaration, Doc. 77-3, ¶ 23.)

**REPLY: Admitted.**

61.  After several minutes, the SPS trainers brought staff back to the larger group. (Ex. 13 at 15; Stip. ¶¶ 1(g), 9; Ex. 15 at 10; see also Henderson Decl. ¶ 24; Lumley Decl. ¶ 22.)

**RESPONSE**:  Defendants admit this Paragraph.

62.  Once they returned to the large group, Mr. Anderson reminded staff that he would call on people if they remained silent. (YGP/Dist. Dep. 229:13 to 230:14.)

**RESPONSE**:  Defendants admit this Paragraph.  Defendants provide the following additional facts.

A.     Garcia-Pusateri recalled Anderson stating that he was going to call on people if they were silent, in order to encourage conversation. (Garcia-Pusateri depo DEX G, p. 229, lns. 23-25.)

71

**REPLY: See Plaintiffs' Reply to Paragraph 46(A) which is incorporated here by reference.**

      B.      Anderson testified as follows:

      Q.      "Did you tell anybody in Ms. Lumleys training ... that
                  if nobody spoke up, you would call on people?
      A.      I don't remember saying that. I don't recollect that.
      Q.      Did any of the trainers in Ms. Lumley's session say that?
      A.      Not that I can recall."

(Anderson depo, DEX H, p. 33, lns. 23-25; p. 34, lns. 1-5).

**REPLY: See Plaintiffs' Reply to Paragraph 46(B) which is incorporated here by reference.**

      C.      Employee Cecil Mooney, who was also present in the October 6, 2020 Training session, said that the presenters "asked for comments or let people volunteer" but he "did not remember them calling on any one individual ... it was open for individuals to speak." (Mooney depo, DEX I, p. 11, lns. 14-17).

**REPLY: See Plaintiffs' Reply to Paragraph 46(D) which is incorporated here by reference.**

      D.      During the October 14, 2020 Equity Training Henderson attended she was never called on by the trainers to answer questions during the large group sessions. (Henderson depo, DEX A, p. 59, lns. 4-11). Henderson testified:

      A.      "(Plaintiff Henderson) ... LA Anderson stated that
                  he wasn't afraid to call on people if they did not answer.
      Q.      (By Mr. Ellis) ... Did he ever call on you?
      A.      No.
      Q.      Did he ever call on anybody?
      A.      Yes.
      Q.      Did some people respond to whatever he was asking?
      A.      Yes.
      Q.      Did some people not respond?
      A.      No.

Q.     Or respond "I don't have an opinion"?
A.      No.
Q.     So everybody had an opinion?
A.     Everybody had an opinion."

(Henderson depo, DEX A, p. 59, lns. 7-21)

**REPLY: See Plaintiffs' Reply to Paragraph 27(B) which is incorporated here by reference.**

63.   In Ms. Henderson's large group, they discussed Kyle Rittenhouse. Ms. Henderson said that she had heard he was defending himself from the rioters, and that she thought he had been hired to defend a business. Dr. Garcia-Pusateri told Ms. Henderson that she was wrong, and then told her that she was confused. Dr. Garcia-Pusateri then told Ms. Henderson that Mr. Rittenhouse murdered an innocent person. (Henderson Decl. ¶ 24.)

**RESPONSE**: Defendants admit that this Paragraph is consistent with Henderson's sworn statements in her Declaration (Doc 77-2).

64.   After the Environmental Scan, SPS covered the topics of oppression, systemic racism, and white supremacy. (Ex. 13 at 16-23; Stip. ¶¶ 1(g), 9.)

**RESPONSE**: Defendants deny this Paragraph in that: (1) the use of the term "SPS" constitutes argument which is unaccompanied by citation; and (2) this Paragraph does not specify whether it refers to the October 6, 2020, October 14, 2020 or some other Fall (2020) Equity Training session.

**REPLY: See Plaintiffs' Reply to Paragraph 22 which is incorporated here by reference. Further replying, Defendants admitted that the presentations, script, and speaker notes for the October 6 and 14 sessions were substantially similar. (Ex 1., Stip. ¶ 9; Ex. 4, YGP/SPS Dep. 23:11-13; Ex. 14, Anderson Dep. 16:2 to 17:8.)**

Thus, for these reasons, Plaintiffs' SUMF Paragraph 64 should be deemed admitted.

Defendants provide these additional facts.

A.     During the October 6, 2020 Equity Training attended by Lumley, after viewing the George Floyd video, the training discussed the oppression matrix and covert and overt white supremacy (Lumley depo DEX B p. 19, lns. 21-25; p. 20 lns. 1-12).

**REPLY: Admitted.**

B.     During the October 14, 2020 Equity Training attended by Henderson, the participants viewed the George Floyd video, had a small group discussion for several minutes and a large group discussion. (Henderson depo, DEX A, p. 96, lns. 7-9). Henderson was not asked to provide information during the discussion and did not provide information. (Henderson depo, DEX A, p. 96, lns. 10-14).

**REPLY: Controverted insofar as it misstates Ms. Henderson's testimony. When asked whether she was "asked to provide any information during [the large group George Floyd video] discussion," she testified, "Not by name, no." (*See* Pls.' Opp'n Ex. 26, Henderson Dep. 96:10-12.)**

C.     Henderson could not remember the format that was used during the October 14, 2020 Equity Training, following the George Floyd large group discussion. (Henderson depo, DEX A, p. 97, lns. 23-25; p. 98, lns. 1-2).

**REPLY: Controverted. The cited testimony does not support the allegation that Ms. Henderson "could not remember the format that was used during the October 14, 2020 Equity Training, following the George Floyd large group**

**discussion.” To the contrary, Ms. Henderson very well remembered the training.**

**(*See, e.g.*, Ex. 2, Henderson Decl. ¶¶ 10-45.)**

D.     Henderson recalled a discussion about the Oppression Matrix as follows:

(1)     Henderson had received a copy of the Oppression Matrix in her "packet" from Phil Hale. (Henderson depo, DEX A, p. 98, lns. 1-2). She was not asked to fill out the Oppression Matrix. (Henderson depo, DEX A, p. 98, lns. 13-14).

**REPLY: Admitted.**

(2)     A small group discussion about the Oppression Matrix followed but Henderson did not recall the specifics of that discussion (Henderson depo, DEX A, p. 100, lns. 15-23). Though she did generally recall her personal objections to rating herself on the Oppression Matrix, she did not recall if she expressed her opinion at the meeting. (Henderson depo. DEX A, p. 101, lns 23-25; p. 102, lns. 1-21).

**REPLY: See Plaintiffs' Reply to Paragraph 30(B) which is**

**incorporated here by reference. Further replying, Paragraph 64(D)(2) is also**

**controverted by Ms. Henderson's declaration. (*See* Ex. 2, Henderson Decl. ¶¶**

**26-30.)**

(3)     During the large group discussion about the Oppression Matrix, Henderson did not recall whether she made a specific statement about where she fell on the Matrix (Henderson depo. DEX A, p. 103, lns 10-14) or whether the presenters "called anyone out" or "called on a group member to give a summary of the conversation" during their small group discussion. (Henderson depo. DEX A, p. 103, lns. 15-22).

**REPLY: Admitted.**

E.     Henderson's discussion of White Supremacy took place in one large

group setting led by Garcia-Pusateri. (Henderson depo. DEX A, p. 104, lns. 2-12).

During the discussion, Garcia-Pusateri introduced white supremacy terms and asked if

anyone in the group had questions. (Henderson depo. DEX A, p. 104, lns. 14-24).

**REPLY: Controverted. First, the topic of white supremacy was**

discussed throughout the Equity Training (*see, e.g.*, Ex. 4, YPG/SPS Dep. 157:11-14 ("Q. Okay. So the District continuously taught that silence for white people was a form of white supremacy; correct? A. Yes. . . ."); Ex. 13 at 8 (the "Overview of Training" slide stated, "Participants will . . . [l]earn about Oppression, White Supremacy, and Systemic Racism.").) Second, the cited testimony refers specifically to the Covert/Overt White Supremacy slide and misstates Ms. Henderson's testimony. Regarding what Dr. Garcia-Pusateri said about the Covert/Overt White Supremacy slide, Ms. Henderson testified:

> Q. What did she say about it?
>
> A. She said that we might not all be familiar with these terms on this covert/overt white supremacy chart. She discussed specifically what overt white supremacy    meant.  And then she said we're all very familiar with overt white supremacy, but we may not – people may not be as familiar with other ways that they can fall into the white supremacist category.  She specifically talked about the BIPOC Halloween    costumes, tokenism, the white savior complex, color-blind.  She talked about the English-only initiatives.  And those are the ones that she – and, again, the education funding from the property tax.
>
> Those were the main ones.

(Pls.' Opp'n Ex. 26 104:13 to 105:1.)

> (1)    Henderson raised a question concerning BIPOC Halloween costumes. (Henderson depo. DEX A, p. 105, lns. 14-22; Rapert depo, DEX F, p. 28-30).
>
> REPLY: Admitted.
>
> (2)    Henderson admitted that there was nothing about the "back-and-forth discussion" that she had with the presenter during the white supremacy large meeting that she considered to have been a violation of her constitutional rights. (Henderson depo. DEX A, p. 106, lns. 8-20).

**REPLY: Controverted. This is not a statement of fact capable of admission; it is a legal conclusion, and whether Plaintiffs' constitutional rights were violated is a question of law for the court. *See, e.g.*, *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 425 (6th Cir. 2019) ("No material facts are in dispute here, so this matter turns on a pure question of law: does [the legislation] compel a doctor's speech in violation of the First Amendment?").**

F.     Henderson indicated that one of the presenters asked the attendees to fill out the Social Identities chart. (Henderson depo. DEX A, p. 107, lns. 14-25). Henderson chose to not fill out the chart. (Henderson depo. DEX A, p. 108; p. 109, lns. 13-22).

**REPLY: Admitted.**

(1)     Henderson did not recall whether there was a breakout session (Henderson depo. DEX A, p. 109, lns. 23-24).

**REPLY: Admitted.**

(2)     During the large session, the presenters asked attendees to share where they fell on their identity chart. (Henderson depo. DEX A, p. 110, lns. 1-4. Henderson did not offer any information without being asked and was not asked to share her identity chart information. (Henderson depo. DEX A, p. 109, lns. 19-20; p. 110, lns. 11-12).

**REPLY: Admitted.**

(3)     Any notes made by the participants during the training were not collected by the District. (Garcia-Pusateri depo, DEX G, p. 224, lns. 7-10; p. 228, lns. 23-25).

**REPLY: Admitted that SPS did not collect the notes from Ms. Henderson's session. Controverted insofar as there is no evidence whether SPS collected notes from any other sessions.**

65.   During this portion of the training, SPS taught staff that "[s]ociety's institutions, such as

government, education, and culture, all contribute or reinforce the oppression of marginalized social groups while elevating dominant social groups." (Ex. 13 at 16; Stip. ¶¶ 1(g), 9.)

      **RESPONSE**: Defendants deny this Paragraph in that: (1) the use of the term "SPS" constitutes argument which is unaccompanied by citation; (2) this Paragraph does not specify whether it refers to the October 6, 2020, October 14, 2020 or some other Fall (2020) Equity Training; and, (3) the Paragraph constitutes political argument.

      **REPLY: See Plaintiffs' Reply to Paragraph 64 which is incorporated here by reference. Further replying, as a written document, SPS's PowerPoint presentation speaks for itself and Slide 16 states, in pertinent part, "Society's institutions, such as government, education, and culture, all contribute or reinforce the oppression of marginalized social groups while elevating dominant social groups." (Ex. 13 at 16.)**

      **Thus, Plaintiffs' SUMF Paragraph 65 should be deemed admitted.**

66.    Through its Equity Training, SPS taught that "systems of oppressions [sic] are woven into the very fabric of the United States and form the foundation of the American culture and its laws." (Ex. 13 at 16; Stip. ¶¶ 1(g), 9; Ex. 15 at 10.)

      **RESPONSE**: Defendants deny this Paragraph in that: (1) the use of the term "SPS" constitutes argument which is unaccompanied by citation; (2) this Paragraph does not specify whether it refers to the October 6, 2020, October 14, 2020 or some other Fall (2020) Equity Training; and, (3) the Paragraph constitutes political argument.

      **REPLY: See Plaintiffs' Reply to Paragraph 64 which is incorporated here by reference. Further replying, as a written document, SPS's PowerPoint presentation speaks for itself and Slide 16 states, in pertinent part, "[S]ystems of oppressions [sic]**

(like systemic racism) are woven into the very foundation of American culture, society, and laws." (Ex. 13 at 16.) Further replying, as a written document, SPS's Script & Slide Breakdown speaks for itself and states that the term "Systems of oppression are woven into the very fabric of the United States and form the foundation of the American culture and its laws." (Ex. 15 at 10.)

Thus, Plaintiffs' SUMF Paragraph 66 should be deemed admitted.

67. As part of the training on oppression, SPS showed staff the same "Oppression Matrix" they received before the session which indicates, among others, that following groups are oppressed: "Asian, Black, Latina/o, Native People," and "Female[s] assigned at birth." (Compare Ex. 13 at 17 with Ex. 9 at PLS 0424; Stip. ¶¶ 1(g), 9.)

RESPONSE: Defendants deny this Paragraph in that: (1) the use of the term "SPS" constitutes argument which is unaccompanied by citation; (2) this Paragraph does not specify whether it refers to the October 6, 2020, October 14, 2020 or some other Fall (2020) Equity Training; (3) the Paragraph constitutes political argument; and (4) Neither Lumley nor Henderson expressed a concern for the terminology specified in this Paragraph.

REPLY: See Plaintiffs' Reply to Paragraph 64 which is incorporated here by reference. Further replying, as written documents, SPS's PowerPoint presentation (Ex. 13) and handouts (Ex. 9) speak for themselves. Further replying, in addition to citing to no contrary evidence, the allegation that "[n]either Lumley nor Henderson expressed a concern for the terminology specified in this Paragraph" is immaterial and unsupported.

