# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
### SOUTHERN DIVISION

| | | |
|---|---|---|
| Brooke Henderson and Jennifer Lumley, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.: 6:21-CV-03219 |
| | ) | |
| School District of Springfield, R-12; Board | ) | |
| of Education for the School District of | ) | |
| Springfield R-12; Dr. Grenita Lathan; | ) | |
| Dr. Yvania Garcia-Pusateri; and | ) | |
| and Lawrence Anderson, | ) | |
| | ) | |
| Defendants. | ) | |

## REPLY SUGGESTIONS IN FURTHER SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants School District of Springfield, R-12; Board of Education for the School District of Springfield, R-12; Dr. Grenita Lathan; Dr. Yvania Garcia-Pusateri; and Lawrence Anderson, by and through counsel, offer the attached Reply Suggestions in further support of Defendants' Motion for Summary Judgment.

Respectfully submitted,

ELLIS, ELLIS, HAMMONS & JOHNSON, P.C.

By:    /s/ Ransom A Ellis, III
  Ransom A Ellis, III  MBN: 29129
  rellis3@eehjfirm.com
  Todd A. Johnson  MBN: 38363
  tjohnson@eehjfirm.com
  Tina G. Fowler  MBN: 48522
  tfowler@eehjfirm.com
  2808 S. Ingram Mill Road, Suite A104
  Springfield, MO  65804
  Phone:  417-866-5091
  Fax:  417-866-1064
  Attorneys for Defendants

# I.    INTRODUCTION

Aside from the legal arguments, the underlying premise for the District's equity training is paramount to the discussion. The District serves students and its students are diverse and not one of them has the same story. The same is true for the District's staff. When one shows up for school or work on a typical day, one likely does not share what occurred the night before, or the year before. In fact, one may never share circumstances in one's life that impact the way one learns, works, relates, or acts. This premise was the core of the training, a training designed to educate and encourage staff to place themselves in others' shoes in order to ensure a safe place where students and staff alike would learn, thrive and grow through acceptance, inclusion and understanding.

## II.    DEFENDANTS' RESPONSE TO PLAINTIFFS' ADDITIONAL STATEMENT OF UNCONTROVERTED MATERIAL FACTS

Defendants respectfully offer the following admissions or denials:

**145.** SPS focused its Equity Training "on current issues that have impacted our society nationally and globally (i.e., Covid-19 and Protests against Systemic Racism towards the Black Community)." (Pls.' MSJ Ex. 9 at 10; Pls.' MSJ Ex. 13 at 8; Pls.' Opp'n Ex. 29, DEX 50C-008301-29 at 8314.)

<u>Response</u>: Defendants deny this Paragraph for the following reasons: (1) the paragraph uses the term "SPS" which constitutes argument and is unaccompanied by citation; (2) the proposed fact uses the term "focused on Equity Training" which constitutes argument; (3) Plaintiffs' MSJ Exhibit 9 at 10 does not contain the quotation set forth in the proposed fact; and (4) Plaintiffs' Suggestion in Opposition to Defendants' MSJ, Exhibit 29, DEX 50C-008301-29 at 8314 mentions "Covid 19" on page 8314 but does not use the term "systemic racism" or contain the quotation set forth in the proposed fact.

Defendants further respond as follows and admit the following:

A. The purpose of the Fall (2020) Equity Training was to: (1) Improve engagement, safety, and attendance rates for under-resourced and under-represented student populations

(2) Demonstrate annual growth in the core academic success (iReady, MAP, EOC, Common Assessments) for all students, with an intensive focus on closing performance gaps for under-resourced and under-represented students; (3) Increase the graduation rate for all student populations, with an intensive focus on under-resourced and under-represented students; and (4) Recruit, hire, develop, support and retain an effective, qualified and diverse workforce of teachers, staff and leaders to better meet the needs of students. (*See* Exh. C, ¶ 42; and Exh. E, ¶ 2, DEX 3.06, 6.01, 6.02, 6.03, 6.05, 6.06, 6.07.

      B. *Also see* Plaintiffs' admissions of Defendants' Statement of Undisputed Material Facts, Doc. No. 78, ¶¶ 26, 34 and 48.

**146.** SPS told staff that they were "required to complete training, or they will be docked pay." (Pls.' MSJ Ex. 6, DEX 50C-009935-40, at 9937.)

Response: Defendants deny this Paragraph for the following reasons: (1) the paragraph uses the term "SPS" which constitutes argument and is unaccompanied by citation; (2) Plaintiffs' MSJ, Exhibit 6, DEX 50 C-009935-40, at 9937 is an email from the secretary of the Equity and Diversity Department, an hourly-paid employee. Plaintiffs' present no evidence that Ms. Searles is an agent of Defendant District or Defendant Board; and (3) Plaintiffs' use of the term "staff" is indicative of a class action. Plaintiffs' cause of action is an individual Section 1983 claim.

Defendants admit the following:  *See* Plaintiffs' admissions of Defendants' Statement of Undisputed Material Facts, Doc. No. 78, ¶¶ 55-60.

**147.** SPS also told staff that the training was "not an invitation to participate in, it is a requirement for staff to participate in which they also are compensated for." (Pls.' MSJ Ex. 4, YGP/SPS Dep. ex. 7, at DEX 50A-000388 (emphasis in original).)

Response: Defendants deny this Paragraph for the following reasons: (1) the paragraph uses the term "SPS" which constitutes argument and is unaccompanied by citation; (2) Plaintiffs' MSJ, Exhibit 4, YGP/SPS Dep. ex. 7, at DEX 50A-000388 is an email from Defendant Garcia-Pusateri

3

to the Principal of Bissett Elementary School and neither Plaintiff received training at that location; and (3) Plaintiffs' use of the term "staff" is indicative of a class action. Plaintiffs' cause of action is an individual Section 1983 claim.

Defendants admit the following: Plaintiff Henderson testified that she did not believe that being told it was "mandatory" for her to attend the Fall (2020) Equity Training Session and to be respectful violated her rights in any way. (*See* Doc 75-1, p. 37).

**148.** SPS provided Ms. Henderson and Ms. Lumley a packet of handouts before their Equity Training sessions. (Pls.' MSJ Ex. 9; Stip. ¶¶ 16-17; *See* also Pls.' MSJ Ex. 10, Hale Dep. 15:4-7, dep. ex. 2.)

<u>Response</u>: Defendants deny this Paragraph for the following reasons: (1) the paragraph uses the term "SPS" which constitutes argument and is unaccompanied by citation; and (2) there is no evidence cited that Plaintiff Lumley received a packet of handouts from Phillip Hale on or prior to October 6, 2020 when she attended the Fall 2020 District-Wide Equity Training.

Defendants otherwise admit the remaining parts of this paragraph.

**149.** SPS provided substantially the same handouts to all SPS employees before their respective Equity Training sessions. (Pls.' MSJ Ex. 4, Pls.' MSJ Ex. 4, YGP/SPS Dep. 128:9-11.)

<u>Response</u>: Defendants deny this Paragraph for the following reasons: (1) the paragraph uses the term "SPS" which constitutes argument and is unaccompanied by citation; (2) other than the testimony about distribution of handouts by Phillip Hale to the October 14, 2020 training session, there is no evidence regarding who distributed handouts to other training sessions; and (3) whether handouts were distributed to other training sessions is immaterial.

Defendants otherwise admit the remaining parts of this paragraph.

