IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| BROOKE HENDERSON, et al,     ) | |
| ) | |
| Plaintiffs,   ) | |
| ) | |
| vs.     ) | Case No.  6:21-cv-03219-MDH |
| ) | |
| SCHOOL DISTRICT OF     ) | |
| SPRINGFIELD R-12, et al.,     ) | |
| ) | |
| Defendants.   ) | |

## ORDER

Before the Court are Defendants School District of Springfield R-12 ("Defendant SPS"), Superintendent Grenita Lathan ("Defendant Lathan"), Dr. Yvania Garcia-Pusateri ("Defendant Garcia-Pusateri"), and Lawrence Anderson's ("Defendant Anderson's") (collectively "Defendants'") Motion for Summary Judgment (Doc. 74) and Plaintiffs Brooke Henderson and Jennifer Lumley's (collectively "Plaintiffs'") Motion for Summary Judgement. (Doc. 76). The parties have fully briefed issues raised in the motions. The Court has reviewed all briefing and the matter is now ripe for review. For reasons herein, Plaintiffs' Motion is **DENIED** and Defendants' Motion is **GRANTED**. Summary judgment is entered in favor of Defendants.

## BACKGROUND

Plaintiffs' allegations stem from their participation in a professional development training during October 2020. Defendant SPS is an urban school district located in Springfield, Missouri with more than 24,000 enrolled students. At the time of the training, Defendant Garcia-Pusateri and Defendant Anderson were both employed by Defendant SPS in its Office of Diversity and

1

Equity. Defendant SPS has employed Defendant Lathan as superintendent since July 1, 2021. Defendant SPS has employed Plaintiff Lumley as a secretary since July 9, 2020, first in its Special Services Department and later in its Analytics, Accountability, and Assessment Department. Defendant SPS has employed Plaintiff Henderson at all times during this dispute as a 504 Process Coordinator in the Special Services Department. Plaintiffs remain employed by Defendant SPS. Plaintiff Henderson attended the training at issue virtually October 14, 2020. Plaintiff Lumley attended an in-person version of the same training October 6, 2020. The two training sessions were substantially similar. Defendant Garcia-Pusateri and Defendant Anderson both took part in the training sessions Plaintiffs attended. The training included distribution of written handouts, videos, and a variety of small and large group discussions. After the training, Plaintiff Henderson completed an online module and corresponding multiple-choice questions.

The professional training covered themes of "equity" and "anti-racism." Plaintiffs generally took issue with some of the concepts presented during the training session and also during the online module. Plaintiffs found the concepts presented during the training to be at odds with their personal views. During the training sessions, Plaintiffs spoke openly about their disagreement with some of the content of the training session. The online module included videos and multiple-choice questions also related to themes of equity and anti-racism. Plaintiff Henderson selected certain credited answers on the online multiple-choice questions, even though those answers were at odds with her personal opinions. Plaintiff Henderson did this in order to receive credit for completing the online module. Defendant SPS informed Plaintiff Henderson completion of the online module was required. Similarly, Defendant SPS employees had to attend the training session to receive professional development credit and compensation. Plaintiffs received credit and compensation for attending the training. Plaintiffs have never faced any official discipline

throughout their employment with Defendant SPS. Plaintiffs suffered no adverse employment action arising out of their participation in the training program. They were not fired, demoted, suspended, transferred, or disciplined. The district did not fail to promote them or change their duties or work assignments in retaliation and there is no claim their participation in the training program, or any opinion they expressed during the training program, has in any way impacted the compensation or benefits of their employment with the district.

Plaintiffs' complaint alleges three counts of constitutional violations under the First Amendment of the United States Constitution and 42 U.S.C. § 1983. Plaintiffs seek a declaratory order from this Court finding as unconstitutional Defendants' equity and anti-racism professional training and permanently enjoining Defendants from conducting the training in the future. Plaintiffs also seek nominal damages for each day of training.

## STANDARD OF REVIEW

Summary judgment is proper where, viewing evidence in the light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Reich v. ConAgra, Inc.*, 987 F.2d 1357, 1359 (8th Cir. 1993). "Where there is no dispute of material fact and reasonable fact finders could not find in favor of the nonmoving party, summary judgment is appropriate." *Quinn v. St. Louis County*, 653 F.3d 745, 750 (8th Cir. 2011). Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets the initial step, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby*,

Inc., 477 U.S. 242, 248 (1986). To satisfy this burden, the nonmoving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## ARGUMENT

The Constitution of the United States limits this Court's jurisdiction to deciding "cases" and "controversies" between parties. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559 (1992). For a dispute to qualify as a justiciable case or controversy under the Constitution, plaintiffs must have standing to bring their claims. *Id*. at 560. Standing requires plaintiffs suffer an injury-in-fact that is traceable to the actions of the defendant and likely to be redressed by the Court's favorable decision. *Id*. at 560-61. The Supreme Court has held that injury-in-fact, in turn, is "an invasion of a legally protected interest that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. *Id*. at 560 (citations omitted). The injury-in-fact requirement allows courts to avoid becoming involved in disputes of a political nature, unnecessarily injecting the judicial branch into politicized controversies. "Federal courts sit solely to decide on the rights of individuals…and must…refrai[n] from passing upon the constitutionality of an act…unless obliged to do so in the proper performance of our judicial function, when the question is raised by a party whose interests entitle him to raise it." *Hein v. Freedom From Religion Found*., Inc., 551 U.S. 587, 598–99 (2007) (citations omitted). Critics from both ends of the political spectrum have been quick to condemn activist judges' decisions with results contrary to their preferences, even in cases where parties have actually suffered an injury-in-fact. Judicial intervention in cases without such injury would certainly receive, and more validly deserve, such criticism.