Thus, Plaintiffs' SUMF Paragraph 67 should be deemed admitted.

68. The "Oppression Matrix" categorized white people and males assigned at birth as the privileged social group under the categories of racism and sexism, respectively. (Ex. 13 at 17; Stip. ¶¶ 1(g), 9.)

RESPONSE: Defendants deny this Paragraph in that: (1) the Paragraph does not specify whether it refers to the October 6, October 14, 2020 or some other Fall (2020) Equity Training; (2) the Paragraph constitutes political argument; and (3) Neither Lumley nor Henderson expressed a concern for the terminology specified in this Paragraph.

**REPLY: See Plaintiffs' Reply to Paragraph 67 which is incorporated here by reference. Thus, Plaintiffs' SUMF Paragraph 68 should be deemed admitted.**

69. As part of its Equity Training, SPS further taught that systemic racism "identifies dimensions of our history and culture that have allowed privileges associated with 'whiteness' and disadvantages associated with 'color' to endure and adapt over time." (Ex. 13 at 18; Stip. ¶¶ 1(g), 9.)

RESPONSE: Defendants deny this Paragraph in that: (1) the use of the term "SPS" constitutes argument which is unaccompanied by citation; (2) this Paragraph does not specify whether it refers to the October 6, 2020, October 14, 2020 or some other Fall (2020) Equity Training; (3) the Paragraph constitutes political argument and (4) Neither Lumley nor Henderson expressed a concern for the terminology specified in this Paragraph.

**REPLY: See Plaintiffs' Reply to Paragraph 67 which is incorporated here by reference. Thus, Plaintiffs' SUMF Paragraph 69 should be deemed admitted.**

70. Likewise, in its Equity Training, SPS showed a video which explained, "You can see evidence of systemic racism in every area of life. . . . As a result, we should support systemic changes" to allow "equal access to resources." (Ex. 13 at 19; Stip. ¶¶ 1(g), 9, 10(d).)

**RESPONSE**: Defendants deny this Paragraph in that: (1) the use of the term "SPS" constitutes argument which is unaccompanied by citation; (2) this Paragraph does not specify whether it refers to the October 6, 2020, October 14, 2020 or some other Fall (2020) Equity Training; (3) the Paragraph constitutes political argument; and (4) Neither Lumley nor Henderson expressed a concern for the terminology specified in this Paragraph.

**REPLY: See Plaintiffs' Reply to Paragraph 67 which is incorporated here by reference. Thus, Plaintiffs' SUMF Paragraph 70 should be deemed admitted.**

71. As part of its Equity Training, SPS taught that "white supremacy is a highly descriptive term for the culture we live in; a culture which positions white people and all that is associated with them (whiteness) as ideal." (Ex. 13 at 20; Stip. ¶¶ 1(g), 9; Ex. 15 at 12.)

**RESPONSE**: Defendants deny this Paragraph in that: (1) the use of the term "SPS" constitutes argument which is unaccompanied by citation; (2) this Paragraph does not specify whether it refers to the October 6, 2020, October 14, 2020 or some other Fall (2020) Equity Training; (3) the Paragraph constitutes political argument. Defendants provide the following:

**REPLY: See Plaintiffs' Reply to Paragraph 67 which is incorporated here by reference. Thus, Plaintiffs' SUMF Paragraph 71 should be deemed admitted.**

A.    The October 6, 2020 Training session attended by Lumley did not contain a discussion about the white supremacy chart. No small group session was held on the white supremacy chart. No one called Lumley's name or asked her directly if she understood the white supremacy chart. Lumley was not asked to affirm or agree to anything that had been presented about the white supremacy chart or to write anything

down. Rather, the participants were told that they could look at the white supremacy chart on their own time. (Lumley depo, DEX B, p. 24, lns. 12-25, p. 25, lns. 1-18).

**REPLY: See Plaintiffs' Reply to Paragraph 27(A) which is incorporated here by reference.**

B.     During the October 14, 2020 Equity Training, Henderson was never called on by the trainers to answer questions during the large group sessions. (Henderson depo, DEX A, p. 59, lns. 4-11).

**REPLY: See Plaintiffs' Reply to Paragraph 27(B) which is incorporated here by reference.**

72.  Participants then watched a video about white supremacy, which depicted a cartoon character dressed as a member of the Ku Klux Klan while the narrator described eradicating white supremacy. (Ex. 13 at 21; Stip. ¶¶ 1(g), 9.)

**RESPONSE**:  Defendants deny this Paragraph in that: (1) this Paragraph does not specify whether it refers to the October 6, 2020, October 14, 2020 or some other Fall (2020) Equity Training;(2) the Paragraph constitutes political argument; and (3) Neither Lumley nor Henderson expressed a concern for the terminology specified in this Paragraph.

**REPLY: Defendants' denial is unsupported by contrary evidence. *See* L.R. 56.1(b)(2); *see also Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 792 (8th Cir. 2012). Further replying, the <u>video</u> (Ex. 13 at 21) speaks for itself. Further replying, in addition to citing to no contrary evidence, the allegation that "[n]either Lumley nor Henderson expressed a concern for the terminology specified in this Paragraph" is immaterial and unsupported.**

**Thus, Plaintiffs' SUMF Paragraph 72 should be deemed admitted.**

73. As part of the presentation on white supremacy, SPS also showed a slide with the same "Covert/Overt White Supremacy" graphic it handed out before the training. (Compare Ex. 13 at 22 with Ex. 9 at PLS 0425; Stip. ¶ 1(g), 9.) SPS also showed a slide that declared, "Privilege is a set of unearned benefits given to people who fit into a specific social group," and it required staff to "Acknowledge YOUR privileges." (Ex. 13 at 26; Stip. ¶ 1(g), 9.)

   **RESPONSE**: Defendants deny this Paragraph in that: (1) the use of the term "SPS" constitutes argument which is unaccompanied by citation; (2) this Paragraph does not specify whether it refers to the October 6, 2020, October 14, 2020 or some other Fall (2020) Equity Training; (3) the Paragraph constitutes political argument; and (4) Neither Lumley nor Henderson expressed a concern for the terminology specified in this Paragraph.

   **REPLY: See Plaintiffs' Reply to Paragraph 67 which is incorporated here by reference. Thus, Plaintiffs' SUMF Paragraph 73 should be deemed admitted.**

74. This graphic stated that "white silence," "colorblindness," "BIPOC [Black, Indigenous, People of Color] as Halloween Costumes," and "all lives matter" constitute white supremacy. (Ex. 13 at 22; Stip. ¶ 1(g), 9.)

   **RESPONSE**: Defendants deny this Paragraph in that: (1) this Paragraph does not specify whether it refers to the October 6, 2020, October 14, 2020 or some other Fall (2020) Equity Training; (2) the Paragraph constitutes political argument. Defendants further deny this Paragraph for this graphic, as stated by the trainers during training, indicated that colorblindness, All Lives Matter, and white silence "can support th[e] structural system of white supremacy." Garcia-Pusateri depo, DEX G, p. 21, l. 12 to p. 22, l. 18; and its deposition exhibit no. 3, p. 13; *also see* Plaintiffs' Uncontroverted Facts, ¶ 39, and Plaintiffs' Exhibit

15, p. 13. Further, trainees were told that they were not being called "as an individual a white supremacist." *See id.*

**REPLY: As a written document, the Covert/Overt White Supremacy graphic (Ex. 9 at PLS 0425; Ex. 13 at 22) speaks for itself. Further replying, Defendants admitted that the presentations, script, and speaker notes for the October 6 and 14 sessions were substantially similar. (Ex 1., Stip. ¶ 9; Ex. 4, YGP/SPS Dep. 23:11-13; Ex. 14, Anderson Dep. 16:2 to 17:8.)**

**Thus, Plaintiffs' SUMF Paragraph 74 should be deemed admitted.**

75. Dr. Garcia-Pusateri also told Ms. Henderson's Equity Training session that staff can't be blind to color because colorblindness is white supremacy, as is denying one's white privilege. She also said that they cannot sit on the sidelines and be silent, that they must be an ally and take action. (Henderson Decl. ¶ 33.)

**RESPONSE**: Defendants deny this Paragraph for the following reasons:

A.     The comments attributed to Garcia-Pusateri were not made at the October 6, 2020 training session attended by Lumley and even if they were made there, they do not constitute compelled speech or a violation of the First Amendment because: (1) the session did not contain a discussion about the white supremacy chart; (2) no one called Lumley's name or asked her directly if she understood the chart; (3) Lumley was not asked to affirm or agree to anything that had been presented about the white supremacy chart or to write anything down; and (4) the participants were told that they could look at the white supremacy chart on their own time. (Lumley depo, DEX B, p. 24, lns. 12-25, p. 25, lns. 1-18).

84

**REPLY:** See Plaintiffs' Reply to Paragraph 27(A) which is incorporated here by reference. Further replying, whether Plaintiffs' constitutional rights were violated is a question of law for the court. *See, e.g.*, *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 425 (6th Cir. 2019) ("No material facts are in dispute here, so this matter turns on a pure question of law: does [the legislation] compel a doctor's speech in violation of the First Amendment?"). Further replying, Paragraph 75 makes no specific reference to Ms. Lumley. Further replying, Defendants' denial is unsupported by contrary evidence. *See* L.R. 56.1(b)(2); *see also Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 792 (8th Cir. 2012).

Thus, Plaintiffs' SUMF Paragraph 75 should be deemed admitted.

B. The comments attributed to Garcia-Pusateri were not made at the October 14, 2020 training session and even if they were, they did not constitute compelled speech or a First Amendment violation because Henderson was never called on by the trainers to answer questions during the large group sessions. (Henderson depo, DEX A, p. 59, lns. 4-11).

**REPLY:** See Plaintiffs' Reply to Paragraph 27(B) which is incorporated here by reference. Further replying, whether Plaintiffs' constitutional rights were violated is a question of law for the court. *See, e.g.*, *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 425 (6th Cir. 2019) ("No material facts are in dispute here, so this matter turns on a pure question of law: does [the legislation] compel a doctor's speech in violation of the First Amendment?"). Further replying, Defendants' denial is unsupported by contrary evidence. *See* L.R. 56.1(b)(2); *see also*

***Gannon Int'l, Ltd. v. Blocker***, 684 F.3d 785, 792 (8th Cir. 2012). Thus, Plaintiffs' **SUMF Paragraph 75 should be deemed admitted.**

        C.      Defendants admit that Garcia-Pusateri gave the following opinions during her deposition: (1) "Colorblindness" says "that I see you as just the person rather than seeing you with everything that you come with." (Garcia-Pusateri depo, DEX G, p. 66, lns. 18-20); (2) Colorblindness "can have harmful impacts" because "it can make someone feel like you do not want to see them for their identity or their lived experience." (Garcia-Pusateri depo, DEX G, p. 66, ln. 25; 67, lns. 2-3); (3) "Equality [treats] everyone the same and sees them as all the same [w]hereas, equity is about seeing their whole selves and their whole personhood." (Garcia-Pusateri depo, DEX G, p. 68, lns. 3-6); (4) "I don't think equality is harmful. I think there is a better way [to make] people feel safe and supported." (Garcia - Pusateri depo, DEX G, p. 68, lns. 13-15).

        **REPLY: See Plaintiffs' Reply to Paragraphs 28(A) and 43(A) which are incorporated here by reference.**

76.    Through the Equity Training, SPS conducted another interactive exercise called the "Major Terminology Groups Share." (Ex. 13 at 23; Stip. ¶ 1(g), 9; Ex. 15 at 14.)

        **RESPONSE**:     Defendants deny this Paragraph in that: (1) the use of the term "SPS" constitutes argument which is unaccompanied by citation; and (2) this Paragraph does not specify whether it refers to the October 6, 2020, October 14, 2020 or some other Fall (2020) Equity Training; and, (3) the only supporting citation about the facts contained in this Paragraph is to the training materials (PEX 13) and the Script (PEX 15).

        **REPLY: See Plaintiffs' Reply to Paragraph 22 which is incorporated here by reference. Further replying, Defendants admitted that the presentations, script, and**

speaker notes for the October 6 and 14 sessions were substantially similar. (Ex 1., Stip. ¶ 9; Ex. 4, YGP/SPS Dep. 23:11-13; Ex. 14, Anderson Dep. 16:2 to 17:8.) **Further replying, as written documents, SPS's PowerPoint presentation (Ex. 13) and Script & Slide Breakdown (Ex. 15) speak for themselves. Thus, Plaintiffs' SUMF Paragraph 76 should be deemed admitted.**

77. In this exercise, SPS directed staff to "[s]pend the next 4 minutes discussing with your partner any of the major terms (Oppression, Systemic Racism, or White Supremacy). Also discuss how your chosen topic has taken place in our community." (Ex. 13 at 23; Stip. ¶ 1(g), 9; Ex. 15 at 14.)

      **RESPONSE**: Defendants deny this Paragraph in that: (1) the use of the term "SPS" constitutes argument which is unaccompanied by citation; and (2) this Paragraph does not specify whether it refers to the October 6, 2020, October 14, 2020 or some other Fall (2020) Equity Training; and, (3) the only supporting citation about the facts contained in this Paragraph is to the training materials (PEX 13) and the Script (PEX 15).

      **REPLY: See Plaintiffs' Reply to Paragraph 76 which is incorporate here by reference. Thus, Plaintiffs' SUMF Paragraph 77 should be deemed admitted.**

78. Ms. Henderson did not speak in the small group because she feared that debating these issues would polarize her co-workers and compromise their work relationship. (Henderson Decl. ¶ 35.)