**150.** The "Greetings!" handout, which was the same statement a school administrator or leader was to read at the start of Equity Training sessions, stated, in part, "It is important that we continue this significant work for our own personal and professional development...[Equity and diversity] is more than a value, but now part of our work and job responsibilities. ...[W]e all are now accountable in this work as well. Growing a deeper sense of cultural consciousness is something we must commit to, not just for ourselves but for all our students. As with any presentation, I ask that

4

you remain engaged and professional and provide our trainers complete attention and respect." (Pls.' MSJ Ex. 4, YGP/SPS Dep. 101:11-22, dep. ex. 7; Pls.' MSJ Ex. 9 at 10.)

Response: Defendants deny this paragraph for the following reasons: (1) the paragraph constitutes argument; and (2) the paragraph is immaterial to the extent that it deals with the Fall 2020 District-Wide Equity training sessions that were not attended by Plaintiffs.

Defendants admit the following: (1) The Greetings handout was distributed to the participants in the October 14, 2020 Fall 2020 District-Wide Equity Training session that was attended by Plaintiff Henderson. (Joint Stipulation, Doc 77-1, ¶ 16). And (2) the "Greetings" handout is the best evidence of what it states.

**151.** SPS's trainers showed the Equity Training attendees a PowerPoint slide presentation during the Equity Training. (Pls.' MSJ Ex. 1, Stip. ¶¶ 1(g), 9; Pls.' MSJ Ex. 13.)

Response: Defendants deny this paragraph as the paragraph is immaterial to the extent that it deals with the Fall 2020 District-Wide Equity training sessions that were not attended by Plaintiffs.

Defendants admit the following:

A. Plaintiff Lumley was shown a PowerPoint slide presentation during the Fall 2020 District-Wide Equity training she attended on October 6, 2020. (DEX 13.01).

B. Plaintiff Henderson was shown a PowerPoint slide presentation during the Fall 2020 District-Wide Equity training she attended on October 14, 2020. (DEX 13.01).

**152.** SPS used substantially the same slide presentation for all Equity Training sessions, including the Equity Training sessions that Ms. Lumley and Ms. Henderson attended. (Pls.' MSJ Ex. 1, Stip. ¶ 9; *See* also Pls.' MSJ Ex. 14, Anderson Dep. 16:2 to 17:8.)

Response: Defendants deny this paragraph as the paragraph is immaterial to the extent that it deals with the Fall 2020 District-Wide Equity training sessions that were not attended by Plaintiffs.

Defendants admit the following:

A. Plaintiff Lumley was shown a PowerPoint slide presentation during the Fall 2020 District-Wide Equity training she attended on October 6, 2020. (DEX 13.01).

5

B. Plaintiff Henderson was shown a PowerPoint slide presentation during the Fall

2020 District-Wide Equity training she attended on October 14, 2020. (DEX 13.01).

**153.** The SPS trainers also used a "Script & Slide Breakdown" ("Script") in connection with the slide presentation, which they largely followed in each Equity Training session. (Pls.' MSJ Ex. 15; Pls.' MSJ Ex. 4, YGP/SPS Dep. 21:11 to 23:13, dep. ex. 3; Pls.' MSJ Ex. 14, Anderson Dep. 20:7 to 21:4, 31:10-14, dep. ex. 1.)

<u>Response</u>: Defendants admit this paragraph.

**154.** SPS communicated the following "Guiding Principles" in the "Guiding Principles" handout and slide: "Speak YOUR Truth and from YOUR Lived Experiences"; "Acknowledge YOUR privileges"; and "Hold YOURSELF Accountable." (Pls.' Ex. 9 at 8; Pls.' Ex. 13 at 7.)

<u>Response</u>: Defendants deny this Paragraph to the extent that it uses the term "SPS" which

constitutes argument and is unaccompanied by citation.

Defendants admit the remaining parts of this paragraph.

**155.** The Equity Training slide presentation included an "Overview of Training" slide that stated that participants would "[r]eceive tools on how to become Anti-Racist educators, leaders and staff members at SPS," among other statements. (Pls.' MSJ Ex. 13 at 8; Pls. MSJ Ex. 4, Henderson Dep. 57:1-5 ("[W]e had to be an ally and it was part of our job duty to be an antiracist educator.")

<u>Response</u>: Defendants deny this Paragraph for the following reasons: (1) the paragraph

contains multiple facts in contravention of Local Rule 56.1(a); and (2) the quotation attributed to

Plaintiff Henderson is not contained in the "Overview of Training" PowerPoint.

Defendants admit the following: The "Overview of Training" slide contained in the

PowerPoint Presentation for the October 6, 2020 and October 14, 2020 Fall District-Wide Equity

Training states in part: "Participants will: Receive tools on how to become Anti-Racist educators,

leaders and staff members of SPS." (Doc 77-13, p. 8; DEX 13.01).

**156.** In connection with the Equity Training overview, SPS informed staff that "we are more than likely going to see more issues come to light with a divisive election upon us." (Pls. MSJ Ex. 15 at 7.)

<u>Response</u>: Defendants deny this Paragraph for the following reasons: (1) the paragraph uses

the term "SPS" which constitutes argument and is unaccompanied by citation; (2) the paragraph is

6

immaterial to the extent that it deals with the Fall 2020 District-Wide Equity training sessions that were not attended by Plaintiffs; and (3) no evidence or citation is made that shows the cited comment was made at the October 6, 2020 or October 14, 2020 Fall District-Wide Equity Trainings attended by Plaintiffs.

Defendants admit the following: The following statement is contained in the "Script" document: "A lot has already occurred this year with COVID-19 and racial injustice. The year has not yet ended and we are more than likely going to see more issues come to light with a divisive election upon us. SPS is not immune from these societal issues - they will appear in our classrooms and our work spaces." (Doc 77-15, p. 7).

**157.** During [the] portion of the Equity Training about "Oppression," SPS taught staff that "[s]ociety's institutions, such as government, education, and culture, all contribute or reinforce the oppression of marginalized social groups while elevating dominant social groups." (Pls.' MSJ Ex. 13 at 16.)

Response: Defendants deny this Paragraph for the following reasons: (1) the paragraph uses the term "SPS" which constitutes argument and is unaccompanied by citation; (2) by using the term "taught" the paragraph constitutes opinion and argument; (3) the paragraph uses the term "staff" making it immaterial to the extent that it deals with the Fall 2020 District-Wide Equity training sessions that were not attended by Plaintiffs; and (4) there is no evidence or citation showing that the paragraph was discussed at the October 6, 2020 or October 14, 2020 Fall District-Wide Equity Trainings attended by Plaintiffs.

Defendants admit the following:

A. The following statement is contained in the "Systems of Oppression" PowerPoint slide (DEX 13.01, p. 16; Doc 77-13, p. 16): "Society's institutions, such as government, education, and culture, all contribute or reinforce the oppression of marginalized social groups while elevating dominant social groups."

B. The "Systems of Oppression PowerPoint" slide attributes the quotation to a book titled "Social Identities and Systems of Oppression" published by the Smithsonian National Museum of African American History and Culture. (Doc 77-13, p. 16).

**158.** The Oppression Matrix handout and slide labeled white people as oppressors and non-white people as oppressed. (Pls. MSJ Ex. 9 at 4; Pls.' MSJ Ex. 13 at 17.)

<u>Response</u>: Defendants deny this paragraph for the following reasons: (1) the statement made in this paragraph is untrue; and (2) the statement contains opinion and political argument.