4

Defendants argue Plaintiffs lack standing because they failed to suffer an injury-in-fact. (Doc. 75 at 45). Plaintiffs' exact claims about injury-in-fact remain somewhat unclear. Plaintiffs argue they suffered an injury-in-fact when Defendant SPS, "presented [Plaintiffs] with three choices: (1) say what [Defendant] SPS wanted to hear by affirming anti-racism and equity; (2) refrain from speaking and risk being labeled white supremacists; or (3) speak out and risk losing professional development credit and pay." (Doc. 78 at 75). Plaintiffs reiterate this theory elsewhere, arguing Defendant SPS forced this choice upon Plaintiffs when they claimed the views expressed during training were part of employees' professional responsibilities. (Doc. 77 at 31). Plaintiffs then contend Defendants compelled Plaintiff Henderson's speech and discriminated against Plaintiff Henderson's viewpoints when Defendants required Plaintiff Henderson to complete online multiple-choice questions, which in turn required Plaintiff Henderson select certain credited responses inconsistent with Defendant Henderson's personal beliefs. (Doc. 77 at 37-40). The selection of the online questions' credited responses rather than alternative responses consistent with Defendant Henderson's personal beliefs, Plaintiffs argue, amounts to viewpoint discrimination and compelled speech. (Doc. 77 at 37-40). Taken altogether, the Court understands Plaintiffs to argue Plaintiffs suffered injury when Defendants' professional training and online questions: 1) compelled Plaintiffs' speech; 2) chilled Plaintiffs' speech; and 3) discriminated against Plaintiffs' viewpoints. Further injury occurred, Plaintiffs appear to argue, when Defendants required Plaintiffs to partake in the alleged unconstitutional training and online multiple-choice questions as part of their employment with Defendant SPS[1]. The Court will address each of these theories in turn.

---

[1] Plaintiffs' compliant and motion for summary judgment tends to conflate separate legal theories, making it difficult to discern the full extent of Plaintiffs' claims. For example, Plaintiffs' Count One appears to allege both compelled disclosure of personal information and compelled speech. Count Two similarly seems to allege chilled speech, content discrimination, and viewpoint discrimination. Though these various legal theories remain separate in federal jurisprudence, Plaintiffs' allegations and argumentation fail to treat

5

## I. Professional Training: Compelled Speech, Chilled Speech, Content and Viewpoint Discrimination

### a. Compelled Speech

Compelled speech may constitute injury-in-fact for standing purposes. *Cressman v. Thompson*, 719 F.3d 1139, 1145 (10th Cir. 2013); *Jacobs v. Clark Cnty. Sch. Dist*., 526 F.3d 419, 426 (9th Cir. 2008). Government compels speech when it takes action that is "'regulatory, proscriptive, or compulsory in nature'" that "punish[es], or threaten[s] to punish, protected speech*." Phelan v. Laramie Cnty. Cmty. Coll. Bd. of Trustees*, 235 F.3d 1243, 1247 (10th Cir. 2000) (citing *Laird v. Tatum,* 408 U.S. 1, 11 (1972)). Such a threat may be "'indirect discouragement'" rather than direct punishment like "'imprisonment, fines, injunctions or taxes.'" *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1290 (10th Cir. 2004) (citing *Am. Communications Ass'n v. Douds,* 339 U.S. 382, 402, 70 S.Ct. 674, 94 L.Ed. 925 (1950)).

Plaintiffs appear to argue Defendants compelled speech in various ways. Plaintiffs characterize what they believe Plaintiffs were forced to do as "affirm," "endorse," "promote," "adopt," and "risk association with" Defendant SPS' viewpoints, at odds with Plaintiffs' personal opinions. (Doc. 77 at 29-30). Plaintiffs also appear to argue during the training Defendant SPS forced Plaintiffs to become "couriers" of a message about equity with which Plaintiffs disagree. (Doc 77 at 30). Plaintiffs also claim Defendants coerced "Plaintiffs into betraying their convictions and promoting ideas they find objectionable." (Doc. 77 at 31). Specifically, Plaintiffs argue various written materials distributed to

---

these theories accordingly. To the extent Plaintiffs intend to raise claims and theories beyond those addressed here, this Court similarly finds Plaintiffs have not suffered an injury-in-fact and therefore lack standing.

Defendant SPS' employees before training compelled Plaintiffs to speak because the written materials made clear that Plaintiffs would be complicit in white supremacy if Plaintiffs remined silent. (Doc. 77 at 27). Plaintiffs argue that Defendant SPS compelled Plaintiff's speech when employees in the training were directed to remain "professional" and "engaged" or risk being asked to leave without credit. (Doc. 77 at 36). Plaintiffs also argue Defendants compelled Plaintiffs' speech when Defendant SPS told employees they "must commit to" Defendants' description of equity and anti-racism. (Doc. 77 at 32). Compulsion also occurred, Plaintiffs argue, when trainers defined anti-racism to include proactive advocacy against racism. (Doc. 77 at 32). Plaintiffs fail to argue Defendants implemented policy requiring Plaintiffs to actually express any viewpoint at odds with their personal opinions. Nor do Plaintiffs argue Defendants threatened punishment should Plaintiffs fail to actually express viewpoints at odds with their personal opinions.