      **RESPONSE**: Defendants admit that Henderson says in her Declaration that she "feared that debating these issues would polarize my co-workers and compromise our work relationship." Defendants further respond that Henderson apparently did not "fear" that she would "polarize" her co-workers when: (1) she "shared her beliefs" in her small group

meeting regarding the George Floyd video (Henderson Declaration PEX 2, ¶ 18); or when (2) she expressed her opinions regarding the Environmental Scan slideshow images in her shall group meeting (Henderson Declaration PEX 2, ¶ 23); or when (3) she spoke up in a large group meeting to say that she thought that Kyle Rittenhouse was defending himself from rioters (Henderson Declaration PEX 2, ¶ 24); or when (4) she asked a presenter "what we should say to a student who wanted to dress like a BIPOC character, such as Pocahontas," for Halloween (Henderson Declaration PEX 2, ¶ 36).

**REPLY: Defendants' denial is mere argument, immaterial, and is unsupported by contrary evidence. *Davis v. Or. Cnty.*, 607 F.3d 543, 548 (8th Cir. 2010) ("A fact is material when it might affect the outcome of the suit under governing law.") (citing *Anderson*, 477 U.S. at 248); L.R. 56.1(b)(2); *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 792 (8th Cir. 2012). Thus, Plaintiffs' SUMF Paragraph 78 should be deemed admitted.**

79. In her Equity Training session, Ms. Lumley spoke out because of how SPS was assigning characteristics based on race. She stated that all humans are all equal. Ms. Lumley stated that she is not a racist, and that not all white people are racist; that racism is something that any person of a particular race could be guilty of; and that not just white people are racist. (Lumley Decl. ¶ 27; Lumley Dep. 27:9 to 28:6.)

**RESPONSE**: Defendants deny this Paragraph. Defendants admit the following:

A.  During her deposition, Lumley stated that during the October 6, 2020 Training session, between the discussion about the oppression matrix and the covert/overt white supremacy sheet she "spoke up" and shared that she thought the presenters:

"... were painting a broad-brush stroke of white people as racist, and I said that that was wrong. I said not all white people are racist. I said there's racism across the board. And, ... my nephew married a Black woman, and they have children together. And there are Black people that tell her she doesn't count as Black anymore because she married a white man and has children with him. And I said that I grew up in a broken home, a poor home with government handouts. I wasn't born into white privilege. And they said because I was white, I was born into white privilege."

(Lumley depo, DEX B, p. 27, lns. 10-23).

**REPLY: Defendants' denial and admission do not rebut Plaintiffs' SUMF Paragraph 79. Thus, Plaintiffs' SUMF Paragraph 79 should be deemed admitted.**

80. Ms. Lumley also used a personal example of how racism can exist within any community by sharing that her nephew married a black woman, but that some black people had told her nephew's wife that she did not "count" as black anymore. Mr. Sode told Ms. Lumley that black people cannot be racist. When she questioned his statement, he responded that black people can be prejudiced but not racist. (Lumley Decl. ¶ 27; Lumley Dep. 27:9 to 28:6.)

**RESPONSE**: Defendants deny this Paragraph but admit Defendants' response provided in paragraph 79, *supra*, incorporated herein by reference.

**REPLY: Defendants' denial and admission do not rebut Plaintiffs' SUMF Paragraph 80. Thus, Plaintiffs' SUMF Paragraph 80 should be deemed admitted.**

81. Ms. Lumley also stated that she did not grow up in white privilege; that she came from a poor family, a broken home, and received government handouts. One of the SPS trainers responded that because Ms. Lumley is white, she was born into white privilege. (Lumley Decl. ¶ 28; Lumley Dep. 27:9 to 28:6.)

**RESPONSE**: Defendants deny this Paragraph but admit Defendants' response provided in paragraph 79, *supra*, incorporated herein by reference.

**REPLY: Defendants' denial and admission do not rebut Plaintiffs' SUMF Paragraph 81. Thus, Plaintiffs' SUMF Paragraph 81 should be deemed admitted.**

82. One of the SPS trainers also told Ms. Lumley that the training wasn't just singling out white people, but then she pointed to the screen that discussed white supremacy. The trainers responded by telling Ms. Lumley that she needed to reflect on herself some more. (Lumley Decl. ¶ 28; Lumley Dep. 27:9 to 28:6.)

     **RESPONSE**: Defendants admit this paragraph.

83. Others also disagreed with Ms. Lumley. When other participants raised their voices and told Ms. Lumley that she didn't understand what the trainers were saying about oppression, systemic racism, and white supremacy, the SPS trainers did not stop or correct her fellow participants. As a result of this exchange with the trainers and co-participants, Ms. Lumley shut down and no longer participated in any of the discussions. (Lumley Decl. ¶ 29; Lumley Dep. 28:17 to 30:4.)

     **RESPONSE**: Defendants deny this Paragraph. Defendants provide the following: Lumley stated during her deposition that during the October 6, 2020 Training session, one participant, Amber Hawkins, "was yelling at me," Lumley stated: "I don't know what [Amber Hawkins] said, I just know that she was yelling at me. I wasn't listening to her." (Lumley depo, DEX B, p. 28, lns. 17-24; p. 29, lns. 2-4).

     **REPLY: Plaintiffs' SUMF Paragraph 83 should be deemed admitted because Defendants' response, which omits certain of Ms. Lumley's testimony, does not rebut Plaintiffs' SUMF Paragraph 83. Ms. Lumley testified:**

     **Q.      Okay.  Did anyone – any of the participants get involved in that?**

     **A.      Yes.**

Q.	All right.  And who was that?  Do you know?

A.	Amber Hawkins.

Q.	Okay.  And what did Ms. Hawkins say?

A.	I don't know what she said.  I just know that she was yelling at me.  She was sitting behind me.  And some other members were saying that I didn't understand what they were saying.

Q.	Okay.  You mean – okay.  So tell me first what you remember Amber Hawkins saying to you.

A.	I don't know.  I wasn't listening to her.

Q.	Who were you listening to?

A.	The trainers.

Q.	Okay.  So the trainers were talking to you on one side, and Amber Hawkins was behind talking to you?

A.	Correct.

Q.	Was there anybody else involved – I mean, there's not that many people left in the room.  Was there anyone else that got involved in that discussion?

A.	Yes, a couple of people in the class.

Q.	Okay.  In particular?

A.	I don't know.

Q.	Was there a man that was involved?

A.	No.

Q.	All women?

A.	Yes.

Q.	So what do you remember, if anything, the other women said?

A.	That I didn't understand what they were saying.

Q.      And "they" being the –

A.      The trainers.

Q.      –trainers.  Okay.  All right.  How long did that last?

A.      A couple of minutes.

Q.      Okay.  So what did you do as a result of that?

A.      Mentally shut down.

(*See* Pls.' Opp'n Ex. 24, Lumley Dep.  28:17 to 30:4.)

84.     During the discussion over "major terms," Ms. Henderson also spoke up and asked Dr. Garcia-Pusateri what staff should say to a student who wanted to dress like a BIPOC character, such as Pocahontas, considering that Halloween was approaching. (Henderson Decl. ¶ 36.)

        RESPONSE:  Defendants admit this Paragraph.

85.     In response, Dr. Garcia-Pusateri told Ms. Henderson that if she had a daughter who wanted to dress as a BIPOC character such as Disney's Moana, that it would not be nice, and that Ms. Henderson should use it as a teaching opportunity to explain to the child why it is not okay to dress as a BIPOC character. (Henderson Decl. ¶ 37.)

        RESPONSE:  Defendants deny this Paragraph.

        **REPLY: Defendants' denial is unsupported by contrary evidence. *See* L.R. 56.1(b)(2); *see also Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 792 (8th Cir. 2012). Thus, Plaintiffs' SUMF Paragraph 85 should be deemed admitted.**

        Defendants provide the following:

A. Garcia-Pusateri does not recall that Henderson said anything at the covert/overt white supremacy portion of the training. (Garcia-Pusateri depo. DEX G, p. 208, lns. 11-14).

**REPLY: Admitted insofar as Dr. Garcia-Pusateri testified:**

> **Q. Do you recall Ms. Henderson saying anything at the covert/overt white supremacy portion of the training?**
>
> **A. I can't recall.**

**(Ex. 4, YGP/SPS Dep. 280:11-14.)**

B. Garcia-Pusateri recalled Henderson saying something about costumes, but did not remember everything that was said or how she responded. (Garcia-Pusateri depo, DEX G, p. 283, lns. 2-16.

**REPLY: Controverted insofar as Paragraph 85(B) misstates Dr. Garcia-Pusateri's testimony. She testified:**

> **Q. Do you recall discussing Halloween costumes with Ms. Henderson?**
>
> **A. I believe she said something about costumes. I can't really recall everything that was said, but I do remember her bringing up something and hearing that.**
>
> **Q. And do you remember how you responded?**
>
> **A. I can't recall.**
>
> **Q. Do you recall her raising the issue of what she should do if a child told her that they wanted to dress like Moana? Does that jar your recollection?**
>
> **A. There was something related to that. I don't exactly remember what her specific comments were, but I believe she said something about that.**
>
> **Q. Did you direct her to tell the child that dressing like Moana was not nice or okay?**

93

A. I don't recall what I exactly said.

Q. What were you telling staff to tell children to do out of school when it came to Halloween costumes?

A. As part of the training or in general?

Q. As part of the training.

A. I don't recall saying – I don't recall what that would have looked like or saying that.

Q. But you're talking about Halloween costumes in general –

A. Yeah.

Q. – just not costumes worn to school; correct?

A. I think Halloween costumes. So when it says BIPOC – so wearing Halloween costume to represent people of color.

Q. Would be white supremacy?

A. In the way that we have it described, yes.

(Ex. 4, YGP/SPS Dep. 282:25 to 284:6.)

C. Garcia-Pusateri's concerns about BIPOC costumes "are more about adults wearing costumes of people of color that portray them in a negative way." (Garcia-Pusateri depo. DEX G, p. 284, lns. 14-15).

**REPLY: Controverted insofar as Paragraph 85(C) misstates Dr. Garcia-Pusateri's testimony. Her testimony quoted in reply to Paragraph 85(B) continued:**

Q. And that would be a white child dressing like Moana; is that right?

A. I think that looks different when it's a child.

Q. Tell me what that means.

A. I think with a child, it looks different. I think that's where

94

parents, guardians have a conversation or whatever that looks like. But I think with this, it's more about adults wearing costumes of people of color that is portraying them in negative manners.

Q. Such as negative stereotyping. Is Moana a negative stereotype?

A. I don't believe she's a negative stereotype. But I think when it comes to this aspect of the image, which, again, was only for the first three schools, it's about wearing costumes that have people of color or figures in negative forms.

Q. So you don't recall what you told Ms. Henderson after she raised the concept?

A. I don't recall what I exactly said, no.

**(Id. 284:7 to 284:25)**

86.   SPS responded differently to participants depending on the participant's viewpoint. (YGP/SPS Dep. 202:8 to 208:2.)

**RESPONSE**: Defendants deny this Paragraph in that: (1) the use of the term "SPS" constitutes argument which is unaccompanied by citation; and (2) this Paragraph does not specify whether it refers to the October 6, 2020, October 14, 2020 or some other Fall (2020) Equity Training.

**REPLY: Defendants' denial does not rebut Plaintiffs' SUMF Paragraph 86. Defendants' denial is unsupported by contrary evidence. *See* L.R. 56.1(b)(2); *see also Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 792 (8th Cir. 2012). Thus, Plaintiffs' SUMF Paragraph 86 should be deemed admitted.**

Defendants provide the following:

A.   Garcia-Pusateri stated that "[w]hen it comes to this learning, we are open to people's perspective but also [to help] them understand how they can think broader with those perspectives." (Garcia-Pusateri depo. DEX G, p. 203, lns. 3-6).

95

**REPLY: Admitted insofar as Paragraph 86(A) states Dr. Garcia-Pusateri's response to the question: "Was the District open to that view [that 'America has not woven systems of oppression into the very fabric of the United States and the foundation of its culture and laws.']? (*See* Ex. 4, YGP/SPS Dep. 202:20 to 203:6.)**

B.      Garcia-Pusateri stated that "the approach" of the training might look different, "but [the training] would come back to the goal of understanding these concepts and having the [attendees] understand these [concepts] are directly related to barriers our students are facing" ... and "ensuring our students feel safe and supported in the classroom." (Garcia-Pusateri depo. DEX G, p. 206, lns. 2-6, 12-13).

**REPLY: Controverted insofar as Paragraph 86(B) misreprents Dr. Garcia-Pusateri's testimony by omitting certain of her testimony. She testified:**

> **Q.      Let me finish my question.  All right.  Would the approach be different if a white person said "I am not privileged" than if a white person said "I admit my privilege"?**
>
> **A.      I believe the approach would look different, but it would come back to the goal of understanding these concepts and, again, having them understand that these are directly related to barriers our students are facing.**

(Ex. 4, YPG/SPS Dep. 205:23 to 206:6.)

C.      Garcia-Pusateri stated that "To me personally ... it's about engaging that person, talking to them, trying to understand their perspective as I would hope they would do ... with their students, and then helping them with the thinking and posing questions and, ... thinking about this broadly and then coming back to the common value of ensuring our students feel safe and supported in the classroom." (Garcia-Pusateri depo. DEX G, p. 207, lns. 3-10).

96

**REPLY: Controverted insofar as Paragraph 86(C) misrepresents Dr. Garcia-Pusateri's testimony by omitting certain of her testimony. She testified:**

> Q.     So a person who says they're not privileged needs to learn more than a person who says they are privileged, isn't that fair?
>
> A.     I believe it looks like about – about what the approach to learning and the approach to engaging them and having those conversations.
>
> Q.     And that's different based on whether or not people agree whether or not they're privileged on the basis of race; correct?
>
> A.     It might look different, yes.
>
> Q.     You've got an equitable approach to how you approach students.  Do you have a different equitable approach for trainees and how they receive this message?
>
> A.     Yes.  To me personally I think it's about engaging that person, talking to them, trying to understand their perspective as I would hope they would do that with their students, and then helping them with the thinking and posing questions and, again, thinking about this broadly and then coming back to the common value of ensuring our students feel safe and supported in the classroom.