Defendants admit the following:

A. The Oppression Matrix handout that was part of the packet distributed by Phillip Hale at the October 14, 2020 Fall District-Wide Equity Training attended by Plaintiff Henderson (Doc 77-9, p. 4) and the PowerPoint presentation that was presented at the October 6, 2020 and October 14, 2020 Equity Trainings attended by both Plaintiffs (Doc 77-13, p. 17) have "white people" listed as a "Privileged Social Group," "Bi-racial people" listed as a "Border Social Group," "Asian, Black, Latina/o, Native People" listed as "Oppressed Social Groups."

B. Plaintiff Henderson testified that during the October 14, 2020 Fall (2020) District-Wide Equity Training she was asked to identify where she fell on the oppression matrix. She admits, however, she did not express any opinion on the matrix, she did not share where she would place herself on the matrix, and she did not recall the presenters calling anyone out. (Doc 75-1, pp. 54-56; *See* Exh. A, p. 98, lns. 3-6; p. 102, lns. 19-21; p. 103, lns. 10-17).

C. Plaintiff Lumley testified that during the October 6, 2020 Fall (2020) District-Wide Equity Training the trainers "went over the Oppression Matrix a little bit" but she did not remember anything that they said about it. Plaintiff Lumley also testified that there was

no small group session on the Oppression Matrix and she was not asked her opinion about it. (*See* Doc 75-2, pp. 14-15; Exh. B, p. 23, lns. 17-25; p. 24, lns. 1-7).

**159.** Through a video, SPS stated that white supremacy needed to be eradicated and claimed that white supremacy had "White House Allies" in the Trump administration. (Pls.' MSJ Ex. 13 at 21; Pls.' MSJ Ex. 1 Stip. ¶ 10(e); Pls.' MSJ Ex. 4, YGP/SPS Dep. 267:18 to 268:9, 269:21-25, dep. ex. 12.)

<u>Response</u>: Defendants deny this Paragraph for the following reasons: (1) the paragraph uses the term "SPS" which constitutes argument and is unaccompanied by citation; (2) the paragraph is immaterial to the extent that it deals with Fall 2020 District-Wide Equity training sessions that were not attended by Plaintiffs; (3) there is no evidence or citation showing that the "video" was shown or discussed at the October 6, 2020 or October 14, 2020 Fall District-Wide Equity Trainings attended by Plaintiffs; (4) there is no reference to President Donald Trump or the "Trump Administration in the video;" and (5) there are no oral "claims" or oral mention that white supremacy had "White House Allies" in the video. (Doc 77-13, p. 21).

Defendants admit the following:

A. Defendant Garcia-Pusateri stated that: "We were facilitating learning. We were not talking about the presidency or politics. We were talking about white supremacy and how it appeared in our history." (*See* Doc 77-4, p. 68; Exh. G, p. 269, lns. 13-16).

B. Plaintiff Lumley testified that during the October 6, 2020 Fall District-Wide Equity training she attended, the presenters talked about "some of the items" on the Overt/Covert White Supremacy handout that came with the packet she received "but they didn't go into great detail about the sheet." There was no breakout session, no one called her name or asked her questions or made her affirm or agree to anything on the sheet. (*See* Doc 75-24, pp. 15-16; Exh. B pp. 24-25).

9

C. During the October 14, 2020 Fall (2020) District-Wide Equity Training session, Plaintiff Henderson was never called on by the trainers (whether it be Defendant Garcia-Pusateri or Defendant Anderson) to answer questions during the large group sessions. (*See* Exh. A, p. 30, ln. 24 to p. 31, ln. 4; p. 59, l. 4-21).

**160.** The Covert/Overt White Supremacy handout and slide indicated that "colorblindness," "All Lives Matter," and "white silence" constituted white supremacy. (Pls. MSJ Ex. 9 at 5; Pls.' MSJ Ex. 13 at 22.)

Response: Defendants admit only that the Covert/Overt White Supremacy handout and PowerPoint slide place the words "colorblindness," "all lives matter," and "white silence" under the heading "Covert White Supremacy-Socially Acceptable." Defendants deny the remaining parts of this paragraph for the term "constituted" constitutes argument and opinion.

**161.** Through its Equity Training, SPS taught that "systems of oppressions [sic] are woven into the very fabric of the United States and form the foundation of the American culture and its laws." (Pls.' MSJ Ex. 13 at 16; Pls.' MSJ Ex. 15 at 10.)

Response: Defendants deny this Paragraph for the following reasons: (1) the paragraph uses the term "SPS" which constitutes argument and is unaccompanied by citation; (2) by using the term "taught" the paragraph constitutes opinion and argument; (3) the paragraph uses the term "staff" making it immaterial to the extent that it deals with the Fall 2020 District-Wide Equity training sessions that were not attended by Plaintiffs; and (4) there is no evidence that the "Script" (Doc 77-15) was used for either or both of the Fall District-Wide Equity Trainings attended by Plaintiffs.

Defendants admit the following:

A. The "Systems of Oppression" slide (Doc 77-13, p. 16) contains the following sentence: "In the United States, systems of oppressions (like systemic racism) are woven into the very foundation of American culture, society, and laws."

10

B. The "Systems of Oppression PowerPoint" slide attributes the above quotation to a book titled "Social Identities and Systems of Oppression" published by the Smithsonian National Museum of African American History and Culture. (Doc 77-13, p. 16).

**162.** The Equity Training defined "anti-racism" as "advocating for changes in political, economic, and social life." (Pls.' MSJ Ex. 13 at 31.)

<u>Response</u>: Defendants admit only that the "Anti-Racism" slide (Doc 77-13, p. 31) contains the following statement: "Anti-Racism is defined as the work of actively opposing racism by advocating for changes in political, economic, and social life. Anti-racism tends to be an individualized approach, and set up in opposition to individual racist [sic]."

**163.** SPS has admitted that the Black Lives Matter slogan and saying colorblindness is white supremacy are overtly political statements. (Pls.' MSJ Ex. 4, YGP/SPS Dep. 331:15 to 332:22, dep. ex. 13; Defs.' Sugg. in Supp. MSJ 51 n.21.)

<u>Response</u>: Defendants deny this Paragraph for the following reasons: (1) the paragraph uses the term "SPS" which constitutes argument and is unaccompanied by citation; (2) Plaintiffs refer to the argument portion of Defendants' Suggestions in Support of their Motion (Doc. 75, n. 21), which is not an admission, but regardless, and as further addressed by Defendants in Their Opposition to Plaintiffs' Motion (Doc. 80, p. 73), as some "may view 'white silence' or 'colorblindness' as white supremacy" and "as some may disagree with that interpretation," "such decisions should be left to the school board," *citing Lee v. York Cty. Sch. Div.*, 484 F.3d 687 (4th Cir. 2007) (citations omitted); (3) the paragraph refers to a "Sports Bulletin" dated October 9, 2020 making it immaterial in that it was not connected to or used in the Fall 2020 District-Wide Equity training sessions that were attended by Plaintiffs; (4) the paragraph constitutes argument; and (5) the statement in the paragraph is patently untrue.

Defendants admit the "Sports Bulletin" dated October 9, 2020 states in pertinent part:

11

<u>**"Equity, Diversity and Inclusion – Athletics**</u>

Hopefully by now most of you have had the opportunity to take part in this year's equity training. This is important work for both teachers and coaches throughout our district on behalf of students. We all should keep in mind the importance of seeking to understand, leaning into the discomfort and most important become an anti-racist.