Despite claims of compulsion, Plaintiffs concede they expressed their personal views during the training. (Doc. 77 at 33). Plaintiffs concede their personal views were at odds with Defendants' views. (Doc. 77 at 26). Plaintiff Henderson expressed during the training that BLM protests were at least in part riotous and that Kyle Rittenhouse acted in self-defense when he shot and killed people during protests in Wisconsin. (Doc. 77 at 33-34). Defendant Garcia-Pusateri responded by telling Plaintiff Henderson she was "confused and wrong." (Doc. 77 at 34). Defendants took no further action in response to Plaintiff Henderson's expression of her personal views during the professional training. Plaintiff Lumley expressed her view that, "[Defendant] SPS was improperly assigning characteristics based on race and that not all white people are racist." (Doc. 77 at 34). Plaintiffs concede, "Ms. Lumley disagreed with [Defendant] SPS's position that she was racist simply because she was white, and she shared a personal story about black people saying her relative did not count as black after marrying a white man." (Doc. 77 at 34). Plaintiff Lumley also expressed during training that she lacked white

7

privilege, "because she came from a poor, broken home." (Doc. 77 at 34). In response to Plaintiff Lumley's expression of her personal opinions, a facilitator informed Plaintiff Lumley, "black people can be prejudiced but not racist" and indicated Plaintiff Lumley needed additional self-reflection. (Doc. 77 at 34). Defendants took no further action in response to Plaintiff Lumley's expression of her personal views during the professional training. Plaintiffs did not express any more of their own views during the training. (Doc. 77 at 34).

Plaintiffs liken their participation in the training to a Minnesota law requiring videographers "to speak favorably about same-sex marriage if they choose to speak favorably about opposite-sex marriage." *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 752 (8th Cir. 2019); (Doc. 77 at 34-35). Unlike the *Telescope* plaintiff, Plaintiffs have not argued, and no evidence suggests, Defendants have implemented a law or policy requiring Plaintiffs to actually speak favorably about something Plaintiffs find objectionable. Plaintiffs also equate their participation in the training to state laws requiring drivers to display vehicle license plates with state mottos or images. *Wooley v. Maynard*, 430 U.S. 705, 717 (1977); *Cressman v. Thompson*, 719 F.3d 1139, 1156 (10th Cir. 2013). Unlike the *Wooley* and *Cressman* plaintiffs, Plaintiffs have failed to argue Defendants forced them to somehow affiliate or associate with a particular message Defendants find objectionable. Rather, facts not in dispute generally show the exact opposite: Plaintiffs voiced their personal objections to anti-racism and equity. Plaintiffs' expression of their views makes clear they neither affirm, endorse, promote, nor adopt equity and anti-racism. Plaintiffs themselves acknowledge this when they argue that Plaintiff Lumley's own coworkers berated her during training for opposing equity and anti-racism (Doc. 77 at 34). Simple logic dictates that Plaintiff Lumley's coworkers cannot both berate her for opposing equity and anti-racism and simultaneously associate her with those concepts.

8

Plaintiffs also attempt to liken their participation in the professional training to a university professor who required a Mormon drama student to orally recite objectionable lines or be expelled from a class. *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1282 (10th Cir. 2004). Specifically, Plaintiffs attempt to liken, on one hand, Defendants saying during the professional training that white people failing to speak out against racism constitutes white supremacy, and on the other, a professor telling a Mormon student she would be expelled from a drama class if she failed to orally recite specific, objectionable words. Plaintiffs also attempt, rather remarkably, to draw a parallel between the *Axson-Flynn* professor and Defendant SPS' facilitators telling employees facilitators would call on them randomly if no one volunteered to participate in the professional training. (Doc. 77 at 33). Such comparisons are grossly attenuated. Unlike the *Axson-Flynn* defendant, Defendants did not require Plaintiffs to articulate, orally or otherwise, viewpoints Plaintiffs found objectionable or face an undesirable consequence. No evidence suggests Defendants somehow required Plaintiffs to actually express a particular viewpoint.

Plaintiffs make much of their belief Defendants required Plaintiffs to attend the professional training to receive professional development credit and financial compensation. (Doc. 77 at 27).[2] Conditioning employees' professional development credit and pay upon their attending a professional training, however, is altogether different than conditioning credit and pay on the expression of a specific message Plaintiffs' find objectionable. Any vague assertion by Defendants during the training that equity and anti-racism generally require advocacy and proactivity, are wholly distinct from

---

[2] Though Plaintiffs claim employees of Defendant SPS told Plaintiffs they would lose pay if absent from training (Doc. 77 at 27), Defendants claim pay used to compensate employees for attending the training was "supplemental." (Doc. 80 at 12-17). Defendants also claim no employee who failed to attend the training was terminated for failure to attend the training. (Doc. 80 at 17). Any disagreement between the parties on this issue is immaterial because Plaintiffs fail to claim, and no evidence suggests, Defendants conditioned pay or professional development credit on Plaintiffs' expressing a specific viewpoint. Conditioning professional credit and pay on employees' attending a training fails to implicate First Amendment free speech protections.

9

Defendants compelling Plaintiffs to express specific views they find objectionable. At most, Defendants' training encouraged Plaintiffs to adhere to Defendant SPS' description of equity and anti-racism. Such a request is wholly apart from compulsion or coercion, which necessarily involve some sort of incentive or disincentive to commit a specific act. Encouragement to follow general principles of equity and anti-racism, absent some incentive or disincentive to actually express a specific message, altogether fails to bestow injury-in-fact required for compelled speech. Such an incentive or disincentive to do or say a specific thing is what separates Plaintiffs' circumstances from precedent they cite. At times, Plaintiffs themselves appear to acknowledge they do not believe Defendants instructed Plaintiffs to do or say a specific thing, "Considering that political advocacy on school grounds violates the law, the most logical conclusion staff could draw here is that [Defendant] SPS intended staff to advocate for [political change] on their own time." (Doc. 78 at 81). Because Defendants' actions do not require a specific message from Plaintiffs, Defendants' actions fail to rise even to the level of "indirect discouragement." Plaintiff's compelled speech claim related to the professional training session fails because Plaintiffs lack the requisite injury-in-fact to show standing.