**(Ex. 4, YPG/SPS Dep. 206:14 to 207:10.)**

87.     Two more interactive exercises followed the Major Terminology Group Share—the "Social Identity Map" and the "Four Corners" exercise. The Social Identity Map required staff to "explore [their] identities," e.g., their race, ethnicity, gender, sexual orientation, etc., while the "Four Corners" exercise was "an interactive game centered around Identity, Beliefs and Values." (Ex. 13 at 28-29, 42; Stip. ¶ 1(g), 9; Ex. 16 at 34-37; Stip. ¶¶ 1(i), 9; YGP/SPS Dep. 302:15 to 305:3.)

    **RESPONSE**:  Defendants agree that the Social Identity Map and the Four Corners exercise were two interactive exercises contained in the Fall (2020) Equity Training materials.

Defendants deny that the Social Identities Map activity was conducted during the October 6, 2020 Equity Training. Per Garcia-Pusateri it was very rare that the District ever got to have participants engage in the Social Identity map. (Garcia-Pusateri depo. DEX G, p. 301, lns. 18-20).

**REPLY: Controverted. First, Dr. Garcia-Pusateri's testimony does not support Defendants' denial. (Ex. 4, YGP/SPS Dep. 301:21-24 ("Q. Do you recall this discussion of social identities at Ms. Henderson's training? A. I cannot recall if we even go to this point in the training.").) Second, Defendants' denial is directly controverted by Ms. Lumley's testimony regarding her October 6, 2020 Equity Training session:**

**Q.      Okay.  The social identities chart – do you remember that chart?**

**A.      Yes, I do.**

**Q.      Tell me how they handled this chart in this meeting.**

**A.      They didn't really go over that.  They told us to look at it ourselves and fill it out basically on our own time.**

**(Pls.' Opp'n Ex. 24, Lumley Dep. 25:19-25.)**

Lumley admitted that the October 6, 2020 training session did not go over the Social Identities map and the participants were "told to look at it ourselves and fill it out basically on our own time."

**REPLY: Admitted.**

Lumley was not asked about her opinion on the social identities map, how she would have filled it out or how she fit in on it. (Lumley depo DEX B, p. 25, lns. 19-25; p. 26, lns. 1-12).

**REPLY: Admitted.**

Defendants admit that the Social Identities Map activity was conducted during the October 14, 2020 Equity Training. Per Henderson the participants at the training session were asked to fill out the Social Identities Map, but she did not fill it out. (Henderson depo, DEX A, p. 108, lns. 13- 24).

**REPLY: See Plaintiffs' Reply to Paragraph 64(F) which is incorporated here by reference.**

Henderson was not asked to say anything about the Social Identities Map and did not say anything or offer to say anything. (Henderson depo. DEX A, p. 109, lns. 16-25; p. 110, lns. 11-12).

**REPLY: See Plaintiffs' Reply to Paragraph 64(F)(2) which is incorporated here by reference.**

Defendants agree that the Four Corners activity was originally designed to have the participants move to one of four corners in the room to signify whether they strongly agree, agree, disagree or strongly disagree with a statement. However, because of Covid and virtual learning, the process was changed and the exercise was put into Kahoot, which is just an on-line tool where participants can log in with their devices and participate in the activity. (Garcia-Pusateri depo. DEX G, p. 302, lns 17-25; p. 303, ln 1, lns. 6-25; p. 304, lns 1-4).

**REPLY: Controverted. (Ex. 2, Henderson Decl. ¶ 39 ("The next interactive exercise was the '4 Corners' exercise where, in response to a series of statements, we had to select a response—either 'strongly agree,' 'agree,' 'disagree,' or 'strongly disagree.' I conveyed my response by holding up one of the corresponding signs SPS**

provided me before the Equity Training."); *see also* Pls.' Opp'n Ex. 26, Henderson Dep. 110:21 to 115:24.)

Defendants deny that a Four Corners Activity was conducted during the October 14, 2020 Equity Training.

**REPLY: Controverted. (Ex. 2, Henderson Decl. ¶ 39; Pls.' Opp'n Ex. 26, Henderson Dep. 110:21 to 115:24.)**

Per Rapert the participants did not do a four corners exercise during the October 14, 2020 Equity Training. The slides were read through, but the participants were not asked to respond to any of the questions.

**REPLY: Admitted only insofar as it correctly paraphrases Dr. Rapert's testimony. It is controverted that there was no 4 Corners Exercise during the October 14, 2020 Equity Training Session. (Ex. 2, Henderson Decl. ¶ 39; Pls.' Opp'n Ex. 26, Henderson Dep. 110:21 to 115:24.)**

Nor did the trainers ask anybody to respond to any of the questions during the session she attended. (Rapert depo. DEX F, p. 44, lns. 8-12, lns. 21- 25; p. 45, lns. 3-6).

**REPLY: Controverted. (Ex. 2, Henderson Decl. ¶ 39; Pls.' Opp'n Ex. 26, Henderson Dep. 110:21 to 115:24.)**

Any notes made by the participants during the training were not collected by the District. (Garcia- Pusateri depo, DEX G, p. 224, lns. 7-10; p. 228, Lns. 23-25).

**REPLY: See Plaintiffs' Reply to Paragraph 58(C), which is incorporated here by reference.**

88. The Four Corners exercise required participants to answer a series of statements with one of four responses: "strongly agree," "agree," "disagree," and "strongly disagree." (Ex. 13 at 29-

30, 42; Stip. ¶ 1(g), 9; Ex. 16 at 35-36; Stip. ¶¶ 1(i), 9.)

      **RESPONSE**: Defendants admit this Paragraph.

89.   Statements included, "I believe all students should be treated equitably," "Learning about my identity makes me better in my role," "I am prepared to have conversations with my students or staff about identity or equity," I believe my identities and lived experiences are affirmed and supported by the district," and "I feel represented in the district." (Ex. 13 at 29-30; Stip. ¶ 1(g), 9; Ex. 16 at 35-36; Stip. ¶¶ 1(i), 9.)

      **RESPONSE**: Defendants admit that the Four Corners exercise contained the following statements:

> "I believe my students or staff feel safe at SPS"
> "I believe my students or staff feel safe in Springfield" "I feel safe at SPS" "I feel safe in Springfield"
> "I believe SPS provides an engaging, relevant and collaborative learning and working environment"
> "I believe in the SPS strategic plan"
> "I was aware of the new Focus V Goal before today"
> "I believe my students or staff is represented in the district" "I feel represented in the district"

(DEX 13.01, p. 42).

90.   Ms. Lumley did not participate in the Four Corners exercise with her small group because she had shut down and no longer wanted to participate because of the earlier exchange she had with the SPS trainers and co-participants. (Lumley Decl. ¶ 30; Lumley Dep. 29:10-32:13.)

      **RESPONSE**: Defendants deny this Paragraph. The testimony cited does not state that Lumley did not participate in the Four Corners exercise with her small group. Defendants admit that Lumley testified about her interchange with Amber Hawkins which

ostensibly caused her to "Mentally Shutdown." (Lumley depo DEX B, pp. 29-30). Lumley

then testified:

> "We had another breakout session after that happened. Amber was my breakout
> partner. It felt very hostile. I almost didn't turn around; but I did, and she
> apologized for yelling at me. And I told her that we all have a voice and that we
> need to be there for each other."

(Lumley depo DEX B, p. 30, lns. 7-12).

> **REPLY: Ms. Lumley's declaration, cited in Paragraph 90, is consistent with
> her cited testimony and states:**

> > **The next interactive exercise was the "4 Corners" exercise where, in
> > response to a series of statements, participants were supposed to select
> > a response—either "strongly agree," "agree," "disagree," or "strongly
> > disagree." Although participants were supposed to discuss the
> > statements, I did not participate in the discussion because I had shut
> > down and did not speak after the SPS's reaction to my views.**

> **Thus, Defendants' denial does not rebut Plaintiffs' SUMF Paragraph 90, which should
> be deemed admitted.**

91.   Ms. Henderson did not agree with several Four Corners statements. (Henderson Decl. ¶ 40;

Henderson Dep. 116:2 to 119:10.)

> **RESPONSE**: Defendants deny this Paragraph. Defendants deny that a Four
> Corners Activity was conducted during the October 14, 2020 Equity Training. Per Rapert
> the participants did not do a four corners exercise during that training. The slides were read
> through, but the participants were not asked to respond to questions. Nor did the trainers ask
> anybody to respond to questions during that session. (Rapert depo. DEX F, p. 44, lns. 8-12,
> lns. 21- 25; p. 45, lns. 3-6).

> **REPLY: Controverted. (Ex. 2, Henderson Decl. ¶ 39 ("The next interactive
> exercise was the '4 Corners' exercise where, in response to a series of statements, we**

had to select a response—either 'strongly agree,' 'agree,' 'disagree,' or 'strongly disagree.' I conveyed my response by holding up one of the corresponding signs SPS provided me before the Equity Training."); *see also* **Pls.' Opp'n Ex. 26, Henderson Dep. 110:21 to 115:24.)**

92. Although Ms. Henderson disagreed with several of the Four Corners statements, she did not express her disagreement in her Equity Training session because she knew by that point in the training session that SPS did not accept alternate viewpoints, and that if she voiced her true views, she would be corrected or considered unprofessional. (Henderson Decl. ¶ 41.)

      **RESPONSE**: Defendants deny this Paragraph in that the use of the term "SPS" constitutes argument which is unaccompanied by citation Defendants deny that a Four Corners Activity was conducted during the October 14, 2020 Equity Training. Per Rapert the participants did not do a four corners exercise during that training. The slides were read through, but the participants were not asked to respond to any questions. Nor did the trainers ask anybody to respond to any of the questions during the session she attended. (Rapert depo. DEX F, p. 44, lns. 8-12, lns. 21- 25; p. 45, lns. 3-6). During that equity training session, Henderson was never called on by the trainers to answer questions during the large group sessions. (Henderson depo, DEX 52.01, p. 59, lns. 4-11).

      **REPLY: See Plaintiffs' Reply to Paragraphs 22, 27(B), and 91 which are incorporated here by reference.**

93. The Equity Training then addressed "anti-racism," defining it as "advocating for changes in political, economic, and social life." (Ex. 13 at 31; Stip. ¶ 1(g), 9.)

      **RESPONSE**: Defendants deny this Paragraph.

**REPLY: See Defendants' admission at Paragraph 50(A) which contradicts their denial of Paragraph 93. Further replying, as a written document, SPS's PowerPoint presentation speaks for itself and Slide 31 states, in pertinent part, "Anti-Racism is defined as the work of actively opposing racism by advocating for changes in political, economic, and social life." (Ex. 13 at 31.)**

Defendants provide the following response:

A.    Garcia-Pusateri stated her opinion that the Fall (2020) Equity Training was asking the participants to commit to "understanding what anti-racism is ... and to learn more about it." (Garcia-Pusateri depo. DEX G, p. 86, lns. 15-19; p. 95, lns. 13-16).

**REPLY: See Plaintiffs' Reply to Paragraph 51(A) which is incorporated here by reference.**

B.    Garcia-Pusateri stated her opinion that the Fall (2020) Equity Training was asking participants to commit to "being an anti-racist educator" (Garcia-Pusateri depo. DEX G, p. 86, lns. 15-19; p. 95, lns. 13-16;) and learning about how to address barriers to students in the classroom, (Garcia-Pusateri depo, DEX G, p. 97, lns. 19-22) such as how to handle the use of a racial epithets in the classroom. (Garcia-Pusateri depo, DEX G, p. 97, lns. 4-7).

**REPLY: See Plaintiffs' Reply to Paragraph 51(B) which is incorporated here by reference.**

C.    Garcia-Pusateri stated her opinion that the Fall (2020) Equity Training was not asking anyone to engage in political activity or political advocacy. (Garcia-Pusateri depo. DEX G, p. 97, lns. 19-20).

**REPLY: See Plaintiffs' Reply to Paragraph 51(C) which is incorporated here by reference.**

94. SPS stated in its training, "The most important thing to reiterate here is that we will actively oppose racism by advocating for change. There is a proactive element in place to no longer remain silent or inactive." (Ex. 15 at 18.)

   **RESPONSE**: Defendants deny this Paragraph in that the use of the term "SPS" constitutes argument which is unaccompanied by citation. Defendants admit that PEX 15 makes the cited statement.

   **REPLY: See Plaintiffs' Reply to Paragraph 22 which is incorporated here by reference. Thus, Plaintiffs' SUMF Paragraph 94 should be deemed admitted for the reasons set forth in Plaintiffs' Reply to Paragraph 22.**

95. Additionally, according to SPS, "To fight against systemic racism means to buck norms." (Ex. 13 at 32; Stip. ¶ 1(g), 9.)

   **RESPONSE**: Defendants deny this Paragraph in that the use of the term "SPS" constitutes argument which is unaccompanied by citation. Defendants admit that PEX 13 makes the cited statement.

   **REPLY: See Plaintiffs' Reply to Paragraph 22 which is incorporated here by reference. Thus, Plaintiffs' SUMF Paragraph 95 should be deemed admitted for the reasons set forth in Plaintiffs' Reply to Paragraph 22.**

96. Moreover, according to SPS, as part their commitment to anti-racism, "Staff . . . at every level must be willing to be uncomfortable in their struggle for black students, recognizing students' power and feeding it by honoring their many contributions to our schools." (Ex. 13 at 33; Stip. ¶ 1(g), 9.)

105

**RESPONSE**: Defendants deny this Paragraph in that the use of the term "SPS" constitutes argument which is unaccompanied by citation. Defendants admit that PEX 13 makes the cited statement.

**REPLY: See Plaintiffs' Reply to Paragraph 22 which is incorporated here by reference. Thus, Plaintiffs' SUMF Paragraph 96 should be deemed admitted for the reasons set forth in Plaintiffs' Reply to Paragraph 22.**

97. SPS concluded its Equity Training with the "Anti-Racist/Solo Write" or "Anti- Racist/Group Share," where SPS directed staff to answer three questions about being an anti-racist educator: "How does this statement impact your role at SPS? What steps will you take to become an Anti-Racist? What tools/support will you need to be Anti-Racist?" (Ex. 13 at 38-9; Stip. ¶ 1(g), 9.)