As we educators come to grips with everything happening in our community and country over the past 7 months, our students must also find their way. Everything has changed from school, daily lives to athletics. National protest/demonstrations to-date have been by sports teams throughout professional leagues. However, since we are a public institution with young students, we ask that you abide by the following guidelines.

- o **No political messaging on our school district equipment or cloth**. (warm-ups, team shirts, shooting shirts, etc.). Statements such as Black Lives Matter or All Lives Matter are prohibited. Please review anything purchased by Boosters.
- o **Note: Students do have a constitutional right to kneel but may not be forced to do so by school personnel**.

The intent of our sports/activities should be to heal our students, community and country. ***It is our job to create a welcoming and safe environment for all of our students and remember that the impact of our words/actions are more important than our intent*.**"

(*See* Doc 77-4, p. 269; DEX 50B 002773).

**164.** SPS reminded staff that the Equity Training was made for "personal and professional development." (Pls.' MSJ Ex. 4, YGP/SPS Dep. 101:11-22, dep. ex. 7; Pls.' MSJ Ex. 9 at 10.)

<u>Response</u>: Defendants deny this Paragraph for the following reasons: (1) the paragraph uses the term "SPS" which constitutes argument and is unaccompanied by citation; (2) by using the term "reminded" the paragraph constitutes opinion and argument; and (3) the paragraph uses the term "staff" making it immaterial to the extent that it deals with the Fall 2020 District-Wide Equity training sessions that were not attended by Plaintiffs.

Defendants admit the following: The "Greetings" handout (Doc 77-9, p. 10) contains the words "personal and professional development."

**165.** The speech SPS paid Ms. Henderson for during the 2020-2021 school year included advocating for individuals with physical or mental disabilities pursuant to Section 504 of the Rehabilitation Act. (Pls.' Opp'n Ex. 26, Henderson Dep. 5:22 to 9:3; Defs.' MSJ Ex. E at 18-20.)

<u>Response</u>: Defendants deny this Paragraph for the following reasons: (1) the paragraph is argument; and (2) the paragraph uses the term "SPS" which constitutes argument and is unaccompanied by citation.

**166.** The speech SPS paid Ms. Lumley for at the time of the 2020-2021 school year included secretarial work that involved managing and producing student records. (Defs.' MSJ Ex. E at 15-17.)

<u>Response</u>: Defendants deny this Paragraph for the following reasons: (1) the paragraph is argument; and (2) the paragraph uses the term "SPS" which constitutes argument and is unaccompanied by citation.

**167.** SPS warned staff that colorblindness is harmful and believes that students should be treated differently based on race. (Pls.' MSJ Ex. 4, YGP/SPS Dep. 64:13 to 68:6; Pls. MSJ Ex. 13 at 22.)

<u>Response</u>: Defendants deny this Paragraph for the following reasons: (1) the paragraph uses the term "SPS" which constitutes argument and is unaccompanied by citation; (2) by using the term "warned" the paragraph constitutes opinion and argument; and (3) the paragraph uses the term "staff" making it immaterial to the extent that it deals with the Fall 2020 District-Wide Equity training sessions that were not attended by Plaintiffs.

Defendants admit the following:

A. Defendant Garcia-Pusateri stated that the Equity and Diversity Department define the term "equity" as "to ensure that we are meeting the unique needs of students and staff to ensure that they're finding their way to success." (*See* Doc 77-4, p. 16; Exh. G, p. 63, lns. 16-20).

B. Defendant Garcia-Pusateri stated that: "Equity means treating people with the things that they need. ... If a student is in a wheelchair and someone is able-bodied, the student in the wheelchair is going to have different needs than the person that is able-bodied." (*See* Doc 77-4, p. 16; Exh. G, p. 63, lns. 16-20).

13

C. Defendant Garcia-Pusateri stated that: "I believe the student that's black is going to have a different lived experience than a white student. Perhaps will have different needs and supports that will still get them to success." ... [so in order to give a student of color what they need under an equity definition] "it means providing the supports that they need. ... based on their identity and their lived experiences." (*See* Doc 77-4, p. 17; Exh. G, p. 65, lns. 1-11).

D. Defendant Garcia-Pusateri stated that: "Colorblindness . ... is saying that I see you as just the person rather than seeing you with everything that you come with. I believe people of color -- so I would say like myself as a Latino -- would want people to see me with my race and my ethnicity because it is who I am." (*See* Doc 77-4, p. 17; Exh. G, p. 66, lns. 18-23).

E. Defendant Garcia-Pusateri stated that: "[Colorblindness] can have harmful impacts. ... It can make someone feel like you do not want to see them for their identity or their lived experience. And you just want to be treated as someone that doesn't have those experiences because those experiences also inform who you are and impact you." (*See* Doc 77-4, p. 17; Exh. G, p. 66, ln. 25; p. 67, lns. 2-6).

**168.** According to SPS, colorblindness is not an equitable concept and equality "takes in colorblindness." (Pls.' MSJ Ex. 4, YGP/SPS Dep. 66:16 to 67:6, 68:7-9, 70:19 to 71:16, 96:4-7.)

<u>Response</u>: Defendants deny this Paragraph for the following reasons: (1) the paragraph uses the term "SPS" which constitutes argument and is unaccompanied by citation; (2) the paragraph misstates the testimony of Defendant Garcia-Pusateri; and (3) *See* Defendants' Response to paragraph 167 above.

Defendants admit the following:

A. Defendant Garcia-Pusateri stated that equality treats everyone the same and sees them as all the same. "Whereas, equity is about seeing [each person's] whole [self] and their whole personhood." (*See* Doc 77-4, p. 17; Exh. G, p. 68, lns. 3- 6).

B. Defendant Garcia-Pusateri stated that "I would say maybe [equality] does take in aspects of colorblindness. I don't think [colorblindness is] part of the definition [of equality], but it probably takes in colorblindness." (*See* Doc 77-4, p. 17; Exh. G, p. 68, lns. 8-10).

C. Defendant Garcia-Pusateri stated that: "I don't think equality is harmful. I think there's a better ... way of making ... people feel safe and supported." (*See* Doc 77-4, p. 17; Exh. G, p. 68, lns. 13-15).

**169.** SPS defined white supremacy as "the all-encompassing centrality and assumed superiority of people defined and perceived as white." (Pls.' MSJ Ex. 13 at 20; Pls.' MSJ Ex. 4, YGP/SPS Dep. 202:2-4.)

Response: Defendants deny this Paragraph for the following reasons: (1) the paragraph uses the term "SPS" which constitutes argument and is unaccompanied by citation.

Defendants admit that the first sentence of the "White Supremacy" slide states: "White Supremacy captures the all-encompassing and assumed superiority of people defined and perceived as white" and is attributed to Robin DiAngelo. (Doc 77-13, p. 20)

**170.** SPS's Chief Equity and Diversity Officer does not know a single staff member that she would characterize as a white supremacist. (Pls.' MSJ Ex. 4, YGP/SPS Dep. 260:1-3.)

Response: Defendants deny this Paragraph for the following reasons: (1) the paragraph misstates the question posed and the answer given by Defendant Garcia-Pusateri.

Defendants admit that the following question and answer occurred:

Q. "Have you ever seen a staff member at SPS that you would characterize as a white supremacist?
A. No."

(*See* Doc 77-4, p. 65; and Exh. G, p. 260, lns. 1-3).