### b. Chilled Speech and Content and Viewpoint Discrimination

It is a core tenant of First Amendment jurisprudence that "the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 828 (1995) (citations omitted). While viewpoint and content discrimination are closely related, viewpoint discrimination tends to focus on government prohibitions on speech from a particular person, while content discrimination focuses on government restrictions toward certain content areas. *Perry Educ. Ass'n v. Perry Loc. Educators'*

*Ass'n*, 460 U.S. 37, 59 (1983). Content-based discrimination by the government is presumptively unconstitutional. *Rosenberger* at 828. Further, regulation that "chills" someone's First Amendment rights may under certain circumstances give rise to a constitutional violation. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 417–18 (2013). A plaintiff asserting a chilling effect injury must, "establish that he would like to engage in arguably protected speech, but that he is chilled from doing so by the existence of the statute." *281 Care Comm. v. Arneson*, 638 F.3d 621, 627 (8th Cir. 2011). A plaintiff's self-censorship may evidence requisite injury-in-fact. *281 Care Comm. v. Arneson*, 638 F.3d 621, 627 (8th Cir. 2011). Standing for such a "subjective chill" theory, however, requires injury beyond the chill alleged by the plaintiff. *Clapper* at 417-18. Eighth Circuit courts consider whether the plaintiff's decision to forego speech was "objectively reasonable," given specific facts of the case. *Zanders v. Swanson,* 573 F.3d 591, 593-94 (8th Cir.2009).

Plaintiffs' views about chilled speech and content and viewpoint discrimination appear conflated. The heading of Count Two of Plaintiff's Complaint references content and viewpoint discrimination, while Count Two's substance emphasizes a chilling effect. (Doc. 1 at ¶¶ 163-168). Plaintiffs' argument, it appears, is that Defendants deterred Plaintiffs from challenging equity and anti-racism, which caused Plaintiffs to self-censor. (Doc. 77 at 40-42). Plaintiffs argue if they voiced their personal views on equity and anti-racism, they risked being labeled white supremacists and losing professional development and pay. (Doc. 78 at 75). As a basis for this concern, Plaintiffs argue, "[Defendant] SPS taught that white supremacy is not just a label for the KKK—it includes anyone who believes in colorblindness or says that all lives matter." (Doc. 77 at 33). Plaintiffs also argue, "[Defendant] SPS warned staff that denying one's white privilege is in itself white supremacy." (Doc. 77 at 33). Plaintiffs do not argue Defendant SPS implemented or contemplated any policy or regulation whereby an expression about equity and anti-racism at odds with Defendant SPS would result in the

speaker being labeled a white supremacist. Defendants did not call Plaintiffs or other employees white supremacists. Similarly, Plaintiffs fail to argue Defendant SPS conditioned pay and professional development credit on Plaintiffs' suppression of opinions at odds with principles discussed during training. Plaintiffs argue Defendant SPS informed employees they must attend the training to meet professional development requirements and failure to attend the training would result in less pay. (Doc. 77 at ¶¶ 16, 17). As discussed more fully above, conditioning employees' professional development credit and pay upon their attending a professional training is altogether different than conditioning credit and pay on the expression or suppression of a specific message.

Plaintiffs also argue Defendants' verbal response to Plaintiffs' expression of personal views during the professional training constituted a rejection of Plaintiffs' opinions, which in turn caused Plaintiffs to forego further expression. (Doc. 77 at 42). The facilitator telling Plaintiff Lumley "she needed to work on herself" and Defendant Garcia-Pusateri telling Defendant Henderson that she was "wrong and confused" is not evidence something more than Plaintiffs' subjective perception of the situation motivated Plaintiffs' decision to forego further expression. Defendants' verbal response to Plaintiffs' personal views during training constitutes at most simple disagreement. Defendants' verbal response offers no evidence whatsoever Defendants would subject Plaintiffs to any sort of negative consequence, should Plaintiffs choose to reassert their personal views. Defendants have not enacted any policy requiring employees to adopt certain views or face undesirable professional consequences. There is no evidence Defendants even suggested to Plaintiffs or anyone else that undesirable consequences would flow from expression of certain views. This differentiates Plaintiffs from the plaintiffs in *281 Care Committee*, who challenged a Minnesota law making them vulnerable to criminal prosecution should they knowingly or recklessly disregard the truth when making public statements about proposed ballot initiatives. *281 Care Comm. v. Arneson*, 638 F.3d 621 (8th Cir. 2011). While

12

*281 Care Committee* plaintiffs had not actually faced criminal prosecution for any statements made, the Eighth Circuit emphasized the law prohibiting recklessly or knowingly making false statements remained active and prosecution remained plausible, albeit unlikely. *281 Care Comm*. at 627. Risk of prosecution, the Court reasoned, granted Plaintiffs standing for their chilled speech argument. *Id*. Here, Plaintiffs face no comparable threat.