**RESPONSE**: Defendants deny this Paragraph in that the use of the term "SPS" constitutes argument which is unaccompanied by citation. Defendants deny that an "Anti-Racist Solo Write was conducted during the October 6 or October 14, 2020 Equity Training sessions." (Lumley Decl. ¶ 32; Henderson Decl. ¶ 45).

**REPLY: See Plaintiffs' Reply to Paragraph 22 which is incorporated here by reference. Further replying, as Plaintiffs attested:**

**The SPS trainers directed all participants to write our answers [to the Anti-Racist/Solo Write] on our own time. I never completed it because I do not agree with SPS's views as expressed in the Equity Training and was unwilling to commit to its understanding of "anti-racism."**

**(Ex. 2, Henderson Decl. ¶ 45; Ex. 3, Lumley Decl. ¶ 32.)**

**Thus, Defendants' denial does not rebut Plaintiffs' SUMF Paragraph 97, which should be deemed admitted.**

106

98. The three "Anti-Racist/Solo Write" questions were reproduced on the Note Sheet handout staff received before the training so that participants could write out their responses. (Ex. 9 at PLS 0422; Ex. 15 at 3; Hale Dep., dep. ex. 2; YGP/SPS Dep. 317:4 to 318:17.)

> **RESPONSE**: Defendants admit that Henderson received a note sheet with the packet of materials she received from Hale prior to the October 14, 2020 Equity Training. Defendants admit that Henderson could use the supplied note sheet to collect their notes if they wanted to. (Garcia- Pusateri depo. DEX G, p. 129, lns. 7-11). Defendants deny the remainder of this Paragraph.

> **REPLY: See Defendants' response at Paragraph 22 which states, "Defendants admit this Paragraph if it is changed to read: 'Ms. Henderson and Ms. Lumley received a packet of printed materials before their Equity Training sessions, which included these handouts.'" Further replying, Paragraph 98 is supported by the evidence cited therein, as well as the Joint Stipulation of Facts (Ex. 1 ¶ 17) – none of which is rebutted by Defendants' response.**

> **Thus, Plaintiffs' SUMF Paragraph 98 should be deemed admitted.**

99. In Ms. Lumley's and Ms. Henderson's Equity Training sessions, because they were short on time, the SPS trainers directed staff to write their answers on their own time. Neither Ms. Lumley nor Ms. Henderson completed it because they were unwilling to commit to becoming "anti- racist educators," as they understood the term to mean. (Lumley Decl. ¶ 32; Henderson Decl. ¶ 45.)

> **RESPONSE**: Defendants admit this Paragraph.

100. During the fall semester of the 2020-2021 school year, SPS also required Ms. Henderson, as part of her professional development, to complete seven equity-based computer modules on

the Canvas platform, consisting of three Social Emotional Learning modules and four Cultural Consciousness modules ("Canvas Modules"). (Ex. 20; Stip. ¶¶ 19, 21.)

**RESPONSE**: Defendants deny this Paragraph in that the use of the term "SPS" constitutes argument which is unaccompanied by citation.

**REPLY: See Plaintiffs' Reply to Paragraph 22 which is incorporated here by reference. Thus, Plaintiffs' SUMF Paragraph 100 should be deemed admitted for the reasons set forth in Plaintiffs' Reply to Paragraph 22.**

Defendants admit that:

A. During school year 2020-21, the Department of Equity and Diversity published the following five (5) training modules ("Five Canvas Modules") on its Canvas Learning Management System ("Canvas"): (1) Overview of Social Emotional Learning from an Equity Lens (DEX 20.06); (2) Elementary Social Emotional Learning as it Relates to Covid- 19 (DEX 20.06.01); (3) Elementary Social Emotional Learning as it Relates to Racial Injustice (DEX 20.07.01); (4) Secondary Social Emotional Learning as it Relates to Covid- 19 (DEX 20.08.01); (5) Secondary Social Emotional Learning as it Relates to Racial Injustice (DEX 20.09.01). (Jungmann Affd, DEX C, ¶ 48; Harrington Affd, DEX E, ¶ 2; DEX 20.06; 20.06.01; 20.07.01; 20.08.01; 20.09.01.)

**REPLY: Admitted that the Department of Equity and Diversity published these five Canvas modules; however, controverted insofar as (as stipulated to by Defendants) SPS published and required certificated staff to take *seven* equity-based computer modules on the Canvas platform, consisting of three Social Emotional Learning modules (two of which had Elementary and Secondary versions) and four Cultural Consciousness modules. (Pls.' MSJ Ex. 1, Stip. ¶¶ 19, 21; Pls.' MSJ Ex. 2,**

**Henderson Decl. ¶ 48; Pls.' MSJ Ex. 11, Henderson Dep. 44:20 to 46:6; Pls.' MSJ Ex. 14, Lawrence Anderson Dep., dep. ex. 8; Pls.' MSJ Ex. 20; Pls.' MSJ Ex. 22, DEX 50F-012919-20, at 12920; Pls.' Opp'n Ex. 26, Henderson Dep. 124:22 to 125:13; Pls.' Opp'n Ex. 27, DEX 50A-002037-39; Pls.' Opp'n Ex. 28, DEX 50B-007711-30.)**

B.      Henderson did access the "Five Canvas Modules." (Henderson depo, DEX A, p. 45, lns. 17-25; p. 46, lns. 1-11; DEX 20.06; 20.06.01; 20.07.01; 20.08.01; 20.09.01).

**REPLY: Controverted insofar as SPS published and required certificated staff, including Ms. Henderson, to take seven equity-based computer modules as set forth in Plaintiffs' Reply to Paragraph 100 and as stipulated to by Defendants.**

C. Henderson did not recall accessing any other Canvas Modules during school year 2020-21 that were placed on Canvas by the District's Office of Equity and Diversity. (Henderson depo, DEX A, p. 46, lns. 7-11). Defendants deny any remaining statements in this Paragraph.

**REPLY: Controverted. As stipulated to by Defendants, SPS published and required certificated staff, including Ms. Henderson, to take seven equity-based computer modules as set forth in Plaintiffs' Reply to Paragraph 100, which is incorporated here by reference. Ms. Henderson took and completed all modules. (Pls.' MSJ Ex. 1, Stip. ¶¶ 19, 21; Pls.' MSJ Ex. 2, Henderson Decl. ¶ 48; Pls.' MSJ Ex. 11, Henderson Dep. 44:20 to 46:6 ("Q. Okay. What were the two? A. So one would have been cultural consciousness. Q. Okay. A. And another one would have been – I think it was titled maybe racial injustice – social and emotional learning through an equity lens."); Pls.' MSJ Ex. 14, Lawrence Anderson Dep., dep. ex. 8;**

**Pls.' MSJ Ex. 22, DEX 50F-012919-20, at 12920; Pls.' Opp'n Ex. 26, Henderson Dep. 124:22 to 125:13.)**

101. Together with the Cultural Consciousness modules, Ms. Henderson completed the following Social Emotional Learning modules: Overview of Social Emotional Learning from an Equity Lens; Elementary Social Emotional Learning as it Relates to Racial Injustice; Secondary Social Emotional Learning as it Relates to Racial Injustice; Elementary Social Emotional Learning as it Relates to Covid-19; and Secondary Social Emotional Learning as it Relates to Covid-19. (Henderson Decl. ¶ 48; Henderson Dep. 44:20 to 46:6.)

      **RESPONSE**:  Defendants admit that:

      A. Henderson accessed and completed the "Five Canvas Modules." (Henderson depo, DEX A, p. 45, lns. 17-25; p. 46, lns. 1-11; DEX 20.06; 20.06.01; 20.07.01; 20.08.01; 20.09.01).

      **REPLY: See Plaintiffs' Reply to Paragraph 100(B) which is incorporated here by reference.**

      B. Henderson did not recall accessing any other Canvas Modules during school year 2020-21 that were placed on Canvas by the District's Office of Equity and Diversity. (Henderson depo, DEX A, p. 46, lns. 7-11). Defendants deny any remaining statements in this Paragraph.

      **REPLY: See Plaintiffs' Reply to Paragraph 100(C) which is incorporated here by reference.**

102. A team of SPS employees that included Dr. Garcia-Pusateri and Mr. Anderson created the modules. (Ex. 7, SPS Interrog. Answers, No. 2.)

      **RESPONSE**:  Defendants admit this Paragraph.

103. As one of the creators of the Canvas Modules stated, "Now that we have our Fall districtwide equity training completed, it's import[ant] to keep the momentum going as anti-racist educators." (Ex. 21, DEX 50B-004071.)

      **RESPONSE**:  Defendants admit this Paragraph.

104. The Canvas Modules addressed topics including white supremacy, anti-racism, social justice, and systemic racism. (Ex. 20.)

      **RESPONSE**:  Defendants admit that the Five Canvas Modules address the topics contained in them. DEX 20.06; 20.06.01; 20.07.01; 20.08.01; 20.09.01). Defendants deny any additional facts contained in this Paragraph.

      **REPLY: See Plaintiffs' Reply to Paragraph 100(A) which is incorporated here by reference.**

105. The Cultural Consciousness modules required Ms. Henderson to watch several videos, including:

   a. "Black Lives Matter Protests | BrainPOP" video;

   b. "What You Should Know About #BlackLivesMatter" video;

   c. The same "Systemic Racism Explained" video that was in the Equity Training, which said that systemic racism is evident "in every area of life" and that staff should do something about it by supporting "systemic changes" to allow "equal access to resources," beginning at 3:16;

   d. "Debunking The Most Common Myths White People Tell About Race" video, which included statements like "I don't see color"; "I have black friends"; "Race has nothing to do with it. It's about class"; and "Focusing on race is what divides us";

e. "Advice For White People from Anti-Racism Trainer" video, which said that "anti-racism depends on white America asking itself the critical question of are you still willing to receive these privileges, most of which . . . can be extended to all people without you losing those privileges," beginning at 3:37, and declared that "in everything we do we have to think about is this increasing the burden that's on the black body . . . and try[] to find acts in your life that you can take to decrease that burden. Go grocery shopping for a black person this week," beginning at 4:20; and

f. "Are Teachers Unintentionally Racist?" video.

(Stip. ¶ 22; Ex. 20 at PLS 0260-62, 0268-70.)

RESPONSE: Defendants deny this Paragraph in that Henderson testified that she did not recall accessing any other than the Five Canvas Modules during school year 2020-21 that were placed on Canvas by the District's Office of Equity and Diversity. (Henderson depo, DEX A, p. 46, lns. 7-11). Defendants deny any remaining statements in this Paragraph.

**REPLY: See Plaintiffs' Reply to Paragraph 100(C) which is incorporated here by reference.**

106. The Cultural Consciousness modules included a "Cultural Competence Self- assessment Checklist" and a "Self-Assessment Reflection" which had to be completed to finish the module. (Stip. ¶ 24; Ex. 20 at PLS 0264-65, 0332-33.)

RESPONSE: Defendants deny this Paragraph in that Henderson testified that she did not recall accessing any other than the Five Canvas Modules during school year 2020-21 that were placed on Canvas by the District's Office of Equity and Diversity. (Henderson depo, DEX A, p. 46, lns. 7-11). Defendants deny any remaining statements in this Paragraph.

**REPLY: See Plaintiffs' Reply to Paragraph 100(C) which is incorporated here by reference.**

107. Dr. Garcia-Pusateri advised Ms. Henderson that the Cultural Competence modules' reflection questions were a requirement. (Ex. 22, DEX 50F-0012919-20; Henderson Dep. 121:17 to 122:21.)

**RESPONSE**: Defendants admit that:

A. On September 17, 2020 at 1:30 pm Garcia-Pusateri advised Henderson that she had to fill in the text boxes for the reflection questions on the Equity Focused Canvas Modules. (*See* Plaintiffs' Exhibit 22, DEX 50F-0012919).

**REPLY: Admitted.**

B. On September 17, 2020 at 2:44 pm Henderson emailed Garcia-Pusateri and again requested to know if the Reflection Questions had to be answered [to complete the module]. (*See* Plaintiffs' Exhibit 22, DEX 50F-0012919).

**REPLY: Admitted.**

C. On September 17, 2020 at 3:42 pm Garcia-Pusateri checked with Jeremy Sullivan, one of the District employees who helped to prepare the modules, to see if Reflection Questions had to be answered [to complete the module]. (*See* Plaintiffs' Exhibit 22, DEX 50F-0012919).

**REPLY: Admitted but immaterial because Ms. Henderson was not a part of this communication.**

D. On September 17, 2020 at 4:17 pm, Mr. Sullivan responded to Garcia-Pusateri and stated: "There aren't. They reflect on their own. We decided we didn't want them to

113

submit stuff except the confirmation at the end." Defendants deny any additional facts contained in this Paragraph. (*See* Plaintiffs' Exhibit 22, DEX 50F-0012919).

**REPLY: Admitted but immaterial because Ms. Henderson was not a part of this communication.**

**Further replying to Paragraphs 107(A)-(D), as a written document, the email (Ex. 22, DEX 50F-0012919-20) at issue speaks for itself. See also Ms. Henderson's testimony regarding the same. (Pls.' Ex. 11, Henderson Dep. 121:17 to 122:21.) Thus, Plaintiffs' SUMF Paragraph 107 should be deemed admitted because Defendants' denial is unsupported by contrary evidence. *See* L.R. 56.1(b)(2); *see also Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 792 (8th Cir. 2012).**

108. The "Cultural Competence Self-assessment Checklist" stated that "[t]his self- assessment tool is designed to explore individual competence." On a scale from "Never" to "Always/Very Well," the assessment required Ms. Henderson to rate her "Awareness" of whether "I have a clear sense of my own ethnic, cultural, and racial identity," "I am aware of my stereotypes as they arise and have developed personal strategies for reducing the harm they cause," and "If I am a White person working with a person of color, I will likely be perceived as a person with power and racial privilege, and that I [may] not be seen as 'unbiased' or as an ally." (Ex. 78 20 at PLS 0332-33.)