**171.** SPS admitted that it did not consider any studies or scholarship when building the Equity Training and Canvas modules. (Pls.' MSJ Ex. 4, YGP/SPS Dep. 57:22 to 58:3, 60:5-22.)

Response: Defendants deny this Paragraph for the following reasons: (1) the paragraph uses the term "SPS" which constitutes argument and is unaccompanied by citation; (2) the paragraph attributes an action to "SPS" – "did not consider any studies or scholarship" which is argument; and (3) the paragraph in immaterial.

Defendants admit that the following:  *See* Plaintiffs' admissions of Defendants' Statement of Undisputed Material Facts, Doc. No. 78, ¶¶ 27, 30 and 31. Defendants also admit that the following questioning and answering occurred with Defendant Garcia-Pusateri:

> Q. "(By Mr. Boucek) When you were creating fall 2020 equity training, did you consider any studies ... [or] bodies of scholarship?
> A. I can't recall exactly what I was thinking at the time of development, no. It did not come to mind. No. It just wasn't there. No.
> Q. Was there any evidence that the District considered to see that requiring this training would help achieve or promote the goals that you've listed?
> A. I believe based on the data that is found in our discipline, our academics, our climate and culture, and also recent public incidents that have taken place in our school sites demonstrated a need for the training.
> Q. ...So which data are you referring to?
> A. I'm talking about data ...--when you look at our discipline rates among students of color, our climate and culture data, academic data. Any data you ... find within the District that talks about the experiences of our students. ... Data shows that ... many of our students are not having positive experiences in the classroom."

(*See* Doc 77-4, p. 15; and Exh. G, p. 57, lns. 22-25; p. 58, lns. 1-23).

**172.** Although it collected data that showed "gaps" in student experiences, SPS did not conduct any studies about how equity programming could and would address those gaps. (Id.)

Response: Defendants deny this Paragraph for the following reasons: (1) the paragraph uses the term "SPS" which constitutes argument and is unaccompanied by citation; (2) the paragraph attributes an action to "SPS" – "did not conduct any studies" which is argument; (3) the paragraph in immaterial; and (4) the cited portions of the record contain no mention of "gaps in student experiences."

16

Defendants admit the following: *See* Defendants' response to Paragraph 171 above.

**173.** SPS did not consider any alternatives to the equity programming that could address its goals. (Id. 60:23 to 62:5.)

Response: Defendants deny this Paragraph for the following reasons: (1) the paragraph uses the term "SPS" which constitutes argument and is unaccompanied by citation; (2) the paragraph attributes an action to "SPS" – "did not consider any alternatives" which is argument; (3) the paragraph in immaterial; and (4) the cited portions of the record contain no mention of "alternatives to the equity programming." *Also see* Defendants' response to Paragraph 171 above.

**174.** SPS found no evidence that the equity programming achieved any of its stated goals, such as increasing student achievement or making students feel more safe, secure, and supported. (Pls.' MSJ Ex. 23, Lathan/SPS Dep. 66:16 to 67:5, 68:8-13, 69:18 to 70:7, 75:3 to 77:24.)

Response: Defendants deny this Paragraph for the following reasons: (1) the paragraph uses the term "SPS" which constitutes argument and is unaccompanied by citation; (2) the paragraph attributes an action to "SPS" – "found no evidence" which is argument; and (3) the paragraph in immaterial.

Defendants admit that Defendant Lathan gave the following answers:

Q. "In the fall of 2021 year -- in the 2021 school year, even without the mandatory fall 2021 equity training, did the district compromise in its commitment to under-resourced or underserved students?
A. No.
Q. Did the district compromise in its commitment to create an equitable culture and climate for under-resourced and underserved students during the 2021-2022 school year.
A. No.
Q. Did the district compromise in its ability to provide the best education for its students in the 2021-2022 school year?
A. No."
                                                    ***
Q. "(By Mr. Boucek) Well, I'm not necessarily saying they were or were not mandatory. What I'm asking is, were staff able to do their job in fall of 2021, continuing through the school year, without mandatory equity training as in fall of 2020?
A. Yes".

17

(*See* Exh. L, p. 66, lns. 16-25; p. 67, lns. 1-5; p. 68, lns. 8-13; and Doc 77-23, p. 17)

**175.** SPS admitted that it achieved those goals in 2021 without mandatory equity programming. (Id. 66:16 to 67:5, 78:5-18.)

Response: Defendants deny this Paragraph for the following reasons: (1) the paragraph uses the term "SPS" which constitutes argument and is unaccompanied by citation; (2) the paragraph attributes an action to "SPS" – "achieved those goals" which is argument; and (3) the paragraph in immaterial;" (4) the citations do not support this paragraph.

Defendants admit that Defendant Lathan gave the following answers:

Q. "In the fall of 2021 year -- in the 2021 school year, even without the mandatory fall 2021 equity training, did the district compromise in its commitment to under-resourced or underserved students?
A. No.
Q. Did the district compromise in its commitment to create an equitable culture and climate for under-resourced and underserved students during the 2021-2022 school year.
A. No.
Q. Did the district compromise in its ability to provide the best education for its students in the 2021-2022 school year?
A. No."

\*\*\*

Q. "...Did the absence of the fall 2021 equity training result in fewer staff members complaining? Was it -- did you hear -- get any positive feedback about -- about that? Feedback one way or the other about not going forward with equity training?
A. No feedback was received about equity training.
Q. In fall of -- in the 2021 to 2022 school year, was the district impaired in its ability to educate children?
A. No.
Q. Was the district impaired in its ability to serve, in particular, underserved and under-resourced students?
A. No.

(*See* Doc 77-23, pp. 17, 20; and Exh. L, p. 66, lns. 16-25; p. 67, lns. 1-5; p. 78, lns. 5-18).

**176.** SPS admitted that it did not conduct equity training during the 2021-2022 school year due, in part, to litigation. (Id. 50:12 to 51:18; Pls.' Opp'n Ex. 30, DEX 50G-014815.)

Response: Defendants deny this Paragraph for the following reasons: (1) the paragraph uses the term "SPS" which constitutes argument and is unaccompanied by citation; (2) the paragraph

attributes an action to "SPS" – "did not conduct equity training" which is argument; (3) the paragraph in immaterial;" (4) the citations do not support this paragraph.

Defendants admit that Defendant Lathan stated as follows:

Q. You discussed litigation with [Defendant Garcia-Pusateri] as a reason why the fall 2021 equity training was not going forward; isn't that right?
A. Litigation in the sense of until their department understood and were trained in how to lead trainings so that we didn't enter into anyone misunderstanding what they were presenting and addressing -- trying to address equity issues in our district."

(*See* Doc 77-23, p. 13; and Exh. L, p. 50, lns. 22-25; p. 51, lns. 1-5).

**177.** SPS admitted that the "district will resume equity training at some point." (Id. 53:5-11.)

<u>Response</u>: Defendants deny this Paragraph for the following reasons: (1) the paragraph uses the term "SPS" which constitutes argument and is unaccompanied by citation; (2) the paragraph attributes an action to "SPS" – "admitted" which is argument; (3) the paragraph in immaterial;" and (4) the citations do not support this paragraph.

Defendants admit the following: Dr. Lathan stated that "the district will resume equity training at some point, yes." (*See* Doc 77-23, p. 14; and Exh. L, p. 53, lns. 10-11).