Plaintiff Henderson's professional training included an activity called the four corners exercise, wherein participants were asked to display a sign reading either "agree," "disagree," "strongly agree," or "strongly disagree," depending on participants' beliefs about a particular prompt. (Doc. 78 at 53). Prompts included statements like, "I believe my identities and lived experiences are affirmed and supported by the District." (Doc. 78 at 53). Regardless of Plaintiff Henderson's actual beliefs, Plaintiff Henderson always displayed the sign that read, "agree." Plaintiff Henderson in fact agreed with some of the prompts; however, others she disagreed with, even though she displayed the "agree" sign. (Doc. 78 at 53). Plaintiff Henderson's participation in this specific exercise also fails to yield injury-in-fact. Plaintiffs do not argue, and no evidence suggests, Defendants encouraged Plaintiff Henderson to display certain signs actually at odds with her own beliefs. Defendants enacted no policy and made no statements indicating participants would suffer negative consequences if they expressed disagreement with a prompt. Though it may have been more popular and easier to agree with some prompts, this does not indicate Defendants actually encouraged Plaintiff Henderson to forego expressing her actual beliefs. Defendants' provision of various signs reflecting differing levels of agreement, speaks to Defendants' preference that participants express their genuine opinions.

Plaintiffs further argue, "simply calling equity programming mandatory—as SPS did—would lead staff to wonder what would happen if they did not attend. The mere appearance of authority is enough to chill speech and confer standing." (Doc. 78 at 77). In support, Plaintiffs cite *Speech First,*

*Inc. v. Schlissel*, claiming, "a chilling effect exists even when an implicit threat causes a fear of harm." (Doc 78 at 77). While this may be true, Plaintiffs do not face an implicit threat of harm in a manner comparable to the *Speech First* plaintiffs. In *Speech First*, the plaintiffs' speech was chilled because the university implemented a bias response team initiative, tasked with intervening into student-reported "bias incidents." *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 762 (6th Cir. 2019). Though meetings with the bias response team were voluntary for those accused of engaging in a "bias incident," the very nature of the bias response team gave the impression that "failure to meet could result in far-reaching consequences, including reputational harm or administrative action." *Id*. at 765. Plaintiffs do not allege, and evidence does not suggest, Defendant SPS has implemented any specific policy or initiative tasked with responding to reported incidents of bias, rendering *Speech First* of little if any precedential value. Plaintiffs' mere speculation, without more, about what may happen should they fail to attend a training Defendant SPS labeled "mandatory" constitutes a textbook example of the "subjective chill" that lacks standing. *Clapper* at 417-418.

Lack of an identifiable threat of negative consequences following expression of certain personal views shows Plaintiffs' decision to self-censor is not objectively reasonable. *Zanders v. Swanson,* 573 F.3d 591, 593-94 (8th Cir.2009) (standing requires the decision to forego speech be objectively reasonable). Lack of any specific, factual evidence showing Defendants targeted Plaintiffs or the viewpoints they expressed also show Plaintiffs failed to suffer requisite injury-in-fact for the viewpoint and content discrimination claim. No evidence suggests Defendants took action to regulate, stifle, or target Plaintiffs' personal views. *See Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 94-95 (1972) (city ordinance regulating certain types of picketing more than others unconstitutional); *Turner Broad. Sys., Inc. v. F.C.C.,* 512 U.S. 622, 641 (1994) ("government speech that stifles speech on account of its message" presumed unconstitutional); *R.A.V. v. City of*

*St. Paul, Minn.,* 505 U.S. 377, 390, 112 S. Ct. 2538, 2547, 120 L. Ed. 2d 305 (1992) (ordinance specifically targeting bias-motivated disorderly conduct unconstitutional). Plaintiff's chilled speech and content and viewpoint discrimination claims related to the professional training session fail because Plaintiffs lack the requisite injury-in-fact to show standing

## II.     Online Multiple-Choice Questions: Compelled Speech, Chilled Speech, and Content and Viewpoint Discrimination

Plaintiffs next argue Defendant SPS compelled speech when it required Plaintiff Henderson to answer online multiple-choice questions a certain way, though the credited responses reflected views at odds with Plaintiff Henderson's personal views. (Doc. 77 at 39). Plaintiffs also allege the multiple-choice questions amount to content and viewpoint discrimination. (Doc. 77 at 42-43). Employees of Defendant SPS informed Plaintiff Henderson and others they were required to complete a certain number of canvas modules developed by Defendants. (Doc. 77-1 at ¶ 19). The online multiple-choice questions were titled "Quick Check" questions and appeared within a larger canvas module. (Doc. 77-1 at ¶ 19). Completing the canvas module required users to answer all Quick Check multiple-choice questions. (Doc. 77-1 at ¶ 23). Unlike multiple-choice questions on an exam or quiz, these Quick Check questions had only two possible answers and appeared in the canvas module following online video clips about equity and anti-racism. (Doc. 77 at 38-39).

Specifically, Plaintiffs take issue with the content of several specific multiple-choice questions. The first Quick Check question asked Plaintiff Henderson, "Acknowledging and addressing students' social and emotional needs in relation to COVID-19 is whose responsibility?" (Doc. 77 at 38). The online module provided two possible responses: 1) "All caregivers and stakeholders," or 2) "Guardians

15

and counselors." (Doc. 77 at 38). Those who selected the first option received the following message, "Correct! In these trying times, we must all work together to ensure that all students are having their social emotional needs met." (Doc. 77 at 38). Those who selected the second choice received the following response, "Incorrect! In these trying times, we must all work together to ensure all students are having their social emotional needs met." (Doc. 77 at 38). Though Plaintiff Henderson disagreed with both options, she nonetheless selected the credited response to complete the module. (Doc. 77 at 38).