**RESPONSE**: Defendants deny this Paragraph in that Henderson testified that she did not recall accessing any other Canvas Modules during school year 2020-21 that were placed on Canvas by the District's Office of Equity and Diversity. (Henderson depo, DEX A, p. 46, lns. 7-11). Any notes made by the participants during the training were not collected

by the District. (Garcia-Pusateri depo, DEX G, p. 224, lns. 7-10; p. 228, Lns. 23-25). Defendants deny any remaining statements in this Paragraph.

**REPLY: See Plaintiffs' Reply to Paragraph 100(C) which is incorporated here by reference. Further replying, the testimony of Dr. Garcia-Pusateri cited in Defendants' response pertained solely writing by hand in the Equity Training sessions and had nothing whatsoever to do with the Canvas Modules. (*See* Ex. 4, YGP/SPS Dep. 224:7-10 ("Q. Do you know whether Ms. Henderson wrote anything down about the George Floyd reflection? A. No. Because it was virtual. We didn't collect these."), 228:23-25 (Q. Do you know if she wrote anything down in her handout? A. No. I don't know. We don't collect these things.").)**

109. After Ms. Henderson rated herself for each prompt, the assessment instructed Ms. Henderson to calculate a final score for how "culturally competent" she was. (Id.)

**RESPONSE**:  Defendants deny this Paragraph in that Henderson testified that she did not recall accessing any other Canvas Modules during school year 2020-21 that were placed on Canvas by the District's Office of Equity and Diversity. (Henderson depo, DEX A, p. 46, lns. 7-11). Any notes made by the participants during the training were not collected by the District. (Garcia-Pusateri depo, DEX G, p. 224, lns. 7-10; p. 228, Lns. 23-25). Defendants deny any remaining statements in this Paragraph.

**REPLY: See Plaintiffs' Reply to Paragraph 108 which is incorporated here by reference.**

110. Even though Ms. Henderson disagreed with the statement "If I am a White person working with a person of color, I will likely be perceived as a person with power and racial privilege, and that I [may] not be seen as 'unbiased' or as an ally," because she does not treat people

differently based on their skin color, she answered with "Always/Very Well" or "Fairly Often/Pretty Well" because she thought SPS would review her responses and that was how it expected her to respond. (Henderson Decl. ¶ 53.)

RESPONSE: Defendants deny this Paragraph in that Henderson testified that she did not recall accessing any other Canvas Modules during school year 2020-21 that were placed on Canvas by the District's Office of Equity and Diversity. (Henderson depo, DEX A, p. 46, lns. 7-11). Any notes made by the participants during the training were not collected by the District. (Garcia-Pusateri depo, DEX G, p. 224, lns. 7-10; p. 228, Lns. 23-25). Defendants deny any remaining statements in this Paragraph.

REPLY: See Plaintiffs' Reply to Paragraph 108 which is incorporated here by reference.

111. The Social Emotional Learning Modules had "Quick Check" Questions that staff had to answer correctly to complete the modules. (Stip. ¶ 23.)

RESPONSE: Defendants deny this Paragraph in that it misstates Stipulation 23 in the parties' stipulations. Defendants admit to the correct wording of Stipulation 23 as follows: "The Social Emotional Learning modules had "quick check" questions which a person had to answer correctly in order to complete the module."

REPLY: Defendants' denial does not rebut Plaintiffs' SUMF Paragraph 111. Thus, Plaintiffs' SUMF Paragraph 111 should be deemed admitted.

Defendants admit to the following:

A. Each of the Five Canvas Modules utilize pages with guided navigation to progress through the learning options. (Douglas Affd, DEX K, ¶ 6).

**REPLY: See Plaintiffs' Reply to Paragraph 100(A) which is incorporated here by reference.**

B. Each of the Five Canvas Modules contain one (1) "Quick Check" question which has two possible answers.

(1) The Elementary and Secondary Social and Emotional Learning as it relates to Racial Injustice modules (DEX 20.07.01 and DEX 20.09.01) each contain the following "Quick Check" question:
"When you witness racism and xenophobia in the classroom, how should you respond?
- Address the situation in private after it has passed.
- Address the situation the moment you realize it is happening."

(2) The Elementary and Secondary Social and Emotional Learning as it relates to Covid-19 (DEX 20.05 and DEX 20.08) each contain the following "Quick Check" question:
"Acknowledging and addressing students' social emotional needs in relation to Covid-19 is whose responsibility?
- All caregivers and stakeholders.
- Guardians and counselors."

(3) The Overview of Social Emotional Learning from an Equity Lens (DEX 20.06) The Elementary and Secondary Social and Emotional Learning as it relates to Covid-19 (DEX 20.06) contains the following "Quick Check" question:
"How does the addition of Focus Area V impact how you serve the students and staff of SPS?
- It provides suggested guidance regarding equity and diversity issues.
- It cements equity and diversity as a district priority that must be followed by all staff."

(Douglas Affd, DEX K ¶ 7).

**REPLY: Admitted that the Social Emotional Learning modules contained Quick Check questions with two possible answers; however, controverted insofar as SPS published and required certificated staff to take seven equity-based computer modules as set forth in Reply to Paragraph 100(A), which is incorporated here by reference.**

117

C. The "Quick Check" questions on these Five (5) Canvas Modules were not designated by the Equity and Diversity Department as a graded assignment or quiz within Canvas. Therefore, the answers to the "Quick Check" questions on the modules that were given by the user are not tracked or recorded by Canvas and cannot be checked or reviewed by anyone because no record of the answers exists. (Douglas Affd, DEX K ¶ 8).

**REPLY: Controverted but immaterial insofar as SPS published and required certificated staff to take seven equity-based computer modules as set forth in Reply to Paragraph 100(A), which is incorporated here by reference. Paragraph 111(C) is further controverted on the basis that SPS staff had to correctly answer the Quick Check questions to complete the Social Emotional Learning modules required of them (Ex. 1, Stip. ¶¶ 19, 21, 23) and, in Ms. Henderson's case, Mr. Anderson personally ascertained that Ms. Henderson completed the Canvas modules. (*See* Pls.' Opp'n Ex. 26, Henderson Dep. 123:2 to 124:2.)**

112. The Elementary and Secondary Social Emotional Learning as it Relates to Racial Injustice modules' "Quick Check" question was: "When you witness racism and xenophobia in the classroom, how should you respond?" (Ex. 20 at 58, 93, 80-81, 103-04.)

**RESPONSE**: Defendants admit the paragraphs contained in Defendants' Response to Paragraph 111, *supra*, incorporated herein by reference.

**REPLY: Defendants' response does not rebut Plaintiffs' SUMF Paragraph 112. Thus, Plaintiffs' SUMF Paragraph 112 should be deemed admitted. Further replying, Plaintiffs incorporate their Reply to Paragraphs 111(A)-(C) here by reference.**

113. The two choices for answers were: "Address the situation in private after it has passed," and "Address the situation the moment you realize it is happening." If staff selected the first

118

possible answer, they received the following message: "Incorrect! It is imperative adults speak up immediately and address the situation with those involved. Being an anti-racist requires immediate action." If they selected the second possible answer, they received the following message and completed the module: "Correct! Being an anti-racist requires immediate action." (Id. at 93, 103-04.)

RESPONSE: Defendants admit this Paragraph.

114. Ms. Henderson disagreed with the "correct" answer because, having worked with students and been in special education for over 20 years, she believes any response must be tailored to the situation and student. Even so, she selected the "correct" answer so that she could complete the module and receive credit. (Henderson Decl. ¶ 57.)

RESPONSE: Defendants admit that Henderson Declaration ¶ 57 expresses this opinion in this Paragraph. Defendants deny that this Paragraph expresses a fact. Defendants admit that the "Quick Check" questions on these Five (5) Canvas Modules were not designated by the Equity and Diversity Department as a graded assignment or quiz within Canvas. The answers to the "Quick Check" questions that were given by the user are not tracked or recorded by Canvas and cannot be checked or reviewed by anyone as no record of the answers exists. (Douglas Affd, DEX K ¶ 8)

**REPLY: Defendants' response does not rebut Plaintiffs' SUMF Paragraph 114. Thus, Plaintiffs' SUMF Paragraph 114 should be deemed admitted. Further replying, Ms. Henderson's statements of her beliefs are statements of fact and are relevant and material to the claims she has asserted in this action. Even if Ms. Henderson's beliefs are considered opinions, as Defendants argue, they are admissible under Fed. R. Evid. 701. Further replying, Plaintiffs incorporate their Reply to**

**Paragraph 100(A)-(C) here by reference. Further replying, SPS staff had to correctly answer the Quick Check questions to complete the Social Emotional Learning modules required of them (Ex. 1, Stip. ¶¶ 19, 21, 23) and, in Ms. Henderson's case, Mr. Anderson personally ascertained that Ms. Henderson completed the Canvas modules. (*See* Pls.' Opp'n Ex. 26, Henderson Dep. 123:2 to 124:2.)**

115. The Elementary and Secondary Social Emotional Learning as it Relates to Covid-19 modules' "Quick Check" question was: "Acknowledging and addressing students' social emotional needs in relation to Covid-19 is whose responsibility?" (Ex. 20 at 51, 70, 90, 98.)

    **RESPONSE**:  Defendants admit the following:

    A. The Elementary and Secondary Social and Emotional Learning as it relates to Covid-19 (DEX 20.05 and DEX 20.08) each contain the following "Quick Check" question:

    > "Acknowledging and addressing students' social emotional needs in relation to Covid-19 is whose responsibility?
    > •      All caregivers and stakeholders.
    > •      Guardians and counselors."
    (Douglas Affd, DEX K ¶ 7).

    **REPLY: Because Paragraph 115(A) admits Plaintiffs' SUMF Paragraph 115, Plaintiffs' SUMF Paragraph 115 should be deemed admitted.**

    B. The "Quick Check" questions on these Five (5) Canvas Modules were not designated by the Equity and Diversity Department as a graded assignment or quiz within Canvas. The answers to the "Quick Check" questions that were given by the user are not tracked or recorded by Canvas and cannot be checked or reviewed by anyone as no record of the answers exists. (Douglas Affd, DEX K ¶ 8).

120

**REPLY: Plaintiffs incorporate their Reply to Paragraph 100(A)-(C) here by reference. Further replying, SPS staff had to correctly answer the Quick Check questions to complete the Social Emotional Learning modules required of them (Ex. 1, Stip. ¶¶ 19, 21, 23) and, in Ms. Henderson's case, Mr. Anderson personally ascertained that Ms. Henderson completed the Canvas modules. (*See* Pls.' Opp'n Ex. 26, Henderson Dep. 123:2 to 124:2.)**

116. The two choices for answers were: "All caregivers and stakeholders," and "Guardians and counselors." If staff selected the first possible answer, they received the following message and completed the module: "Correct! In these trying times, we must all work together to ensure that all students are having their social emotional needs met." If they selected the second possible answer, they received the following message: "Incorrect! In these trying times, we must all work together to ensure that all students are having their social emotional needs met." (Id. at 90, 98.)

**RESPONSE**: Defendants admit this Paragraph.

117. Ms. Henderson disagreed with the "correct" answer because she believes that parents (or guardians if they have been appointed) should be the decisionmakers for their children, while SPS's "correct" response suggested that the school is an equal decisionmaker to the parent. Even so, she selected the "correct" answer so that she could complete the module and receive credit. (Henderson Decl. ¶ 60.)

**RESPONSE**: Defendants admit that Henderson Declaration ¶ 57 expresses her opinion in this Paragraph. Defendants deny that this Paragraph expresses a fact. Defendants admit that the "Quick Check" questions on these Five (5) Canvas Modules were not designated by the Equity and Diversity Department as a graded assignment or quiz within

Canvas. Therefore, the answers to the "Quick Check" questions on the modules that were given by the user are not tracked or recorded by Canvas and cannot be checked or reviewed by anyone because no record of the answers exists. (Douglas Affd, DEX K ¶ 8)

**REPLY: Defendants' response does not rebut Plaintiffs' SUMF Paragraph 117. Thus, Plaintiffs' SUMF Paragraph 117 should be deemed admitted. Further replying, Ms. Henderson's statements of her beliefs are statements of fact and are relevant and material to the claims she has asserted in this action. Even if Ms. Henderson's beliefs are considered opinions, as Defendants argue, they are admissible under Fed. R. Evid. 701. Further replying, Plaintiffs incorporate their Reply to Paragraph 100(A)-(C) here by reference. Further replying, SPS staff had to correctly answer the Quick Check questions to complete the Social Emotional Learning modules required of them (Ex. 1, Stip. ¶¶ 19, 21, 23) and, in Ms. Henderson's case, Mr. Anderson personally ascertained that Ms. Henderson completed the Canvas modules. (*See* Pls.' Opp'n Ex. 26, Henderson Dep. 123:2 to 124:2.)**

118. Ms. Henderson timely completed the Canvas Modules, as required by SPS. (Stip. ¶ 20.)

**RESPONSE**: Defendants deny this Paragraph in that it contains opinion and political argument by use of the word "SPS also provided" which is unaccompanied by citation. Defendants admit that Henderson completed the Five Canvas Modules. Defendants deny any additional facts stated in this Paragraph.

**REPLY: See Plaintiffs' Reply to Paragraph 22 which is incorporated here by reference. Further replying, Paragraph 26 does not state "SPS also provided," as argued by Defendants. Thus, Plaintiffs' SUMF Paragraph 26 should be deemed admitted for the reasons set forth in Plaintiffs' Reply to Paragraph 22.**

119.    During school year 2018-19 the District experienced a series of disturbing events that impacted the District's students, staff, parents and the school community. The acts targeted several District students, specifically students of color and LGBTQ+ students, and represented what the District's Board believed to be "opposition to basic human rights and to a learning environment defined by inclusivity and respect for every individual." Jungmann Affd, DEX C, ¶ 16.