### III. ARGUMENT

As discussed, Plaintiffs' Opposition does not preclude sustainment of Defendants' motion.

**A. Plaintiffs have failed to show standing.**

It must be noted that Plaintiffs did not address Defendants' primary authorities which solidify their lack of standing. In each of the following cases, a form of diversity awareness in a school setting was challenged and in each case no standing was found. *See Brown v. Hot, Sexy & Safe Prod.*, 68 F.3d 525 (1st Cir. 1995); *Preskar v. U.S.*, 248 F.R.D. 576 (E.D. Cal. 2008); and *Menders v. Loudoun Cty. Sch. Bd.*, 2022 WL 179597 (E.D. Va. 2022). Rather, Plaintiffs avoid these cases and focus on cases involving certain violations of law or policy.[1] One of their primary authorities is *Cressman v. Thompson* wherein the plaintiff claimed an image of a Native American shooting an arrow towards the sky on an Oklahoma license plate was religiously offensive. 719 F.3d 1139, 1141 (10th Cir. 2013) (*Cressman I*). Thus, Plaintiffs compare a state law requiring use of a certain license plate (or face fines) with a school district's requirement to attend equity training. This is the ultimate cliché of comparing apples to oranges. Specifically, Plaintiffs want to attribute:

1. "saying what SPS wanted to hear by affirming anti-racism and equity" <u>with</u> being required to drive, legally, with a license plate containing an image one allegedly finds objectionable (i.e. "displaying the government message"); or
2. "refraining from speaking and risk being labeled white supremacists" <u>with</u> purchasing specialty license plates for extra money to avoid displaying the image (i.e. "pay to avoid displaying the message"); or
3. "speak out and risk losing development credit and pay" <u>with</u> covering up the image on the license plate and facing fines or penalties (i.e. "refuse to speak and face the consequences").

*See* Doc. No. 78, p. 75 (*citing Cressman I* at 1145).

Parsing out their alleged basis for standing this way reveals how far Plaintiffs will go to try and salvage their claims. *Cressman* concerned a state law that guaranteed fines and penalties for

---

[1] For example, in *Meriwether v. Hartop*, the plaintiff received a reprimand for violating a policy that required him to refer to students by pronouns that reflected their self-asserted gender identity. 992 F.3d 492 (6th Cir. 2021). His suit claimed the policy conflicted with his religious beliefs. *Id.* at 512.

failure to comply with the law. While the plaintiff there did not need to actually possess the license plate he found objectionable for standing, he had previously covered up the image on the plate exposing himself to prosecution. This is why he had standing.[2] Conversely here, in order to be paid for training, Plaintiffs were only required to attend the training, and they did. Per their admissions, it is undisputed that Plaintiffs were not subjected to any penalty and it is undisputed that no one else was subjected to any penalty. This is dispositive; Plaintiffs have no standing.

Plaintiffs' application of "a chilling effect" to the facts at bar is also misplaced. As pointed out by Plaintiffs, and as this Court has aptly noted, "[t]he Supreme Court has held that constitutional violations may arise from the chilling effect of 'regulations that fall short of a direct prohibition against the exercise of First Amendment rights.' " *Hershey v. Curators of Univ. of Mo.*, 2022 WL 1105742 at *3 (W.D. Mo. 2022) (citation omitted). However, allegations of a subjective chill are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm. *Id.* (citation and internal quotations omitted). Unlike the allegations in *Hershey*, there is no evidence here that the District "acted" to penalize Plaintiffs <u>and</u> "demonstrated" that they will likely do so again in the future. *See id.*; and *cf. Steffel v. Thompson*, 415 U.S. 452, 459-60 (1974) (finding standing as police told plaintiff he would be prosecuted for continued violations of trespass law); and *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 765 (6th Cir. 2019) (finding standing as university's response team made referrals which could lead to punishments). At bottom, Plaintiffs' claimed "wonder[ing] [about] what would happen if they did not attend" the training is wholly insufficient to confer standing. Their claims must be dismissed for lack of standing.

_____

[2] Notably, although the plaintiff stated a plausible claim at the motion-to-dismiss stage, the Tenth Circuit affirmed the district court's finding that he was not compelled to speak in that a reasonable person would not understand the license plate image to convey a pantheistic message. *Cressman v. Thompson*, 798 F.3d 938, 942-43 (10th Cir. 2015) (*Cressman II*), *cert. denied*, 577 U.S. 1216 (2016).

**B. Plaintiffs have not shown a compelled speech violation.**

Based on the overall tenor of Plaintiffs' opposition, it is questionable whether Plaintiffs have even put compelled speech at issue.[3] Regardless, given Plaintiffs' focus on *Janus v. AFSCME*, *infra*, 138 S.Ct. 2448 (2018), it is important to distinguish when the Supreme Court has upheld compelled speech challenges. It has sustained challenges "in two categories of cases: true 'compelled-speech' cases, in which an individual is obliged personally to express a message he disagrees with, imposed by the government; and 'compelled-subsidy' cases, in which an individual is required by the government to subsidize a message he disagrees with, expressed by a private entity." *Johanns v. Livestock Mktg.*, 544 U.S. 550, 557 (2005). As to the first category, Plaintiffs concede they cannot show the required compulsion. They admit they were paid for training, received credit, were not disciplined, and remain employed. They admit they and others spoke up during training and were not penalized. It is undisputed that they were not directly called out, that any answers or responses were not recorded or graded, and that they did not complain after the training. Although Plaintiffs mince words as to whether speech was optional, outside of handouts and slides, there is no evidence that Plaintiffs were forced, mandated or required to speak.

Rather, without a showing of compulsion, Plaintiffs claim they wanted to remain silent and spend much time on category two, compelled-subsidy cases. They discuss *Janus*, *supra*, which has

---

[3] Plaintiffs made no definitive objection to the alleged speech which is fatal. *See Semple v. Griswold*, 934 F.3d 1134, 1143 (10th Cir. 2019) ("[A] plaintiff must establish…(1) speech; (2) to which the speaker objects; that is (3) compelled by…governmental action.") (emphasis added). Plus, "[s]peech is not conduct just because the government [or Plaintiffs here] says it is." *Telescope Media v. Lucero*, 936 F.3d 740, 752 (8th Cir. 2019). "[T]he First Amendment does not prevent restrictions directed at…conduct [] imposing incidental burdens on speech. That is why a ban on race-based hiring may require employers to remove 'White Applicants Only' signs." *Sorrell v. IMS Health*, 564 U.S. 552, 566 (2011) (citations omitted). Notably, employment-discrimination and public-accommodation laws "that actually do target conduct [] are generally constitutional even when they incidentally affect speech." *Telescope Media*, *supra*, 936 F.3d at 757 (emphasis in original, citations omitted).

no practical application here.[4] In *Janus*, an employee refused to join the union but was charged an "agency fee." 138 S.Ct. at 2461. The public employer was merely the pass through for deduction of his nonmember union dues. *Id.* The plaintiff asked the Supreme Court to find the agency fee unconstitutional and overrule *Abood v. Detroit Bd. of Ed.*, 431 U.S. 209 (1977) (upholding a state requirement that teachers join the union or pay "service fees" equal to union dues). Recognizing that "[c]ompelling a person to *subsidize* the speech of other private speakers raises…First Amendment concerns," the Court analyzed *Abood*. *Id.* at 2464-66 (emphasis in original, citations omitted). In doing so, the Supreme Court took note of the union's position that "*Abood* was correctly decided because the First Amendment was not originally understood to provide *any* protection for the free speech rights of public employees." *Id.* at 2469 (emphasis in original). The Court then stated:

> Taking away free speech protection for public employees would mean overturning decades of landmark precedent. Under the Union's theory, *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U.S. 563…(1968), and its progeny would fall. Yet *Pickering*…is now the foundation for respondents' chief defense of *Abood*. And indeed, *Abood* itself would have to go if public employees have no free speech rights, since *Abood* holds that the First Amendment prohibits the exaction of agency fees for political or ideological purposes.