The second multiple-choice question Plaintiffs take issue with asked, "When you witness racism and xenophobia in the classroom, how should you respond?" (Doc. 77 at 38). The online module again provided two possible responses: 1) "Address the situation in private after it has passed," or 2) "Address the situation in the moment you realize it is happening." (Doc. 77 at 37-40). Those who selected the first option received the following response, "Incorrect! It is imperative adults speak up immediately and address the situation with those involved. Being anti-racist requires immediate action." (Doc. 77 at 38). Those who selected the second, received the following, "Correct! Being an anti-racist requires immediate action." (Doc. 77 at 38). Though Plaintiff Henderson generally agreed with the first option, she selected the credited option to complete the module. (Doc. 77 at 38-39).

Plaintiffs appear to argue compulsion occurred in two ways. First, Defendants compelled Plaintiff Henderson's speech when it required Plaintiff Henderson to select the credited response to the multiple-choice question, even though Plaintiff Henderson personally disagreed with the content of the credited response. (Doc. 77 at 39). In effect, Plaintiffs argue, this caused Plaintiff Henderson to become a courier of the government's viewpoint, at odds with Plaintiff Henderson's personal viewpoint. (Doc. 77 at 39). Plaintiffs' second point is less clear. Plaintiffs appear to argue Defendants compelled Plaintiff Henderson's speech when Defendants' Quick Check module labeled as "correct," only those answers

16

consistent with Defendant SPS' description of equity and anti-racism. (Doc. 77 at 39). Because Defendants defined anti-racism as requiring support of systemic change, Plaintiffs appear to argue, Defendants suggesting that anti-racism is correct, requires Plaintiff Henderson to accept that she must take "immediate action" to combat racism. (Doc. 77 at 39). This reference to anti-racism requiring immediate action, Plaintiffs seem to argue, amounts *somehow* to compelled speech. (Doc. 77 at 39). Separately, Plaintiffs argue Defendants' Quick Check module unconstitutionally discriminated against Plaintiffs' viewpoints because they favored Defendant SPS' description of equity and anti-racism over other viewpoints. (Doc. 77 at 42-43).

As discussed before, the government compels speech when it takes action that is "'regulatory, proscriptive, or compulsory in nature'" that "punish[es], or threaten[s] to punish, protected speech*." Phelan v. Laramie Cnty. Cmty. Coll. Bd. of Trustees*, 235 F.3d 1243, 1247 (10th Cir. 2000) (citing *Laird v. Tatum,* 408 U.S. 1, 11 (1972)). Such a threat may be "'indirect discouragement'" rather than direct punishment like "'imprisonment, fines, injunctions or taxes.'" *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1290 (10th Cir. 2004) (citing *Am. Communications Ass'n v. Douds,* 339 U.S. 382, 402, 70 S.Ct. 674, 94 L.Ed. 925 (1950)). It is a core tenant of First Amendment jurisprudence that "the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 828 (1995) (citations omitted).

Each of Plaintiffs' theories relies heavily on *C.N. v. Ridgewood Bd. of Edu.*, a Third Circuit case holding a voluntary survey asking students questions about personal issues including substance use, sexuality, and mental health, did not violate students' protections against compelled disclosure of private information. *C.N. v. Ridgewood Bd. of Educ.,* 430 F.3d 159 (3d Cir. 2005). The *Ridgewood* plaintiffs sued the school district and others claiming, *inter alia*, administration of

17

the survey compelled students to reveal personal information about themselves. *Id.* at 189. The Third Circuit reasoned the survey's voluntary nature, anonymity, and the lack of threat or punishment directed toward any student who declined to take the survey, showed absence of compulsion to disclose private information. *Id.* The Court also considered whether *Ridgewood* defendants required students to select certain survey answers. *Id.* The Third Circuit acknowledged the relevance of the issue of whether the act of completing a survey constitutes speech, though specifically withheld ruling. *Ridgewood* at n. 27. Plaintiffs argue *Ridgewood* is distinguishable from the present matter because Defendant SPS informed Plaintiff Henderson that the canvas module was required and because Plaintiff Henderson had to select the Quick Check's single credited answer, which reflected a view at odds with Plaintiff Henderson's, to complete the canvas module. (Doc. 77 at 39).

Plaintiffs reliance on *Ridgewood* is misguided. *Ridgewood* deals with a survey that asks students questions about deeply personal matters including sexuality, drug use, and mental health. *C.N. v. Ridgewood Bd. of Educ.,* 430 F.3d 159, 164 (3d Cir. 2005). The *Ridgewood* plaintiffs' specific claim deals with whether the school board compelled the plaintiffs to disclose private information. *See C.N. v. Ridgewood Bd. of Educ.,* 146 F. Supp. 2d 528, 538 (D.N.J.), *aff'd in part, rev'd in part,* 281 F.3d 219 (3d Cir. 2001) ("Plaintiffs contend their First Amendment claim falls under the category of 'compelled disclosure' cases"); *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 189 (3d Cir. 2005) ("the disclosure required for a constitutional violation of the First Amendment's protection against compelled disclosure of private information simply has not been shown"). In the instant matter, however, Defendants have not asked Plaintiff Henderson questions about personal information like sexuality, drug use, and mental health. Rather, the Quick Check questions asked Plaintiff Henderson questions about general issues like whose responsibility it is

to address students' needs and how to respond to xenophobia in the classroom. Further, these multiple-choice questions appeared following videos discussing equity and anti-racism. The multiple-choice questions functioned to assist in grasping concepts presented during videos. This is of course why each of the questions was labeled, "Quick Check." Plaintiff Henderson's selection of the credited response suggests no personal affirmation of or affiliation with that response. Rather, choosing the credited response at most reflects an ability to grasp the material presented during the video. In this sense, the Quick Check questions are akin to multiple-choice exam questions in *Sabra v. Maricopa County Community College District*, where the Ninth Circuit upheld a district court's finding that a student's answer on a multiple-choice exam did not force a student to, "choose between denouncing his religion by selecting the 'correct' answer or receiving a lower grade…[but only required the student to] demonstrate an understanding of the material taught." *Sabra v. Maricopa Cnty. Cmty. Coll. Dist.,* 479 F. Supp. 3d 808, 818 (D. Ariz. 2020), *aff'd,* 44 F.4th 867 (9th Cir. 2022).