**RESPONSE: Controverted. Further responding, Plaintiffs object to Paragraph 119 on the basis that the cited paragraph of Dr. Jungmann's affidavit is hearsay, conclusory, and unsubstantiated.** *Lujan v. Nat'l Wildlife Fed'n*, **497 U.S. 871, 888 (1990) ("The object of [Fed. R. Civ. P. 56(e)] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit.");** *Postscript Enters. v. Bridgeton*, **905 F.2d 223, 226 (8th Cir. 1990) (summary judgment affidavits "must be made on personal knowledge, must set forth facts which would be admissible in evidence, and must show affirmatively that the affiant is competent to testify to the matters stated" to comply with Rule 56(e));** *Evans v. Techs. Applications & Serv. Co.*, **80 F.3d 954, 962 (4th Cir. 1996) (summary judgment affidavits cannot be conclusory or based upon hearsay);** *Ruffin v. Shaw Indus.*, **149 F.3d 294, 302 (4th Cir. 1998) ("[w]ithout a factual basis for the conclusory comments" in a summary judgment affidavit, the affiant was not competent "to testify about an allegedly defective product);** *TIG Ins. Co. v. James*, **276 F.3d 754, 759 (5th Cir. 2002) ("Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial.").**

123

120. In response to these events, the Board issued a definitive statement opposing racism, bigotry and disrespect in any form and on May 21, 2019 passed a Resolution to Affirm Commitment to Equity and Inclusivity in all District operations during an open meeting of the Board. Jungmann Affd, DEX C, ¶ 17; and Harrington Affd, DEX E, ¶ 2, DEX 26.02.

**RESPONSE: Admitted but immaterial.**

121. In August, 2019, a forty-six (46) person citizen's committee composed of residents of the District, present and former members of the District's Board of Education, educators and administrators was gathered by the District to serve as the Equity and Diversity Advisory Council ("EDAC"). Jungmann Affd, DEX C, ¶ 18; and Rector Affd, DEX D, ¶ 16.

**RESPONSE: Admitted but immaterial.**

122. On May 19, 2020, the Board of Education amended the District's Strategic Plan, consistent with the recommendations of EDAC and Chief Equity and Diversity Officer Garcia-Pusateri. This amendment added Focus Area 5 – Equity and Diversity. Subsequently, the following five (5) Strategies were added to Focus Area 5:

Strategy 5.1.1: Facilitate learning opportunities for staff and leaders that foster exploration of identity and self, and create applications to demonstrate cultural consciousness in their work.

Strategy 5.1.2: Develop and deploy improved recruitment, collaboration and communication structures to enhance and diversify the workforce.

Strategy 5.1.3: Review, improve and expand programming and services for under-resourced and under-represented students.

Strategy 5.1.4: Review and expand the curriculum to reflect student identities, lived experiences, cultural history and significant contributions.

Strategy 5.1.5: Research, develop and deploy engagement and advocacy policy, practices, and programs that support students and staff, and foster greater community engagement.

Jungmann Affd, DEX C, ¶ 33; and Harrington Affd, DEX E, ¶ 2, DEX 3.06.

**RESPONSE: Admitted but immaterial.**

124

123. The purpose of the Fall (2020) Equity Training was to:

- Improve engagement, safety, and attendance rates for under-resourced and under-represented student populations.
- Demonstrate annual growth in the core academic success (iReady, MAP, EOC, Common Assessments) for all students, with an intensive focus on closing performance gaps for under-resourced and under-represented students.
- Increase the graduation rate for all student populations, with an intensive focus on under-resourced and under-represented students.
- Recruit, hire, develop, support and retain an effective, qualified and diverse workforce of teachers, staff and leaders to better meet the needs of students.

Jungmann Affd, DEX C, ¶ 42; and Harrington Affd, DEX E, ¶ 2, DEX 3.06, 6.01.

**RESPONSE: Controverted. SPS's goals for equity training were: (1) prioritize equity for its own sake; (2) make students and staff feel safe; and (3) improve academic outcomes. (Ex. 4, YGP/SPS Dep. 55:25 to 56:17; Ex. 23, Lathan/SPS Dep. 24:24 to 25:12.) Additionally, the "Goals" PowerPoint slide described the Equity Training's goals as:**

> ***To create shared understanding around the following:***
>
> **• Identity and Self - Who we are and how identity shows up in our roles at SPS**
>
> **• Complex issues of Systemic Racism and Xenophobia
>   - And how we should address it in our school system.**
>
> **• Our ethical responsibility to make SPS an inclusive and equitable learning environment for ALL students[.]**

**(Pls.' MSJ Ex. 13 at 5.)**

124. "Under-represented students" include, but are not limited to the following groups: students of color, students with disabilities, LGBTQ+ students, students who are English LanguageLearners and students who are from diverse religious backgrounds and belief systems. Jungmann Affd, DEX C, ¶ 31.

**RESPONSE: Admitted.**

125.    "Under-resourced students" include, but are not limited to the following groups: students who qualify for and receive free and reduced lunch services and students who receive McKinney-Vento services. Students can be both under-represented and under-resourced, depending upon their personal circumstances. Jungmann Affd, DEX C, ¶ 31.

**RESPONSE: Admitted.**

126.    The terms "under-represented" and "under-resourced," are based on the student subgroup data (such as graduation data, discipline data and attendance data), the analysis of which allows the District to create better educational practices that yield more equitable educational outcomes for the students. Garcia-Pusateri depo, DEX G, p. 143, l. 11-22.

**RESPONSE: Controverted. Dr. Garcia-Pusateri did not use the term "educational" in reference to "better practices that have more equitable outcomes":**

> **Q.    Goal, Slide 5, second paragraph underrepresented or facing difficult issues.  My question to you, are those difficult issues the ones you outlined previously?**
>
> **A.    Yes.  Based on the data the District has, so graduation data, discipline data, attendance data.**
>
> **Q.    And it's everyone's responsibility at SPS to address those shortfalls; right?**
>
> **A.    Yes.  To look at the data and to see where the barriers are for our students and then figure out ways how we can create better practices that have more equitable outcomes.**

**(Ex. 4, YGP/SPS Dep. 143:11-22.)**

127.    The purpose of the Fall (2020) Equity Training was to create more equitable environments for students by providing adults learning and understanding about the barriers to education that students and staff may encounter in school and understand how those barriers to learning impact the education of students in the District. Garcia-Pusateri depo, DEX G, p. 42, l. 20

126

to p. 43, l. 3, and l. 12-16; p. 44, l. 5-7.

**RESPONSE: Controverted. See Plaintiffs' Response to Paragraph 123 which is incorporated here by reference.**

128.    The concepts contained in the Fall (2020) Equity Training were designed for adults to "broaden their perspectives so they can find ways [to] better identify the barriers in [the] system that [are] impacting students." Garcia-Pusateri depo, DEX G, p. 325, l. 11-15.

**RESPONSE: Controverted but immaterial. See Plaintiffs' Response to Paragraph 123 which is incorporated here by reference. Further responding, through its Equity Training, SPS also expected staff to commit to the concept of becoming "anti-racist" educators. (Ex. 4, YGP/SPS Dep. 86:11-24, 94:14 to 95:14, 97:23 to 98:19, 99:15 to 100:1, dep. ex. 7 at 1.)**

**ARGUMENT**

## I. SPS violated Plaintiffs' freedom of speech.

The Civil Rights Act codified what the Declaration of Independence and Constitution made clear: all individuals, regardless of race or color, are equal before the law. The government cannot discriminate against any individual based on protected traits. SPS claims that in the fall of 2020, it initiated equity programming to teach staff about these laws. But nowhere does a single document within SPS's cited evidence so much as mention Title VI, Title VII, or Title IX of the Civil Rights Act, much less the Constitution. Nowhere has SPS pointed to a single example where it taught civil rights compliance to staff. And nowhere has SPS shown that federal law requires the type of programming it conducted.[4] That is because SPS did not conduct equity programming to teach staff about equal treatment under the law. SPS had a different goal: to produce "anti-racist" educators who were committed to being "equity champions." (SUMF ¶¶ 18, 49, 103.) And although SPS tries to compare anti-racism to anti-discrimination, the two are not the same.[5]

---

[4] SPS admits that it declined to conduct equity programming in 2021, even though such training is supposedly required by federal law. (SUMF ¶ 176.) If it really were required by law, SPS could not have simply stopped the equity programming. And if SPS really were training staff about equal treatment, there would be no lawsuit; Plaintiffs fully support anti-discrimination training aimed at treating individuals equally.

[5] Plaintiffs are *not* claiming that they were "infiltrated by 'diversity thinking.'" *Preskar v. United States*, 248 F.R.D. 576, 582 (E.D. Cal. 2008). Unlike in *Preskar*, they are not broadly alleging that public schools across America are infiltrated with diversity thinking. Instead, they are making a specific claim: that SPS unconstitutionally infringed on their freedom of speech when it required staff to commit to becoming anti-racist, favored certain views over others, and chilled dissenting speech in the fall of 2020. *Menders* is also inapposite, where K-12 students challenged a bias reporting system. *Menders v. Loudoun Cnty. Sch. Bd.* No. 1:21-cv-669, 2022 U.S. Dist. LEXIS 10157, at *12 (E.D. Va. Jan. 1, 2022). Not only is the standard for free speech different in K-12 schools, *infra* n.10, but in *Menders*, the students already had conversations about current affairs with their classmates that led to "vitriolic" responses, so self-censorship resulting from those conversations "would exist separate and apart from the Bias Reporting system." *Id*. at *27; see also* Pls.' Am. Compl., *Menders v. Loudoun Cnty. Sch. Bd.*, No. 1:21-cv-669, ¶ 18 (Aug. 30, 2021). Plaintiffs' claims stem directly from the equity programming and cannot be separated from it.

First, in the summer of 2020, SPS declared that all staff members have a "responsibility to be equity champions," and it directed staff to articles about anti-racism, white privilege, calling white people "on their racism," and "ridiculous white sh—" white people say in response to being called racist. (Id. ¶¶ 18-21.) SPS told staff that their "learning should not stop with these resources, but continue to expand." (Id. ¶ 18.) It notified staff that "training and professional learning will continue throughout the district" through Equity Training and Canvas modules. (Id. ¶¶ 14, 18, 100.) SPS required staff to attend the equity programming; if they refused, they would lose pay and professional development credit. (Id. ¶¶ 16-17, 100.) Before the Equity Training even began, SPS gave handouts to staff that said, "remain engaged," "Stay Engaged," "Be Professional," and "Lean into your discomfort," advised that "[Equity and diversity] is more than a value, but now part of our work and job responsibilities," labeled white people as privileged oppressors, and called "white silence," "colorblindness," and "all lives matter" white supremacy. (Id. ¶¶ 22, 27, 30, 31.)

When the training began, SPS flashed the words "Be Professional" on the screen, adding, "*Or be Asked to Leave with No Credit.*" (Id. ¶ 47 (emphasis in original).) SPS required Ms. Henderson to keep her computer camera on during her session. (Id. ¶ 36.) It told each Plaintiff that she would receive tools on how to become an anti-racist educator, which it defined as "advocating for changes in political, economic, and social life." (Id. ¶¶ 49, 50.) It then repeated the concepts that white people are privileged oppressors and that "white silence" and "colorblindness" are white supremacy. (*See* id. ¶¶ 41, 45, 47, 67, 73.) It defined white supremacy as "the all-encompassing centrality and assumed superiority of people defined and perceived as white." (Id. ¶ 169.) It told Plaintiffs that "systems of oppressions [sic] (like systemic racism) are woven into the very foundation of American culture, society, and laws," and that "government, education, and culture, all contribute or reinforce the oppression of marginalized social groups while elevating dominant

social groups." (Id. ¶¶ 65-66.) And it told Plaintiffs that a "divisive election" was coming, while it showed a cartoon depicting a member of the Ku Klux Klan with the caption, "Now with White House Allies," a reference to the Trump administration. (Id. ¶¶ 156, 159.)

Throughout the training, SPS directed Ms. Henderson and Ms. Lumley to break into small discussion groups. (*See* id. ¶¶ 55, 58, 77, 90.) Each time it did so, SPS warned that it would bring them back to the large group, suggesting that Plaintiffs should be prepared to share their views with the large group. (Id. ¶¶ 55-62.) At no point did SPS tell either Plaintiff that if she felt uncomfortable or disagreed with the views expressed, she could remain silent. (Id. ¶ 44.) Instead, SPS continuously told Plaintiffs that "white silence" is white supremacy. (Id. ¶ 45.)

In the large group discussions, each Plaintiff expressed her views once, only to be shot down by the trainers. (Id. ¶¶ 63, 80-83.) After that, neither shared her views again.[6] When Ms. Henderson participated in the mandatory Canvas modules, she could not complete the modules and receive credit until she rated herself for how well she understood that as a white person, she would "likely be perceived as a person with power and racial privilege," and would "not be seen as 'unbiased' or as an ally." (Id. ¶¶ 108-09.) She also would not receive credit until she selected answers SPS deemed "correct." (Id. ¶ 111.) That meant choosing anti-racist responses and accepting that she must be an anti-racist, which required supporting "systemic changes" and "debunking" so-called myths like colorblindness. (Id. ¶¶ 105(c)-(d), 113.)

## A. SPS compelled Plaintiffs' speech, discriminated against their views, and chilled their expression.

Even if requiring Plaintiffs to advocate for certain political change could somehow be called "anti-discrimination," SPS did not merely restrict conduct or speech incidental to conduct.

___
[6] Ms. Henderson asked a question about BIPOC Halloween costumes, but it was a clarifying question that did not include her opinion. (SUMF ¶¶ 84-85.)