*Id.* at 2469. This was the backdrop to the Court's statements upon which Plaintiffs rely here to claim *Pickering* has never been applied when employees want to remain silent.[5]

---

[4] Plaintiffs' reliance on *Janus* is not surprising given their lack of attention to the bulk of Defendants' authorities which legally and factually address the claims at hand. *See, e.g.*, *Christian Legal Soc. Chap. of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S. 661 (2010); *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988); *Keefe v. Adams*, 840 F.3d 523 (8th Cir. 2016); *Keeton v. Anderson-Wiley*, 664 F.3d 865 (11th Cir. 2011); *Parker v. Hurley*, 514 F.3d 87 (1st Cir. 2008); *McAllum v. Cash*, 585 F.3d 214 (5th Cir. 2009); *Hanover Cty. Unit of the NAACP v. Hanover Cty.*, 461 F.Supp.3d 280 (E.D. Va. 2020); and *Duren v. Byrd*, 2021 WL 3848105 (M.D. Tenn. 2021).

[5] By relying on *Janus* and claiming *Pickering* has never been applied when an employee wants to remain silent, Plaintiffs appear to try and except their claim from <u>any</u> examination or scrutiny by putting their conduct on an island of "silence." For example, they claim that although the plaintiff in *Kennedy v. Bremerton Sch. Dist.*, did not speak, he "*wanted* to engage in speech *and did so*" by praying after football games. 142 S.Ct. 2407, 2423-24 (2022). Notably, *Kennedy* applied certain aspects of the *Pickering* and *Garcetti* framework to the plaintiff's free speech claim. *Id.*

Thus, *Janus* does not automatically bar application of *Pickering* and *Garcetti*, *infra*, as Plaintiffs suggest. It does not matter if *Pickering* developed, as Plaintiffs claim, in cases where an employer sanctioned an employee for past expression. In this regard, Plaintiffs omitted the relevant sentence from *Janus*, the one that states, "*Pickering* is based on the insight that the speech of a public sector employee may interfere with the effective operation of a government office." *Id.* at 2473. In this context it can certainly be applied to Plaintiffs' instant claims and such is consistent with the Eighth Circuit's analysis in *Altman v. Minn. Dept. of Corr.*, 251 F.3d 1199 (8th Cir. 2001).[6] In *Altman*, the plaintiffs did not speak but read their Bibles during a mandatory anti-discrimination training session. *Id.* at 1200. The court applied *Pickering* and required the plaintiffs to show they were punished for conduct characterized as speech on a matter of public concern and "that their interest in speaking out on that matter of public concern 'outweigh[ed] the public employer's interest in promoting its efficiency by prohibiting the conduct.' " *Id.* at 1202 (*citing Pickering*, 391 U.S. at 568) (other citations omitted).

After applying *Pickering*, the Eighth Circuit reversed the district court's finding that the plaintiffs did not engage in speech on a matter of public concern[7] and stated:

> Though the issue is inherently "internal," the way…MCFS deal[s] with issues of gays and lesbians in the workplace affects the performance of their public duties and is a matter of political and social concern…By making attendance at the training session mandatory, MCFS created a context in which employees speaking out in opposition to

---

[6] Plaintiffs attempt to distinguish *Altman* by claiming that those plaintiffs were told that the training was not designed to tell them what their personal beliefs should be. But, the same is true here. Plaintiffs were told "share your personal experiences," and "your truth comes from your identities." *See* ¶ 153; Plaintiffs' Exh. 15, p. 6. They were also told "Speak YOUR Truth and from Your Lived Experiences." *See* ¶ 154; Plaintiffs' Exh. 9, p. 8. These statements certainly do not mean that Plaintiffs were to change their views. In fact, they were encouraged to speak their own views.

[7] For purposes of this motion, Defendants do not contest that a matter of public concern is implicated. The inquiry is whether Plaintiffs' speech was as private citizens or whether it amounted to governmental speech attributable to the District. *See Kennedy*, *supra* n. 5, 142 S.Ct. at 2424. Based on the undisputed facts it is the latter.

24

their public employer's handling of this social issue should be considered speech on a matter of public interest and concern. [] <u>Even if a public employee's speech addresses a matter of public concern, "[t]he *Pickering* balance requires full consideration of the government's interest in the effective and efficient fulfillment of its responsibilities to the public.</u>" [] We deal here with actions of the government as public employer…and "constitutional review of government employment decisions must rest on different principles than review of speech restraints imposed by the government as sovereign." [] The public employer will be justified in imposing discipline if the speech impeded the employee's ability to perform his or her responsibilities, or undermined office relationships, or disrupted office operations or efficiencies. [] <u>In this regard, a public employer may decide to train its employees, it may establish the parameters of that training, and it may require employees to participate. An employee who refuses to be trained has, from the employer's reasonable perspective, impeded his or her ability to do the job</u>.

*Id.* at 1202-03 (emphasis added) (citations omitted).

Here, Plaintiffs want to gloss over *Altman* and holdings applicable to public school employees and trainings and they want to remove equity as a job requirement. They ignore that by accepting public employment, their speech is only protected <u>if</u> their right to speak outweighs the District's interests. *Garcetti v. Ceballos*, 547 U.S. 410, 418-20 (2006). Without question, Plaintiffs' right to speak does <u>not</u>. Per the Supreme Court:

When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom. [] ("[T]he government as employer indeed has far broader powers than does the government as sovereign"). Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services. [] ("[G]overnment offices could not function if every employment decision became a constitutional matter"). Public employees, moreover, often occupy trusted positions in society. When they speak out, they can express views that contravene governmental policies or impair the proper performance of governmental functions.

*Garcetti*, *supra*, 547 U.S. at 418-19 (citations omitted). A school employee, by not agreeing to diversity and equity, could impair proper school district functions, just as an employee who refuses training would "impede[] his or her ability to do the job." *See Altman*, *supra*, 251 F.3d. at 1203.

Thus, and contrary to Plaintiffs' position, <u>how Plaintiffs interact with students and staff is certainly job-related</u>.[8] *Cf. Pickering*, 391 U.S. at 572-73 (teacher's public criticism of a tax proposal was not job-related). This is particularly true considering the training occurred in close proximity to school events targeting students of color and LGBTQ+ students, and events relating to COVID-19 and racial unrest.[9] The training was designed to increase cultural awareness and to inform staff about societal or political matters that <u>could</u> be offensive to students and staff.[10] Plaintiffs' speech within any public school environment is certainly part of their job-related duties. They cannot isolate themselves from the fact that their particular employer serves and focuses on students and their right to a discrimination-free education. It is vital that Plaintiffs consider the potential adverse impacts on students and staff, regardless of the source, by others' words, actions, conduct, and deeds.