Citing the First Amendment's establishment and free exercise clauses, the *Sabra* plaintiff argued multiple-choice exam questions that asked students about materials presented during class, "forced [the plaintiff] to agree to [defendant professor's] radical interpretation of Islam." *Sabra v. Maricopa Cnty. Cmty. Coll. Dist*., 479 F. Supp. 3d 808, 813 (D. Ariz. 2020), *aff'd*, 44 F.4th 867 (9th Cir. 2022). Discussing qualified immunity, the Ninth Circuit found it was "plausible," as the district court had, to interpret the plaintiff's multiple-choice answers as simply a reflection of the plaintiff's command of the course's subject matter. *Sabra v. Maricopa Cnty. Cmty. Coll. Dist.,* 44 F.4th 867, 892 (9th Cir. 2022). The plausibility of the lower court's finding, the Ninth Circuit reasoned, entitled the defendant professor to qualified immunity. *Id*. The Ninth Circuit did not substantively address whether the completion of a multiple-choice exam implicates First

Amendment free exercise protection. Despite these departures from the present matter, *Sabra* remains more instructive than *Ridgewood* because of the nature of the multiple-choice questions at issue. The present matter and *Sabra* both concern multiple-choice questions plainly designed to test command of subject matter, while *Ridgewood* concerns a survey with questions about matters personal to the survey taker. Because it is wholly unreasonable to suggest Plaintiff Henderson's selection of the credited response amounts to something beyond a mere grasp of the taught materials, or lack thereof, Plaintiffs have failed to demonstrate any corresponding injury whatsoever.

Plaintiffs further cite a variety of precedent in support of claims about the multiple-choice questions. None persuades. Specifically, Plaintiffs cite *W. Virginia State Bd. of Educ. v. Barnette,* in which the Supreme Court affirmed unconstitutionality of a regulation requiring students salute the American flag. *W. Virginia State Bd. of Educ. v. Barnette,* 319 U.S. 624 (1943). Unlike the act of saluting a flag, however, answering an online multiple-choice question does not suggest "affirmation of a belief and an attitude of mind." *W. Virginia State Bd. of Educ.* at 633. Similarly, unlike operating a motor vehicle with a license plate publically displaying a state motto, Plaintiff Henderson selecting the credited response on an online multiple-choice question fails to render Plaintiff Henderson a "'mobile billboard' for the State's ideological message." *Wooley v. Maynard*, 430 U.S. 705, 715 (1977). This is true even where Plaintiff Henderson had to complete the multiple-choice questions to receive credit for completing the module and when Plaintiff Henderson's superiors were aware of her completion of the module. Finally, unlike enforcing a state law to require inclusion of certain minority groups in a parade, requiring Plaintiff Henderson to select certain credited responses at odds with Plaintiff Henderson's views does not violate Plaintiff Henderson's "autonomy to choose the content of [her] own message." *Hurley v. Irish-*

*Am. Gay, Lesbian & Bisexual Grp. of Bos.,* 515 U.S. 557, 573 (1995). This is, of course, because one's selection of credited responses on an online multiple-choice question reflects at most a belief about how to identify the question's credited response. This is especially true where, as here, the multiple-choice questions ask about general rather than personal issues, are labeled "Quick Check," and focus on the content of a video presented during the same module. The fact that one of the Quick Check questions asked, "how should *you* respond?" (emphasis added), does not change the nature of Plaintiff Henderson answering the question. Nor does the labeling of one answer as "correct" and another "incorrect." Because Plaintiff Henderson's selection of a certain answer on Defendant's online multiple-choice question indicates nothing more than belief about a credited response vis-à-vis others, Plaintiffs' claims regarding the online multiple-choice questions fail due to lack of injury-in-fact.

### III.     Unconstitutional Employment Condition

Count Three of Plaintiffs' complaint argues, because the online multiple-choice questions and professional training were unconstitutional, requiring Plaintiffs to complete the professional training and online multiple-choice questions constitutes an unconditional condition of Plaintiffs' employment with Defendant SPS. Because, however, Plaintiffs have failed to show the training and multiple-choice questions were unconstitutional and resulted in injury, Plaintiffs also fail to show the requisite injury required for standing to assert their unconstitutional employment conditions claim.

## IV.     The Employment Context

It is significant that Plaintiffs' action arises in an employment context. An essential element of the employee-employer relationship is an understanding that an employee will be expected to comply with the rules and policies of an employer as a condition of employment. While no employee is required to comply with any illegal employer directive, or in even rarer cases, directives that violate sincerely held religious beliefs, employees are not free to disregard policy simply because of disagreement. This is generally the basis of the Supreme Court's opinion in *Pickering*, 391 U.S. 563, and its progeny. *See Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2473 (2018) ("*Pickering* is based on the insight that the speech of a public-sector employee may interfere with the effective operation of a government office.").