130

*See Telescope Media Grp. v. Lucero*, 936 F.3d 740, 757 (8th Cir. 2019) (holding that regulating wedding videos is different from removing "White Applicants Only" signs because the former "is targeting speech itself" while the latter targets "the *activities* of hiring employees") (emphasis in original). Rather, SPS compelled Plaintiffs to adopt its views on anti-racism and equity by presenting them with a choice: (1) become anti-racist equity champions; (2) openly reject anti-racism and risk being labeled white supremacists, losing pay, and forgoing professional development credit; or (3) remain silent and *still* risk being labeled white supremacists. *See Cressman v. Thompson*, 719 F.3d 1139, 1156 (10th Cir. 2013) (finding injury when the government presented a speaker with the choice of sharing the government's message or risking consequences) (*Cressman I*); *Meriwether v. Hartop*, 992 F.3d 492, 517 (6th Cir. 2021) (same).

Compulsion need not take the form of an actual punishment; the mere threat of punishment which indirectly discourages action is enough. *See Axson-Flynn v. Johnson*, 356 F.3d 1277, 1290 (10th Cir. 2004) (holding that compulsion existed even though university never imposed a penalty or even threatened to expel or suspend student). Unlike in *Hanover*, where cheerleaders were not threatened with a punishment if they refused to wear uniforms displaying the Confederate flag, SPS threatened to withhold pay and professional development credit if staff did not attend the Equity Training or were considered unprofessional during the training. *See Hanover Cnty. Unit of the NAACP v. Hanover Cnty.*, 461 F. Supp. 3d 280, 293 (E.D. Va. 2020). While presenting its views to staff, SPS warned them to "Stay Engaged," "Speak YOUR Truth," "Acknowledge YOUR privileges," and "Lean into your discomfort," and that even silence itself in the face of its controversial program would be understood as "white supremacy." (SUMF ¶¶ 31, 48.) Because SPS presented Plaintiffs with the impossible choice of affirming the government's position or

taking an equally unfavorable course of action, it compelled their speech while discriminating against their views.

SPS also discriminated against Plaintiffs' views when it favored equity and anti-racism over equality and colorblindness. SPS now claims that it was simply teaching staff views that *could* be offensive, and that "one *may* view 'white silence' or 'colorblindness' as white supremacy, and therefore, employees should understandably be cognizant of this." (Defs.' Sugg. in Opp'n MSJ 73 (emphasis added).) But SPS never presented staff with a range of views to consider. Instead, it showed staff a video called "Understanding White Supremacy (And How to Defeat It)" that described "eradicat[ing] white supremacy once and for all." (SUMF ¶ 72.) In the following slide, it listed colorblindness and "all lives matter" as forms of white supremacy. (Id. ¶ 74.) At the same time, it announced, "Saying you are 'Colorblind', supporting 'Racist Mascots', 'Inequitable Healthcare', and displaying the heritage of 'BIPOC as Halloween Costumes' are all forms of White Supremacy." (*See* id. ¶ 39.) Thus, SPS made clear that any staff member who believes in colorblindness—like Ms. Henderson and Ms. Lumley—engages in white supremacy, and their views must be eradicated.[7] SPS further stressed that being anti-racist meant staff could "no longer remain silent or inactive," while it listed "white silence" as another form of white supremacy. (Id. ¶¶ 27, 74, 94.) SPS did not merely teach one point of view that some people hold. It demanded that Plaintiffs abandon views that did not fit its mold of equity and anti-racism.

SPS admits that it "requested . . . Plaintiffs' *commitment* to anti-racism" and that the purpose of its equity programming was "to *ensure* that staff were *committed* to being anti-racist."

---

[7] SPS suggests that Ms. Henderson and Ms. Lumley should take their claims to the School Board. But this misstates Supreme Court precedent. The Court has only held that school boards can regulate "the *manner* of speech in the classroom"; they cannot regulate the content of speech in or outside the classroom, particularly when it comes to adult employees. *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 267, 271 (1988) (emphasis added).

(Defs.' Sugg. in Opp'n MSJ 73, 76 (emphasis added).) But because SPS defines anti-racism as advocating for political, economic, and social change, demands that staff see color, rejects that all lives matter equally, and believes that students should be treated differently based on race, Ms. Henderson and Ms. Lumley would have to abandon their views on equality and colorblindness to meet this commitment. (SUMF ¶¶ 27, 42-43.) A demand of this nature is plainly unconstitutional.

On top of compelling their speech and discriminating against their views on equality and colorblindness, SPS chilled Plaintiffs' speech when it threatened to dock pay for failure to participate in equity programming, deny professional development credit for failure to be professional, and attach the white supremacy label for failure to speak. It does not matter whether SPS carried out those threats.[8] The mere appearance of authority to punish speakers is a chilling effect that creates a constitutional injury. *See Speech First, Inc. v. Schlissel*, 939 F.3d 756, 764 (6th Cir. 2019) (collecting cases). And although SPS gave every indication that Plaintiffs could lose pay or professional development credit for failure to participate in the equity programming, that was not the only thing that created a chilling effect. Ms. Henderson and Ms. Lumley also faced reputational harm if they either pushed back against SPS's views or remained silent, given that SPS declared "white silence" white supremacy. *See id*. at 765.

Plaintiffs were not alone; other staff expressed fears about sharing their views. As early as September 2020, an administrator notified Dr. Garcia-Pusateri that "[s]ome of the participants said they felt uncomfortable in speaking their own feelings and felt that it was not a safe environment to do so, and worried that doing so may cause issues in the workplace environment." (SUMF ¶ 41

---

[8] SPS did carry out its threat by refusing to pay five employees who did not attend the training. (*See* Defs.' SUMF ¶ 61.) Additionally, the fact that only five out of thousands of employees in the school district did not attend the training only underscores how seriously staff took attendance and participation.

(citing Pls.' Ex. 17).) She explained that after a staff member raised a concern with the training materials, "one of the trainers was very dismissive," causing the staff member to cry. (Id.) At least four staff members felt unable to speak in the training because "if they said anything in the training they would have a 'target on their back' and that it would make for a hostile work environment as the topics were very political."[9] (Id.) Staff also expressed that the training "was not a safe space for them to express their feelings/opinions as they were asked and expected to do." (Id.)

Rather than remedying those concerns, Dr. Garcia-Pusateri responded with: "Its [sic] unfortunate that staff are rather taking the content personally and a challenge to their own beliefs and making this political rather than questioning why topics like systemic racism and white supremacy negatively impact them"; "I understand that the content is controversial in nature and some may be uncomfortable, but at the end of the day we are asking everyone to lean into their discomfort and explore different thinking and perspectives"; "Equity work is not easy and is meant to be difficult and at times uncomfortable"; and "Staff cannot support these students if they are not willing to address these issues and start the work of becoming antiracist educators." (Id.) SPS carried on with the equity programming.

**B. The messages in SPS's equity programming were not ordinarily within the scope of Plaintiffs' official job duties, nor were they lawful.**

As the Supreme Court held in *Janus v. AFSCME, Council 31*, "it is not easy to imagine a situation in which a public employer has a legitimate need to demand that its employees recite words with which they disagree." 138 S. Ct. 2448, 2473 (2018). SPS lacks a legitimate reason to compel Plaintiffs' speech because the speech at issue is not ordinarily within the scope of their

---

[9] SPS suggests Plaintiffs should have filed internal grievances after the equity programming, but a chilling effect deters speakers from saying anything that could put a target on their back, *including* filing grievances.

official duties, nor is it lawful. *See id.* ("[I]f the speech in question is part of an employee's official duties, the employer may insist that the employee deliver any lawful message.")

SPS admits that its equity programming included "societal and political ideologies" and appears to accept that it involved speech on matters of public concern. (*See* Defs.' Sugg. in Opp'n MSJ 72, 67; SUMF ¶ 163.) SPS required Plaintiffs to speak as private citizens on matters of public concern in at least two ways. First, it demanded that staff advocate for political, economic, and social change (a role that must be adopted on their own time unless SPS wanted staff to break the law). Second, and more importantly, SPS did not hire either Plaintiff to speak on matters involving anti-racism, white supremacy, or any other topic covered in the fall 2020 equity programming.

Moreover, SPS cannot compel Plaintiffs' speech because anti-racism, as SPS defines it, is *not* the law. SPS has an obligation to treat individuals equally *regardless* of race, color, or national origin. Because of this, the law demands colorblindness. "That the Constitution is color blind is our dedicated belief." Br. for Appellants in Nos. 1, 2, and 4 and for Resp'ts in No. 10 on Reargument, at 65, *Brown v. Bd. of Educ.*, 347 U.S. 483 (1954). Yet SPS boldly asserts that it "cannot be colorblind," that equality "takes in colorblindness," which is "harmful," that students *must* be seen and treated differently based on skin color, and that staff should reject the notion that all lives matter equally. (Defs.' Sugg. in Opp'n MSJ 75; SUMF ¶¶ 27, 42-43, 167-68.) There is no reason to compel Ms. Henderson and Ms. Lumley to accept views so contrary to our nation's laws.

### C. SPS cannot meet its high burden under the First Amendment.

When compulsion and viewpoint discrimination are found, the inquiry ends because they are *per se* unconstitutional. (*See* Pls. Sugg. in Supp. MSJ 26, 36 n.3.)[10] But even if strict scrutiny

---

[10] SPS relies on cases involving K-12 student speech, but the standard for student speech is much different from the standard for school employees. *Compare Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038, 2045 (2021) (explaining that schools "at times stand in loco parentis" and can regulate

applies, SPS cannot show that the messages it compelled staff to convey, and the views it required staff to abandon, were narrowly tailored to serve a compelling government interest.[11] Anti-racism, as SPS defines it, is not the same as anti-discrimination; it therefore cannot serve the same compelling interest anti-discrimination may serve. SPS has not shown and cannot show any other compelling interest that may justify its equity programming. (*See* Pls.' Sugg. in Opp'n MSJ 81.)

Likewise, SPS makes no effort to show that the Equity Training or Canvas modules were narrowly tailored. It claims to be "very aware" of factors that keep a student from "attaining the most out of their education" without explaining what those factors are or how requiring staff to affirm views on anti-racism, oppression, and white supremacy would further this cause. (*See* Defs.' Sugg. in Opp'n MSJ 76.) And even more telling, SPS has produced no evidence showing it so much as considered alternatives to the equity programming. Finally, SPS did not conduct *any* equity programming during the 2021-2022 school year, yet it admits that a lack of training did not compromise students' educational experience in any way. (SUMF ¶¶ 174-76.) Thus, equity programming is not narrowly tailored to meet any compelling interest SPS may think it has.

## II.  SPS placed an unconstitutional condition on Plaintiffs' employment.

SPS placed an unconstitutional condition on Plaintiffs' employment when it coerced them into adopting SPS's views on equity and anti-racism as part of their jobs. The unconstitutional

---

student speech in limited circumstances) *with Pickering v. Bd. of Educ.*, 391 U.S. 563, 569 (1968) (holding school violated teacher's freedom of speech without considering the pedagogical value of his speech); *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 416 (1979) (same).

[11] Motive is not a factor for viewpoint discrimination. SPS's claim traces to *Board of Education v. Pico*, where a Supreme Court plurality held that a school board violated the First Amendment when it removed books from a library because it denied "access to ideas" it found unfavorable. 457 U.S. 853, 871 (1982). The Court held that the suppression of ideas cannot be motivated by and exercised in "a narrowly partisan or political manner." *Id*. Moreover, even if motive did matter, *Pico* made clear that SPS need not have a personal animus toward Plaintiffs' ideas, but merely a desire to suppress certain ideas, like equality and colorblindness. *See id*.

conditions doctrine states that the government "may not impose conditions which require relinquishment of constitutional rights." *Frost & Frost Trucking Co. v. Railroad Comm'n. of Cal.*, 271 U.S. 583, 594 (1926). The government need not deny a benefit for the doctrine to apply. *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 606 (2013) ("[R]egardless of whether the government ultimately succeeds in pressuring someone into forfeiting a constitutional right, the unconstitutional conditions doctrine forbids burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them."). Although SPS is wrong to characterize the pay tied to equity programming as "supplemental," "the government may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech *even if* he has no entitlement to that benefit." *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 59 (2006). Plaintiffs risked losing pay, being denied professional development credit, and being called white supremacists unless they adopted SPS's views on equity and anti-racism. This unconstitutional condition of employment must be remedied.

## CONCLUSION

Because SPS has not shown that the equity programming will not recur, an injunction is necessary to ensure that SPS does not continue to infringe on Plaintiffs' speech. And because SPS already infringed on Plaintiffs' speech, backward-looking relief in the form of nominal damages is also necessary. Finally, a declaratory judgment is necessary to secure Plaintiffs' constitutional rights and freedoms. For these reasons, this Court should grant Plaintiffs' Motion for Summary Judgment and deny Defendants' Motion for Summary Judgment.

August 26, 2022                    /s/ B. H. Boucek
                                   KIMBERLY S. HERMANN*
                                   GA Bar No. 646473
                                   BRADEN H. BOUCEK*
                                   TN BPR No. 021399
                                   GA Bar No. 396831
                                   CELIA H. O'LEARY*
                                   GA Bar No. 747472
                                   JEFFREY A. CLAYMAN*
                                   LA Bar No. 30442
                                   FL Bar No. 52017
                                   Southeastern Legal Foundation
                                   560 W. Crossville Road, Suite 104
                                   Roswell, GA  30075
                                   Telephone: (770) 977-2131
                                   khermann@southeasternlegal.org
                                   bboucek@southeasternlegal.org
                                   coleary@southeasternlegal.org
                                   jclayman@southeasternlegal.org

                                   *Admitted Pro Hac Vice

                                   Derek H. MacKay MO #59078
                                   Knight Nicastro MacKay, LLC
                                   304 W. 10th Street
                                   Kansas City, MO 64105
                                   Phone: (816) 708-0105
                                   mackay@knightnicastro.com

**CERTIFICATE OF SERVICE**

I hereby certify that on August 26, 2022 a copy of the foregoing was filed electronically.

Notice of this filing will be sent by operation of the Court's electronic filing system to all parties

indicated on the electronic filing receipt. All other parties will be served by regular U.S. Mail

and/or facsimile. Parties may access the filing through the Court's electronic filing system.

/s/ B. H. Boucek
BRADEN H. BOUCEK