Hence, it is difficult to conceive how Plaintiffs do not appreciate or have an understanding that some individuals, depending on their background, culture, upbringing, or familial relationships may interpret or perceive certain phrasings, words, usages or terminologies as racist, discriminatory, offensive, or hurtful. Plaintiffs want to make this about themselves. But this matter concerns those that the school district serves. There is no evidence that the District implemented the training due to

_____

[8] Plaintiffs claim it must be shown they were "hired to engage in speech on race and political matters" and rely on *Kennedy*, *supra* n. 5, 142 S.Ct. at 2424. This is another apples to oranges comparison. While the coach in *Kennedy* was not paid to pray, he was paid to speak with his players which would have included his obligation to engage in speech that was not racist or discriminatory. Also of note, Plaintiffs here were told "During this training we want you to explore who you are and specifically how that shows up in your role at SPS." *See* ¶ 153; Plaintiffs' Exh. 15, p. 5.

[9] Plaintiffs' challenge to Dr. Jungmann's affidavit is of no consequence. *See* Doc. 78, p. 11, ¶ 21. He was the Superintendent during the 2018-19 school year when the events occurred. His affidavit is based on firsthand knowledge. Plus, Plaintiffs offered no evidence to dispute his affirmations.

[10] Plaintiffs disregard the 2020 national events and their potential adverse impacts on students. Events include, for example, six months of national protests "[a]fter the murder of George Floyd." *See Don't Shoot Portland v. City of Portland*, 2022 WL 2700307 (D. Oregon 2022).

26

Plaintiffs' views. For if there were, this would be a different analysis. The training was implemented to ensure that those on the perimeter would be considered in another's words and actions. This tenet should be inherent in all employment positions at the school regardless of one's role or classification. But, Plaintiffs do not share this tenet for when the District requested Plaintiffs' attention, during training, to matters that could negatively impact students and staff, Plaintiffs geared up behind the scenes for ten months and then filed suit. They now claim to take issue with the training's focus on events impacting our society nationally and globally and they claim they "heard that they could no longer support colorblindness or believe that all lives matters without being considered white supremacists"[11] and that this is unlawful.

But, the training was lawful. There is no basis for Plaintiffs' contrary contention. The law protects "color" and "[c]ourts are clear that a color discrimination claim is separate from a race or national origin discrimination claim." *Benitez v. Tyson*, 2022 WL 1283087 at *16 (M.D. Tenn. 2022). *Also see Williams v. Wendler*, 530 F.3d 584, 587 (7th Cir. 2008); and 42 U.S.C. §§ 2000e *et seq.* (Title VII). Per the Equal Employment Opportunity Commission, "[e]ven though race and color clearly overlap, they are not synonymous." *See* EEOC Compliance Manual, § 15-III at 15-6 (2006). The same is true for Title VI, 42 U.S.C. § 2000d.[12] Plaintiffs ignore this and use the Equal Protection Clause to argue that anti-discrimination and equality (not anti-racism and equity) are the law. This

---

[11] Plaintiffs make this assertion but they were told "we are not calling you as an individual a white supremacist." Plaintiffs were simply put on notice that certain actions or statements on the white supremacy matrix "can support that structural system." *See* ¶ 153; Plaintiffs' Exh. 15, p. 13.

[12] Some believe that colorblindness "can be used to prohibit policies such as affirmative action that benefit members of disadvantaged racial minority groups." Ralph Banks, *Beyond Colorblindness: Neo-Racialism & the Future of Race & Law Scholarship*, 25 Harv. BlackLetter L.J. 41 (2009). In the Supreme Court's first full affirmative action case, *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978), Justice Marshall urged the Court to reject it stating, "It is because of a legacy of unequal treatment that we now must permit the institutions of this society to give consideration to race in making decisions about who will hold the positions of influence, affluence, and prestige."

use of semantics certainly misses the mark.[13] While the Equal Protection Clause requires equal protection regardless of race or color, the anti-discrimination laws <u>provide these protections by recognizing race and color</u>. Plaintiffs also disingenuously argue that "discrimination refers to conduct, not speech." If this were true, then one could discriminate (or harass) via one's spoken words at will. This is also certainly not the law. Thus, accepting Plaintiffs' claimed interpretation of anti-discrimination and equality would not only contravene the law, it would impair the proper performance of the District's functions including its commitment to anti-racism.

### C. Plaintiffs have not shown content/viewpoint discrimination or an unconstitutional condition of employment.

Plaintiffs appear to have abandoned their Count II, content and viewpoint discrimination claim. This is likely because schools may impose speech restrictions that are reasonable and viewpoint neutral. *See Pleasant Grove City v. Summum*, 555 U.S. 460, 470 (2009); *also see Menders*, *supra*, 2022 WL 179597 at * 6 (noting that addressing racist behavior, dismantling systemic racism and amplifying voices of students of color are legitimate pedagogical and state purposes); and *Robertson v. Anderson Mill Elem. Sch.*, 989 F.3d 282, 289 (4th Cir. 2021) (stating school boards, not the courts, have the responsibility to assess how best to advance these pedagogical concerns). It is also likely because there is no evidence that the District implemented the training because the District disagreed with Plaintiffs' views. They also appear to have abandoned their Count III, unconstitutional condition of employment claim. This is likely because Plaintiffs cannot show they were denied any benefit of employment.

---

[13] Plaintiffs use of Justice Harlen's dissent in *Plessy v. Ferguson*, 163 U.S. 537 (1896) also misses the mark. Commentators have recently stated his dissent "gave opponents of Black advancement the language of colorblindness to protect white supremacy while feigning a commitment to equality." Olwyn Conway, *Are There Stories Prosecutors Shouldn't Tell?: The Duty to Avoid Racialized Trial Narratives*, 98 Denv. L. Rev. 457, 467 (2021). As one may view "white silence" or "colorblindness" as white supremacy, employees should understandably be cognizant of this.

# IV. **CONCLUSION**

For the reasons above, as well as those in Defendants' Suggestions in Support of their Motion for Summary Judgment, judgment as a matter of law is mandated in favor of Defendants. Additionally, as their claims fail, Plaintiffs have no basis for equitable relief or attorneys' fees.

Respectfully submitted,

ELLIS, ELLIS, HAMMONS & JOHNSON, P.C.

By*:   /s/ Ransom A Ellis, III*
    Ransom A Ellis, III     MBN: 29129
    rellis3@eehjfirm.com
    Todd A. Johnson     MBN: 38363
    tjohnson@eehjfirm.com
    Tina G. Fowler     MBN: 48522
    tfowler@eehjfirm.com
    2808 S. Ingram Mill Road, Suite A104
    Springfield, MO  65804
    Phone:  417-866-5091
    Fax:  417-866-1064
    *Attorneys for Defendants*

29

## CERTIFICATE OF SERVICE

      I hereby certify that on this 26th day of August 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, and a copy was made available to all electronic filing participants.

Derek H. MacKay
Knight Nicastro MacKay, LLC
304 W. 10th Street
Kansas City, MO 64105

Celia H. O'Leary
Southeastern Legal Foundation
560 W. Crossville Rd., Suite 104
Roswell, GA 30075

Kimberly S. Hermann
Southeastern Legal Foundation
560 W. Crossville Rd., Suite 104
Roswell, GA 30075

Jeffrey A. Clayman
Southeastern Legal Foundation
560 W. Crossville Rd., Suite 104
Roswell, GA 30075

Braden H. Boucek
Southeastern Legal Foundation
560 W. Crossville Rd., Suite 104
Roswell, GA 30075

                      */s/ Ransom A Ellis, III*
                          Attorney of Record