The professional training in question related to important but inherently controversial issues facing all public entities, and in particular, school districts. Issues of race discrimination, inequality, and prejudice have confounded policymakers throughout our country's history. It started with the framers of the Constitution, continued with debates about whether to admit states as slave states or free states, led to a bloody Civil War, and persisted through Jim Crow laws, the rise of the Ku Klux Klan, racially-motivated lynchings and massacres, controversy over the separate but equal doctrine, race riots, enactment of the Civil Rights Acts, and claims of inverse discrimination. None of these developments have put the controversy to rest.

Here, Defendant SPS' professional training endeavored to address, increase, and enhance employees' understanding and sensitivity to race issues likely to be confronted by minority students served by Defendant SPS. The training, however, did not require by means of compulsion or coercion Plaintiffs or anyone else to express a specific message after encountering examples of discrimination

22

or xenophobia. This Court has found nothing in the professional training, or policy suggested by the training, requiring an employee to violate the Constitution or federal law. A person could act in exact accord with the suggestions of the trainers, even if considered a requirement of employment rather than merely a suggested approach, and avoid violating the law. Defendant SPS, therefore, was not requiring any employee to engage in illegal activity. Plaintiffs are correct that Defendant SPS, as a public employer, may run afoul of the Constitution should it somehow require Plaintiffs to articulate a specific message on issues of public interest *unrelated* to employees' official duties. *See Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2473 (2018) ("Of course, if the speech in question is part of an employee's official duties, the employer may insist that the employee deliver any lawful message…Otherwise, however, it is not easy to imagine a situation in which a public employer has a legitimate need to demand that its employees recite words with which they disagree.") (citations omitted). Lack of compulsion to express a specific message in the present case, renders these principles irrelevant, given Plaintiffs' specific claims.

Plaintiffs contend they should not have to listen to, learn, or follow Defendants' description of equity and anti-racism discussed during the training because they personally disagree. The problem with such a theory is, particularly in areas of controversy like racial policy, a government entity would be unlikely to find any approach all employees find agreeable. For example, if the training were to teach and recommend action and conduct consistent with Plaintiffs' personal opinions, other employees with different opinions would certainly find that training offensive. Because employees have diverse opinions on politics and policy, especially in areas of controversy, it is the right and duty of the elected school board of the school district, acting by and through a school superintendent and administration, to determine a single, unified, districtwide approach to policy issues. If that approach does not require an employee to engage in illegal behavior, the employee is appropriately expected to

comply. Similarly, if that approach does not compel an employee, apart from her official job duties, to express specific, objectionable words with which the employee disagrees, the employee is expected to comply. Plaintiffs do not argue, and no evidence suggests, the training somehow implemented a specific policy of the district which could lead to consequences for the employee if not followed. Rather, the training relates more to enhancing awareness of racial issues and suggesting an increased sensitivity to deal with issues of discrimination when identified. Further, no evidence suggests Defendants expected employees to personally believe or appreciate the policy, approach, or underlying principles. At most, they were required to demonstrate they understood the approach suggested by the training. The claim that the district should not conduct training for them to attend on policies applicable at work involving their employment because they disagree with them, however, is untenable. Such a ruling would make administration of a governmental unit such as a large, urban school district wholly unworkable. It would distort the employer-employee relationship. It is a frivolous claim and theory.

For the reasons described, even if plaintiffs could demonstrate injury-in-fact, which they cannot, this court would enter summary judgment on behalf of Defendants and would deny Plaintiffs' motion for summary judgment.

V.    Attorney's Fees

Citing 42 U.S.C.A. § 1988, Defendants request this Court award attorney's fees. (Doc. 75 at 63). In response, Plaintiffs argue attorney's fees are appropriate for defendants only when plaintiffs' claims are frivolous, lacking a basis in law or fact. (Doc. 78 at 89). Plaintiffs further argue Defendants have failed to allege Plaintiffs have brought their claims without bases in law or fact. (Doc. 78 at 89). Plaintiffs are once again incorrect. The thrust of Defendants' argument is that Plaintiffs lack standing

24

because of failure to suffer injury-in-fact. This may constitute an allegation that Plaintiffs' claims lack a factual basis. Lack of injury-in-fact does not on its own constitute a frivolous claim. However, Plaintiffs' total lack of injury, especially related to Plaintiffs' claims of compelled speech, may suggest a groundlessness that trivializes the important work of the federal judiciary. *See Williams v. City of Carl Junction, Mo.,* 523 F.3d 841, 843 (8th Cir. 2008) (award of attorney's fees for 1983 lawsuit appropriate where plaintiffs' claims are groundless); *Morrison v. Bd. of Educ. of Boyd Cnty*., 521 F.3d 602, 611 (6th Cir. 2008) (lack of standing works to "trivialize…the important business of the federal courts"). The court is mindful Defendants have incurred substantial legal fees in defending this claim. Taxpayer dollars which could have been devoted to enhancing the educational opportunity of the students served by the district have instead been diverted to the defense of this lawsuit. The students of the district deserve better. So too do the taxpayers whose hard-earned money is taxed by the district for the purpose of educating the children of the district in which they reside. Accordingly, this Court will entertain a separate motion for attorney's fees on behalf of Defendants.

## CONCLUSION

For foregoing reasons, summary judgment is granted in Defendants' favor. Accordingly, Defendants' Motion for Summary Judgment (Doc. 64) is **GRANTED** in its entirety. Plaintiffs' Motion for Summary Judgment is **DENIED**. It is **FURTHER ORDERED** Defendants have until February 17, 2023 to move for attorney's fees, should they desire.


**IT IS SO ORDERED.**

Dated: January 12, 2023                                    /s/ Douglas Harpool
                                                                    **DOUGLAS HARPOOL**
                                                                    **United States District Judge**